D2RUVAL1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        12 CR 0847 (PGG)

5   GILBERTO VALLE,

6              Defendant.

7   ------------------------------x
                                        New York, N.Y.
8                                       February 27, 2013
                                        10:25 a.m.
9

10  Before:

11                    HON. PAUL G. GARDEPHE

12                                      District Judge
                                          and a Jury
13
                              APPEARANCES
14
    PREET BHARARA
15       United States Attorney for the
         Southern District of New York
16  RANDALL W. JACKSON
    HADASSA WAXMAN
17  Assistant United States Attorneys
    Present: Annie Chen, Paralegal Specialist
18           Special Agent Anthony Foto, FBI

19  FEDERAL DEFENDERS OF NEW YORK
    BY:  JULIA GATTO
20       ROBERT M. BAUM
         EDWARD ZAS
21       JOHN J. HUGHES
    Attorneys for Defendant Valle
22  Present: Alexandra Katz, Paralegal
             Anna Finkel, Investigator
23

24

25

D2RUVAL1

1           (In open court, jury not present)

2           THE COURT:  I am going to rule on the issue that has

3    been presented with respect to the 2011 database searches and

4    the encounter with Ms. Frisca in April of 2011.

5           The defense has moved to preclude evidence concerning

6    certain events that took place in 2011.  (See February 26, 2013

7    Gatto letter.)  The defendant is charged with conspiracy to

8    commit kidnapping and with knowingly accessing a federal

9    government database without authorization.  The indictment

10   charges that the kidnapping conspiracy ran "from at least in or

11   about January 2012, up to and including on or about October 24,

12   2012."  The unlawful access charge is based on an incident that

13   took place on May 31, 2012.

14          The government has offered, and will offer, numerous

15   Internet chats -- beginning in January 2012 -- in which the

16   defendant agrees with others to kidnap, sexually abuse, murder,

17   and eat certain women.  The key, if not the only issue, in this

18   case as to the kidnapping conspiracy charge is the defendant's

19   intent.  The government contends that the defendant fully

20   intended to commit the crime; the defense maintains that the

21   defendant's Internet chats simply reflect his sexual fantasies.

22          Before the Court is the defendant's motion to preclude

23   evidence that he conducted unauthorized database searches

24   regarding alleged kidnap targets Maureen Hartigan, Kimberly

25   Sauer, Andria Noble and Kathleen Mangan.  The searches

D2RUVAL1

1    regarding Maureen Hartigan and Andria Noble took place on July

2    20, the search regarding Kimberly Sauer took place on July 21;

3    and Kathleen Mangan, the search regarding her took place on

4    September 5, 2011.  The database searched by the defendant

5    provide basic pedigree information, such as home address, date

6    of birth, height, weight, eye color, and criminal record, among

7    other things.

8         As I mentioned, the defendant also seeks to preclude

9    evidence of an encounter between himself and alleged kidnap

10   target Alisa Frisca in April of 2011.

11        The defendant argues that this evidence should be

12   excluded because it falls outside the conspiracy period charged

13   in the indictment.  The defendant also points out that the

14   defense sought notice of any Rule 404(b) evidence long before

15   trial, and that the government provided no notice that it

16   intended to introduce Rule 404(b) evidence.

17        The government contends, among other things, that this

18   evidence is not Rule 404(b) evidence, but instead is,

19   "essential background and ... is necessary to complete the

20   story of how Mr. Valle positioned himself to further the goals

21   of the charged conspiracy," citing February 25, 2013 government

22   letter at 2.

23        The Second Circuit has noted that, "[t]o be relevant,

24   evidence need only tend to prove the government's case, and

25   evidence that adds context and dimension to the government's

D2RUVAL1

1   proof of the charges can have that tendency.  Relevant evidence

2   is not confined to that which directly establishes an element

3   of the crime," citing United States v. Gonzalez, 110 F.3d 936,

4   941 (2d Cir. 1997).  The Circuit has also stated, and I quote:

5   "The trial court may admit evidence that does not directly

6   establish an element of the offense charged, in order to

7   provide background for the events alleged in the indictment.

8   Background evidence may be admitted to show, for example, the

9   circumstances surrounding the events or to furnish an

10  explanation of the understanding or intent with which certain

11  acts were performed." Id. (quoting United States v. Coonan, 938

12  F.2d 1553, 1561 (2d Cir. 1991) (quoting United States v. Daly,

13  842 F.2d 1380, 1388 (2d Cir. 1988)).

14         There is, of course, "no requirement that all the

15  government's evidence fall within the time period of the

16  indictment, providing that it is relevant to the charges,"

17  citing United States v. Bagaric, 706 F.2d 42, 65 (2d Cir. 1983)

18  (approving admission of evidence concerning events 10 years

19  before charged offense, where evidence demonstrated

20  relationship between defendant and source of dynamite, citing

21  United States v. Del Purgatorio, 411 F.2d 84, 86-87 (2d Cir.

22  1969)  The Second Circuit has approved the admission of

23  evidence occurring long before the time period charged in an

24  indictment where the evidence sheds light on the beginning of

25  the defendant's criminal involvement or his state of mind in

D2RUVAL1

1    the months proceeding that criminal involvement.  See, e.g.,

2    Del Purgatorio, 411 F.2d at 86-87 (approving admission of

3    conversation eight months before charged conspiracy where the

4    conversation "show[ed] the beginning of [the defendant's]

5    involvement in the criminal enterprise and his state of mind at

6    the time").

7         "It is well established that 'evidence of uncharged

8    criminal activity is not considered other acts evidence under

9    Federal Rules of Evidence 404(b) if it "arose out of the same

10   transaction or series of transactions as the charged offense,

11   if it [is] inextricably intertwined with the evidence regarding

12   the charged offense, or if it is necessary to complete the

13   story of the crime [on] trial.'" Gonzalez, 110 F.3d at 942

14   (quoting United States v. Towne, 870 F.2d 880, 886 (2d Cir.

15   1989 (quoting United States v. Weeks, 716 F.2d 830, 832 (11th

16   Cir. 1983)).

17        As to the defendant's database search concerning his

18   wife, Kathleen Mangan, the government has not proffered any

19   theory as to how that search could have furthered a conspiracy,

20   to kidnap her, or how it could shed light on the defendant's

21   intent.  The defendant already possessed the pedigree

22   information about Mangan contained in the various government

23   databases.  He knew her address, date of birth, and all the

24   other information.  Because the database search regarding

25   Mangan is not intertwined with the evidence regarding the

D2RUVAL1

1      charged offense and it is not necessary to complete the story

2      of the crime on trial, it will be excluded.

3              As to the search involving Hartigan, the government

4      has not proffered any evidence that there was ever an agreement

5      between Mr. Valle and someone else to kidnap Hartigan.  Defense

6      counsel has asserted, and the government has not disputed, that

7      there are no Internet chats between the defendant and another

8      person involving a kidnapping of Hartigan.  Given that at least

9      at this point in the trial there appears to be no evidence that

10     Valle conspired with someone to kidnap Hartigan, the fact that

11     Valle conducted an unauthorized database search concerning her

12     in July 2011 would simply be irrelevant.  This alleged

13     unauthorized search could have been charged as a separate crime

14     under 18, United States Code, Section 1030(a)(2)(B), of course,

15     but the government did not seek such a charge against Valle.

16             As to Sauer and Noble, the facts are different.  The

17     government has already proffered evidence of Internet chats

18     between the defendant and others in which a jury could find

19     that the defendant agreed to participate in kidnapping,

20     murdering, and eating them.  These chats took place within the

21     period charged in the indictment.  The question then, as to

22     them, is whether evidence of Valle's July 2011 database

23     searches concerning them can be said to be "inextricably

24     intertwined with the evidence regarding the charged offense" or

25     "necessary to complete the story of the crime on trial."

D2RUVAL1

1   Gonzalez, 110 F.3d at 942.

2           I conclude that the database searches regarding Sauer

3   and Noble are intertwined with the evidence regarding the

4   charged offense and necessary to complete the story of the

5   crime on trial.  The evidence is thus relevant, probative and

6   admissible as background evidence to the charged conspiracy.

7           As an initial matter, these incidents are not, in my

8   view, Rule 404(b) evidence.  These two remaining July 2011

9   database searches concern the same women whom Valle is in the

10  chats explicitly agreeing to kidnap.  Moreover, there is strong

11  evidence that Mr. Valle had a long-term interest in kidnapping,

12  murdering and eating Sauer and Noble.  Indeed, he said as much

13  in the Internet chats.  As to Noble, Valle tells an alleged

14  co-conspirator "for eight years I've thought about cooking

15  her."  (Government Exhibit 426 at 1)  As to Sauer, Valle tells

16  a co-conspirator that he wants to cook her alive, and he

17  comments that "she has been one of my favorite victims to

18  fantasize about for almost 10 years now." (Government Exhibit

19  402 at 3)  Accordingly, a jury could reasonably conclude that

20  in July 2011, Valle was interested in kidnapping, murdering and

21  eating both Sauer and Noble, and that he was collecting

22  pedigree information concerning these women in furtherance of

23  that interest.  There is no obvious evidence of an innocent

24  motive in collecting this information in July 2011 and there is

25  evidence of a guilty motive.

D2RUVAL1

1          While there is no direct evidence that the database

2     searches conducted by Valle concerning Sauer and Noble led to

3     information that Valle used in the conspiracy, a reasonable

4     jury could conclude that they were part and parcel of Valle's

5     efforts to maintain information concerning the home addresses

6     of the alleged kidnap targets.  The government has offered

7     evidence that Valle requested home address information from

8     Hartigan and Sauer, and proffers that there will be similar

9     evidence concerning Frisca.  The information was obtained

10    through what the government contends was a ruse -- asking the

11    women whether they wanted a PBA card and when they said yes,

12    requesting their home address so that the PBA card could be

13    mailed to them.

14          Valle also engaged in the conduct at issue -- the

15    unauthorized searching of databases for information about women

16    he was alleged interested in kidnapping, both before and during

17    the charged conspiracy.  See United States v. Rigas, 490 F.3d

18    208, 238-239 (2d Cir. 2007) (admitting as background evidence

19    fraudulent invoices submitted before the period charged in the

20    indictment, noting that these fraudulent invoices were

21    essentially the same as fraudulent invoices submitted during

22    the charged conspiracy).

23          The databases searches regarding Sauer and Noble also

24    shed light on Valle's state of mind in the months leading up to

25    his explicit conversations about kidnapping these women.  Valle

D2RUVAL1

1    risked serious administrative and criminal charges in accessing

2    these databases without authorization.  The government has

3    proffered that it will offer evidence that he was warned of

4    these penalties during his training as a police officer.  Were

5    the jury to conclude that he nonetheless accessed these

6    databases to collect information on Sauer and Noble, that

7    determination would tend to rebut the defense theory that

8    Valle's statements about wanting to kidnap, murder, and eat

9    these women are fantasy.  In accessing the databases, Valle was

10   exposing himself to criminal and administrative penalties, a

11   high price to pay for furthering an alleged sexually violent

12   fantasy.

13            Admission of the evidence concerning the database

14   searches regarding Sauer and Noble also tends to complete the

15   story of the charged conspiracy.  The evidence tends to suggest

16   that Valle did not wake up on July, on January 1, 2012 with a

17   sudden desire to kidnap these women, but rather that he had

18   taken steps to collect useful information concerning them in

19   the months preceding 2012.  The evidence is also consistent

20   with other evidence from 2011, including Google searches

21   involving oven equipment, Facebook searches concerning Kristen

22   Ponticelli, and posts on darkfetishnet.com concerning Hartigan.

23   The jury could view all of this conduct as preparatory to the

24   Internet chats in 2012, in which Valle repeatedly stated his

25   interests in kidnapping and committing other crimes against

D2RUVAL1

1    these women as well as his conclusion that he needs an

2    assistant to help him in his endeavors.

3          I have considered whether this evidence should be

4    excluded under Rule 403, and have concluded that exclusion is

5    not warranted under this rule.  The evidence is probative for

6    the reasons stated and its probative value is not substantially

7    outweighed by a danger of unfair prejudice to the defendant.

8    Even absent this evidence, the jury would have heard about

9    Valle's alleged unauthorized database access in connection with

10   Count 2.

11         In sum, defendant's motion to preclude the database

12   access evidence is granted as to Mangan and Hartigan but denied

13   as to Sauer and Noble.

14         That brings me to the April 2011 incident involving

15   Alisa Frisca.

16         I understand that Alisa Frisca worked with Valle's

17   wife at PS 375 at East 111th Street and Lexington Avenue.

18   Valle had met Frisca through his wife, but he had no

19   independent relationship with her.  Valle's wife stopped

20   working at PS 375 in June 2010.  Valle had no apparent reason

21   to be waiting for Frisca outside of her school in April of

22   2011.  This location is nowhere near his precinct, which was on

23   the Upper West Side.  Nonetheless, the government has proffered

24   that Frisca is prepared to testify that Valle was waiting for

25   her outside her school one day in April of 2011.  He was alone

D2RUVAL1

1    in his squad car and got out of his car when he saw her exit

2    the school.  They apparently had a brief conversation and

3    Frisca then walked away.

4           The encounter -- as described by the government -- is

5    reminiscent of a thought Valle mentions to an alleged

6    co-conspirator on February 28, 2012 during a conversation about

7    kidnapping, raping, torturing, and murdering Frisca.  He tells

8    the alleged co-conspirator, Michael Vanhise, that "it will be

9    absolutely amazing to watch [Frisca] come out of her school and

10   follow her without her knowing."  Government Exhibit 432 at 2)

11          Having said that, the April 2011 encounter takes place

12   approximately 10 months before Frisca is first mentioned on the

13   Internet chats.  There likewise appears to be no evidence that

14   Valle had long harbored thoughts of kidnapping and murdering

15   Frisca.  Stated another way, there is no evidence comparable to

16   the evidence that I have discussed concerning Sauer and Noble.

17          Because the government has not offered evidence that

18   Valle had formed and intent to kidnap Frisca in April of 2011,

19   the April 2011 will be excluded.

20          Anything the parties want to raise?

21          MS. GATTO:  Yes, a couple of matters, your Honor.

22          One, before the evidence relating to NCIC searches and

23   Ms. Sauer and Ms. Noble be entered into evidence, that the jury

24   be instructed to -- really two instructions -- (1) that the

25   searches are being introduced only for the limited purpose as

D2RUVAL1

1    background to Count 1; and (2) this is a big concern for us,

2    that these searches in 2011 may not be considered at all as to

3    Count 2 -- certainly for Count 2 it is pure propensity.

4         THE COURT:  I take it that the government has no

5    objection to that?

6         MS. WAXMAN:  No objection, your Honor.

7         THE COURT:  So I will instruct the jury that the

8    database search evidence of 2011 is being admitted only as

9    background evidence as to Count 1 the kidnap and conspiracy

10   charge and that this evidence has no relevance to Count 2 which

11   charges Valle with accessing the database in May of 2012.  Is

12   that acceptable?

13        MS. GATTO:  Yes, your Honor.  Thank you.

14        One other matter, we wanted to talk about scheduling,

15   but I don't know if you want to talk about that on our next

16   break, if your intention is to get the jury started since we

17   are starting late, if you want to do that.

18        THE COURT:  Maybe we should.

19        Anything the government wants to raise?

20        MS. GATTO:  One other thing, I just wanted to make

21   sure that the factual basis was accurate for your Honor's

22   ruling.  I don't want to misstate, but I thought that you had

23   said in your ruling regarding NCIC searches that (1) the

24   government had proffered that there would be evidence related

25   to do the PBA card being used as a ruse to get the address for

D2RUVAL1

1    Ms. Frisca.  I don't think that is the proffer.

2              THE COURT:  Mr. Jackson, did I miscite that?

3              MR. JACKSON:  Yes, your Honor.  It is not our proffer

4    that he attempted to get Ms. Frisca's information with the PBA

5    card.  He could get that from Ms. Mangan.  He asked Ms. Mangan

6    to give a PBA card to Ms. Frisca.  Our belief is that he was

7    doing that in order to intend to build a relationship of trust

8    with Ms. Frisca.

9              THE COURT:  All right.  So it is not the government's

10   contention that he used the PBA card as a way to get Ms.

11   Frisca's address?

12             MR. JACKSON:  That's correct. your Honor.

13             THE COURT:  I appreciate that correction.

14             MS. GATTO:  One other, and it seemed to me -- I took a

15   note and I may be wrong, but also the Court thought that there

16   was PBA card testimony as it relates to Ms. Noble and there was

17   no PBA card testimony as it relates to Ms. Noble.

18             THE COURT:  Actually, my discussion of PBA card was in

19   the context of Hartigan, Sauer and Frisca, so I appreciate the

20   correction with respect to Ms. Frisca, but it doesn't change

21   the outcome.

22             Anything else?

23             MS. WAXMAN:  Not from the government, your Honor.

24

25             (Continued on next page)

D2RUVAL1                          Waters – direct

1          (Jury present)

2                    MS. WAXMAN:  Your Honor, may we have a moment?

3                    THE COURT:  Sorry for the delay this morning, ladies

4     and gentlemen.  I had some difficulty getting to the courthouse

5     today -- I hope you didn't, but I did.  I also had to issue a

6     legal ruling concerning some of the evidence that you are going

7     to hear this morning.  So I apologize for the delay.

8     JONATHAN WATERS,

9          called as a witness by the government,

10     having been duly sworn, testified as follows:

11    DIRECT EXAMINATION

12    BY MR. JACKSON:

13                    THE COURT:  Do you wish to approach, Ms. Gatto?

14                    MS. GATTO:  Yes, your Honor.

15

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

D2RUVAL1                        Waters - direct

```
1              (At the sidebar)
2              MS. GATTO:  I'm sorry, but I thought Ms. Frisca was
3      first, and with this witness, I have an exhibit -- and based on
4      the Court's ruling -- it would have to be partially redacted.
5      I don't know if you intend to introduce the NCIC audits.
6              MR. JACKSON:  You bring up a good point.
7              The NCIC audits have a number of reference to facts
8      that have to be redacted pursuant to the Court's ruling, but my
9      plan is to introduce it subject to the Court's prior ruling.  I
10     am not going to go through it in any detail today and then we
11     can redact it.  The jury is not going to actually go through
12     that.
13             MS. GATTO:  Then that will solve that -- maybe we
14     could resolve this right here.  I notice that the exhibit in
15     the government's binder is not the complete chart, it was sent
16     it us in discovery in two batches.
17             MR. JACKSON:  There are two different exhibits.
18             MS. GATTO:  Is it all of the NCIC audits, so we can
19     work out the redactions and I don't have a problem.
20             THE COURT:  We are all set?
21             MR. BAUM:  Just one moment, Judge?
22             MS. GATTO:  Thank you very much.
23
24             (Continued on next page)
25
```

```
 1                (In open court)

 2                THE COURT:  Ladies and gentlemen, you may have noticed

 3    that Agent Walsh is not on the stand this morning.  We are

 4    interrupting Agent Walsh's testimony to hear from witnesses who

 5    had to travel to be here.  We will take their testimony, both

 6    direct and cross, and then we will pick up with Agent Walsh

 7    later today.  I wanted you to understand why we have a new

 8    witness this morning.

 9                JURORS:  Thank you, your Honor.

10                THE COURT:  You may proceed, Mr. Jackson.

11                MR. JACKSON:  Thank you.

12    BY MR. JACKSON:

13    Q.  Good morning, Mr. Waters.

14    A.  Good morning, sir.

15    Q.  Mr. Waters, where do you work?

16    A.  I work at Datamax Applied Technologies.

17    Q.  Can I ask you to slide the microphone as close to your

18    mouth as possible, just because this courtroom is very --

19    A.  Is that better.

20    Q.  Yes.  Thank you.

21                Could you tell me again where you work, Mr. Waters?

22    A.  Datamax Applied Technologies.

23    Q.  What is Datamax?

24    A.  We are a company that provides computer systems to the law

25    enforcement environment.
```

D2RUVAL1                        Waters - direct

1    Q.  When you say "computer systems," what are you talking

2    about?

3    A.  We are talking about systems that allow authorized users to

4    access various databases, both from desktop and from mobile

5    data systems, handheld and a variety of devices.

6    Q.  I want to talk more about what Datamax does.  Briefly can

7    you explain what you do at Datamax?

8    A.  I am the executive vice president and chief technology

9    officer responsible for implementation of most major systems.

10   Q.  How long have you been at Datamax?

11   A.  21 years.

12   Q.  Just in brief summary, what do you do in your job on a

13   daily basis?

14   A.  I analyze the requirements.  I work with the staff to

15   implement and do a lot of the actual implementations of the

16   software systems personally, myself.

17   Q.  So you were telling us that you provide support to

18   different law enforcement agencies.  What are some of the law

19   enforcement agencies that Datamax works with?

20   A.  We work with the Federal Bureau of Investigation, the

21   National Crime Information Center.  We work with the New York

22   Police Department.  We work with many states such as the state

23   of Washington, the State of Nebraska, the State of Maryland.

24   Q.  Do you know how many police officers, approximately, are in

25   the New York City Police Department?

D2RUVAL1                         Waters – direct

1    A.   I believe approximately 45,000.

2    Q.   What are some of the things that Datamax does for the New

3    York City Police Department?

4    A.   We provide the systems that are used by the officers in the

5    cars and on their handheld devices to access various databases.

6    Q.   Can you describe how these systems work, generally?

7    A.   Yes.  An end user has a device such as a laptop or a

8    handheld such as a BlackBerry.  They enter information into it

9    such as driver's license, name, date of birth.  They send that

10   system to the police headquarters, and the system there

11   distributes the data to various databases to see what is in the

12   database regarding the information that was put in.

13   Q.   I want to show you something that has been marked as

14   Government Exhibit 2000.  Do you recognize that document, Mr.

15   Waters?

16   A.   Yes, I do.

17   Q.   What is it?

18   A.   This document shows at a high level, the data flow of when

19   someone creates a query in a police vehicle and the flow of

20   data to the different computer systems and the databases that

21   would be accessed by it.

22   Q.   Is that a summary of the systems that are accessed through

23   Datamax?

24   A.   In this case, this is a high-level summary for the NYPD.

25        MR. JACKSON:  Your Honor, the government offers

D2RUVAL1                          Waters – direct

1    Government Exhibit 2000.

2              MS. GATTO:  Your Honor, we object.

3              THE COURT:  Would you like a sidebar?

4              MS. GATTO:  Yes, please.

5              MR. JACKSON:  Your Honor, before we go to the sidebar,

6    may I ask one more foundation question?

7              THE COURT:  Sure.

8    Q.  Mr. Waters, do you know who created the summary that is

9    Government Exhibit 2000?

10   A.  Yes, I do.

11   Q.  Who created it?

12   A.  I did.

13             MR. JACKSON:  Thank you.

14

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              MR. BAUM:  Your Honor, the basis for our objection to

3     permit this in evidence, to have him read it in and explain it

4     crosses that line between layperson -- and I won't use the word

5     "expert" because that is not the word used in the Federal Rules

6     of Evidence, but he becomes a witness with specialized

7     knowledge that would have to be qualified under Rule 702.

8              THE COURT:  In the future, if you know you are going

9     to have an objection to an exhibit like this, I need you to

10    raise it ahead of time.  You knew that they were going to offer

11    it.  There is absolutely no reason why we should be taking it

12    up now.  It could have been raised before now.

13             MR. BAUM:  We explained the objection to the Court.

14    Mr. Jackson proffered, in most respects, he would be clerical

15    in nature --

16             THE COURT:  You didn't raise any objection to this

17    document yesterday.

18             MR. BAUM:  We wanted to know if he did it or just a

19    person that kept a record, it would be clerical in nature.  If

20    he intends now to explain it -- which I have no doubt now he

21    does -- he becomes a witness with specialized knowledge.

22             THE COURT:  I think that was obvious yesterday and

23    probably for a long time before that.

24             MR. JACKSON:  Your Honor, we told defense counsel

25    yesterday and previously that we would ask for a brief

1   explanation of what Datamax does.  He is explaining how their

2   systems work.

3            THE COURT:  I don't find his explanation of what

4   databases are available to the system calls for any expert

5   testimony, specialized knowledge, technical knowledge.  It is

6   just going to be simply an explanation of what the cop in the

7   car can access through that system.  Is that it?

8            MR. JACKSON:  Yes, sir.

9            THE COURT:  Do you think that calls for technical

10   information or specialized information?

11            MR. BAUM:  Just to say about the computer and car,

12   just that these databases would not be specialized

13   information --

14            THE COURT:  Are we going beyond that?

15            MR. JACKSON:  He was going to give a very brief

16   explanation of how the system works.  It is not specialized

17   knowledge.

18            MR. BAUM:  To say how the system works is specialized

19   knowledge.  No layperson could explain that.

20            THE COURT:  I don't know the nature of the testimony

21   but what I am anticipating is that he is going to explain what

22   databases the cop in the car can access.  And if that's what he

23   is doing, I don't see how that involves specialized or

24   technical knowledge.

25            MR. BAUM:  What if he starts going into how you access

D2RUVAL1                         Waters - direct

1      these databases, how they are hooked up, what information you

2      get from the databases?  That is specialized knowledge.

3              MR. JACKSON:  Your Honor, there is a fundamental

4      problem with what Mr. Baum is saying.  He is attempting to

5      suggest that any area of knowledge that a person has, that is

6      beyond the ken of every person on the street because expert

7      testimony requires notice.

8              He is not offering any opinions.  He is not offering

9      anything that requires conclusions or for him to make an

10     assessment of various facts.  He is simply relaying the facts

11     of how his company works what they do for the NYPD.  And they

12     have been aware since the beginning of this case that we were

13     going to call witnesses who were going to explain just how the

14     system works and what they were able to retrieve from the

15     system.

16             THE COURT:  I might say, to the extent that the

17     witness is going to testify that from the database you can

18     access date of birth, DMV information, I think everybody here

19     probably already knows that, certainly if you have ever been

20     pulled over by a police officer you know that.  That it is

21     beyond the ken of a juror and requires expert knowledge, I

22     don't think so.

23             At this point I am overruling the objection.  If you

24     feel that his testimony goes beyond what I just said, then you

25     are welcome to object.

D2RUVAL1                          Waters – direct

1          MR. BAUM:  A sidebar may not be necessary.  We don't

2     want to delay it.  We just point out that our objections -- Mr.

3     Jackson argued that our objections would be to a person who has

4     knowledge beyond the ken of the jury -- our objection is based

5     on 701 and 702.

6

7               (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  I am overruling the objection to

3   Government Exhibit 2000.

4          You may proceed.

5          MR. JACKSON:  Thank you.

6          Your Honor, may we publish Government Exhibit 2000?

7          THE COURT:  You may.

8   BY MR. JACKSON:

9   Q.  Mr. Waters, can you just explain what is depicted on this

10  chart?

11  A.  Right.  This chart, if you start at the top, the blue box,

12  the NYPD police vehicle, that is where a laptop or similar

13  device would be mounted.

14          Data then flows through a communications system

15  labeled "New York Wireless Communication Network."  That

16  information is received by a computer system installed at One

17  Police Plaza.

18          That computer system looks at the data that was sent

19  in and then calculates automatically all of the various

20  databases that may have information that would be of interest

21  to the data sent in.

22  Q.  This chart identifies some of the databases that are

23  accessed when a person on a laptop in an NYPD vehicle accesses

24  the system.  What are these databases that you identify here?

25  A.  On the left there, the one labeled New York police

1   department databases, these are databases run by the New York

2   Police Department itself for wants and warrants, for pistol

3   licenses and domestic violence records.

4   Q.  What about this purple box to the right under New York

5   State police?

6   A.  The New York State police information networks creates

7   connectivity to four databases that are maintained by the State

8   of New York, which is the New York Motor Vehicles which is

9   driver's licenses, vehicle registrations, the New York State

10  police wanted persons files, New York State police paroled

11  persons files and the New York State police protection orders.

12  Q.  Now, there are two additional boxes, this orange box that

13  says -- let me just back up very quickly.

14      New York State police, what are some of the types of

15  information that are accessed when a person accesses these New

16  York State databases?

17  A.  Well, depending on what was given, say, a driver's license

18  number or a person's name, they will do the state system in

19  Albany or records located there, will look at all of its

20  databases and see if there is any matching information to be

21  found and if so, we will return that information or something

22  that says no record found.

23  Q.  Could that include address information and other

24  information?

25  A.  Yes, it could, depending on the database.

D2RUVAL1                    Waters - direct

1   Q.  Now, over here we have the National Law Enforcement

2   telecommunications system.  What is accessed at that database?

3   A.  What that is, if a request is made for information such as

4   a driver's license or person that is not within New York State

5   such as California, Nebraska or any other state, that data then

6   flows through the National Law Enforcement telecommunications

7   system to go to that target state and returns via that.  So

8   that is used for systems that are not within the State of New

9   York.

10  Q.  The final one you have over in the bottom left corner, the

11  National Crime Information Center, first of all, what is the

12  National Crime Information Center?

13  A.  The National Crime Information Center is a repository

14  maintained by the FBI in which agencies place data, wants,

15  warrants, stolen vehicles, stolen guns -- information that may

16  be of interest nationally to law enforcement.

17  Q.  In your role at Datamax, in order to facilitate access,

18  have you had to visit the National Drug Information system?

