D2s6val1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                              12 CR 0847 (PGG)

5  GILBERTO VALLE,

6              Defendant.

7  ------------------------------x
                                         New York, N.Y.
8                                        February 28, 2013
                                         9:40 a.m.
9

10 Before:

11                 HON. PAUL G. GARDEPHE

12                                       District Judge
                                            and a Jury
13
                             APPEARANCES
14
   PREET BHARARA
15      United States Attorney for the
        Southern District of New York
16 RANDALL W. JACKSON
   HADASSA WAXMAN
17 Assistant United States Attorneys
   Present: Annie Chen, Paralegal Specialist
18          Special Agent Anthony Foto, FBI

19 FEDERAL DEFENDERS OF NEW YORK
   BY:  JULIA GATTO
20      ROBERT M. BAUM
        EDWARD ZAS
21 Attorneys for Defendant Valle
   Present: Alexandra Katz, Paralegal
22          Anna Finkel, Investigator
            John Hughes
23

24

25

D2s6val1

| | |
|---|---|
| 1 | (In open court, jury not present) |
| 2 | THE COURT:  Please be seated. |
| 3 | Mr. Jackson, is there some exhibit that you are |
| 4 | waiting for?  My deputy tells me there is something that hasn't |
| 5 | quite arrived yet. |
| 6 | MR. JACKSON:  Yes, your Honor.  There was some |
| 7 | printing difficulties at the FBI, but we expect any moment |
| 8 | Mr. Flatley is going to bring us additional copies that we |
| 9 | handed up yesterday and that we'll mark and hand up to the |
| 10 | Court. |
| 11 | THE COURT:  I appreciate that.  I am not going to take |
| 12 | that up right now.  We'll probably do it at the next break. |
| 13 | MR. JACKSON:  Thank you very much, your Honor. |
| 14 | Are we ready to proceed? |
| 15 | MS. GATTO:  We are, your Honor. |
| 16 | I am sorry, your Honor, but Mr. Baum is in the |
| 17 | bathroom. |
| 18 | THE COURT:  We'll wait for Mr. Baum. |
| 19 | MR. JACKSON:  Should I put Agent Walsh on the stand? |
| 20 | THE COURT:  That will be good. |
| 21 | Are we ready to proceed? |
| 22 | MS. GATTO:  Yes. |
| 23 | THE COURT:  You can bring in the jury. |
| 24 | Agent Walsh, you can take the stand. |
| 25 | |

1          (In open court; jury present)

2          THE COURT:  Please be seated.

3          You may proceed, Mr. Baum.

4          MR. BAUM:  Thank you, your Honor.

5          THE COURT:  Agent Walsh, you remain under oath.

6          THE WITNESS:  Yes, sir.

7    COREY WALSH, resumed.

8    CROSS-EXAMINATION (Cont'd)

9    BY MR. BAUM:

10   Q.  Good morning, Agent Walsh.

11   A.  Good morning, sir.

12   Q.  Agent Walsh, do you recall that when we left yesterday I

13   was asking you some questions about Michael Vanhise?

14   A.  Yes, sir, I do.

15   Q.  Isn't it a fact that Mr. Valle and Mr. Vanhise communicated

16   with each other for a period of about tree and a half months

17   between January 27th and May 4th of 2012?

18   A.  Approximately.  Yes, sir.

19   Q.  Isn't it a fact that during that three and a half months

20   there was a total of five e-mails where they communicated with

21   each other?

22   A.  I don't recall the exact number, sir, but it sounds

23   approximate.

24   Q.  And I believe you testified on direct examination that you

25   determined who the other party was with MHal52 by checking the

D2s6val1                    Walsh - cross

1    IP address of the other party, is that accurate?

2    A.  One of the ways.  Yes, sir.

3    Q.  And you then determined that it was Michael Vanhise,

4    correct?

5    A.  One of the ways, yes, sir.

6    Q.  Well, the result was you determined that the other party

7    was Michael Vanhise?

8    A.  Yes, sir.  He also used his real name in the e-mail

9    account.

10   Q.  Right.  You found out that Michael Vanhise is a 22-year-old

11   male, correct?

12   A.  That's correct, sir.

13   Q.  And you found out that Michael Vanhise lives in the

14   basement of his grandmother's apartment, is that accurate?

15   A.  I don't believe it is the basement.  No, sir.

16   Q.  He lives in his grandmother's house?

17   A.  At the time when we spoke to him, yes, sir.

18   Q.  I assume because of the nature of the e-mails involving

19   requests for money, you investigated Mr. Vanhise's finances?

20   A.  Yes, sir, we did.

21   Q.  And isn't it a fact that you found out that Mr. Vanhise has

22   practically no money in the bank?

23   A.  I don't know what you consider "practically no money," sir,

24   but not a lot.

25             MR. BAUM:  And if we may let's go back to the e-mails

D2s6val1                    Walsh - cross

1   for Mr. Vanhise, Government Exhibit 430, Ms. Chen.  Ms. Chen,

2   can you go to the e-mail from Hal M to Michael Vanhise on

3   January 27th in this exhibit at 1:36 p.m.?

4   Q.  Now in this message from Hal M, do you know who he is

5   talking about?

6   A.  Based on prior conversations, sir, I believe he is talking

7   about Alissa Frisca.

8   Q.  Right.  In this conversation, Hal M says that she is a

9   teacher, has the week of February 20th off, I can kidnap her

10  then.  Do you see that?

11  A.  I do, sir.

12  Q.  Did he kidnap her during the week of February 20th?

13  A.  No, sir.  He did not.

14  Q.  In fact, Mr. Valle isn't it a fact that Mr. Valle told Ali

15  Khan that he would kidnap Kathleen during the week of

16  February 20th?

17  A.  I believe so.  Yes, sir.

18          MR. BAUM:  Ms. Chen, is it possible for you to go to

19  Government Exhibit 417, a conversation on 1-23-12?  Can you

20  focus on the conversation dated 6-48-30?  Can you focus on line

21  6:45:38 and 6:45:43.

22  Q.  6:45:38.  Do you see 6:45:38, Agent Walsh?

23  A.  I do, sir.

24  Q.  This is a conversation with Ali Khan, isn't it?

25  A.  Yes, sir.

D2s6val1               Walsh - cross

1    Q.  And this is a conversation of January 23rd, is that

2    correct?  Do you recall?

3    A.  Yes, sir.

4    Q.  And the conversation that we were just talking about with

5    Michael Vanhise in which he says he is going to kidnap Alissa

6    the week of February 20th, that was January 27th, correct?

7    A.  Yes, sir.

8    Q.  Now, in this particular line that I focused on MHal52 says,

9    She's is a teacher and has off the week of February 20th.  Do

10   you see that?

11   A.  I do, sir.

12              MR. BAUM:  Can we go to the next page or the next

13   conversation which is 6:58:52 in the heading?

14   Q.  Now, just to back up a little, do you know who Mr. Valle

15   was talking about when he says, She is a teacher and has off

16   the week of February 20th?

17   A.  In which conversation, sir?

18   Q.  In the conversation that we just viewed prior to this page?

19   A.  With Ali Khan I believe he was talking about his wife.

20   Q.  Right.  He is talking about his wife, correct?

21              When he said in that prior conversation, She is a

22   teacher and has a week off on February 20th, in fact that was

23   false, wasn't it?

24   A.  That he did not kidnap her?

25   Q.  No.  Well, yes.  He did not kidnap her during the week of

D2s6val1            Walsh - cross

1   February 20th, is that accurate?

2   A.  That's correct, sir.

3   Q.  Now, when he is talking about Ali Khan about Kathleen and

4   says, I am going to kidnap Kathleen the week of February 20th

5   because she is a teacher and has the week off, in fact she was

6   not working as a teacher then, correct?

7   A.  I am not sure, sir.

8   Q.  Well, didn't you read the interviews with Kathleen?

9   A.  Some of them, yes, sir.

10  Q.  And weren't you aware that in February 2012 she was not

11  working as a teacher?

12  A.  Yes, sir.

13  Q.  So when Mr. Valle says to Ali Khan, we can kidnap Kathleen

14  the week of February 20th because she is on vacation, that was

15  not a true statement, right?

16  A.  She might have been on vacation, sir.  I am not aware.

17  Q.  But when he says specifically she is a teacher and has a

18  week off starting February 20th, isn't he referring to the fact

19  that teachers have a week off February 20th?

20          MS. WAXMAN:  Objection.

21          THE COURT:  Overruled.

22  A.  Sir, teachers may have the week of February 20th off.

23  Q.  She was not a teacher on February 20th, 2012?

24          MS. WAXMAN:  Objection.

25          THE COURT:  Overruled.

1   Q.  Do you know that?

2   A.  Her profession was a teacher, sir.

3   Q.  Do you know that she was not working?  It is a simple

4   question.  Do you know that she was not working as a teacher on

5   February 12th, 2012?

6   A.  That is correct.

7        MS. WAXMAN:  Objection.  I think the witness has

8   answered this question.

9        THE COURT:  Overruled.

10  A.  That's correct, sir.

11  Q.  So now you have Mr. Valle telling Michael Vanhise that he

12  is going to kidnap Alissa the week of February 20th, correct?

13  A.  Yes, sir.  He does say that.

14  Q.  And now you have Mr. Valle telling Ali Khan that he is

15  going to kidnap Kathleen the week of February 20th, correct?

16  A.  Yes, sir, he does say that.  But if I may, there is another

17  conversation.

18  Q.  No.  I am asking you did he say that he is going to kidnap

19  Kathleen the week of February 20th?

20  A.  He did say that.  Yes, sir.

21  Q.  Now, didn't he also tell Ali Khan later on that he would

22  kidnap Andria during the week of February 20th?

23  A.  I don't recall that specific conversation.

24        MR. BAUM:  Ms. Chen, can we go to Government Exhibit

25  424, a conversation on 2-11-2012.

D2s6val1                    Walsh - cross

1   Q.  Now, this is a conversation with Ali Khan on February 11th,

2   2012, correct?

3   A.  Yes, sir.  It is.

4           MR. BAUM:  Now, Ms. Chen, can you highlight like the

5   first seven lines, please?

6   Q.  Now, do you see that MHal52 says at 5:57:38 about Andria,

7   February 20th is a holiday so that is my target weekend,

8   correct?

9   A.  Sir, that is what he said, but the line above that Ali Khan

10  is referring to Andria, not MHal52.

11  Q.  So is it your testimony that when MHal52 says,

12  February 20th is a holiday so that is my target weekend, it

13  doesn't refer to Andria when the statement just before that is

14  so Andria is going to have it soon?

15          MS. WAXMAN:  Objection to form, your Honor.

16          THE COURT:  Sustained to form.

17          MR. BAUM:  I am sorry.

18  Q.  Ali Khan says, So Andria is going to have it soon, and

19  MHal52 responds, February 20th is a holiday so that is my

20  target weekend.  Do you see those two lines?

21  A.  I do, sir.

22  Q.  And is it your testimony that you do not believe that that

23  is a reference to Andria?

24  A.  Sir, I am only saying that I am not sure Ali Khan was

25  referring to the same person that MHal52 is referring to in the

1  same conversation.

2  Q.  So you are saying that the statement that Andria is going

3  to have it soon, February 20th is a holiday so that is my

4  target weekend doesn't refer to Andria, is that what you are

5  saying?

6          MS. WAXMAN:  Objection, your Honor.

7          MR. BAUM:  I am trying to understand the answer.  I

8  was clarifying.

9          THE COURT:  Overruled.

10 A.  Sir, on occasions these two when they are exchanging

11 conversations mixed up who they are talking about.

12 Q.  I am not asking on occasion.  I am asking a simple fact.

13 There are two lines.  If I say to you, What time is it and you

14 say to me, it is 2:20 and if I say to you what time and you say

15 2:20, am I referring to what time it was yesterday?

16         MS. WAXMAN:  Objection.

17 Q.  Is that your understanding?

18         THE COURT:  I am sustaining the objection.

19         MR. BAUM:  Okay.

20         THE COURT:  Why don't you stay focused on this

21 language.

22         MR. BAUM:  I will, Judge.

23 Q.  So it is your testimony nevertheless that in his

24 conversations with at least Ali Khan and Mike Vanhise that

25 Mr. Valle said he is going to kidnap anywhere from two to three

D2s6val1            Walsh - cross

1    women during the same period of time?

2    A.  Yes, sir.  He does say that.

3    Q.  And you believe those are realistic statements?

4    A.  Yes, sir.  I do.

5    Q.  Okay.

6             MR. BAUM:  Can we go back to Mr. Vanhise, Ms. Chen,

7    please?

8             THE COURT:  Is this back to Exhibit 430?

9             MR. BAUM:  No.  I am just saying I am going back to

10   Mr. Vanhise.  I am just alerting Ms. Chen.

11   Q.  Now, the conversation we just went over with Mr. Vanhise

12   took place on January 27, 2012.  Do you recall that?

13   A.  I do, sir.

14   Q.  The conversation we just completed, the next conversation

15   that they had was February 20th, 2012 over a month later, about

16   a month later, is that accurate?

17   A.  Yes, sir.

18   Q.  Do you have the the exhibit in front of you to doublecheck?

19   A.  I do not, sir.

20            MR. BAUM:  Can we give him one of the exhibits,

21   please?

22            THE COURT:  What exhibit is it that you want?

23            MR. BAUM:  I mean the exhibits involving Mr. Vanhise,

24   which is Government Exhibits 430, 431.

25            THE COURT:  Do you want him to look at 431 now?

D2s6val1                    Walsh - cross

1          MR. BAUM:  Yes.  I am going to be looking at 431 now,

2    Judge.  I just wanted him to have it so he could look at it and

3    confirm dates.

4    A.   Thank you.

5    Q.   You are welcome.

6          So Government Exhibit 431 is a conversation on -- well

7    the caption is February 28th, do you see that, 2012?

8    A.   Yes, sir.

9    Q.   And it is a series of e-mails on February 28th, is that

10   accurate?

11   A.   Yes, sir.

12   Q.   It is about one month after the conversation that we just

13   went through in which Mr. Vanhise and Mr. Valle is supposedly

14   talking about kidnapping, I believe it was Alissa, right?

15   A.   In late January, yes.

16         MR. BAUM:  Can we go to the first conversation in that

17   e-mail, which I believe is -- well, it is actually the second.

18   February 28th at 3:51 p.m.

19         I am sorry.  It is a government exhibit.  Can you put

20   it up, 432?  It is a February 28th conversation.  I am looking

21   for February 28th, 3:51 p.m.  Can you highlight that, please,

22   Ms. Chen?  Thank you.

23   Q.   Now, at 3:51 p.m. you see how the conversation started,

24   Agent Walsh, in which Hal M, MHal52, says, I am going to send

25   all of them in this e-mail.  Let me know which one interests

D2s6val1          Walsh - cross

1    you the most.  To your knowledge is he talking about

2    photographs?

3    A.  Yes, sir.

4    Q.  And in sending photographs in this e-mail which you

5    determined to be a realistic and not role-play conversation

6    isn't that the same thing he did in some of the fantasy chats

7    in which he sends photographs?

8    A.  He did similar things, yes.

9    Q.  Let's look at 351.  Now, in 351 what does Michael Vanhise

10   say to Mr. Valle?

11   A.  The second one, what is her name, age and how much.

12   Q.  Now, in the e-mail that we just reviewed which took place a

13   month earlier, they had already agreed on an individual for

14   $4,000, didn't they?

15   A.  They did, sir.

16   Q.  So now a month later Mr. Vanhise has no recollection of who

17   they talked about or how much.  Would that be your

18   interpretation?

19              MS. WAXMAN:  Objection.

20              THE COURT:  Sustained.

21   Q.  Would you interpret that as a question as to who is the

22   second one and how much is she?

23              THE COURT:  Sustained.

24              MR. BAUM:  Can we go to the next e-mail, please, which

25   is I believe at 359?

D2s6val1          Walsh – cross

1   Q.  Now, in the first e-mail you acknowledge that they were

2   discussing Alissa, correct?

3   A.  Yes, sir.

4   Q.  Now, a month later Mr. Valle is writing to Mr. Vanhise

5   about a totally different person, isn't he?

6   A.  In this conversation?

7   Q.  Yes.

8   A.  Yes, sir.

9   Q.  And he is trying to interest Mr. Vanhise in someone

10  completely different after they have already agreed on Alissa,

11  right?

12          MS. WAXMAN:  Objection.

13          THE COURT:  Sustained.

14  Q.  In the first e-mail they agreed on Alissa, correct?

15  A.  They did, sir.

16  Q.  Now, in this e-mail Mr. Valle is saying I know a few girls

17  who are cops, a couple in the groups I sent you.  How about a

18  cop instead.  Correct?

19  A.  That is what he is saying, yes, sir.

20  Q.  And then as we go up to two more e-mails, which is on

21  February 28th, 2012 at 4:05 p.m., he says the second girl

22  listed is a cop, Evelyn, 33 years old.  Right, isn't that what

23  he said?

24  A.  He does say that, sir.

25  Q.  Now, at this point they are discussing someone completely

D2s6val1                    Walsh - cross

 1  different than they did in the first e-mail?

 2           MS. WAXMAN:  Objection.

 3           THE COURT:  Overruled.

 4  Q.  Right?

 5  A.  They are, sir.

 6  Q.  Now, as we go on in this chat in this e-mail, Mr. Vanhise

 7  says, No, I want to stay with Alissa.  Is that accurate?

 8  A.  He does, sir.

 9           MR. BAUM:  Now, can we go to February 28th at

10  4:30 p.m.?

11  Q.  Now, this is an e-mail from Mike Vanhise to MHal52,

12  Mr. Valle.  Could you read it, please?

13  A.  No prob.  She's never leaving the house and also about the

14  price would you do a payment plan or full up front?

15  Q.  So Mr. Vanhise is asking a kidnapper if he will do a

16  payment plan as though he is buying a used car?

17           MS. WAXMAN:  Objection.

18  Q.  Is that accurate?

19           THE COURT:  Sustained.

20  Q.  Mr. Vanhise is asking if a purported kidnapper will do a

21  payment plan for a kidnapping, is that correct?

22  A.  That's what he is asking, yes, sir.

23  Q.  Are you telling the jury that you believe that this is a

24  realistic conversation that a kidnapper would ask the intended

25  person to whom he is delivering would have a conversation about

D2s6val1          Walsh - cross

1   a payment plan?

2           MS. WAXMAN:  Objection.

3           THE COURT:  Sustained as to form.

4   Q.  You believe this is a real conversation about a payment

5   plan for a kidnapping?

6   A.  Yes, sir.  I do.

7           MR. BAUM:  Now, could we back up, please, Ms. Chen, to

8   an earlier conversation which is if you could show both

9   4:26 p.m. and 4:25 p.m. on that same exhibit.

10  Q.  So now they are talking about Alissa.  And MHal52 says,

11  5,000 she is all yours.  And Mr. Vanhise says, Could we do

12  four.  Correct?

13  A.  He does, sir.

14  Q.  I think you testified on direct that you interpreted four

15  to mean 4,000, right?

16  A.  I did, sir.

17  Q.  Isn't it a fact that in the prior conversation a month ago

18  they had already agreed on 4,000?

19          MS. WAXMAN:  Objection.

20          THE COURT:  Overruled.

21  Q.  The answer is they did, right?

22  A.  Yes, sir.

23  Q.  So this is just another negotiation all over again,

24  correct?

25  A.  It appears that way, yes, sir.

D2s6val1                    Walsh - cross

1          MR. BAUM:  Ms. Chen, can you highlight two

2     conversations, two brief conversations at 4:26 p.m. and

3     4:35 p.m.?

4     Q.  Now, in this conversation MHal52, or excuse me, Hal M says,

5     Would there with anything else you want me grab out of her

6     apartment?  Sourvenirs?  Do you see that?

7     A.  I do.

8     Q.  Can you read Mr. Vanhise's reply?

9     A.  No.  Just her and maybe a sexy spare outfit and pajamas for

10    her.

11    Q.  Now, is it your testimony that you believe that this is a

12    real conversation?

13    A.  Yes, sir, it is.

14    Q.  And you believe that in a real conversation Mike Vanhise is

15    saying can you bring a sexy spare outfit and a pair of pajamas

16    for her?

17         MS. WAXMAN:  Objection.

18         THE COURT:  Overruled.

19    A.  Yes, sir.

20    Q.  You do believe that that is a real conversation --

21    A.  Yes, sir.

22    Q.  -- bring a pair of pajamas?

23    A.  Yes, sir, I do.

24         MR. BAUM:  Now, Ms. Chen, can you highlight the

25    conversation at 4:40 p.m.?

D2s6val1            Walsh - cross

1    Q.  Now, in this conversation in this particular statement Mike

2    Vanhise is saying, Can you have her tied barefoot?  I don't

3    want her kicking me when I untie her at home.  Do you see that?

4    A.  I do, sir.

5    Q.  Do you recall in one of the conversations determined to be

6    fantasy role-play there was also a discussion about delivering

7    a victim barefoot so that the victim wouldn't kick?

8    A.  Yes, sir.  I do recall that.

9            MR. BAUM:  Now, Ms. Chen, can you highlight the

10   conversation or the e-mail at 5:27 p.m., please?

11   Q.  This is from MHal52, Mr. Valle, to Mike Vanhise, correct?

12   A.  Yes, sir, it is.

13   Q.  In this e-mail Mr. Valle says, I am aspiring to be a

14   professional kidnapper and that's business.  Do you see that?

15   A.  I do, sir.

16   Q.  And do you believe that a real kidnapper would say, I am

17   aspiring to be a professional kidnapper?

18   A.  Sir, I haven't read conversations of other kidnappers so I

19   couldn't tell you if that is the same thing they would say.

20   Q.  Right.  So you haven't read conversations of other

21   kidnappers so you really cannot say what kidnappers say, right?

22   Is that what you are telling me?

23   A.  I can't relate it to this particular conversation.

24   Q.  Basically what you are saying is when you say, I haven't

25   read conversations with other kidnappers, then you are saying

D2s6val1                    Walsh - cross

1    you really don't know what a real kidnapper might say?

2              MS. WAXMAN:  Objection.

3              THE COURT:  Overruled.

4    Q.  Is that accurate?

5    A.  Can you repeat the question, sir?

6    Q.  Sure.  When you say I haven't read conversations with other

7    kidnappers, what you are saying to me is you don't know what a

8    real kidnapper would say?

9    A.  What I am saying, sir, is I haven't read conversations with

10   other kidnappers.

11   Q.  And when you say that, tell the jury what you mean in

12   reference to my question whether a real kidnapper would say I

13   am aspiring, to be a professional kidnapper?

14   A.  I am not trying to be elusive, sir.  I just have not read

15   conversations with other kidnappers.

16   Q.  So you believe that this reference is not a fantasy

17   role-play statement but a real statement?

18   A.  That's my testimony.  Yes, sir.

19   Q.  That is your testimony and you are sticking to it, right?

20             MS. WAXMAN:  Objection.

21   A.  Yes, sir.

22             THE COURT:  Overruled.

23   Q.  Now, in this conversation Mr. Valle supposedly is saying

24   that he is going to put the person that he is kidnapping into

25   his van, right?

D2s6val1                    Walsh - cross

1    A.  Yes.  He does say that.

2    Q.  In fact, you know that Mr. Valle does not have a van,

3    correct?

4    A.  That's correct, sir.

5         MR. BAUM:  Now, can we go to the conversation at

6    5:33 p.m.?

7    Q.  Now, in this conversation MHal52, Hal M, says, It is a

8    short drive to you.  Do you see that?

9    A.  I do, sir.

10   Q.  In fact, you have examined all of the conversations between

11   MHal52 and Michael Vanhise, correct?

12   A.  The e-mails, yes, sir.

13   Q.  Yes, the e-mails.  All conversations in the e-mails.

14        And in none of them did Michael Vanhise ever give him

15   an address?

16   A.  No, sir.  Not in these e-mails.

17   Q.  By the way, I was asking you about Michael Vanhise's

18   finances before.  Do you recall that question?

19   A.  I do, sir.

20   Q.  Now, since Michael Vanhise and Mr. Valle were talking about

21   an exchange of cash -- they were talking about that, right?

22   A.  Yes, sir.

23   Q.  Did you ever see in any of these e-mails any wiring

24   instructions or bank account information for sending cash?

25   A.  No, sir.

D2s6val1                    Walsh - cross

1              MR. BAUM:  Now, Ms. Chen, can you put up Exhibit 433?

2    Q.  Now, you see the subject in this e-mail?

3    A.  Yes, sir.

4    Q.  What is the subject's name?

5    A.  Veronica.

6    Q.  Now, this is approximately the third e-mail between the

7    parties, correct?

8    A.  Yes, sir.

9    Q.  Approximately.  And this date is April 25th, which is about

10   two months after the last e-mail which was in February, right?

11   A.  Yes, sir.

12   Q.  And in this e-mail they are no longer talking about Alissa,

13   are they?

14   A.  No, sir.

15   Q.  They are talking about someone completely different,

16   correct?

17   A.  Yes, sir.

18              MR. BAUM:  Can we go to Government Exhibit 434,

19   please?  Can you highlight the very first conversation under

20   the heading, please, Come on over here next week.

21   Q.  Now, they have a conversation May 3rd, right?

22   A.  Yes, sir.

23   Q.  And in this conversation May 3rd Mr. Valle says, I can

24   knock the price down to 10,000.  Do you see that?

25   A.  I do, sir.

D2s6val1          Walsh – cross

1   Q.  Now, what was the previous price agreed upon?

2   A.  For the other woman, sir?

3   Q.  Yes.

4   A.  $4,000.

5   Q.  4,000.  This says I knock the price down to 10,000.

6   Doesn't it say that?

7   A.  That is what it says, yes.

8   Q.  So that is a complete departure from anything discussed in

9   any of the other e-mails about the price?

10          MS. WAXMAN:  Objection.

11          THE COURT:  Overruled.

12  A.  In the other e-mails regarding Alissa the price was 4,000.

13  In this one, which apparently refers to Veronica, the price can

14  come down to 10,000, sir.

15  Q.  Agent, I would like to show you what I have marked for

16  identification as W3.

17  A.  Thank you.

18  Q.  You are welcome.

19          Is this an e-mail conversation involving Mr. Valle?

20  A.  Yes, sir.  MHal52.

21  Q.  And the topic is Veronica, right?

22  A.  Yes, sir.

23  Q.  This one is from someone who is called Michael S, correct?

24  A.  Yes, sir.

25  Q.  Isn't that in fact Mr. Vanhise?

D2s6val1          Walsh - cross

1    A.  Yes, sir.

2    Q.  And you've reviewed this e-mail as part of the other

3    e-mails that you reviewed from Michael Vanhise and Mr. Valle,

4    correct?

5    A.  Yes, sir.

6              MR. BAUM:  Your Honor, I offer Defendant's Exhibit W3

7    in evidence.

8              THE COURT:  Any objection?

9              MS. WAXMAN:  No objection.

10             THE COURT:  Defense Exhibit W3 is received.

11             (Defendant's Exhibit W3 received in evidence)

12             MR. BAUM:  Ms. Katz, can you put W3 up, please?

13   BY MR. BAUM:

14   Q.  Now, this is a conversation between Michael Vanhise and

15   Mr. Valle on May 4th, is that accurate?

16   A.  Yes, sir.

17             MR. BAUM:  Can you highlight the very first message

18   under "heading," Ms. Katz, please?

19   Q.  And in this e-mail can you read what Michael Vanhise wrote?

20   A.  K.  Sounds good.  And for some reason if I can't get there,

21   I will let you know.  By the way, where are you again?

22   Q.  And did Mr. Valle ever tell him where he was?

23             MS. WAXMAN:  Objection.

24             THE COURT:  Rephrase.

25             MR. BAUM:  Yes, I will.

D2s6val1          Walsh - cross

1    Q.  In this e-mail or any of the other e-mails, did Mr. Valle

2    ever tell Michael Vanhise his address?

3    A.  In the E-mails that I reviewed, I don't believe so, sir.

4    Q.  Now, if we may, I would like to ask you some questions

5    about the person identified as Moody Blues, if that is okay.

6    A.  Yes, sir.

7    Q.  Now, Mr. Valle communicated with an individual known as

8    Moody Blues, correct?

9    A.  He did, sir.

10   Q.  I believe you testified to that on direct examination?

11   A.  I did, sir.

12   Q.  And those were chats, essentially chats?

13   A.  Yes, sir.

14   Q.  I think there may have been one or two e-mails, correct?

15   A.  Yes, sir.

16   Q.  Is it accurate to say that all the chats with Moody Blues

17   covered a period of two months from July 9th to September 8th,

18   2012?

19   A.  Approximately.  Yes, sir.

20        MR. BAUM:  Can we turn to Government Exhibit 401,

21   Ms. Chen?  Thank you.

22   Q.  Now, is this the first chat that you have between Mr. Valle

23   and Moody Blues?

24   A.  I believe it is one of the earlier ones.  Yes, sir.  I

25   don't know if it is the exact first one.

D2s6val1             Walsh - cross

1   Q.  Well, you have government exhibits to refresh your

2   recollection.  Do you have anything earlier than this?

3   A.  I don't have them in front of me, but I believe this is the

4   first ones.

5   Q.  Now, in this chat it starts out with Moody Blues, who is it

6   accurate to say is Meatmarketman?