19  A.  Yes.

20  Q.  Where is that?

21  A.  It is in Clarksburg, West Virginia.

22  Q.  So you described these various databases that are accessed

23  through the Datamax system.  I think you mentioned there is a

24  car and also a handheld unit that is available.  What is the

25  handheld unit?

D2RUVAL1                    Waters – direct

1    A.  The handheld device is a such as BlackBerry or smart phone

2    but also offers access through the server at One Police Plaza.

3    Q.  Now, Mr. Waters, in the course of the last several months,

4    were you asked by the U.S. Attorney's office or the NYPD to

5    conduct any searches through your system of specific records?

6    A.  Yes, we were.

7    Q.  I want to hand you what has been marked first as Government

8    Exhibits 615 and 617.  Do you recognize those items?

9    A.  Yes, I do, sir.

10   Q.  What are Exhibits 615 and 617?

11   A.  These are summaries of transactions that were processed by

12   the server at One Police Plaza with functions requested from

13   various mobile devices such as laptops in cars.

14        MR. JACKSON:  Your Honor, the government offers

15   Government Exhibits 615 and 617, subject to the Court's prior

16   rulings.

17        MS. GATTO:  No objection.

18        THE COURT:  All right.  Then Government Exhibits 615

19   and 617, those exhibits are received.

20        (Government Exhibits 615, 617 received in evidence)

21        MR. JACKSON:  Your Honor, I would like to go through

22   the first page of Government Exhibit 615 to explain what they

23   are looking at.  Could I publish that?

24        THE COURT:  Yes.

25   Q.  Now, Mr. Waters, first of all, what is Government Exhibit

D2RUVAL1                          Waters – direct

1    615?

2    A.   This is a summary of transactions that were run with date

3    and time by the user who was identified by 942642 at the dates

4    and times that are shown there.

5    Q.   When you say the user identified by 942642, what does that

6    refer to?

7    A.   That refers to, in the context of NYPD, what they call the

8    tax ID which is used to identify officers as a log-on accessing

9    the system.

10   Q.   Does every NYPD officer have a unique tax ID number?

11   A.   To my knowledge, yes.

12   Q.   In order to access that Datamax system, are they also

13   required to put in any other information besides their tax ID

14   number?

15   A.   They also must enter their password.

16   Q.   Password that each NYPD officer has?

17   A.   Correct.

18   Q.   In the next column it says date and time.  What does that

19   refer to?

20   A.   That is the date and time stamp of when the transaction was

21   received at the computer system at One Police Plaza.

22   Q.   This next column says reference ID, what does that refer

23   to?

24   A.   Reference ID is a unique stamp that we put on every message

25   for audit purposes so that we can identify when it was run and

D2RUVAL1                        Waters - direct

1    what the contents were.

2    Q.  Can you just explain these next two items, MKE and summary,

3    what we have here?

4    A.  MKE is an acronym for message key and that is the actual

5    function that was performed or was received by the server at

6    One Police Plaza.  And the summary is a summary -- not the

7    detail, but a summary of the transaction, sort of a shorthand

8    for quick reference.

9    Q.  So for example, in this first entry where it says LN and

10   MKE and LN 942642, what does that stand for?

11   A.  LN sands for log-on and the summary is what is the data

12   that was provided with the log-on request.

13   Q.  So a person attempting to log on and entered this specific

14   tax ID number?

15   A.  Correct.

16   Q.  There is another column, the next column says ticket.  What

17   is that.  This column that says ticket, could you explain what

18   that refers to?

19   A.  Yes.  The ticket it is not a ticket like a speeding ticket

20   or a parking ticket.  This is a temporary authorization for

21   that user to use the system for a certain period of time from

22   that device.

23   Q.  When say an authorization, you mean a digital

24   authorization?

25   A.  Correct.

D2RUVAL1                          Waters – direct

1   Q.   Why does Datamax require a ticket to be issued when the

2   user enters their ID and password?

3   A.   We use it for tracking all of our activity, when they

4   logged on and when they logged off and everything that is run

5   with it.

6   Q.   Just to run through these last few.  Event type description

7   what does that refer to?

8   A.   Event type is input message.  That was data that came from

9   the device, the laptop.  And output message is what was

10   responded back.

11   Q.   And interface?

12   A.   Interface in this way it is coded as OFM.  OFM stands for

13   Omni Force Mobile, which means this came from a laptop device

14   instead of a handheld device.

15   Q.   Is the OFM laptop device the same used by NYPD in their

16   cars?

17   A.   No.  It is the software program used on the laptop.

18   Q.   And device, what does that refer to?

19   A.   The device is a unique identifier that uniquely identifies

20   the actual laptop or handheld device from which the message was

21   sent.

22   Q.   Finally, address, what does that refer to?

23   A.   The address is a technical term for where the device was

24   and how it was accessed and relates to the vehicle that the

25   laptop was in or the actual handheld device used by the

D2RUVAL1                      Waters - direct

1    officer.

2    Q.   Just to summarize, what you are talking about was 615 and

3    617 are all of the transactions for a user with 942642 tax ID

4    number during a specific time period?

5    A.   Yes, sir.

6             MR. JACKSON:  You can take that down, Ms. Chen.

7    Q.   Now at any point did you run through your system and create

8    printouts for certain specific items that were the subject of

9    942642 searches that are described in those database summaries

10   that you just went through?

11   A.   Yes, sir.

12   Q.   I want to hand you what has been marked as Government

13   Exhibits 616B, 616C and 616E.  Have you had a chance to look at

14   those?

15   A.   If you will give me a minute I will look at them.

16   Q.   You don't need to review them in entirety, but have you had

17   a chance to glance at those exhibits?

18   A.   Yes, I have.

19   Q.   To be clear, you have seen those exhibits before, right?

20   A.   Yes, sir.

21   Q.   What are they?

22   A.   These exhibits here, the top page shows a summary of very

23   detailed transactions and then the following pages are the

24   actual details of all the data exchanges that went back and

25   forth between the laptop and the databases.

D2RUVAL1                        Waters - direct

1    Q.  Now, I know you have conducted a number of searches, but

2    today I want to talk only about B, C and E, these three

3    exhibits.

4          MR. JACKSON:  The government offers 616B, C and E,

5    your Honor.

6          THE COURT:  Any objection?

7          MS. GATTO:  No objection.

8          THE COURT:  Government Exhibits 616B, C and E are

9    received.

10         (Government Exhibits 616B, 616C and 616E received in

11    evidence)

12         MR. JACKSON:  Your Honor, may we publish Government

13    Exhibit 616B?

14         THE COURT:  Yes.

15   Q.  Mr. Waters, can you just explain what is depicted on the

16   first page of 616B?

17   A.  Pictured on the first page is the summary of a person query

18   that was made on the 07/20/2011 at 17:03 with the information

19   of Condez Andria, date of birth and F for female.

20   Q.  Can you just explain what that means in terms of being a

21   summary of a search of this person?

22   A.  What we did in this case, we are drilling down into the

23   overall list of records we are provided and we are returning

24   information in reference to a subject of Condez, Andria.  So we

25   are isolating messages concerning that subject.

D2RUVAL1                    Waters - direct

1   Q.  So, in essence, this is one of the searches that we talked

2   about with the 94642 subject user and you are saying that there

3   was a search conducted on Andria Condez and this contains all

4   of the information for that?

5   A.  Yes, sir.  And it also in the summary gives you the date,

6   the time and the user and the reference ID.

7   Q.  For this one, what is the date?

8   A.  The date on this one is the July 20, 2011.

9   Q.  What is the time?

10  A.  And the time is 5:03 in the afternoon.  Now that is

11  Greenwich meantime, not clock time, New York.

12  Q.  What does that mean?

13  A.  For legal reasons every record is stamped with what is

14  called Universal Time, so it is not affected by Daylight

15  Savings Time changes, so we can pinpoint the time exactly.

16  Q.  The other information here matches up with what you were

17  telling us about the summary, right?

18  A.  Yes, sir.

19  Q.  Can we go to the next page of this exhibit?

20  A.  Yes, sir.

21  Q.  Now, what are we looking at here, Mr. Waters?

22  A.  What you are looking at here is not only the query that was

23  made but also the responses that came back from the various

24  databases to that query.

25  Q.  What do you mean when you say responses?

D2RUVAL1                        Waters - direct

1   A.  When you query the database, all of the different data

2   sources will return information, so this is the information

3   that came back from each individual database that was queried.

4   Q.  Can we go to the next page.

5        What is depicted here, Mr. Waters?

6   A.  This is depicted as a response from the state of Ohio Motor

7   Vehicles to a query that was made with subject Andria Condez,

8   and that is the response that came back from the state of

9   Ohio's Motor Vehicles database with the information.

10  Q.  So this is the information that was actually transmitted

11  back to the computer after the person entered in Andria Condez?

12  A.  Yes, sir.

13  Q.  And the next page.

14  A.  This is a response from the state system in Albany saying

15  that the name Andria Condez was not located in the state order

16  of protection file.

17  Q.  Can we go to the next page.

18       What is depicted here?

19  A.  This is a response that came back from the state databases

20  saying that the name Andria Condez was not found in the parole

21  database in Albany.

22  Q.  The next page?

23  A.  This is a response from the state databases saying that the

24  name Andria Condez was not found in their wanted person

25  database.

D2RUVAL1                        Waters - direct

1   Q.   The next page?

2   A.   This is a response from the National Crime Information

3   Center that the name Andria Condez was not found in the NCIC

4   database.

5   Q.   Now, each of these databases that you are talking about

6   where there was a response generated, does that mean when that

7   search went in all of these databases were accessed?

8   A.   Yes, sir.

9               Thank you, Mr. Waters.

10              Now, can we turn your attention to Government Exhibit

11  616C.

12              MR. JACKSON:   Your Honor, may we publish Government

13  Exhibit 616C?

14              THE COURT:   Yes.

15              MR. JACKSON:   Thank you.

16  Q.   What is depicted here?

17  A.   This depiction shows not only queries that were made on the

18  name Kimberly Sauer but also a log-on and other messages that

19  did not pertain such as AFR Sync which does not pertain to any

20  database query.

21  Q.   So at the top here where it says LF 942642, what does that

22  mean?  What do we see there?

23  A.   That is -- these are in reverse temporal order.  In other

24  words, after these functions were performed, a log-off function

25  was received at the server.

D2RUVAL1                          Waters – direct

1    Q.  I see.  So at the bottom we are seeing the various outputs

2    from the system as a result of someone entering Kimberly Sauer

3    and this is the log-off?

4    A.  Correct.  This reads in reverse time order, the newest at

5    the top, the oldest at the bottom.

6    Q.  Can we go to the next page.  And what is depicted here?

7    A.  This is a response from the Maryland Department of Motor

8    Vehicles saying that the name Kimberly N. Sauer, date of birth,

9    02/27, female was not found in their database.

10   Q.  Does that indicate that the person who entered this also

11   gave the date of birth as well as the name?

12   A.  Yes.

13   Q.  Can you go to the next page.  And the next page, what is

14   depicted here?

15   A.  This is a response from the National Crime Information

16   Center saying that the name Kimberly Sauer, date of birth,

17   1984, 02/27 as a female is not found in the NCIC database.

18   Q.  Can we now go to Government Exhibit 616E.

19              MR. JACKSON:  Your Honor, may we publish it?

20              THE COURT:  Yes.

21   Q.  What are we looking at here, Mr. Waters?

22   A.  You are looking at the bottom, an input message with a

23   query for the person Maureen Hartigan and the responses reading

24   up that came back from the databases to which that message was

25   sent.

D2RUVAL1                          Waters – direct

1  Q.  What is the user ID of the person who is using that into

2  the system?

3  A.  The user ID is 942642.

4  Q.  When did this accessing of the system to get information on

5  Maureen Hartigan occur?

6  A.  This occurred on May 31, 2012.

7  Q.  And what was the time that this occurred?

8  A.  The time stamp is 15:43, which is 3:43 in the afternoon.

9  Q.  Actually, can we go to the next page.  What is the depicted

10 here?

11 A.  Depicted here is a response from the New York Department of

12 Motor Vehicles with information about subject Maureen Hartigan,

13 date of birth 6/14/1986.

14 Q.  What is some of the information this user ID is able to get

15 about Ms. Hartigan that is depicted here?

16 A.  The information provided is the address that they have on

17 file in New York for that person, information about the

18 validity of the driver's license, some personal identifiers

19 such as the height of the subject and their eyes and also some

20 information about incidents that may have occurred under that

21 driver's license such as the restrictions, corrective lenses

22 and any list of accidents that may have occurred.

23 Q.  Can you go to the next page, and the next page.  What is

24 depicted here?

25 A.  This is a response from the National Crime Information

D2RUVAL1                    Waters – direct

1   Center saying that they do not have any records on subject

2   Maureen Hartigan, date of birth 1986, 6/14, female.

3   Q.  So to be clear, the person who accessed the system on this

4   day accessed NCIC?

5   A.  Yes, sir.

6   Q.  Mr. Waters, how long has your company been working with the

7   NYPD?

8   A.  12 years, sir.

9            MR. JACKSON:  No further questions, your Honor.

10           THE COURT:  Cross-examination.

11           MS. GATTO:  Yes.

12  CROSS-EXAMINATION

13  BY MS. GATTO:

14  Q.  Good morning, Mr. Waters.

15  A.  Good morning.

16           MS. GATTO:  Ms. Chen, if you could put up Government

17  Exhibit 615, please.

18  Q.  Mr. Waters, I would like to just ask you a few questions

19  about the first page.

20  A.  OK.

21  Q.  Do you see at the very top line under MKE, it has the

22  letters LN?

23  A.  Yes, ma'am.

24  Q.  I think you testified that that means that the user is

25  logging into the system?

D2RUVAL1                        Waters - cross

1   A.  He is attempting to log on to the system.

2   Q.  Following that right below it is the word ERR, do you see

3   that?

4   A.  Yes, I do.

5   Q.  Does that indicate that there was some sort of error?

6   A.  Yes it does.

7

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2r6val2                              Waters - cross

1    BY MS. GATTO:

2    Q.  If you go -- one, two, three, four, five, six, seven,

3    eight -- eight lines down starting from the top in the column

4    NKE, you see LN followed by ERR several times.  Do you see

5    that?

6    A.  Yes, ma'am.

7    Q.  So that indicates that there was some error logging on?

8    A.  Correct.

9    Q.  Is that a computer problem or a computer user problem?

10   A.  That is -- its kind of both because it could be a user

11   problem or "fat finger" on the password or the computer or they

12   accidently turned on the caps lock also.  Because the passwords

13   are hidden and the user doesn't see what is typed in.

14   Q.  It is not uncommon in flipping through that to see the ERR

15   under the NKE?

16   A.  That is correct.

17   Q.  Oftentimes where the system malfunctions if -- that may be

18   too strong of a word.  Let me rephrase.

19          There is oftentimes when the system is not properly

20   functioning?

21   A.  I don't are agree.

22   Q.  You don't agree.  It is true though that sometimes the

23   system will connect to the databases, is that correct?

24   A.  That's true but on incredibly rare occasions.

25   Q.  But it is not uncommon, right, to log in and put a name or

1   input some information and for the information not to come

2   back?

3   A.  No.  That is not common.

4   Q.  Isn't it true that sometimes the system is not connecting?

5   You know the science better than me.  Maybe I should take a

6   step back.

7          So basically the way it works -- correct me when I am

8   wrong -- a user will input the information into a lap top in

9   the parole car, correct?

10  A.  Correct.

11  Q.  And then that information is sent out to various databases,

12  correct?

13  A.  Correct.

14  Q.  And the database will then return to the user the

15  information that was requested?

16  A.  Correct.

17  Q.  Now, isn't it true that sometimes the information will go

18  out to one database but not another?

19  A.  That is theoretically possible, but the uptime starts are

20  like 99.9 percent.

21  Q.  Let's do this.  I think it might be easier to talk in less

22  abstract.

23          MS. GATTO:  Ms. Chen, if you can take us to the third

24  page of Government Exhibit 615.

25  Q.  You see here -- one, two, three, four -- four down the user

D2r6val2                          Waters – cross

1  number is 942642 as it is for this entire chart and the user

2  has inputted the name Gilberto Valle.  Do you see that?

3  A.  Yes, ma'am.

4  Q.  And so if you keep following along the --

5          MS. GATTO:  Actually, Ms. Chen, can you blow it up for

6  me?

7  Q.  If you follow across under the event type description, it

8  says "input message," right?

9  A.  Correct.

10  Q.  So that means the user inputted the name Gilberto Valle?

11  A.  Correct.

12  Q.  Then there are -- one, two, three -- three output messages?

13  A.  Correct.

14  Q.  So the user has attempted to access multiple databases but

15  has returned through output messages?

16  A.  That is correct.

17  Q.  Now, if you return to the first page.  Let's take by way of

18  example about halfway down at 12:22:10.

19          MS. GATTO:  Ms. chen, if you can highlight that whole

20  section?

21  A.  Yes, ma'am.

22  Q.  There the user has inputted OFM_QVFDV6295.  Do you see

23  that?

24  A.  Yes, ma'am.

25  Q.  And the output messages are way more than when we saw when

1   we were looking at that Gilberto Valle?

2   A.  That is correct.

3   Q.  So this time the system returned more messages?

4   A.  Because a different function was requested.

5   Q.  So there is a function where you ask for certain things?

6   A.  Yes.

7   Q.  And you can access more databases?

8   A.  Correct.

9   Q.  The user controls how many databases?

10  A.  No.

11  Q.  Who controls how many databases are accessed?

12  A.  The system such as NCIC and the New York system access the

13  databases based on the type of request.  In your example,

14  ma'am, this was an query about a license plate number of a

15  vehicle as distinct from other examples where you are querying

16  on the person's information.  So depending on the content

17  provided, you get different results.

18  Q.  I understand.  So depending on what information you input

19  into the system, it accesses a different number of databases?

20  A.  Correct.

21  Q.  Are there times where the system is being maintained so the

22  users don't have access?

23  A.  There is no scheduled downtime in this system.

24  Q.  Is it Internet based?  How is the information transmitted?

25  A.  This system never touches the Internet at all.  It is all

D2r6val2                    Waters – cross

1   on private, secure encrypted networks.

2   Q.  It is some sort of wireless system?

3   A.  It is a bunch of them.  The system that runs from the lap

4   top to One Police Plaza is run by the City of New York.  It is

5   a private nonInternet based network.  And then the information

6   that runs from One Police Plaza to the New York State Police

7   and then to NCIC is non Internet based on a private encrypted

8   network.

9   Q.  I see.  If you could look also, Mr. Waters, at 616 C.

10          MS. GATTO:  Ms. Chen, if you wouldn't mind.

11  Q.  By the way, you testified AFR sync means what?

12  A.  Okay.  That is a function that has nothing to do with the

13  query and it is a function that if the officer was filling out

14  something like a traffic ticket, that information would be sent

15  out; but since there is nothing attached to it, it has no

16  bearing on this.

17  Q.  I am confused.  Can you explain that again?

18  A.  This is -- a AFR sync is a totally different function that

19  is used for uploading information that may have been entered as

20  a traffic ticket rather than a query to databases.

21  Q.  I see.  And this here is the input message whenever the

22  user here used Ms. Sauer's name?

23  A.  That is correct.

24  Q.  We see the input message a little more than halfway down?

25  A.  Correct.

D2r6val2                          Waters - cross

1   Q.  Then we see the output messages.  That is the information

2   that the user obtained?

3   A.  Correct.

4           MS. GATTO:  If you can flip through the pages,

5   Ms. Chen.

6   Q.  If you flip through the pages, is this the screen that the

7   user would see?

8   A.  No.  The portions of the information here starting with the

9   word TXT and going down to TXT will be the actual information

10  displayed.  The information at the top there is not all

11  displayed to the user and is part of our auditing and

12  accounting process.

13  Q.  I see.  The text.  Everything below the two columns that

14  have the shaded area, the text below that is what the user

15  sees?

16  A.  No, ma'am.  If you go about halfway down, you will see

17  something that looks like a little pointy thing, TXT.

18  Q.  Uh-huh.

19  A.  That is the -- that, yes.  It is now being highlighted

20  here.  That is the information that will actually display to

21  the officer's screen.

22  Q.  So focusing on this first page.

23          MS. GATTO:  Thank you, Ms. Chen, for highlighting it.

24  Q.  Am I right that Ms. Sauer's address doesn't appear in what

25  the user would see?

D2r6val2                         Waters - cross

1    A.   That is correct because the address was not provided by the

2    system.

3    Q.   Great.

4             MS. GATTO:   Then the next page, Ms. Chen, if you

5    wouldn't mind.

6    Q.   So here the user sees everything below the text?

7    A.   Correct.

8             MS. GATTO:   So, Ms. Chen, can you highlight that?

9    Q.   Again, Ms. Sauer's address doesn't appear on there?

10   A.   Correct.

11            MS. GATTO:   Ms. Chen, if you can go to the next page.

12   Again if you can highlight from the text down as the user would

13   see it.

14   Q.   Ms. Sauer's address doesn't appear there?

15   A.   Correct.

16            MS. GATTO:   The next page, Ms. Chen.  Again, if you

17   can highlight from the text down.

18   Q.   Again no address?

19   A.   Correct.

20            MS. GATTO:   On the next page could you do the same

21   thing, Ms. Chen.

22   Q.   I am right, no address?

23   A.   Correct.

24            MS. GATTO:   The next page.

25   Q.   Same question, no address?

D2r6val2                         Waters - cross

1    A.   Correct.

2    Q.   Perhaps for ease, why don't you flip through the document.

3    A.   Okay.  Yes.

4    Q.   Just confirm that there is no address on all of these

5    pages?

6    A.   Correct.

7    Q.   Mr. Waters, you don't know who has the taxpayer ID No.

8    942642?

9    A.   No.

10   Q.   You don't know who inputted this information in the charts

11   that the government has showed you?

12   A.   Can you -- I don't fully understand the question, ma'am.

13   Q.   You don't know who inputted the information.  All you know

14   is this information was captured, but you don't know the user?

15   A.   Correct.

16   Q.   Is the user's identified by that number.

17   A.   Right.

18   Q.   And you don't know which of these searches in the

19   government's charts were authorized or unauthorized by the

20   police department?

21   A.   No, I do not.

22   Q.   You are not familiar with police procedures, correct?

23   A.   Only as a layman.

24            MS. GATTO:  Can I have one moment, your Honor?

25            THE COURT:  Yes.

D2r6val2                          Waters - cross

 1          (Pause)

 2          MS. GATTO:  I am sorry, just one more question.

 3   Q.  The system connects to the databases through modem in the

 4   trunk?

 5   A.  When it is lap top controlled computer, it is a modem of

 6   sorts but not a modem like you would think you would use on

 7   your home computer.

 8   Q.  It is some device that is in the trunk of the patrol car?

 9   A.  In the trunk or actually attached to the lap top itself.

10   Q.  Is it always connected when you turn the computer on?

11   A.  If it is in the trunk, it is always connected.

12   Q.  Thank you.

13          MS. GATTO:  No further questions.

14          THE COURT:  Any redirect?

15          MR. JACKSON:  Very briefly.

16   REDIRECT EXAMINATION

17   BY MR. JACKSON:

18   Q.  You were asked some questions on cross-examination,

19   Mr. Waters, about whether or not information was returned from

20   Ms. Sauer's address.  Do you remember those questions?

21   A.  Yes, sir.

22   Q.  Now, what we were looking at, do those reflect the person

23   with the 942642 actually accessing on those databases?

24   A.  Yes, they do, sir.

25   Q.  If there had been information on the address or any other

D2r6val2                      Waters - redirect

1   information, would they have been able to access it through

2   those means?

3   A.  Yes, sir.

4           MR. JACKSON:  No further questions.

5           THE COURT:  Anything else?

6           MS. GATTO:  No, your Honor.

7           THE COURT:  You may step down, Mr. Waters.

8           (Witness excused)

9           THE COURT:  The government may call its next witness.

10          MR. JACKSON:  Your Honor, before we call the next

11  witness, we would like to ask for a brief conference with your

12  Honor.

13          THE COURT:  All right.

14          MR. JACKSON:  Perhaps the jury can be excused for a

15  few minutes.  There are a few things we need to share with the

16  Court.

17          THE COURT:  Ladies and gentlemen, we'll take a brief

18  recess and get started again.

19          THE DEPUTY CLERK:  All rise.

20          (Jury excused)

21          (Continued on next page)

22

23

24

25

D2r6val2                         Waters – redirect

1              (In open court; jury not present)

2              THE COURT:  Please be seated.  I wanted to say that in

3     my copy of 616 B, the last page relates to a 7-2011 Hartigan

4     search.  The page is just out of order, but I wanted to make

5     sure that whatever the jury gets in hard copy that that page is

6     not there.  It is GV 003830.

7              MR. JACKSON:  Thank you, your Honor.

8              MS. GATTO:  We have that in our binder, too.

9              MR. JACKSON:  Thank you.  That is a mistake, your

10    Honor.  I don't think it was shown to the jury.

11             THE COURT:  It wasn't.  It wasn't shown to the jury.

12    I anticipate that the hard copy will go back to the jury and I

13    want to make sure that that page was noted.

14             MR. JACKSON:  Excellent, your Honor.

15             There are a few things, your Honor.  I apologize for

16    having to raise this issue now, but as your Honor understands

17    this has been a very fast moving process with regard to one of

18    the issues for our next witness.  There are two things we want

19    to bring to the Court's attention.

20             First, apart from the argument that this activity

21    predates or constitutes some sort of 404(b) the defense has

22    raised, we believe that based on defense counsel's

23    cross-examination of Ms. Mangan and the other witnesses that

24    were cross-examined who were friends with Mr. Valle, the

25    defense has at minimum opened the door to us asking questions

D2r6val2                        Waters - redirect

1    to help us to understand what the relationship was between

2    Ms. Frisca and Mr. Valle.

3              Now, let me be specific about what I am talking about.

4    In the cross Ms. Mangan on page 213 says -- I am sorry.  Ms.

5    Gatto says, I am sorry.  I wanted to ask you questions about

6    Alissa.  So you consider her a friend?

7              THE COURT:  I need the transcript.  Sorry,

8    Mr. Jackson.  I am trying to get the transcript.

9              MR. JACKSON:  I am sorry, your Honor.

10             THE COURT:  Page 213?

11             MR. JACKSON:  Yes, your Honor.  Page 213.

12             THE COURT:  All right.  I am with you.

13             MR. JACKSON:  So at this point Ms. Gatto starts by

14   saying she wants to ask questions about Alissa, saying, "You

15   consider her a friend.  You socialize with her when you worked

16   together, and they are talking about their 2011 relationship,

17   their relationship in 2011 and prior to the marriage because

18   she says, She knew you were dating Gil and she said she knew

19   that Gil was a police officer and then there are questions

20   where further down on page 214 where she says, Well, you

21   brought her to a police officer Christmas party once.  Do you

22   remember that?  And there are a number of questions that

23   suggest that they are about the relationship between

24   Ms. Frisca, Mr. Valle and Ms. Mangan throughout the time

25   period, throughout the entire time period that Mr. Valle was

D2r6val2                              Waters - redirect

1    dating Ms. Mangan and then into their marriage and about times

2    when they are dropped off or going to the baby shower, etc.

3              So to be honest, your Honor, I don't understand even

4    what the purpose was of some of these where she is inquiring

5    about Ms. Frisca's interest in a particular police officer or

6    something like that.  But the real point is they have placed

7    into question what the nature of the relationship was between

8    Mr. Valle, Ms. Mangan and Ms. Frisca.  It was highlighted.  It

9    was an important point in the cross-examination and it was

10   something that the jury was clearly attuned to.

11             At this point it would be unfair for us to not be able

12   to elicit from Ms. Frisca what to her was a critical incident

13   in terms of her understanding of what the relationship was

14   between her and Mr. Valle.  She is going to explain that for

15   her this was a very strange occurrence before we even get to

16   2012, before we get to the point where Mr. Valle is asking that

17   a PBA card -- insisting that his wife give a PBA card to

18   Ms. Frisca.  It is important for the jury to understand the

19   nature of the relationship.

20             I think moreover that is opened up by the other lines

21   of cross defense has done with these other women, which

22   suggests that Mr. Valle's relationships with these women is an

23   appropriate subject of inquiry.  We've been attempting to

24   understand what the nature of the relationship was with each

25   one of the women for the entire time he is interacting with

D2r6val2                        Waters - redirect

1    them.  At this point, your Honor, I think regardless it is not

2    a criminal act.  So it is not something that has prejudicial

3    impact in that way, but it is important for us to just ask

4    about the few occasions where she saw and actually interacted

5    with Mr. Valle and this is one of the occasions.

6              MS. GATTO:  Your Honor, I am sure that the prosecutor

7    is going to elicit from Ms. Frisca that she didn't have a close

8    relationship with Mr. Valle.  Our inquiry of the other women

9    who testified regarding their relationship with Mr. Valle I am

10   confused on how that opens the door to questions relating to an

11   incident in April 2011 with Ms. Frisca.

12             THE COURT:  I might comment that I didn't understand

13   the relevance of those questions and if you get into those

14   questions again I am going to have to have an understanding of

15   why.

16             MS. GATTO:  Which questions?

17             THE COURT:  The questions about her interest in police

18   officers.  There wasn't an objection on relevance grounds.

19   There was an objection at one point of hearsay.  It wasn't

20   hearsay because it wasn't being offered for the truth, but I

21   didn't understand the relevance of that line of questioning.