7   A.  Yes, sir.

8   Q.  Saying, Hello, Chris C from DFN here.  Do you see that?

9   A.  Yes, sir.

10  Q.  What is that DFN?

11  A.  Darkfetishnetwork.

12  Q.  So is it fair to say or would you say that Moody Blues is

13  reminding Mr. Valle that it is someone who he may have met on

14  DFN?

15              MS. WAXMAN:  Objection.

16              THE COURT:  Sustained.

17              MR. BAUM:  Can you highlight about the first seven

18  lines, please?

19  Q.  Now, MHal52, Mr. Valle, says that he is in New York about

20  an hour north of the city.  Do you see that?

21  A.  I do, sir.

22  Q.  That is not true, right?

23  A.  He is in New York city, sir, but not an hour north of the

24  city.

25  Q.  Does this say New York city?

1    A.  It says New York, sir.

2    Q.  He says he is an hour out of the city, correct, north?

3    A.  Yes, sir, he does.

4    Q.  That is not a true statement?

5    A.  It is correct, sir.

6    Q.  And then he says that he is sending some girls who he has

7    available for $6,000, correct?

8    A.  Yes, sir.

9    Q.  So now he is discussing the negotiation.  Is that your

10   interpretation?

11   A.  Yes, sir.

12   Q.  And is it the same kind of negotiation that he discussed

13   with Michael Vanhise, correct?

14   A.  Similar.

15   Q.  And the same kind of negotiation that he discussed in many

16   of the fantasy role-play chats, correct?

17           MS. WAXMAN:  Objection.

18           THE COURT:  Overruled.

19   A.  They were similar negotiations.

20   Q.  He is talking to Moody Blues July 9th, correct?

21   A.  Yes, sir, he is.

22   Q.  And in many of the fantasy role-playing conversations he

23   was talking to people between February and July, right?

24   A.  I don't have those conversations in front of me, but it

25   sounds accurate, yes.

D2s6val1                    Walsh - cross

1    Q.  So now he is talking with Moody Blues in July and he is

2    talking about some of the same issues that were raised in the

3    fantasy e-mails, is that accurate?

4    A.  Similar negotiations, yes, sir.

5    Q.  Also he is sending pictures of some of the women, right?

6    A.  Yes, sir, he is.

7    Q.  And do you recall that in the fantasy role-play e-mails he

8    also sends pictures of the women, correct?

9    A.  That is correct, sir.

10   Q.  Now, in this e-mail he is talking about Kathleen, Kimberly,

11   among others, right?

12   A.  Yes, sir.

13   Q.  And isn't it a fact that in the fantasy role-play e-mails,

14   he also sends pictures of Kathleen and Kimberly?

15   A.  Yes, sir.

16           MR. BAUM:  Can we go to Government Exhibit 401,

17   Ms. Chen?  That is a conversation on July 9th at 8:07:00.  I

18   meant the heading dated.  Can you highlight 8:02:40, please,

19   that specific line.

20   Q.  Now, in this conversation with Moody Blues on July 9th, he

21   talks about, I can make chloroform here.  Do you see that?

22   A.  I do, sir.

23   Q.  And he also said the same thing to Ali Khan, correct?

24   A.  He did, sir.

25   Q.  Isn't it a fact that he also said the same thing in the

D2s6val1                    Walsh - cross

1    fantasy e-mail?

2    A.  One of the ones he showed me yesterday, yes, sir.

3    Q.  In fact, in the fantasy e-mail, Spin9979, he talked about

4    chloroform and the date of that was June 9th.  Do you recall

5    that?

6              MS. WAXMAN:  Your Honor, may we have the exhibit

7    number?

8              THE COURT:  What is the exhibit number?

9              MR. BAUM:  The defense exhibit?

10             MS. WAXMAN:  Yes.

11             THE COURT:  No.  Well, the e-mail you are talking

12   about.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

D2SUVAL2                    Walsh - cross

1              THE COURT:  The email, the chat that you are talking

2      about is --

3              MR. BAUM:  I will give it to you.  It is Defendant

4      Exhibit E12.  I will make it clearer.

5              Ms. Katz, can you go to E12 -- I will give the page to

6      you in a moment -- page 11, which is a conversation on June 12

7      at 6:30:19.  Can you highlight line 6:26:15.

8      Q.  Now, in this fantasy role play email on June 12, Mr. Valle

9      writes to the other person that some chloroform will do the

10     trick, do you see that?

11     A.  I do, sir.

12             MR. BAUM:  Thank you, Ms. Katz, and can you give it

13     back to Ms. Chen.

14     Q.  On the email with Moody Blues, he talks about chloroform

15     and this is almost a month later, correct?

16     A.  That's correct, sir.

17             MR. BAUM:  Now, on the exhibit that we have been

18     talking about with Moody Blues, GX 401, Ms. Chen, can you

19     highlight the two lines 8:04:41 and the line below that.

20     Q.  Now, in this conversation, Mr. Valle does mention Kathleen

21     but says it would be too tough, correct?

22     A.  He does, "a little tough."

23     Q.  And then they go on to talk about Kimberly later on in the

24     same conversation, do you see that down at the bottom?

25     A.  Yes, sir.

D2SUVAL2                    Walsh - cross

1           MR. BAUM:  Can we go to the very next chat, Government

2      Exhibit 402, please.  Can you highlight 8:09:38 and about five

3      lines down from that.  Thank you, Ms. Chen.

4      Q.  Now, this conversation with Moody Blues Mr. Valle says, I

5      am single.  It is a big gas oven.  He talks about an outdoor

6      spit roast.  And he says no one is around me for three-quarters

7      of a mile.  Do you see that?

8      A.  I do, sir.

9      Q.  Mr. Valle is not single, correct?

10     A.  Correct.

11     Q.  Mr. Valle, as far as you know, doesn't have a spit roast,

12     correct?

13     A.  Not that we have found, no.

14     Q.  And Mr. Valle, living where he lives, has thousands and

15     thousands, perhaps tens of thousands of people around him for

16     three-quarters of a mile, correct?

17     A.  I don't know the exact count, sir, but there are quite a

18     few people.

19     Q.  He lives in Queens, right, in an apartment building?

20     A.  Yes.

21          MR. BAUM:  Can you go down to the bottom of the page,

22     if you may, highlight the last seven lines from the bottom.

23     Can you highlight specifically 8:19:31 and four lines after

24     that -- is it on two different pages, so if you can.

25     Q.  So at this part Moody Blues is saying you need to be very

1  secluded, do you see that?

2  A.  I do, sir.

3  Q.  Mr. Valle answers on the second page, I have a place up in

4  the mountains, no one is around for three-quarters of a mile,

5  do you see that?

6  A.  I do, sir.

7  Q.  That is not true, is it?

8  A.  Not that we have found, sir.

9           MR. BAUM:  Can you go to Government Exhibit 402, a

10  conversation headed 8:36:39, Ms. Chen.  Can you highlight lines

11  8:29:28 through 8:29:39.

12  Q.  Now, in this conversation Moody Blues says to Mr. Valle,

13  have you ever eaten any women before and what is Mr. Valle's

14  response?

15  A.  Mhal52 responds:  "No, I haven't."

16  Q.  Thank you.

17           MR. BAUM:  Can we go to Government Exhibit 403,

18  please.  Can you highlight 8:39:06 and 8:39:22.

19  Q.  Here Mr. Valle is saying to Moody Blues, I will go to her

20  place on September 2nd, kidnap her and we will start cooking

21  Monday afternoon.  Do you see that?

22  A.  I do, sir.

23  Q.  Do you know who this is in reference to?

24  A.  I believe he is referring to Kimberly, sir.

25  Q.  Was Kimberly kidnapped on Labor Day weekend?

1    A.  Thankfully, no, sir.

2    Q.  Thankfully, no.  Thank you.

3            MR. BAUM:  Can you highlight, please, 8:42:09 and the

4    next line, 8:42:16.

5    Q.  Now, do you see that Mhal52 makes another reference to

6    chloroform?

7    A.  I do, sir.

8    Q.  We also discussed that there was a reference to chloroform

9    in one of the role play fantasy chats?

10   A.  We did, sir.

11   Q.  Wasn't there also a reference to chloroform in his

12   discussions with Ali Khan?

13   A.  Yes, there was.

14   Q.  This conversation about chloroform is something that

15   Mr. Valle talks about in the fantasy chats prior to January 9

16   which is this chat and also talks to Ali Khan about, right?

17   A.  Yes, sir.

18           MR. BAUM:  Can you go to Government Exhibit 404

19   please, Ms. Chen.  Can you highlight 8:53:16 down to 8:53:42.

20   Q.  Now here is another conversation between Moody Blues and

21   Mr. Valle about the location where he lives, correct?

22   A.  Yes, sir.

23   Q.  And in this one Moody Blues asks him how long to get to the

24   mountain place, do you see that?

25   A.  I do, sir.

D2SUVAL2                    Walsh - cross

1   Q.  What does Mhal52 say?

2   A.  He says a couple of hours from the airport.

3   Q.  And what does he say after that?

4   A.  Lots of winding roads.

5   Q.  And, again, you know that is not a true statement, correct?

6           MS. WAXMAN:  Objection.

7           THE COURT:  Overruled.

8           Go ahead.

9   Q.  You know that is not a true statement?

10  A.  Yes, sir.  We are not aware of a place he had in the

11  mountains.

12  Q.  Can you turn to the next conversation, I believe it is 404,

13  which is a conversation dated July 9, headed 9:13:20.

14          MR. BAUM:  Ms. Chen, can you highlight lines 9:02:38

15  and 9:03:04.

16  Q.  Now, do you know who this conversation is in reference to?

17          I withdraw that question.

18          Is this conversation in reference to Kim Sauer?

19  A.  Yes, sir.

20  Q.  In this conversation, Moody Blues asked, "do you see her

21  often," correct?

22  A.  He does, sir.

23  Q.  Mhal says -- can you read what his responses is, those two

24  lines?

25  A.  "Once a month or so, talk on the phone more often."

1    Q.  During the course of your investigation, have you

2    determined that that statement is false?

3    A.  Sir, I don't recall how often she said she saw him.

4    Q.  Do you recall that Ms. Sauer said she rarely talks to

5    Mr. Valle on the phone?

6    A.  I don't recall that, no, sir.

7    Q.  Can you turn to Government 407, please.  This is a

8    conversation July 10th with Moody Blues, correct?

9    A.  That's correct, sir.

10          MR. BAUM:  Can you highlight, Ms. Chen, lines 5:48:51

11   and 5:49:03.

12   Q.  Now, in July, Mhal says to Moody Blues, I'm working on a

13   Word document, right?

14   A.  He does say that, sir.

15   Q.  And a blueprint of everything we will need to carry this

16   out, correct?

17   A.  He does.

18   Q.  In fact during the course of your testimony, it was

19   admitted into evidence, Government Exhibit 601 -- do you recall

20   that?

21   A.  That was the blueprint, yes, sir.

22   Q.  Do you have that in front of you?

23   A.  I do not.

24          Thank you, sir.

25   Q.  You are welcome.

1          Now, would you take a look at Government Exhibit 601?

2     A.   Yes, sir.

3          MR. BAUM:  Ms. Chen, can you put 601 up on the screen.

4     Q.   Now, this is a picture of Kim Sauer, correct?

5     A.   That is correct.

6     Q.   Let's look at the pedigree basic information on this

7     document, if we can.  Is that all right, Agent Walsh?

8     A.   Of course.

9     Q.   It says that the full name is Kimberly Marie Shea.  Do you

10    see that?

11    A.   I do, sir.

12    Q.   That is in fact not Kim Sauer's full name?

13    A.   That is not her full name, correct, sir.

14    Q.   And it says a date of birth.  Do you see that?

15    A.   I do, sir.

16    Q.   That is not Ms. Sauer's date of birth?

17    A.   I don't recall her exact date of birth.

18    Q.   It says that her age is 27, in fact she is 29, is that

19    correct?

20    A.   Who, sir --

21    Q.   It says that her place of birth is Carey, North Carolina.

22    That is incorrect, isn't it?

23    A.   I don't know, sir.

24    Q.   It says that she has a master's degree.  Does she have a

25    master's degree?

D2SUVAL2                    Walsh - cross

1    A.  I don't know, sir.

2    Q.  It says that her master's degree is in journalism.  Do you

3    know whether it's in journalism?

4    A.  I don't recall.

5    Q.  It says she went to Syracuse University.  Didn't she go to

6    the University of Maryland?

7    A.  She did.

8    Q.  So that would be an incorrect statement?

9    A.  Yes, it is.

10   Q.  There was a second page on this, correct?

11   A.  Yes, sir, there was.

12   Q.  This says "Abducting Kimberly, Target Date September 2nd,"

13   correct?

14   A.  It does, sir.

15   Q.  And, thankfully, she wasn't abducted September 2nd?

16   A.  Thankfully, yes, sir.

17   Q.  Thankfully, of course.

18        In the materials needed it includes chloroform, right?

19   A.  Yes, sir.

20   Q.  You never found any chloroform?

21   A.  No, I never found any.

22   Q.  And it includes rope, the strongest kind.  You never found

23   any rope, did you?

24   A.  No, sir, I never found any rope.

25   Q.  It includes duct tape.  You never found any duct tape?

D2SUVAL2                    Walsh - cross

1   A.  There may have been duct tape, but we did not seize any

2   duct tape.

3   Q.  The chloroform, the rope and the duct tape were items that

4   were discussed in one of the fantasy chats that we have been

5   through.  Do you recall that?

6   A.  I do recall that, sir.

7   Q.  Did you ever seize any gloves from Mr. Valle's apartment?

8   A.  I don't believe so.

9   Q.  And you never seized any sneakers either, did you?

10  A.  I don't believe so, no, sir.

11  Q.  So the last conversation that you are aware of between

12  Moody Blues and Mr. Valle was on -- withdrawn.

13        The prior conversation that you are aware of between

14  Moody Blues and Mr. Valle was, I believe, July 10th, correct?

15        THE COURT:  I don't know, Mr. Baum, what exhibit --

16        MR. BAUM:  That was Government Exhibit 407.  That was

17  July 10th.

18  Q.  Do you recall?  Do you want to make a look at it?

19  A.  Yes, sir.  I see it.

20  Q.  Do you know what date the next conversation with Moody

21  Blues was?

22  A.  I don't recall the time of that, no, sir.

23        MR. BAUM:  Can we turn to Government Exhibit 408,

24  please.  Can you turn to the chats on July 17, 2012 with a

25  caption of 8:03:54 as the header.

D2SUVAL2                    Walsh - cross

Q.  Do you know, isn't it a fact that these chats are about
Kimberly?

A.  I believe they are, yes, sir.

          MR. BAUM:  Can you highlight, Ms. Chen, lines 7:53:19.

Q.  And what is Mhal saying on that line?

A.  He says:  "God help her if I find out where she lives."

Q.  Isn't it a fact that Mr. Valle did know where Kimberly
lived?

A.  He may have at this time, yes, sir.

Q.  Isn't it a fact that Mr. Valle sent a PBA card to Kimberly
at her address, do you know that?

A.  I believe he did, yes.

Q.  And when Mr. Valle says to Moody Blues, "God help her if I
find out where she lives," that's false?

A.  I can't testify to what Mr. Valle --

Q.  He knew where she lived, right?

A.  Yes, sir.

          MR. BAUM:  Can you go to Government Exhibit 409,
please.

Q.  Now, this is a conversation on July 17 with Moody Blues,
correct?

A.  Yes, sir, it is.

          MR. BAUM:  Can you highlight for me lines 8:09 through
8:11.

Q.  Now, in this conversation he again talks about chloroform,

1   correct?

2   A.  Yes, sir, he does.

3   Q.  And he says -- "he" being Mhal, Mr. Valle -- "I found a web

4   site a couple of nights ago," correct?

5   A.  He does say that, yes, sir.

6   Q.  And the date of this is July 17, right?

7   A.  It is.

8   Q.  Do you know whether it is true that he found the web site a

9   couple of nights ago or whether he had found it much earlier?

10  A.  I don't know when he found it, sir.

11  Q.  Do you see the web site that he sends,

12  www.howtodothings.com?  Do you see that?

13  A.  Yes, sir, I do.

14          MR. BAUM:  May I just have a moment, your Honor?

15          THE COURT:  Yes.

16  Q.  So here he is having a conversation with Moody Blues on

17  July 17 and telling Moody Blues, on July 17, "I found a web

18  site a couple of nights ago"?  Am I reading it accurately?

19  A.  Yes, you are.

20          MR. BAUM:  Can we go, Ms. Chen, please, to Government

21  Exhibit 427.  And the specific conversation I am looking for is

22  May 9 at 5:37:10.  Can you highlight lines 5:32:47 down to

23  5:34:18.

24  Q.  Now, this is a conversation on May 9, correct?

25  A.  Yes, it is, sir.

D2SUVAL2                    Walsh - cross

1    Q.  And the other conversation with Moody Blues was July 17,

2    right?

3    A.  That's correct, sir.

4    Q.  On July 17, he said that he found a recipe for chloroform a

5    couple of nights ago and sent him the recipe to the web site

6    howtodothings.com, do you recall it?

7              MS. WAXMAN:  Objection.

8              THE COURT:  Overruled.

9    Q.  Do you recall that?

10   A.  Yes, sir.

11   Q.  In fact, do you see the highlighted portion --

12   A.  Yes, sir.

13   Q.  -- of this conversation May 9.  In fact, Mr. Valle had

14   found the web site almost a month before that, right, not a

15   couple of nights before?

16             MS. WAXMAN:  Objection.

17             THE COURT:  Overruled.

18   A.  I believe that is a different site, sir.

19   Q.  But Mr. Valle had found the web site for making chloroform

20   back in May, right?

21   A.  One of the web sites, yes, sir.

22   Q.  And had discussed that with Ali Khan and sent him a link,

23   right?

24   A.  Yes, sir, a link.

25   Q.  By the way, do you recall that the government put into

1   evidence an exhibit for making chloroform?

2   A.  I do, sir.

3          MR. BAUM:  You can take that down.

4   Q.  That exhibit that you put into evidence, did you download

5   that from the web?

6   A.  I did, sir.

7   Q.  So you went on the web and downloaded it for the exhibit?

8   A.  I did, sir.

9   Q.  You didn't find that on his computer, did you?

10  A.  No, sir, I did not.

11  Q.  Now, we were just talking about the blueprint that is a

12  Government Exhibit, do you recall that?

13  A.  I do, sir.

14  Q.  I would like to show you again Defendant Exhibit E10.

15         MR. BAUM:  Ms. Katz, will you turn to page 24 of

16  Defendant Exhibit E10, and can you highlight the top down to

17  the first line.

18  Q.  Now, this is a fantasy role play conversation with

19  Meandharris on July 17th, correct?

20  A.  It is, sir.

21  Q.  What does Mhal say on the first line?

22  A.  "That's a blueprint and it is definitely doable."

23  Q.  Isn't it a fact that, based upon your interpretation of

24  that first line, that he discussed the blueprint with

25  Meandharris?

1    A.  Some blueprint, yes, sir.

2               MR. BAUM:  Can you go to page 25, down three lines,

3    the last few lines.

4    Q.  Just so that we are sure, you determined that that

5    conversation with Meandharris, including the conversation about

6    the blueprint was fantasy, right?

7    A.  Yes, sir.

8    Q.  Just to be sure, you have a conversation with Meandharris

9    on July 17 where Mhal says -- can you read it to us?

10   A.  "If you were wondering, it's all fancy.  I just enjoy

11   pushing the envelope a bit."

12              MR. BAUM:  Thank you.

13              You can take that down.

14              Ms. Chen, can we go back to the Moody Blues exhibits,

15   and I believe it is Exhibit 410, and I was specifically looking

16   for a conversation, July 19th under the heading 7:12:48,

17   subject "Take Care."

18              Can you highlight line 7:10:48 and the following

19   7:10:57.

20              Now in this conversation in the highlighted portion,

21   Moody Blues is asking Mhal for the address of Kim, right?

22   A.  He is, sir.

23   Q.  Can you read Mhal's response?

24   A.  "Don't know it by heart."

25   Q.  Isn't it a fact that he knew Kim's address, we have

D2SUVAL2                    Walsh - cross

1   established that, correct?

2   A.  Yes, sir.

3   Q.  Do you know when the last chat with Moody Blues was?

4   A.  I believe there's one September 8, but I don't recall the

5   exact date.

6   Q.  Can we go to Government Exhibit 445, please.  Now, this is

7   appears email between Mhal or HalM and Christopher Collins,

8   correct?

9   A.  Yes, sir.

10  Q.  But I think that you stated that Christopher Collins was

11  Moody Blues, is that accurate?

12  A.  I believe so, yes.

13          MR. BAUM:  Can we go down, Ms. Chen, to the email of

14  22:46:00.

15  Q.  Now, in this email Mhal says to Moody Blues that his oven

16  is pretty big, it is five feet long, four feet deep and four

17  feet high.  Do you see that?

18  A.  I do, sir.

19  Q.  You testified that you were in Mr. Valle's apartment?

20  A.  Yes, sir, I was.

21  Q.  I think it is fair to say that he did not have an oven of

22  that size?

23  A.  Yes, sir, it is fair to say.

24          MR. BAUM:  Thank you, Ms. Chen.

25          Can you go to Government Exhibit 412.

1   Q.  Now this was a conversation, isn't it, Agent Walsh, between

2   Mhal and Moody Blues on August 24, 2012, correct?

3   A.  Yes, sir, it is.

4   Q.  In this conversation -- I don't know if you can see down to

5   the bottom or at least line 6:52:27, is this a conversation

6   about Kristen?

7   A.  Yes, sir.  It says, "we are good to go if we get Kristen."

8   Q.  And Kristen is a high school student?

9   A.  Yes.

10  Q.  Real person, right?

11  A.  Real person, yes.

12  Q.  And in fact, Kristen, high school student, real person, was

13  mentioned numerous times in the role play fantasy chats, wasn't

14  she?

15  A.  I believe she was, sir.

16          MR. BAUM:  Can you, Ms. Chen, highlight just the line

17  6:44:51.

18  Q.  Now, in this line Mhal says, "I think she's going away

19  school real soon."  Do you see that?

20  A.  I do, sir.

21  Q.  In fact, when Kristen graduated high school, didn't she

22  attend college in the city, in New York City?

23  A.  I don't know about her college, but I believe so.

24          MR. BAUM:  Can you turn to the next page, Ms. Chen,

25  which is Government Exhibit 412 but the heading is 7:11:27:

1    "OK, sounds good, take care."

2            Thank you.

3            Can you highlight just the first two lines.

4    Q.  Mhal says:  "In August I checked out how long a drive would

5    be from her college to my house and it is around four, four and

6    a half hours."  Do you see that?

7    A.  I do, sir.

8    Q.  Do you know if Kristen was going to college four or four

9    and a half hours outside of New York?

10   A.  I don't know, sir.

11   Q.  Down at the bottom, do you see the same email, she is going

12   to the University of Maryland.  Do you see that?

13   A.  Yes, sir, I do.

14   Q.  And do you know for a fact that Kristen did not go to the

15   University of Maryland; she went to school in New York City?

16   A.  That's correct, sir.

17           MR. BAUM:  Ms. Chen, can you go to GX 413.

18   Q.  Do you see that this is a conversation about Andria?  If

19   you look down through the context, you will see at the bottom,

20   it mentions Andria, the prosecutor?

21   A.  Yes, sir, I see that.

22           MR. BAUM:  Can you highlight 5:10:10, please -- excuse

23   me -- 5:10:01 and 5:10:10.

24   Q.  What did Mhal say in those two lines?

25   A.  Mhal52:  "So I pretty much ruled her out but in my

1  fantasies, she is the number 1 by far."

2          MR. BAUM:  Can you turn, Ms. Chen, to a conversation

3  with Moody Blues which is dated August 25th at 5:52:59.

4  Q.  Do you see in this conversation Mhal says:  "If Andria

5  lived near me, she'd be gone by now"?  Do you see that?

6  A.  I do.

7  Q.  Do you recall that he said the same exact words in one of

8  the fantasy role play chats?

9  A.  I don't recall the exact same words but similar, yes.

10 Q.  He said:  "If Andria lived near me, she'd be gone by now:

11 Do you recall that in the fantasy chats?

12         MS. WAXMAN:  Objection.

13         THE COURT:  Overruled.

14 Q.  Do you recall that?

15 A.  I don't recall the exact same words, but something similar.

16         MR. BAUM:  You can take that down, Ms. Chen.

17 Q.  Now, in your review of the chats with Moody Blues and Mhal,

18 isn't it a fact that there was discussion of kidnapping, Kim,

19 Kristen, Andria, is that accurate?

20 A.  Yes, sir.

21 Q.  Were any of them kidnapped?

22 A.  Fortunately --

23 Q.  Fortunately not?

24 A.  Fortunately not.

25         MS. WAXMAN:  Objection.

1          THE COURT:  Overruled.

2          MS. WAXMAN:  Your Honor, the government objects to

3   Mr. Baum answering the question before the witness can finish

4   his answer.

5          THE COURT:  Please don't speak over the witness,

6   Mr. Baum.

7          MR. BAUM:  I'm sorry, Judge.  I will try to improve.

8          Can you go to Government Exhibit @415, Ms. Chen.

9   Q.  This is a conversation on September 8, 2012, is that

10  accurate?

11  A.  Yes, sir, it is.

12  Q.  Do you know who they are talking about here?  If you look

13  in the body, maybe that will help you?

14  A.  I see the name Andria, yes, sir.

15          MR. BAUM:  In this conversation, at line 4:24:18,

16  Ms. Chen -- I'm sorry -- 4:24:18, two lines, and 4:24:59.

17  Q.  Do you see those two lines, questions by Moody Blues:

18  "Does she live close to you"?

19  A.  Yes, sir, I do.

20  Q.  In 4:24:59, the answer by Mhal, can you read it?

21  A.  "Not sure of her exact location, but probably an hour to an

22  hour and a half or so."

23  Q.  And that is not true, is it?

24  A.  No, sir.  Andria lives in Ohio.

25  Q.  In fact, Mr. Valle knew that Andria lived in Ohio?

1   A.  I believe he did, sir.

2          MR. BAUM:  Can you highlight, Ms. Chen, 4:27:50 to

3   4:27:54, two lines.

4   Q.  Mhal says about Andria:  "I'm going to start Monday.  I

5   will follow her home."  Do you see that?

6   A.  I do, sir.

7   Q.  The date of this, if you get up to the top, you see right

8   at the top, it is September 8, right?

9   A.  Yes, sir.

10  Q.  And did in fact Mr. Valle leave New York for Ohio anytime

11  between September 8 and thereafter?

12  A.  I'm not aware that he did, sir.

13  Q.  Do you recall that in fact Mr. Valle said the same thing

14  about following Andria home to Ali Khan?

15  A.  I don't recall that, sir.

16  Q.  Can you turn to Government Exhibit 415, please.

17         MR. BAUM:  Can you highlight 4:50:15.

18  Q.  Here Mhal says to Moody Blues that he might waterboard her,

19  do you see that?

20  A.  I do, sir.

21  Q.  Do you recall yesterday in one of his role play fantasy

22  chats he also said to a fantasy partner, I might waterboard

23  somebody -- used the same word "waterboard"?

24  A.  Yes, sir, he did.

25         MR. BAUM:  You can take that down, Ms. Chen.

D2SUVAL2                    Walsh - cross

1  Q.  You also testified on direct examination about a number of

2  chats that Mr. Valle, Mhal, had with Ali Khan, do you recall

3  that?

4  A.  I do, sir.

5          MR. BAUM:  Can we go to Government Exhibit 417,

6  please.

7  Q.  Do you know if this was the first chat that he had with Ali

8  Khan?

9  A.  I'm not aware, sir.

10 Q.  Nevertheless, this is January 23, 2012, correct?

11 A.  Yes, sir, that's the date on the chat.

12 Q.  Do you see the time on this chat, 5:47?

13 A.  I do, sir.

14 Q.  In the beginning of this chat Ali Khan says, "I'd like to

15 share my ideas with you."  Do you see that?

16 A.  Yes, sir, I do.

17 Q.  And then Mhal says:  "Sounds good.  Let's talk about

18 getting a girl to you."  Do you see that?

19 A.  Yes, sir, I do.

20 Q.  Are you aware or do you recall that he spoke to

21 Mr. Valle -- Mr. Valle spoke to Tim Chase in a fantasy role

22 play chat on that same date?

23 A.  I don't recall the date, no, sir.

24 Q.  I would like to give you back what is marked in evidence as

25 Defendant's Exhibit E1, a series of conversations with Tim

1  Chase?

2  A.  Thank you.

3  Q.  You are welcome.

4         I would like you to note, Agent Walsh, that the

5  conversation with Ali Khan about getting a girl for him took

6  place on January 23 at 5:47, do you see that?

7  A.  I do, sir.

8         MR. BAUM:  Ms. Katz, can you put up, Mr. Chase, E1,

9  page 1.  Can you go to, Ms. Katz, page 3.

10 Q.  Now, here is a conversation with Tim Chase.  Do you see

11 that?

12 A.  Yes, sir, I do.

13 Q.  In this conversation with Tim Chase, it is January 23.  Do

14 you see the time?