22   So I am telling you that on cross-examination if you intend to

23   get into that, we're going to have to have a conversation

24   beforehand so I understand what the relevance of that is.

25             The problem as I see it with respect to the April 2011

D2r6val2                         Waters - redirect

1    incident is that the government wants to use that incident to

2    suggest that Mr. Valle was surveilling Ms. Frisca.  I indicated

3    the missing link from my perspective is the absence of evidence

4    that he was interested at that time in kidnapping her.  If

5    there had been a record comparable to the one that exists for

6    Sauer and Nobel that would be one thing, but there isn't.  What

7    I have before me is simply that the first reference to Frisca

8    is in February of 2012 and we're talking about April 2011,

9    which is approximately 10 months before and it seemed too

10   remote to me.

11          So, Mr. Jackson, my concern about the incident is that

12   we're asking the jury to speculate.  You want them to draw on

13   certain information from that encounter and we don't have

14   enough information in my judgment for the jury to draw any

15   inference about that encounter.

16          MR. JACKSON:  Judge, I think there is an appropriate

17   response to that, and I have another thing that I have to show

18   the Court.  But the first response is that we're not going to

19   be making arguments when we elicit this.  The question that

20   we're going to be asking is about what the incidents were where

21   she actually saw Mr. Valle.  There is no rule of evidence that

22   leads to us reasonably excluding an occasion on which one of

23   the handful of occasions which she Shaw Mr. Valle throughout

24   the entire time that she knew them.  Then one of the core

25   issues in this case is what was the relationship between

D2r6val2                      Waters - redirect

1    Mr. Valle and these women and is it reasonable to believe that

2    based on the nature of the relationship Mr. Valle would engage

3    in this conduct only for fantasy's sake.  We have to understand

4    the nature of the relationship.  That is why defense counsel

5    with every one of the women has been cross-examining them

6    about --

7           THE COURT:  Not to interrupt, Mr. Jackson, but there

8    is no argument here, there is no contention, there is no theory

9    that I am aware of that would suggest that Mr. Valle's

10   relationship with any of these women would explain, justify or

11   otherwise mitigate the conversations over the Internet.  In

12   other words, Ms. Gatto's defense here is not that there was

13   something about the relationship between Mr. Valle and these

14   women that makes this noncriminal.  As you know it was all just

15   a fantasy.

16          MR. JACKSON:  I understand your Honor's point.  Our

17   argument is that based on the nature of the relationship that

18   is one of the factors that the jury should take into account in

19   determining whether or not what he is saying is reasonable.  I

20   mean, these are women that he had a certain type of

21   relationship with each one.  These are not celebrities.

22          THE COURT:  I understand that, but his relationship

23   with this particular witness is quite limited.

24          MR. JACKSON:  Yes.  I think we want to have the jury

25   have a clear picture of the limited nature.

D2r6val2                          Waters - redirect

1        THE COURT:  I don't think Ms. Gatto is going to be

2   arguing that it wasn't limited.  You are not going to be

3   arguing it wasn't limited?

4        MS. GATTO:  No.

5        THE COURT:  You are going to be arguing it was very

6   limited?

7        MS. GATTO:  Right.

8        THE COURT:  She was essentially the friend of the

9   wife?

10        MS. GATTO:  That's right.

11        MR. JACKSON:  Your Honor, we're precluding the witness

12   from talking about one of the few instances she saw him before

13   we get to the question -- it certainly is relevant.

14        THE COURT:  How is it relevant, though?  Tell me what

15   the relevance of it is.

16        MR. JACKSON:  The relevance of it is it helps us to

17   understand he only interacted with this woman on a few

18   occasions.  She was a friend.

19        THE COURT:  There is already going to be evidence of

20   that.  There is already going to be evidence that they only

21   interacted on a very few occasions and when they did, it was

22   through the wife.  And so the question is:  What is the

23   relevance of this encounter in April of 2011.  The only

24   relevance that I can see is that it suggests that he was

25   surveilling her in some fashion, stalking her perhaps.  My

D2r6val2                          Waters - redirect

 1   concern is that we don't have an adequate foundation for the

 2   jury to draw that inference.  So that is my concern.

 3          MR. JACKSON:  Let me respond to that, your Honor.

 4   We've been responding to this this morning.  We immediately

 5   contacted Mr. Flatly and asked him to look at the hard drives

 6   for anything that -- the hard drives which were produced as

 7   your Honor knows in discovery to see if there is anything else

 8   that we can say about the data there that is telling on this

 9   particular issue and what we've been informed is that there is

10   a document.  We've identified a document called Government

11   Exhibit 442, which is a list of women that Mr. Valle sent

12   himself in September of 2012.

13          THE COURT:  All right.

14          MR. JACKSON:  Now, at the bottom of this list,

15   Mr. Valle has a number.  Obviously a number of these women,

16   including Ms. Frisca --

17          THE COURT:  I see her name.

18          MR. JACKSON:  -- are identified as targets of the

19   conspiracy and there are a number of strange terms at the

20   bottom that Mr. Valle listed.

21          THE COURT:  Your last point that these women are

22   identified as targets, I don't see that on the first page.  Is

23   that someplace else?

24          MR. JACKSON:  No.  No.  No.  I mean in other

25   conversations he identifies these women as targets.

1              THE COURT:  All right.

2              MR. JACKSON:  Let me explain the relevance of what

3     Mr. Flatley was able to do.  We introduce this exhibit.  As

4     your Honor knows, there are many things on Mr. Valle's hard

5     drive that we're not introduced.  It is a small section that

6     we're introducing for convenience.  What Mr. Flatley was able

7     to determine is that Mr. Valle created a precursor of this list

8     with the name Alissa on it in June of 2011.  That will be the

9     nature of his testimony.

10             In response to your Honor's concerns about this

11     particular issue, I think that that proximity shows that's a

12     very short amount of time after this incident occurs with

13     Ms. Frisca.  I think that combined with the other information

14     that we have about the facts that in 2011 Mr. Valle's already

15     deeply in his DFN chats and he is engaging in his accessing of

16     the NYPD systems for no purpose that we've been able to

17     identify other than identifying personal information about

18     these women and now we have a document similar to this one,

19     which was created in June of 2011.  We think that that is the

20     piece of evidence that advances this to a point we should be

21     able to simply ask the question without putting any

22     characterization on it and then when we get to the end of the

23     case, your Honor can make a determination as to whether there

24     are arguments that should be limited.  I think we should be

25     able to ask this question based on this proffer and simply have

D2r6val2                      Waters – redirect

1   a record of what the interactions were between Ms. Frisca and

2   Mr. Valle.

3         THE COURT:  Let me say that I am not happy with the

4   way the information has been dribbled out in this case and it

5   creates all kind of problems.  There has been a pattern frankly

6   on both sides of last-minute objections, last-minute

7   revelations that makes it very difficult to conduct these

8   proceedings in an organized, rational way.

9         Now, you have known for a very long this particular

10  incident existed.  You presumably knew that you were interested

11  in introducing it.  You knew there was an issue about it

12  because of the date and now you are telling me after I have

13  ruled on the issue that there is actually another piece of

14  evidence that you think is probative.  Well, why didn't you

15  collect the evidence before?

16        MR. JACKSON:  Well, your Honor, I definitely

17  appreciate your Honor's concern.  First of all, we apologize

18  for the dribble of information, but there were motions in

19  limine dates.  This was not raised in a motion in limine.  It

20  was raised two days ago.  I have not left this building in the

21  last two days.  I have spent the entire night responding to the

22  initial briefing, the initial question creating briefing the

23  day it was raised on the first day of trial.  Mr. Flatley

24  wasn't available when we left court at 8:00 last night for us

25  to do another look at this after we were arguing this issue.

D2r6val2                    Waters - redirect

1    We have been in court all day dealing with witnesses.

2              So, your Honor, I appreciate the Court's concern and I

3    would ask the Court's indulgence on this issue.  We have tried

4    as hard as we can to make sure that the Court is aware of every

5    issue.  That is why we produced all of our exhibits well in

6    advance of trial.  We produced them more than a week before the

7    start of trial.  We produced our 3500 material well in advance

8    of trial.  We filed all of our motions in limine on time.  We

9    have not moved in limine on anything, any line of questioning

10   since the case began.  The defense has filed additional

11   challenges to every one of our witnesses since we started.  I

12   simply have been trying to deal with Mr. Waters' issue in the

13   wee hours of the night last night and it is complicated, your

14   Honor.

15             So with regard to this, I think that we had made a

16   good faith effort at each stage to keep the Court informed and

17   now we're offering what I think is a responsive piece of

18   information.  I think that based on the defense's opening the

19   door, we would ask the Court to reconsider to allow us to

20   simply ask the question which establishes what the relationship

21   was and then we can reserve for later at the end the question

22   of whether or not there are arguments that should be limited on

23   that basis.

24             THE COURT:  Do you have the document that you said was

25   created in June of 2011?

D2r6val2                          Waters - redirect

1           MR. JACKSON:  We're bringing it over, your Honor, from

2    the FBI from 26 Federal Plaza.

3           THE COURT:  I need to see the document.

4           MS. GATTO:  As do we, your Honor, because we don't

5    know that document.

6           Just if I can respond briefly.  I don't mean to

7    belabor the point, but I do think that this is a problem, this

8    particular instance, this April 2011 is a problem that the

9    government created.  I know the Court has ruled that this is

10   not a 404(b) issue, but typically this would have been briefed

11   in a 404(b) manner.

12          Regardless, your Honor, we'll look at the document.  I

13   don't think it changes the calculus that they charge in June

14   2011 there is a document with a list of many names on it, but

15   we'll obviously look at the document if they have the document.

16   We have to go find it on the computer and do our forensics.

17   That is why these things should be brought to light early.  It

18   wasn't.  I don't see that even if there is an e-mail that looks

19   like this with a list of 100 names how that changes it.  I also

20   completely disagree with Mr. Jackson that the defense has in

21   any way opened the door to this.

22          THE COURT:  Let's talk about that for a minute.  You

23   have gotten into the contacts between Mr. Valle and, for

24   example, Ms. Frisca.  There was questioning about, for example,

25   the Christmas party and the fact that Ms. Frisca was interested

D2r6val2                          Waters – redirect

1    in going and the fact that there was some police officer there

2    who was "hitting on her" and there were other questions along

3    those lines.  I am not saying this to criticize you, but you

4    certainly have attempted to bring out the nature of the

5    relationship between Mr. Valle and Ms. Frisca.  There is no

6    question of that.  What Mr. Jackson is saying is, Well, if the

7    Christmas party is relevant, then how can it be that this is in

8    April 2011, which involves direct contract between Mr. Valle

9    and Ms. Frisca, how could that not be relevant?

10            MS. GATTO:  Your Honor, there are two pieces of

11    evidence that the government seeks to elicit from Mr. Frisca.

12    One was the April 2011 that the Court has ruled is

13    inadmissible.  The other is the issue about the PBA card.  The

14    government will argue that the giving of the PBA card from

15    Mr. Valle to Ms. Mangan to Ms. Frisca is very creepy and weird

16    and some indication of malcontent on Mr. Valle's part.

17            I was trying to elicit that Ms. Frisca wanted a PBA

18    card, that she has been intrigued by police officers and thinks

19    having a PBA card is cool for lack of better words.  I think

20    that is totally appropriate since the government is admitting

21    evidence we have not seen.  It seems based on arguments earlier

22    this morning that the PBA cards are at the center of the

23    government's case.  They are going to ask the jury to infer

24    that the fact that Mr. Valle gave PBA cards to friends and his

25    wife's friends that he was engaged in some giant ruse to get

 1  close to them.  I think it is totally appropriate especially

 2  when the government is willing to ask those kinds of questions.

 3  I don't think that that opens the door to an instance in

 4  April 2011 that has nothing to do with what we're talking about

 5  right now.

 6           Yes, of course I have gotten into the relationship,

 7  but on this end we're not disputing that Ms. Frisca and

 8  Mr. Valle are not friends.  They only know each other through

 9  Ms. Mangan.  My questions to Ms. Sauer and Ms. Hartigan is

10  different because they have a very different relationship.

11  Just as it is appropriate for me to ask Ms. Sauer when you got

12  the PBA card you weren't weirded out because of it because of

13  their nature of the relationship, I should be able to explore

14  the feelings around Ms. Frisca when she received the PBA card

15  from Ms. Mangan.

16           THE COURT:  All I will say about the Christmas party

17  in my judgment doesn't have anything to do with the PBA

18  incident and as I said I was really mystified as to what the

19  relevance was.  I draw from what you said that you want to be

20  able to argue that Ms. Frisca has some kind of interest in

21  police officers.

22           MS. GATTO:  Your Honor, that is a minor point.  I

23  didn't get the answers that I anticipated from Ms. Mangan, but

24  I am entitled to explore the surrounding circumstances of the

25  PBA card.  If in deed Ms. Mangan said, Yes, Ms. Frisca loves

D2r6val2                    Waters – redirect

1    cops and she would be tickled pink if she got a PBA card, that

2    would make the PBA card incident which we don't see on this

3    side as very odd thing even less odd.  So I understand

4    sometimes questions are asked and the answers are not what are

5    anticipated so the Court or even the prosecutor doesn't

6    understand why we're asking them, but it is one or two

7    questions.  I don't see how those questions related to how

8    Ms. Frisca would feel about getting a PBA card opened the door

9    to an April 2011 incident.

10             THE COURT:  In any event, the issue for me at this

11   point is that the government has said there is some document

12   that supports its argument or that would support an argument

13   that Mr. Valle was considering Ms. Frisca as a kidnap target in

14   June of 2011.  I need to see the document.  I am not going to

15   permit examination on this issue until I have the document.  So

16   if you are in a situation where Ms. Frisca is your next

17   witness, I am not going to allow examination on the subject.

18   You are welcome to recall the agent and continue with that and

19   take up the issue once we have the document or you can proceed

20   with Ms. Frisca.  It's up to you.  The nature of the document

21   is going to be absolutely critical to determine what inferences

22   can be drawn from it.  I am not going to make any ruling on the

23   subject until I have the document in front of me.

24             MR. JACKSON:  Absolutely, your Honor.  Our preference

25   would be to either continue with Mr. Walsh for a bit and then

D2r6val2                          Waters – redirect

1    at lunch we can secure the document and get it to your Honor or

2    to take an early lunch and secure the document, get it to your

3    Honor and then we deal with Ms. Frisca as soon as we finish,

4    whichever way your Honor feels is appropriate.

5              THE COURT:  I cannot take an early lunch today.  I am

6    sitting on the Court of Appeals at 1:30.  So actually I need to

7    take the jury up until 1:00 or 1:15 particularly given that we

8    had such a late start this morning I am also reluctant to break

9    early for that reason.

10             Also, with respect to Agent Walsh, if you are going to

11   recall him at this point, we're going to have to finish his

12   testimony.  We cannot keep jockeying back and forth between

13   witnesses.  If your decision is that you want to make an

14   argument to me to get this incident in and you want to show me

15   the document in support of that incident, then we're not going

16   to be able to take Ms. Frisca now.  You will have to put the

17   agent back on.  If you put Agent Walsh on, we're going to

18   finish him and then we'll take up the Frisca matter.  It sounds

19   like that is the approach you want to take.

20             MR. JACKSON:  Yes, your Honor.

21             THE COURT:  Let's get Agent Walsh back in here and

22   let's get the jury in here on we're going to go to about 1:15.

23             MR. JACKSON:  Your Honor, can you give us five minutes

24   to try to secure Agent Walsh?

25             THE COURT:  Yes.

D2r6val2                          Waters – redirect

1              (Recess)

2              THE COURT:  Are we prepared to proceed?

3              MR. JACKSON:  Yes, your Honor.

4              MS. WAXMAN:  Your Honor, the government calls Agent

5     Walsh at this time.

6              THE DEPUTY CLERK:  Are you ready for the jury?

7              THE COURT:  Yes.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2r6val2                          Waters – redirect

 1              (In open court; jury present)

 2              THE COURT:  Please be seated.

 3              Ladies and gentlemen, we're going to be resuming the

 4      testimony of Agent Walsh.  I also wanted to tell you that we'll

 5      be going a little bit later today because we started later

 6      today.  So my intention is to take us up to 1:15 and then we'll

 7      break for lunch at that point.

 8              Agent Walsh, you remain under oath.

 9              You may proceed.

10      COREY WALSH,

11      DIRECT EXAMINATION (Cont'd)

12      BY MS. WAXMAN:

13      Q.  Agent Walsh, just to remind the jury where we left off, we

14      were reviewing e-mail communications between an MHal52 and an

15      individual called Moody Blues.

16      A.  Yes, ma'am.

17      Q.  In the investigation did the FBI discover where Moody Blues

18      lives?

19      A.  Yes, ma'am.

20      Q.  Where is that?

21      A.  The IP address is traced back to the United kingdom.

22      Q.  Can you slow down a little bit?

23      A.  Yes.  His IP address is traced the back to the town of

24      Kent, which is outside of London, United Kingdom.

25      Q.  Directing your attention now, Agent Walsh, to Government

D2r6val2                        Walsh – direct

1    Exhibit 415, which was admitted yesterday into evidence.

2            MS. WAXMAN:  Your Honor, may we publish this exhibit

3    to the jury?

4            THE COURT:  Yes.

5    Q.  What are we looking at, Agent Walsh?

6    A.  We're looking at a chat conversation between Moody Blues

7    and MHal52.

8    Q.  What is the date of that conversation?

9    A.  September 8th, 2012.

10   Q.  Directing your attention to MHal52 at 4:10:57, can you just

11   read from there for the next few lines down?

12   A.  MHal52, I closed out my DFN account.

13           Meatmarketman, Works all the time at a local takeaway.

14   Why?

15           MHal52, Less chance of getting caught I figure.

16           Meatmarketman, LOL.

17   Q.  Agent Walsh, in your investigation did you determine what

18   DFN is or means?

19   A.  I believe DFN stands for the Darkfetishnetwork.

20   Q.  Did you confirm in your investigation that Officer Valle

21   closed his DFN account around this time?

22   A.  Yes, ma'am.

23   Q.  Yesterday, Agent Walsh, you testified that you reviewed

24   communications between Officer Valle and an individual known as

25   Ali Khan?

1    A.  Yes, ma'am.

2    Q.  What method did Officer Valle and Ali Khan use to

3    communicate?

4    A.  The chats.

5    Q.  Like the chats that we've been looking at for Moody Blues?

6    A.  Yes.

7    Q.  What were these chats about, the nature of the chats?

8    A.  Kidnapping, killing and eating young women.

9    Q.  Did Ali Khan and Officer Valle identify women who they

10   wanted to kidnap?

11   A.  Yes, ma'am.

12   Q.  Who were these women?  Who did these women include?

13   A.  Kathleen Mangan, Andria Nobel.

14   Q.  Over what period of time did Officer Valle and Ali Khan

15   communicate through electronic chats?

16   A.  Early 2012 through late summer.

17   Q.  I am going to ask you to take a look at what has been

18   received into evidence as Government Exhibit 417, 4-1-7.

19            MS. WAXMAN:  Your Honor, may we publish that exhibit?

20            THE COURT:  Yes.

21   Q.  Agent Walsh, can you tell us what we're looking at?

22   A.  This is a chat conversation between Ali Khan

23   Alisherkhan79@Yahoo.com and MHal52@yahoo.com.

24   Q.  What is the date of this conversation?

25   A.  January 23rd, 2012.

D2r6val2                          Walsh - direct

1   Q.  If you can just start reading from the top.

2   A.  Alisherkhan, I hope to share my ideas with you, which I am

3   doing for the very first time.

4          MHal52 50, Yes.  Sounds good.  Let's talk about

5   getting you a girl -- getting a girl to you.

6          THE COURT:  You have to read it exactly as it appears

7   in the transcript.

8          THE WITNESS:  Yes, your Honor.

9   A.  Alisherkhan, As I said, I would love to slaughter a girl

10  and make her meat.  I killed a few goats to see what happened

11  to the animal and how it is done.  I found it easy.  It is just

12  the use some arm power to lay it down, tie it a little and cut

13  its throat.  Girls or women are not cooperative like animals.

14         MHal52, Right.  So she would have to be tied up of

15  course.

16         Alisherkhan, If I get a middle-aged or adult woman or

17  a teenaged girl, I can slaughter her, but from where to get

18  this animal?

19         Alisherkhan, Are you there?

20         MHal52, Yes.

21         Alisherkhan, So?

22         MHal52, What body type do you like?  I am trying to

23  pick out a girl who I can send over.

24         Alisherkhan, How you can send her to me if she will

25  know what I will do with her?  By the way, young women will be

D2r6val2                          Walsh - direct

1   good.  Not big and fat ones.  But sometimes in winters fat

2   animals are also consumed.

3           MHal52, I can talk my girlfriend into going to India

4   for a trip and then we will meet up.

5   Q.  Stopping you there for a moment, Agent Walsh, in the course

6   of your investigation, did you discover whether Officer Valle

7   had a girlfriend in or about January 2012?

8   A.  Yes, ma'am.

9   Q.  Who was his girlfriend at that time?

10  A.  Kathleen Mangan.

11  Q.  Thanks.  If you can just continue.

12  A.  Alisherkhan, would you?  Is she good?

13          MHal52, She is 25 years old.

14          Alisherkhan, if you bring her here, I promise I will

15  make a good meal for you.  Wow, she is young.

16          MHal52, She is five foot seven, around 140 pounds.

17          Alisherkhan, I promise I will kill her as humanly as

18  possible has she has spent some time with you so she is ideal,

19  man.  I can't resist her meat.  She is yuck and I can wrestle

20  her to lay her down and cut her up.

21          MHal52, it is all right you don't have to worry about

22  humane.

23          Alisherkhan, By the way, I am 35 years old.  Will you

24  participate in the slaughtering process with me?

25          MHal52, Absolutely.  I have longed to butcher and cook

D2r6val2                          Walsh - direct

1   female meat.

2   Q.  Stopping you there for a moment, Agent Walsh.  In the

3   course of your investigation did you identify where Alisherkhan

4   lives?

5   A.  Yes, ma'am.

6   Q.  Where is that?

7   A.  Pakistan.

8   Q.  How did you learn that he lives in Pakistan?

9   A.  Through tracing the Internet protocol IP address from the

10  e-mails and chats.

11  Q.  If we can just go to the next page of that chat.  If we can

12  begin where it says Alisherkhan at 5:36.

13          I am sorry.  Go to the next page of that chat

14  beginning at 5:58.

15  A.  Alisherkhan, Listen, don't let her tell her parents, know

16  that she is coming with you anywhere.

17          MHal52, That will be hard.  She talks to them every

18  day.

19          Alisherkhan, So what is the call, man?  I say we don't

20  want to go to jail.

21          MHal52, will you be able to come here?  I have a place

22  in the middle of nowhere with plenty of space.

23          Alisherkhan, I can but where do you live, buddy?  Do

24  you have some more pics of her?

25          MHal52, We can set up an apparatus and kidnap another

D2r6val2                          Walsh - direct

1   girl out of nowhere so I am not a suspect.

2            Alisherkhan, I need to seek travel permission from

3   family as I am looking after shops here.

4            MHal52, I am in Pennsylvania.

5            Alisherkhan, Buddy, your girl is too good and after

6   seeing her I think she deserves to be eaten.

7            MHal52, I have some others who I can easily abduct.

8   How do you like her?

9            Alisherkhan, Wow.  U.S. travel laws are difficult,

10  man.  How can I come?  If you manage to reach and we can see if

11  it will be your girlfriend or dirty brown meat of Pakistani or

12  Indian.  Her second photo shows her pink face telling that she

13  is very healthy and American meat has its own taste.  She is

14  young so it is more than good.

15           MHal52, All right.  So you are fixated on Kathleen?

16           Alisherkhan, Fixated, yes.  You can say.  We can keep

17  on sharing until we come up with a plan.  I got her photo in

18  the pink dress.  Her breasts are good and arms are good with

19  meat.  She is not skinny.  It will be a lot of expenses if I

20  travel to U.S., but your girl is worth it.  Hey, what will you

21  do when she is gone?

22           MHal52, She is a sweet girl.  I like her a lot, but I

23  want to move on.  I am going to send a few more pics of her.

24           AlisherKhan, You say, well, sweet girl.  Send me more.

25  Do you have a photo that shows her body and meat without or

D2r6val2                        Walsh – direct

1    less dress.  I want to analyze her meat.

2              MHal52, I sent you a bikini picture, but it is only

3    the top.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Agent Walsh, during your investigation, did you discover on

2    a computer used by Mr. Valle a picture of Ms. Mangan dressed in

3    a bikini?

4    A.  Yes, ma'am.

5    Q.  You can continue, please.

6    A.  Alisherkhan:  "Can you feel her ribs under her breasts or

7    they are all covered in thick skin, has she broad back.  Bikini

8    is good enough."

9         Mhal52:  "It is set."

10   Q.  Can you go to the next page of that chat.

11   A.  Mhal52:  "She has some meat on her.  If it's going to be

12   her, I'll just come to you.  I will send you our hotel.  And we

13   will get her tied up and gagged."

14        Alisherkhan:  "Can you catch her Adam's apple or hold

15   her windpipe in throat.  I think you can as I see her neck

16   perfect for soup."

17        Mhal52:  "I want to eat some leg meat."

18        Alisherkhan:  "I will take my car across the border of

19   Pakistan.  We can meet in Rawalpindi in a hotel and from there

20   I will take you to my home.  You can tell her I am your old

21   friend.  When we reach home, we will gag her than and take her

22   to basement.  I have a servant there and few people, whom I

23   will send on leave for two days."

24   Q.  Do you know where Rawalpindi is?

25   A.  It is in Pakistan.

D2RUVAL3                          Walsh – direct

1    Q.  You can continue.

2    A.  Alisherkhan:  "Meat on leg is only meat that is perfect.

3    Send me a bikini pic."

4             Mhal52:  "It's there 6th picture.

5             Alisherkhan:  "Didn't get it.  I will send you her

6    meat analysis report as we do on our goats."

7             Mhal52:  "OK."

8             Alisherkhan:  "Perfect.  Her hips are ideal and leg

9    meat is classy."

10            Mhal52:  "Good."

11            Alisherkhan:  "Her every part is wonderful.  I can

12   wait to have her here under our knife."

13            "Mhal52:  "We can have some fun first."

14            Alisherkhan:  "She has no muscles and seems weak.  So

15   we can easily handle her."

16            Mhal52:  "Tie her up and rape her."

17            Alisherkhan:  "Sure, wasting such a good girl will not

18   be good.  Have you ever done anal on her.  If not, now is your

19   chance."

20            Mhal52:  "No, I haven't."

21            Alisherkhan:  "So tear her anus apart before she is

22   cut up."

23            Mhal52:  "Hell, yes."

24            Alisherkhan:  "I forgot to ask about this.  Make her

25   shave her hair in pubic area.  We need a clean vagina to carve

D2RUVAL3                         Walsh – direct

1    it."

2              Mhal52:  "Yeah.  She keeps it neat.  You will love

3    her, the look of terror in her eyes.

4              Alisherkhan:  "I got her photo with her tongue out,

5    when her throat will be cut her tongue will droop out like

6    this.  I have seen this in animals."

7              Mhal52:  "Nice."

8              MS. WAXMAN:  If we can go to the next page of that

9    exhibit.

10   Q.  Agent Walsh, can you continue reading?

11   A.  Mhal52:  "Would the feet be edible?"

12             Alisherkhan:  "Yes.  Feet soup will be good and

13   nutritious, even her tongue can be eaten."

14             Mhal52:  "Excellent."

15             Alisherkhan:  "She is very precious.  We won't waste

16   any of her thing."

17             Mhal52:  "Good.  I want to eat all of her.

18             Alisherkhan:  "We can make nice chops from her ribs,

19   even I want to keep her head.  If you don't mind, will you

20   allow me for one thing with her, if I ask.  If you don't agree

21   it is OK."

22             Mhal52:  "Ask.

23             Alisherkhan:  "I would love to fuck her throat.  I

24   mean a good blowjob."

25             Mhal52:  "Fine with me.  She hates that.  It would

D2RUVAL3                        Walsh - direct

1   humiliate her.  Do you have something to keep her mouth open?

2   Otherwise she will bite.

3            Alisherkhan:  " OK, you.  Than can I have an anal

4   than?

5            Mhal52:  "Definitely.  We will take turns with her.

6   We'll tie her down spread eagle."

7            Alisherkhan:  "Thanks.  I would love that.  I think

8   there is ceiling fan in the store in Pakistan home.  I can get

9   it removed to use the hook for slaughter."

10            Mhal52:  " OK."

11            Alisherkhan:  "She is not that big and we can even cut

12   her on the floor.  The floor is made of marble."

13            Mhal52:  "Whatever is easiest."

14            Alisherkhan:  "We normally cut animals in Muslim way.

15   Do you know the Muslim way?"

16   Q.  During your investigation did you discover what Ali Khan

17   does for a living?

18   A.  Yes.

19   Q.  What is that?

20   A.  He claims to be a butcher.

21            MR. BAUM:  Objection.  Hearsay.  Source of the

22   information.

23            THE COURT:  Could you bring out the source of the

24   agent's information.

25   Q.  Agent, what is the source of your information?

1   A.  Internet chat, he says that he is a butcher.

2            MS. WAXMAN:  Then I withdraw the question.

3            THE COURT:  Withdrawn.

4            Go ahead.

5   Q.  We can continue with Mhal52 at 6:37.

6   A.  Mhal52:  "But I just love the thought of stringing her

7   upside down.  No."