15 A.  I do, sir.

16 Q.  The time is 5:35, correct?

17 A.  Yes, sir, that is the last communication.

18 Q.  It started at 5:23, correct?

19 A.  That's correct, sir.

20 Q.  And the conversation with Ali Khan that we were just

21 talking about, Mr. Valle getting him a girl, that conversation

22 started at 5:34, correct?  Do you recall that?  Take a look to

23 refresh your recollection.

24 A.  I don't have that conversation, sir.

25 Q.  Excuse me.  That conversation started at 5:47.  This

1    conversation occurred before the conversation with Ali Khan,

2    didn't it?

3    A.  It did, sir.

4    Q.  In this conversation which is the fantasy role play chat,

5    they are talking about Mr. Valle getting paid for kidnapping

6    someone and sending that person to Tim Chase, correct?

7    A.  That's correct, sir.

8    Q.  So within minutes of going in this fantasy role play

9    conversation, he has a similar conversation with Ali Khan,

10   correct?

11   A.  Yes, sir, he does.

12   Q.  And it is still your testimony that minutes earlier,

13   talking about the same content in a fantasy role play

14   conversation, it is your testimony that the Ali Khan

15   conversation is real?

16   A.  Yes, sir, I believe it is.

17           MR. BAUM:  Can we go back to Government Exhibit 417,

18   please.  Can you highlight lines 5:42:38 and 5:42:46.

19   Q.  In this conversation Mr. Valle is saying:  "I can talk my

20   girlfriend into going to India for a trip and then we will meet

21   up," correct?

22   A.  Yes, sir, he says that.

23   Q.  Do you recall -- if not I can refresh your recollection --

24   of what they were talking about was kidnapping Kathleen the

25   week of February 20th -- do you recall if that is accurate?

D2SUVAL2                    Walsh - cross

1    A.  Yes, sir, it is.

2    Q.  I am sure after viewing this conversation in order to prove

3    it was real, you checked with all of the airlines about

4    international flight reservations for Mr. Valle?

5    A.  We did, sir.

6    Q.  You found nothing?

7    A.  We did not find flight reservations, no, sir.

8    Q.  Can you go to Government Exhibit 417, please.

9         MR. BAUM:  Can you highlight 6:01:56.

10   Q.  Mhal now says that he is in Pennsylvania, correct?

11   A.  Yes, sir, that's what he says.

12   Q.  So in some of the chats, he says he is in upstate New York?

13   A.  Yes, sir.

14   Q.  And now he is talking to Ali Khan and he says he is in

15   Pennsylvania right?

16   A.  Yes, sir.

17   Q.  And you know that is not true, right?

18   A.  That's correct, sir.

19        MR. BAUM:  Can you go to the same exhibit, 417,

20   conversation 6:27:04.  Can you highlight the first five lines

21   of the conversation.

22   Q.  Now, there's a conversation that Mhal had with Ali Khan

23   saying that he was going to take a woman, Kathleen, kidnap her

24   and meet Ali Khan in a hotel, correct?

25   A.  Yes, sir, that's what he says.

D2SUVAL2             Walsh - cross

1   Q.  So I assumed that you also checked in Pakistan.  I assume

2   that you also checked to see if Mr. Valle had made any hotel

3   reservations?

4   A.  Sir, we are not able to verify hotel reservations in

5   Pakistan.

6   Q.  So you didn't check?

7   A.  No, sir.

8   Q.  So you have no evidence that Mr. Valle ever intended or

9   carried through on plans to go to a hotel in Pakistan?

10          MS. WAXMAN:  Objection.

11          THE COURT:  Sustained.

12  Q.  To your knowledge, does the FBI know of any facts that

13  would indicate that Mr. Valle made a hotel reservation?

14  Pakistan?

15  A.  No, sir, we are not aware of any hotel reservations.

16          MR. BAUM:  You can take that down, Ms. Chen.

17  Q.  Again, do you remember or I can refresh your recollection

18  that Mr. Valle told Ali Khan that Kathleen was a teacher and

19  has off the week of February 20th, right?

20  A.  I do recall that.

21  Q.  And that's why they were planning that they kidnap her the

22  week of February 20?

23  A.  Yes, sir.

24  Q.  And I think that you acknowledged in February or February

25  20 of 2012, Kathleen was not working as a teacher, is that

D2SUVAL2                    Walsh - cross

1  right?

2  A.  That's correct, sir.

3  Q.  I think you also acknowledged previously that that is

4  either the second or third time that he mentioned kidnapping a

5  person -- at least two or three women that he was going to

6  kidnap on February 20?

7  A.  Yes, sir.

8          MR. BAUM:  Can you, Ms. Chen, go to January 23 on the

9  same exhibit, 6:58:52 in the heading, "she is good" -- I'm

10  sorry.  It is 6:58:52 in the heading under the date January

11  23rd.  I think it is the same exhibit.  Can you highlight

12  6:52:11 and 6:52:14.

13  Q.  This is the same day that he had discussed kidnapping

14  Kathleen the week of February 20th -- this is January 23 -- do

15  you recall that?

16  A.  Yes.

17  Q.  In this conversation, Mr. Valle says, "I've had other girls

18  who I want to cook more than Kathleen."  Do you recall that?

19  A.  Yes, sir, he says that.

20  Q.  At this point, was he moving Ali Khan away from the idea of

21  kidnapping Kathleen?

22          MS. WAXMAN:  Objection.

23  Q.  Do you know, based on your review of the chats?

24  A.  Do I know if he was moving him away from Kathleen?  I can't

25  state really what he was trying to do, sir.

1    Q.  OK.

2            MR. BAUM:  Well, let's go to Government Exhibit 418

3    and I will try to help you.

4    Q.  This is a conversation, January 25th, two days after the

5    one that we just discussed.

6            MR. BAUM:  Ms. Chen, can you highlight lines 7:56:15

7    and down to 7:56:44.

8    Q.  Now, here Ali Khan says:  "Can you get the girl here?"  And

9    now Mr. Valle says:  Not on that day," and he goes on to say,

10   "I spoke to her about her week off.  She is going to visit her

11   parents."  Do you see that?

12   A.  Yes, sir.

13   Q.  So now let's go back to my prior question.  Two days after

14   he said that we are going to kidnap Kathleen, is he trying to

15   move Ali Khan away from Kathleen?

16   A.  He is just saying he can't do that that day, sir.

17           MR. BAUM:  Can you go, Ms. Chen, to the next page

18   which is under the date January 25, 8:33:05.  Can you highlight

19   lines 8:27:15 and 8:28:03.

20   Q.  In this exchange, Ali Khan says to Mhal:  "You are not

21   really interested in slaughtering them."

22           And what is Mhal's response?

23   A.  "Maybe one day."

24           MR. BAUM:  Thank you, Ms. Chen.  You can take it down.

25           Can you turn to Government Exhibit 422, Ms. Chen.  Can

1   you highlight the first five lines, please.

2   Q.  Do you know who this is about?  Isn't this about Andria in

3   Ohio?  If you look in the body, you can see they mention

4   Andria?

5   A.  Yes, sir, I see that.

6   Q.  Do you see the exchange where Ali Khan says:  "I hope you

7   make your first kill soon."

8          And Mhal says:  "It's good, been watching outside her

9   house."  Do you see that?

10  A.  I do, sir.

11  Q.  In fact Andria is in Ohio, correct?

12  A.  That's where she resides, yes, sir.

13  Q.  And this date is February 10th, correct?

14  A.  Yes, sir.

15  Q.  And of course you checked Mr. Valle's travel records with

16  the airlines, I assume?

17  A.  Not with the airlines, no, sir.

18  Q.  Well, did you ever determine that Mr. Valle actually

19  traveled to Columbus, Ohio?

20  A.  No, sir.  We were not able to.

21         MR. BAUM:  Can you turn to GX 424, please, and can you

22  highlight -- I think we are looking at 6:11.  Thank you.  And

23  can you highlight 5:57:09 and 5:57:58.

24  Q.  Now, in this conversation Ali Khan says:  "So Andria is

25  going to happen soon?"

D2SUVAL2                    Walsh - cross

1          And Mhal says:  "February 20 is a holiday so that's my

2   target weekend."  Do you see that?

3   A.  Yes, sir, I do.

4   Q.  So this is another person that Mr. Valle is talking about

5   kidnapping, among the several others, the weekend of February

6   20?  Do you see that?

7   A.  Yes, among the same ones.

8   Q.  Among the two or three that he says he is going to kidnap

9   the week of February 20, correct?

10  A.  Yes, sir.

11  Q.  Just to be sure, you have no evidence that Mr. Valle ever

12  traveled to Columbus anytime around February 20th and anytime

13  ever, right?

14  A.  No, sir.

15          MR. BAUM:  Can you put up, Ms. Chen, Government

16  Exhibit 425.

17  Q.  Now, in this exhibit Mr. Valle is talking to Ali Khan about

18  Andria, is that accurate?

19  A.  Yes.  I see her name in the conversation.

20  Q.  Mr. Valle says, "Her name is Andria."  Do you see that?

21  A.  Yes, sir, I do see that.

22

23          (Continued on next page)

24

25

1          MR. BAUM:  Now, can you highlight, Ms. Chen, 5:54:29

2     and up to 5:55:10.  I am sorry.  Highlight 5:54:29 up to line

3     5:55:10.

4     BY MR. BAUM:

5     Q.  And Ali Khan, as we just discussed, and Mr. Valle had

6     previously discussed kidnapping Andria the week of

7     February 20th, right?

8     A.  Yes, sir.  Mr. Valle discussed that topic with Ali Khan.

9     Q.  And that conversation took place in February, correct?

10    A.  Yes, sir.

11    Q.  Now, here we are about a month and a half later, right?

12    April 4th, 2012, correct?

13    A.  Yes, sir.

14    Q.  And a month and a half later there is a conversation, How's

15    your hunt going?  Do you see that?

16    A.  Yes, sir.  I do.

17    Q.  And MHal52 says, It is going well.  I am going to grab this

18    girl I've known for seven years.  Right?

19    A.  Yes, sir, he does.

20    Q.  Now, a month and a half before that they had the same

21    discussion.  Do you recall that?

22    A.  Yes, sir.  Similar conversation.

23    Q.  So now they are starting all over again, having a

24    discussion about Andria a month and a half later, correct?

25    A.  Yes, sir.  It appears that way.

D2S6VAL3                    Walsh - cross

1    Q.  And is it your testimony that even though they are

2    repeating a role-play that they did a month and a half earlier

3    that this is real?

4                MS. WAXMAN:  Objection.

5                THE COURT:  Sustained.

6    Q.  It is your testimony that although they are repeating a

7    conversation that they had a month and a half earlier that this

8    is real?

9    A.  Sir, I believe they are continuing the conversation, yes.

10               THE COURT:  Mr. Baum, we'll take our midmorning break

11   at this point.

12               Ladies and gentlemen, don't discuss the case, keep and

13   open mind and we'll continue after the break.

14               (Jury excused)

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Please be seated.

3          Let me say that I am getting concerned about time.

4     Mr. Baum estimated that he had about an hour left with the

5     agent.  We're now approaching two hours.  So to the extent the

6     estimate of times are wildly wrong, I am not going to be able

7     to not sit on Friday.  The agreement to not sit on Friday was

8     premised on the time estimates I received.  To the extent that

9     those time estimates were not accurate, let's put it that way,

10    we'll have to continue on Friday.  So I just wanted to alert

11    both sides to that.

12         MR. BAUM:  Judge, just so you know I expect to finish

13    in about 15 minutes.

14         THE COURT:  That will put you at about twice as much

15    time.

16         MR. BAUM:  The problem is putting up the screens is

17    adding to the time.

18         THE COURT:  I am not criticizing you.  It is very hard

19    to estimate.  There is a practical side to this, which is to

20    the extent that the examinations go on much longer than I had

21    been told they would, then we're not as far along in the trial

22    as I hoped we would be.

23         Does the government still believe that their redirect

24    will take an hour, or does it believe it will be longer?

25         MS. WAXMAN:  Your Honor, I think it will be shorter

D2S6VAL3                    Walsh - cross

1    than an hour.

2              THE COURT:  We'll see where we are around lunchtime.

3    In the meantime, we'll take 10 minutes.

4              MS. WAXMAN:  Thank you, your Honor.

5              (Recess)

6              THE COURT:  Please bring in the jury.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Please be seated.

3    BY MR. BAUM:

4    Q.  Agent Walsh, can you look at Government Exhibit 428.

5          MR. BAUM:  Ms. Chen, can you put that up, please?

6    Ms. Chen, can you highlight 5:49:50 down 5:50:38.

7    Q.  Now, Agent Walsh, this is a conversation June 25th, 2012,

8    correct?

9    A.  That's correct, sir.

10   Q.  And in this conversation Ali Khan says, How are you and

11   how's your hunt going on?  Do you see that?

12   A.  Yes, sir.

13   Q.  And MHal52 says, The plan is evolving.  Do you see that?

14   A.  Yes, sir.

15   Q.  Now, in February, four months earlier, there was a plan

16   with Ali Khan to kidnap Andria and go to Pakistan.  Do you

17   recall that?

18   A.  I believe it was Kathleen.

19   Q.  Kathleen.

20          Didn't he also talk to Ali Khan about kidnapping

21   Andria the week of February 20th?

22   A.  That he was going to kidnap Andria.

23   Q.  Right.  So there were plans in February with Ali Khan to

24   kidnap Andria and kidnap Kathleen, correct.

25   A.  I believe the plan was to kidnap Kathleen.

D2S6VAL3                    Walsh - cross

1    Q.  Sorry.

2              MS. WAXMAN:  Your Honor, objection.

3              THE COURT:  Please don't talk over each other.

4              MR. BAUM:  I thought he had finished.

5    A.  He had.

6    Q.  I stand corrected.  The plan to kidnap Kathleen to take her

7    to Pakistan.  There was a separate plan to kidnap Andria,

8    correct?

9    A.  I don't believe there was a plan between the two of them to

10   kidnap Andria.

11   Q.  In any event now we're four months later and MHal says, The

12   plan is slowly evolving.  Is that accurate?

13   A.  That is what he says.  Yes, sir.

14   Q.  He also says, I am in the middle of constructing a pulley

15   apparatus in my basement.  Correct?

16   A.  Yes, sir.  He says that.

17   Q.  Just a clarify you didn't find any pulley apparatus?

18   A.  No, sir.  We did not find a pulley apparatus.

19   Q.  Now, do you recall that in the e-mails with Mike Vanhise,

20   Mr. Valle said to him, I am an aspiring professional kidnapper?

21   Do you recall that?

22   A.  I do, sir.

23   Q.  And you said you don't believe that that --

24             MR. BAUM:  You can take this down, Ms. Chen.

25             Ms. Katz, can you be prepared?

1   Q.  He said, I am an aspiring professional kidnapper, and you

2   said you believed that that was a real statement, right?

3   A.  Yes.

4   Q.  And earlier in my questions to you we talked about what you

5   considered to be real versus what you considered to be fantasy,

6   right?

7   A.  Yes, sir.

8         MR. BAUM:  Ms. Katz, can you put on Defense Exhibit E3

9   at page 2, and can you highlight 8:24:29 and the next line.

10  Thank you.

11  Q.  Now, the statement, I am an aspiring professional kidnapper

12  to Mike Vanhise was a statement you said you thought was real,

13  right?

14  A.  Yes, sir.

15  Q.  Can you read what MHal said there at 8:24:29?

16  A.  I just have a world in my mind and in that world I am

17  kidnapping women and selling them to people interested in

18  buying them.

19  Q.  Isn't that exactly what he said in substance to Mike

20  Vanhise?

21  A.  No, sir.  That is not exactly what he said.

22        MS. WAXMAN:  Objection.

23        THE COURT:  Overruled.

24  Q.  In substance isn't that what he said to Mike Vanhise?

25  A.  I believe Mike Vanhise said he was an aspiring professional

1    kidnapper.

2    Q.  Here in this fantasy role-play he says, I just have a world

3    in my mind and in that world I am kidnapping women and selling

4    them to people interested in buying them.  Is that accurate?

5    A.  Yes, sir.  That is what he said.

6            MR. BAUM:  No further questions.

7            THE COURT:  Redirect?

8            MS. WAXMAN:  Thank you, your Honor.

9            MR. BAUM:  You can take that down.

10           MS. WAXMAN:  Your Honor, may I inquire?

11           THE COURT:  Yes.

12   REDIRECT EXAMINATION

13   BY MS. WAXMAN:

14   Q.  Good afternoon, Agent Walsh.

15   A.  Good afternoon, ma'am.

16   Q.  Do you remember that yesterday Mr. Baum showed you portions

17   of electronic chats between Officer Valle and other

18   individuals?

19   A.  Yes, ma'am, I do.

20   Q.  And before Mr. Baum highlighted those particular portions

21   of the chats he was showing you, did you have an opportunity to

22   examine the entire chat?

23   A.  No, ma'am.  I did not.

24   Q.  Did you have an opportunity to examine the entire body of

25   chats between Officer Valle on upon whom the individual Mr.

1    Baum was focusing?

2    A.   Not yesterday, but previously.

3    Q.   When Mr. Baum was asking you the question, did you have an

4    opportunity go back and look at the whole body of chats between

5    Officer Valle and the individual that Mr. Baum was focusing on?

6    A.   Not while he was showing them to me.  No, ma'am.

7    Q.   I want to go back and do that.

8              Directing your attention to Defendant's Exhibit E6.

9              MS. WAXMAN:  Your Honor, may we show that to the jury?

10             THE COURT:  Yes.

11             Go head, Ms. Waxman

12             MS. WAXMAN:  Thank you.

13   Q.   Mr. Baum highlighted a portion of that chat beginning at

14   Jackcrow 9:48:47 until Jackcrow 9:51:58.

15             MS. WAXMAN:  Ms. Chen, can you highlight that portion

16   of the chat.

17   Q.   When Mr. Baum was asking you about this particular chat,

18   did he highlight or did he ask you to review the portions above

19   the highlighted portion?

20   A.   No, ma'am.  I don't believe he did.

21   Q.   Did he ask you to review the portion below the highlighted

22   portion?

23   A.   No, ma'am.  I don't believe he did.

24   Q.   I would like you to do that today.

25             MS. WAXMAN:  Ms. Chen, if you can highlight from

1    Jackcrow 9:49:17 until the portion just before what Mr. Baum

2    showed Agent Walsh yesterday.

3    Q.  If you can just read that into the record, Agent.

4    A.  Jackcrow2011, Just read Kerry's story over on DGF.

5    Awesome.

6              MHaL52, Thanks.  They are fun to write.

7              Jackcrow, And fun to read.  I love the way your

8    stories flow.  So different from my own style.  It's really

9    refreshing.

10             MHal52, Yeah.  The more brutal the situation, the

11   better.

12             Jackcrow, Yes, indeed.  I have a more laid back

13   approach on and on.  I don't know how that you read it yet, but

14   I asked a few weeks ago if you would be interested in doing a

15   story about my favorite girl.

16             MHal52, Yeah.  I can do that.  I may not get around to

17   it right away though.  I have a couple more ideas I wanted to

18   knock out first.

19             Jackcrow, After reading your stories, I was just

20   feeling a grand story like that.  That is not problem.  I

21   cannot wait to see what you do come up with next.

22   Q.  Thank you, Agent Walsh.

23             Did you review in connection with your investigation

24   other chats between Jackcrow and MHal?

25   A.  Yes, ma'am.

1   Q.  Based on your review of all of those chats, all the chats

2   that the FBI obtained between Jackcrow and MHal, what is your

3   understanding of what they are talking about in the portion

4   that I just highlighted?

5   A.  I believe they are talking about writing stories about the

6   kidnapping and rape, eating of women, ma'am.

7   Q.  In your investigation did you determine whether Officer

8   Valle had written other stories about kidnapping, raping,

9   torturing, cannibalizing women?

10  A.  Yes, ma'am.

11  Q.  And directing your attention to the chats between Officer

12  Valle and Moody Blues, did you find any chats between Officer

13  Valle and Moody Blues in which they are discussing stories?

14  A.  No, ma'am.

15  Q.  Did you find any chats between Officer Valle and Moody

16  Blues where they attempt to write a story together?

17  A.  No, ma'am.

18  Q.  And with respect to Ali Khan, in reviewing the chats or the

19  e-mails between Ali Khan and Officer Valle, did you find any

20  evidence of them discussing stories?

21  A.  No, ma'am.

22  Q.  Did you find any evidence of them attempting to write

23  stories together?

24  A.  No, ma'am.

25  Q.  What about Mike Vanhise, any evidence that Officer Valle

1    and Mike Vanhise wrote stories together?

2    A.  No, ma'am.

3    Q.  Or talked about writing stories or reading stories about

4    cannibalism?

5    A.  No, ma'am.

6    Q.  Now, directing your attention to Defense Exhibit E3, which

7    I believe that you were shown yesterday, I would like to focus

8    on a part of the chat that Mr. Baum did show you yesterday,

9    which is where it says BairdValerie at 8:21.

10           MS. WAXMAN:  If you can just highlight, Ms. Chen, that

11   portion until the end of the page.

12   Q.  Just to remind the jury, could you review that with us?

13   A.  Yes, ma'am.

14           BairdValerie, So you would be okay owning a slave like

15   that, yes?

16           MHal52, No.  I am more in business of selling them to

17   whomever or whatever they have in store.

18           Valerie, So could you sell a slave like that?

19           MHal52, Yeah.

20           Valerie, I mean for real?

21           MHal52, No.  I am just talking fantasy.

22           Valerie, Smiles.

23           MHal52, No matter what I say, it's make believe.

24   Q.  If you can just stop there for a moment.

25           Agent Walsh, when you were reviewing the electronic

1    communications between Officer Valle and Moody Blues, did you

2    find any statements in which Officer Valle says to Moody Blues,

3    I am just talking fantasy?

4    A.  No, ma'am, I did not.

5    Q.  Did you find any statements to Moody Blues in which Officer

6    Valle said, No matter what I say, it is make believe?

7    A.  No, ma'am, I did not.

8    Q.  With respect to the communications between Ali Khan and

9    Officer Valle, did you find any statements in any of those

10   communications in which Officer Valle says to Ali Khan, I am

11   just talking fantasy.  No matter what I say, it is make

12   believe?

13   A.  No, ma'am, I did not.

14   Q.  And with respect to the communications you reviewed between

15   Officer Valle and Mike Vanhise, any statements in which Officer

16   Valle says, No, I am just talking fantasy no matter what I say,

17   it is make believe?

18   A.  No, ma'am, I did not.

19          MS. WAXMAN:  If we can just go to the next page,

20   Ms. Chen.

21   Q.  Again, I would like to focus on a portion that Mr. Baum

22   showed you yesterday?

23          MS. WAXMAN:  If you could highlight 8:32:24 up until

24   MHal52 8:47 -- actually, 8:27:03.

25   Q.  Do you recall reading this with Mr. Baum yesterday?

1   A.  Yes, ma'am, I do.

2   Q.  Can you take a quick look at it just to refresh your memory

3   of what that portion said?

4   A.  Would you like me to read it, ma'am?

5   Q.  No.  It's okay.  I am going to read some parts into the

6   record.

7            Do you see at MHal52 8:23:24, I just like to get a

8   little dirty with ideas.  And then a little bit further down at

9   8:24:29 we see MHal saying, I just have a world in my mind and

10  in that world I am kidnapping women and selling them to people

11  interested in buying them?

12  A.  Yes, ma'am.

13  Q.  Do you see where it says that?

14  A.  Yes, ma'am, I do.

15  Q.  And in your review of the communications between Michael

16  Vanhise and Officer Valle, did you see anything like that in

17  which Officer Valle is talking about ideas and in my mind with

18  respect to kidnapping and torturing women?

19  A.  No, ma'am.

20  Q.  And with respect to the chats or the communications you

21  reviewed between Officer Valle and Ali Khan, did you see

22  anything in there in which Officer Valle says something like, I

23  like to get a little dirty with the ideas or I just have a

24  world in my mind?

25  A.  No, ma'am.

1   Q.  Same question with respect to the communications between

2   Officer Valle and Mike Vanhise, any statement in there in which

3   Officer Valle discusses dirty ideas and a world in my mind?

4   A.  No, ma'am.  I do not.

5        MS. WAXMAN:  Ms. Chen, if you can go down and

6   highlight MHal52 8:32 until the end of the page.

7   Q.  I think, Agent Walsh, you reviewed those sections with

8   Mr. Baum yesterday.  Do you recall that?

9   A.  Yes, ma'am.

10  Q.  And if you can just focus on when MHal says, In my

11  fantasies, the girls don't experience happy endings.  And then

12  again ValerieBaird says, Can you imagine branding a slave.  And

13  MHal52 says, Yes, I can but not for real.  Excuse me Baird

14  says, But not for real?  And MHal52 says, No.

15       Did you see any discussions between Ali Khan and

16  Officer Valle in which Ali Khan asks whether Officer Valle is

17  interested in really branding slaves and Officer Valle says, No

18  I am not really interested it is just fantasy?

19  A.  No, ma'am.

20  Q.  And any discussions between Michael Vanhise and Officer

21  Valle in which Officer Valle says, I am not for real about

22  branding slaves, I don't really want to do that?

23  A.  No, ma'am.

24  Q.  Same question with respect to Michael Vanhise.  Any

25  communication between Officer Valle and Vanhise in which Valle

1  says, I like to think about branding slaves, but I really

2  wouldn't do it?

3  A.  No, ma'am.

4         MS. WAXMAN:  If we can turn to the next page of that

5  exhibit, Ms. Chen.

6  Q.  Do you recall reviewing this with Mr. Baum yesterday, Agent

7  Walsh?

8  A.  Yes, ma'am.

9         MS. WAXMAN:  And if we can just focus on MHal at

10  8:38:14 and the next three lines.

11  Q.  MHal52 says, Well, the cannibalism really fascinates me.

12  ValerieBaird answers, Could you actually eat in reality if you

13  had the chance?

14         MHal there answers, Yes.

15         Agent Walsh, did you view every single statement in

16  this entire communication as pure fantasy?

17  A.  No, ma'am.

18  Q.  Did you view some of the statements within this chat as

19  shedding light on Officer Valle's state of mind?

20  A.  Yes, ma'am.

21  Q.  And how would you categorize this particular statement?

22         MR. BAUM:  Objection.

23         THE COURT:  Overruled.

24  A.  I would categorize this as real, ma'am.

25  Q.  Thank you.

1          Directing your attention, Agent Walsh, please, to

2    Defense Exhibit E10.  Do you recall reviewing this exchange

3    with Mr. Baum yesterday?

4    A.  Yes, ma'am.

5          MS. WAXMAN:  Ms. Chen, if you can highlight where it

6    says MeandHarris at 6:42 up until the end of that page.

7    Q.  You will see MeandHarris says, How many have you done?  Do

8    you know what that is referring to based on your review of this

9    exchange and other exchanges between MHal and MeandHarris?

10   A.  I believe these are --

11         THE COURT:  The court reporter is trying to get the

12   answer down.

13         MS. WAXMAN:  Sorry.

14   A.  Referring to killing and cooking.

15   Q.  How does MHal answer?

16   A.  He answers, In my imagination a lot.  Haha.

17   Q.  MeandHarris then answers, yeah, Me too.  LOL.  Do you know

18   what LOL means?

19   A.  Laugh out loud.

20   Q.  Do you see MHal's response?

21   A.  Yes, ma'am.

22   Q.  Can you read those next two lines into the record?

23   A.  But none for real and never for real.

24   Q.  In your review of the communications between Officer Valle

25   and MeandHarris, and I am not just referring to this particular

1   communication but in the body of the communications that you

2   have reviewed, was that statement where MHal says, But not for

3   real and never for real, was that a factor in deciding not to

4   focus on this particular chat?

5   A.  Yes, ma'am.

6   Q.  Was that a factor in deciding not to focus on the

7   relationship between MeandHarris and Officer Valle?

8   A.  Yes, ma'am.

9   Q.  In reviewing the exchanges between Officer Valle and Moody

10  Blues, did you find Officer Valle stating anywhere, Never for

11  real, not for real?

12  A.  No, ma'am.

13  Q.  And in reviewing the communications between Officer Valle

14  and Ali Khan, did Officer Valle say anywhere something like,

15  None for real and never for real?

16  A.  No, ma'am, he did not.

17  Q.  What about the communications you reviewed between Michael

18  Vanhise and Officer Valle, any statement by Officer Valle in

19  which he says, Not for real, never for real?

20  A.  No, ma'am.

21          MS. WAXMAN:  If we can go to the next page of Defense

22  Exhibit E10.

23  Q.  This I believe you reviewed with Mr. Baum yesterday as

24  well?

25  A.  Yes, ma'am.

1  Q.  I would like you to focus on the top of that chat where

2  MHal says, I like your honesty.

3          MS. WAXMAN:  Ms. Chen, can you highlight that line and

4  the four lines that follow?

5  Q.  What does MHal say in response to MeandHarri's, And always

6  honest?

7  A.  MHal says, If I were absolutely 100 percent sure to get

8  away with it, I think I would think about it.

9  Q.  If you can just continue.

10          MS. WAXMAN:  Ms. Chen, you can highlight up until

11  6:47:45.

12  Q.  Can you review that whole highlighted section, please?

13  A.  Do you want me to read it, ma'am?

14  Q.  Yes, please.  Thank you.

15  A.  MeandHarris, That is what I am saying when I say if the

16  conditions are right.

17          MHal52, Right.

18          MeandHarris, MB if you are in a very desolate place,

19  it doesn't take long to do.