8            Alisherkhan:  "It is called 'zabah' and you can see

9   'eid azha' videos on YouTube.  OK, we can hang her.  Gutting

10  will be easier that way."

11           Mhal52:  "Awesome."

12           Alisherkhan:  "What if she agrees for this and we

13  don't have to force her.  Maybe she has a reverse fantasy like

14  us, maybe not."

15           Mhal52:  "Feet soup as an appetizer, and I'll take a

16  hunk of thigh meat as my entree."

17           MS. WAXMAN:  If we can go to the next page, and the

18  next page after that.

19  Q.  Directing your attention to Ali Khan at 6:41:09.  Can you

20  begin reading there.

21  A.  Alisherkhan:  "Throat has four things.  Windpipe or

22  trachea, esophagus or food pipe and two jugular veins.  Our aim

23  is to cut three out of these four.  The slit is quick and we

24  leave spinal cord intact to let heart beat so she throws a lot

25  of blood.  People say it's humane."

D2RUVAL3                      Walsh - direct

1              Mhal52:  "OK."

2              Alisherkhan:  "No leftovers of course.  We are too

3    hungry to share one nasty thing.  Some animals shit when the

4    knife cuts the throat.  I think due to pain.  Don't let her eat

5    much before slaughter or we will have to clean a lot.

6              Mhal52:  "OK.  Will do."

7              Alisherkhan:  "Is she a vegetarian?"

8              Mhal52:  "Yes.  She is."

9              Alisherkhan:  "OK.  Then her meat quality be slightly

10   less.  She will taste like a tasty goat."

11             Mhal52:  "Poor girl.  All of a sudden she has around a

12   month to live."

13             Alisherkhan:  "Do you have any other method of

14   slaughter.  I told you the way we do it.  Blood must be drained

15   as it is said here, as blood carries germs.

16             Mhal52:  "No, I really don't.  I've never butchered."

17             Alisherkhan:  "How much she has time to live depends

18   upon you."

19             Mhal52:  "She is a teacher and has a week off starting

20   February 20.  Perfect time for a vacation.

21             Alisherkhan:  "I will buy some nice knives for this

22   occasion, new ones.  Make sure she is not missed.  Bring her to

23   Pakistan.  It's easy for me to get there as we import sheep

24   from a city called Lahore.  But bring her to Rawalpindi."

25             Mhal52:  "OK."

1          Alisherkhan:  "If there is a problem, and you were

2     unable to bring her here, you can do that there, but I will

3     miss it.  I don't want to miss it."

4     Q.  Do you know where Lahore is?

5     A.  Yes.

6     Q.  Where is it?

7     A.  It is also in Pakistan.

8     Q.  You can continue with that page.

9     A.  Mhal52:  " I will absolutely do my best.

10          Alisherkhan:  "Send he some pics as I am saving it in

11     a separate folder."

12          Mhal52:  "I sent all I have."

13          MS. WAXMAN:  Ms. Chen, can you go to the next page of

14     the exhibit.

15     Q.  Agent Walsh, you can continue with that conversation.

16     A.  Alisherkhan:  " OK.  I have saved them.  Thanks.  Let me

17     ask a question.  If I get girlfriend here, I will slaughter her

18     myself here and never let anyone know.  Didn't you get idea of

19     doing her yourselves?"

20          Mhal52:  "Too much work for me to do on my own and I

21     have no experience butchering.  I would actually love to cook a

22     girl alive over an open fire, but just cook her until she dies.

23     Then take her down, properly butcher her and cook the meat, the

24     live cooking is just for my entertainment and for her

25     suffering."

D2RUVAL3                        Walsh - direct

1          Alisherkhan:  "What if I guide you on webcam.  I got

2     her picture in red dress with stretched neck.  And she says

3     'cut my throat, I'm ready'? he, he, he, he."

4          Mhal52:  "Ha, ha.  I've had other girls who I want to

5     cook more than Kathleen."

6          Alisherkhan:  "the Most easiest thing in life is

7     slaughtering.  When I killed my first goat, my workers said

8     it's easy.  So it was.  But the most important thing, never get

9     caught."

10          Mhal52:  "Of course.  If I did it here, I can easily

11     get away with it."

12     Q.  If I can now ask you to look at Government Exhibit 418.

13          MS. WAXMAN:  Your Honor, may we publish that exhibit?

14          THE COURT:  Yes.

15     Q.  If we can go to the second page of that exhibit.  Directing

16     your attention your attention, Agent Walsh, to Alisherkhan at

17     8:25.

18     A.  Alisherkhan:  "Who are these girls any ways, buddy.  You

19     have a lot of them."

20          Mhal52:  "Friends of mine."

21          Alisherkhan:  "You are lucky.  Get some courage man.

22     I am drooling for their meat but I am not happy with you.  I

23     think you are not for real, otherwise they would not be living.

24     You are not really interested in slaughtering them."

25          Mhal52:  "Maybe one day."

1          Alisherkhan:  "You are wasting time, buddy.  I am for

2     real, not fantasy."

3          Mhal52:  "I am just afraid of getting caught.  If I

4     were guaranteed to get away with it, I would do it."

5          Alisherkhan:  " OK.  Let me tell you.  Can you please

6     close these photos.  It makes me hot.  I can guarantee.  I have

7     done it before.  I am doing it this month and will always do

8     it.  You need a plan and in a little detail."

9          Mhal52:  " I am a little different, though.  I am a

10    little more sadistic.  I would want her to suffer.  I would

11    want to see her suffer.  I want to tie her up to a metal frame

12    and slowly roast her until she dies."

13    Q.  You can go to the next page of the exhibit and the page

14    after that.

15          Directing your attention, Agent Walsh to Alisherkhan

16    at page 3707.

17    A.  Alisherkhan:  " OK.  Let me ask you one last time before I

18    tell you more.  Are you really, really into it?  Are you ready

19    to slaughter one being safe?"

20          Mhal52:  "Yes."

21          Alisherkhan:  "Are you sure?

22          Mhal52:  "Definitely."

23          Alisherkhan:  "So when you think you can do it?  How

24    soon can you gather courage?"

25          Mhal52:  "I don't know."

D2RUVAL3                    Walsh – direct

1          Alisherkhan:  "Get your mind ready.  I will guide you

2    rest."

3          Mhal52:  "OK."

4          Alisherkhan:  "what time you have free with you in

5    daytime?  What do you do to earn?'

6          Mhal52:  "Typical office job.  I am home by 6 p.m."

7          Alisherkhan:  "Do you have free Saturday and Sunday?

8          Mhal52:  "Yes."

9          Alisherkhan:  "Whyan you do it on weekend?"

10         Mhal52:  "Yeah."

11         Alisherkhan:  "Get your mind ready and choose your

12   first victim.  Mail me on, leave me message on Yahoo Messenger.

13   I will help you out.  You won't believe how easy it is.  It is

14   damn, damn easy."

15   Q.  Now directing your attention to Government Exhibit 419.

16         MS. WAXMAN:  Your Honor, may we publish that exhibit?

17         THE COURT:  Yes.

18   Q.  If you can start, Agent Walsh, reading from Alisherkhan --

19   what does 16:36 mean?

20   A.  That is the UTC time stamp.

21   Q.  If you could just start reading from there.

22   A.  "Hey, Hal.  I am watching few videos to practice my

23   slaughter.  See this."

24         And that's when it went to the YouTube video.

25   Q.  In your investigation did you look at that YouTube video?

D2RUVAL3                         Walsh – direct

1    A.  I did, ma'am.

2    Q.  Generally what is it?

3    A.  Several men holding a live goat down to the ground,

4    splitting the throat with a knife and watching the blood rush

5    out.

6             MS. WAXMAN:  Your Honor, may I have a moment, please?

7             THE COURT:  Yes.

8    Q.  I am now directing your attention your attention, Agent

9    Walsh, to Government Exhibit 421.

10            MS. WAXMAN:  Can I publish that, your Honor?

11            THE COURT:  Yes.

12   Q.  What are we looking at there, Agent Walsh?

13   A.  It is another chat.

14   Q.  Between who?

15   A.  Ali Khan and Mhal52.

16   Q.  What is the date of that chat?

17   A.  February 9, 2012.

18   Q.  You can just start reading from the top.

19   A.  Alisherkhan:  "Hi buddy."

20            Mhal52:  "Hey."

21            Alisherkhan:  "Nice to see you again."

22            Mhal52: "Likewise.  I have my victim picked out.

23            Alisherkhan:  "Good.  Great.  Nice, so did you plan.

24            Mhal52:  "Should be very easy to kidnap her right from

25   home."

1          Alisherkhan:  "Please see you plan every detail from

2     drugs to dismembering and than throwing away what you do not

3     need."

4          Mhal52:  "Yeah, I was actually able to get a stun gun.

5     I'm gonna zap the bitch in her home, tie her up, pack her in a

6     large suitcase and get her to my car."

7          Alisherkhan:  "Not a good idea.  You might get

8     attention of her neighbors, bro."

9          Mhal52:  " I know her, they have seen me before."

10          Alisherkhan:  "Use a blanket to wrap her after she

11     faints.  Take a drink to her with drugs in it."

12          Mhal52:  "Yeah."

13          Alisherkhan:  "How old is she?

14          Mhal52:  "26, and she won't turn 27."

15          Alisherkhan:  "Ideal meat."

16          Mhal52:  "I can't send you pics."

17          Alisherkhan:  "Will you finish her by throat slit or

18     any other way?

19          Mhal52:  "My mouth is watering."

20          Alisherkhan:  "I tell you, it will be a great

21     experience."

22          Mhal52:  "I have a question actually would it be

23     remotely possible to stick her in the oven while she is alive

24     at a relatively low heat, maybe 160 to 170 just for my own

25     entertainment and for her suffering.  Once she dies, I will

pull her out and then properly butcher her.  I don't think she

will last more than 20 min so her body won't be ruined."

       Alisherkhan:  "I am banned from DFN due to my search

for real women willing for slaughter or people willing to send

their women to me."

       Mhal52:  " oh, damn."

Q.  Go to the next page and directing your attention to Mhal at

10:39.

A.  Mhal52:  "I want her to experience as much pain as humanly

possible through her ordeal.  Andria is her name.  Her hands

and feet will be tied very tight in the oven.  She won't be

going anywhere.  I wish you could see some pictures."

       Alisherkhan:  "I wish if I could see her.  You can try

to cook her alive."

       Mhal52:  "Only until she dies.  That's it."

       Alisherkhan:  "When will you be ready for this?"

       Mhal52:  "Soon."

       Alisherkhan:  "She should die for our meal."

       Mhal52:  "I can't get her out there."

       Alisherkhan:  "I hope you do it soon."

       Mhal52:  "Me too.  I get hungry every time I think of

her."

       Alisherkhan:  "Her meat must be delicious."

Q.  Agent Walsh, directing your attention to Government Exhibit

422.

D2RUVAL3                        Walsh - direct

1           MS. WAXMAN:  Your Honor, may we publish this exhibit?

2           THE COURT:  Yes.

3   Q.  Directing your attention, Agent Walsh, to Ali Khan at

4   18:26?

5   A.  Alisherkhan:  "Give me a minute.  Let me receive some mail

6   at my doorsteps.  Meanwhile, send some pics."

7           Alisherkhan:  "Wow, man.  She is cool."

8           Mhal52:  "That's my Andria."

9           Alisherkhan:  "Great bust."

10          Mhal52:  "Oh, yes."

11          Alisherkhan:  "Andria has good meat on her arms as

12  well."

13  Q.  Agent Walsh, in the course of your investigation, including

14  your review of a computer used by Officer Valle, did you

15  discover photographs of an individual named Andria?

16  A.  Yes, ma'am.

17  Q.  Did you identify Andria?

18  A.  Yes, ma'am.

19  Q.  Who is she?

20  A.  Andria Noble.

21  Q.  You can continue, please.

22  A.  Mhal52:  " Yep."

23          Alisherkhan:  "She has good quality meat on her."

24          Mhal52:  "Definitely."

25          Alisherkhan:  "Fuck her well before killing her."

1          Mhal52:  "Oh, absolutely.  She is going to suffer

2     incredible pain.  The rape will be the easy part for her.

3          Alisherkhan:  "Rupture her anus and give her a good

4     anal."

5          Mhal52:  "Yeah, I really want her to be alive in the

6     oven.  I want her to experience being cooked alive."

7          Alisherkhan:  "Tie her in a hogtied position and put

8     her in oven.  She will be a cool meat."

9          Mhal52:  "No.  She'll be trussed up like a turkey

10    laying on her back, her hands tied in front of her, her feet

11    crossed at the ankles and tied up, then the hands and feet

12    connected, tied with cooking twine."

13         Alisherkhan:  "Oil her well before putting in oven."

14         MS. WAXMAN:  Ms. Chen, can we go to the next page of

15    that exhibit.

16    Q.  And I will ask you Agent Walsh to begin reading at Mhal at

17    the top of the page.

18    A.  Mhal52:  "I want to show you my kitchen.  She will very

19    easily fit in that oven and that counter in the center is

20    perfect to lay her out on.  Yeah, I will oil her real nice.  I

21    don't want to ruin her body.  I'm hoping in 20 minutes she'll

22    be dead."

23         Alisherkhan:  "She will take about 50 minutes to get

24    done in the oven."

25         Mhal52:  She'll be cooking at around 160 degrees and

1    she will be terrified, screaming, and crying and very little

2    oxygen in there.  I don't think she will last too long before

3    she suffocates or something."

4              Alisherkhan:  "Tie her well."

5              Mhal52:  "She will be very, very tight and an apple in

6    her mouth."

7              Alisherkhan:  "Good preparation buddy."

8              Mhal52:  "I cannot wait.  I am not into the humane

9    stuff either.  It's personal with Andria.  She will absolutely

10   suffer."

11   Q.  Agent Walsh, now directing your attention to Government

12   Exhibit 426.

13             MS. WAXMAN:  Your Honor, may we publish 426?

14             THE COURT:  Yes.

15   Q.  What is the date of this conversation, Agent Walsh?

16   A.  May 1, 2012.

17   Q.  Who is involved in this conversation?

18   A.  Ali Khan and Mhal52.

19   Q.  If you could just start reading from the top, Mhal.

20   A.  Mhal52:  "Hey."

21             Alisherkhan:  "Hi buddy.  How you doing?  How is the

22   plan going on?"

23             Mhal52:  "Going well.  I've been keeping in touch with

24   her."

25             Alisherkhan:  "Great.  I hope you get her one day."

D2RUVAL3                    Walsh - direct

1          Mhal52:  "Yes, it will happen."

2          Alisherkhan:  "Her pics were awesome and makes my

3   mouth water.  She is awesome for slaughter.  By the way, I was

4   kicked out again from DFN, so I have a new name, Throat

5   Slitter.  We can remain in touch on DFN as well."

6          Mhal52:  "OK great."

7          Alisherkhan:  "Wow.  Healthy meat.  Ahh, you are very

8   lucky."

9          Mhal52:  "Agreed.  For eight years I've thought about

10  cooking her.

11  Q.  Agent Walsh, based on your review of these email

12  communications or these electronic chats between Ali Khan and

13  Mhal, do you have an understanding of who Mhal is referring to

14  for eight years I've thought about cooking her?

15  A.  Yes, I have.

16  Q.  Who is that individual?

17  A.  Andria Noble.

18  Q.  Now directing your attention to the third page of that

19  exhibit.  If you could go to the next page.  Agent Walsh,

20  please look at Mhal at 6:18.

21  A.  Mhal52:  "If I use chloroform to abduct her will it ruin

22  the meat?"

23          Alisherkhan:  "No, it won't."

24          Mhal52:  "OK."

25          Alisherkhan:  "It is secure way."

D2RUVAL3                        Walsh - direct

1             Mha152:  "Yeah, I can make some at home."

2             Alisherkhan:  "Get chloroform from away from your

3     town.  How you can make that?"

4             Mha152:  "There are a couple of web sites with

5     instructions, basic household products can make it."

6             Alisherkhan:  "Wow.  I will see it as well."

7             Mha152:  "Yeah, I will kidnap her right from her

8     home."

9             Alisherkhan:  "You need a good amount of chloroform."

10            Mha152:  "Yeah.  I can easily conceal it too.  She

11    will never see it coming."

12            Alisherkhan:  "Do it when her neighbors are not

13    active.  Use a very sharp knife to cut her head off and do that

14    in bathtub."

15            Mha152:  "Yeah."

16            Alisherkhan:  "Cleaning will be easy.  Buy few

17    shoppers to put her guts and intestines in it.  Put her hear in

18    another shopper and cut off her identifiable parts like hands

19    and feet.  Bury unwanted things in your backyard.  You need a

20    cleaver or a chopper as bones don't get cut easily."

21            Mha152:  "Yeah, I'm working on a list of everything I

22    need.  Is there any way I can cook her hands and feet?"

23    Q.  Agent Walsh, now directing your attention to Government

24    Exhibit 427.

25            MS. WAXMAN:  Your Honor, may we publish 427?

D2RUVAL3                          Walsh – direct

1           THE COURT:  Yes.

2     Q.   What are we looking at here, Agent Walsh?

3     A.   This is another chat between Ali Khan and Mhal52.

4     Q.   What is the date of that chat?

5     A.   May 9, 2012.

6     Q.   So directing your attention to Ali Khan at 5:32, about

7     halfway down the page.

8     A.   Alisherkhan:  "That's good.  She must trust you.  Did you

9     get chloroform formulat for making chloroform?  I would love to

10    make it as well."

11          Mhal52:  "I found a web site but I haven't made it."

12          Alisherkhan:  "OK.  It will be great if you share its

13    recipe."

14          Mhal52:  "Let me find it."

15          Alisherkhan:  "OK.  Thanks."

16          Mhal52, and then there's a link to the web site.

17    Q.   And what is the web site called?

18    A.   Howtomakechloroform .net.

19    Q.   In connection with your investigation, did you go on that

20    web site?

21    A.   Yes.

22    Q.   Describe generally what that web site contains?

23    A.   It is similar to the other one we saw yesterday.  It is

24    instructions for making chloroform.

25    Q.   If you can just continue through the rest of that page?

D2RUVAL3                        Walsh – direct

1   A.  Alisherkhan:  "Thanks.  It seems to be a good site."

2            Mhal52:  "Yeah.  I can wait to crathe soaked rag into

3   her face and feel her go limp."

4            Alisherkhan:  "And put her in some big bag in back of

5   your truck.  Feels good."

6            Mhal52:  "Yeah.  It's going to be a memorable

7   experience."

8   Q.  Agent Walsh, now directing your attention to Government

9   Exhibit 428.  What is that?

10  A.  It is another chat between Ali Khan and Mhal52.

11           MS. WAXMAN:  If we can publish that, your Honor?

12           THE COURT:  Yes.

13  Q.  Can you just read from where it says Ali Khan at 5:49?

14  A.  Alisherkhan:  "Great, but a little busy.  How are you and

15  how's your hunt going on?"

16           Mhal52:  "I'm doing well and the plan is slowly

17  evolving.  I'm in the middle of constructing a pulley apparatus

18  in my basement to string her up by her feet."

19           Alisherkhan:  "Great.  That's good.  How's A doing,

20  hope she will trust you to visit you and finally get cut up."

21           Mhal52:  "She's doing well.  I spoke with her

22  yesterday.  Such a sweetheart."

23           Alisherkhan:  "She will be really sweet and tasty."

24           Mhal52:  "Yeah.  It will be very memorable."

25  Q.  Agent Walsh, directing your attention to Government Exhibit

D2RUVAL3                         Walsh - direct

1    429.

2            MS. WAXMAN:  Your Honor, may we publish that exhibit?

3            THE COURT:  Yes.

4    Q.  What are we looking at here, Agent Walsh?

5    A.  This is another chat between Ali Khan and Mhal52 on July

6    17, 2012.

7    Q.  If I could just direct your attention to Mhal at 8:21 and

8    if you could just read those four lines.

9    A.  Mhal52:  "I found someone who is going to help me with

10   Andria."

11           Alisherkhan:  "Wow, that's cool."

12           Mhal52:  "We were going to cook her outdoors on the

13   rotisserie in September."

14           Alisherkhan:  "That will be wonderful."

15   Q.  Could you continue reading?

16   A.  Mhal52:  "Just wanted to refresh your memory."

17           Alisherkhan:  " I am drooling for her meat.  Lucky you

18   guys."

19           Mhal52:  "Her days are numbered.  And he shares my

20   passion for inflicting as much pain as possible."

21           Alisherkhan:  "Must use her before you kill her."

22           Mhal52:  "Which is why we're going to very slowly cook

23   her alive until she dies.  We're going to model our rotisserie

24   after this photo.  It's a perfect contraption."

25   Q.  Agent Walsh, in your review of the contents of a computer

D2RUVAL3                          Walsh - direct

1    used by Officer Valle, did you find photographs after

2    rotisserie?

3    A.  Yes, ma'am.

4    Q.  Can we go to the next page.  Would you just start reading

5    from Mhal at 8:33?

6    A.  Mhal52:  "Just need to work out a few kinks with the

7    abduction but we think we are all set.  Have a nice recipe for

8    some chloroform."

9            Alisherkhan:  "Please plan well and make it perfect.

10   That's great.  I wish to know it too.  Can you share please?"

11           Mhal52, there's a link to howtodothings.com.

12   Q.  Did you go in that link during the investigation?

13   A.  Yes, ma'am.

14   Q.  Is that the document we saw yesterday, I think it was

15   Government Exhibit 604?

16   A.  Yes, ma'am.

17   Q.  You can just continue the next couple of lines.

18   A.  Mhal52:  "Her husband goes out on Friday afternoons after

19   work and she gets home early.  I'm going to show up at her

20   place and chloroform her, strip her right there and tie her up.

21   She has a garage and I'm just going to pull right in."

22           Alisherkhan:  "That's good."

23           Mhal52:  "We're going to take her clothes with us of

24   course."

25           Alisherkhan:  "Better."

D2RUVAL3                          Walsh - direct

1            Mhal52:  Much less likely to try and run if she's

2      naked and she will feel much more vulnerable."

3            Alisherkhan:  "Yes."

4            Mhal52:  "Some nice strong hemp to tie her hands and

5      feet.  We will be out of there with Andria in 10 minutes.

6            Alisherkhan:  "Cool."

7            Mhal52:  "Maybe even less.  I just have to practice my

8      techniques in tying someone up."

9            Alisherkhan:  "I know you will tie her well."

10           Mhal52:  "Yeah.  Working on soundproofing the basement

11     too.  That's where she will be held captive and raped.  Then

12     she'll be cooked outdoors but I have a lot of space and no one

13     is around for three-quarters of a mile.  I really hope she

14     lasts a long time over the fire."

15           Alisherkhan:  "Yummy."

16           Mhal52:  "I will save all of the news reports too.

17     She will definitely make the news.  She is a city prosecutor."

18     Q.  Can you go to the next page of the exhibit.

19           Agent Walsh, if you could just read the first few

20     lines, beginning with Mhal at 8:41.

21     A.  Mhal52:  "The good thing about that is there will likely be

22     plenty of suspects, family members of people she put in jail,

23     you know?"

24           Alisherkhan:  "Don't care what happens after you eat

25     her.  Enjoy and devour her cooked meat."

D2RUVAL3                          Walsh – direct

1              THE COURT:  Ms. Waxman, let's take our lunch break.

2     Ladies and gentlemen, we will take an hour.  Come back at 215.

3              Don't discuss the case.

4              Keep an open mind.

5              Thank you very much.

6              (Luncheon recess)

7

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2r6val4

```
1                      A F T E R N O O N     S E S S I O N

2                                2:15 p.m.

3            THE COURT:  Is there anything we need to take up

4    before the jury is brought in?

5            MS. WAXMAN:  Not from the government, your Honor.

6            MS. GATTO:  No, your Honor.

7            THE COURT:  Please bring in the jury.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

D2r6val4

| | |
|---|---|
| 1 | (In open court; jury present) |
| 2 | THE COURT:  Please be seated. |
| 3 | Agent, you remain under oath. |
| 4 | THE WITNESS:  Yes, your Honor. |
| 5 | THE COURT:  Ms. Waxman. |
| 6 | MS. WAXMAN:  Thank you, your Honor. |
| 7 | BY MS. WAXMAN: |
| 8 | Q.  I am going to show you two more exhibits. |
| 9 | MS. WAXMAN:  Your Honor, may I approach? |
| 10 | THE COURT:  Yes. |
| 11 | Q.  Agent Walsh, I am showing you what has been marked for |
| 12 | identification as Government Exhibit 442 and 443.  Can you just |
| 13 | take a look at those and let us know whether you recognize |
| 14 | those documents? |
| 15 | A.  Yes, ma'am, I do. |
| 16 | Q.  What are those documents, Agent Walsh? |
| 17 | A.  The first one is an e-mail from the MHal52@Yahoo.com |
| 18 | account and contains approximately 80-something female names as |
| 19 | well as a list of 10 activities. |
| 20 | Q.  Agent Walsh, have you seen that document before today? |
| 21 | A.  Yes, ma'am. |
| 22 | Q.  Where did you originally obtain it from? |
| 23 | A.  From the search warrant that we received from the |
| 24 | MHal52@Yahoo account. |
| 25 | Q.  If you can take a look at the other exhibit that I handed |

D2r6val4

1    you and describe what that is?

2    A.  This is an e-mail from the MHal52@Yahoo.com account to

3    Webmaster@darkfetishnet.com.  The subject is the account did

4    not upgrade.  Sent on Monday, July 2nd, 2012.

5    Q.  Where did you originally obtain that document?

6    A.  This was also from the search warrant that we obtained.

7    Q.  Are those two documents contained on Exhibit 108 that we

8    looked at yesterday?

9    A.  Yes, ma'am, that disk.

10             MS. WAXMAN:  Your Honor, the government offers

11   Government Exhibit 442 and 443 into evidence.

12             THE COURT:  Any objection?

13             MR. BAUM:  No objection.

14             THE COURT:  Government Exhibits 442 and 443 are

15   received.

16             (Government's Exhibits 442 and 443 received in

17   evidence)

18   BY MS. WAXMAN:

19   Q.  Agent Walsh, directing your attention to Government

20   Exhibit 442.  You may have said this already, but approximately

21   how many names are on this exhibit?

22   A.  Approximately 80 names, ma'am.

23   Q.  Sorry?

24   A.  Approximately 80 names, ma'am.

25   Q.  What is the gender of the names?

D2r6val4

```
 1    A.  They appear to be all female.

 2    Q.  Do you see Kimberly --

 3            MS. WAXMAN:  Your Honor, can we publish this for the

 4    jury?

 5            THE COURT:  Yes, you may.

 6    Q.  Do you see Kimberly Sauer's name on this list?

 7    A.  Yes, ma'am, I do.

 8    Q.  Do you see Alissa Frisca's name on this list?

 9    A.  Yes, ma'am, I do.

10    Q.  Where is that?

11    A.  Towards the bottom.

12    Q.  Do you see Andria Condez's name on this list?

13    A.  Yes, ma'am, I do.

14    Q.  And where is that?

15    A.  Towards the bottom.

16    Q.  And what about Maureen Hartigan?

17    A.  Yes, ma'am, I do.  It is right in the middle.

18            MS. WAXMAN:  We can highlight that as well.

19    Q.  Kimberly Sauer?

20    A.  Yes, ma'am.

21            MS. WAXMAN:  If we can highlight that one as well,

22    Ms. Chen.  Can we go to the top of this document and if we can

23    look at the header.