20          MHal52, Yeah.  It would take a lot of planning.

21          MeandHarris, We are not in a hurry.

22  Q.  Thank you.  In reviewing the body of communications between

23  MHal and MeandHarris, did you find every single statement in

24  those communications to be pure fantasy?

25  A.  No, ma'am.

1         MR. BAUM:  Objection.

2         THE COURT:  Overruled.

3    Q.  Agent Walsh, did you find MHal's statement, If I were

4    absolutely 100 percent sure to get away with it, I think I

5    would think about it, was that statement relevant in your

6    investigation of Officer Valle?

7    A.  Yes, ma'am.

8    Q.  How so?

9    A.  I believe that went to his state of mind, ma'am.

10   Q.  Now I would like you to focus on Defense Exhibit E11.

11        MS. WAXMAN:  Your Honor, may we show this to the jury?

12        THE COURT:  Yes.

13   BY MS. WAXMAN:

14   Q.  Do you recall reviewing this exchange with Mr. Baum

15   yesterday?

16   A.  Yes, ma'am.

17   Q.  And I think Mr. Baum began his review with you of this

18   exchange on page 4, is that correct?

19   A.  It is possible, ma'am.

20   Q.  Are there pages that proceed page 4?

21   A.  Yes, ma'am.

22   Q.  Do you recall reviewing yesterday with Mr. Baum pages 1, 2

23   and 3?

24   A.  Yes, ma'am.  Actually, ma'am, I do not.

25   Q.  I would like to review those with you now just to put it in

D2S6VAL3                    Walsh - redirect

1    context.

2           If we can look at page 1, who is this chat between or

3    who is this electronic communication between?

4    A.   Between GertrudeH, the Gandr@ymail.com and MHal52.

5    Q.   What is the date of that communication?

6    A.   May 1st, 2012.

7    Q.   I would like you to read that communication from its very

8    beginning where G-a-n-d-r says, Hi.  Here is hex from DFN.

9    A.   Gandr, Hi.  Here is hex from DFN.

10          MHal52, Hey.  Thanks for the compliment.

11          Gandr responds with a smily face, ma'am.

12          Gander, How about a setup for a secret restaurant?

13          MHal52, Yeah.  Sounds good.  I have that scenario in

14   mind as well.  The victim gets sold to the restaurant by a

15   coworker or something.

16          Gandr, No.  There is a restaurant that sells women

17   meat in all varieties.  Sometimes grilled or roasted as a

18   whole.  Sometimes in stakes or pieces.  Sometimes à la carte.

19   Sometimes in a buffet to very wealthy clients around the world.

20          MHal52, Okay.  Sounds fun.

21          Gander, One boss, a cook, some guards and some

22   hunters... can have a double roles.  It would be nice to have

23   women in that roles as well.

24          MHal52, Yeah.  I love women who help with the cooking.

25   Who is that?  Can you send it again?  It came out very choppy.

1  Q.  I am going to stop you there.  If you can skip down to

2  6:12:54 and read that line.

3  A.  But I don't have the copyrights so it is just for

4  imagination.  It would be great if someone can make drawings.

5          MS. WAXMAN:  If you can turn to the next page,

6  Ms. Chen.

7  Q.  Do you see MHal52 and Gertrude continuing to communicate?

8  A.  Yes, ma'am.

9  Q.  Could you read from MHal at 6:18 up until MHal at 6:24?

10 A.  MHal52, Oh, yes.  She is ready to go.

11          Gander, And a guard?

12          MHal52, Some evil looking women you got for a staff.

13          Gander, Are you interested in creating a story around

14 them together?

15          MHal52, Definitely.

16          Gander, Okay.  So let us start with some background

17 and names.  How about the boss?

18          MHal52, Her name is Serena.

19          Gander, Ummm.  Is she Italian?

20          MHal52, She looks German.

21 Q.  If you can just stop there.  Do you recall reviewing this

22 yesterday with Mr. Baum?

23 A.  This particular section?

24 Q.  Yes.

25 A.  No, ma'am.

1   Q.  And based on your review of communications between Gertrude

2   and MHal, what is going on here in this exchange?  What are

3   they doing.

4   A.  I believe they are making a story, ma'am.

5           MS. WAXMAN:  If you can skip the next four pages,

6   Ms. Chen, and go to the page May 1st, 2012, MHal at 7:57:14.

7   Could you highlight the text on that page?

8   Q.  You will see there are quotation marks where MHal says, We

9   have two good ones here, but I can't way to see Andria in

10  particular naked.  Do you see where it says that?

11  A.  Yes, ma'am.

12  Q.  Based on your review of the communications between

13  GertrudeH and MHal, what do those quotations indicate?

14  A.  Lines, ma'am.

15  Q.  Lines in what?

16  A.  In a story that someone would say.

17  Q.  If you can read the rest of that page, please?

18  A.  I've got to end it here.

19          Gander, Great.  But I think we have a great start.

20  Let's continue next time.

21          MHal52, Definitely.  Nicely done.  Flowing very well.

22  All right.  Talk to you soon.

23          MS. WAXMAN:  Can you turn to the next page, please,

24  Ms. Chen.

25  Q.  Do you see that Gertrude and MHal continue their

1   conversation on May 3rd, 2012?

2   A.  Yes, ma'am.

3   Q.  Directing your attention to Gandr at 17:39.  What does

4   GertrudeH say to MHal there?

5   A.  I think there is a great story evolving.  When will you

6   return?

7   Q.  Can you continue?

8   A.  MHal52, In a few hours.

9           Gander, Okay.  So maybe I will still be gone.

10          MHal52, Okay.  Great.  Take care.

11  Q.  So this conversation occurs two days after the one we just

12  reviewed between the same participants?

13  A.  Yes, ma'am.

14  Q.  What did you understand the participants of this

15  conversation, specifically MHal52 and GertrudeH, to be doing

16  here?

17  A.  Talking about a story they had previously started, ma'am.

18  Q.  In your review of e-mails between Ali Khan and Officer

19  Valle, did you see them trying to write stories together?

20  A.  No, ma'am.

21  Q.  What about in your review of the exchanges between Officer

22  Valle and Moody Blues, did you see them trying to write stories

23  together?

24  A.  No, ma'am.

25  Q.  In your view of communications between Officer Valle and

1  Mike Vanhise, did you see those two individuals trying to write

2  stories together as MHal52 did with Gertrude here?

3  A.  No, ma'am, I did not.

4  Q.  Now directing your attention to Defense Exhibit E12.  I am

5  just going to count the page I want you to turn to.  It is page

6  8 or 9 I think.  It is a conversation dated June 12th, 2012.

7  Mr. Baum showed you this either yesterday or this morning, and

8  I can't remember, MHal at 6:26, But some chloroform will do the

9  trick.

10           MS. WAXMAN:  Can you highlight that, please?

11  Q.  Do you recall reviewing this particular phrase or sentence

12  with Mr. Baum either yesterday or today?

13  A.  Yes, ma'am.

14  Q.  In your review of e-mails between MHal and Sten9979, did

15  you see MHal sending Sten9979 a link for a recipe for

16  chloroform?

17  A.  No, ma'am.

18  Q.  Did you see any discussion between MHal and Sten9979 about

19  the materials needed to make chloroform?

20  A.  No, ma'am.

21  Q.  Do you remember yesterday and even today Mr. Baum was

22  asking you some questions about certain words that were

23  similar?

24  A.  Yes, ma'am.

25  Q.  And he pointed to certain words in certain chats that

1  existed in the chats between Officer Valle and Moody Blues, for

2  example, Officer Valle and Ali Khan, Officer Valle and Mike

3  Vanhise.  Do you recall that?

4  A.  Yes, ma'am, I do.

5  Q.  And was one of though words "waterboard"?

6  A.  Yes, ma'am.

7  Q.  And what about "chloroform"?

8  A.  Yes, ma'am.

9  Q.  And what about "blueprint"?

10  A.  Yes, sir.

11  Q.  Have you seen the word "waterboard" in any document or news

12  article unrelated to this case?

13          MR. BAUM:  Objection.  Relevance unrelated to the

14  case.

15          THE COURT:  What is the relevance?

16          MS. WAXMAN:  Your Honor, may we have a side bar?

17          THE COURT:  All right.

18          (Continued on next page)

19

20

21

22

23

24

25

D2S6VAL3                    Walsh - redirect

1           (At the side bar)

2           MS. WAXMAN:  Your Honor, I have a series of questions

3    to ask Agent Walsh following up on what Mr. Baum said yesterday

4    about the existence of the word "waterboarding" and

5    "chloroform," "blueprint" in documents that Mr. Baum called

6    fantasy chats in documents, that Mr. Baum referred to reality

7    chats.  What I want to establish is that just because those two

8    words existed in two different documents doesn't mean

9    necessarily that the documents or the context of those

10   documents are identical, that in fact two of the same words can

11   exist in two documents and those documents can have entirely

12   different meanings.

13          THE COURT:  I understand the point, but I am not sure

14   why we have to get into whether waterboarding has been

15   discussed in the newspaper articles.  The initial question was

16   I think something along the lines, Have you ever seen the word

17   waterboarding in newspapers?

18          MS. WAXMAN:  Yes.

19          THE COURT:  Do you need that to make your point?

20          MS. WAXMAN:  I think I can do it another way.

21          THE COURT:  I don't obviously want to get into

22   waterboarding in newspaper.

23          MS. WAXMAN:  Of course.  I understand.  Thank you,

24   Judge.

25          (Continued on next page)

1            (In open court; jury present)

2            THE COURT:  You may proceed.

3            MS. WAXMAN:  Thank you, Judge.

4   BY MS. WAXMAN:

5   Q.  Agent Walsh, just to follow up on a last question that I

6   asked.  You recall Mr. Baum asking you about the word

7   waterboard and it appearing in two different documents?

8   A.  Yes, ma'am.

9   Q.  And also do you believe that the fact that the term

10  waterboard exists in two different documents, the documents are

11  identical in their entirety?

12  A.  No, ma'am, I don't.

13  Q.  Do you believe that those documents are similar in their

14  entirety?

15  A.  Not based on that one word.  No, ma'am.

16  Q.  Is it your belief that a word waterboard can be used in two

17  different documents but the document have different meanings

18  entirely?

19  A.  Yes, ma'am.

20  Q.  What about the word "chloroform"?  Mr. Baum I believe asked

21  you about chloroform and he showed you how it existed in a

22  number of different chats.  Do you recall that?

23  A.  I do, ma'am.

24  Q.  Does the existence of the word chloroform in two different

25  documents makes those documents identical?

1    A.  No, ma'am.

2    Q.  Does it make those documents even similar?

3    A.  Not necessarily.  No, ma'am.

4    Q.  He focused on another word which was the word "blueprint."

5    Do you recall that?

6    A.  Yes, ma'am.

7    Q.  He showed you Government Exhibit 601, which was the

8    blueprint for the abduction and cooking of Kimberly?

9    A.  Yes, ma'am.

10   Q.  He also showed you that word in one of the chats that he

11   referred to as the fantasy chats, correct?

12   A.  Yes, ma'am.

13   Q.  Does the existence the word "blueprint" in the chat and in

14   the document related to Kimberly render those documents

15   identical?

16   A.  No, ma'am.

17   Q.  Does it render those documents similar in any way?

18   A.  No, ma'am.

19   Q.  Agent Walsh, Mr. Baum also asked you whether you saw e-mail

20   communications or other communications between Michael Vanhise

21   and Officer Valle about Michael Vanhise indicating his exact

22   address to Officer Valle?

23   A.  Yes, ma'am.  I recall he asked me that.

24   Q.  What was your answer to that?

25   A.  I am not aware of any.

D2S6VAL3                    Walsh - redirect

1   Q.  In your investigation did you uncover evidence suggesting

2   that Michael Vanhise and Officer Valle communicated in ways

3   other than e-mail?

4   A.  It is possible, yes, ma'am.

5   Q.  How would they have communicated?

6           MR. BAUM:  Objection.  The answer was "possible."

7           THE COURT:  I think I will need an offer of proof.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              MS. WAXMAN:  Your Honor, I think that if I ask Agent

3    Walsh he will say that there was evidence suggesting that

4    Michael Vanhise and Officer Valle met on the Darkfetishnetwork.

5              MR. BAUM:  If that is the answer that is elicited, I

6    have no objection.

7              MS. WAXMAN:  Should I continue with the offer?

8              THE COURT:  Well, what you just said is

9    noncontroversial.

10             MR. BAUM:  That's it?

11             MS. WAXMAN:  That's it.

12             MR. BAUM:  If that is where we're going?

13             MS. WAXMAN:  That is where we're going.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court; jury present)

2                    THE COURT:  Go ahead, Ms. Waxman.

3                    MS. WAXMAN:  Thank you, Judge.

4     BY MS. WAXMAN:

5     Q.  Based on your investigation, did it appear that Officer

6     Valle met with individuals with whom he was communicating with

7     on the Darkfetishnetwork?

8     A.  Yes, ma'am.

9     Q.  Was Michael Vanhise one person that he met on the

10    Darkfetishnetwork?

11    A.  Yes, ma'am.

12    Q.  Did you review communications between Officer Valle and

13    Michael Vanhise on the Darkfetishnetwork?

14    A.  No, ma'am.  I was unable to.

15    Q.  Why were you unable to review those communications?

16    A.  Because Officer Valle's Darkfetishnetwork account had been

17    closed.

18    Q.  Do you know who closed Officer Valle's Darkfetishnetwork

19    account?

20    A.  Officer Valle.

21    Q.  As a result of the closure of that account, do you have an

22    understanding of what happened to the communications between

23    Officer Valle and others?

24    A.  My understanding is that all those communications were --

25    Q.  Were?

1    A.  Deleted.

2    Q.  Mr. Baum also asked you questions about chloroform and

3    whether you found the actual recipe for chloroform on a

4    computer used by Officer Valle.

5    A.  Yes, ma'am, he did.

6    Q.  What was your answer to that question?

7    A.  My answer was I did not find the download.  We found the

8    link in the chats.

9    Q.  Who put that link in the chats based on your review of the

10   chats?

11   A.  Officer Valle.

12   Q.  You testified also in response Mr. Baum's questions that

13   you were able to click on that link?

14   A.  Yes, ma'am.

15   Q.  How were you able to click on that link?  How did you know

16   what link to click on?

17   A.  It was in the chat, ma'am.

18   Q.  When you clicked on that link, what did you find?

19   A.  The recipe for chloroform on that website, ma'am.

20   Q.  That recipe included steps on how to make chloroform?

21   A.  Yes, ma'am, it did.

22   Q.  What other information about the making of chloroform did

23   that link include, did that website include?

24   A.  The ingredients and how to safely handle them.

25   Q.  Approximately how many links to the recipe for chloroform

1   did you find in the chats between Officer Valle and the other

2   individuals with whom he was speaking?

3   A.  Either two or three, ma'am.

4   Q.  I believe that Mr. Baum also asked you about communications

5   I believe it was between Officer Valle and Michael Vanhise

6   about a woman named Evelyn?

7   A.  Yes, ma'am.

8   Q.  If I can just grab my binder so I can direct you exactly.

9   I believe it was the e-mail communication between MHal and Mike

10  Vanhise.  It is Government Exhibit 432 on page 7 of 9.

11          MS. WAXMAN:  Could we show that?

12  Q.  You see MHal or Hal M says to MikeVanhise81 on February 28,

13  2012, The second girl listed is a cop... Evelyn, 33 years old?

14  A.  Yes, ma'am.

15  Q.  In your investigation did you identify an Evelyn?

16  A.  Yes, ma'am.

17  Q.  What is her profession?

18  A.  She is a police officer, ma'am.

19  Q.  Where does she work?

20  A.  In New York city, ma'am.

21  Q.  Did she ever supervise Officer Valle?

22  A.  She did, ma'am.

23  Q.  In connection with your investigation did you find a file

24  folder with Evelyn's name?

25  A.  Yes, ma'am.

1    Q.   What did that file folder contain?

2    A.   Pictures of Evelyn, ma'am.

3    Q.   Approximately how many if you can recall?

4    A.   I don't recall the exact number, but it is somewhere

5    between 12 and 40.  It was the average file folders.

6    Q.   Agent Walsh, in your experience as a agent with the FBI,

7    have you heard of criminals telling other criminals details

8    that are not true involving real criminal activity?

9              MR. BAUM:  Objection.

10             THE COURT:  Grounds?

11             MR. BAUM:  Hearsay and also it is a compound question,

12   but hearsay is the ground.

13             THE COURT:  I will sustain it as to form not as to

14   hearsay.

15   Q.   In your duties as a special agent with the FBI, have you

16   reviewed communications, not in this case but in other cases,

17   between criminal actors between two people who are working

18   together in a criminal activity?

19             MR. BAUM:  Objection, relevance.

20             THE COURT:  Overruled.

21             MS. WAXMAN:  Your Honor, may I have a moment, please?

22             THE COURT:  Yes.

23   Q.   Agent Walsh, in your work as a special agent with the FBI,

24   have you been made aware of communications between criminal

25   actors in which they are telling each other things that are not

D2S6VAL3                    Walsh – redirect

1   true?

2   A.  Some.  Yes, ma'am.

3   Q.  In your experience as a special agent, does that suggest

4   that the criminal activity did not occur or is not going to

5   occur?

6   A.  No, ma'am.

7           MR. BAUM:  Objection.

8           THE COURT:  Overruled.

9           MS. WAXMAN:  Your Honor, may I have moment?

10          THE COURT:  Yes.

11          MS. WAXMAN:  Your Honor, may we have a brief side bar,

12  please?

13          THE COURT:  All right.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. JACKSON:  Your Honor, Ms. Waxman man is almost at

3   the conclusion of our redirect.  There is one other area that

4   we would like to evaluate over lunch, just to look at the

5   transcript from yesterday before we determine if we did go in

6   that area.  It would be very brief.  We would give the Court a

7   proffer when we come back from lunch.  We would ask for the

8   Court's indulgence to send the jury to lunch and then finish

9   with the witness right after.

10          THE COURT:  All right.

11          MR. JACKSON:  Thank you.

12          (Continued on next page)

1                (In open court)

2                THE COURT:  Ladies and gentlemen, we're going to break

3       for lunch.  Don't discuss the case, keep on open mind and I ask

4       you to return at 2:00.  Thank you very much.

5                THE DEPUTY CLERK:  All rise.

6                (Jury excused)

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Please be seated.

3          Mr. Baum, how long do you think you will be?

4          MR. BAUM:  Well, they haven't completed so it is hard

5     so to say, but it is probably almost as long as the redirect.

6          THE COURT:  What is next after Agent Walsh?

7          MS. WAXMAN:  Your Honor, after the testimony of Agent

8     Walsh, the government plans to call Alissa Frisca.  I think I

9     only have a half hour's worth of questioning with respect to

10    her.

11         THE COURT:  There is an outstanding issue as you know

12    with respect to Ms. Frisca and that is her encounter with

13    Officer Valle in April of 2011.  I have two questions I want to

14    pose to the government about that issue.  First of all, in the

15    government's submissions there is a statement that there was

16    some conversation between Mr. Valle and Ms. Frisca, but there

17    isn't any explanation of what was said.  Will there be evidence

18    between Mr. Valle and Ms. Frisca and if so what was the

19    substance of their communications?

20         MR. JACKSON:  Your Honor, I think the testimony will

21    be that there was no substantive communication and that

22    Mr. Valle approached and began speaking to Ms. Frisca and she

23    acknowledged him and then moved along.

24         THE COURT:  So there was no communication essentially

25    verbal, I mean?

1          MR. JACKSON:  I think he acknowledged her, spoke to

2     her for a moment and then she acknowledged him and then

3     continued on.

4          THE COURT:  The second question is there was some

5     documents that were handed up yesterday that I asked the

6     government to mark so that we would have a record.  There are

7     three documents.  They have been marked as Government Exhibits

8     1006, 1007, 1008.  1006 and 1007 are lists of women's names.

9     We talked about this list yesterday and there are terms next to

10    them.  There are terms next to each woman's name.  Although,

11    the significance of the terms is not always immediately clear.

12         My question is:  The government has represented that

13    it has a witness who will be able to testify when these

14    documents were created and specifically that Government

15    Exhibit 1006 was created on June 20th, 2011 and the other

16    Exhibit 1007 was created on July 2nd, 2011.  The other point I

17    should make is that Ms. Frisca's name appears on both lists.

18    My question is whether there will be any evidence as to when

19    Ms. Frisca's name was first put on these lists, or to put it

20    another way, do we know or will there be evidence that when the

21    lists marked Exhibits 1006 and 1007 were first created, do we

22    know that Ms. Frisca's name was on the list?

23         MR. JACKSON:  Your Honor, I think my conversation with

24    Mr. Flatley indicates it is -- first of all for clarification,

25    your Honor, I think that the dates that your Honor gave are

1    flipped around.  It is actually Government Exhibit 1006 that

2    was created in July 2011 and Government Exhibit 1007 was

3    created in June of 2011.

4           Your Honor, the last page of each one of these

5    exhibits contains medadata or a printout of medadata retrieved

6    by Mr. Flatley from the computer which shows that each one of

7    these documents was created on the date we've described.  It

8    also identifies a time when the documents were modified close

9    to the time period when they were created.

10          Now, it is impossible to determine with certainty

11   based on my conversation with Mr. Flatley when a particular

12   entry on the document was actually added to the document, but

13   we do know it was created at that time and that there was

14   around the same time a modification.  So based on that, your

15   Honor, I think it is a reasonable inference that the document

16   is current form.

17          THE COURT:  So Mr. Flatley is going to testify.  I am

18   looking at the medadata now on, for example, 1006 and there is

19   a line that says, Last modified by Gilby.  I don't see a date

20   at that particular point.  What you are telling me is that

21   Mr. Flatley is going to testify that Government Exhibit 1006

22   was created on July 2nd, 2011 and that it was modified I think

23   you said a short time later?

24          MR. JACKSON:  I believe so, your Honor.  I believe so.

25   Mr. Flatley is going to say it is impossible to determine when

1    any particular text exactly was added to the document.

2            THE COURT:  Are you saying, for example, with respect

3    to Ms. Frisca's name that her name could have been added to the

4    list at a much later time than July 2nd, 2011, is that

5    possible?

6            MR. JACKSON:  Well, it is possible that it was added

7    at a later time, but I will say, your Honor, that this document

8    was placed in the recycling bin, that was the other thing, by

9    the beginning of 2012.  That is the first page of the document.

10   Whatever use Mr. Valle originally created it for, by the time

11   we get to the beginning of 2012, he has taken this data and he

12   has dumped the document into the recycling bin and he is using

13   these names in other ways as we continue from 2012.  I think

14   the shelf life of this document is this period from 2011 until

15   if he destroys it in 2012.

16           THE COURT:  March 16th, 2012, is that the date it was

17   destroyed?

18           MR. JACKSON:  Yes, your Honor.

19           Based on all of that, your Honor, I think it is a

20   reasonable inference that this document was created in the form

21   that it existed now or at least close to the form it exists now

22   around the date and time of the creation.

23           THE COURT:  Anything defense counsel wants to say on

24   the subject before we break for lunch?

25           MS. GATTO:  On this exhibit?

D2S6VAL3                    Walsh – redirect

1          THE COURT:  Yes, these exhibits.

2          MS. GATTO:  Yes.  What I am hearing is that it is a

3    possibility that Ms. Frisca name or any other names was added

4    as late of March 2012.  There is not any evidence about when

5    the document was modified to include additional names, whether

6    it was modified at all, whether it was modified as late as

7    March 15th, 2012 or February 2012.  So it sounds to me what

8    we've been saying I don't think this document adds much to the

9    discussion we've been having now about Ms. Frisca and the

10   April 2011 incident.

11         THE COURT:  I will rule on the matter after lunch.

12         Anything else we should take up before we break?

13         MR. JACKSON:  No, your Honor.

14         MS. GATTO:  No, your Honor.

15         THE COURT:  I have another matter so I am going to ask

16   you to clear out.

17         (Luncheon recess)

18         (Continued on next page)

19

20

21

22

23

24

25

A F T E R N O O N   S E S S I O N

2:05 p.m.

3          THE COURT:  The defense has moved to preclude evidence

4    of an encounter between Mr. Valle and alleged kidnap target

5    Alisa Frisca in April 2011.  I ruled on that motion yesterday,

6    granting the defendant's request to preclude because I found

7    that there was no evidence that the defendant was contemplating

8    kidnapping Ms. Frisca in April 2011.

9          The government has asked me to reconsider that ruling,

10   arguing that (1) the defendant opened the door on this issue by

11   questioning Kathleen Mangan about Frisca's relationship with

12   Valle; and (2) the government has found new documents

13   suggesting that Mr. Valle focused on Ms. Frisca as a possible

14   kidnap target as early as June of 2011.  I have reconsidered my

15   earlier ruling in light of these arguments and new documents.

16         To recap the relevant facts concerning Ms. Frisca, my

17   understanding is that she worked with Valle's wife at PS 375 at

18   East 111th Street and Lexington Avenue.  Valle met Frisca

19   through his wife, but had no independent relationship with her.

20   Valle's wife stopped working at PS 375 in June 2010.  And as I

21   said yesterday, Valle appears to have had no apparent reason to

22   be waiting for Ms. Frisca outside of her school in April 2011.

23   This location is not near his precinct which is on the Upper

24   West Side.  I further understand that Ms. Frisca is prepared to

25   testify that Mr. Valle was waiting for her outside her school

D2SUVAL4

1    one day in April 2011, alone in his squad car, that he got out

2    of his car when he saw her exit the school.  They apparently

3    said hello to each other but apparently had no substantive

4    conversation, as Ms. Frisca was walking away from the school.

5         The government has argued in the past that Mr. Valle

6    was surveilling or stalking Ms. Frisca in April 2011 and that

7    this was a preparatory step for his discussions with others in

8    February 2012 about kidnapping Ms. Frisca.  The defendant

9    argues that this incident is too remote to draw an inference

10   that it relates to the defendant's 2012 Internet chats

11   discussing a possible kidnapping of Ms. Frisca.  The first

12   mention of Ms. Frisca in an Internet chat or an emails of

13   Valle's is on January 27, 2012 -- approximately nine months

14   after the April 2011 incident, citing Government Exhibit 430 at

15   3.  In this chat Valle agrees with alleged co-conspirator

16   Michael Vanhise to kidnap Frisca for $4,000, citing Government

17   Exhibit 430 at 2.

18        I touched on the "opening the door" argument

19   yesterday.  The testimony cited by the government is at pages

20   213 and 218 of the trial transcript, and it is part of the

21   cross-examination of Kathleen Mangan.  There is only one

22   question at this portion of the transcript that arguably

23   relates to the nature of the relationship between Valle and Ms.

24   Frisca.  At page 215, Ms. Gatto asks Mangan whether Frisca

25   asked Valle to address Frisca's class at a sort of career day.

Mangan answered no.  I am not persuaded that this one question which resulted in a no answer, opened the door to the government introducing evidence of the April 2011 encounter. Up to this point in the trial, the defense has not elicited any evidence concerning the relationship concerning Frisca and Valle.  That could change, of course, but as of now, admission of the April 2011 incident on an "opening the door" theory cannot be justified.

The three documents newly submitted by the government -- which have been marked, 1006, 1007, 1008 -- also do not provide a basis for admitting evidence of the April 2011 encounter between Valle and Frisca.  Government Exhibit 1006 and Government Exhibit 1007 are a lists of names of women.  The government represents that a witness could testify that Government Exhibit 1007 was first created on June 20, 2011, and that Government Exhibit 1006 was first created on July 8, 2011. Both documents were sent to the recycle bin on the computer on March 16, 2012.

There is a great deal of overlap between these lists and the list of women found on the list of women used by Valle at the time of his arrest.  The list found at the time of Valle's arrest, Government Exhibit 442 contains the name of 80 women, but the government contends that only seven of these women were kidnap targets.  Accordingly, the vast majority of women on the list were not kidnap targets.  Moreover, even

D2SUVAL4

though there is a great deal of overlap between Government Exhibit 442 and Government Exhibits 1006 and 1007, the fact that Frisca's name appears on Government Exhibits 1006 and 1007 does not necessarily suggest that she was a kidnap target at the time these lists were created.  Most of the women on these lists are not alleged to be kidnap targets.

Another problem with using these lists as evidence that Frisca was a kidnap target in April 2011 is that we don't know when Ms. Frisca's name was first put on these lists.  All we know is that these documents were first created in June and July 2011 and that they were sent to the recycle bin in March 2012.  We know from the metadata that these documents were both modified on multiple occasions, but we don't know what modifications were made nor do we know when all the modifications were made.  Accordingly, we don't know whether Ms. Frisca's name was included in July or July of 2011, or added later.  In sum, these lists don't tell us whether Mr. Valle considered Ms. Frisca a kidnap victim in 2011, or at any point in 2011.

The third document, Government Exhibit 1008 is a printout from darkfetishnet.com.  The government represents that this shows what photos Valle posted on DFN, as I will refer to it, as of September 16, 2011.  This document indicates that Valle had posted images of Alisa in a folder entitled Tasty Girls.  Assuming that Alisa is Frisca, most of the women

D2SUVAL4

1    whose photos Valle had posted on DFN as of September 16, 2011

2    are not alleged by the government to be kidnap targets.