24    Q.  Who appears to have sent this e-mail?

25    A.  It is from the MHal52@Yahoo.com account.
```

D2r6val4

1    Q.  Who is the recipient?

2    A.  MHal52@yahoo.com account.

3         MS. WAXMAN:  If we can go to the bottom of that

4    document.

5    Q.  Can you just read those items at the bottom of that e-mail?

6    A.  Number 1, Cooking class.  Number 2, Thanksgiving.  Number

7    3, Hotel.  Number 4, Redneck Grill.  Number 5, Vacation Tribe.

8    Number 6, Supermarket.

9         MS. WAXMAN:  Can we see the next page of that exhibit?

10   Q.  That list appears to continue.  Can you read those items,

11   please?

12   A.  Number 7, Obsession Summer.  Number 8, Poor family.  Number

13   9, Coworker.

14   Q.  Thank you.

15        MS. WAXMAN:  We can take that down.

16   Q.  Agent Walsh, directing your attention now to what is in

17   evidence as Government Exhibit 443.

18        MS. WAXMAN:  Can we publish that for the jury, your

19   Honor?

20        THE COURT:  Yes.

21   Q.  What are we looking at here, Agent Walsh?

22   A.  This is an e-mail from the MHal52@yahoo.com account to the

23   Webmaster@Darkfetishnet.com.

24   Q.  What does that indicate if you know,

25   Webmaster@Darkfetishnet?

D2r6val4

1    A.   Typically the person who runs or administers the website.

2    Q.   And can you read the text of that e-mail?

3    A.   Hey, I was successful in purchasing a premium account last

4    night for $15.95 cents but I still have the no been updated.  I

5    am Girlmeat Hunter on the site and my e-mail is

6    MHal52@Yahoo.com.  Thank you and great website.

7    Q.   Agent Walsh, do you have an understanding based on your

8    review of the e-mail and your review of Darkfetishnet what a

9    premium account is?

10   A.   Yes, ma'am.

11   Q.   What is that?

12   A.   The premium account allows you to access additional content

13   on the website.

14        MS. WAXMAN:   Thank you.  You can pull that down.

15   Q.   Agent Walsh, approximately how many of Officer Valle's

16   e-mails and electronic chats did you review in connection with

17   your investigation?

18   A.   Thousands.

19   Q.   We just reviewed over yesterday and today about 40, is that

20   right?

21   A.   That's correct, ma'am.

22   Q.   Why did you focus on these 40 particular communications?

23   A.   We believed that these chats and e-mails contained elements

24   of real crimes.

25   Q.   And why did you come to that conclusion?

D2r6val4

1    A.   They described dates, names and activities that you would

2    use to conduct a real crime.

3    Q.   And did you cast aside a certain number of e-mails as well?

4    A.   Yes, ma'am.

5    Q.   Why did you choose not to focus on those e-mails?

6    A.   Quite frankly, ma'am, they didn't seem realistic.

7    Q.   Why not?

8    A.   They were clearly role-play.  They used the the word

9    "fantasy" in the actual chats or e-mails.

10   Q.   You mentioned during your testimony a woman by the name of

11   Andria Condez?

12   A.   Yes, ma'am.

13   Q.   We saw her name on this list as well in Government

14   Exhibit 442?

15   A.   Yes, ma'am.

16   Q.   Was there a maiden name of that individual?

17   A.   Yes, ma'am.

18   Q.   What is that?

19   A.   Nobel.

20   Q.   Nobel.

21           Mr. Jackson reminded me of something.

22   Q.   You testified that Nobel was associated with the name

23   Andria?

24   A.   Yes, ma'am.

25   Q.   Nobel is the married name and Condez is the married name?

D2r6val4

1    A.  Yes, ma'am.

2    Q.  Is that your understanding?

3    A.  Yes, ma'am.

4    Q.  You also testified that you reviewed in connection with

5    your investigation the Darkfetishnetwork?

6    A.  Yes, ma'am.

7    Q.  Did you review any communications between Officer Valle and

8    Michael Vanhise from Darkfetishnetwork?

9    A.  I was unable to, ma'am.

10   Q.  Why is that?

11   A.  The account was deleted so we could not gain access.

12   Q.  The same question for communications between Officer Valle

13   and Moody Blues.  Were you able to retrieve those

14   communications from the Darkfetishnetwork?

15   A.  No, ma'am.

16   Q.  What was the reason for that?

17   A.  We were unable to access the account because it had been

18   closed.

19   Q.  Also communications between Officer Valle and Ali Khan,

20   were you able to review those communications that occurred on

21   the Darkfetishnetwork?

22   A.  No, ma'am.

23   Q.  What was the reason?

24   A.  Because the account had been closed.

25           MS. WAXMAN:  Your Honor, may I have a moment, please?

D2r6val4

1         THE COURT:  Yes.

2         (Pause)

3         MS. WAXMAN:  Your Honor, the government has no further

4    questions at this time.

5         THE COURT:  Cross-examination.

6    CROSS-EXAMINATION

7    BY MR. BAUM:

8    Q.  Good afternoon, Agent Walsh.

9    A.  Good afternoon, sir.

10   Q.  Agent Walsh, you testified on direct examination that you

11   had received all the Valle chats and e-mails and it involved

12   about two dozen participants, correct?

13   A.  There are more e-mails and chats that occurred, but the

14   bulk of the repeated e-mails and chats were approximately two

15   dozen individuals.

16   Q.  You testified that you separated the real ones, the real

17   participants from the fantasy, right?

18   A.  Yes, sir.

19   Q.  So out of 24 fantasy participants that you looked at --

20   excuse me.  Out of 24 participants you look at, 21 you found to

21   be fantasy, didn't you?

22   A.  To the best of my abilities.  Yes, sir.

23   Q.  Now, if you excuse me math is not my strong point, but 21

24   of 24 is around 80 percent of the participants you looked at

25   were fantasy role-plays involving Mr. Valle, right?

D2r6val4                        Walsh – cross

1   A.  They could have been.  Yes, sir.

2   Q.  No.  No.  Not that they could have been.  You concluded

3   that they were, isn't that a fact?

4           MS. WAXMAN:  Objection.

5           THE COURT:  Overruled.

6   A.  Yes, sir.

7   Q.  Now.  When that decision was made, you are not a forensic

8   psychiatrist, are you?

9   A.  No, sir.

10  Q.  I know you went to college.  What did you major in?

11  A.  Sociology, sir.

12  Q.  And did you get any postcollege degrees?

13  A.  No, sir.

14  Q.  So you didn't major in psychology and you don't have any

15  degrees in psychology, right?

16  A.  No, sir.

17  Q.  Now, when you made that decision that 21 out of 24

18  participants with Mr. Valle were engaged in fantasy role-play,

19  were you the only one who made that decision?

20  A.  No, sir.

21  Q.  How many agents were involved in that decision?

22  A.  Approximately eight to 10, sir.

23  Q.  How many?

24  A.  It eight to 10, sir.

25  Q.  And how many people from the U.S. Attorney's Office were

D2r6val4                        Walsh - cross

1   involved in that decision?

2   A.  About two, sir.

3   Q.  So eight to 10 law enforcement officers and at least two

4   lawyers from the U.S. Attorney's Office decided that out of 24

5   people that Mr. Valle chatted or e-mailed with 21 were fantasy

6   role-plays, is that correct?

7   A.  Approximately.  Yes, sir.

8   Q.  Now, you testified about separating the ones that you

9   thought were fantasy from the ones that you thought were real.

10  Do you remember just being asked those questions?

11  A.  Yes, sir.

12  Q.  I think you said that the ones that were real involved

13  names, correct?

14  A.  That was one of the elements.  Yes, sir.

15  Q.  And the ones that were real involved dates, correct?

16  A.  That was one of the elements.  Yes, sir.

17  Q.  What were the other elements that made you believe it was

18  real?

19  A.  Discussions of past crimes as well, sir.

20  Q.  You said the ones that were fantasy role-plays, you

21  believed because they actually said in the chat that they were

22  engaged in fantasy?

23  A.  Not all of them, sir.  But some of them, yes.

24  Q.  So it is true that at least some of the 21 or 24 that you

25  found, you and at least 10 other people found the fantasy

D2r6val4                        Walsh – cross

1   role-plays did not include statements that, Hey, we're engaged

2   in fantasy role-plays, correct?

3   A.   Some of them.   That's correct, sir.

4   Q.   Isn't it a fact, Agent Walsh, that of some of the

5   role-plays that you determined were fantasy did involve women's

6   names?

7   A.   That's correct, sir.

8   Q.   In fact, some of the role-plays that you determined were

9   fantasy role-play involved many of the names that were in the

10  ones you thought were real?

11  A.   I can't recall every single conversation, sir, but I

12  believe that to be true.

13  Q.   There was Alissa in the fantasy role-plays?

14  A.   There could have been, sir.

15  Q.   Maureen, right?

16  A.   It is possible, sir.

17  Q.   Kim?

18  A.   It is possible.   I don't have those conversations in front

19  of me.

20  Q.   And the chats that you discussed that are on the government

21  exhibit, the disk, you reviewed those chats, didn't you?

22  A.   Yes, sir.

23  Q.   Now, you testified here that the real chats involved an

24  individual by the name of Ali Khan, Mike Vanhise and Moody

25  Blues, correct?

D2r6val4                        Walsh – cross

1    A.  Those are ones I believe to be real, sir, yes.

2    Q.  Isn't it a fact that some of the women named in those real

3    chats were also named in the fantasy chats?

4    A.  Yes, sir.

5    Q.  Isn't it a fact that the photos that were sent in the real

6    chats were also sent in fantasy chats?

7    A.  Again, sir, I don't have those in front of me, but it is

8    possible.

9    Q.  Isn't it a fact that the fantasy chats that about 10 people

10   determined were fantasy also involved kidnapping, rape, torture

11   and cooking women?

12          MS. WAXMAN:  Objection, your Honor.  The question is

13   compound.

14          THE COURT:  Can you break it down, Mr. Baum?

15          MR. BAUM:  Yes, of course.

16   Q.  Isn't it a fact that some of the chats that were found to

17   be fantasy by these 10 people who looked at it involved

18   kidnapping?

19   A.  Yes, sir.

20   Q.  Isn't it a fact that some of the chats that 10 people found

21   to be fantasy involved rape?

22   A.  Yes, sir.

23   Q.  Isn't it a fact that some of the chats that 10 people found

24   to be fantasy involved torture?

25   A.  They could have.  Yes, sir.

D2r6val4                          Walsh - cross

1   Q.  And isn't it a fact that some of the chats that 10 people

2   including yourself found to be fantasy involved cooking women?

3   A.  They could have.  Yes, sir.

4   Q.  And eating them, correct?

5   A.  They could have.  Yes, sir.

6   Q.  Isn't it a fact that some of the chats you found to be

7   fantasy involved target dates?

8   A.  Again, sir, I don't have those in front of me, but it is

9   possible.

10  Q.  Isn't it a fact that some of the chats you found to be

11  fantasy discussed the use of chloroform?

12  A.  Sir, they could have.  I don't have those in front of me.

13  Q.  Isn't it a fact that some of the chats you found to be

14  fantasy involved Mr. Valle selling women for prices like

15  $4,000?

16  A.  Again, sir, could have.  I don't have those in front of me.

17  Q.  Isn't it a fact that some of the chats you found to be

18  fantasy involved creating menus to eat women?

19  A.  Again, sir, I don't have those in front of me, but it is

20  possible.

21  Q.  Now, all of the things that I just mentioned -- targets,

22  dates, chloroform, selling women for a specific price, torture,

23  rape, cooking, photos -- in the fantasy chats were elements

24  that you considered in determining the real chats?

25  A.  There were some of them.  Yes, sir.

D2r6val4                          Walsh - cross

1   Q.  And now you are telling the jury that you were able to

2   determine that some chats were fantasy and some chats even

3   though they involved the same elements, the same women were

4   real?

5            MS. WAXMAN:  Objection.

6            THE COURT:  Sustained.

7   A.  I wouldn't say that all of those --

8            THE COURT:  No.  I sustained the objection.  That

9   means you don't answer the question.

10  Q.  Government Exhibit I think it is 108 was the disk I believe

11  that was in evidence.  Do you recall that?

12           MS. WAXMAN:  Just to be clear, your Honor --

13  Q.  108 was a disk from which the hard drivers from the two

14  computers were downloaded involving chats, is that it?

15  A.  108 was the search warrant results, I believe, sir.

16  Q.  I am sorry.  Nevertheless, you reviewed a number of chats

17  including the fantasy chats, correct?

18  A.  Yes, sir.

19  Q.  I would like to show you what I have marked as Defense

20  Exhibits collectively E1, E4, E3, E5, E6, E10, E12, E11.  I

21  would like to show you these chats that you reviewed between

22  MHal52 and other participants.

23  A.  Yes, sir, I recognize these.

24           MR. BAUM:  Your Honor, I now offer them into evidence

25  as defense exhibits as stated in the record previously.

D2r6val4                       Walsh - cross

1          MS. WAXMAN:  Your Honor, we object to the admission of

2     these chats.

3          THE COURT:  On what grounds?

4          MS. WAXMAN:  Your Honor, on the ground that they are

5     hearsay.

6          THE COURT:  They are not offered for their truth, are

7     they, Mr. Baum?

8          MR. BAUM:  Well, Judge, they are offered on two

9     grounds.  One, the government brought out that he had reviewed

10    these chats in making his decision and this is to discuss the

11    basis for that decision.  That was brought out on the

12    government's direct case.

13          Secondly, they are offered simply as proof of -- some

14    may be offered not for its truth, but mostly they are offered

15    because on direct examination he had discussed these chats.

16          THE COURT:  No.  The objection is hearsay.  So my

17    question to you is --

18          MR. BAUM:  They are not being offered for their truth.

19          THE COURT:  Because they are not being offered for

20    their truth, they are not hearsay.  So there is no hearsay

21    objection that is proper.

22          Any other objection?

23          MS. WAXMAN:  Your Honor, I am not sure of the

24    relevance of these chats.

25          THE COURT:  Well, Mr. Baum has made a representation

1    of their relevance and I am going to overrule the objection to

2    the extent it is based on relevance.  Defense Exhibits E1, E3,

3    E4, E5, E6, E10, E11 and E12 are received in evidence.

4              (Defendant's Exhibits E1, E3, E4, E5, E6, E10, E11 and

5    E12 received in evidence)

6    BY MR. BAUM:

7    Q.  Now, Agent Walsh, before we look at those chats, I would

8    like to ask you a few more questions about your investigation

9    in this case.  You talked about your involvement in the

10   investigation when you were on direct examination.

11             Do you recall that?

12   A.  Yes, sir.

13   Q.  I believe you testified on direct examination that the

14   investigation itself began in September 2012?

15   A.  Yes, sir.

16   Q.  Is that correct.

17             I believe you testified on direct examination that the

18   investigation began when Mr. Valle's wife came to the FBI?

19   A.  Yes, sir.  In Reno.

20   Q.  And I believe you testified that you entered the

21   investigation sometime in October of 2012, correct?

22   A.  That's correct, sir.

23   Q.  You also testified that you received the contents of two

24   computers, correct?

25   A.  Yes, sir.

D2r6val4                        Walsh - cross