3            Based on this record, I cannot find that the April

4    2011 incident constitutes background evidence to the charged

5    conspiracy.  In the context of this case, the April 2011

6    incident is background to the charged kidnapping conspiracy

7    only if there is evidence that, for example, Valle had formed

8    and intent to kidnap Frisca as of April 2011, that he later

9    used the information obtained in the April 2011 encounter

10   during the period of the charged conspiracy, or that he engaged

11   in the same type of conduct during the period of the charged

12   conspiracy.  There is no such evidence.

13           I have, of course, not been able to admit either this

14   incident, or the 2011 database searches as Rule 404(b)

15   evidence, because the government did not respond to defendant's

16   letter demanding notice of Rule 404(b) evidence, nor has it

17   offered good cause for failing to do so.

18           Even if I were able to find that the April 2011

19   incident constitutes background evidence to the charged

20   conspiracy, I would have to weigh its probative value against

21   the potential for unfair prejudice to the defendant under

22   Federal Rules of Evidence 403.

23           The government has argued in the past that this

24   incident constitutes stalking of Frisca or surveillance of her,

25   or in some fashion was a preparatory step to kidnapping her.

1     But the problem is that there is no evidence as of April 2011

2     Valle was interested in kidnapping her.  It is just as likely

3     that he stopped by the school because he was sexually attracted

4     to her.

5          The government argues that the evidence should

6     nonetheless be admitted, because defense will be free to make

7     its arguments that it has no significance.  The problem is that

8     in the context of this case -- in which there is almost no

9     evidence of action by Valle beyond computer-based activities --

10    this incident -- which took place eight months before the

11    period charged in the indictment and nine months before Frisca

12    was first identified by Valle as a kidnap target -- may be

13    given undue weight by the jury.  Given that there is no

14    evidence that Valle was considering Frisca as a kidnap in April

15    2011, or that he later used the information obtained in April

16    2011 during the period of the charged conspiracy, or that he

17    engaged in the same type of conduct during the period of the

18    charged conspiracy, I conclude that evidence of the April 2011

19    incident is also more prejudicial than probative under Rule 403

20    and is properly excluded for that reason as well.

21         Anything else that we should take up before we bring

22    the jury out and recall the agent?

23         MS. WAXMAN:  Your Honor, as I said at sidebar a few

24    moments before we took a break, there are a couple of areas

25    that we believe the defense opened the door to that we would

1    like to caution Agent Corey on.

2              THE COURT:  Agent Walsh?

3              MS. WAXMAN:  Excuse me, Agent Walsh.

4              The first is, based on Mr. Baum's cross-examination of

5    Agent Walsh, including questions such as referring Agent Walsh

6    to areas in the chats where, for example, Michael Vanhise said,

7    due to a payment plan.  Mr. Baum asked Agent Walsh whether or

8    not he believed that statement was real.  Therefore the

9    government contends that, by asking those questions, Mr. Baum

10   opened the door into what investigative techniques and what was

11   done by the FBI to determine whether in fact Mr. Vanhise was

12   for real.

13             THE COURT:  Say that to me again.

14             MR. JACKSON:  Your Honor, in essence, Mr. Baum has

15   placed Agent Walsh's subjective belief that Mr. Vanhise was

16   actually serious about kidnapping these individuals into issue.

17             THE COURT:  I don't think there is any question about

18   that.

19             MR. JACKSON:  Thank you, your Honor.  So what our

20   proffer is that we should be allowed to inquire.  We said that

21   we would not ask any questions about the statements that were

22   made by Mr. Vanhise and we even gave notice in our submission

23   on that.  We cautioned the defense that there were areas of

24   inquiry that we thought that could open the door to questions

25   that relates to that.

1          Now, it is not our question to elicit from Agent Walsh

2     all the information that Mr. Vanhise disclosed in a post

3     arrest, but it is our intention to ask Agent Walsh:

4          Did you end interviewing Mr. Vanhise at any point.

5          Yes -- we anticipate that the answer will be yes.

6          Or were you involved in an interview?

7          Was that information part of what you factored into

8     your determination that Mr. Vanhise was serious about his

9     intent to commit these acts?

10         The second question, your Honor, is just:  Did you

11    review communications Mr. Vanhise sent to others?

12         And we anticipate that the answer will be yes.

13         And the question is:  Did your review of Mr. Vanhise's

14    communications to others factor into your conclusion that

15    Mr. Vanhise was serious?

16         Finally, your Honor, we think that based on Mr. Baum's

17    questions about Mr. Vanhise living with his grandmother which

18    suggests that Mr. Vanhise was living with his grandmother -- I

19    don't know, a man of limited -- I don't know what the

20    implication was there but I think that he was suggesting that

21    he was some person who was shut in, living with his grandmother

22    when, in reality, Mr. Vanhise was living with his grandmother

23    only at the time of his arrest, because he was previously

24    living with his wife and child and he admitted that his wife

25    put him out of the house because she believed that he was

D2SUVAL4

1     involved in misconduct with their children.

2           Again, we don't intend to inquire about the specifics

3     of that and what Mr. Vanhise admitted, but the final question

4     that we want to ask Agent Walsh is:  Did you know about any

5     living arrangements before he was living with his grandmother

6     that Mr. Vanhise had?

7           And we anticipate that the answer would be yes.

8           And then:  Did you learn why he was living with his

9     grandmother?

10           He would say yes.

11           Did you learn that he was living with his grandmother

12     as a result of difficulties he had with his family that he was

13     living with previously?

14           And we think that the answer to that would also be

15     yes.

16           THE COURT:  Mr. Baum, do you wish to be heard on this

17     issue?

18           MR. BAUM:  Yes, briefly, Judge.  I think that in terms

19     of opening the door to Mr. Vanhise's background information,

20     and certainly the statement the government has mischaracterized

21     exactly what opens the door.

22           As your Honor said -- and I agree -- there is no

23     question that the purpose of much of the cross-examination was

24     to show that Mr. Vanhise was engaged in fantasy chats with

25     Mr. Valle.

D2SUVAL4

1      On the other hand, the specific questions I asked

2 related to that was:  Do you believe that the statement

3 represents fantasy or reality?  I think those were the specific

4 questions.

5      MR. JACKSON:  I'm sorry, your Honor.  There is a

6 slight problem.  We did not realize that your deputy had

7 brought Mr. Walsh into the room.  We ask that he be excused.

8      THE COURT:  Mr. Walsh, would you step out.

9      (Witness excused)

10      THE COURT:  Thank you, Mr. Jackson.

11      Go ahead, Mr. Baum.

12      MR. BAUM:  The other thing about bringing out

13 statements, that are other issues with that.

14      THE COURT:  Let me break in there.

15      I don't think that Mr. Jackson is talking about

16 bringing in statements.  What he is talking about really is

17 eliciting from the witness that his conclusion that these

18 conversations were real was based in part on his interview of

19 Mr. Vanhise and emails of Vanhise and not solely the chats

20 themselves.  That is what I think -- without getting into the

21 substance.

22      Am I correct, Mr. Jackson?

23      MR. JACKSON:  That's correct.

24      THE COURT:  And the question is whether, in fairness,

25 that should be permitted because the jury could believe at this

1    point that Agent Walsh made his determination solely on the

2    basis of the content of the emails.  That strikes me as unfair.

3            I will hear you.

4            MR. BAUM:  The problem with that is that whatever

5    unfairness you may perceive in that has to be balanced against

6    the confrontation clause because what happens then is,

7    effectively, the agent is testifying about information he

8    obtained from Mr. Vanhise and there is a confrontation clause

9    issue attached to that.

10           THE COURT:  He is not testifying about what Vanhise

11   said or what his email said.  What the agent is saying is that,

12   as part of his investigation -- and you asked him numerous

13   questions about the broader investigation and not just the

14   chats and there were countless questions about other things

15   that this agent did or that other agents did that he learned

16   of.

17           The question is, given the focus on the Internet chats

18   and given that the agent's conclusions were based on more than

19   the Internet chats, whether it is fair to disclose to the jury

20   that the agent's conclusions are not based solely on the

21   Internet chats themselves.

22           MR. BAUM:  I am wondering what he is going to bring

23   out.  The emails, according to the agent -- and this is what I

24   believed he testified -- was that the emails that are in

25   evidence are the only emails that he viewed.  It seems that Mr.

Jackson is saying there are other emails between Mr. Valle and

Mr. Vanhise.  I believe he said that he believe that it was

possible but he had not seen any.

THE COURT:  No.  I think Mr. Jackson is talking about

emails between Vanhise and others.

Am I correct, Mr. Jackson?

MR. JACKSON:  That's correct, your Honor.

MR. BAUM:  So he is just going to ask him about in the

course of your investigation, did you learn from emails from

others.

THE COURT:  As I understand what he proposes to do, he

is simply going to bring out his conclusions that these chats

were real, that that determination was based in part on his

interview of Vanhise and emails of Vanhise that he reviewed and

that he will not elicit what the substance of either the

interview or the emails was.  That is my understanding.

MR. BAUM:  I think that becomes implied hearsay

because he is saying, I spoke to Vanhise and based on what he

told me, I have more information that I made a judgment on.  I

think that whatever probative value it has, it is offset by the

implied hearsay and confrontation clause issues.

THE COURT:  It is my belief that it would be unfair to

the government to leave the jury with the impression that the

agent's determination here was based solely on the emails if

that is not the truth.  We have to maintain some fidelity to

D2SUVAL4

1    reality here.  And the reality, as I understand from Mr.

2    Jackson, that the agent's determination was not based solely on

3    the language of the emails, and so that's what I am concerned

4    about, Mr. Baum.

5         MR. BAUM:  I think that the answer to that which

6    satisfies my concerns and solves the government's concerns is

7    to say, based upon the entire investigation that he did with

8    Mr. Vanhise, his conclusions are based on that as opposed to

9    saying it is based on conversations had with Mr. Vanhise.

10        MR. JACKSON:  That does not address our concerns, your

11   Honor.

12        THE COURT:  I'm not sure I understand what your

13   proposal is, Mr. Baum.

14        MR. BAUM:  He can say that there was an investigation

15   that I conducted into Mr. Vanhise.  And when I say I believe

16   that the emails represented something real not fantasy is based

17   on the entire investigation I conducted.

18        THE COURT:  What about that, Mr. Jackson?

19        MR. JACKSON:  I think that is unacceptable, your

20   Honor.

21        THE COURT:  Why?

22        MR. JACKSON:  Because Mr. Baum's questioning about

23   Special Agent Walsh's state of mind was so specific and,

24   frankly, inflammatory.

25        THE COURT:  I'm sorry?

D2SUVAL4

1    MR. JACKSON:  Frankly, inflammatory.  We objected at

2    one point where Mr. Baum was screaming at the witness at the

3    top of his voice:  Do you expect this jury to believe that you

4    believe that this was a real conversation?

5        It is imperative that the jury understand at this

6    point that there were other pieces of information that Agent

7    Walsh had and have some understanding of what the nature of

8    those pieces of information were, whether it would be

9    reasonable for him to rely on those in addition to what he

10   relied on in terms of examination of the chats.

11       THE COURT:  I believe that the jury is entitled to

12   know that the agent's conclusions were not based solely on

13   these Internet chats but rather reflect his broader

14   investigation.  What I am not clear on is why we need to be

15   specific about what the nature of the broader investigation is.

16       MR. JACKSON:  Your Honor, because the jury is going to

17   have no idea, in the absence of us giving them some record of

18   what specifically this would be, could be involved in that.

19   This conversation they are attacking specifically what Agent

20   Walsh's subjective belief was about Vanhise and his actual

21   intent to engage in these activities.  We need to have the jury

22   have an understanding of what we are talking about, and we have

23   no intention to get to the substance of any of that.  So I

24   don't think that any of Mr. Baum's concerns about 403 are

25   applicable at all.

D2SUVAL4

1         MR. BAUM:  Judge, one of the facts that I hope that we

2    are not overlooking and I hope Mr. Jackson is not overlooking

3    it is this.

4         First of all, we know that the government opened the

5    door to this whole inquiry in its direct examination by having

6    the agent testify that he examined 24 participants and decided

7    21 were non-fantasy role plays.  And then, of course, we had a

8    sidebar in which they objected and your Honor approved my

9    inquiries on this sole issue which, basically, is all that I

10   have been doing for two days.

11        But here is the more important issue.  When he made

12   that statement that it was separated 21 -- 24 when he decided

13   that Vanhise was one of the real chats, it was not based on any

14   statement Vanhise made because the statement they are alluding

15   to was not made until after that separation was made, and Mr.

16   Jackson probably neglected to mention that or forgot about it.

17        MR. JACKSON:  No.  I think Mr. Baum is slightly

18   confused because, first, his questioning was related to what

19   Agent Walsh's belief was as he was sitting in the courtroom

20   about these specific communications and about whether or not

21   Mr. Vanhise actually had an intent to engage in these

22   activities.

23        Secondly, the statement came in, in the middle of the

24   investigation.  And what Agent Walsh was testifying about at

25   the beginning was simply how he separated the people that he

D2SUVAL4

1    intended to focus on from the conversations that he did not

2    intend to focus on.

3         Your Honor, I think for those reasons, it is clearly

4    the case, based on the questioning Mr. Baum engaged in during

5    cross-examination, what was put in issue was Agent Walsh's

6    subjective belief in whether Mr. Vanhise actually had an intent

7    to engage in these activities.  And the jury is allowed and

8    should be allowed to consider the fact that he had other

9    important pieces of information that he was allowed to

10   consider.  I don't think that will raise any of the concerns

11   that Mr. Baum is suggesting.

12        MR. BAUM:  Just, finally, Judge, the cross-examination

13   was directed to why it landed in the real pile.  And it landed

14   in the real pile before Agent Walsh had received the bulk of

15   his information about Mr. Vanhise and before he had a statement

16   from Mr. Vanhise.  And that was the whole purpose of the

17   cross-examination and that was the focus, why did that land in

18   the real pile.  He said it landed in the real pile, I went

19   through the chats and said, does this represent a real chat.

20        THE COURT:  You repeatedly asked him, as of today,

21   whether he was telling this jury that he believed these chats

22   were real.

23        So I don't accept your argument that your questions

24   were directed just to what he believed whenever he created

25   column A and column B.  I think it was quite clear that your

1    questions were directed to his answers now.  He answered you.

2    And as I said, I believe it would be unfair to leave this jury

3    with the impression that Agent Walsh's conclusions were based

4    solely on the content of the chats between Vanhise and Valle

5    when in fact that is not true.

6         Now, we are not going get into the substance at all of

7    anything that the agent learned from Vanhise or from reading

8    Vanhise's emails, but I will permit Mr. Jackson to elicit the

9    fact that the agent's determinations about these chats being

10   real, the chats with Vanhise were based on more than these

11   Internet chats themselves and included the interview of Vanhise

12   as well as emails with Vanhise.

13        Now, with respect to the grandmother if he was not

14   living with the grandmother at the time, the jury is now under

15   the impression he was living with the grandmother at the time

16   because that was brought out on cross-examination.

17        Is this agent in a position to say that Vanhise was

18   not living with his grandmother at the time?

19        MR. JACKSON:  What I think what Agent Walsh is in a

20   position to say is that Vanhise admitted that he had been

21   previously been living with his wife and that she put him out

22   of the house, essentially because of --

23        THE COURT:  We are not going to get into that.

24        MR. JACKSON:  Your Honor, I am not suggesting that we

25   would ask the question.  I am just giving your Honor context as

D2SUVAL4

1    to what Agent Walsh knows about that.

2          So I think what he would be able to say is, the simple

3    question we would ask is:  Did you learn during the course of

4    the investigation whether Mr. Vanhise had lived anywhere else?

5          And I anticipate that the answer would be yes.

6          And then we would ask:  Did you learn that he moved to

7    his grandmother's house as a result of family difficulties?

8          And I anticipate that the answer would be yes and we

9    would have no further questions.

10          THE COURT:  What I am concerned about is, just quite

11    simply at the time of his chats with Valle, was Vanhise living

12    with his grandmother or not?  Do we know the answer to that?

13          MR. JACKSON:  He was living with his wife at the time

14    of those chats.

15          THE COURT:  So the answer is he was not living with

16    his grandmother at the time.

17          So, Mr. Jackson, I will permit you to elicit from the

18    agent at the time of the chats between Vanhise and Valle that

19    Mr. Vanhise was not living with his grandmother.  We are not

20    going to get into who he was living with or the circumstances

21    of who he was living with or how it came to be that he was

22    thrown out.  We are not going to get into any of that.  But to

23    the extent that the jury has been left with the impression that

24    he was living with his grandmother at the time, that is false,

25    and I think that you are entitled to elicit that.

D2SUVAL4

1          Are there other issues?

2          No?

3          MR. JACKSON:  No, your Honor.

4          THE COURT:  Mr. Baum?

5          MR. BAUM:  Just for the record, may I place my

6     objection to your Honor's ruling -- again, just to be clear for

7     the record -- to allow him to say that at least part of his

8     answer is based on an interview with Mr. Vanhise, I believe,

9     does raise confrontation clause issues, does raise hearsay

10    issues.

11         We are not in a position to cross-examine him about

12    what that interview revealed to him, whether the basis for that

13    interview made him think it was real or made him think it was

14    fantasy; he is just saying that part of what he learned was

15    from the interview.  I think it raises those issues.  And I

16    think an examination under Rule 403 would preclude it in the

17    way that I suggested which is, that based on a full and

18    complete investigation I determined -- my opinion was based on

19    a full investigation as opposed to mentioning the interview.

20         THE COURT:  Because your attack was very precise with

21    respect to Vanhise -- very, very precise and very focused on --

22    I can remember one line of questioning about whether the agent

23    had a subjective belief that a kidnapper would attempt to

24    negotiate a payment plan.  That is a very, very specific attack

25    on the agent's credibility and in a context where the agent had

D2SUVAL4

1    other sources of information, as I said, I think as a matter of

2    fairness, the government should be permitted to elicit that so

3    that the jury is not under a misimpression which I fear they

4    may well be now.

5            MR. BAUM:  I understand, Judge.

6            MR. JACKSON:  Your Honor, may we have a moment?

7            (Pause)

8            MR. JACKSON:  We want to give a special instruction to

9    the witness to make sure that he doesn't accidentally give more

10   information than we are permitted to elicit?

11           THE COURT:  I think that is a good idea.

12           (Pause)

13           (Witness present)

14           THE COURT:  You can bring in the jury.

15           MR. BAUM:  Just a very quick thing.  I hope that we

16   will finish Agent Walsh, hopefully, today.

17           Based on conversations that we have had in the past,

18   can the government please advise Agent Walsh to keep himself

19   available in case the defense wants to call him on our case?

20           We had discussions about this.

21           MR. JACKSON:  Yes.  We have informed all law

22   enforcement witnesses that they should be available for the

23   defense case.

24           THE COURT:  I guess you will not be going to Hawaii,

25   Mr. Walsh.

D2SUVAL4

1          THE WITNESS:  I can't afford it on a government salary

2     anyway, your Honor.

3          THE COURT:  Particularly with the sequestration.

4

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D2SUVAL4

1    (Jury present)

2    THE COURT:  Sorry for the delay, ladies and gentlemen.

3  I had legal issues that I needed to resolve.

4    Ms. Waxman, you may proceed.

5  COREY WALSH, resumed.

6  REDIRECT EXAMINATION

7  BY MS. WAXMAN:

8  Q.  Good afternoon, Agent Walsh.

9  A.  Good afternoon.

10  Q.  Mr. Baum asked you during cross-examination whether you

11  believed that Mr. Vanhise was serious about entering a

12  kidnapping conspiracy?

13  A.  Yes, ma'am.

14  Q.  You testified that you believed that Michael Vanhise was in

15  fact serious about entering into a kidnapping conspiracy?

16  A.  Yes, ma'am, I did.

17  Q.  Was your conclusion that Mr. Vanhise was serious about

18  entering into a kidnapping conspiracy based on factors other

19  than the email chat that we reviewed and you reviewed with

20  Mr. Baum?

21  A.  Yes, ma'am.

22    MS. WAXMAN:  Your Honor, may I have a moment, please?

23    THE COURT:  Yes.

24  Q.  Agent Walsh, was your conclusion that Michael Vanhise was

25  serious about entering into a kidnapping conspiracy based in

1    part on an interview that you participated in with Mr. Vanhise?

2    A.  Yes, ma'am.

3    Q.  Agent Walsh, was your conclusion that Michael Vanhise was

4    serious about entering into a kidnapping conspiracy based in

5    part on emails that you reviewed that Mr. Vanhise sent to

6    individuals other than Officer Valle?

7    A.  Yes, ma'am.

8    Q.  Mr. Baum asked you on cross-examination whether Mr. Vanhise

9    was living with his grandparents.  Do you recall that?

10   A.  Yes, ma'am, I do.

11   Q.  And your answer to that was, he was, correct?

12   A.  Yes, ma'am.

13   Q.  Did you learn during your investigation that prior to

14   Mr. Vanhise living with his grandparents and during the time

15   that Michael Vanhise was communicating with Officer Valle, that

16   Michael Vanhise was living elsewhere?

17   A.  Yes, ma'am.

18          MS. WAXMAN:  Your Honor, the government has no further

19   questions at this time.

20          THE COURT:  All right, Mr. Baum.

21          MR. BAUM:  Thank you.

22   RECROSS EXAMINATION

23   BY MR. BAUM:

24   Q.  Good afternoon, Agent Walsh.

25   A.  Good afternoon, sir.

1          (Pause)

2              MR. BAUM:  Sorry, Judge.

3              THE COURT:  No problem.

4   Q.  In the most recent questions by Ms. Waxman -- not the most

5   recent, but the questions by Ms. Waxman today -- she asked you

6   about whether or not you had an opportunity to examine some of

7   the particular chats that you testified to that I presented to

8   you yesterday.  Do you recall that question?

9   A.  Yes, sir.

10  Q.  And I think you said that you had not had an opportunity to

11  review it prior to your testimony, do you recall that?

12  A.  I have reviewed all of the chats, sir, but just prior to

13  the testimony yesterday or this morning, no, sir.

14  Q.  But you had previously reviewed all the chats that I

15  questioned you on, correct?

16  A.  Correct.

17  Q.  In fact not only did you review it, but I believe that you

18  testified that other members of the FBI as well as the U.S.

19  Attorney's office reviewed those chats, right?

20  A.  I can't say whether specific ones were reviewed by other

21  people, sir, but all of the chats I reviewed.

22  Q.  I believe it was your testimony that after that review was

23  when you separated 21 of the 24 participants and labeled those

24  21 as being involved in role play chats, fantasy role play

25  chats, correct?

1          MS. WAXMAN:  Objection.

2          THE COURT:  Grounds.

3          MS. WAXMAN:  I don't believe that question is an

4     accurate characterization of Mr. Walsh' prior testimony.

5          THE COURT:  I will overrule the objection.

6     A.  Can you repeat the question?

7     Q.  Sure.  When you separated 21 of 24 chats, including some of

8     which I asked you questions about, that was done after you had

9     an opportunity to fully review those chats, right?

10    A.  Sir, the separation was during the course of those, and the

11    number 21 out of 24 is a rough estimation.

12    Q.  Yes, I understand that, but my question was, you did that

13    after you had a chance to fully review the chats, not just

14    portions of it, right?

15    A.  Yes.

16    Q.  Now, some of the chats, which I reviewed with you which

17    were in the portions that you had labeled fantasy role play did

18    not state this is a fantasy, correct?

19    A.  Some of them did not, sir.

20    Q.  Yet they still ended up in your characterization that these

21    were fantasy role plays, right?

22    A.  For those individual people, yes.

23    Q.  Now, earlier today when Ms. Waxman questioned you, she

24    asked you whether Mr. Vanhise and Mr. Valle had communicated on

25    DFN, Dark Fetish Network, do you recall that?

D2SUVAL4                    Walsh - recross

1   A.  I do.

2   Q.  I believe you said that they had.  Is that what you

3   testified to?

4   A.  I don't recall that particular -- yes, sir.

5   Q.  They did, right.  I think you said that you didn't see

6   those particular chats, however, because Mr. Valle's DFN file

7   was deleted?  Is that what you testified to?

8   A.  Yes, sir.

9   Q.  But you know that they chatted on DFN?

10  A.  No, sir, I do not.

11  Q.  Did you know that based on the investigation that you

12  conducted with Mike Vanhise?

13  A.  Did I know that they chatted on DFN?

14  Q.  On DFN.

15           MS. WAXMAN:  Objection, your Honor.

16           THE COURT:  Grounds?

17           MR. BAUM:  I'm sorry.  I didn't hear the ruling.

18           THE COURT:  I just asked for the grounds of the

19  objection.

20           MS. WAXMAN:  It appears that the question calls for

21  information about the rest of the investigation.

22           THE COURT:  That is up to Mr. Baum.

23           I am overruling the objection.

24           MR. BAUM:  I will withdraw the question.

25  Q.  You are aware, based on the chats that are in evidence,

D2SUVAL4                    Walsh - recross

1   that Michael Vanhise was a member of DFN, correct?

2   A.  Yes, sir.

3   Q.  It is indicated in the chats.

4           And it is also fair to say that Ali Khan was a member

5   of DFN as indicated in the chats, correct?

6   A.  Yes, sir.  It is indicated in the chats.

7   Q.  It is also fair to say that Moody Blues was a member of DFN

8   as included in the chats, correct?

9   A.  Yes, sir.

10  Q.  Based on the chats that are in evidence, is it also fair to

11  say that there may have been communications between all three

12  of them on DFN with Mr. Valle?

13  A.  All three at the same time?

14  Q.  No, no, no.  At separate times?

15  A.  There could have been.

16  Q.  You saw references in some of the chats about that, is that

17  accurate?

18  A.  References to DFN, yes, sir.

19  Q.  Yes.

20          You saw the DFN web pages when you reviewed the

21  contents of Mr. Valle's hard drive, didn't you?

22  A.  The actual pages, sir?

23  Q.  Yes.

24  A.  We saw screen captures of the actual pages.

25  Q.  So you know what those pages actually looked like?

1   A.  I do, sir.

2   Q.  Did you ever go on that dfnnet.com?

3   A.  Yes.

4   Q.  So you know how it works, essentially, correct?

5   A.  Roughly, sir.  I didn't spend a lot of time on it.

6   Q.  Is it fair to say that DFN membership was something that

7   Ali Khan, Moody Blues, Michael Vanhise and Mr. Valle had in

8   common?

9   A.  The only one that I could say had a membership was

10  Mr. Valle because I saw the email that said --

11  Q.  Right, again, referring to the chats, wasn't one of the

12  chats in which I think that Moody Blues said that he had been

13  kicked off of DFN?

14  A.  Yes.  They were users of DFN; I couldn't say that they were

15  members.

16  Q.  That's all that I am asking.

17  A.  Yes, sir.

18  Q.  Would it be fair to say that Mr. Valle met and chatted with

19  them on DFN?

20  A.  I couldn't say where he met them, sir, but it would be fair

21  to say that he may have chatted.

22  Q.  Again, when you went into Mr. Valle's hard drive, I think

23  you said that you saw some screen captures showing the DFN web

24  page, correct?

25  A.  Yes, sir.

1    Q.  You also saw screen captures which you reviewed showing

2    Mr. Valle's profile, is that correct?

3    A.  Yes, sir.

4    Q.  In fact, the reason that you know Mr. Valle, as you

5    testified earlier was called Girlmeathunter is because you saw

6    that on his profile?

7    A.  Yes, sir.  I saw his screen capture.

8    Q.  Is it fair to say that in order to communicate with an

9    individual on DFN, you have to go into the profile page first?

10   A.  Sir, I am not exactly sure how DFN works.

11   Q.  You went on DFN, didn't you, you said that?

12   A.  I did, sir.  But I didn't attempt to chat with anyone.

13   Q.  I understand that.  But in order to chat with someone, you

14   have to go on the profile page, first, don't you?  That's how

15   you chat?

16   A.  Sir, I am not sure how DFN works for chatting.  I didn't go

17   on it for that purpose.

18   Q.  Now, in reference to your testimony that you saw the

19   profile page with Mr. Valle, I would like to show you what I

20   have marked for identification as Defense Exhibit J2.

21   A.  Thank you, sir.

22   Q.  You are welcome.

23        Now, is that the profile page that you reviewed from

24   Mr. Valle's hard drive?

25   A.  It could be, sir.  I don't recall the exact page, but I do

1  recall seeing a profile from it.

2  Q.  I would like to show you what I would mark as Defendant

3  Exhibit J2A which is, hopefully, a clearer copy of that.

4          Would you take a look at this.

5          I am going to ask you if it is identical, just

6  different in color?

7  A.  Thanks.

8  Q.  Is that the same J2?

9  A.  Yes, sir, it appears to be.

10         MR. BAUM:  Your Honor, I now offer J2 and J2A as

11  defense exhibits.

12         THE COURT:  Any objection?

13         MS. WAXMAN:  Your Honor, I am not quite sure of the

14  purpose of this.  If it is being offered for the truth, the

15  government objects.

16         THE COURT:  Are you offering it for the truth,

17  Mr. Baum?

18         MR. BAUM:  No, judge.

19         MS. WAXMAN:  Your Honor, I believe that Mr. Baum has

20  not laid a sufficient foundation for the introduction of this

21  document.  We would object on those grounds as well.