```
 1   Q.  And is it true that you also were brought up to date
 2   regarding the status of the investigation after you came on
 3   board, is that accurate?
 4   A.  Yes, sir.
 5   Q.  Did you actually participate in any of the interviews of
 6   any of the women who were the subjects of the investigation?
 7   A.  No, sir.
 8   Q.  Did you review interviews had by FBI agents with the women?
 9   A.  I've read some of the 302s, yes, sir.
10   Q.  And were you involved in entering Mr. Valle's apartment on
11   October 9th to retrieve one of the computers?
12   A.  No, sir.
13   Q.  Now, based on your knowledge of the investigation, isn't it
14   a fact that no women who are named in any of the chats that you
15   reviewed were kidnapped?
16   A.  Thankfully, no.
17   Q.  Isn't it a fact that no women in any of the chats you
18   reviewed were tortured, raped or cooked?
19   A.  Thankfully, no.
20   Q.  And isn't if a fact based on your review of the
21   investigation, your participation in the investigation that
22   there is no evidence that Mr. Valle ever met personally with
23   any of the individuals that he chatted with?
24   A.  There could be, sir, but I am not aware of any interaction.
25   Q.  That is what I am asking.  Based on your investigation,
```

D2r6val4                        Walsh - cross

1   discussions with other agents, everything you know about this

2   case, there is no evidence to your knowledge that Mr. Valle

3   ever met with anyone else, correct?

4   A.  To my knowledge, no, he never met with anyone.  No.

5   Q.  In fact, isn't it a fact that to your knowledge based on

6   everything that you know about this investigation, there is no

7   evidence that Mr. Valle even spoke by phone with any of these

8   individuals?

9   A.  I am not aware of any phone contact, no, sir.

10  Q.  And isn't it a fact based on your review of the chats and

11  e-mails that not a single chat or e-mail had an address of the

12  person that Mr. Valle was speaking with.

13  A.  Of the ones that I was able to review, no, sir.

14  Q.  When you say of the ones you have seen.  Ali Khan's e-mail,

15  was there any address in there for Ali Khan?

16  A.  No, sir.

17  Q.  Mike Vanhise's email, any address if there for Mike

18  Vanhise?

19  A.  Not between him and Mr. Valle.  No, sir.

20  Q.  In Moody Blues' e-mail, any address in there for Moody

21  Blues?

22  A.  Not in the ones I reviewed.  No, sir.

23  Q.  Well, did you review all of the Moody Blues?

24  A.  Yes, sir.  Not in the ones I reviewed.

25  Q.  So then what you are saying is in every single chat and

D2r6val4                        Walsh - cross

1   e-mail you reviewed -- Moody Blues, Ali Khan and Mike Vanhise,

2   which includes all the chats that existed to your knowledge --

3   there was no address in any of those chats?

4   A.  Of the ones I reviewed, I never saw the address.

5   Q.  In the ones reviewed.

6           Did you find any chloroform in this case?

7   A.  Only the recipes.

8   Q.  I am sorry?

9   A.  Only the links to the recipes that were contained in--

10  Q.  Okay.  So what you found was a list in the computer,

11  correct?

12  A.  A list of?

13  Q.  Well, the receives?

14  A.  The links, sir.

15  Q.  Okay.  I am asking you did you actually find a bottle of

16  chloroform?  Did the FBI find chloroform that belonged to

17  Mr. Valle?

18  A.  No, sir.

19  Q.  Did the FBI find any ropes to tie up women that is

20  attributable to Mr. Valle?

21  A.  There could have been ropes in the apartment, sir.

22  Q.  Did you know of any ropes recovered attributable to

23  Mr. Valle?

24  A.  We did not recover any rope.  No, sir.

25  Q.  Did you find a pulley system that would hang people from

D2r6val4                        Walsh - cross

1    the ceiling in Mr. Valle's apartment or anywhere else?

2    A.  In areas we viewed, no, sir.

3    Q.  Did you find an oven large enough to cook women in

4    Mr. Valle's apartment?

5    A.  I think that is debatable on the size of the woman, sir.

6    Q.  I am sorry?

7    A.  I think that is debatable depending on the size of the

8    women.

9    Q.  Let me ask you are you familiar with the oven that was in

10   Mr. Valle's apartment?

11   A.  I saw it, yes, sir.

12   Q.  Most ovens are either 30 or 36 inches in length.  Was his

13   bigger than that?

14           THE COURT:  Are you testifying, Mr. Baum?

15           MR. BAUM:  No.  I withdraw that, Judge.  I will

16   rephrase.

17   Q.  Isn't it a fact that standard oven is 30 or 36 inches in

18   length?

19           MS. WAXMAN:  Objection.

20           THE COURT:  Overruled.

21   Q.  Do you know that?

22   A.  I don't know the size of ovens.  No, sir.

23   Q.  Do you have an oven in your house?

24           MS. WAXMAN:  Objection.

25           THE COURT:  Overruled.

D2r6val4                         Walsh - cross

1    A.  I do, sir.

2    Q.  What size is it?

3    A.  I honestly have never measured it, sir.

4    Q.  Do you know if the oven in Mr. Valle's house was larger

5    than 36 inches?

6    A.  I didn't measure it, sir.

7    Q.  Did the FBI seize the oven as evidence?

8    A.  No, it did not, sir.

9    Q.  Did you find any body parts or bodies anywhere attributable

10   to Mr. Valle?

11   A.  Thankfully, no.

12   Q.  Thankfully, no.

13        Now, did you find whether Mr. Valle had a house in

14   upstate New York?

15   A.  We're not aware of any houses that Mr. Valle had in upstate

16   New York.

17   Q.  I assume the FBI looked for a house in upstate New York,

18   correct?

19   A.  Yes, sir.

20   Q.  And there is no house in upstate New York?

21   A.  There may be, sir, but not one that we attributed to

22   Mr. Valle.

23   Q.  You mean there may be one, but the FBI with the hundreds of

24   thousands of agents couldn't find it, is that what you are

25   saying?

D2r6val4                          Walsh – cross

1           MS. WAXMAN:  Objection.

2           THE COURT:  Sustained.

3   Q.  Did you determine whether Mr. Valle ever traveled out of

4   the country in 2012?

5   A.  No, sir.  I did not.

6   Q.  He did not, right?

7           Are you aware of the apartment building that Mr. Valle

8   lived in?

9   A.  Yes, sir.

10  Q.  How many floors in that building?

11  A.  I don't recall exactly, sir, but not many.

12  Q.  Would it be six floors?

13  A.  It could have been, sir.  I wasn't counting floors.

14  Q.  Do you know how many apartments on each floor?

15  A.  I do not know, sir.

16  Q.  Do you know how many people lived in the building?

17  A.  No, sir.  I do not.

18  Q.  Do you know if that building has a common basement?

19  A.  I believe it does, sir.

20  Q.  Do you know if the laundry room is in there?

21  A.  I do not, sir.

22  Q.  Do you know if people go in the basement who live in that

23  building?

24  A.  I do not, sir.

25  Q.  Do you know if a camera was recovered from Mr. Valle's

D2r6val4                          Walsh - cross

1    apartment?

2    A.  I believe there was.

3    Q.  Do you know if a camera contained any pictures of women

4    involved in this case?

5    A.  Not to my knowledge, no, sir.

6    Q.  Do you know whether Mr. Valle has a car?

7    A.  I believe he does, sir.

8    Q.  Now, there is mention in the chats with Mr. Valle having a

9    van.  Do you recall that?

10   A.  Yes, sir.

11   Q.  Mr. Valle doesn't have a van, does he?

12   A.  Not to my knowledge.

13   Q.  In one of the chats at least is there discussion where

14   Mr. Valle and MHal says that he is going to put a body in the

15   trunk of his car?

16   A.  Yes, sir.  I believe there is.

17   Q.  Now, the FBI must have searched the trunk of Mr. Valle's

18   car, right?

19   A.  No, sir.

20   Q.  You didn't search for DNA in the trunk?

21   A.  No, sir.

22   Q.  You didn't search to determine if there had ever been a

23   body in that trunk?

24   A.  No, sir.

25   Q.  Now, after the complaint that his wife made to the FBI in

D2r6val4                          Walsh – cross

1    September 21st how long elapsed until Mr. Valle was arrested?

2    A.  He was arrested I think on the 24th of October, sir.

3    Q.  So that would be a little over a month, right?

4    A.  Yes, sir.

5    Q.  The FBI must have had some sort of surveillance on

6    Mr. Valle, correct?

7    A.  We did not, sir.

8    Q.  Were you following him in any way?

9    A.  I was not.  No, sir.

10   Q.  Do you know whether in that month he did anything illegal?

11   A.  I do not, sir.

12   Q.  Now, the 89 folders that you said were in Mr. Valle's file,

13   they were Facebook pictures, right?

14   A.  A lot of them were, sir.

15   Q.  And in those folders that had the pictures, there was no

16   identifying information, was there?

17   A.  In the folders, no, sir.

18   Q.  Now, I would like you to go to Defense Exhibit E3, which is

19   a chat between MHal52 and Valerie bear.

20             MR. BAUM:  Ms. Katz, can you put page 1 of E3 on the

21   screen?

22             Judge, may we have a moment?  There is a technical

23   glitch.

24             THE COURT:  Sure.

25   BY MR. BAUM:

D2r6val4                        Walsh - cross

1    Q.   Now, what does this represent, this first page?

2    A.   This appears to be a chat between Valerie Baird and MHal52.

3    Q.   I believe you testified that you believed MHal52 to be

4    Gilberto Valle, correct?

5    A.   Yes, sir.

6    Q.   What is the date of this chat?

7    A.   February 7th, 2012.

8    Q.   Now, I would like you to look down at the bottom of the

9    page starting with 82150.

10            MR. BAUM:  Can you show that, Ms. Katz, please?

11   Q.   Now, Ms. Baird says, So can you sell a slave like that?

12            And MHal says, Yeah.

13            And Ms. Baird says, I mean for real?

14            And MHal says, No, I am just talking fantasy.

15            Baird, smiles.

16            MHal, No, matter what I say, it's make believe.

17            Baird, Okay.

18            Was this one of the chats that you found to be

19   fantasy?

20   A.   Yes, sir.

21            MR. BAUM:  Can we go to page 2, Ms. Katz?

22   Q.   Can you read starting at the top down to 82710?

23   A.   From the top, sir?

24   Q.   Yes, please.  Down to 82710.

25   A.   MHal52, I just like to get a little dirty with the ideas.

D2r6val4                          Walsh - cross

1           Valerie, Just so you know that reality occurs.

2           MHal52, Okay.  I just have a world in my mind and that

3    world I am kidnapping women and selling them to people

4    interested in buying them.

5           Valerie, I understand.  That world isn't too far off

6    you have to understand.

7           MHal52, I got you.

8           Valerie, Does that bother you?

9           MHal52, Yeah.  I wish women wouldn't have to go

10   through that.

11   Q.  And then the next line?

12   A.  Valerie, I know.

13   Q.  This was a chat that you found to be fantasy, correct?

14   A.  Yes, sir.

15   Q.  And is it fair to say you found them to be fantasy at least

16   in part because MHal said that I have a world in my mind and in

17   that world I am kidnapping women and selling them to people

18   interested in buying them; is that part of the reason you found

19   this to be fantasy?

20   A.  Part of it, sir.

21   Q.  Now, could you go down to 83204 and can you read that line,

22   please?

23   A.  MHal52, In my fantasies the girls don't experience happy

24   endings.

25   Q.  Following that can you read to the end of the page?

D2r6val4                              Walsh - cross

1   A.  Valerie, Usually in reality they don't either.

2             MHal52, You mean death?

3             Valerie, Happens.  Can you imagine branding a slave?

4             MHal52, Yeah, I can.

5             Valerie, But not for real?

6             MHal52, No.  I can also imagine butchering and cooking

7   a girl.

8             Valerie, Nods.

9   Q.  So in this chat so far, Mr. Valle was talking about having

10  women as slaves and cooking a girl, correct?

11  A.  Yes, sir.

12  Q.  But this is fantasy, isn't it?

13  A.  It appears to be.

14  Q.  It is a fantasy role-play, isn't it?

15  A.  It appears to be.

16            MR. BAUM:  Can you go to the next page, Ms. Katz, page

17  3?

18  Q.  Can you read, Agent, starting at 83721?

19            MR. BAUM:  Can you highlight that, Ms. Katz, 83721 for

20  a few lines, about four or five lines.

21  Q.  Can you read 82731?

22  A.  Eight --

23  Q.  Where it says, Go ahead and ask...

24  A.  Valerie, Go ahead and ask.  I can tell you are full of

25  questions.

D2r6val4                        Walsh - cross

1              MHal52, Well, the cannibalism really fascinates me.

2              Valerie, Can you actually eat in reality if you had

3      the chance?

4              MHal52, Yes.

5      Q.   Okay.  That's enough.

6              Now, there is a reference to cannibalism, correct?

7      A.   Correct.

8      Q.   And this is a fantasy chat, isn't it?

9      A.   It could be, sir.

10     Q.   No.  No.  You determined it was?

11             MS. WAXMAN:  Objection.

12             THE COURT:  Overruled.

13             You need to pose questions, Mr. Baum.

14             MR. BAUM:  Yes.  Excuse me.

15     Q.   Didn't you and perhaps 10 other people in law enforcement

16     determine this was a fantasy chat?

17     A.   I don't agree with that, sir.

18     Q.   Well, you testified from the very beginning that this chat

19     was fantasy, didn't you?

20     A.   I said that it appears to be, sir.

21     Q.   No.  No.  Was there a determination that this was one of

22     the 21 of 24 participants who were engaged in fantasy?

23     A.   Sir, I said we focused on three, but the other 21 could

24     have been, but we didn't focus on them.

25     Q.   No, Agent.  You testified that you found 21 of 24

D2r6val4                         Walsh - cross

1    participants to have engaged in fantasy role-playing, didn't

2    you?

3              MS. WAXMAN:  Objection.

4              THE COURT:  Overruled.

5    A.  Can you repose the question, sir?

6    Q.  Of course.

7              MR. BAUM:  Can the reporter please read it back?

8              (Record read)

9    Q.  21 of 24 participants you testified you found and you

10   testified so did perhaps eight to 10 other people engaged in a

11   fantasy role-play, isn't that what you testified to?

12   A.  I did, sir.

13   Q.  This was one of the fantasy role-plays, wasn't it?

14   A.  It appears to be, sir, yes.

15   Q.  You keep saying it appear to be.  You believed it was?

16   A.  Sir, I can't say with 100 percent certainty.

17   Q.  Of course you can't.  Just like you can't say with

18   100 percent certainty that the ones you believe are real are

19   real?

20             MS. WAXMAN:  Objection.

21             THE COURT:  Sustained.

22   Q.  Well, isn't it a fact that you can't say with 100 percent

23   certainty that the three you picked out are real?

24   A.  I believe they are, sir.

25   Q.  Oh, and this one you believe is fantasy or not fantasy?

D2r6val4                          Walsh – cross

1    A.  Yes, sir, I believe it is fantasy.

2    Q.  So there is a discussion about cannibalism in this one,

3    isn't there?

4    A.  There was in the previous page.  Yes, sir.

5    Q.  And there was a discussion in which someone said, Could you

6    actually eat in reality if you had a chance, and MHal52 said,

7    Yes, wasn't there in this fantasy?

8    A.  Yes, sir.  On the last page.

9    Q.  Fantasy.

10             Now, can you look at Defendant's Exhibit E6, please?

11   A.  Yes, sir.

12             MR. BAUM:  Let's look at the page 2, Ms. Katz.

13             MS. WAXMAN:  Your Honor, we object to this.  Can we

14   have a side bar, please?

15             THE COURT:  Yes.

16             MS. WAXMAN:  Thank you.

17             (Continued on next page)

18

19

20

21

22

23

24

25

D2r6val4                              Walsh - cross

1          (At the side bar)

2          MR. JACKSON:  So, your Honor, there are two basis for

3     our objection to this line of questioning.  One, we think it is

4     irrelevant.  Mr. Baum is asking questions about the details of

5     specific conversations with a number of individuals who are not

6     identified as targets of the conspiracy.  We don't think that

7     is relevant.

8          Two, there is no cross-examination in this.  Agent

9     Walsh has already testified that he separated out a number of

10    e-mails he thought were not relevant to the investigation.  His

11    testimony is the ones he was focused on.  Now we're going

12    through the process of reviewing a bunch of other e-mails.

13    This also brings into question the 611 --

14         THE COURT:  Well, on the 611(b) issue you had agreed

15    that for law enforcement agent you would raise no 611(b)

16    objection.  We talked about that before the trial began.  Am I

17    correct about that?

18         MR. JACKSON:  I think it is the opposite.  We said we

19    raised no 611(b).

20         MR. BAUM:  Judge.

21         THE COURT:  Let him finish.

22         MR. JACKSON:  My issue is it appears that at this

23    point what they are attempting to do with Agent Walsh is simply

24    review a bunch of chats that they think are relevant to

25    Mr. Valle's mindset.  If they would like to call a witness who

D2r6val4                         Walsh - cross

1    can authenticate a number of these chats and the Court believes

2    they are relevant, they are entitled to that.  But this is not

3    really cross-examination.

4            THE COURT:  Well, what I think they are doing is the

5    agent has testified that he divided the chats into ones that he

6    believed were real and ones that he believed were fantasy.

7    That was elicited on his direct examination.  So I don't know

8    how I can preclude the defense from exploring whether that

9    division is rational or not.  That is the way you set it up.

10           MR. BAUM:  Uh-huh.

11           THE COURT:  Mr. Baum, I am not seeking your approval.

12           MR. BAUM:  I am sorry.  You did take the words out of

13   my mouth.

14           THE COURT:  That is the problem.  It was set up that

15   way.  The paradigm that was set up by the government was, okay,

16   there were thousands of chats, we reviewed them, we plucked out

17   the ones that we thought were real and we discarded the ones

18   that were fantasy and now they are seeking to explore whether

19   that division makes any sense.  And of course there are larger

20   points that everything that took place on this site is fantasy

21   and the more examples you have I suppose of Mr. Valle engaged

22   in fantasy, admittedly fantasy chats, increases the possibility

23   that the chats that the government contends are real are

24   actually fantasy.

25           Now, that is one of the reasons why I asked Mr. Baum

D2r6val4                      Walsh - cross

1    whether he was introducing the chats for their truth.  As I

2    suspected he was not.  He is merely introducing them for the

3    fact that it goes to the agent's credibility in terms of making

4    a division between real fantasy.  The situation we have is

5    because the testimony on direct was that, I reviewed these and

6    I made a determination of what was real and what was fantasy

7    his credibility on that issue is very much centrally before the

8    jury.

9            So is there anything you want to say, Mr. Baum?

10           MR. BAUM:  No.  I have nothing to add.

11           THE COURT:  Do you understand the basis?

12           MR. JACKSON:  I absolutely understand the Court's

13   rationale.

14           The only addition thing I would say the Court's

15   rationale makes sense, but I would note that we may object to

16   certain questions because I think some of Mr. Baum's questions

17   are not really going to that issue.  I think a valid inquiry,

18   but I think that every one of the questions appear to attempt

19   to hide the aspects of the chats that don't go to the real

20   question that the Court has identified as a valid question.

21           THE COURT:  I would ask you to keep that in mind,

22   Mr. Baum.

23           MR. BAUM:  I will, Judge.

24           THE COURT:  In particular I would be concerned if the

25   questioning veered into this being offer for its truth and

D2r6val4                          Walsh – cross

1    essentially Mr. Baum's offense being put in without Mr. Valle

2    being called to testify.  So I am concerned about that.

3              MR. BAUM:  Okay.  I will try.

4              THE COURT:  That is not the reason that I believe you

5    were introducing these.

6              MR. BAUM:  It is not the reason.

7              THE COURT:  Okay.

8              MR. BAUM:  Just to clarify, what I am going to try to

9    do with these chats as you said is point out that they have

10   aspects that are identical or similar to what is in the ones

11   that identfed as real chats.

12             THE COURT:  I understand.

13             MR. BAUM:  Okay.

14             MR. JACKSON:  Thank you, your Honor.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1              (In open court)

 2              MR. BAUM:  May I proceed?

 3              THE COURT:  Yes.

 4              MR. BAUM:  Thank you.

 5         May I please put up page 2 of Defense E6.

 6         Can you focus on 9:48:07 through 9:51:58.

 7    BY MR. BAUM:

 8    Q.  Now would you take a look at those lines 9:48:07 through

 9    9:51:58, Agent, please?

10    A.  Yes.

11    Q.  Do you see them?

12    A.  Yes, sir.

13    Q.  And those lines, there is a discussion between Mhal and

14    Jackcrow2 about barbecue, in which women would be barbecued, is

15    that correct?

16    A.  It appears that way, yes.

17    Q.  Wasn't that one of the points that was raised in the real

18    chats, women being barbecued?

19    A.  Yes.

20              MR. BAUM:  Now, Ms. Katz can you go down to 9:55:32

21    through the end of the page.

22    Q.  Now, in those lines 9:55:32 through the end of the page

23    there are a number of women mentioned there, right?

24    A.  Yes.

25    Q.  There's Allison, Danielle, Andria, Caitlin, Erika, Abby,

D2RUVAL5                          Walsh – cross

1   Sarah -- are those the names mentioned.

2   A.  Yes, sir.

3   Q.  And one of the names mentioned is Andria, correct?

4   A.  Yes.

5   Q.  In fact, wasn't Andria one of the women named as a subject

6   or target in the real chats?

7   A.  Yes.

8   Q.  Do you see where Mhal says, the third line from the bottom:

9   "Very nice selections, but Caitlin and Abby are already dead"?

10  Do you see that?

11  A.  Yes, sir.

12  Q.  In fact, no women that you could determine were dead?

13  A.  Of the women that we identified, that's correct, sir.

14          MR. BAUM:  Can you turn to page 3, Ms. Katz.

15  Q.  Now, this is a chat on February 24, 2012 at 10:19, is that

16  correct, Agent?

17  A.  Yes, sir.

18          MR. BAUM:  Can you highlight, Ms. Katz, line

19  10:10:01 -- excuse me -- line 10:08:38 through line 10:10:54.

20  Q.  Now, in those lines there's a discussion between Mhal and

21  Jackcrow about women that they may want to cook and there's a

22  discussion about the price, is that correct?

23  A.  Yes, sir.

24  Q.  And Jackcrow says on line 10:10:01:  "Sweet.  How much for

25  all of them?"

1          And Mhal responds:  "In determining prices, I factor

2     in the degree of difficulty in kidnapping the girl."  Do you

3     see that?

4     A.  Yes, sir.

5     Q.  Isn't that a negotiation which in fact appeared in the

6     chats or emails with Mike Vanhise?

7     A.  The negotiation, yes, sir.

8     Q.  So here in the fantasy email, you also have a negotiation

9     for a price for women to be kidnapped which also appeared in

10    the real -- the ones you termed the real chats, correct?

11    A.  In the Mike Vanhise conversation, yes, sir --

12    Q.  That's what I said.

13          MR. BAUM:  Can you highlight line 10:15:59, Ms. Katz.

14    Q.  Now, in this line, Mhal writes:  "For Allison and Danielle

15    $5,000."  Do you see that?

16    A.  Yes, sir.

17    Q.  In what you have termed to be the real role play or the

18    real chats with Mike Vanhise, there was a negotiation for

19    $5,000, wasn't there?

20    A.  Yes, sir.

21    Q.  But this is a fantasy chat, isn't it?

22    A.  Yes, sir.

23          MR. BAUM:  Can you turn to page 5 which is the

24    conversation, Ms. Katz, on February 27, 2012.

25    Q.  Now, starting with the second line, Mhal writes:  I

D2RUVAL5                          Walsh - cross

1   actually got off the phone with Andria a little while ago and

2   continues, so that motivated me to plaster her on DFN."  Do you

3   see that?

4   A.  Yes, sir.

5   Q.  On the ones that you termed real chats, in fact there was a

6   discussion about Andria, right?

7   A.  Yes.

8   Q.  In fact in the real chats -- just like in the fantasy role

9   play -- Andria's picture was posted, correct, on DFN?

10  A.  Yes.

11  Q.  Now, would you look down at 6:42:12 to 6:44:24.  Now,

12  Jackcrow says:  "I'm still wanting to help you with her."  Do

13  you see that?

14  A.  Yes, sir.

15  Q.  In fact, in the real chats, there are occasions when

16  Mr. Valle is alleged to have said, I need help with this,

17  correct?

18  A.  Yes, sir.

19          MS. WAXMAN:  Objection.

20          THE COURT:  What grounds?

21          MS. WAXMAN:  Your Honor, I think that these questions

22  are not an accurate representation of what the agent testified

23  to.

24          THE COURT:  This is cross-examination.  He is welcome

25  to say that.

D2RUVAL5                        Walsh - cross

1           Overruled.

2     Q.  So in the fantasy chats there is a discussion about someone

3     helping him and in the real chats there was a similar

4     discussion, correct?

5           THE COURT:  That is not clear, Mr. Baum.

6     Q.  In the fantasy chats there is a discussion in which someone

7     offers to help him with Andria, correct, in this fantasy chat?

8     A.  Right here, yes, sir.

9     Q.  And in the real chats at some point -- that you have termed

10    to be the real chats -- wasn't there also a discussion where

11    either Ali Khan or Moody Blues offered to help Mr. Valle with

12    Andria?

13    A.  Yes, sir.

14    Q.  Now, on line 6:43:55, Mhal says:  "I have been researching

15    bondage positions."  And then he goes on to say:  "There is one

16    that I want to try on her, her arms are spread eagle on the bed

17    and then her legs are raised up, pushed up all the way back

18    toward her arms and taped to her arms."

19           Now, in what you have described in the real chats,

20    wasn't there discussions about tying up women in that fashion?

21    A.  If I had all of these conversations in front of me, so I

22    don't know if it is the exact same way.

23    Q.  I am not asking you if it is the exact same way.  In the

24    conversations that you read on direct examination, weren't

25    there conversations in what you termed to be the real chats

1    that involved tying up women and spreading them out spread

2    eagle?

3    A.  Yes.  There were discussions about tying up women.

4           MR. BAUM:  Can you highlight the last three lines of

5    that page, Ms. Katz?

6    Q.  Now in these lines, the fantasy role play, there is a

7    discussion about butchering a woman and that Mhal saying:  "I

8    love the thought of her spending her last moments on earth

9    being cooked alive."  Isn't that similar to statements in what

10   Mhal made in what you described as the real chat?

11   A.  Similar, yes, sir.

12          MR. BAUM:  Can you go to the next page, conversation

13   of February 27 which is a continuation.

14   Q.  Now, in the first two lines Mhal said:  But really she is

15   not -- referring to the butchering, correct?

16          Can you read it from the prior page, the butchering

17   and being cooked alive?

18   A.  Yes, sir.

19   Q.  But he says:  "Really she is not.  It is just for my

20   entertainment and her suffering."  Do you see that?

21   A.  Yes, sir.

22   Q.  Now, what you described as the real chats, weren't there

23   portions where Mhal said that the cooking was so that women

24   would suffer?

25   A.  Yes.  There were similar conversations.

1    Q.  Would go down to line 6:53:27, and the three lines and two

2    lines after that.  Now, here, Jackcrow says:  "Then we torture

3    her beyond belief."

4            And Mhal says:  "Yeah, some waterboarding would be in

5    order."

6            And Jackcrow says:  "Oh, yes."

7            Isn't it a fact that Mr. Valle in what you described

8    as the real chats also said that he wanted to do waterboarding

9    to someone?

10   A.  I don't recall that particular conversation.

11           MR. BAUM:  Ms. Katz can you take that down, please.

12           Ms. Chen, can you put up Government Exhibit 415,

13   please.  Can you highlight for us line 4:50:15.

14   Q.  Do you see what Mhal says in that chat?

15   A.  I do, sir.

16   Q.  What does he say?  Doesn't say:  "I might waterboard her

17   too"?

18   A.  Yes, sir, he does.

19   Q.  Isn't that the exact word, the exact word that he used in

20   his fantasy role play?

21   A.  Yes, sir, the exact word.

22           MR. BAUM:  Could you go to the heading, Ms. Chen,

23   please.

24   Q.  Now, in this chat, it was a chat with Moody Blues, correct?

25   A.  Yes, sir.

 1   Q.  In which he used the term "waterboarding," right?

 2   A.  Yes, sir.

 3   Q.  And that was a chat that you believed was real?

 4   A.  Yes.

 5   Q.  The date of this chat is, I believe, September 8th,

 6   correct?

 7   A.  Yes, sir.

 8           MR. BAUM:  Ms. Katz, I apologize for going back and

 9   forth.  Could we go back to page 6 of Defendant Exhibit E6.

10   And get a full page, please.

11   Q.  So the Moody Blues chat was September 8th and the

12   waterboarding reference was to Andria; this chat is February

13   27, well in advance of that one, isn't that right?

14   A.  Yes, sir.

15           MR. BAUM:  Can we go down, Ms. Katz, and highlight

16   lines 7:01:51 to the rest of the page.

17   Q.  Now, in this fantasy chat, Mhal says:  "I have to figure

18   out a way to just grab her from her house.  It would be easier.

19   I need to stake it out and find out when the husband leaves."

20           Now, isn't that similar words that were used in the

21   chats that you described as real?

22   A.  Similar, yes, sir.

23           MR. BAUM:  Can we go to page 8, Ms. Katz.  Can you

24   highlight from the top down to about line 7:36:07, including

25   that line.  Thank you.

D2RUVAL5                         Walsh - cross

1    Q.  Now, in this fantasy chat there is a discussion about a

2    chain and pulley system, do you see that?

3    A.  Yes, sir, I do.

4    Q.  Isn't it a fact that in the chats you described as real,

5    there was a discussion about a chain and pulley system?

6    A.  I believe there was, sir.

7    Q.  Can you see line 7:33:35, there's a reference and that

8    reference is to Andria, correct?

9    A.  Yes, sir.

10   Q.  And that was one of your factors in determining whether a

11   chat is fantasy or real, wasn't it?

12   A.  One of the factors, yes.

13   Q.  And Andria is a real person, right?

14   A.  She is, sir.

15   Q.  And Andria was mentioned prominently in the chats that you

16   described as real, wasn't she?

17   A.  She was, sir.

18   Q.  And here she is in a fantasy chat in February 2012,

19   correct?

20   A.  It appears that way.

21            MR. BAUM:  Could you go to, I believe, the next page,

22   Ms. Katz.  Can you highlight line 7:50:51 -- excuse me.  Wait

23   one second.  Yes, can you highlight line 7:51:46.

24   Q.  Now, in this fantasy chat there is a discussion about using

25   the feet of a victim for soup, isn't there?

D2RUVAL5                    Walsh - cross

1   A.  Yes, sir.

2   Q.  Isn't it a fact that that description of using feet as an

3   edible form of soup or as soup was used in the chats that you

4   described as real?

5   A.  There was, sir.

6          MR. BAUM:  Can you go to page 14, please, Ms. Katz.

7   Can you highlight from the beginning of the conversation -- one

8   second.

9   Q.  Do you see a chat, April 29, 2012, Agent, at 2:57:44?

10  A.  Yes, sir.

11         MR. BAUM:  Can you highlight, Ms. Katz, from the first

12  line down to including line 2:49:01.

13  Q.  Take a look at those lines, Agent.  Do you see that in this

14  fantasy role play chat, Mhal is saying:  "The other day I

15  visited my old high school and I was talking to one of the

16  teachers and a student walked in, the most desirable piece of

17  meat I have ever met and I was able to track down her Facebook.

18  Awesome.  She is 18 years old.  Kristen.  And she is absolutely

19  delicious."  Do you see that?

20  A.  I do, sir.

21  Q.  Hasn't you identified Kristen as an 18 year-old high school

22  student?

23  A.  Yes, sir.

24  Q.  And wasn't Kristen an 18 year-old high school student

25  referred to in virtually the same manner in one of the chats

1   that you said was real?

2   A.  She was.

3   Q.  But this chat is fantasy, right?

4   A.  Yes, sir.

5        MR. BAUM:  On the bottom can you highlight the last

6   four lines.

7   Q.  There is an additional statement by Mhal -- she plays on

8   the softball team.  Didn't Kristen play on the softball team?

9   A.  She does.

10  Q.  And Mhal says, I will follow her home one day, correct?

11  A.  He does.

12  Q.  Aren't they virtually identical words in the chats that you

13  said are real?

14  A.  Similar.

15  Q.  So you have virtually the same person identified -- a real

16  person, clearly identified in the chats you described as

17  fantasy and the chats you described as real, right?

18  A.  Yes.

19       MR. BAUM:  Can you turn, Ms. Katz, to Exhibit E13,

20  please -- page 1.  I'm sorry.

21  Q.  Now, what is the subject of this chat -- it is an email,

22  isn't it?

23  A.  Yes, sir, it is.

24  Q.  What is the subject?

25  A.  4th of July menu.

D2RUVAL5                        Walsh - cross

1    Q.  This email included photographs, correct?

2    A.  That's correct.  Attachments at the bottom.

3    Q.  And the photographs were of different women, correct?

4    A.  Yes.

5    Q.  And the title of the email is the 4th of July Menu, right?

6    A.  The subject, yes, sir.

7    Q.  I'm sorry.  Can you read the names of the women who are

8    identified in this email?

9    A.  Clarissa, Kristen C., Kristen B., Sylvia, Cecelia,

10   Kathleen.

11   Q.  Now, Kathleen under picture number 6, she is described as

12   26 years old, correct, married, and has a baby daughter, right?

13   A.  Yes, sir.

14   Q.  Now, this fantasy email, do you know who that Kathleen is?

15   A.  I believe it's his wife, sir.

16   Q.  So here you have photos sent out of people who are

17   supposedly targets, put on a menu and this is a fantasy chat,

18   isn't it, a fantasy email?

19   A.  It appears that way, yes, sir.

20   Q.  Isn't it a fact that in your direct examination, you

21   identified a number of photographs -- of real women, some of

22   them right here in this fantasy email -- who were involved in

23   what you have described to be real chats?

24   A.  Yes, sir.

25   Q.  Isn't it a fact that in your direct examination, when you

D2RUVAL5                         Walsh - cross

1    were talking about the real chats, you also talked about these

2    women being part of a menu to be eaten, do you recall that?

3    A.  Yes, sir.

4           MR. BAUM:  Can you, Ms. Katz, go to Defendant Exhibit

5    E4, page 3.

6    Q.  This is another fantasy chat, correct?

7    A.  Yes, sir.

8    Q.  And this is between Mhal and Brenda Falcon, correct?

9    A.  Yes, sir.

10          MR. BAUM:  Can you highlight the first six or seven

11   lines of this chat, please, Ms. Katz.

12   Q.  Now, starting on the first line, there is a reference by

13   Mhal:  I would like to get my hands on a stun gun."  Do you see

14   that?

15   A.  I do, sir.

16   Q.  In fact wasn't a similar reference made in one of the chats

17   you described as real, a reference to a stun gun?

18   A.  Yes, sir.  I believe he said he was able to get his hands

19   on a stun gun.

20   Q.  And then in the lines following, there is a discussion

21   about skinning her, showing up unexpectedly, knocking her out,

22   tying up her hands raping her, abusing her -- plenty of rape

23   and suffering, do you see that?

24   A.  I do, sir.

25   Q.  Aren't they similar thoughts and words that were used in

D2RUVAL5                          Walsh – cross

1    the chats that you described as real chats?

2    A.  Similar, yes, sir.

3           MR. BAUM:  Ms. Katz, can you highlight 9:24:20 to the

4    end of the page.

5    Q.  In this fantasy role play, Mhal says:  I've been obsessed

6    with her for six years.  It's personal with her."  Do you see

7    that?

8    A.  I do.

9    Q.  Isn't that identical to a statement that was made in one of

10   the chats that you described as real?