22         THE COURT:  I will speak to counsel at the bench.

23

24         (Continued on next page)

25

1          (At the sidebar)

2          THE COURT:  Is there any significant dispute about

3     whether this is a screen shot from Valle's computer?

4          MS. WAXMAN:  Your Honor, our concern is some of the

5     language here, that it is for the truth.

6          MR. JACKSON:  I don't believe that Agent Walsh could

7     testify to the question if this is similar to whatever.  I

8     don't think that he can testify that this represents the page

9     as it existed during the time period of the conspiracy.  If

10    they have another witness who could, that would be a different

11    foundational matter, but I still think it would be hearsay.

12         MS. GATTO:  Agent Walsh agreed that he viewed the

13    screen capture.  He said there is no dispute.

14         MS. WAXMAN:  I don't think this particular one came

15    from --

16         MS. GATTO:  -- his hard drive.

17         THE COURT:  Just so that there is no dispute, this

18    came from the hard drive of Valle's computer?

19         MR. JACKSON:  I have no idea.  I have never seen this

20    page before.

21         MS. GATTO:  You guys have never seen this document?

22         What about the file path at the top?  Isn't that a

23    file path from the hard drive of Mr. Valle's computer?

24         MS. WAXMAN:  I honestly don't know.

25         MS. GATTO:  Anyway, agent Walsh said that he reviewed

1    screen captures from Mr. Valle's computer.  Mr. Baum asked is

2    this a screen capture that he reviewed.  He reviewed the

3    profile of girlmeathunter.  I don't think that this is a

4    dispute that this is a profile that the agent reviewed of

5    screen captures.  If Ms. Waxman says the timing, if this was

6    not screen captured at the time of the conspiracy, well, you

7    can ask the agent if he has seen it.  If he says that he

8    doesn't think it is during the relevant period, then I don't

9    see a foundation objection.

10           MR. JACKSON:  I mean this in just a literal sense, the

11   defense has been challenging every one or our exhibits on this

12   exacting standard of us being able to demonstrate that this was

13   related to the conspiracy.  I think that they should have some

14   witness, not a cross-examination of our witness, who testified

15   that this is reflective of the page as it existed during the

16   time period that Mr. Valle was engaging in this.

17           MS. GATTO:  That maybe the case if this agent had not

18   testified that it was a screen capture.

19           I disagree that we have objected to every piece of

20   evidence.

21           THE COURT:  We don't need to get into that.

22           MS. GATTO:  I was stating it for the record.

23           THE COURT:  Let's not waste time.

24           I do think that the document presents significant

25   hearsay issues because of at least two things I could see in a

D2SUVAL4                    Walsh - recross

1    quick review.  One is under the section about me, who I am.  He

2    responds:  A guy with a job who occasionally gets bored at home

3    and wants to talk about his cannibalization fantasy and --

4              MS. GATTO:  Your Honor --

5              THE COURT:  Can I finish?

6              At the bottom, it says under the heading "About My

7    Fetish," what he would like to do with somebody offline, he

8    answers nothing, this is all fantasy.  And that is just what I

9    have seen on a quick review.  There could be other aspects of

10   this that present hearsay problems as well, so I am concerned.

11             MS. GATTO:  He can testify that part of his analysis

12   and separating the emails into the fantasy and real world pile

13   was whether the word "fantasy" or some other indication of

14   fantasy appeared in the email.  He has now said that what he

15   put on the real file was on DFN --

16             THE COURT:  You need to focus on the hearsay.

17             MS. GATTO:  I am getting to that.

18             THE COURT:  Well, hurry up.

19             MS. GATTO:  It goes to his credibility about what went

20   into the fantasy and real word pile.  He said that the word

21   "fantasy" appeared in some of the fantasy.  This showed that

22   "fantasy" was actually related to the participants who ended up

23   in the real world because they ended up on DFN.

24             THE COURT:  The fact that Mr. Valle said fantasy at

25   various -- you have introduced countless emails in which he

D2SUVAL4            Walsh - recross

1    talked about fantasy.  That point is already before the jury.

2              MS. GATTO:  What you said, fantasy does not appear in

3    any of the real world pile, but every person that he chatted

4    with, that wound up in the real world pile, he met or had some

5    relationship with DFN -- this is how the relationship starts.

6    This is the relationship, and it indicates the word "fantasy"

7    is there.  And when he said -- and I think it was several words

8    by Ms. Waxman he never said -- those two never used "fantasy"

9    they had a relationship on DFN.

10             THE COURT:  We don't have a record, and his testimony

11   has been very equivocal about how he met these individuals.  He

12   said that it is "possible" that they chatted on DFN, but he has

13   not represented that Mr. Valle "met" Moody Blues and the other

14   alleged co-conspirators on DFN.  The most that he has said is

15   that it is possible that they chatted on DFN.

16             MS. GATTO:  Yes.  Exactly.  There is some relationship

17   through DFN -- Mike Vanhise and certainly the communications

18   with Moody Blues and Ali Khan that references they had some

19   relationship on that site.

20             THE COURT:  The problem is that when Mr. Baum asked

21   him this whole question about you had to go through the profile

22   in order to talk to the guy, he said, I don't know anything

23   about that, I actually never chatted with anybody on DFN.  So

24   he has not bought into the notion that you have to look at the

25   profile before you can chat with a person.  He doesn't know.

1    MS. GATTO:  Maybe Mr. Baum can ask a few additional

2    foundational program, but I am sure that the agent knows

3    something about the workings.  Maybe Mr. Baum can ask

4    foundation and that it can only be admitted for the truth of

5    the matter asserted and it is not going to the agent's

6    credibility when he said that there were no communications that

7    the relationship was not based on any communication that

8    Mr. Valle said "fantasy" when in fact --

9         THE COURT:  He said that he doesn't know anything

10   about the profile and he has indicated that he doesn't know

11   that you have to see the profile before you chat.  That's what

12   the record is.

13        Mr. Baum, you are welcome to explore it, but he has

14   been fairly dispositive on this.  I don't think that you were

15   going to get him to say that he understands that in order to

16   chat with someone --

17        THE DEPUTY CLERK:  One of the jurors needs a break.

18        THE COURT:  We will have to take a break.

19        (In open court)

20        THE COURT:  We will take a brief recess, ladies and

21   gentlemen.

22

23        (Continued on next page)

24

25

D2s6val5

1      THE COURT:  So I think we were talking about whether

2  the agent was going to be able to testify that in order to chat

3  with somebody on DFN you had to be exposed to their profile

4  page.  As I was saying I think he has fairly clearly indicated

5  he doesn't know.  So I am not sure that you will be able to

6  make the connection to his credibility that you wish to.

7      MS. GATTO:  Well, I have another argument, your Honor.

8      THE COURT:  Okay.

9      MS. GATTO:  He indicated on his direct or his redirect

10  that he was familiar with Mr. Valle's profile name Girlmeat

11  Hunter.

12      THE COURT:  Yes.

13      MS. GATTO:  I can't remember how it came out because

14  we don't have realtime on our side, but that related to his

15  investigation which includes his investigation into the hard

16  drives and whatever the DFN screen captures including this one.

17  He has just said that he seen the profile page.  Mr. Baum can

18  explore the profile page with the limiting instruction if

19  necessary.

20      THE COURT:  He actually hasn't seen his profile page.

21  I don't recall that.  Am I wrong about that?

22      MR. BAUM:  He saw this, Judge.  J2 he recognized it as

23  his profile page.

24      MS. WAXMAN:  He recognizes that as a possible profile

25  page.  We'll have to look back.

D2s6val5

1          MR. JACKSON:  Your Honor, I would just also argue,

2    stress this is recross-examination.

3          THE COURT:  We've gone way beyond.  There is no

4    question about that.  Yes, we've gone way beyond their

5    redirect.  You cannot really dispute that.  We're introducing

6    exhibits.  We have gone so far beyond it.

7          MS. GATTO:  We asked questions about DFN that were not

8    asked on direct.

9          THE COURT:  Again, when you are introducing exhibits,

10   it is obvious you've gone beyond.  There was no objection and

11   it is a little bit too late now.  If there had been an

12   objection beyond the scope, I would have likely sustained it.

13   As a practical matter, they can recall him later so we might as

14   well do it now.

15         Anyway, you are welcome to try to bring out more

16   foundation.  What I mean by that is I don't think the record is

17   clear that he has seen this before.  Yes, it says Girlmeat

18   Hunter so I am sure that he can say that I understand Girlmeat

19   Hunter to be Valle's name on DFN, but I don't know that the

20   agent is going to say that he has seen these pages before.  I

21   don't know that.  Even if he does say that he has seen these

22   pages before, I still am very concern about the hearsay issue.

23   If he hasn't seen the pages before that, you don't have an

24   argument.

25         MS. GATTO:  The plan would be for Mr. Baum to lay some

D2s6val5

1    foundational questions and the government can renew its

2    objection should we get there.

3            THE COURT:  Right.  Just so that we're clear, as I

4    understand it your contention is because this says -- there are

5    aspects about your discussion already rejected.  To the extent

6    that Valle is saying this is all a fantasy, he said that before

7    in other chats that are already before the jury.  So the only

8    relevance of this I can see is that the agent should have

9    understood if he saw this page that Valle met Moody Blues, Ali

10   Khan and Vanhise through DFN and that there was reason to think

11   that Moody Blues, Vanhise and Ali Khan would have understood

12   based on Valle's profile page that as far as he was concerned

13   this was all fantasy.

14           MS. GATTO:  First, it is not met, but just had some

15   sort of relationship through DFN.  But, yes, we're saying the

16   same thing.  Agent Walsh just said that he reviewed certain

17   things to determine Mr. Valle's state of mind.  He said that

18   when he was talking about the fantasy chats, the fact that

19   Mr. Valle says it is fantasy indicated to him that in those

20   chats Mr. Valle's state of mind was that it was fantasy.  We're

21   offering though Mr. Valle's state of mind for all the

22   participants, particularly the participants that he sought

23   relationships with on DFN who have ended in the real profile,

24   his state of mind was the same.

25           THE COURT:  Well, but that means you are offering this

1    for its truth.

2            MS. GATTO:  Not really.  It goes to his state of mind.

3    It goes to the fact and the viewer's state of mind, the

4    participant's state of mind.

5            THE COURT:  The premise for that you would have to

6    establish that Ali Khan, Moody Blues and Vanhise actually saw

7    this.  There is no record on that at this point.

8            MS. GATTO:  At this point.

9            MR. BAUM:  I don't think we have to establish that --

10   if we can establish that they had to go through this profile

11   page in order to speak with them, I think that that would be

12   sufficient to further its relevant.  I think that we may be

13   prepared to do that.

14           THE COURT:  Well, you may succeed in do being that.  I

15   very much doubt you will do it through this witness based on

16   his prior answers, but you are welcome to try.

17           Are we ready?

18           MS. GATTO:  We're ready.

19           THE COURT:  All right.

20           (Continued on next page)

21

22

23

24

25

D2s6val5

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | (In open court; jury present)                                |
| 2  | THE COURT:  Please be seated.                                |
| 3  | You may proceed, Mr. Baum.                                    |
| 4  | MR. BAUM:  Thank you, your Honor.                            |
| 5  | BY MR. JACKSON:                                               |
| 6  | Q.  Agent Walsh, I would like to show you what has been      |
| 7  | previously mark for identification as Defendant's Exhibit L1, |
| 8  | L2, and L3.                                                   |
| 9  | THE COURT:  Go head, Mr. Baum.                                |
| 10 | Q.  Have you reviewed those documents?                        |
| 11 | A.  I am doing that right now.                                |
| 12 | Q.  Let me know when you've reviewed them.                    |
| 13 | A.  I have reviewed them, sir.                                |
| 14 | Q.  You've already testified that you reviewed documents and  |
| 15 | images from Mr. Valle's hard drive.  Do you recall that?     |
| 16 | A.  Yes, sir.                                                 |
| 17 | Q.  And do you recognize these documents as documents that you |
| 18 | have reviewed from Mr. Valle's hard drive?                   |
| 19 | A.  I don't recall these specific ones, sir.                 |
| 20 | Q.  I would like to ask you a few other questions if I may,   |
| 21 | Agent Walsh.                                                  |
| 22 | A.  Of course.                                                |
| 23 | Q.  Ms. Waxman asked you questions about stories in some of the |
| 24 | chats that I reviewed with you.  Do you recall that this     |
| 25 | morning?                                                      |

D2s6val5

1    A.  Yes, sir.

2    Q.  And I believe your testimony was that you clearly

3    recognized them as stories, right?

4    A.  Because it said stories right under it.  Yes, sir.

5    Q.  There were stories involving kidnapping, rape, murders

6    cannibalism, correct?

7    A.  Yes, sir.

8    Q.  The stories involved chloroform, duct tape, correct?

9    A.  Yes, sir.

10   Q.  The stories involved women with names that we've identified

11   in this case, correct?

12   A.  Yes, sir.

13   Q.  And those stories, the themes in those stories were

14   repeated in the chats with Ali Khan, with Moody Blues and with

15   Mike Vanhise, weren't they?

16   A.  The kidnap, rape, murder, yes, sir.

17   Q.  And selling of women for money, correct?

18   A.  Correct.

19   Q.  So although they were clearly labeled stories, everything

20   in those stories or at least the content of the stories was

21   duplicated in the chats with the three individuals that I

22   mentioned?

23   A.  The subject matter, yes, sir.

24   Q.  Yes, the subject matter.

25          Now, Ms. Waxman went through some of the chats that

1    the defense questioned you about.  Do you recall that this

2    morning?

3    A.  I do, sir.

4    Q.  Do you have those exhibits before you still, Defense

5    Exhibits E1 through whatever?

6    A.  I have E1, E10, W3, sir.

7    Q.  If you don't have them, let me provide you with a bunch of

8    those and I will like to ask you questions about them.

9    A.  Thank you, sir.

10   Q.  You are welcome.

11        Now, would you take a look at Defense Exhibit E6.

12   Jackcrow was a participant with Mr. Valle.  Do you see that

13   exhibit?

14   A.  Yes, sir, I do.

15   Q.  I believe Ms. Waxman asked you a number of questions

16   involving reading from that exhibit this morning.  Do you

17   recall that?

18   A.  Yes, sir, I do.

19   Q.  Isn't it a fact that that is an exhibit that you have

20   identified as being a fantasy role-play between Mr. Valle and

21   Jackcrow?

22   A.  We've identified this person Jackcrow as being a fantasy

23   person, sir.

24   Q.  That isn't what you said yesterday.  You said that that

25   exhibit was a fantasy role-play?

D2s6val5

1    A.  This exhibit, sir, is a bunch of conversations between

2    these two people, as are all of the exhibits, and this person

3    we don't believe is for real.

4    Q.  Didn't you testify that there were 21 folders that you

5    separated and you testified that those 21 involved fantasy

6    role-plays, isn't that what you said?

7    A.  Yes, sir.

8    Q.  Is that one of the 21?

9    A.  It's some of the conversations with one of the 21 people,

10   sir.

11   Q.  So that one that involves fantasy role-play does not have

12   anything in it that says this is a fantasy.  Take a look at it.

13   Tell me if you think that there is anything in there which any

14   of the participants said this is a fantasy?

15   A.  I don't see the word "fantasy" in here.  No, sir.

16   Q.  Now, I want you to look at Exhibit E13.  That is Mr. Valle

17   communicating with someone called the Wolfman.  That exhibit is

18   in evidence.  Do you see that?

19   A.  I don't believe I have that one.

20   Q.  I will give you another copy if you like.

21   A.  Sorry, sir.

22   Q.  You have Exhibit E13?

23   A.  I do, sir.

24   Q.  It is an e-mail from Mr. Valle to the Wolfman, right?

25   A.  It is, sir.

D2s6val5

1    Q.  Is there anything in this e-mail that says something about

2    fantasy?

3    A.  No, sir.  That word does not appear.

4    Q.  In fact, this e-mail is a list of women with some physical

5    descriptions, right?

6    A.  It is, sir.

7    Q.  And I believe you said yesterday that these women,

8    including Kristen C, Kristen P, Cecilia, Kathleen, who you

9    identified as his wife, and Carissa were real people?

10   A.  Yes, sir.

11   Q.  And this was in the pile of the 21 fantasy role-plays,

12   right?

13   A.  This individual Wolfman, yes, sir.  That was in the fantasy

14   pile.

15   Q.  That is all I am asking.

16   A.  Yes, sir.

17   Q.  Now, is it fair to say that E4, Brenda Falcon and E1, Tim

18   Chase and E12, Sten9979 are all in the 21 pile and none of them

19   have statements of fantasy?

20           MS. WAXMAN:  Objection.

21           THE COURT:  Grounds?

22           MS. WAXMAN:  As to the form of the question, your

23   Honor.

24           THE COURT:  Do you understand the question?  Are you

25   able to understand it?

THE WITNESS:  I would have to review all those

conversations again to make sure there was no word fantasy in

there.

Q.  Go right ahead.

A.  Can you say the number again?

Q.  Sure.  You can start with E4, Brenda Falcon.

A.  Brenda Falcon does not have the word fantasy in it, sir.

Q.  You can go to E1, to Chase.

A.  This one does not appear to have the word fantasy in it

either.

Q.  And if you can go to the third one, Sten9979.  I hope that

is short.

A.  This does not have the word fantasy in it either.

Q.  Just two -- hopefully -- more questions.  Maybe three.

They are short.  The stories that you talked to Ms. Waxman

about that you saw in Mr. Valle's chats, stories take many

forms, don't they?

A.  They could, sir.

Q.  They could be screenplays, right?

A.  Yes, sir.

Q.  Stories could be books?

A.  Yes, sir.

Q.  They could be magazine articles?

A.  They could be, sir.

Q.  And they could be chats, can't they?

D2s6val5

| | |
|---|---|
| 1 | A. They could be, sir. |
| 2 | MR. BAUM: No further questions. |
| 3 | THE COURT: Anything else from the government? |
| 4 | MS. WAXMAN: Your Honor, can we have a moment? |
| 5 | THE COURT: Yes. |
| 6 | (Pause) |
| 7 | MS. WAXMAN: Your Honor, I have a few brief questions. |
| 8 | THE COURT: All right. |
| 9 | REDIRECT EXAMINATION |
| 10 | BY MS. WAXMAN: |
| 11 | Q. Good afternoon again, Agent Walsh. |
| 12 | A. Good afternoon, ma'am. |
| 13 | Q. Agent Walsh, the chats between Officer Valle and Michael |
| 14 | Vanhise, did those appear to you to be stories? |
| 15 | A. No, ma'am. They are not. |
| 16 | MR. BAUM: Objection, your Honor. Improper redirect |
| 17 | direct. |
| 18 | THE COURT: Overruled. |
| 19 | Q. Agent Walsh, the chats between Officer Valle and Ali Khan, |
| 20 | did those appear to you to be stories? |
| 21 | A. No, ma'am. |
| 22 | Q. And the final question, the chats between Officer Valle and |
| 23 | Moody Blues, did those appear to you to be stories? |
| 24 | A. No, ma'am. |
| 25 | MS. WAXMAN: The government has no further questions |

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    at this time, your Honor.

2              THE COURT:  Anything else, Mr. Baum?

3              MR. BAUM:  Hard to believe, no.

4              THE COURT:  You may step down.

5              (Witness excused)

6              THE COURT:  The government may call its next witness.

7              MR. BAUM:  Can we have a brief side bar.  It will be

8    quick.

9              THE COURT:  All right.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At the side bar)

2        MS. GATTO:  Your Honor, for the same reasons that we

3    moved to preclude the government from eliciting from Ms. Mangan

4    her state of mind, her reaction when she found the Internet

5    history of Mr. Valle, we also ask that the government not

6    elicit this witness how she -- for the purpose of PBA card how

7    she felt when she had gotten the PBA card.  In light of the

8    problems we had with Ms. Mangan, I thought we would flag it so

9    the government has an opportunity to make sure that the witness

10   complies with the Court's ruling.

11       THE COURT:  I am not sure I understand what you are

12   saying.

13       MS. GATTO:  Ms. Frisca's state of mind, the way she

14   felt when she was given the PBA card is not the issue here.  It

15   was the fact that she received the PBA card that is the reason

16   why they are calling the witness.  Nothing further should be

17   elicited.  It goes to the same argument with Ms. Mangan.  It

18   was not elicited from Ms. Mangan that she was shocked, fearful,

19   in danger.  It is irrelevant to the question here, which is a

20   fact question.  So I don't actually think it is a controversial

21   point, but I could be wrong.  I wanted to flag it because we

22   had certain problems with Ms. Mangan that tainted her testimony

23   improperly and I am just hoping to avoid that with this

24   witness.

25       MR. JACKSON:  Your Honor, I don't think that we're

D2s6val5                    Walsh - redirect

1    going to ask Mr. Frisca how she felt about the PBA card, but I

2    think we're entitled to ask her whether or not what her

3    perception was of the PBA card being sent to her, her

4    subjective view of whether or not Mr. Valle giving her a PBA

5    card was a normal thing is something that the jury is entitled

6    to factor into the determination about what significance that

7    has.

8            THE COURT:  I don't really know that her state of mind

9    about the PBA card matters here.

10           MR. JACKSON:  It's not her state of mind, your Honor.

11   I think it is her explanation that she was confused by getting

12   a PBA card from Mr. Valle because I expect -- I don't know

13   exactly what she will say, but I expect she will testify that

14   she was confused about getting it because there was no reason

15   for her to get a PBA card.

16           THE COURT:  Maybe I need to understand.  I thought she

17   got the PBA card through Mangan.

18           MR. JACKSON:  That's correct.

19           THE COURT:  So Mangan gave her the PBA card?

20           MR. JACKSON:  Yes.

21           THE COURT:  So I understand that Mangan got the PBA

22   card from Valle, but did Mangan say, Here, this is from Gil or

23   what?

24           MR. JACKSON:  Yes.  He wrote his name on it and wrote

25   his number on it.

1          MS. GATTO:  Well, they can certainly elicit that the

2     Gil's name is on the back of it, but I think past that --

3          THE COURT:  I don't find it relevant what her reaction

4     was to getting the PBA card.  I don't see how that is relevant.

5     Unless you can explain to me why you think it is relevant.

6          MR. JACKSON:  Well, your Honor, the way that a person

7     can explain whether receiving a gift was a normal thing or it

8     made sense within the context of the relationship that they had

9     with them I think probative.  She will explain that she didn't

10    have any significant relationship with Mr. Valle.  She didn't

11    drive so she didn't understand that --

12         THE COURT:  You can bring out all of those facts.

13    What you can't do is what her reaction was.

14         MR. JACKSON:  Her emotional reaction?

15         THE COURT:  Right.  You can bring out she doesn't

16    drive.  You can bring out she had no relationship with

17    Mr. Valle.  Those are facts you can bring out.  I am not going

18    to permit you to bring out sort of the ultimate question, which

19    is you want to elicit from her that she thought it was weird

20    that he sent her the card.  That I will not permit you to do.

21    You can argue that to the jury, but I don't think her state of

22    mind is relevant to any issue in the indicate.

23         MS. GATTO:  If the government can take a moment to

24    meet with the witness.  That is the problem we had with Ms.

25    Mangan.

1          MR. JACKSON:  Your Honor, I think the real question is

2     the question we expect to ask, Did you understand why Mr. Valle

3     was giving it to you and our expectation is that she is going

4     to say no.

5          THE COURT:  We're not going to get into that.  Her

6     state of mind doesn't matter.  Her state of mind doesn't

7     matter.  That is simple.  There is nothing else I can tell you.

8     It doesn't matter that she thought it was weird.  You can make

9     the argument that they had no relationship, that the woman

10    doesn't even drive.  You can do that, but you cannot elicit her

11    view that she thought it was weird because her state of mind

12    doesn't matter here.

13         MR. JACKSON:  We understand, your Honor.

14         MS. GATTO:  Can they take a moment with the witness

15    because I really want to avoid the problem we had last time.

16         THE COURT:  This is not in any way comparable to

17    Mangan.

18         MS. GATTO:  I agree.

19         THE COURT:  But yes they can take a moment.

20         MR. JACKSON:  We don't need to take a moment.  We're

21    not going to take a moment.

22         THE COURT:  All right.

23         (Continued on next page)

24

25

D2s6val5                    Walsh - redirect

1              (In open court; jury present)

2    ALISA FRISCA,

3         called as a witness by the Government,

4         having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MS. WAXMAN:

7    Q.  Good afternoon, Ms. Frisca.

8              How old are you?

9    A.  I am 29 years old.

10   Q.  Are you married?

11   A.  No.  I am single.

12   Q.  What is your approximate height?

13   A.  Five, five and a half.

14   Q.  I am sorry to ask you this, but what is your approximate

15   weight?

16   A.  130 pounds.

17   Q.  Where are you from originally?

18   A.  New Jersey.

19   Q.  Where is your family -- where is your family originally

20   from?

21   A.  My mom was born in Cuba and my cad is Italian and Irish.

22   Q.  Where do you work?

23   A.  Special education teacher in East Harlem.

24   Q.  Can you just describe the general location of that school?

25   A.  Sure.  It is East Harlem on 111th and Lexington.

D2s6val5                    Frisca - cross

1    Q.  How long have you been teaching?

2    A.  This is my fourth year teaching.

3    Q.  What is it that you teach?

4    A.  I teach elementary special education and right now I am

5    teaching second grade special education.

6    Q.  Have you ever taught the fifth grade?

7    A.  Yes.  I did for two months.

8    Q.  Directing your attention to February 20th, 2012, do you

9    recall having a break from school during that period?

10   A.  Yes, I do.

11   Q.  Are you familiar with a woman named Kathleen Mangan?

12   A.  Yes.  She was my coworker.

13   Q.  Where did you and Ms. Mangan teach together.

14   A.  In the same school I am teaching now and 111th and

15   Lexington.

16   Q.  When did you meet Ms. Mangan?

17   A.  2009-2010 school year.

18   Q.  And how long did you and Ms. Mangan teach together?

19   A.  For a year.

20   Q.  So what happened after that year?

21   A.  I remained teaching and I am still there now and she left

22   to go teach at another school.

23   Q.  Was that approximately 2010?

24   A.  She left probably June 2010.

25   Q.  Did you and Ms. Mangan ever socialize outside the work?

D2s6val5                    Frisca - cross

1  A.  With other coworkers maybe a handful of times and once

2  one-on-one.

3  Q.  After Ms. Mangan left the school in 2010, did the two of

4  you remain in touch?

5  A.  Yes, we did.  Text messages and again hanging out with

6  coworkers a few times.

7  Q.  Did you consider her a close friend?

8  A.  No.

9  Q.  Do you know Gilberto Valle?

10  A.  Yes I do.

11  Q.  How do you know Mr. Valle?

12  A.  Through Kathleen.

13  Q.  Do you know what he does for a living?

14  A.  He is a police officer.

15  Q.  How do you know that?

16  A.  Because of Kathleen.

17  Q.  Can you describe generally Ms. Frisca your relationship

18  with Officer Valle?

19  A.  There is no relationship at all.

20  Q.  Did you ever consider Mr. Valle a friend?

21  A.  Never.  I don't even consider his wife a close friend.

22  Q.  Have you ever considered Officer Valle a friend?

23  A.  No.  Because he has never been a friend.

24  Q.  You testified that you saw Ms. Mangan from time to time

25  outside of work after she left the school in June 2010?

D2s6val5                    Frisca - cross

1    A.  That's correct.

2    Q.  Approximately how many times do you think you specialized

3    with her outside of school?

4    A.  A handful of times and from what I remember once

5    one-on-one.

6    Q.  When did you see Ms. Mangan one-on-one?

7    A.  In the fall of 2010 we both lived or at that time we both

8    lived on the Upper East Side so we met to have sushi and

9    discuss where she was teaching.

10   Q.  Was that a lunch meeting?

11   A.  No.  We had a sushi dinner.

12   Q.  When was the last time that you saw Ms. Mangan?

13   A.  I randomly saw her in the spring of 2012 for about five

14   minutes.

15   Q.  Can you describe what happened when you saw her in the

16   spring of 2012?

17   A.  Sure.  I was with coworkers having an early lunch.  Sorry,

18   early dinner.  And one of my coworkers had just had a baby.

19   She was going to meet Kathleen at Lenny's which was two blocks

20   from where I was.  I told my coworkers I never met Kathleen's

21   daughter so I wanted to surprise Kathleen.  So at that point I

22   went and surprised her for a few minutes.

23   Q.  Can you slow down a little bit for the court reporter?

24   A.  Okay.

25   Q.  When you saw Kathleen in the summer of 2012, I think you

D2s6val5                    Frisca - cross

1    described it as a random meeting, did she give you anything?

2    A.  She did.

3    Q.  What did she give you?

4    A.  She gave me a PBA card.

5    Q.  Sorry?

6    A.  PBA card.

7           MS. WAXMAN:  Your Honor, may I approach?

8           THE COURT:  Yes.

9    Q.  I am handing you, Ms. Frisca, what has been marked for

10   identification as Government Exhibit 109.  Will you take a look

11   at that and let us know whether you recognize that.

12   A.  Yes, I do.

13   Q.  What is that?

14   A.  That is a PBA card.

15   Q.  Is that a PBA card that Ms. Mangan gave you in the summer

16   of 2012?