11   A.  It is similar, sir, but I believe that the date was longer,

12   I believe it was the eight --

13   Q.  Right.  In the one that you described, Mhal said eight

14   years, right?

15   A.  Yes, sir.

16   Q.  But he also said, I've been obsessed with her, correct?

17   A.  Yes, sir.  He --

18   Q.  He also said it is personal with her?

19   A.  Yes, sir, he did.

20   Q.  He also said that she is going to suffer, correct?

21   A.  I believe he said that, sir.

22   Q.  He also said a few lines down that she had moved away for

23   law school, correct?

24   A.  Yes, sir.

25   Q.  And do you know who that person is that he is talking

D2RUVAL5                        Walsh – cross

1    about?

2    A.  I do, sir.

3    Q.  Isn't it Andria?

4    A.  Yes, sir, it is.

5    Q.  So now you have another fantasy chat in which a real person

6    is being discussed with identical language that was in one of

7    the chats that you described as real, correct?

8    A.  Yes, sir.

9            MR. BAUM:  In fact, could you go to the next page,

10   Ms. Katz, page 4.  Just so that there is no mistake, can you

11   highlight the first three lines, Ms. Katz.

12   Q.  Just so that there is no mistake, Mhal is talking about

13   Andria, right?

14   A.  Yes, sir.

15           MR. BAUM:  Can you highlight the caption at the top,

16   Ms. Katz.

17   Q.  Now, this is a discussion that took place on February 9,

18   2012, isn't it?

19   A.  Yes, sir.

20           MR. BAUM:  Could you go to page 6 of this exhibit,

21   Ms. Katz.

22   Q.  Now, there is a brief discussion, again, in a fantasy role

23   play on March 7, 2012?  Do you see that, Agent?

24   A.  I do, sir.

25   Q.  And in this one, Mhal is saying, I was just planning out

1   Andria's ordeal, is that correct?

2   A.  Yes, sir.

3   Q.  And in fact in what you described as the real chats, there

4   is similar language about planning out Andria's kidnapping,

5   correct?

6   A.  Yes, sir.

7           MR. BAUM:  Can you, Ms. Katz, go to defense E1,

8   please -- I'm sorry -- page 3.

9   Q.  Now, Agent Walsh, this is another fantasy chat with an

10  individual by the name of Tim Chase, isn't it?

11  A.  Yes, sir.

12  Q.  And this is a conversation on January 23, 2012, isn't it?

13  A.  Yes, sir.

14  Q.  In this conversation Mr. Valle is having a fantasy role

15  play about kidnapping someone for the 27th, do you see that?

16  A.  Yes, sir.

17          MR. BAUM:  Can you go down and highlight 5:27:35,

18  Ms. Katz, please.

19  Q.  And in this fantasy role play, there is also a discussion

20  about a price, right?

21  A.  Yes, sir.

22  Q.  And the discussion is about Mhal saying, I can lower it

23  down to $4,000, do you see that?

24  A.  I do, sir.

25  Q.  Wasn't there an identical negotiation with Mike Vanhise

D2RUVAL5                          Walsh - cross

1   about 4,000 versus 5,000 dollars?

2   A.  Similar, yes, sir.

3          MR. BAUM:  Could you go to page P11, please.

4   Q.  And this is, Agent, a conversation with Tim Chase on March

5   11, 2012.

6          MR. BAUM:  Now, Ms. Katz, can you highlight from line

7   4:33:21 down to 4:34:07, including that line.

8   Q.  Now, in this chat there is a discussion in which Mhal is

9   saying:  Sorry about Danielle.  She was riskier than I

10  originally thought.  Too many people around all hours of the

11  day."

12         And the answer is:  "That's cool.  No problem."  Do

13  you see that?

14  A.  I do, sir.

15  Q.  In this fantasy role play chat, Mr. Valle is saying, I

16  decided not to kidnap Danielle because it was too risky.  He

17  didn't want to get caught, do you see that?

18  A.  Yes, sir, I do.

19  Q.  In fact in what you have described as the real chats,

20  weren't there statements about the risk involved in kidnapping

21  and Mr. Valle saying I don't want to be caught?

22  A.  Yes, sir, there were.

23  Q.  So this factor, this element for your consideration is very

24  similar to what you found in the real chats?

25  A.  Yes, sir, it is similar.

D2RUVAL5                        Walsh - cross

1              MR. BAUM:  In fact, Ms. Katz, can you highlight 4:36,
2      I think it is 56 to the end of the page.
3      Q.  Now, in this part of the fantasy role play chat, Mhal is
4      discussing with Tim Chase various prices for women?  Do you see
5      that?
6      A.  I do, sir.
7      Q.  And he says that low risk results in low prices, correct?
8      A.  Yes, sir.
9      Q.  And he mentions Sally for 3500, Maureen for 4,000,
10     Christina, 5,000 -- Sally, Maureen and Christina are real
11     people?
12     A.  They are, sir.
13     Q.  He mentions Allison for 6,000, but he can get down to 5.
14     And then he mentions Christina for 4,000.  And then he says:
15     "That's all I have as far as low risk bargains."  Do you see
16     that?
17     A.  I do, sir.
18     Q.  Isn't this factor meaning bargaining over the cost of
19     kidnapped women very similar to what was found in Mike
20     Vanhise's chats which you deemed to be real?
21     A.  Similar, yes, sir.
22             MR. BAUM:  Could you turn to page 12, Ms. Katz,
23     please.  This is a chat on March 11 at 5 o'clock p.m.  Can you
24     highlight, Ms. Katz, lines 4:47 down to 4:49:15.
25     Q.  In this fantasy chat, there appears to be an agreement

1    between Mr. Valle and Tim Chase saying that Mr. Valle is going

2    to kidnap Sally.  Do you see that?

3    A.  I do, sir.

4    Q.  And Mr. Valle says:  I'll get to work watching her, but she

5    should be a cinch to grab."  Do you see that?

6    A.  I do, sir.

7    Q.  And the chats that you termed to be real, there was also an

8    agreement between the parties about someone Mr. Valle would

9    kidnap, wasn't there?

10   A.  There was also agreement, yes, sir.

11   Q.  In the chats you deemed to be real, just like here,

12   Mr. Valle said that I'll start watching her, right?

13   A.  In some of them he may have, yes, sir.

14   Q.  Just like in the role play chat.

15           MR. BAUM:  Can you turn to page 14 of the chats with

16   Tim Chase which is a chat on March 11, 2012 at 5:30:08.  Can

17   you highlight, say, the first half of the page down to 5:25:00.

18   Q.  In this fantasy role play chat, Mr. Valle says:  "There's a

19   good possibility that I'm going to do this this coming Friday."

20   Do you see that?

21   A.  Yes, sir.

22   Q.  In fact, in some of the chats you have identified as real

23   chats, he also said things like, I'm going to do this in two

24   days, correct?

25   A.  I don't recall that particular time frame, sir.

1    Q.  Now, in this one, there is a discussion at 5:21:41 where

2    Mr. Valle says:  "I will leave her clothes on, but I'm going to

3    tie her up barefoot in case she starts kicking and shit."  Do

4    you see that?

5    A.  I do, sir.

6    Q.  Wasn't there a conversation with Mike Vanhise when Mike

7    Vanhise said make sure she doesn't wear any shoes because she

8    could start kicking?  Do you recall that?

9    A.  I do, sir.

10   Q.  So here in the fantasy role play comes a scenario that was

11   very similar to the one in the Mike Vanhise discussion which

12   you termed to be real, right?

13   A.  Yes, sir.

14           MR. BAUM:  Could you turn to the next page, Ms. Katz,

15   please.  This is a very brief discussion on March 23 at

16   5:56:31.

17   Q.  Now, in this one, do you see Mhal saying:  "Sally is

18   sleeping right now for the last time in her bed.  Tomorrow she

19   is yours let me know if we are good to go and you've made your

20   preparations."  So here, Mr. Valle is supposedly saying that

21   tomorrow is the day that he is going to kidnap Sally, do you

22   see that?

23   A.  I do, sir.

24           MR. BAUM:  Can you go to page 17, Ms. Katz, which is a

25   conversation April 22 at 3:25.  Can you highlight the first

D2RUVAL5                        Walsh - cross

1    half of the page.

2    Q.  Now, in this part of the conversation, this fantasy role

3    play conversation with Tim Chase in reference to Sally, there's

4    a discussion in which Mr. Valle is alleged to have said, "Grab

5    Sally.  Are you ready for her?"  Do you see that?

6    A.  I do, sir.

7    Q.  He says that he had been watching her, do you see that?

8    A.  Yes, sir.

9    Q.  And isn't that similar to statements that were made by

10   Mr. Valle which you termed to be the real chats?

11   A.  There could be, sir, but I don't recall this specific

12   thing.

13          MR. BAUM:  Ms. Katz, can you highlight the one line

14   3:19:11.

15   Q.  Now Mhal says here:  "I will get her loaded up in the back

16   of my van."  Do you see that?

17   A.  I do, sir.

18   Q.  In fact in some of the chats that you described as real,

19   Mr. Valle is alleged to have said that he is going to kidnap

20   people and put them in his van, right?

21   A.  I don't recall that specific language, sir.

22   Q.  Well, he certainly -- I think you have already testified to

23   this -- said in some of the chats that he had a van -- in the

24   real chats, do you recall that?

25   A.  I believe he did, yes.

D2RUVAL5                         Walsh – cross

1   Q.   In fact you know he hasn't got a van, right?

2   A.   That's correct.

3              THE COURT:  Ladies and gentlemen, we will take our mid

4   afternoon break.

5              Don't discuss the case.

6              Keep an open mind.

7

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (Jury not present)

2                THE COURT:  How much longer do you expect to be,

3     Mr. Baum?

4                MR. BAUM:  On the fantasy chats, not that much longer,

5     but then I am going to the real chats.

6                THE COURT:  Will that take up the rest of the day?

7                MR. BAUM:  I do believe so.

8                THE COURT:  Don't look at that clock.

9                MR. BAUM:  That doesn't tell me anything.  I thought

10    we had a lot of time when I looked at it.

11               I think it is fair to say that we will go the rest of

12    the day.

13               THE COURT:  Take 10 minutes.

14               (Recess)

15

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

D2RUVAL5                          Walsh – cross

1              (Jury present)

2              THE COURT:  Mr. Baum, you made reference to Defendant

3    Exhibit E13 that was actually not offered by you.  Would you

4    like to offer it now.

5              MR. BAUM:  Yes.  I thought I did.  I apologize.

6              THE COURT:  Any objection to Defense Exhibit E13?

7              MS. WAXMAN:  No, your Honor.

8              THE COURT:  Then Defense Exhibit E 13 is received.

9              (Defendant Exhibit E13 received in evidence)

10             MR. BAUM:  Thank you, your Honor.

11   BY MR. BAUM:

12   Q.  Agent Walsh, if we may go back to the chats with Tim Chase,

13   which is E1.

14             MR. BAUM:  Page 17, Ms. Katz.

15             Now, Ms. Katz can you highlight 3:13:03 -- actually,

16   to put in context, can you highlight the top to that line.

17   Q.  Now, Agent Walsh, in line 3:13:03, Mhal says in reference

18   to Sally:  "She is knocked out right now, tied up in my

19   basement," correct?

20   A.  Yes, sir.

21   Q.  Sally is in fact Sally Kane, correct?

22   A.  I believe so, sir.

23   Q.  And Sally Kane is somebody that the FBI identified and

24   spoke to?

25   A.  We did.

D2RUVAL5                        Walsh - cross

1   Q.  Was Sally Kane ever kidnapped, locked up and tied up in any

2   basement?

3   A.  No, sir.

4           MR. BAUM:  Ms. Katz, can you go to Exhibit E10, page

5   1.

6   Q.  This is a fantasy chat between Mr. Valle and Meandharris,

7   is that correct, Agent Walsh?

8   A.  It appears so, yes, sir.

9           MR. BAUM:  Ms. Katz, can you highlight from around the

10  middle line 6:42:36 to the bottom of the page.

11  Q.  Starting at line 6:42:36, Agent.  There is a discussion in

12  which Mhal says -- he is asked how many have you done and Mhal

13  says, in my imagination.  And Mhal goes on to say "but none for

14  real, never for real, it is fun to chat and push the envelope."

15  Do you see that?

16  A.  I do, sir.

17  Q.  Was that one of the reasons that you determined that this

18  conversation with Meandharris was a fantasy role play?

19          MS. WAXMAN:  Objection.

20          THE COURT:  Overruled.

21  A.  Yes.

22  Q.  Then, do you see where Meandharris at line 6:43:47 asked

23  Mr. Valle:  "Would you do it is you had the chance," and

24  Mr. Valle says, "I don't think so."  Do you see that?

25  A.  I do, sir.

D2RUVAL5                          Walsh – cross

1   Q.  Was that another reason why you determined that this was a

2   fantasy role play?

3   A.  Yes, sir.

4

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2R6VAL6                      Walsh - cross

1            MR. BAUM:  Could you go to the next page, page 2, Ms.

2    Katz, which is a chat of April 22nd at 6:54?  Can you highlight

3    Line 64618, about the fourth line from the top?

4    Q.  Do you see at this point Mr. Valle says, If I were

5    absolutely 100 percent sure to get away with it, I think I

6    would think about it; do you see that?

7    A.  I do, sir.

8    Q.  In fact, in some of the chats you identified as real,

9    Mr. Valle also says if I thought I could get away with it, I

10   would do it.  Do you recall that?

11   A.  I do, sir.

12   Q.  Yet, this is a fantasy chat, correct?

13   A.  Correct, sir.

14           MR. BAUM:  Can you go to page 3, Ms. Katz?

15   Q.  Now, this is a chat again with Meand Harris, a fantasy

16   role-play on April 22nd at 7:03:10.  Do you see that?

17   A.  I do, sir.

18   Q.  Do you see that in this chat Mr. Valle says --

19           MR. BAUM:  Can you highlight line 6:55:45 and the next

20   line, Ms. Katz?

21   Q.  Mr. Valle says, I have a place up in the mountains.  No one

22   around for a half mile.  Do you see that?

23   A.  I do, sir.

24   Q.  This is what he says in a fantasy role-play, but isn't it a

25   fact that he said the same exact thing in one or more of the

1    chats you've identified as real chats?

2    A.  A similar thing, yes, sir.

3            MR. BAUM:  Can you highlight the last half of the

4    page, Ms. Katz?

5    Q.  Now, in this chat also isn't it a fact that Mr. Valle

6    identifies real people, Christina, Carissa and Kimberly, do you

7    see that, Agent Walsh?

8    A.  I do, sir.

9    Q.  Wasn't that one of the factors that you reviewed to

10    determine the difference between a fantasy and reality chat?

11    A.  I do, sir.

12    Q.  This one is fantasy and the real chats he mentions the same

13    women, correct?

14    A.  He does, sir.

15            MR. BAUM:  Can you go to page 7, Ms. Katz, please?

16    Q.  This is a chat on April 24th, a fantasy role-play with

17    Meand Harris.

18            MR. BAUM:  Can you highlight 17:24 and the next very

19    line, 17:24:03 and 17:24:23?

20    Q.  This is a conversation between Mr. Valle and Meand Harris

21    in which Ms. Harris says, There will be a lot of torture,

22    crucifixion and spitting.

23            The more suffering the better.

24            Now, in the chats you have identified as real, there

25    was also discussion about torturing and placing a woman on a

D2R6VAL6                        Walsh - cross

1    spit, correct?

2    A.   There was, sir.

3    Q.   In fact, the chats you described as real as opposed to this

4    fantasy role-play chat, Mr. Valle also said the more suffering

5    the better, correct?

6    A.   He did, sir.

7             MR. BAUM:   Can you turn to page 10, Ms. Katz.   This is

8    a chat on April 26th with Meand Harris at 5:55:37.   Can you

9    highlight for us, Ms. Katz, the bottom seven lines starting

10   with 5:54:32.

11   Q.   Now, in this fantasy role-play chat MHal52, Mr. Valle,

12   says, I spotted another potential victim today.   Very

13   desirable.   I went to visit my old high school and I was

14   speaking to a former teacher of mine and he introduced me to

15   one of the students.   She is 18 years old.

16             Do you see that?

17   A.   I do, sir.

18   Q.   Isn't that virtually identical language to one of the

19   fantasy role-play chats we just discussed?

20   A.   It is, sir.

21   Q.   And isn't that in reference to Kristen Ponticelli?

22   A.   I believe so, sir.

23   Q.   And isn't that a same reference that is made in one of the

24   chats you've described as real?

25   A.   I believe so, sir.

D2R6VAL6                     Walsh - cross

1        MR. BAUM:  Could you turn to page 16 please of Meand

2   Harris. April 25th, 2012 a chat at 7:08:12.  Can you highlight

3   the last five lines, please?

4   Q.  Now, in this chat Meand Harris asks Mr. Valle, Where are

5   you?  And Mr. Valle says, In New York.  And then he goes on.

6   Meand Harris says, Do you have a cellar in your country house.

7   And Mr. Valle says, A basement that I am working on.

8        Do you see that portion?

9   A.  I do, sir.

10  Q.  Isn't that in fact similar statements made by Mr. Valle in

11  what you described to be real chats?

12  A.  The basement part, yes.

13  Q.  That is what I meant.  And also a house in New York

14  somewhere?

15  A.  Yeah.  And the other chats, sir, he said a house in the

16  country.

17       MR. BAUM:  Can you go to page 23, please, Ms. Katz?

18  Can you highlight the first eight lines.

19  Q.  Now in this chat, which took place on July 17, he is still

20  talking to Meand Harris, correct?

21  A.  Yes, sir.

22  Q.  In this chat he reminds Meand Harris at 8:45:25 that we

23  chatted about kidnapping and eating a girl.

24       Do you see that?

25  A.  I do, sir.

D2R6VAL6                        Walsh - cross

1   Q.  In fact, this is a fantasy role-play chat, correct?

2   A.  I believe so, sir.

3   Q.  And in the real chats, what you've described as real chats,

4   he also chats about kidnapping and eating a girl, correct?

5   A.  He does, sir.

6           MR. BAUM:  Can you go to page 25, Ms. Katz.  Another

7   chat with Meand Harris on July 29.  Highlight the last three

8   lines.

9   Q.  Now, in this fantasy chat Mr. Valle says, And if you are

10  wondering, it is all fantasy.  I just enjoy pushing the

11  envelope a bit.

12          Do you see that?

13  A.  I do, sir.

14  Q.  Was that one of the reasons why you determined that this

15  was a fantasy chat?

16  A.  Yes, sir.

17  Q.  Now, wasn't it your testimony that in some of the chats

18  despite the fact that the person didn't announce a fantasy, you

19  still believed it was fantasy role-play, correct?

20  A.  In some of them it is a possibility, yes.

21  Q.  That is because you were employing the factors that you

22  discussed previously?

23  A.  Yes.

24  Q.  So would it be fair to say that if Mr. Valle were talking

25  about a bunch of things even though he didn't say this is

D2R6VAL6                          Walsh - cross

1  fantasy you know, I am just making this stuff up because I am

2  pushing the envelope, even if he didn't say that, it still

3  might be a fantasy chat, right?

4  A.   In some of those other conversations that we identified,

5  yes, sir.

6  Q.   Well, I am asking you generally using your criteria that

7  you articulated.  What I am saying is that even if Mr. Valle

8  did not announce that I am engaged in fantasy, based on the

9  criteria you have articulated it could still be a fantasy

10  role-play chat?

11  A.   I believe --

12         MS. WAXMAN:  Objection, your Honor.  I thought the

13  question was very confusing.

14         THE COURT:  Do you understand the question?

15         THE WITNESS:  If you can repeat it.  Yes, sir.

16  Q.   Okay.  You articulated a number of factors for determining

17  whether a chat is fantasy or real, right?

18  A.   Yes, sir.

19  Q.   One of the factors was that the person says, Hey, this is

20  fantasy and I am just pushing the envelope.  You know, I like

21  to talk about cannibalism and suffering.  That was one of the

22  factors?

23  A.   If they mention the actual word fantasy.

24  Q.   Right.  Now, didn't you also testify earlier that even if

25  that was not mentioned, it still might be fantasy, right?

1    A.  For those ones that we separated out, yes, sir.

2    Q.  No.  No.  I am not asking about the ones separated out.  I

3    am asking you if using the criteria that you've articulated

4    wasn't necessary to say in the chat this is fantasy for you to

5    find that it wasn't?

6    A.  It wasn't necessary, no, sir.

7    Q.  Okay.  That was my question.

8            MR. BAUM:  Can you go to Defense Exhibit E12, Ms. Katz

9    and Agent Walsh.  E12.

10   Q.  Now, this fantasy role-play conversation between Mr. Valle

11   and an individual by the name of Spin9970; correct?

12   A.  Yes, sir, it is.

13           MR. BAUM:  Ms. Katz, can you highlight lines 4:58:44

14   to 5:00:12.

15   Q.  Now, in this fantasy role-play Mr. Valle is again talking

16   about Andria, correct?

17   A.  Yes, sir.

18   Q.  Now, he says in this fantasy role-play, Andria has been my

19   primary target.  I have known her for seven years, right?

20   A.  He does, sir.

21   Q.  Now, in fact in one chat he said I've known her for eight

22   years.  Do you recall that?

23   A.  I do, sir.

24   Q.  In another chat he said, I've known her for six years,

25   correct?

1   A.  He did, sir.

2   Q.  Now, in this chat he says I've known her for seven years,

3   correct?

4   A.  He does, sir.

5   Q.  In here in this chat at the bottom he said, Yeah, I have to

6   watch her house for a while.  I don't know what her husband

7   does.  Isn't that a reference that was made in one of the chats

8   that you've described as real?

9   A.  The reference of her husband?

10   Q.  The reference of her husband and that he had been watching

11   the house because of the husband?

12   A.  He did refer to her husband and he did say that he would

13   have to watch the house, yes.

14          MR. BAUM:  Could you turn to page 3, Ms. Katz, May 16,

15   2012.  Can you highlight two lines 6:01:06 and 6:01:37.

16   Q.  Here there is a discussion about Andria being cooked and

17   MHal52 says, My mouth waters every time I think about it.

18          Do you recall his saying something, if not identical,

19   similar to that in a discussion about Andria being cooked in

20   one of your real chats?

21   A.  I do, sir.

22          MR. BAUM:  Ms. Katz, can you highlight three lines,

23   6:02:21 to 6:02:54?

24   Q.  Here on these three lines there is a discussion about

25   Mr. Valle and MHal52 working with someone else.  Do you see

1    that.

2    A.  Yes, sir.

3    Q.  Mr. Valle says, Great.  He would like to work with somebody

4    else.  Isn't that a similar reference made in the real chats

5    that you've discussed about Mr. Valle wanting to work with

6    other people?

7    A.  Yes.  He did discuss wanting to work with other people.

8    Q.  This chat is a fantasy role-play, isn't it?

9    A.  Yes, sir.

10           MR. BAUM:  Ms. Katz, can you turn to page 11?

11   Q.  Now, this again is a fantasy role-play chat between MHal52,

12   Mr. Valle, and Spin9979 on June 12th, 2012.

13           Do you see that?

14   A.  I do, sir.

15           MR. BAUM:  Ms. Katz, can you highlight line 6:26:06

16   and 6:26:15?

17   Q.  Now, in this fantasy role-play Mr. Valle says that he wants

18   to use chloroform during the plan of the kidnapping.  Do you

19   see that?

20   A.  I do, sir.

21   Q.  In fact, isn't that something that Mr. Valle said on

22   numerous occasions in the chats you've also described as real?

23   A.  He discussed chloroform, yes, sir.

24   Q.  And this is a fantasy role-play chat, isn't it?

25   A.  Yes, sir.

D2R6VAL6                          Walsh - cross

1      MR. BAUM:  Ms. Katz, can you go to Defense Exhibit

2   E11.  Can you go, please, to page 4?  Sorry, can you go to page

3   5, Ms. Katz?

4   Q.  Now, this is a fantasy role-play with another individual

5   and Mr. Valle, isn't that correct, Agent Walsh?

6   A.  Yes, sir.

7   Q.  In fact, this is a fantasy role-play with an individual by

8   the name of or the e-mail screen name of Gertrude H, is that

9   correct?

10  A.  Yes, sir.

11      MR. BAUM:  Can you go to line 7:27:24 and the two

12  lines under that, please, Ms. Katz?

13  Q.  Now, in this fantasy role-play Mr. Valle says, I will carry

14  the bag with the ropes and duct tape.  When you knock the young

15  one out, give me the mallet and I will take care of the other

16  one.

17      Now, isn't it a fact that that is a fantasy role-play?

18  A.  Yes, sir.

19  Q.  Do you remember the list that Mr. Valle had that was put

20  into evidence?

21  A.  The e-mail from, sir.

22  Q.  Yes.  In this list Mr. Valle included duct tape and rope.

23  Do you remember that?

24  A.  He did, sir.

25  Q.  So in this fantasy chat on May 1st he talked about using

D2R6VAL6                       Walsh – cross

1   duct tape and rope and that appears in what you've described as

2   his, I think, to-do list.  Do you recall that?

3   A.  Sir, are you referring to the blueprint?

4   Q.  Yes.  Do you recall that?

5   A.  Yes, sir.  He mentioned duct tape and rope.

6   Q.  And you believed that that blueprint was real?

7   A.  I do, sir.

8        MR. BAUM:  Can you turn to page 6, Ms. Katz?

9   Q.  This is a conversation on May 1st between MHal52 and

10  Gertrude H, which is a fantasy role-play.

11       MR. BAUM:  Can you highlight, Ms. Katz, line 7:42:54

12  and the next two lines?

13  Q.  Now, you see in this one MHal52 says, I am taking this

14  one's shoes off.  I don't want these heels kicking me when she

15  wakes up.  Do you see that?

16  A.  I do, sir.

17  Q.  Isn't it a fact in this fantasy role-playing reference to

18  taking the shoes off, it was the same kind of conversation that

19  he had with Mike Vanhise about taking the shoes off?

20  A.  Yes, sir, I recall this.

21       MR. BAUM:  Ms. Katz, can you go down to line 7:48:26

22  and the next four lines after that, three lines after that?

23  Q.  And in this fantasy role-play Mr. Valle is talking about

24  Andria Cordez, 26 years old and assistant district attorney.

25  In fact, that is Andria who has been identified as a real

1    person, right?

2    A.  That is not the correct last name but, yes, sir.

3    Q.  But doesn't that represent Andria Nobel?

4            MS. WAXMAN:  Objection, your Honor.

5    Q.  In your opinion does it represent Andria?

6            MS. WAXMAN:  Objection.

7            THE COURT:  Overruled.

8    A.  Andria Condez Nobel.  Yes, sir.

9    Q.  Yes.  Might the "R" be a typo?

10           MS. WAXMAN:  Objection.

11           THE COURT:  Sustained.

12   Q.  So in this fantasy role-play this is a reference to a real

13   person, correct?

14   A.  This particular person, I am not aware of Cordez.

15   Q.  You are not aware of Andria Cordez, but you are aware of

16   Andria, right?

17   A.  I am, sir.

18   Q.  And in using Andria Cordez, is it possible that Mr. Vanhise

19   didn't want to use the correct last name so he didn't identify

20   a real person?

21           MS. WAXMAN:  Objection.

22           THE COURT:  Sustained.

23           MR. BAUM:  I am sorry.  Mr. Valle.  The question was

24   Mr. Valle.  That is my only change, Judge.

25           THE COURT:  Right.  Are you objecting?

 1              MS. WAXMAN:  I am objecting.

 2              THE COURT:  Sustained.

 3              MR. BAUM:  Same objection, I understand.

 4              Can you go to page 19, Ms. Katz.  Can you highlight,

 5      please, 7:57:49 and the three lines that follow?

 6      Q.  This is still a fantasy role-play between Mr. Valle and

 7      Gertrude H, isn't it?

 8      A.  Yes, sir.

 9      Q.  And in the lines that are highlighted, Mr. Valle is talking

10      about a new recipe, a girl I am dying to see cooked, Andria.

11      Do you see that?

12      A.  I do, sir.

13      Q.  Isn't it a fact that Andria is a reference that was also

14      made in what you described as in the real chats?

15      A.  Yes, sir.

16      Q.  Isn't it a fact that Mr. Valle made references to cooking

17      Andria and other women in the real chats?

18      A.  Yes, sir.

19              MR. BAUM:  Your Honor, at this time I am going to move

20      to chats that were introduced to the government.  Should I do

21      this or would this be a good time to take a break?

22              THE COURT:  You can go on to that.

23              MR. BAUM:  Thank you, your Honor.

24      BY MR. BAUM:

25      Q.  Agent Walsh, do you have the chats in front of you that

D2R6VAL6                         Walsh - cross

1    were introduced by the government?

2    A.  I do, sir.

3    Q.  Thank you.  Can you turn to the chats involving Mike

4    Vanhise, which is starting with Government exhibit 430?

5    A.  Actually, I don't have that folder in front of me.

6            MR. BAUM:  Oh, do you have that, Ms. Waxman?

7            MS. WAXMAN:  Yes.  I will get it.

8            THE WITNESS:  Thank you, ma'am.

9    Q.  Now, this series of government exhibits are e-mails,

10   correct?

11   A.  Yes, sir, they are.

12   Q.  And they are e-mails between Mr. Valle and an individual

13   you've identified as Mike Vanhise, aren't they?

14   A.  That's correct, sir.

15   Q.  These e-mails are one of the three out of 24 that you say

16   is real, correct?

17           MS. WAXMAN:  Objection.

18           THE COURT:  Sustained.

19   Q.  Is this one of the e-mails that you've identified as real?

20   A.  Yes.

21   Q.  And this is an e-mail that is one of the 24 participants

22   that you said you made divisions between real and fantasy?

23   A.  Approximately 24.

24   Q.  Well, that is what you said, 24?

25   A.  I said approximately.

D2R6VAL6                           Walsh – cross

1    Q.  Approximately.

2              On Government Exhibit 430 when we start with the first

3    e-mail, which is starting with the back, which is an e-mail on

4    Friday, January 27th at 1:11 p.m., okay.

5              MR. BAUM:  Can we get that up?  Thank you.

6    Q.  So it starts out where Mr. Vanhise is e-mailing to MHal52

7    and says, Please get back to me.  Do you see that?

8    A.  Yes, sir.

9              MR. BAUM:  Then if we can have the next e-mail.

10   Q.  Then we see it is saying, Hey, it is Girlmeat Hunter.  Do

11   you see that?

12   A.  I do, sir.

13   Q.  In that e-mail is that the name that Mr. Valle used?

14   A.  One of them.  Yes, sir.

15   Q.  That is the name he used on Darkfetishnet, right?

16   A.  It is, sir.

17             MR. BAUM:  Can we go to the very next e-mail, which is

18   at 1:11 p.m.?

19   Q.  Now, in this e-mail, and this is one of the first e-mails

20   that you have between Mr. Valle and Mike Vanhise, correct?

21   A.  Yes, sir.

22   Q.  Now, in this early e-mail of January 27th, Mike Vanhise

23   says, Are you interested in trading.  Do you see that?

24   A.  I do, sir.

25   Q.  And what do you interpret that to mean?

D2R6VAL6                         Walsh – cross

1            MS. WAXMAN:  Objection, your Honor.

2            THE COURT:  He testified on direct about his

3      interpretation of various e-mails.

4            MR. BAUM:  Yes.

5            MS. WAXMAN:  Your Honor, I think that on direct this

6      witness interpreted as to which people, individuals that

7      Mr. Valle was communicating about based on his review of many,

8      many e-mails.  This is a different question.

9            MR. BAUM:  No.  I think he interpreted what words

10     meant.

11           MS. WAXMAN:  Those words included abbreviations.  Pic,

12     is picture.  This is a different question that Mr. Baum is

13     asking.

14           THE COURT:  I will allow Mr. Baum to inquire of the

15     witness whether he has an understanding.

16     Q.  Do you have an understanding of what that term trading

17     meant?

18     A.  Sir, I can only assume trading either an object or a

19     person.

20     Q.  Okay.  Then there is a response from Mr. Valle, right?

21     A.  Yes.

22     Q.  Mr. Valle says, Honestly, I am in it for the cash and I

23     have a few women I plan on grabbing for myself, correct?

24     A.  Yes, sir.

25     Q.  In the fantasy e-mails that we went through, at least some

D2R6VAL6                         Walsh - cross

1   of the ones we went through, Mr. Valle also talks about trying

2   to kidnap women and selling them for cash, doesn't he?

3   A.  He does, sir.

4          MR. BAUM:  Now, can we go to the next one, please,

5   Ms. Chen.

6   Q.  Now, Mike Vanhise asks a question.  Do you see that?  He

7   asks two questions, right?

8   A.  Yes, sir.

9   Q.  One of the questions is, Do you do payments.  Do you see

10  that?

11  A.  I do, sir.

12  Q.  Are you going to tell this jury that a question to a

13  kidnapper --

14         MS. WAXMAN:  Objection, your Honor.

15  Q.  -- is real --

16         MS. WAXMAN:  Objection.

17         THE COURT:  I need to hear the whole question first.

18         Go ahead, Mr. Baum.

19  Q.  You testified that you believed this is a real discussion,

20  not a fantasy role-play, correct?

21  A.  Yes, sir.

22  Q.  And you see that Mike Vanhise asks a question to a person

23  whose supposedly trying to sell a woman.  Do you do payments,

24  do you see that?

25  A.  I do, sir.

1    Q.  And are you telling the jury that you believe that this is

2    a real statement that a kidnapper and his coconspirator would

3    make to each other?

4            MS. WAXMAN:  Objection.

5            THE COURT:  Overruled.

6    A.  I do believe this.

7            MR. BAUM:  Can we go to the next one, please?

8            MS. WAXMAN:  Objection.

9            MR. BAUM:  He said yes.

10           MS. WAXMAN:  He was interrupting the witness.

11           THE COURT:  Did have something else you wanted to say,

12   Agent?

13           THE WITNESS:  No, sir.

14           MR. BAUM:  Can we go to the next one?

15   Q.  Now, Mr. Valle says COD, cash on delivery.  Do you see

16   that?

17   A.  Yes, sir.

18   Q.  That is part of this real discussion, not a role-play,

19   right?

20   A.  Yes, sir.

21           MR. BAUM:  Can we go to a message from Mike Vanhise in

22   this exhibit to Mr. Valle at 1:37 p.m.?

23   Q.  So in response to Mr. Vanhise -- to Mr. Valle's supposedly

24   saying, Cash on delivery, you have Mr. Vanhise saying, I don't

25   have the money right now, but as soon as I do we'll let you

D2R6VAL6                        Walsh - cross

1   know.  How much are you asking.  Do you see that?

2   A.  I do, sir.

3   Q.  Then there is a negotiation, correct?

4   A.  I can't see the next e-mail.

5          MR. BAUM:  Can we go to the next one, please?

6   Q.  MHal52 says or Hal M says, $4,000.  Do you see that?

7          MS. WAXMAN:  Objection, your Honor.

8          THE COURT:  What is the objection?

9          MS. WAXMAN:  I withdraw it, your Honor.

10  Q.  Do you see that Hal M says, $4,000?

11  A.  I do, sir.

12  Q.  Isn't that identical in both figure and statement made in

13  several of the fantasy role-plays that we just discussed?

14  A.  The 4,000-dollar price?

15  Q.  Yes.

16  A.  Yes, sir.  It is the same.

17         THE COURT:  Mr. Baum, it is 5:00.  If you want to

18  break here, you can.

19         MR. BAUM:  Thank you, Judge.

20         THE COURT:  Ladies and gentlemen, we'll resume at 9:30

21  tomorrow morning.  In the meantime, don't discuss the case with

22  anyone.  Keep an open mind.  There is more evidence to hear.  I

23  wish you a pleasant evening and will see you tomorrow.

24         (Jury excused)

25         (Continued on next page)

1                    (In open court; jury not present)

2                    THE COURT:  I wanted to get a sense of what tomorrow

3       is going to look like.  Mr. Baum, how much longer do you expect

4       to be with this witness?

5                    MR. BAUM:  I expect to go through the chats between

6       Ali Khan, we're almost finish with Mr. Vanhise, and then Moody

7       Blues.  It could last an hour.  Then just a few brief questions

8       and then I will be finished.

9                    THE COURT:  Mr. Jackson, any sense of how long

10      redirect might go?

11                   MS. WAXMAN:  Your Honor, I think redirect might be an

12      hour of this witness.

13                   THE COURT:  So it sounds like we should assume that

14      much in the morning will be consumed with this witness?

15                   MS. WAXMAN:  I think that is right, your Honor.

16                   THE COURT:  What is going to happen after that?

17                   MS. WAXMAN:  After Agent Walsh finishes testifying,

18      the government is going to call Alissa Frisca.  I expect to

19      have her on maybe a half hour at the most and depending on the

20      cross we may have some redirect.

21                   THE COURT:  Let's talk about Ms. Frisca because at

22      some point earlier today I was handed some documents.  Can you

23      tell me what they are?

24                   MR. JACKSON:  Yes, your Honor.  Those are a set of