17   A.  Yes.

18          MS. WAXMAN:  Your Honor, the government offers

19   Government Exhibit 109 into evidence.

20          THE COURT:  Any objection?

21          MR. BAUM:  No objection, your Honor.

22          THE COURT:  Government Exhibit 109 is received.

23          (Government's Exhibit 109 received in evidence)

24          MS. WAXMAN:  Your Honor, may we show it to the jury?

25          THE COURT:  You may.

1    BY MS. WAXMAN:

2    Q.  Did you know what a PBA card was before Ms. Mangan gave it

3    to you?

4    A.  I just knew very briefly it was something that policemen

5    give to their close family and friends and it is used to get

6    out of speeding tickets.

7    Q.  Did you ever have a problem with speeding?

8    A.  It is kind of funny because I don't drive and anyone who

9    knows me at all knows I don't drive.

10   Q.  If we can look at the back of the card, which is page 2 of

11   the exhibit, do you recognize that back of that card?

12   A.  Yes.

13   Q.  Is that the card that Ms. Mangan gave you?

14   A.  Yes, it is.

15   Q.  And there is some numbers on the top, 718-310-7979.  Did

16   you write that?

17   A.  No, I did not.

18          MS. WAXMAN:  I think there is some issues with the

19   screens.

20          THE COURT:  Okay?

21          UNIDENTIFIED JUROR:  Yes.

22          MS. WAXMAN:  May I continue?

23          THE COURT:  Yes.

24   Q.  Do you recognize that telephone number?

25   A.  No, I do not.

D2s6val5                    Frisca - cross

1    Q.  Did you write that telephone number?

2    A.  No.

3    Q.  Do you know who wrote that phone number?

4    A.  I believe Gil.

5    Q.  When --

6           MR. BAUM:  Objection, your Honor.

7           THE COURT:  What is the basis for that?

8           MS. WAXMAN:  Withdrawn, your Honor.

9           MR. BAUM:  I ask it be stricken.

10          THE COURT:  The answer will be stricken.

11          MS. WAXMAN:  Your Honor, may I reask the question?

12          THE COURT:  Sure.

13   Q.  Do you have a basis for knowing whose phone number that is?

14   A.  When she handed it over she said --

15          MR. BAUM:  Objection, hearsay.

16          THE COURT:  Sustained.

17   Q.  Ms. Frisca, when Ms. Mangan handed you this card, describe

18   how the card looked on the back when she handed it over to you.

19   A.  It looked exactly like it looks now.

20   Q.  Do you recognize Ms. Mangan's handwriting?

21   A.  No.

22   Q.  Do you recognize Ms. Mangan's phone number?

23   A.  No.  She had a phone number from Nevada where she lived and

24   it was a different area code because that is a New York city

25   area code.

D2s6val5                    Frisca - cross

1    Q.  Did you ever socialize with Officer Valle?

2    A.  Never.

3    Q.  You never saw him once on a social occasion?

4    A.  I saw him a few times, but again it was when his wife was

5    there and coworkers.

6    Q.  Describe the circumstances in a little bit more detail.

7    A.  The few times I saw him were in a social work setting.

8    Q.  During those circumstances did you have one-on-one

9    conversations with Mr. Valle?

10   A.  We would have a brief hello, how are you.  Nothing.

11   Q.  And, Ms. Frisca, directing your attention to March 1st,

12   2012, do you have recall where you were that day?

13   A.  Oh, March 1st, 2012, yes.  Definitely.  I'm sorry.  I

14   was -- that was -- it was a Saturday.  Sorry.  That was a

15   Thursday.  I worked late.  I have a journal so I keep track of

16   everything I do.  So I was getting confused.  I worked late

17   doing my bulletin board with a coworker and then the coworker

18   and I went to get dinner.

19   Q.  When you say you were doing a "bulletin board," where did

20   that happen?

21   A.  In the school.  We spent three or four hours on our

22   bulletin board.  It is a joke that you work late.  We do them

23   and after we go socialize and have dinner.

24   Q.  Did you meet Ms. Mangan for lunch that day?

25   A.  Never.  I was at work.

D2s6val5                    Frisca - cross

1    Q.  Did you have lunch with Mangan at any time around March

2    1st, 2012?

3    A.  I saw her once last year at the incident I told you about

4    earlier.

5    Q.  So you didn't see her that week or that month?

6    A.  Never.

7    Q.  -- or that year?

8    A.  No.

9    Q.  -- prior to March 1st?

10           Has Ms. Mangan ever been to your apartment?

11   A.  I believe she did for a few minutes with other coworkers

12   before we were going out to get some food.

13   Q.  Do you know whether Officer Valle dropped her at your

14   apartment?

15   A.  No.  She took the subway.

16   Q.  Are you familiar with an Internet site called Facebook?

17   A.  Yes.

18   Q.  What is Facebook?

19   A.  Social media site.

20   Q.  Have you ever been a member of Facebook?

21   A.  I was a member from when it first began through September.

22   Q.  Did you post photographs of yourself on Facebook?

23   A.  Yes, I did.

24   Q.  Did you post photographs of your friends on Facebook?

25   A.  Yes.

D2s6val5                      Frisca - cross

1    Q.  Did you post information about your life on Facebook?

2    A.  Yes.

3    Q.  Did you ever reveal on Facebook that you had a connection

4    to Cuba?

5    A.  When I was 19 years old, I joined Facebook.  I put a quote

6    in it about, like, in Cuba there is no freedom and people in

7    Cuba are not able to have the same rights as Americans and I

8    kept that on my profile for nine years.

9    Q.  Are you familiar with Facebook privacy settings?

10   A.  Yes.

11   Q.  What are they?

12   A.  At the time I was on Facebook until this happened six

13   months ago, I had the settings all the people I was friends

14   with were able to see my pictures.

15   Q.  You mentioned the term "a friend on Facebook."  What is

16   that?

17   A.  It is a very, very vague term.  Again, when Facebook

18   initially started, I was one of the few schools they were

19   friends on Facebook.  Over the last eight or nine years,

20   Facebook added where there is something where -- friend is a

21   very lose term.

22   Q.  When you were a member of Facebook, approximately how many

23   friends did you have?

24   A.  Between 11 and 1300.

25   Q.  Was Officer Valle one of your Facebook friends?

D2s6val5                    Frisca – cross

1    A.  I didn't even know that or remember that until everything

2    happened and I had to go back and see if he was my Facebook

3    friend.

4    Q.  What did you conclude?

5    A.  He was.

6    Q.  He was?

7    A.  Uh-huh.

8    Q.  Have you met all of your Facebook friends?

9    A.  No.

10   Q.  Do you know all of your Facebook friends?

11   A.  No.

12   Q.  Are you friends in a conventional term with everyone who

13   you are friends with on Facebook?

14   A.  That is 1300 people.  Fortunately, no.

15   Q.  Are you still a member of Facebook?

16   A.  No.

17   Q.  Ms. Frisca, did you ever tell Officer Valle that it was

18   okay for him to engage in conversations about you involving

19   kidnapping and other violence?

20   A.  Of course not.

21           MS. WAXMAN:  Your Honor, may I have a moment, please?

22           THE COURT:  Yes.

23           MS. WAXMAN:  Your Honor, no further questions for the

24   government.

25           THE COURT:  Cross-examination?

D2s6val5                    Frisca - cross

1          MS. GATTO:  Your Honor, we have no cross-examination.

2          THE COURT:  You may step down, Ms. Frisca.

3          Government will call its next witness.

4          MR. JACKSON:  Your Honor, if we can have one moment.

5          The government calls Officer Robin Martinez.

6          THE DEPUTY CLERK:  Please remain standing and raise

7    your right hand.

8     ROBIN MARTINEZ,

9          called as a witness by the Government,

10         having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. JACKSON:

13   Q.  Good afternoon, Officer Martinez.

14   A.  Good afternoon.

15   Q.  Officer Martinez, where do you work?

16   A.  I work in police academy, computer training unit.

17   Q.  How long have you worked there?

18   A.  12 years.

19   Q.  How long have you been an officer with the NYPD?

20   A.  Today actually marks my 19th anniversary.

21   Q.  Can you tell us a little bit about some of the assignments

22   that he have had as a police officer before going into the

23   police academy?

24   A.  Sure.  I was assigned to the 40th precinct in the South

25   Bronx.  I was also assigned to the 28th precinct in Harlem and

D2s6val5                    Martinez - direct

1    also assigned to the domestic violence unit in One Police

2    Plaza.

3    Q.  Thank you.  So when was it that you came to the computer

4    training unit at the police academy?

5    A.  July of 2009.

6    Q.  What brought you there?

7    A.  I applied.  I wanted to do something different.  I

8    possessed some knowledge in teaching and computers as well.

9    Q.  Just to be clear in your assignments before, what types of

10   police work were you doing?

11   A.  Well, everyone has to do patrol for an amount of time.  I

12   also was a domestic violence unit coordinator at 1 PP.  I have

13   done crime analysis to crime prevention.  Various assignments.

14   Q.  So turning your attention to July 21 when you joined the

15   computer training unit, what job did you have when you first

16   went there?

17   A.  I was just originally an instructor for the computer

18   training.

19   Q.  What is your job now?

20   A.  Well, currently I am the curriculum coordinator for the

21   computer training unit, so I develop training for other

22   instructors and how classes are to be taught and the length of

23   classes.  Also, develop PowerPoint presentations for other

24   instructors to utilize.  So I basically set up the training.

25   Q.  In your role as curriculum coordinator are you still an

1  instructor?

2  A.  Yes.

3  Q.  So you've been some sort of an instructor continuously

4  since you got to the police academy?

5  A.  Yes.

6  Q.  What is some of the things that your unit teaches the NYPD

7  officers?

8  A.  Well, we teach the my Microsoft applications such as Word,

9  PowerPoint, Excel and Access.  We also teach newly promoted

10 sergeants, newly promoted lieutenants on how to utilize the

11 computers in their duties.  We also instruct incoming recruits

12 on how to utilize the various computer programs to the

13 performance of their duties as well as captains, also outside

14 agencies upon request.  We also instruct them on how to utilize

15 the departmental applications such as, for example, running a

16 license plate or using the various applications for patrol or

17 any other of those types of functions.

18 Q.  Does the police academy only train new police officers?

19 A.  No.

20 Q.  What other situations are you giving training to police

21 officers?

22 A.  Oh, we also train in-service as well.  Once you are

23 promoted to the rank of police officer after being a recruit

24 for six months, when new applications come into to be

25 developed, we have to bring you back in for additional training

D2s6val5                    Martinez - direct

1    and that is ongoing throughout an officer's career in various

2    ranks.

3    Q.  I am going to show you a set of documents that have been

4    marked as Government Exhibits 210, 210 A through 210 D.

5    Actually, let me start first with Government Exhibits 210 A,

6    210 B, and 210 D.  I am going to hand you one more, 211 A and

7    B.

8              Officer Martinez, can you tell us what those documents

9    are?

10   A.  Okay.  210 D is the sixth floor of the police academy upon

11   existing the elevators.  That is the emblem.

12   Q.  You don't have to show it.  We'll go through it after it is

13   admitted in evidence.  Just briefly identify what each one of

14   those things are.

15   A.  Okay.

16   Q.  I think you told us what 210 -- you don't have to hold it

17   up.  Show us one by one.

18   A.  210 A is our police academy classroom, computer training

19   unit classroom.  210 B is a picture of the computers that we

20   use to train on in the classroom.  The computer that is

21   currently installed in the patrol cars as we referred to them

22   as RMPs.  Let's see.  There are some that aren't marked.

23   Q.  That is all one set there.

24   A.  All right.  I mixed them up.  Sorry.

25   Q.  The 211 series?

D2s6val5                    Martinez - direct

1    A.  The 211 series -- 211 A and 211 B -- looks like the outside

2    of the 26 precinct.

3    Q.  Thank you.

4         MR. JACKSON:  Your Honor, the government offers

5    Exhibits 210 A, 210 B, 210 D, and 211 A and B.

6         MR. HUGHES:  Your Honor, we object to at least A, B

7    and C.  There is no showing with respect to --

8         THE COURT:  He hasn't offered 210 C.  You don't have

9    to object to it.

10        As I understand it, Mr. Jackson, you are offering 210

11   A, 210 B, 210 D, 211 A and 211 B, is that correct?

12        MR. JACKSON:  Actually, your Honor, that is correct.

13   I actually want to withdraw at this moment my offer of 211 A

14   and B.

15        THE COURT:  All right.  We're talking about 210 A and

16   210 B and 210 D?

17        MR. JACKSON:  That's correct.

18        THE COURT:  Any objection to 210 A, 210 D and 210 D?

19        MR. HUGHES:  Yes.  We object because there is no

20   showing of time frame that these photos were taken and if there

21   has been any change to the classroom since then.

22   BY MR. JACKSON:

23   Q.  Officer Martinez, have the classrooms at the police

24   academy, the computer classrooms and the emblem that is in the

25   hallway of the police academy as depicted there, has it looked

1    the same over the approximate time that you have been at the

2    police academy?

3    A.  For the entire 12 years?

4    Q.  Has it looked approximately the same?

5    A.  Yes.  Approximately.

6    Q.  Is it the way it looks now?

7    A.  Yes.

8    Q.  Is this the classroom you have been given instructions to

9    police officers in since at least 2006?

10   A.  That's correct, sir.

11            MR. JACKSON:  Your Honor, the government offers

12   Government Exhibits 210 A, 210 B and 210 D.

13            MR. HUGHES:  Your Honor, we renew the objection.  At

14   least on the first page, 210 B, there is a picture of a

15   computer that we don't believe has been there in that classroom

16   very long.

17            THE COURT:  I cannot hear you.  I am sorry.

18            MR. HUGHES:  I said at least on the first page of 210

19   B, there is a picture of computer.  In fact, the exhibit

20   consists entirely of pictures of computers and we believe that

21   some or all of those computers may not have been there until at

22   least relatively recently.

23            MR. JACKSON:  Your Honor, maybe we should take a brief

24   side bar.

25            THE COURT:  All right.

D2s6val5                    Martinez - direct

1              (Continued on next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          (At the side bar)

2          MR. JACKSON:  I don't understand the objection, your

3    Honor.  This is pretty basic photography.  It is a photograph

4    of a classroom as it exists today.  It essentially existed over

5    the time period.

6          THE COURT:  Let's take it one by one.  Let's start

7    with 210 A, which appears to be photographs of the classroom in

8    which the witness teaches.  It shows some desks, shows some

9    chairs.

10          You are objecting to this?

11          MR. HUGHES:  Of this general picture the classroom.

12          THE COURT:  We're going to take them one by one.  You

13    have no objection to 210 A?

14          MR. HUGHES:  I don't have an objection to this page.

15    On this page I am not sure that that computer -- when that

16    computer was installed in the classroom and I don't want to get

17    ahead of us, but if I go to the next page, I just want to --

18          THE COURT:  No.  We're going to do it one by one and

19    we're going to find out what the government's position is.

20          Second page of 210 A.

21          MR. JACKSON:  I think that while Ms. Martinez will

22    testify that the computers have been updated and she will

23    explain more in her testimony over a time period that they have

24    used different software and different points and she is going

25    to explain exactly what each version different software came

D2s6val5                    Martinez - direct

1    in, she is talking about the way the classroom looks.  It is

2    the same building they have been using the entire time.  The

3    purpose of the exhibits is to show how they instruct on the

4    computers not to say that this is the precise computers that

5    Mr. Valle used.

6              MR. HUGHES:  Your Honor, I think it is more confusing

7    than probative if that is not the computer that Mr. Valle used

8    for his training and if that is not the layout of the

9    classroom.  The probative value is this exhibit seems to be

10   relatively limited.

11             MR. JACKSON:  I didn't say this was the layout of the

12   classroom.  She stated already this is the classroom.

13             MR. HUGHES:  I think you questioned her and she

14   said -- your question was is this the classroom as it existed

15   currently and the question is this the classroom.

16             THE COURT:  When do you contend that he was trained?

17             MR. JACKSON:  In 2006 and then again I believe in

18   2010.

19             MS. GATTO:  Would it make sense to get that out first?

20             MR. JACKSON:  I didn't think these were objectionable,

21   but I can go in whatever order you like.

22             THE COURT:  They don't strike me as particularly

23   objectionable either, but we're taking the time to do this.

24   Compared to the other exhibits that we have had to discuss,

25   this seems quite mild.  In any event, I am happy to have

D2s6val5                    Martinez - direct

1    Mr. Jackson elicit from the witness whether as to 210 A this is

2    how the classroom appeared in 2006 and 2010 or whether it is

3    different or whatever if you think it is worth it.

4             MR. JACKSON:  Sure.

5             MS. GATTO:  I think we wouldn't have an objection if

6    the timing was clear.

7             MR. HUGHES:  Right.  With respect to this exhibit.

8             THE COURT:  You mean 210 B?

9             MR. HUGHES:  210 B, I am sorry.  The first page.  Our

10   understanding is that this particular computer was not

11   installed in the police vehicles until probably around 2010.  I

12   don't know the dates of the training.

13            THE COURT:  Okay.  It seems to me one way to handle

14   this is if this isn't the computer that was in -- well,

15   actually, we're talking about 2012.  So if you are saying this

16   was installed in 2010, I don't understand the problem.

17            MS. GATTO:  Mr. Jackson, could you get the timing down

18   so we can see --

19            MR. JACKSON:  Your Honor, these are not appropriate

20   objections.  Clearly what the testimony is going to be is these

21   are the current computers that are installed.  What we're

22   talking about is Mr. Valle's misuse of this type of computer.

23   The witness is going to explain that they have received

24   instruction on this computer and also before that in a slightly

25   different version of the operating system, which accomplishes

1    the same objectives.  We're going to introduce records that

2    show Mr. Valle got that instruction in 2006 and also in 2010.

3    So I think that these are just meaningless technical

4    objections.

5              THE COURT:  Well, what about 210 D, you are not

6    objecting to 210 D, are you?  This is just a picture of the

7    hallway.

8              MR. HUGHES:  That's fine.

9              THE COURT:  So what I will ask to you do, Mr. Jackson,

10   first if the pictures that are 210 A and 210 B are different

11   than how, for example, the classroom appeared in 2006 and 2010,

12   just bring that out.  And with respect to 2010 B, if this is

13   not the equipment that was used in 2006, let's establish

14   whether it is or isn't.

15             MR. JACKSON:  I will start back and work my way to the

16   photograph.

17             THE COURT:  If it is different, she will explain.  If

18   it is the same, she will explain and then I will make a ruling.

19             MR. JACKSON:  Excellent.

20             MS. WAXMAN:  Thank you, Judge.

21             (In open court; jury present)

22             (Continued on next page)

23

24

25

1          (In open court)

2          MR. JACKSON:  Your Honor, I understand there is no

3     objection to 210D.  The government offers 210D.

4          THE COURT:  Is there any objection?

5          MR. HUGHES:  No.

6          THE COURT:  Then Government Exhibit 210D is received.

7          MR. JACKSON:  Could we display Government Exhibit

8     210D?

9          THE COURT:  Yes.

10    BY MR. JACKSON:

11    Q.   What are we looking at here, Ms. Martinez?

12    A.   This is the police academy emblem.  It looks like it is a

13    picture of the 6th floor when you first exit the stairway and

14    the elevator.  It is right in front.

15    Q.   Is that the area that the computer training unit is on?

16    A.   No.

17    Q.   Is this emblem on the floor that the computer training is

18    on -- the computer department?

19    A.   Yes.

20    Q.   Let me back up because I have asked you about a lot of

21    photographs.  We had a sidebar, and I know there is some

22    confusion.

23         MR. JACKSON:  You can take that down for a second.

24    Q.   Let me ask you first, during the course of your work, have

25    you been asked to look at records of an individual named

1    Gilberto Valle?

2    A.   Yes.

3    Q.   During the course of examining those records relating to

4    Gilberto Valle, were you able to determine whether Mr. Valle

5    had ever done any training with the computer training unit?

6    A.   Yes.

7    Q.   Did you end up retrieving any records relating to that

8    training?

9    A.   Yes.

10   Q.   I want to show you something that has been marked -- three

11   items that have been marked as Government Exhibits 609, 610,

12   and 611.  What are Government Exhibits 609, 610 and 611,

13   officer Martinez?

14   A.   These are attendant sheets for the computer training unit

15   on specific dates.

16   Q.   Are there just attendance sheets there, or are there --

17   A.   One is an attendant sheet --

18   Q.   Would you identify them by the number?

19   A.   Exhibit 609 is an attendant sheet dated October 20th of

20   2006.

21        Government Exhibit 610 is a copy of -- we have a

22   computer system called ELM which is the employee learning

23   management system.  Everyone takes training, police officers

24   and civilian members of service take training.  We track

25   service from the time they enter into the academy until they

D2SUVAL6                    Martinez - direct

1    retire.  And this is a copy of that.  That is Exhibit 610.

2              On a specific date, this is actually a copy of

3    property evidence tracking system from Police Officer Gilberto

4    Valle of the 26 Precinct, the training that he completed on

5    December 2, 2010.

6              Also part of Exhibit 610 is a cover sheet of our

7    sign-in log from Room 520.  That is one of our computer

8    training unit rooms.

9              And another page is a copy of an attendance sheet.  It

10   looks like from December 2, 2010 from the log-off Room 520.

11   Q.  Then, finally, what is Government Exhibit 611?

12   A.  Government Exhibit 611 is a copy of all the training taken

13   by Gilberto Valle from the time he entered into police academy

14   until present.

15   Q.  Is there a record of Mr. Valle's training that you printed

16   out after reviewing the records of the computer training

17   system?

18   A.  Yes, it is.

19   Q.  Do all of these reflect training that Mr. Valle engaged in?

20   A.  Yes.

21   Q.  You already mentioned 2010 training.  With regard to

22   Government Exhibit 609, what year does that training reflect

23   Mr. Valle engaged in training?

24   A.  Mr. Valle engaged in training in 2006, October 20.

25              MR. JACKSON:  Your Honor, the government offers

1    Exhibits 609, 610 and 611.

2              THE COURT:  Is there any objection?

3              MR. HUGHES:  We are going to object on hearsay,

4    foundation.

5              THE COURT:  Lay a foundation.

6              MR. JACKSON:  Yes, your Honor.

7    Q.  Are these records, records that are kept by the police

8    department in the regular course of the police department's

9    business?

10   A.  Yes.

11             MR. JACKSON:  Your Honor, the government offers

12   Government Exhibits 609 through 611.

13             MR. HUGHES:  No objection, your Honor.

14             THE COURT:  Government Exhibits 609, 610 and 611

15   received.

16             (Government Exhibits 609, 610, 611 received in

17   evidence)

18   Q.  Before we review 609, 610 and 611, now that we have

19   discussed the fact that Officer Valle did training in 2006 and

20   2010, I want to ask you specifically about the photographs that

21   you previously looked at.  Those photographs reflect -- the

22   first set of photographs that you looked at reflected a

23   classroom.  Is that the way that the classroom looked in 2006?

24             THE COURT:  We are referring to Government Exhibit

25   210A?

1          MR. JACKSON:  Yes, your Honor.

2     A.   Not I'm not entirely sure.  The only -- we only had two

3     chambers of classrooms, meaning that the desk was the only

4     thing that was upgraded, and I believe it might have been at or

5     around 2006.

6     Q.   What about in 2010, is that the way that the classroom

7     looked?

8     A.   Yes.

9     Q.   Even in 2006, besides changing some of the desks, is this

10    approximately the way that the classroom was set up?

11    A.   Yes.

12         MR. JACKSON:  Your Honor, the government offers 210A.

13         MR. HUGHES:  No objection, your Honor.

14         THE COURT:  Government Exhibit 210A is received.

15         (Government Exhibit 210A received in evidence).

16         MR. JACKSON:  Your Honor, may we publish Government

17    Exhibit 210A?

18         THE COURT:  Yes.

19    Q.   So Officer Martinez, can you just explain what the jury has

20    seen in this classroom in Government Exhibit 210A?

21    A.   You are seeing approximately four rows of computer desks.

22    These are called Nova desks.  You see the glass on top because

23    the computer is encased inside of the glass -- or at least the

24    computer screen is.  That is to save desk space so that they

25    can take notes and put their books and belonging on top, along

1    with chairs, and some covers to shade the sun or the glare.

2          At the top you will notice there is a projector.  That

3    projector is hooked up to the teacher's terminal so that the

4    teacher can -- sort of like a show-and-tell.

5          MR. JACKSON:  Can we go to the next page of Government

6    Exhibit 210A.

7    Q.  What are we looking at there?

8    A.  You are looking at the computer screen encased inside of

9    what we refer to as the Nova desk.

10   Q.  Now, that computer screen, is that the screen that the

11   students train at when they are getting instruction in the

12   room?

13   A.  Yes, it is.

14   Q.  Let me ask you, are all NYPD officers required to go

15   through the computer training unit?

16   A.  I believe, either of 2000 or 2001 -- maybe a little prior

17   to that -- that's when the computer course was initially

18   implemented to police officers.

19   Q.  Apart from when they first join the police department and

20   come in through the academy, are officers required to go to

21   training at any point after that?

22   A.  Yes.

23   Q.  Why might they be required to go to training after their

24   initial experience in the police academy?

25   A.  Any upgrades in training, any new applications that may

1    come about, any type -- basically, any type of applications or

2    they get promoted to various ranks, they have to come through

3    us as well.

4    Q.  Does your unit train officers on how to access NYPD

5    systems?

6    A.  Yes.

7    Q.  What are some of the systems or law enforcement databases

8    that your unit trains NYPD officers on how to access?

9    A.  We have a program called Finest, which has recently been

10   upgraded to Z Finest.  That is part of the NLETS, the acronym

11   for the National Law Enforcement telecommunications system.

12   That is something that is used nationally by all police

13   jurisdictions.  Also part of the NCIC National Crime

14   Information Center, we access and retrieve information.  That

15   is just a computer program on how we access that information,

16   federal and local warrants and that type of stuff.

17           I am trying to think of what else.

18   Q.  No.  That is sufficient.

19           Let me ask you very quickly.  If you could take a look

20   at Government Exhibit 210B.  Can you tell us what is depicted

21   in 210B?

22   A.  This is a picture of a computer that is on a cart in our

23   classroom.  This is a replica of the computer that is in the

24   police vehicle, also known as the RMP.

25   Q.  Is that the computer that is currently in NYPD vehicles?

1    A.  Yes, it is.

2    Q.  How long has that been in NYPD vehicles?

3    A.  Approximately three years.  This is an upgrade, this

4    particular version.

5    Q.  Prior to this computer coming in, how different was the

6    last computer?

7    A.  Not very.  It was just a little bit larger and the program

8    looked esthetically different, but the functionality was the

9    same.

10    Q.  Did that previous computer reach back to 2006?

11    A.  Yes.

12              MR. JACKSON:  Your Honor, the government offers

13    Government Exhibit 210B.

14              MR. HUGHES:  No objection.

15              THE COURT:  All right.  Government Exhibit 210B is

16    admitted.

17              (Government Exhibit 210B received in evidence)

18              MR. JACKSON:  May we publish it?

19              THE COURT:  You may.

20    Q.  Officer Martinez, what are we looking at on the first page

21    of Government Exhibit 210B?

22    A.  That is a computer, a replica that we use in the classroom

23    that is currently in the police vehicles today.  It is what we

24    use to train on.

25              MR. JACKSON:  Can we go to the next page.

1    Q.   What does this photograph depict?

2    A.   That is the actual cart that the computer is standing on

3    and that is the wireless modem that it is connected to.

4    Q.   Now, in an actual New York City police car, would that same

5    wireless modem be there?

6    A.   Yes.

7    Q.   Where would be it situated in the actual car?

8    A.   It varies depending on the models.  It could be in the

9    trunk -- wherever there is space.  It could be in a normal

10   vehicle where the armrest would be.

11        MR. JACKSON:  Could we go to the third page and the

12   fourth page.

13   Q.   What are we looking at here, Officer Martinez?

14   A.   You are looking at the computer open.  Prior to that it was

15   closed.  That's what it looked like when it was open and ready

16   to use.

17   Q.   In terms of the software that we are seeing upon the

18   screen, what is that software?

19   A.   It is currently called OFM which is the Omnixx Force

20   Mobile.

21        MR. JACKSON:  Can we go to the next page.

22   Q.   What is depicted there?

23   A.   That is the log-in screen for the Omnixx Force Mobile.

24   Q.   When you say the log-in screen, what do you mean?

25   A.   Well, you have to have a unique user ID and password in

1    order to gain access into the computer.

2    Q.  During your training, do you teach police officers how to

3    log-in to Omnixx Force Mobile?

4    A.  Yes.

5    Q.  So what do they have to do with this screen?

6    A.  Well, the user ID, they would have to put in their unique

7    tax number.  Every officer is issued a tax number along with

8    the shield number to personally identify themselves and, also,

9    a password.  That password is an alphanumeric password

10   consisting of two letters and two numbers.  And the unit ID

11   would be the RMP or the police vehicle number.

12   Q.  When officers are issued their password, are they

13   instructed that that is confidential information?

14   A.  Absolutely.

15   Q.  Does every officer get a unique password?

16   A.  Yes.

17         MR. JACKSON:  Can we go to the next page.

18   Q.  Is that just the same computer with the screen swivel?

19   A.  Yes.

20         MR. JACKSON:  Can we go to the next page, Ms. Chen,

21   and then the next page.

22   Q.  What is depicted here?

23   A.  That depicts the portion of the program where you can

24   actually run someone's -- retrieve someone's information, their

25   driver's license information.