25      documents that are files that were recovered from Mr. Valle's

D2R6VAL6                          Walsh - cross

1    computer that are documents that were created by him.  What

2    those documents indicate is -- the first one is a list.

3              THE COURT:  Do you have these, Ms. Gatto?

4              MS. GATTO:  I don't have copies, but the government

5    has shown them to me.

6              MR. JACKSON:  So each one of them, your Honor,

7    Mr. Flatley is able to see the creation date of the document

8    and then the point at which it was placed into the recycling

9    bin or otherwise moved to a file.  Those documents were created

10   in the summer of 2011.  Two of them are lists of women with a

11   number of terms that Mr. Valle has placed in there that relate

12   to different concepts.

13             The third one is an image, sort of a stray image that

14   was left on the computer of Mr. Valle's DFN profile.  It shows

15   on the DFN profile at the date that is identified on the

16   document, which is also in 2011, Mr. Valle was apparently

17   uploading pictures of Alissa in connection with this Girlmeat

18   Hunter profile.

19             THE COURT:  So first I have this list of 90 -- it

20   looks like 90 women and then there are terms next to each one.

21   Is there going to be any evidence about what the terms mean or

22   what their significance is?

23             MR. JACKSON:  Your Honor, I think that we're not going

24   to offer specific evidence about what the terms mean.  We're

25   not likely to.  Some of them I think sort of self-identify as

D2R6VAL6                          Walsh - cross

1    terms that are related to potential violence or kidnapping.  So

2    I expect to have just Mr. Flatley identifying those documents

3    and explaining where they came from.

4             THE COURT:  So we have Alissa Frisca listed in this

5    first document, which bears the heading Windows history recycle

6    bin file and next to her name it says Elizabeth.  So I take it

7    you don't expect to be offering any evidence about what that

8    reference to Elizabeth means?

9             MR. JACKSON:  No, your Honor.

10            THE COURT:  So with respect to this first document,

11   the list of 90 women, I think you told me that Mr. Flatley will

12   testify that the list was created in, did you say, the summer

13   of 2011?  Because handwritten on the document is the statement

14   created June 20th, 2011.  Is that what he is actually going to

15   say?

16            MR. JACKSON:  Yes, your Honor.

17            THE COURT:  Mr. Flatley is going to testify the

18   document of the list of 90 women was created on June 20th,

19   2011.  What inference do you wish me to draw from that?

20            MR. JACKSON:  Your Honor, we wish the Court to draw

21   that -- there is the second document where Mr. Frisca is

22   identified also.

23            THE COURT:  So why don't we talk about the two lists

24   at the same time.  On the second document is some kind of

25   handwritten notation of 7-2-2011.

D2R6VAL6                    Walsh – cross

1          MR. JACKSON:  Which is also the date on which

2   Mr. Flatley testified it was created.

3          THE COURT:  Okay.  That is a list of 35 women and

4   again there are terms next to their names.  Also, it is not

5   immediately obvious to me what the significance of the terms

6   is.  I am looking to see if Ms. Frisca's name is included on

7   this list.  Yes, she is No. 13.  Next to her name it reads

8   Cooking Show June 1st.  There is not going to be any evidence

9   on what that means?

10          MR. JACKSON:  No, your Honor.

11          THE COURT:  So I have the two lists.  One is

12   June 20th, 2011.  The other is July 2nd, 2011.  Then I have the

13   documents relating to the Darkfetishnetwork, which you told me

14   reflects photographs that Mr. Valle has posted on the

15   Darkfetishnetwork site as of, I gather, September 16th, 2011

16   because that is handwritten on the top.

17          Now, I think you've said that Ms. Frisca's photograph

18   was posted.  Do you know what page that is on?

19          MR. JACKSON:  I believe it is the fourth, your Honor.

20   I am not 100 percent sure.

21          THE COURT:  Page 4 has a reference to Marissa and

22   Lacey.  I don't see any other names mentioned.

23          MR. JACKSON:  I am sorry, your Honor.  I haven't had a

24   chance to make an additional copy of that document.

25          THE COURT:  Just give me a moment and I will see if I

D2R6VAL6                          Walsh - cross

1   can find the page.  Yes, on page 24 there are references to

2   Alissa.  Pages 24 and 25.

3          Now, is it possible or was Mr. Flatley able to see the

4   photographs that were actually attached or that is not possible

5   anymore?

6          MR. JACKSON:  I don't believe so, your Honor.

7          THE COURT:  So I have these three documents.  You have

8   explained what they are.  Now tell me what inference you want

9   me to draw from them?

10          MR. JACKSON:  Your Honor, we would like the Court to

11   draw the inference that by the time we get to the middle part

12   of 2011, Mr. Valle is already deeply involved in some of the

13   preparatory steps that relate to the charged conspiracy along

14   with -- just as he is already engaging in violating NYPD

15   regulations and what he is instructed is a violation of

16   violating federal law and NYPD regulations in terms of

17   accessing the databases that we heard testimony about earlier

18   today.  He is also accumulating lists of women and putting

19   together sort of these free form thoughts about potential

20   targets.  One of them is Ms. Frisca.

21          We think that because of that that allows us to argue

22   reasonably that in the spring of 2000, towards the end of the

23   school year, Mr. Valle shows up inexplicably at Ms. Frisca's

24   school.  This is something that could be taken into account as

25   a reasonable -- there is a reasonable inference that this was

D2R6VAL6                    Walsh - cross

1    one of the preparatory steps that Mr. Valle was taking in terms

2    of formulating his role in the conspiracy -- identifying women,

3    identifying various ways that they moved around their homes and

4    workplaces -- and so we would ask the Court to admit it for

5    that reason.

6             THE COURT:  Now, the list of 90 that you have handed

7    up, how does this compare to the list that has already been

8    introduced?

9             MR. JACKSON:  Your Honor, I think it is very similar.

10   I haven't compared it name for name, but many of the names that

11   appear on that are the same names.

12            THE COURT:  What is the exhibit number for the list?

13            MR. JACKSON:  It is Exhibit 442.

14            THE COURT:  442?

15            MR. JACKSON:  Yes, your Honor.

16            THE COURT:  Give me a moment.

17            There are a lot of names.  They are certainly not in

18   the same order so I will have to examine all this more closely

19   later.

20            MS. GATTO:  Your Honor, can we get a copy also?

21            THE COURT:  Absolutely.

22            MR. JACKSON:  Absolutely, your Honor.  We're planning

23   to deliver copies as soon as we leave court with defense.  We

24   shared with them a copy and went through the pages with them.

25            MS. GATTO:  We also have some questions about it since

1    we haven't seen it.  I understand that Agent Flatley will

2    testify that the documents -- I don't know if it is documents

3    or document -- that he has the date it was created.  But does

4    he also have additional medadata that indicates when it was

5    modified?  It is kind of a meaningless date the date it was

6    created.

7              THE COURT:  You have seen these documents?

8              MS. GATTO:  I have, your Honor.  They showed me

9    earlier.

10              THE COURT:  Do you want to have them now as you are

11   speaking?

12              MS. GATTO:  I wouldn't mind.

13              THE COURT:  Okay.

14              MS. GATTO:  My point really was that if the government

15   is going back and getting copies and additional forensics on

16   the document, we would like to know when the document was

17   created, when their forensics person says it was created.

18              THE COURT:  He said that.

19              MS. GATTO:  And also when it was modified because the

20   document is created document and adds a name in 2012.  But

21   regardless I am not quite sure how this changes the Court's

22   equation from earlier that Ms. Frisca's name appears on a

23   document that we don't -- the government doesn't appear to have

24   any evidence to explain it amongst 90 other names.  Next to her

25   name I think your Honor said was a word like Elizabeth.  I

D2R6VAL6                        Walsh - cross

1    don't know what the document is.  We're just seeing it.

2              Anyway, even if the document was cited in 2011, I

3    don't think it changes the calculus.  Is the government going

4    to offer every interaction Mr. Valle had with 90 women going

5    back to as far as possible?  I understood the Court's ruling as

6    to the NCIC searches related to Andria and Kim because there

7    were indications in fantasy chats that Mr. Valle had had

8    fantasies about those women dated back for 10 years and eight

9    years I think was the time frame.  I really don't think that

10   this document is comparable to the information the Court relied

11   on to admit the NCIC searches relating to Kim Sauer and Andria

12   Nobel.

13             So I don't think this changes anything.  I do have

14   additional questions just because we haven't seen them and

15   there are forensic questions.  But even without those questions

16   being answered, I don't see how anything should change and we

17   ask that the Court's ruling stays the same.

18             THE COURT:  What is the evidence going to be as to

19   Government Exhibit 442?  Is Agent Flatley going to be

20   testifying about the list?

21             MR. JACKSON:  Yes, your Honor.

22             THE COURT:  What can you tell me about what he is

23   going to say about the list?

24             MR. JACKSON:  No.  No.  I am sorry.  Your Honor, 442?

25   No, 442 is already in evidence.

D2R6VAL6                        Walsh - cross

1              THE COURT:  Okay.

2              MR. JACKSON:  That was the subject of Mr. Walsh's

3     direct testimony.

4              THE COURT:  I see.  Then maybe you can refresh my

5     memory about what he said about the list.

6              MR. JACKSON:  I think what he said --

7              THE COURT:  Other than it was taken off of

8     Mr. Valle's -- Ms. Mangan's computer.  I understand that he is

9     going to say he took it off the computer, but did he say

10    anything else about it?

11             MR. JACKSON:  Your Honor, I hesitate because there has

12    been a lot of testimony today, but my recollection is that he

13    just testified that there were a number of names on this list

14    that were also the subject of discussions where Mr. Valle was

15    discussing violence against particular women including Kimberly

16    Sauer, including Maureen Hartigan, including Alissa Frisca,

17    Andria Condez, Kristen Ponticelli and some other women.  He

18    also identified some of the terms at the bottom including,

19    white slavery, cooking class, which is also terms I believe --

20    it is similar to the terms that is next to Ms. Frisca's name.

21             Your Honor, I think the real essence of our argument

22    on this issue is what your Honor was pointing out with regard

23    to the Andria Nobel and the Kimberly Sauer hits on NCIC in 2011

24    is that there was some indication that Mr. Valle had been

25    involved in planning to reach back before 2012 in terms of

1    targeting these women, specifically his own statements.

2          Here we have similarly an indication that Mr. Valle in

3    2011 was beginning to already identify women that he thought

4    would be potential targets and he specifically identified

5    Ms. Frisca.  This is coming in on the heels and showing up at

6    her school in this way that is inexplicable.  I think for that

7    reason, your Honor, and also for the other reason we

8    identified, which is that defense counsel completely opened the

9    door to the questions about what the nature of the relationship

10   was between Ms. Frisca, Mr. Valle and Ms. Mangan it is

11   important for us to have this limited testimony where she is

12   going to describe what I think amounts to a few sentences about

13   one of the few occasions in which she actually interacted with

14   Mr. Valle and will explain how that transpired and that will be

15   the end of that.

16         THE COURT:  Give me a moment.

17         Do you have the cites to the trial transcript where

18   you claim that Ms. Gatto opened the door on this issue so that

19   I can take a look at them?

20         MR. JACKSON:  Yes, your Honor.

21         THE COURT:  I guess it would be during Ms. Mangan's

22   cross-examination?

23         MR. JACKSON:  Yes, your Honor.  It was during

24   Ms. Mangan's cross-examination at page --

25         THE COURT:  213?

1          MR. JACKSON:  213, your Honor.

2          It begins at 213 and continues, your Honor, through

3     217 or 218.  Approximately 218.

4          MS. GATTO:  Can I get the pages again?  I was getting

5     my transcript.

6          THE COURT:  Pages 213 to 218.

7          I must say I have looked at the trial transcript pages

8     213 to 218 and I don't see much questioning about the

9     relationship between Mr. Valle and Ms. Frisca.  There is on 213

10    questioning about the relationship between Alissa and

11    Ms. Mangan and the fact they were friends.  They had dinners

12    together, she knew that Ms. Mangan was dating Mr. Valle and we

13    get into this issue about whether she likes police officers,

14    whether she went to the Christmas party, the fact that the

15    commanding officer kept hitting on her and making her

16    uncomfortable.

17         Then the first question that really goes directly to

18    her relationship with Mr. Valle, if she has a relationship, is

19    Ms. Gatto asks on page 215 whether at one point Ms. Frisca

20    asked Mr. Valle if he could speak at the school on career day

21    and Ms. Mangan said, No.  Then Ms. Gatto elicited that

22    Mr. Valle came to the school, she was aware that Mr. Valle came

23    to the school and spoke to the students, but there is no

24    further discussion or suggestion that Ms. Mangan had anything

25    to do with that, had anything to do with Mr. Valle coming to

D2R6VAL6                         Walsh - cross

1    the school to speak to the students.

2           Then the next part of the examination is the nature

3    the relationship was between Ms. Mangan and Ms. Frisca after

4    Ms. Mangan stopped working at the school.  Ms. Mangan said that

5    they obviously didn't communicate as much because they were as

6    she said living very different lives with Ms. Mangan being a

7    mother and Ms. Frisca continuing to teach at the school.

8           Ms. Gatto elicited that Ms. Frisca went to Ms.

9    Mangan's baby shower, that the two had lunch in May or June of

10   2012 in the Upper East Side.  She elicited the fact that

11   Mr. Valle drove Ms. Mangan into the city for that lunch, but

12   there was no suggestion that Mr. Valle and Ms. Frisca saw each

13   other at the time.

14          Then the next part of the examination was about the

15   PBA card that Mr. Valle had given to Ms. Mangan to give to

16   Ms. Frisca and really the only point that came out of that was

17   that Mr. Valle is giving PBA cards to other neighbors and so

18   forth.

19          So what I am saying, Mr. Jackson, is having looked at

20   the testimony I don't see a lot of questions about the nature

21   of the relationship between Mr. Valle and Ms. Frisca.  It is

22   more about the nature of the relationship between Ms. Mangan

23   and Ms. Frisca.

24          MR. JACKSON:  I agree, your Honor.  The question is

25   about the nature of the relationship, but there are several

1    questions that she asked which could only be related to the

2    relationship between Mr. Frisca and Mr. Valle.  For example, at

3    one point she asked if Gil could talk in her place as sort of

4    career day.

5             THE COURT:  And the answer to that was no.

6             MR. JACKSON:  Right.  Then she pushed, Do you remember

7    Gil going to the school and speaking to Alissa's class?  And

8    the suggestion or implication of those questions is that Alissa

9    Frisca has some sort of relationship with Mr. Valle such that

10   it was so friendly and her and Mr. Valle got along so well that

11   she actually invited Mr. Valle to come to career day.

12            THE COURT:  I understand the question, but the answer

13   was no.  It was a flatout no.  I am not sure why the jury would

14   assume that Ms. Frisca had something to do with Mr. Valle

15   coming to the school because the answer is no.

16            MR. JACKSON:  Well, the followup, your Honor, is after

17   she says, Do you remember Gil going to the school, going and

18   speaking to Alissa's class, Ms. Mangan says, I remember he came

19   to career day, but I don't know if he went to her class.  So I

20   think the jury could be left with the misimpression from this

21   line of questioning.

22            Clearly Ms. Gatto is attempting to push.  The only

23   reason it is mentioned there is that now Ms Gatto has put in

24   the mind of the jury that Ms. Frisca had such a swimming

25   relationship with Mr. Valle that she is inviting him to career

D2R6VAL6                          Walsh - cross

days, if there was a career day that Mr. Valle attended and

that Ms. Frisca invited Mr. Valle to come to the class and

speak to the students and that she is enamored with Mr. Valle.

It ties into the comments about the fact that there is she

likes police officers, which really has no relevance to

anything other than a suggestion that Ms. Frisca has some sort

of affinity to Mr. Valle that is inconsistent with -- I am not

even sure whatever notion the relationship that they are

attempting to paint a different picture of.

          Moreover, your Honor, she is talking about events that

took place in 2011.  She brought up a December 2011 Christmas

party.  So we're in 2011.

          MS. GATTO:  Your Honor, I don't mean to interrupt but

that is not 2011.  Mr. Mangan didn't work at the school in

2011.

          THE COURT:  No.  It is not about Ms. Mangan working at

the school.  She is already gone.  She had the baby.

          MS. GATTO:  I don't think that is the testimony

actually.  I don't think the testimony is that the career day

is 2011.

          MR. JACKSON:  I am talking about the Christmas party.

          MS. GATTO:  Sorry.

          MR. JACKSON:  The question is I am asking about the

question party, Do you know when the Christmas party was?  And

Ms. Mangan says, December 2011.  She says, Think about it.  And

D2R6VAL6                         Walsh - cross

1    the answer is, It was 2011.  Then there is a question, Alissa

2    was single at the time.  I am not sure again what that relates

3    to, but again the entire point of this area of questioning is

4    attempting to draw a certain picture of what the nature of the

5    relationship was between Ms. Frisca and Mr. Valle and Ms.

6    Mangan in 2011 before the date that is charged as the start of

7    the conspiracy.

8            So defense counsel is going into that before we even

9    put Ms. Frisca on the stand and attempting to preclude us from

10   asking the simple question when have you seen Mr. Valle.  There

11   are only a handful of occasions that she actually interacted

12   with Mr. Valle.  The fact that they want to argue that there is

13   a different implication to this occasion when they saw

14   Mr. Valle I don't think amounts to a reason for excluding the

15   evidence.  There is no 403 issue.  It certainly is relevant.

16   If it weren't relevant, the nature of the relationship, I don't

17   think they could have asked any of these questions.  So, your

18   Honor, we would ask the Court to allow us to have that brief

19   questioning.

20           MS. GATTO:  Your Honor, I think that it is clear in

21   the transcript.  We all read it.  Mr. Jackson is reading a lot

22   into the words.  I already explained my examination was about

23   Ms. Mangan's relationship with Ms. Frisca.  My additional

24   questions were aimed at addressing the government's argument,

25   which they have told us they are going it make that Ms. Mangan

D2R6VAL6                        Walsh – cross

1   bringing a PBA card from Ms. Frisca from Gil was some sort of

2   creepy thing to do.  It goes to the PBA card and they have not

3   sought to preclude introducing evidence that Ms. Mangan brought

4   PBA cards to Ms. Frisca.

5        The Court has ruled on this.  We talked about this

6   earlier.  We're spending a lot of time talking about the same

7   things over and over again.  They are certainly going to elicit

8   from Mr. Frisca her relationship with Ms. Mangan and her

9   limited, if any, relationship with Mr. Valle.  But to elicit

10  from her some event in April 2011 almost a year before any of

11  these chats related to her again is irrelevant, it is confusing

12  and is it prejudicial.

13       THE COURT:  Really for every woman who has testified

14  up to now the nature of Mr. Valle's relationship has been

15  elicited.  When did you last see him?  How did you communicate

16  with him?  Those questions have been asked I think with respect

17  to every woman who has testified.

18       (Continued on next page)

19

20

21

22

23

24

25

D2RUVAL7

1          MS. GATTO:  By the government, yes, your Honor.

2          There is a very different relationship.

3          THE COURT:  Actually, Ms. Gatto, you have gone into it

4     with a number of these women as well.

5          MS. GATTO:  That's true, your Honor.  There is a real

6     marked difference between Ms. Sauer and Ms. Hartigan and

7     Ms. Noble -- they all testified that they had relationships.

8     They were very good friends -- was some of the testimony --

9     with Mr. Valle, whether it was high school and whether it was

10    normal friendly interactions after high school, whether they

11    were great friends after college.  This is a different

12    relationship.  We are not asking the government not to elicit

13    the relationship, they will, but the April 2, 2011 date has

14    really nothing to do with the charges.

15          The government has alleged with Ms. Sauer and Ms.

16    Hartigan and Ms. Noble that he was somehow skirting around

17    trying to find their address.  That is not the same argument

18    that was made with Ms. Frisca.  I am not sure what the argument

19    is with Ms. Frisca.  They are in totally two separate piles.

20          I don't think it is fair to say that because you have

21    elicited the relationship between Mr. Valle and his good friend

22    from college Ms. Sauer and his good friend Ms. Hartigan or

23    Mr. Valle and his friend Ms. Noble, that the government should

24    be permitted to introduce testimony related to a period outside

25    of the conspiracy from which they will ask the jury to infer

D2RUVAL7

1     that Mr. Valle was stalking her.

2              THE COURT:  That brings us to back to an inquiry that

3     I made earlier today, which is what is the government's

4     intention is to do with the evidence if it were admitted.  So I

5     asked that question earlier.  Let me ask it again.

6              Suppose that the evidence came in.  How does the

7     government intend to use it in summation?

8              MR. JACKSON:  One, your Honor, I think some of that

9     depends on the way the rest of the case plays out.  We still

10    have more than a week left of this case, and I think that a

11    number of those things would impact the way that we argue in

12    summation.  But, I think that the first basic point that we are

13    want to make is that Mr. Valle did not have the type of

14    relationship with Ms. Frisca that would warrant some of the

15    activities he is engaging in, in terms of asking for her to

16    have a PBA card delivered to her.  We think that that was an

17    attempt to sort of build up the relationship of trust which

18    coincides with what he talks about with certain of the

19    co-conspirators in terms of doing whatever can be done to sort

20    of gain access and getting closer to these women.

21             We would argue that it is an extreme coincidence and

22    we are likely to say to the jury that it looks like he was

23    attempting to observe Ms. Frisca outside of her school at that

24    point.  That is a preliminary step in the process of the

25    formulation of a conspiracy.

1            Similar to other steps in 2011, like illegally
2       searching NYPD and federal databases during the same time
3       period for other women.  These are preliminary steps, but they
4       are important.  They are limited inferences that we are asking
5       your Honor to draw.
6            And we think that defense counsel is completely
7       entitled to argue that this is simply a friendly coincidence,
8       something that is just a part of their normal relationship, but
9       I don't see a legal principle that warrants preclusion of this
10      area.  If the relationship is relevant for all of these women
11      throughout the time period that they are dealing with
12      Mr. Valle, then it is relevant to Ms. Frisca.  If the
13      relationship was relevant in 2011 and, as was the subject of
14      questioning by defense counsel, then their interactions in 2011
15      are relevant.  So we would ask that the Court to allow us to
16      discover it.
17           THE COURT:  Anything else, Ms. Gatto?
18           MS. GATTO:  No.  What Mr. Jackson is saying is that he
19      will use this information to ask the jury to infer that
20      Mr. Valle was stalking Alisa Frisca when he drove by her school
21      in the middle of the day in April 2011 when the conspiracy
22      didn't start until January 2012.  That is prejudicial.  It is
23      not relevant to the charges.  It has limited probative value,
24      now when they concede the inference that they are going to ask
25      the jury to draw based on it.

D2RUVAL7

1           Our position has always been the same on it, and I

2   don't think that anything has changed since this morning when

3   we discussed it at length.

4           THE COURT:  What has changed Ms. Gatto, they have

5   provided a list -- which I have not fully examined yet -- which

6   contains the names of many women who have been identified as

7   kidnap targets and about whom there has been evidence.  And as

8   I said, I haven't had an opportunity to examine those lists,

9   and I will do that tonight.  But that's what has changed, and

10  you know that's why we are having the conversation.  That is

11  why it has changed.

12          MS. GATTO:  That has changed, and Mr. Jackson has

13  brought up things that were available before.  I guess my point

14  is, I don't see how this list of 90 women in a document we

15  don't know the date, that Ms. Frisca's name was added to it, in

16  a document that we don't know what it means -- it sounds like

17  the government is not going to have any evidence to somehow

18  link an event four or five months -- putting aside the

19  modification date -- that somehow links into a conspiracy that

20  starts in January 2012 for a woman who isn't even chatted about

21  until January, the end, of 2012.  So I don't think that

22  changes.

23          THE COURT:  Can I have those pages back.

24          Anything else anyone wants to raise before we break

25  for the evening.

D2RUVAL7

1          MS. GATTO:  I wanted to talk about scheduling.  It

2     seems like we may be on a schedule where the government may

3     rest tomorrow, if they are in the same place.

4          MR. JACKSON:  I think it very much depends on how much

5     cross-examination is done.  We are certainly going to get close

6     to finishing our case, if we don't finish it.

7          MS. GATTO:  Your Honor, I know that you would like to

8     sit on Friday, and I would ask that you consider an application

9     that we do our legal motions on Friday and not take testimony.

10          There are a couple of things going on.

11          One is, access to Mr. Valle is very difficult,

12     especially when we are on trial.  Our trial days are long days.

13     We have arguments -- mostly the parties' fault because we are

14     raising things -- but we are not getting out of court until 6,

15     6:30.  It can take up to an hour for me to get Mr. Valle to be

16     produced after court.  So I don't get to him until 8 o'clock.

17     I am kicked out for the count at 9 o'clock.  So we have a hard

18     time effectively advising him on his right to testify, should

19     he choose to testify, and I am preparing him for that.

20          So we are asking that Friday be set aside for legal

21     motions.  We anticipate having very significant Rule 29

22     motions.  It will also give us time to produce -- should our

23     case have to go forward and that we have to produce whatever

24     documents to the government and resolve any issues that may

25     come up when we produce additional 3500 exhibits, if we have

D2RUVAL7

1      those.

2             I don't know what the government's position is.  I

3      raised this with them earlier.  I don't think that they take a

4      position, but we have been working at a @break-neck pace for a

5      long time and it has become difficult to advise Mr. Valle in

6      the detention condition that he is currently under.  I put that

7      application out.

8             I know that the Court likes to sit on Friday and move

9      quickly.  I think that we are well within the estimated time

10     frame that we have provided for this jury.  We think that our

11     case will take about three days, so if we start on Friday, we

12     should be closing on Wednesday, maybe Thursday morning at the

13     latest.

14            THE COURT:  What is the government's feeling?

15            MR. JACKSON:  Your Honor, we defer to the Court's

16     wisdom on this scheduling matter.

17            I would just note that it is impossible for us to give

18     extremely helpful information about our estimation of how long

19     the defense case will be because we haven't gotten final

20     notification of who the defense witnesses are expected to be.

21     I think defense counsel is planning to give that to us today.

22     But assuming that the schedule is as defense suggests, we don't

23     have any specific objection to any of their application.  We

24     defer to the Court's wisdom.

25            THE COURT:  What I will say is that, if you believe I

D2RUVAL7

1  am in a position to tell the jury that we are making good

2  progress and that it is the lawyers' expectation that the trial

3  will be completed within the two-week period that I told the

4  jury it would be, and that I can tell them that, even with

5  taking Friday off -- and I am prepared to do that, but I try to

6  remain true to what I have told people on the jury about the

7  progress of the case.  And so I am willing to entertain the

8  notion of not sitting on Friday, if by doing so I don't

9  endanger the two-week period that I told them about at the

10  outset.

11       MS. GATTO:  I don't think that it is going to be a

12  problem.  I think that we are going to finish well within the

13  two weeks, your Honor.

14       THE COURT:  Mr. Jackson, I take it that you agree to

15  the extent that you can hypothesize what might happen next

16  week.

17       MR. JACKSON:  Yes, your Honor.  We would just ask

18  defense counsel, as soon as possible, to update us as soon as

19  possible on what the schedule will be for the next week.

20       THE COURT:  All right.  You can assume that we won't

21  sit on Friday, other than to entertain whatever motions there

22  might be.

23       MS. GATTO:  The only other thing that is pending, your

24  Honor, is the deposition, the introduction of the deposition

25  for Mr. Merenkov.

D2RUVAL7

1              THE COURT:  Right.  Well, we can talk about that on

2      Friday.

3              Now, there are a few objections which I gather the

4      parties have not been able to reach an agreement on?

5              MR. JACKSON:  I don't think so.  We waived our

6      objections to certain questions.  We are not confident that we

7      have reached agreement on the others.

8              THE COURT:  Ms. Gatto, is it your intention to play

9      the whole deposition?

10             MS. GATTO:  Yes, your Honor.  We would have to edit

11     out any portions that the Court strikes out because of

12     objections, but that would take a little time.  But our plan is

13     to play the whole transcript -- the whole video.

14             There is an issue of whether the transcript would be

15     offered into evidence.  I think that the government might have

16     objected.  We would just suggest that the transcript be handed

17     out to the jury the way that transcripts are handed out in

18     cases where we play audiotapes or videotapes as an aid, which I

19     think will resolve the dispute.

20             THE COURT:  I don't object.  It sounds just like a

21     transcript of a recorded call.

22             MR. JACKSON:  It is a little bit different, your

23     Honor, because this is testimony.  This is not a recorded call

24     from a wiretap.  I think it is important for the jury to remain

25     focused on the way the witness is answering and responding.

D2RUVAL7

1    This is supposed to be a substitute for their in-court

2    testimony and I think particularly because the witness is

3    testifying in Russian, the jury could become impatient and lose

4    focus on the actual video and just read the actual transcript.

5            THE COURT:  I think those are valid points, and I am

6    sure we want the jury to focus on the demeanor of the witness.

7    I know they cannot understand what he is saying, but they can

8    pick up clues from his body language and demeanor.  And if they

9    are given a transcript, it does seem to me that there is a risk

10   that they may just read the transcript, and that is not what I

11   want them doing.  I want them watching the witness.

12           MS. GATTO:  Your Honor, if during deliberations they

13   want the video, we can offer them --

14           THE COURT:  Absolutely.

15           MS. GATTO:  I haven't listened or watched the video

16   since we got it back.  We had a professional videographer.  I

17   am hopeful that the audio is fine.  I think Ms. Katz listened

18   to it and said it is fine.

19           THE COURT:  So if anything goes wrong, it is

20   Ms. Katz's fault.

21           MR. JACKSON:  Of course, your Honor, we have no

22   objection if the jury asks for it, like any other transcript.

23           THE COURT:  Let me tell you that my practice is to

24   send back into the jury room all documentary exhibits, so you

25   can assume that that is going to happen.  If a document came

D2RUVAL7

1    into evidence it will go back into the jury room.  As we get

2    closer to the end of the trial, I will want the lawyers to

3    agree on what is going to go back into the jury room.  And,

4    yes, I will tell them that if they want to see something like

5    the video which is not a document, all that they have to do is

6    ask for it and we will play it for them.

7              Anything else that we should talk about now?

8              MS. GATTO:  Judge, just if the government can be

9    instructed and remind them that the witness is on cross and not

10   to prep him for tomorrow and not to discuss his testimony.

11             MR. JACKSON:  We plan to instruct him that he is to

12   speak to no one.

13             THE COURT:  Anything else?

14             (Proceedings adjourned until 9:30 a.m., February 28,

15   2013)

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

JONATHAN WATERS

Direct By Mr. Jackson . . . . . . . . . . . 560

Cross By Ms. Gatto . . . . . . . . . . . . . 584

Redirect By Mr. Jackson . . . . . . . . . . 594

COREY WALSH

Direct By Ms. Waxman . . . . . . . . . . . . 613

Cross By Mr. Baum . . . . . . . . . . . . . 653

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 615, 617 . . . . . . . . . . . . . . . . . 573

 616B, 616C and 616E  . . . . . . . . . . . 578

 442 and 443  . . . . . . . . . . . . . . . 647

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 E1, E3, E4, E5, E6, E10, E11 and E12   . . . 661

 E13   . . . . . . . . . . . . . . . . . . . 703