D2SUVAL6                    Martinez - direct

1   Q.  So in order to reach this page, is this after you have

2   already logged in with your tax ID number and your unique PIN?

3   A.  Yes.

4   Q.  What information is entered in Omnixx Force Mobile here?

5   A.  It would be the last name, first name and also, as you can

6   see here, the license plate number and the state that the

7   license was issued.

8          MR. JACKSON:  Can we go to the next page.

9   Q.  What is depicted there, Officer Martinez?

10  A.  For training purposes, running someone by the name of Jack

11  Frost -- last name Frost, first name Jack.

12  Q.  Is that a name that is used commonly when you do training

13  with officers?

14  A.  Yes.  Jack Frost as well as Santa Claus, these are

15  different names that New York State has provided us to use in

16  training.

17  Q.  Why do you use a fictional name as opposed to a real name

18  in the training?

19  A.  Well, if we are using a real name, it would access real

20  information and we are not allowed to do that.

21  Q.  Essentially, the state is set up Jack Frost as a false

22  account for you to access on the system?

23  A.  That is correct.

24  Q.  And to be clear, the actual Jack Frost has no criminal

25  record?

1    A.  No.

2              MR. JACKSON:  Turn to the next page.

3              THE WITNESS:  Santa Claus does, though.

4              MR. JACKSON:  Can we have the next page.

5    Q.  What is depicted there, Ms. Martinez?

6    A.  Well, it is a little bit hard to see, if you can blow it up

7    a little bit -- much better.

8              It is a response to Jack Frost.  The information that

9    we ran on the previous screen, that's the response that came

10   back for it.  It looks like New York State's response.

11             The bottom of it looks like Jack Frost, they say he

12   does not have any orders of protection in New York State.

13             Also, it came back with his name and date of birth and

14   that he is not a wanted person according to NYSPIN, New York

15   State-Wide Police Information Network.

16   Q.  Just for our understanding, all that was entered on the

17   first screen was Jack Frost, correct?

18   A.  I am trying -- I don't recall if that's all we entered.

19   Q.  Is it possible to enter just the name?

20   A.  Yes, absolutely.

21   Q.  If only the name Jack Frost is entered or Jack Frost's

22   birthday, are these responses that will come back for that?

23   A.  Yes.

24   Q.  What are some of the databases that are accessed by

25   entering the name Jack Frost into the computer system?

D2SUVAL6                    Martinez - direct

1   A.  The National Crime Information Center information, NCIC,

2   NYSPIN -- which as I stated was the New York State-wide Police

3   Information network.

4           Also, I believe there's what we refer to as III check

5   which is the Interstate Information Index.  I believe that's

6   what the three Is stand for.

7           All of this accesses both local and federal

8   information on the individual that we place in to run the

9   information.

10          MR. JACKSON:  Can we go to the next page.

11  Q.  Are these more examples of some of the responses that were

12  generated by entering Jack Frost into the system?

13  A.  Yes.

14          MR. JACKSON:  Can we go to the following page.

15  Q.  Are these additional databases that we access?

16  A.  Yes.

17  Q.  By the way, do you get address information when you enter a

18  person's name into this Omnixx Force Mobile system?

19  A.  Yes.

20  Q.  Where does that address information come from, where are

21  some of the places it could come from?

22  A.  It can come from within the state, New York state.  If it

23  is out of state, it has to come from their database, National

24  Crime Information Center, NCIC -- all of those databases are

25  hit.

D2SUVAL6                    Martinez - direct

1    Q.  You mentioned National Crime Information Center.  What is

2    NCIC?

3    A.  National Crime Information Center will tell us if the

4    individual has outstanding warrants in another state, if they

5    are affiliated -- if they used any aliases.  If they have any

6    current warrants locally.  Also it will access orders of

7    protection because orders of protection are enforceable in all

8    50 states, so if you have an order of protection in Hawaii and

9    something happens here, we are still responsible for making

10   that arrest.

11             MR. JACKSON:  Could we go to the next page.

12   Q.  Is this just a screen saver for the program?

13   A.  Yes.

14             MR. JACKSON:  You can take it down, Ms. Chen --

15   actually, can we go back to the second to last screen of 210B.

16   Q.  What is NYMV?

17   A.  That is New York Motor Vehicles, New York State Motor

18   Vehicles.

19   Q.  Is that one of the databases you access when you enter

20   names into the system?

21   A.  Yes, it is.

22   Q.  What is this information that was retrieved by Jack Frost

23   for this query?

24   A.  It was DAL which stands for the driver information.

25             What was accessed is his name, last name, which we

1   have the information, the address, his sex, his height, the

2   county he lives in and the motorist ID, along with the client

3   ID which is there.

4           MR. JACKSON:  Thank you.  You can take that down.

5   Q.  I want to hand you what's been marked as Government Exhibit

6   210C.  What is Government Exhibit 210C, Officer Martinez?

7   A.  It is PowerPoint presentation.  The title of it is

8   Department Confidentiality on the projector in front of the

9   classroom.

10  Q.  Are those photographs of you doing a demonstration of the

11  actual PowerPoint presentation that you do for students?

12  A.  Yes, it is.

13          MR. JACKSON:  Your Honor, the government offers 210C.

14          MR. HUGHES:  Your Honor, we are going to object and

15  ask about the timing of this exhibit.

16          THE COURT:  Yes.  You need to establish whether the

17  presentation was in 2006, 2010 or whatever the time period is.

18          MR. JACKSON:  Thank you, your Honor.

19  Q.  How long have you been giving this particular PowerPoint

20  presentation?

21  A.  We have been giving this particular PowerPoint presentation

22  since approximately 2005.

23          MR. JACKSON:  Thank you, Officer Martinez.

24          Your Honor, the government offers 210C.

25          MR. HUGHES:  No objection.

1      THE COURT:  Government Exhibit 210C received.

2      (Government Exhibit 210 received in evidence)

3      MR. JACKSON:  Your Honor, may we display 210C?

4      THE COURT:  Yes.

5   Q.  So what is the subject of this particular PowerPoint

6   presentation that we are looking at?

7   A.  The subject is department confidentiality which basically

8   instructs the police officers what they can and can't do while

9   accessing a department database.

10  Q.  Why do you give this instruction to police officers?

11  A.  To inform them of things, the proper procedures and things

12  they can and cannot do, meaning that you cannot run personal

13  information and the consequences thereof.

14      MR. JACKSON:  Can we go to the next page.  If you

15  could zoom in on that.

16  Q.  I have another copy of this, let me just back up and ask

17  you --

18  A.  I think that I can read it.

19      MR. JACKSON:  Can we back up and can we go to the next

20  page.

21  Q.  On this slide, what is depicted?

22  A.  It is department confidentiality, and it is explaining to

23  members of service, meaning both uniformed police officers and

24  some civilian employees, that we have when they can properly

25  access what we refer to -- another acronym -- CHRI which is

1    Criminal History Record Information.

2          And this particular slide says that members of service

3    with access to this information can only do so within the

4    performance of their duties and they must adhere to department

5    policies and procedures and that responsibility basically lies

6    with the individual that is accessing that information with the

7    smiley face pointing at whoever is looking at the screen,

8    meaning you.

9          MR. JACKSON:  Can we go to the next page in this

10   presentation.

11   Q.  Can you read what that says, it is little blurry?

12   A.  It says:  "MOS" -- that is the abbreviation for members of

13   the service, pertaining to both uniformed and civilian members

14   -- "may only examine a criminal history record or any other

15   confidential information when they are required to do so in the

16   course of their official duties and responsibilities.  There

17   are no exceptions to this policy."

18         MR. JACKSON:  Can you go to the next page.

19   Q.  What is this slide?

20   A.  "Members of service are prohibited from removing any

21   official document, department of records, copies of documents,

22   or record from the workplace."  And the example that we give

23   are emails, but while doing the presentation we also elaborate

24   further.

25         MR. JACKSON:  Next page, please, Ms. Chen.  You don't

1    have to expand that.

2              The next page.

3    Q.   Can you explain what this slide is?

4    A.   These are the consequences of unauthorized use of criminal

5    history record information, also called CHRI.

6    Q.   What do you identify as the consequences of unauthorized

7    use of CHRI in the slide?

8    A.   We list it as arrest, prosecution, termination of

9    employment and fines up to $10,000, also with a picture of

10   someone in handcuffs.

11   Q.   What do you explain to students in terms of these

12   consequences when you are instructing them?

13   A.   If you misuse or if you access information in an

14   appropriate manner, it is not within the performance of your

15   duties, you are going to face serious trouble such as being

16   prosecuted, being arrested, being fired and also the big fines

17   of up to $10,000.

18             MR. JACKSON:  Can we go to the next page, and the next

19   page.

20   Q.   What is depicted on this slide?

21   A.   These are the list of criminal charges for the unauthorized

22   use of CHRI, criminal history record information.  And there

23   are approximately 11 different charges that you can be

24   prosecuted for.

25   Q.   And those are just for state charges, right?

1   A.  Yes.

2           MR. JACKSON:  Can we go to the next page.

3   Q.  What is instructed on this slide?

4   A.  How to safeguard access to criminal history record

5   information.

6   Q.  What is the instruction?

7   A.  Well, never leave your PC or personal computer unattended.

8   Once when you log into a computer, if you leave the computer,

9   someone else can come in and access that using your

10  information, access anything.

11          And we inform new students, don't leave your personal

12  computer unattended.

13          Also, never let anyone access your user idea and

14  password -- don't share with your partner, they have their own

15  information.

16          Never use password or user ID belonging to another

17  member of service.

18          MR. JACKSON:  Then, can we go to the last slide.

19  Q.  Explain on this slide.  Could you just read that?

20  A.  Sure.  It says:  "Remember, your user ID plus your password

21  plus your unattended PC equals your responsibility and your

22  problem.

23  Q.  Why in your training do you go to these steps to emphasize

24  the importance of safeguarding CHRI?

25  A.  Well, we ant to inform officers, first and foremost, of

1    integrity on the computer level.  We also want to prohibit

2    anyone from -- at least providing them with knowledge that this

3    is not allowed, this will not be tolerated and just, basically,

4    to inform everyone that this is not what they are supposed to

5    do.

6    Q.  I want to hand you previously -- in fact, I think that you

7    have them in front of you -- Government Exhibits 609, 610.

8            MR. JACKSON:  Your Honor, may we display Government

9    Exhibit 609?

10           THE COURT:  Yes.

11   Q.  So, Officer Martinez, can you just explain what this is for

12   the jury?

13   A.  This is an attendance sheet from my unit, the computer

14   training unit.  It is dated October 20 of 2006.  And it gives

15   the instructor's name and the courses that were taught.  On

16   this particular sheet it happens to be life scan, digital

17   camera and the MDC 2020, which is the computer in car and the

18   time.  And, also, in the top it tells you the company number.

19   This was a recruit company at the time.

20   Q.  Does Officer Valle's name appear on this?

21   A.  Yes, it does.

22   Q.  Where is it?

23   A.  It would have been number 15.

24   Q.  Who would entered his name and his tax ID number on this

25   sign-in sheet?

1    A.  He would have.

2    Q.  Is this tax ID number the unique tax ID number that you

3    were talking about that every police officer has?

4    A.  Yes, it is.

5    Q.  What is this number where it says SS?

6    A.  That would have been for Social Security number which we no

7    longer use.

8    Q.  Can you just explain, in the course of taking these MDC

9    2020 classes and life scan and digital camera, would Officer

10   Valle have gotten instruction on how to properly handle CHRI?

11   A.  Yes.

12   Q.  Would he have received the PowerPoint that you just talked

13   about?

14   A.  I am not exactly sure.  I believe he did.

15   Q.  In 2010 would he have received that PowerPoint?

16   A.  Absolutely.

17   Q.  In 2006, would he have gotten instruction on the same

18   principles that are in that PowerPoint?

19   A.  Absolutely.

20           MR. JACKSON:  Can we go to Government Exhibit 610.

21   Q.  So, again, what is Government Exhibit 610?

22   A.  This is a copy of Officer Valle's training from -- dated

23   December 2, 2010 when he attended the PETS training, which is

24   short for property evidence tracking system.

25           MR. JACKSON:  Can we go to the next page, and the next

1    page.

2    Q.  Does officer's Valle's name appear on this page?

3    A.  Yes, it does.

4    Q.  Where is it?

5    A.  OK.  It is approximately -- because it is not numbered --

6    26th Precinct, P.O. Valle -- and I guess maybe 15 or 20 names

7    from the top.

8            MR. JACKSON:  Can you highlight that, Ms. Chen.  It is

9    approximately two-thirds of the way down.

10   Q.  Again, who would have entered Officer Valle's name, tax ID

11   name and this other information on this sheet?

12   A.  He would have.

13           MR. JACKSON:  Your Honor, can we now go to Government

14   Exhibit 611?

15           THE COURT:  Yes.

16           MR. JACKSON:  Thank you, your Honor.

17   Q.  So what is depicted on this sheet?

18   A.  This is a copy of all the training attended by Officer

19   Valle.

20           MR. JACKSON:  I don't want to go through all of these,

21   but if you could just expand that Ms. Chen.

22   Q.  These are all trainings that Officer Valle received?

23   A.  I believe it is.

24   Q.  This is the record of that?

25   A.  Yes.

1        MR. JACKSON:  Can we go to the next page.

2   Q.  Now a number of these on the second page after we passed

3   the completed ones, there are some of these that say DNA --

4   some of these say dropped, what does that mean?

5   A.  They were entered in error.  There was a point in time when

6   each individual command, meaning the precinct, was responsible

7   for entering in this information.  And as a result of that,

8   they put some things and they couldn't delete it so they just

9   put it as dropped to show that he didn't attend that course.

10  Q.  I want to hand you what has been marked as Government

11  Exhibit 612.  What is Government Exhibit 612?

12  A.  It is a copy of the PowerPoint presentation entitled

13  "Department Confidentiality."

14  Q.  Is that the PowerPoint that we just went through?

15  A.  It is.

16  Q.  Is that just another clear copy of just the PowerPoint?

17  A.  Yes, it is.

18        MR. JACKSON:  Your Honor, the government offers 612.

19        THE COURT:  Any objection?

20        MR. HUGHES:  No objection.

21        THE COURT:  Government Exhibit 612 is received.

22        (Government Exhibit 612 received in evidence)

23  BY MR. JACKSON:

24  Q.  I want to hand you what's been marked as Government

25  Exhibits 613 and 614.  Do you recognize those documents?

1    A.   Yes.

2    Q.   What are they?

3    A.   Exhibit 613 is a copy of the student guide for the MDC 2020

4    mobile data client system that is the older version of the

5    computer that is in the police car.

6    Q.   What is Government Exhibit 614?

7    A.   Exhibit 614 is the copy of the student guide of the current

8    computer that is in the police car.

9    Q.   So, to be clear, 613 is the student guide for that prior

10   computer system that you talked about that was in existence in

11   2006, and 614 is the current computer system?

12   A.   That's correct.

13   Q.   Do all students receive a copy of the student guide when

14   they are instructed on the proper use of these computer

15   systems?

16   A.   Yes.

17   Q.   Would Mr. Valle had received copies of these?

18   A.   Yes.

19            MR. JACKSON:  Your Honor, the government offers 614

20   and 613.

21            THE COURT:  Any objection?

22            MR. HUGHES:  No objection, your Honor.

23            THE COURT:  Government Exhibits 613 and 614 received.

24            (Government Exhibits 613, 614 received in evidence)

25            MR. JACKSON:  Could we just display the first page of

1   Government Exhibit 613.

2           Can we display the first page of Government Exhibit

3   614.

4   Q.  What are some of the types of things that are instructed in

5   these exhibits that relate to the proper use of these

6   computers?

7   A.  I'm sorry.  Can you repeat that?

8   Q.  Let me rephrase that question.

9           Can you just summarize what is contained in each of

10  these student guides?

11  A.  How to use the computer, basic functions, keys, etc.

12          MR. JACKSON:  You can take that down, Ms. Chen.

13  Q.  Just a couple of additional questions.

14          During the course of your career, Officer Martinez,

15  have you found, have you observed misuse of computer systems is

16  a common occurrence in the NYPD?

17  A.  Have I observed it personally?

18  Q.  Yes, as a common occurrence.

19  A.  I know it occurs.  I wouldn't say it is common, but I know

20  that it does occur.

21  Q.  In your work as a police officer.  Did you observe that it

22  was a common occurrence?

23  A.  No.

24          MR. JACKSON:  Just one moment, your Honor?

25          THE COURT:  Yes.

D2SUVAL6                    Martinez - direct

1    Q.  To be clear, Officer Martinez, are officers instructed that

2    any accessing of the system from non-work related purposes is

3    improper and illegal?

4    A.  Yes.

5              MR. JACKSON:  No further questions, your Honor.

6              THE COURT:  I will see the lawyers at the bench.

7

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Are you going to be cross-examining this

3   witness?

4          MR. HUGHES:  Yes.

5          THE COURT:  How long do you think that it would take?

6          MR. HUGHES:  I would say on the order of a half hour.

7          THE COURT:  I don't think that I am going to be able

8   to not sit tomorrow.

9          MS. GATTO:  Your Honor, could I be heard on this?

10         THE COURT:  Yes.

11         MS. GATTO:  First, I think that we are still well

12  within the schedule.  I think that we had planned, because we

13  talked about it yesterday, to use tomorrow, the day out of

14  court to go through the bulk of government evidence, and we

15  have problem with access to Mr. Valle --

16         THE COURT:  You have the weekend.

17         MS. GATTO:  We have Saturday and Sunday, but the short

18  day is invaluable to the defense.  We kind of planned our

19  schedule around it.  I appreciate the Court's concern that this

20  may then go beyond, but I do not anticipate our case taking

21  more than three days, three and a half days.  So the

22  government, if we start on Monday instead of tomorrow, the

23  government is certain to rest -- I don't think that you have

24  much more.

25         MR. JACKSON:  Your Honor, I have to object.  We have

1    certain witnesses who had to wait for extended amounts of time

2    to testify.  There have been a certain number of applications

3    by defense counsel -- I'm not faulting that, but it has caused

4    us to have witnesses waiting.

5         THE COURT:  Before you went any further, I wanted to

6    have a sense of how much longer your case is going to go.

7         MR. JACKSON:  That's where I was going.

8         THE COURT:  Go right ahead.

9         MR. JACKSON:  We still have some significant testimony

10   that we have to finish.  We have short testimony from the

11   sergeant who was the driver for Mr. Valle.  We don't that much

12   from them, but then we have to talk about Mr. Flatley who is

13   going to testify about forensic analysis.  It is going to be a

14   lot of things that he has to go through and that takes some

15   time.  And Sergeant Foto is going to testify about statements

16   post arrest, and I imagine there will be significant cross.

17        Our view, especially because we asked defense counsel

18   several times to let us know what their anticipated schedule of

19   witnesses were -- Ms. Gatto told us after our last conference

20   she was going to send me that night a list of anticipated

21   witnesses and we still --

22        THE COURT:  What I am really interested in is the

23   following.  It is clear to me that the government still has a

24   substantial amount of evidence.  So let me tell you my concern

25   Ms. Gatto.  If we start out Monday, a part of Monday is devoted

D2SUVAL6                    Martinez - direct

1    to the government's case.  Then suppose your case takes three

2    and a half days.  That brings us to Thursday afternoon, Friday,

3    then charge the jury, and I am taking it beyond the two-week

4    period because deliberations will take some time, and I don't

5    think it is in anyone's interest to pressure the jury to try to

6    reach a quick verdict here.  I told them two weeks.  I want to

7    stay as close as I possibly can, and I am not willing to lose

8    the whole day tomorrow.

9         It may be the case that the government can get in most

10   of its evidence and we will break early tomorrow.  And if we

11   can, I will do that, but to say that we are not going to sit at

12   all tomorrow, I cannot do that because of the reasons just

13   stated.  So I want to tell the jury to come back tomorrow.  If

14   we can break early, we will, but I cannot lose the whole day.

15

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  I am aware of the time.  Yes, we are going

3     to break for the day.  And, actually, the reason why I was

4     talking to the lawyers was just figuring out the schedule.  We

5     are going to break for the day now.

6          I am going to ask you to return at 9:30 tomorrow

7     morning.

8          In the meantime, don't discuss the case, keep an open

9     mind.

10          See you tomorrow.

11

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Is there anything that we need to take up

3      for the evening?

4              MR. JACKSON:  Your Honor, just very briefly, we would

5      like to ask the Court temporarily to order that the filing of

6      the documents submitted in evidence be delayed for us to file a

7      motion.  Some of the exhibits, we would like to send the Court

8      a letter this evening asking -- there are just three of the

9      exhibits -- the training manuals be filed under seal with

10     regard to Officer Martinez's testimony.

11             THE COURT:  Which exhibits are those?

12             MR. JACKSON:  612, 613, 614 and 210C.

13             THE COURT:  So the government wants to make an

14     application that they be filed under seal?

15             MR. JACKSON:  Yes, your Honor.

16             THE COURT:  So when are you going to submit papers on

17     that?

18             MR. JACKSON:  We would submit it later tonight.

19             THE COURT:  Then that application is granted.

20             Any other matters that we should take up?

21             I want to come back to an issue that was discussed at

22     an earlier point, and that is these images of what appear to be

23     dead and mutilated women.  And we discussed this issue before.

24     The issue is whether the record will indicate that Mr. Valle

25     saw these images.

1          And when we last discussed this, the government

2     represented that it would be able to introduce evidence

3     demonstrating that it was a fair inference that the he saw

4     these images.

5          I understand that Mr. Flatley is going to be the

6     witness through whom these images will come in, am I right

7     about that?

8          MR. JACKSON:  That is correct, your Honor.

9          THE COURT:  Now, it is my sense that we could see

10     whether the foundation is adequate, that all of that could

11     happen before the jury, but if the lawyers disagree and believe

12     that we need to do that outside of the presence of the jury,

13     then let me know now.

14          MS. GATTO:  Your Honor, we would ask that it be done

15     outside the jury.  There are questions that have to be asked on

16     voir dire on our part, if they can't lay the foundation and the

17     questions are not properly before the jury.

18          MR. JACKSON:  Your Honor, we disagree.  I don't think

19     that there are any questions that would have to be posed to

20     Mr. Flatley that would cause any issues.  The content of the

21     images won't be the subject of any of our discussions, so I

22     think that it could all be done before the jury.

23          MS. GATTO:  Your Honor, I would imagine questions to

24     Mr. Flatley about the kind of images on fetish web sites, what

25     are thumbnails as compared to what are not thumbnails.  It is

1    just going to be very confusing and not necessary for the jury.

2         And I think that the Court will probably want to hear

3    argument about our 403 arguments which are very significant and

4    real arguments, even after the government lays its foundation,

5    if it can -- which we don't think it can.  So it seems like it

6    makes sense to do it as efficiently as possible.

7         THE COURT:  So we are going to finish with this

8    witness and then you mentioned that there will be a sergeant

9    that will be testifying.  Is Mr. Flatley the next witness?

10        MR. JACKSON:  Yes, your Honor.

11        THE COURT:  At what point in his examination would we

12   reach the issue about these images?

13        MR. JACKSON:  Probably approximately 30 percent of the

14   way through, your Honor.

15        THE COURT:  Well, we will see how it goes tomorrow.

16        I would like to know the exhibit numbers of all the

17   exhibits that the government intends to introduce that relate

18   to this issue.  I need to know them.  If you know them now,

19   just tell me; if you don't, fax me a letter telling me what the

20   exhibits are.

21        MR. JACKSON:  I think that I can tell you now, your

22   Honor, if your Honor could indulge me for one moment.

23        THE COURT:  Yes.  Take your time.

24        (Pause)

25        MR. JACKSON:  Your Honor, I think -- and since this is

1  a defense application -- I will defer to them.  I am not sure

2  about the exact contours of their application but I believe

3  that it is Government Exhibits 246 through, I think, 278.  And

4  then potentially a couple of others beyond that, also 282.

5  283.  I think those are the only images that are -- it is the

6  defense's application.

7          I would just note that one of these, 274 --

8          THE COURT:  I'm sorry, I can't hear you.

9          MR. JACKSON:  I would just note that with regard to

10  one of these, 274, an additional bit of information that we

11  have is that Ms. Mangan testified that, based on her

12  description, this is a photograph that she saw on the software

13  that she utilized to capture images of what Mr. Valle was

14  looking at, the severed feet in refrigerator.

15          MS. GATTO:  Your Honor, I don't think that the

16  testimony is clear enough for the government to say that this

17  image in Government Exhibit 274 is the image that Ms. Mangan

18  was describing.  And if that were the case, then the government

19  should have elicited that from Ms. Mangan.

20          THE COURT:  These exhibits that Mr. Jackson just

21  listed, does the government agree these are ones in dispute?

22          MS. GATTO:  Your Honor, we dispute the cache images.

23  All of these images were taken from the cache files of the

24  computer, so yes.

25          THE COURT:  So these are the ones, Mr. Jackson, that

1    you identified -- these are the only ones that are cache

2    images?

3             MR. JACKSON:  Those are the only ones, your Honor,

4    that I believe are cache images.

5             I just note that there was one additional that I

6    omitted that was out of place, Government Exhibit 273.  I don't

7    believe that that's a cache images.

8             MS. GATTO:  I think that it might make tomorrow easier

9    if they give the cache files on the hard drive --

10            MR. JACKSON:  We have already given defense every

11   single image that we intend to offer.  We gave them photographs

12   of each exhibit some time ago and the specific file path on the

13   computer to correspond to it.

14            MS. GATTO:  I will doublecheck my records.  What we

15   have is the file source from what was originally identified as

16   cache images.  Originally it was 31 image and they did

17   ultimately provide the file passwords.  For example, Government

18   Exhibit 273, I don't have the file path source for that.  If

19   the government is going to allege it was saved on the hard

20   drive, which is fine, we would like to know before tomorrow so

21   that I can just confirm where it came from.

22

23            (Continued on next page)

24

25

1    MS. GATTO:  In our review of the hard drive, absent

2    the cache fold, it does not exist there.

3    THE COURT:  It is everyone's interest that there be as

4    much clarity about this before tomorrow as possible.

5    Mr. Jackson, if there is any ambiguity, lack of

6    clarity about whether these images were saved on the hard drive

7    or simply cache images, I would ask you to clear that up with

8    Ms. Gatto before tomorrow.

9    MR. JACKSON:  Absolutely, your Honor.  I will say

10   again we provided long before we started the trial all these

11   photos.

12   THE COURT:  Anything else?

13   MR. JACKSON:  Your Honor, we would ask the Court to

14   ask defense counsel to give us some proffer of the witness

15   schedule for next week.  We were told by defense counsel we

16   would have it yesterday or the day before.

17   THE COURT:  Where are you on that, Ms. Gatto?

18   MS. GATTO:  Your Honor, I think that at first we

19   intended to play the deposition of Mr. Barrenkoff.  Again,

20   we're going to reevaluate all this after the government's case

21   has come in, but our anticipation now is that Mr. Barrenkoff

22   deposition.  Then our paralegal has prepared a video, a

23   demonstrative video, that is in the defendant's exhibit

24   binders.  I think she would be our next witness.

25   THE COURT:  What is the nature of the video?

1          MS. GATTO:  It is a video of Darkfetishnet.com.

2          THE COURT:  Has the government seen this video?

3          MR. JACKSON:  No.  We haven't had a chance to review

4    it yet.  Defense counsel has given it to us, but we haven't had

5    a chance to review it.

6          MS. GATTO:  Our third witness will be Dr. Herriot From

7    there we are evaluating where we are going to go next, your

8    Honor.

9          THE COURT:  It seems like that will take all of the

10   first day.

11         MS. GATTO:  I would think so, yes, your Honor.

12         THE COURT:  Anything else?  Then we'll resume at 9:30

13   tomorrow.

14         MS. WAXMAN:  Thank you, your Honor.

15         THE LAW CLERK:  All rise.

16         (Adjourned to February 29, 2013 at 9:30 a.m.)

17

18

19

20

21

22

23

24

25

1                       INDEX OF EXAMINATION

2   Examination of:                            Page

3   COREY WALSH

4   Cross By Mr. Baum . . . . . . . . . . . . . . 754

5   Redirect By Ms. Waxman . . . . . . . . . . . 816

6   Redirect By Ms. Waxman . . . . . . . . . . . 873

7   Recross By Mr. Baum . . . . . . . . . . . . . 874

8   Redirect By Ms. Waxman . . . . . . . . . . . 897

9   ALISA FRISCA

10  Direct By Ms. Waxman . . . . . . . . . . . . 903

11  ROBIN MARTINEZ

12  Direct By Mr. Jackson . . . . . . . . . . . . 914

13                  GOVERNMENT EXHIBITS

14  Exhibit No.                        Received

15   109  . . . . . . . . . . . . . . . . . . 907

16   609, 610, 611  . . . . . . . . . . . . . . 928

17   210A  . . . . . . . . . . . . . . . . . 929

18   210B  . . . . . . . . . . . . . . . . . 932

19   210  . . . . . . . . . . . . . . . . . . 940

20   612  . . . . . . . . . . . . . . . . . . 947

21   613, 614 . . . . . . . . . . . . . . . . . 948

22                  DEFENDANT EXHIBITS

23  Exhibit No.                        Received

24   W3  . . . . . . . . . . . . . . . . . . . 774

25