UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X
UNITED STATES OF AMERICA        :
        :
        :
      - v. -        :   No. 12-cr-847 (PGG)
        :
GILBERTO VALLE,        :
        :
        Defendant.        :
        :
-----------------------------------------------------X


# **DEFENDANT GILBERTO VALLE'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A JUDGMENT OF ACQUITTAL ON COUNT ONE**

David Patton
Federal Defenders of New York, Inc.
52 Duane Street, 10th Floor
New York, New York    10007
*Attorney for Defendant Gilberto Valle*

*Of Counsel*:
Julia Gatto
Robert Baum
Edward S. Zas
John J. Hughes, III
James A. Cohen

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iv

PRELIMINARY STATEMENT ............................................................ 1

STATEMENT OF FACTS ................................................................... 6

    A.    The Government Concedes that Most of Mr. Valle's Discussions of Kidnapping Were "Clearly Role-Play" Started on a Sexual Fantasy Website. ...................................................................... 7

    B.    The Three Disputed Chats and Any Related Real-World Acts ............................... 8

        1.    Mhal52 Chats with Mikevanhise81. ............................................... 9

        2.    Mhal52 Chats with Aly Khan. ..................................................... 11

        3.    Mhal52 Chats with Moody Blues. ............................................. 15

    C.    The Government Did Not Present Evidence that the Allegedly "Real" Chats Are Inconsistent with Sadomasochistic Erotic Role-Play. ...................................................................... 20

STANDARD OF REVIEW ................................................................ 21

ARGUMENT ............................................................................... 25

I.    THERE WAS NO NONSPECULATIVE EVIDENCE THAT THE SUPPOSEDLY "REAL" CHATS WERE INCONSISTENT WITH EROTIC ROLE-PLAY. ................................................................. 26

II.    EVEN CONSIDERING THE CHATS, NO RATIONAL JURY COULD FIND A REAL CONSPIRACY BEYOND A REASONABLE DOUBT. .......................................................................... 29

    A.    No Rational Jury Could Find Beyond a Reasonable Doubt that the Mikevanhise81 Chats Are a Real Criminal Conspiracy. ..................................... 29

        1.    Every Statement in the Chats About Kidnapping or Surveillance Was Either Uncorroborated or Disproven by Extrinsic Evidence. ........... 29

        2.    There Were No Overt Acts in Furtherance of the Vanhise Chats............ 30

3.  There Was Insufficient Evidence that MikeVanhise81 Had the Specific Intent to Kidnap and That He Entered a Real Agreement. ......... 32

B.  No Rational Jury Could Find Beyond a Reasonable Doubt that the Aly Khan Chats Are a Real Criminal Conspiracy. ................................. 33

1.  The Purported "Agreement" Is Riddled with Make-Believe Elements that Only Make Sense as Fantasy. ............................ 33

2.  Every Statement About Kidnapping or Surveillance Was Uncorroborated or Disproven. .................................................. 35

3.  Valle Explicitly Told Aly Khan that He Does Not Intend to Carry Out the Kidnappings. .................................................. 35

4.  The Evidence Created a Reasonable Doubt About Whether Aly Khan Was Also Merely Engaged in Fantasy. ............................ 38

5.  Even if Assumed to Be Real, the Discussions Would, at Best, Be Mere Preliminary Negotiations, Not a True "Meeting of the Minds." ......................................................................... 39

6.  There Were No Overt Acts. ...................................................... 42

C.  No Rational Jury Could Find Beyond a Reasonable Doubt that the Moody Blues Chats Are a Real Criminal Conspiracy. ........................... 42

1.  The Make-Believe Elements Necessarily Created a Reasonable Doubt About Whether the Chats Are Real. ............................ 42

2.  There Were No Overt Acts in This District. ........................... 45

3.  Internal Contradictions in the Chats Necessarily Created a Reasonable Doubt about Whether Moody Blues Is "Real." .................... 48

4.  Even if Their Chats Were Real, Moody Blues and Mhal52 Never Reached a "Conclusive" Agreement. ...................................... 50

III.  THE COCONSPIRATORS' STATEMENTS WERE INADMISSIBLE FOR THEIR TRUTH. ................................................. 52

A.  The Government Failed to Rebut the Presumption that the Coconspirators' Statements Are Unreliable. ........................................ 54

B.  The Government Did Not Prove that It Is More Likely than Not that a Real Conspiracy Existed and that All Four Men Were Members of It. ........................................................................... 56

C.  The Remedy in This Case Is an Acquittal. .......................................... 57

**IV.   THE GOVERNMENT FAILED TO PROVE THE SINGLE CONSPIRACY IT ALLEGED BEYOND A REASONABLE DOUBT.** ...................57

    A.    The Government Proved, at Most, Multiple, Independent Conspiracies. ...................................................................................58

    B.    The Agglomeration of Three Conspiracies Into One Was Prejudicial. ...................................................................................62

        1.    The Error Misled the Jury into Aggregating Evidence. ............................ 63

        2.    The Prosecution Included at Least One Conspiracy in the Wrong District. ................................................................................ 66

        3.    The Error Allowed the Introduction of Inflammatory and Irrelevant Evidence Concerning Other Conspiracies. ................................................ 67

**CONCLUSION** ....................................................................................69

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bourjaily v. United States,*
    483 U.S. 171 (1987)................................................................................53

*Brooks v. United States,*
    164 F.2d 142 (5th Cir. 1947) ...............................................................63

*Grunewald v. United States,*
    353 U.S. 391 (1957)................................................................................42

*Jackson v. Virginia,*
    443 U.S. 307 (1979)......................................................................5, 21, 22

*Kotteakos v. United States,*
    328 U.S. 750 (1946)..........................................................................62, 65

*Osorio v. Conway,*
    496 F. Supp. 2d 285 (S.D.N.Y. 2007)....................................................22

*Patterson v. New York,*
    432 U.S. 197 (1977)..................................................................................5

*Shinseki v. Sanders,*
    556 U.S. 396 (2009)................................................................................62

*United States v. Acosta-Gallardo,*
    656 F.3d 1109 (10th Cir. 2011) .......................................................52, 58

*United States v. Adan,*
    No. 3:10-cr-00260, 2012 WL 6623079 (M.D. Tenn. Dec. 19, 2012)....................................61

*United States v. Al-Moayad,*
    545 F.3d 139 (2d Cir. 2008)....................................................................56

*United States v. Alameh,*
    341 F.3d 167 (2d Cir. 2003)....................................................................53

*United States v. Arbane,*
    446 F.3d 1223 (11th Cir. 2006) .......................................................25, 39

*United States v. Armone,*
    363 F.2d 385 (2d Cir. 1966)....................................................................32

*United States v. Beckham,*
   968 F.2d 47 (D.C. Cir. 1992) ................................................................52

*United States v. Beech-Nut Nutrition Corp.,*
   871 F.2d 1181 (2d Cir. 1989) ...............................................................47

*United States v. Bertolotti,*
   529 F.2d 149 (2d Cir. 1975) .................................................................59

*United States v. Bibby,*
   752 F.2d 1116 (6th Cir. 1985) ..............................................................67

*United States v. Blasini-Lluberas,*
   169 F.3d 57 (1st Cir. 1999) ..............................................................5, 23

*United States v. Bowens,*
   224 F.3d 302 (4th Cir. 2000) ...............................................................47

*United States v. Bucaro,*
   801 F.2d 1230 (10th Cir. 1986) ............................................................54

*United States v. Candella,*
   487 F.2d 1223 (2d Cir. 1973) ...............................................................66

*United States v. Carlton,*
   442 F.3d 802 (2d Cir. 2006) ...........................................................25, 33

*United States v. Carnagie,*
   533 F.3d 1231 (10th Cir. 2008) .......................................................59, 61

*United States v. Ceballos,*
   340 F.3d 115 (2d Cir. 2003) ...........................................................41, 44

*United States v. Chandler,*
   388 F.3d 796 (11th Cir. 2004) ........................................................61, 62

*United States v. Cianchetti,*
   315 F.2d 584 (2d Cir. 1963) .....................................................24, 37, 38

*United States v. Conrad,*
   507 F.3d 424 (6th Cir. 2007) ...............................................................54

*United States v. Coplan,*
   703 F.3d 46 (2d Cir. 2012) ..................................................................24

*United States v. Coward,*
   630 F.2d 229 (4th Cir. 1980) ...............................................................64

*United States v. Daly*,
842 F.2d 1380 (2d Cir. 1988)................................................................54

*United States v. Davis*,
No. 06-cr-911(LBS), 2009 WL 1098477 (S.D.N.Y. Apr. 21, 2009)......................................55

*United States v. Dellosantos*,
649 F.3d 109 (1st Cir. 2011)................................................................60

*United States v. Diaz*,
176 F.3d 52 (2d Cir. 1999)................................................................54

*United States v. Direct Sales Co.*,
319 U.S. 703 (1943)................................................................41

*United States v. Durades*,
607 F.2d 818 (9th Cir. 1979)................................................................60, 66

*United States v. Garcia-Duarte*,
718 F.2d 42 (2d Cir. 1983)................................................................56, 57

*United States v. Glenn*,
828 F.2d 855 (1st Cir. 1987)................................................................66

*United States v. Grant*,
No. 05-cr-1192(NRB), 2008 WL 678553 (S.D.N.Y. Mar. 11, 2008)......................................55

*United States v. Iennaco*,
893 F.2d 394 (D.C. Cir. 1990)................................................................25, 40, 51

*United States v. Jackson*,
696 F.2d 578 (8th Cir. 1982)................................................................68

*United States v. Johansen*,
56 F.3d 347 (2d Cir. 1995)................................................................62

*United States v. Johnson*,
337 F.2d 180 (4th Cir. 1964), *aff'd*, 383 U.S. 169 (1966)......................................47

*United States v. Jones*,
482 F.3d 60 (2d Cir. 2006)................................................................58

*United States v. Josephberg*,
562 F.3d 478 (2d Cir. 2009)................................................................22

*United States v. Kapelioujnyj*,
547 F.3d 149 (2d Cir. 2008)................................................................24

*United States v. Kim,*
    435 F.3d 182 (2d Cir. 2006)..................................................................22

*United States v. LaSpina,*
    299 F.3d 165 (2d Cir. 2002)..................................................................31

*United States v. Lopac,*
    411 F. Supp. 2d 350 (S.D.N.Y. 2006)...................................................57

*United States v. Lorenzo,*
    534 F.3d 153 (2d Cir. 2008)..................................................................23

*United States v. Lukashov,*
    694 F.3d 1107 (9th Cir. 2012) ..............................................................66

*United States v. Mathern,*
    329 F. Supp. 536 (E.D. Pa. 1971) .......................................................31

*United States v. Melchor-Lopez,*
    627 F.2d 886 (9th Cir. 1980) ................................................................25

*United States v. Miley,*
    513 F.2d 1191 (2d Cir. 1975)................................................................65

*United States v. Nusraty,*
    867 F.2d 759 (2d Cir. 1989)..................................................................31

*United States v. Palmer,*
    203 F.3d 55 (1st Cir. 2000)...................................................................37

*United States v. Parker,*
    839 F.2d 1473 (11th Cir. 1988) ............................................................41

*United States v. Penn,*
    131 F.2d 1021 (2d Cir. 1942)..........................................................25, 40

*United States v. Perlitz,*
    728 F. Supp. 2d 46 (D. Conn. 2010) ...................................................47

*United States v. Portela,*
    167 F.3d 687 (1st Cir. 1999).....................................................58, 59, 60

*United States v. Quattrone,*
    441 F.3d 153 (2d Cir. 2006)..................................................................23

*United States v. Reyes,*
    18 F.3d 65 (2d Cir. 1994)......................................................................55

*United States v. Reyes*,
  979 F.2d 1406 (10th Cir. 1992) ................................................................51

*United States v. Rodriguez-Adorno*,
  695 F.3d 32 (1st Cir. 2012) ....................................................................25

*United States v. Rosnow*,
  977 F.2d 399 (8th Cir. 1992) ........................................................... passim

*United States v. Russano*,
  257 F.2d 712 (2d Cir. 1958) ...................................................................67

*United States v. Samaria*,
  239 F.3d 228 (2d Cir. 2001) ...................................................................25

*United States v. Saneaux*,
  365 F. Supp. 2d 488 (S.D.N.Y. 2005) ....................................................55

*United States v. Silverman*,
  861 F.2d 571 (9th Cir. 1988) ..................................................................54

*United States v. Snider*,
  720 F.2d 985 (8th Cir. 1983) ..................................................................68

*United States v. Steinberg*,
  525 F.2d 1126 (2d Cir. 1975) .................................................................41

*United States v. Stewart*,
  305 F. Supp. 2d 368 (S.D.N.Y. 2004) ...................................23, 24, 28

*United States v. Stewart*,
  433 F.3d 273 (2d Cir. 2006) ...................................................................54

*United States v. Swafford*,
  512 F.3d 833 (6th Cir. 2008) ...............................................58, 63, 64, 65

*United States v. Taylor*,
  464 F.2d 240 (2d Cir. 1972) ...................................................23, 24, 28

*United States v. Torres*,
  604 F.3d 58 (2d Cir. 2010) .....................................................................24

*United States v. Tracy*,
  12 F.3d 1186 (2d Cir. 1993) ...................................................................53

*United States v. Tyson*,
  653 F.3d 192 (3d Cir. 2011) ...................................................................44

*United States v. Vazquez,*
   113 F.3d 383 (2d Cir. 1997)........................................................................38, 53

*United States v. Wallach,*
   935 F.2d 445 (2d Cir. 1991)........................................................................34, 37

*United States v. Wieschenberg,*
   604 F.2d 326 (5th Cir. 1979) ............................................................................51

*Workneh v. Pall Corp.,*
   897 F. Supp. 2d 121 (E.D.N.Y. 2012) ..............................................................31

**STATUTES**

28 U.S.C. § 2111.......................................................................................................62

**OTHER AUTHORITIES**

Fed. R. Evid. 801 ..........................................................................................53, 55, 56

U.S. Const., amend. VI .......................................................................32, 42, 48, 66

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

UNITED STATES OF AMERICA          :
          :
          :
      - v. -          :   No. 12-cr-847 (PGG)
          :
GILBERTO VALLE,          :
          :
      Defendant.          :

------------------------------------------------------X

## PRELIMINARY STATEMENT

At the trial of Mr. Valle, the issue before the jury was not whether Mr. Valle had disgusting and extreme sadomasochistic fantasies.   It was not whether Mr. Valle's erotic fantasies were normal or healthy.   It was not even whether Mr. Valle might have acted on his fantasies someday.   The much narrower question before the jury was whether the government had proven beyond a reasonable doubt that Mr. Valle actually agreed with Moody Blues, Michael Vanhise, or Aly Khan to kidnap women, and whether he and those individuals specifically intended to carry out the plans that they discussed.   While reasonable minds might disagree about some of the former questions, no reasonable mind could disagree about the latter.   Mr. Valle plainly had no intention of carrying out any of his online chats.   He is legally innocent of count one.

The evidence that Mr. Valle is legally innocent of any kidnapping conspiracy is overwhelming.   As the Court recognized at trial, in a criminal conspiracy that allegedly spanned a year, "there is almost no evidence of action by Valle beyond computer-based activities."   Almost none.   What little evidence there is, moreover, amounts to nothing more than a hodgepodge of random and disconnected acts—a gift of a PBA card, for instance, or a coffee break with an old friend—none of which amount to proof that Mr. Valle was planning to kidnap women.   Almost

none of these acts were mentioned in any chats between Mr. Valle and his alleged coconspirators. Indeed, most of these acts did not even occur at the same time as chats about the woman in question.

That this isolated and disparate set of "acts" was nothing more than a random collection of benign social gestures is made even clearer by the "acts" that the government did not prove: any kidnappings.   The evidence showed that Mr. Valle and three men he met on an erotic fantasy website talked about kidnapping numerous women on specific dates.   Every one of these dates came and went with no kidnapping.   There was no evidence of any intervening event that might have caused the so-called coconspirators to abandon their plans, if they had really intended to carry these plans out when they were made.   Indeed, in most cases, the coconspirators did not even bother to communicate with each other before abandoning these "plots."   The government offered no explanation for these mysteriously disappearing plots.   Nor could it.   The only rational explanation is that the "plots" do not take place because they were never real to begin with.

Without any meaningful "evidence of action," the government resorted to relying heavily on Mr. Valle's statements in online chats.   Any jury should be skeptical of such evidence: As the Court noted, the old "adage 'actions speak louder than words' is applicable here."   The absence of "evidence of action" speaks volumes more than Mr. Valle's outrageous late-night "chats" on the Internet.

But viewed in context, even the chats only underscore that Mr. Valle did nothing more than communicate about strange erotic fantasies he had no intention of carrying out.   There is no dispute that Mr. Valle chatted with 24 different people about kidnapping women, tying them up in vulnerable positions, and objectifying them—quite literally—by treating the women's naked and bound bodies like "livestock" or "meat" to be eaten.

As disgusting as such fantasies are to most people, there is also no dispute that almost all of these discussions "were clearly role-play."   As the government acknowledged, most of the time when Mr. Valle was chatting, either he or one of the individuals he was chatting with "used the word 'fantasy' in the actual chats or e-mails."   When that was the case, the government conceded that the chat was not a real crime.   The government's rule in this respect was simple:   If an erotic chat about kidnapping "use[s] the word 'fantasy,'" the participants are not committing real crimes.   That commonsense premise is quite sound, as far as it goes.

Where the government went awry, however—ultimately bringing the jury with it—was in applying the logical fallacy of the inverse.   The government also argued that if an erotic chat about kidnapping does *not* explicitly use the word fantasy, then the participants *are* committing a real crime.   But as every law student learns, if *a*, then *b*, does not mean, if not *a*, then not *b*.   If the government wanted to rely on the theory that the absence of an explicit statement of "fantasy" somehow proves that the chat is a real crime, it needed to introduce evidence supporting that assertion.   But the government did not introduce any evidence (from, say, a profiler or psychologist) to support this crucial premise, and indeed, this premise is wrong.   The government led the jury into error by speculating otherwise.

Relying on the fallacy of the inverse as a basis for conviction is even more irrational and unreasonable when one compares the so-called real chats to the chats that the government conceded were mere "role-play."   There was evidence in this case that Mr. Valle participated in "role-play" chats where he talked about kidnapping women for money, and described how he would objectify women, put them into bondage, and exploit their vulnerability.   In some instances, neither Mr. Valle nor the man he is chatting with ever use the word "fantasy," or refer to story-telling.   But we know these chats are fake because Mr. Valle claims to have actually

-3-

kidnapped a woman as promised, and that never happened.   These chats undermine whatever superficial appeal the fallacy of the inverse might have to the jury.   The record evidence in this case shows quite clearly that the absence of an explicit statement of "fantasy" does not mean that the chat is real.   The prosecution's arguments for treating some of these chats as "real" thus collapse under the weight of their own contradictions.

        This alone necessarily raises at least a reasonable doubt.   But there are countless other telltale signs that the three chats the government contended were "real" were just as "clearly role-play" as the other 21 chats.   While the so-called real chats may not have involved "pixie dust," to use the prosecution's term in summation, most of the elements in those chats were about as real as "fairies" and "unicorns."   Mr. Valle's supposed conspiratorial "scheme" went something like this:

        After stuffing the women into his nonexistent "van," Mr. Valle intended to drive them to his nonexistent "house"—a place "up in the mountains" in the middle of nowhere (sometimes in Pennsylvania, sometimes someplace an hour north of New York City).   There, Mr. Valle is going to put the women into bondage using a fictional "pulley apparatus in [his] basement," which he was "just about finished" building in June of 2012.   The apparatus is situated in his "soundproofed" basement (in a nonexistent house).   Then Mr. Valle was going to objectify and humiliate the women further, by cooking their naked and bound bodies in his nonexistent human-sized oven, which he measured to be "5 feet long, 4 feet deep and 4 feet high."

        For all of the made-up details, Mr. Valle conspicuously omitted obvious "real" details, like a firearm—which, unlike the "pulley apparatus," Mr. Valle actually had.   On this record, no rational mind could believe that Mr. Valle intended to carry out these "plots."   He's only encountered these men on the Internet, never in real life.   And he's told them a bunch of

nonsense—all the while, never giving real last names or real addresses, never exchanging phone numbers, never taking steps that would meaningfully move these discussions towards fruition. The jury cannot convict a "kidnapper" for a "conspiracy" that exists only in Never Never Land.

As thin as the case against Mr. Valle is, the evidence that he had a culpable coconspirator for these purported "plots" is even weaker.   The only evidence presented about Moody Blues, Aly Khan, and Michael Vanhise were chats.   In light of the indications that most of Mr. Valle's chats were mere erotic "role-play"—even most of his chats that omit any mention of "fantasy"—any reasonable jury must have a reasonable doubt about whether anything that Moody Blues, Aly Khan, and Michael Vanhise said in chats was necessarily real.   Indeed, Mr. Valle's profile explicitly announced to the world that he was only a fantasist—a statement that tends to invite other fantasists to explore their own bizarre and elaborate erotic fantasies.

\*                    \*                    \*

As the U.S. Supreme Court has made clear, while a jury's verdict should not lightly be set aside, "in our system" of checks and balances, "the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion."   *Jackson v. Virginia*, 443 U.S. 307, 318 n.10 (1979).   One of most "fundamental value determination[s] of our society" is that "it is far worse to convict an innocent man than to let a guilty man go free."   *Patterson v. New York*, 432 U.S. 197, 208 (1977) (internal quotation marks omitted).   As a result, the Due Process Clause does not require, or even allow, the Court to merely rubber-stamp the jury's verdict.   Quite the contrary, the Court must take a "hard look" at the evidence, and it must be satisfied that every inference the jury has drawn is rational, reasonable, and nonspeculative.   *United States v. Blasini-Lluberas*, 169 F.3d 57, 62 (1st Cir. 1999).   The Court must be persuaded that the government's evidence is capable of persuading a truly rational and reasonable jury of guilt beyond a reasonable doubt.

Here, the evidence overwhelmingly demonstrated that Mr. Valle is a fantasist who never had any intention of acting these discussions out in the real world.   At the very least, any reasonable jury would be left with countless reasonable doubts.   The Court must enter a judgment of acquittal on count one.

## STATEMENT OF FACTS

There were few credibility disputes or conflicts in the testimony presented at trial. In summarizing the facts here, we assume that the jury resolved any such disputes or conflicts in the government's favor.

The principal evidence against Mr. Valle consisted of electronic records recovered from two computers that he and his wife, Kathleen Mangan, used in their Forest Hills, New York, apartment.   As the Court observed, "there is almost no evidence of action by Valle beyond computer-based activities."   (Tr. 857:8-9.)   Mr. Valle never kidnapped, tortured, killed, raped, or cooked any woman.   (Tr. 662:13-19.)   He never "construct[ed] a pulley apparatus in [his] basement."   (GX 428 (June 25, 2012, 05:50:38); Tr. 664:25-665:2, 814:14-18.[1])   The FBI found no chloroform, and no special ingredients or tools that could be used to make chloroform. (Tr. 664:15-18; *see also id.* 487:5-11.)   Mr. Valle did not have a house in the mountains or a human-sized oven.   (Tr. 189:15-16, 666:4-19, 794:15-23.)   Mr. Valle never met any of his alleged coconspirators in person, or talked with them on the phone.   (Tr. 662:20-664:4.)   They were known to him only by their screen names and online profiles.

There is no evidence that Mr. Valle has ever been violent towards any woman. Ms. Mangan agreed that Mr. Valle had never laid a hand on her or on their child, and that he had no

---

[1]        Government Trial Exhibits are labeled "GX."   Defense Trial Exhibits are labeled "DX."

problems with drugs or alcohol.   (Tr. 197:7-15.)   Ms. Sauer and Ms. Nobel, both of whom have

known Mr. Valle for many years, also agreed that Mr. Valle was never abusive or aggressive

towards anyone, and he seemed like a good, nonviolent person.   (Tr. 302:10-22, 252:18-21,

302:23-303:1, 16-18.)

A.     **The Government Concedes that Most of Mr. Valle's Discussions of Kidnapping Were "Clearly Role-Play" Started on a Sexual Fantasy Website.**

Mr. Valle has been a user of the DarkFetishNet.com website ("DFN") since at least

October 2011.   (GX 1003, at 1.)   DFN is "a social media network" designed to facilitate

communication among "like-minded" users who share an interest in unusual sexual fetishes,

including erotic asphyxiation, cannibalism, rape, necrophilia, and "peril" fetishes (*i.e.*, fantasies

involving "a victim in a dangerous situation").   (Merenkov Dep. 10:24-11:2, 24:12-13, 64:12-25,

66:4-6.)   DFN has public chat rooms and private messaging features that allow its members to

discuss these topics.   (Merenkov Dep. 15:9-16:2, 29:3-10, 29:25-30:11.)   The owner of DFN

runs it as a "hobby."   (Merenkov Dep. 54:21.)   With 37,000 registered users (4,500 of whom use

the site "several times a week or more"), DFN is a relatively "small" player in the sadomasochistic

social media market, but a number of larger competitors, including sites such as Fetlife.com and

Alt.com, offer similar services.   (Merenkov Dep. 17:13, 33:5-11; Tr. 176:10-12, 225:9-10,

225:15-23.)

Mr. Valle communicated with 24 different users, using instant messaging services

and e-mail (collectively, the "chats").   (Tr. 424:25-425:10, 1056:7-13; *cf.* Tr. 652:4-24,

877:25-879:25.)   (For clarity, statements made in online chats will be attributed to the applicable

user's screen name; Mr. Valle's was "mhal52."   (Tr. 422:22-23.))   The topic of the chats between

mhal52 and the 24 other users was "[k]idnapping, raping, killing, eating, [and] cooking" women.

(Tr. 445:3.)

Mhal52 typically pretended he was a professional kidnapper who could obtain any woman of the buyer's dream.   For example, in March 2012, mhal52 offered several women in the "$4,000-$5,000" range.   (DX E1 (Mar. 11, 2012, 04:34:54-04:36:06).)   Mhal52 and an interested "buyer" agreed that, on a specific date, in exchange for $3,500, the woman would be "[d]elivered bound and gagged," then put into further bondage, raped, and tortured.   (DX E1 (Mar. 11, 2012, 05:11:19-05:12:32, 05:21:41-05:28:19, 04:36:56-04:37:00, 04:50:03-04:50:27, Mar. 23, 2012, 05:37:42); *see also* Tr. 698:18-25.)   The men discussed banal problems like how far the drive would be, and how to evade detection and minimize risks.   (DX E1 (Jan. 23, 2012, 05:33:39-05:33:45; *id.* (Jan. 23, 2012, 05:37:50-05:51:12); *id.* (Mar. 11, 2012, 04:33:32, 04:36:06, 04:41:17.)

It is undisputed this exchange (with "Tim Chase"), like nearly all of the chats, was a sadomasochistic sexual fantasy role-play.   (Tr. 695:14-16, 696:15-25, 697:3-21, 697:25-698:14.) Indeed, FBI Agent Corey Walsh, who recovered the chats from Mr. Valle's computers, determined that the overwhelming majority of the 24 chats recovered "were clearly role-play," because in many chats, the participants " used the . . . word 'fantasy' in the actual chats or e-mails."   (Tr. 651:8, 653:19-22, 654:2-6, 651:8-9; *see also id.* at 892:2-4 (agreeing that he "clearly recognized [portions of the chats] as stories" for similar reasons; *id.* at 892:19-23.) Mr. Walsh chose, however, to "separate the[ chats] into groups," "focus[ing] on" three chats that he "believed . . . contained elements of real crimes."   (Tr. 650:23-24, 425:11-16.)

### B.   The Three Disputed Chats and Any Related Real-World Acts

In these sections, each of the "real" chats is described along with "real-world" (*i.e.*, non-computer-based) evidence that the government has argued is relevant to those chats.

   1.   **Mhal52 Chats with Mikevanhise81.**

    a.   **Chats Concerning Alisa (Jan. 27, Feb. 28)**

    In their first conversation on January 27, 2012, mhal52 offers mikevanhise81 a number of women, and mikevanhise81 selects "Alisa."  (GX 430 (Jan. 27, 2012, 1:29 p.m.).)  Mhal52 says, "she is a teacher and has the week of Feb 20 off.   I can kidnap her then, it will be awhile before anyone realizes she is missing."  (GX 430 (Jan. 27, 2012, 1:36 p.m.)   The price is $4,000, and mikevanhise81 says that he plans to make the woman his sex slave.  (GX 430 (Jan. 27, 2012, 1:38 p.m., 1:40 p.m.).)   Alisa is not kidnapped.

    The two next chat a month later (after the previously scheduled kidnapping).  Mikevanhise81 looks at pictures again, but picks the same woman a second time.  (GX 432 (Feb. 28, 2012, 3:46 p.m., 4:06 p.m.).)   The price is $5,000; mikevanhise81 requests both the woman and "a sexy spare outfit and pajamas for her."  (GX 432 (Feb. 28, 2012, 4:25 p.m., 4:36 p.m.).)   The two excitedly discuss having sex with the woman.   Mhal52 "will really get off" on putting the woman in bondage.   (GX 432 (Feb. 28, 2012, 5:11 p.m., 5:27 p.m.).)

    b.   **Chats Concerning Veronica (Apr. 24, May 3)**

    The two never discuss "Alisa" again.   The next chat is about "Veronica."   Mhal52 claims that he learned Veronica's "route to and from her job yesterday.   I saw her go to work this morning too."  (GX 434 (Apr. 24, 2012, 9:57 a.m.).)   There was no evidence that Mr. Valle had done so or that he knew where Veronica worked.   Mhal52 offers to "knock the price down to $10,000" for kidnapping Veronica.   (GX 434 (May 3, 2012, 22:39:21 PDT).)   This contradicts the previous chat, in which the supposed price was lower (specifically, $5,000).   The two do not communicate again after the second discussion of Veronica.   Veronica is not kidnapped.

### c.    March 1, 2012

In late October 2012, Mr. Valle told FBI Agent Anthony Foto that he had "drop[ped] his wife off to have lunch with" Alisa Frisca on March 1, 2012.   (Tr. 1034:5-6.) Mr. Valle's wife, Ms. Mangan, testified that Mr. Valle had dropped her off to meet Ms. Frisca on some other date (she wasn't sure which).   According to Ms. Mangan, on March 1, 2012, Mr. Valle and his supervisor (Sergeant Edwige Antsui) met Ms. Mangan at Mount Sinai Hospital, where she was visiting a friend who had given birth.   (Tr. 217:18-218:14, 185:20-24, 219:19-221:2.).)   Sergeant Antsui recalled the hospital meeting, but she wasn't sure of the date. (Tr. 1006:25-1007:15, 1008:4-9, 1011:4-1012:24.)   She and Mr. Valle were working on March 1, 2012, according to her logs, which means Mr. Valle would have been with her the whole day. (Tr. 1011:4-25, 1014:10-18, 1015:15-17.)

### d.    Gift of PBA Card (Summer)

Mr. Valle gave Ms. Mangan a Police Benevolent Association ("PBA") card, which Ms. Mangan gave to Ms. Frisca in the summer of 2012.   (Tr. 186:6-7, 906:25-907:4.)   PBA cards cost "a dollar apiece."   (Tr. 1424:15-21.)   Mr. Valle also gave PBA cards to neighbors who have no connection to the alleged plots.   (Tr. 218:20-24.)   It is not unusual to give them to people who do not drive, because there are "all sorts of different reasons" why someone might have a police interaction in which the card could be helpful.   (Tr. 1427:6-11, 1426:2-8.)

Mr. Valle did not deliver Ms. Frisca's card in person.   He did not ask Ms. Frisca for her address in connection with the card, and had no direct contact with her before, during, or after delivery of the card.   (Tr. 906:25-907:17.)   The card was delivered in the summer of 2012, several months after the last Vanhise chat about kidnapping Alisa (February 2012).

-10-

2.      **Mhal52 Chats with Aly Khan.**

Aly Khan describes himself in the chats as a butcher living in India.   (GX 417
(Jan. 23, 2012, 06:17:39, 06:52:21); GX 418 (Jan. 25, 2012, 08:44:16).)   His chats frequently
involve the idea that women should be objectified and treated like animals such as goats.   (*See,
e.g.*, GX 417 (Jan. 23, 2012, 05:36:19, 05:39:06, 06:17:39, 06:26:54, 06:42:17).)   For example,
Aly Khan "send[s mhal52 a] meat analysis report [for a woman] as we do on our goats."   (GX 417
(Jan. 23, 2012, 06:17:39).)   Aly Khan says he "would love to slaughter a girl and make her meat."
(GX 417 (Jan. 23, 2012, 05:36:19).)

a.      **Chats Concerning Kathleen and a Woman Willing to Meet Aly
Khan in India (Jan. 23, 25, 27)**

In their first chat, mhal52 and Aly Khan explored several potential scenarios:
(1)  Mhal52 offers to "talk [his] girlfriend into going to india," where they could meet Aly Khan
(GX 417 (Jan. 23, 2012, 05:42:38)); (2) Mhal52 then suggests an alternative where the two could
meet "in Pennsylvania," where mhal52 has "a place in the middle of nowhere . . . with plenty of
space" (GX 417 (Jan. 23, 2012, 06:00:37, 06:00:44, 06:01:12, 06:01:56)); (3) Aly Khan suggests
that mhal52 could do a girl by himself, while Aly Khan watches (GX 417 (Jan. 23, 2012,
06:49:37-06:51:14)).   The two switch between discussions of kidnapping "Kathleen" and
abducting some other woman in the United States.   (GX 417 (Jan. 23, 2012, 06:53:24-06:55:37,
06:57:37-06:59:37).)   Later, after the chat ends, Aly Khan tells mhal52 that Aly Khan's father has
given him permission to go Pakistan between February 24 and February 26, 2012, if mhal52 wants
to meet there.   (GX 417 (Jan. 23, 2012, 07:13:00).)

Two days later, Aly Khan writes with a new "plan."   He said he "found some one
willing" to come to India, and asks if mhal52 would like to meet him there and bring a second
woman.   (GX 418 (Jan. 25, 2012, 07:54:30-07:56:00).)   Mhal52 says that his girlfriend made

plans for February 20, so she cannot be kidnapped in India that week.   (GX 418 (Jan. 25, 2012, 07:56:44).)   This annoys Aly Khan, who responds, "I am serious about it..so donot think im joiking [sic] and wasting my time…may be later you can bring her."   (GX 418 (Jan. 25, 2012, 07:56:54).)

Mhal52 says, "i really wish i could"; "maybe you can talk me into" kidnapping someone.   (GX 418 (Jan. 25, 2012, 07:59:59, 08:07:33).)   Mhal52 says that "maybe one day" he would do a kidnapping, but he is "just afraid of getting caugh[t]."   (GX 418 (Jan. 25, 2012, 08:28:03).)   He says, "if i were guaranteed to get away with it, i would do it."   (GX 418 (Jan. 25, 2012, 08:29:42).)   Aly Khan tries to persuade mhal52 that he "can guarantee" a risk-free crime—claiming, "i ahve [sic] done it before, i ma [sic] doing it this month and i will always do it." (GX 418 (Jan. 25, 2012, 08:32:04).)   Mhal52 continues to resist: "i am a little different though, i am a little more sadistic."   (GX 418 (Jan. 25, 2012, 08:32:44).)   Kidnapping a woman is too risky because what excites mhal52 is the woman's "suffer[ing]."   (GX 418 (Jan. 25, 2012, 08:32:48).) Mhal52 tells Aly Khan he would "definitely" kidnap a woman if it were risk-free.   Aly Khan asks when mhal52 would do so.   Mhal52 says, "i dont know…"   (GX 418 (Jan. 25, 2012, 08:39:01).)

Two days later, in a short conversation, Aly Khan announces that he "found a woman" and will slaughter her alone on January 29.   (GX 419 (Jan. 27, 2012, 16:41:14).)   He expresses displeasure towards mhal52, noting, "i thought you will help me ..but you could not get me one."   (GX 419 (Jan. 27, 2012, 16:40:54).)   Aly Khan abruptly ends the chat.

### b.      Chats Concerning Andria (Feb. 9-11, Apr. 4)

Having chatted three times in the course of a week, Aly Khan and mhal52 then communicate more sporadically over the next four months.   The remaining chats involve separate plans that each purportedly intends to carry out individually.   For example, in their next chat, on February 9, 2012, mhal52 says, "I have my victim picked out" (specifically, "Andria").   (GX 421

(Feb. 9, 2012, 10:18:27).)   Aly Khan does not expect to participate in this; he is jealous that mhal52 has a victim.   He says:   "i donot [sic] know, how to find woman for slaughter . . . .   You are lucky to have got your animal."   (GX 421 (Feb. 9, 2012, 10:25:41, 10:25:58).)

        In discussing his individual plan to kidnap Andria, mhal52 says that he was "able to get a stun gun" so he can "pack her in a large suitcase" when he nabs her.   (GX 421 (Feb. 9, 2012, 10:18:27, 10:20:06, 10:20:32, 10:40:01).)   There is no evidence that Mr. Valle had a "stun gun." Patrol supervisors in the Police Department are issued Tasers during shifts.   Mr. Valle was not a patrol supervisor so he was not issued a Taser.   And Tasers must be returned after every shift and accounted for; officers cannot take them home.   (Tr. 1005:3-12.)

        The government proved one "act" concerning Andria.   Mr. Valle ran a search in his police computer on July 21, 2011, with her name—seven months before any discussion of Andria with Aly Khan.   (Tr. 578:15-25; GX 616B.)   The search returned only Andria's driver's license record.   Although the computer automatically queried various New York State databases and the federal criminal records database, there was no evidence that Mr. Valle had any reason to believe that Andria—a member of the bar and a prosecutor who lives in Ohio—would have any records in these databases.   (Tr. 239:22-23, 240:20-24, 579:21-581:4; GX 616B, at GV003836.) Mhal52 never mentioned the fact of the search or any information obtained thereby in any chats. The driver's license information the search returned was not found in Mr. Valle's possession or on his computer.   (Tr. 663:10-664:4, 669:15-17.)

        Mhal52 tells Aly Khan that "Feb 20 is a holiday, so that is [his] target weekend" for kidnapping Andria.   (GX 424 (Feb. 11, 2012, 05:57:38).)   The date came and went; Andria was never kidnapped.

Aly Khan and mhal52 chat again briefly in April.   Aly Khan complains again, "My hunt is not getting me anyone so far."   He says that he has not found "any real one willing for this" (*i.e.*, Aly Khan has not found a woman who will volunteer to be slaughtered).   (GX 425 (Apr. 4, 2012, 05:54:29, 05:55:01).)   Mhal52 reintroduces "Andria," the same woman they had already discussed, yet again.   Aly Khan approves of the woman's "[g]ood breasts and fine meat," and notes that "she is fuckable."   (GX 425 (Apr. 4, 2012, 05:57:15, 05:58:33).)

### c.    Chats Concerning Aly Khan's Girlfriend and Andria (May 1, 9, June 25, July 17)

A month later, they have a similar conversation, again admiring Andria's physical characteristics.   (GX 426 (May 1, 2012, 06:07:13-06:08:10).)   Aly Khan, who previously claimed he was planning a slaughter for January 30, 2012, boasts that he "scared away [his] GF" (*i.e.*, girlfriend).   (GX 426 (May 1, 2012, 06:10:08).)   He says that he, "in fun play, tied her up, and told her that [he] will slaughter her."   (GX 426 (May 1, 2012, 06:11:04).)   He did not actually harm her, but he says his girlfriend "was terrified and cried," adding, "i scared her away :)." (GX 426 (May 1, 2012, 06:11:38).)

A few days later, the two chat briefly.   Mhal52 sends Aly Khan a link relating to chloroform, http://www.howtomakechloroform.net/.   (GX 427 (May 9, 2012, 05:34:18).)

In June of 2012, they again chat briefly, and mhal52 says that he's "in the middle of constructing a pulley apparatus in [his] basement," which will allow him to "string her up by her feet."   (GX 528 (June 25, 2012, 05:50:38, 05:50:42).)   Mr. Valle's multi-story apartment building in Queens has a common basement shared by all tenants, and no pulley apparatus. (Tr. 664:25-665:2, 667:18-19, 814:14-18.)

3.      **Mhal52 Chats with Moody Blues.**

Mhal52 first communicates with Moody Blues in mid-July 2012, offering to kidnap numerous women for $6,000.   (GX 401 (July 9, 2012, 07:34:42).)   After initially suggesting he would kidnap a woman in exchange for a fee, mhal52 switches gears (following Moody Blues's lead) and suggests that the two consider doing one together, which "would be free" for Moody Blues, since mhal52 "definitely need[s] an assistant."   (GX 401 (July 9, 2012, 07:51:14-07:52:25).)   Moody Blues says he can "teach [mhal52] the proper way to prepare a girl."   (GX 401 (July 9, 2012, 07:54:02); GX 404 (July 9, 2012, 09:04:14).)   He claims to have eaten two females before.   (GX 402 (July 9, 2012, 08:30:48, 08:32:55); GX 405 (July 9, 2012, 09:23:09).)

Mhal52 says that he is "single," and has "a big gas oven" large enough to cook a human alive.   (GX 401 (July 9, 2012, 08;09:38).)   He also says he lives in a secluded house "up in the mountains," with "no one . . . around . . . for about 3/4 of a mile."   (GX 402 (July 9, 2012, 08:09:38, 08:10:14, 08:19:36-08:19:43).)   The human-size oven element seems to offend Moody Blues's sense of realism.   He pushes back, noting he's "seldom seen an over big enough to take a whole adult," and advises mhal52 that he "need[s] to find out the dimensions of [his] oven," because Moody Blues is "not sure if she'd fit even as small as she is."   (GX 402 (July 9, 2012, 08:18:12).)   Mhal52 later says that he "did verify the measurements on the oven"; it is "around 5 feet long, 4 feet deep and 4 feet high." (GX 412 (Aug. 24, 2012, 06:52:18-06:52:27); GX 445 (Aug. 21, 2012, 22:46:00).)   Mr. Valle had no such oven.   (Tr. 189:15-16, 666:4-19, 794:15-23.)

a.      **Chat Concerning Kim (July 9-10, 2012)**

Mhal52 says he is "thinking of a Labor Day cookout" "with Kimberly as the main course."   (GX 402 (July 9, 2012, 08:32:15-08:32:30).)   Moody Blues, who says he lives in England, notes that, since Labor Day is on September 3, that leaves "not a lot of time to sort out

plane tickets etc," but he "[w]ill see what cheap deals [he] can get."   (GX 404 (July 9, 2012,

08:52:13); *see also* GX 401 (July 9, 2012, 07:54:02).)   There was no evidence that the two made

any air or hotel bookings or even inquired about any reservations.   (Tr. 803:2-7, 804:1-15.)

> Mhal52 tells Moody Blues that he will send him "a blueprint of everything we will

need to carry this out."   (GX 407 (July 10, 2012, 05:49:03).)   When mhal52 sends the

"blueprint," each piece of personal identifying information is fictional, except the woman's first

name.   The blueprint contains a fake last name, a fake birthday, a fake city and state of birth, and

a fake master's degree that the woman does not have, attributed to a university the woman did not

attend.   (*Compare* GX 601 *with* Tr. 786:12-13; Tr. 266:16-17, 300:10-11; Tr. 266:18-19,

300:22-25; Tr. 267:11-12, 300:12-21.)   The only accurate information in the blueprint was first

name and a handful of generic characteristics (specifically, that Kimberly is roughly 5'2" and

Irish, unmarried, has no tattoos, drinks socially, and does not smoke or use drugs).

> Mhal52 repeatedly declined to give Moody Blues the woman's address.   When

Moody Blues asked, "May I have her address?   For Googling using the Map app?" mhal52 said he

was "not sure her exact address."   (GX 407 (July 10, 2012, 06:08:23-06:08:33).)   In fact,

Mr. Valle did have her address.   (GX 436, at 15.)

### b.   Chats Concerning an Unnamed Kenyan Woman, Kimberly, and Several Others (July 17, 19)

> Mr. Valle and his family planned a trip to Maryland in mid-July 2012, and

Mr. Valle left a voicemail for Ms. Sauer, an old college friend, to let her know they would be in the

area.   (GX 436, at 25.)   Mr. Valle went to Maryland four times during his marriage, but saw

Ms. Sauer only on this occasion, in July 2012.[2]   Ms. Sauer was "friends" with Mr. Valle in

---

[2]    After meeting Ms. Sauer for brunch in July 2012, Mr. Valle and his family went back on
Labor Day 2012, but he did not meet with Ms. Sauer on that visit.   (Tr. 208:19-23.)

*(footnote continued)*

college, and they "had a pretty decent size social circle" there.   (Tr. 271:23, 272:6, 301:21-25.)

The two had "remained friends" after college and kept in touch "over the years," communicating

ten to fifteen times a year.   (Tr. 273:4-8.)   After learning that Mr. Valle would be in town,

Ms. Sauer suggested, "let's plan some time to hang out!"   (GX 436, at 25.)   Ms. Sauer later

suggested, "Lunch Sunday?"   (GX 436, at 25.)   Mr. Valle agreed.

   After the lunch was planned, mhal52 wrote to Moody Blues that he was "having

lunch with Kimberly on Sunday."   (GX 408 (July 17, 2012, 07:18:58).)   Moody Blues joked,

"When you sit at her table are you going to fantasize that the meal isn't from her but form her!

Lol!"   (GX 408 (July 17, 2012, 07:36:24).)   After chatting about Ms. Sauer for about twenty

minutes, the two went on to discuss a number of other women.   Moody Blues reports that he's

found an attractive Kenyan girl and jokes that he would "[l]ove to eat [his] way around the

world! . . .   Try Japanese (sushi!), Chinese, Indian.   Love to try an Islamic girl.   Try to prepare

her Halal!"   (GX 408 (July 17, 2012, 07:37:49, 07:40:31).)

   Mhal52 changes the subject to another attractive woman he's found on Facebook.

(GX 408 (July 17, 2012, 07:47:05).)   They then talk about numerous other women.   Moody

Blues says that he has been talking to "owned slaves," supposedly telling them that he would like

to eat them.   Moody Blues complains that "they are not giving me much after they find out WHY

I want a slave."   (GX 408 (July 17, 2012, 07:58:54).)   When mhal52 asks about selling "a non

consensual girl," Moody Blues indicates that the slaves he was referring to were so-called

*consensual* slaves.   Moody Blues is not sure if the slave trader he knows actually "deals in

non-consensual" slaves.   (GX 408 (July 17, 2012, 08:00:05-08:01:08).)

---

(*continued from previous page*)
  Ms. Mangan recalled that they made two other trips to Maryland, but there was no
  evidence that Mr. Valle met Ms. Sauer on those other trips.   (Tr. 208:25-209:1.)

In a subsequent chat, the two talked about a number of women, including "Kimberly." Mhal52 says that he hasn't really "given any thoughts as to how [he] want[s] her prepared." (GX 410 (July 19, 2012, 06:13:15).) They discuss her for a few minutes, and then move on to talk about other women. Mhal52 says he is "mulling some girls [he] know[s] who are teachers," and sends Moody Blues pictures. (GX 410 (July 19, 2012, 06:18:08, 06:26:10-06:28:54).) They also talk about "Pulp Toons," a sadomasochistic cartoon website. (GX 410 (July 19, 2012, 06:21:30).) Moody Blues advises mhal52 that at lunch with Kimberly, "Drooling is definitely out!" (GX 410 (July 19, 2012, 06:54:02).) At the end, Moody Blues again asks mhal52, "Well, give me the address of Kim and I can google the address. REALLY want to see the neighbourhood!" (GX 410 (July 19, 2012, 07:10:48).) Although Mr. Valle does have the address, mhal52 again does not provide it. (GX 436, at 15; GX 410 (July 19, 2012, 07:10:57).)

### c.      Vacation in Maryland (July 20-22)

On the weekend when he had brunch with Ms. Sauer, Mr. Valle and his family stayed in a hotel in a different city from where Ms. Sauer lives. (GX 436, at 15, 26; Tr. 184:12-15.) Ms. Sauer chose the restaurant where she met the Valle family for brunch. (GX 436, at 27.) It was located in a "large outdoor mall with shopping." (Tr. 289:11.)

The brunch "was fine," and "pleasant," and the foursome "talked about old college friends." (Tr. 291:1, 326:9-10.) Nothing strange happened; the interactions were normal. (Tr. 291:4-5, 8-9.) Mr. Valle was "good with the baby." (Tr. 327:4-7.) Ms. Mangan and Mr. Valle "seemed like they have a nice relationship." (Tr. 327:8-9.) On the same trip, the Valle family met other college friends, including Scott and the Tingles. (GX 436 at 25.)

The only other alleged "act" relating to Kimberly was that Mr. Valle queried her in his police computer on July 21, 2011, a year before any discussion with Moody Blues. This

-18-

search returned no driver's license record for Ms. Sauer.   (Tr. 582:1-582:17; GX 616C.)   The

computer also automatically queried New York State databases and the National Crime

Information Center, but there was no evidence that Mr. Valle had any reason to suspect that those

databases contained any information about Ms. Sauer, who lived in Maryland.   (GX 616C.)

    After brunch, mhal52 told Moody Blues that Kimberly "looked absolutely

mouthwatering."[3]   (GX 411 (July 22, 2012, 23:57:42).)   The two did not talk again for a month,

at which point they mostly ignored Kimberly.   She does not surface in the chats again.

### d.    Chats Concerning a Kenyan Woman, Kristen, an Asian-American Consensual Slave, Andria, a Chinese Girl (Aug. 24-25, Sept. 8)

    When they next speak, they talk about a new woman ("Kristen"), for whom mhal52

says his oven is large enough.   (GX 412 (Aug. 24, 2012, 06:52:27).)   Mhal52 says that the drive

from that woman's college to his house would be "around 4/4 and a half hours," because "she will

be playing softball" at the University of Maryland.   (GX 412 (Aug. 24, 2012, 07:01:34,

07:07:57).)   The only "Kristen" for whom evidence was introduced at trial attends college in the

New York metropolitan area.   (Tr. 413:16-21.)

    The two later discuss other women that they are hoping to eat.   Moody Blues says

he's "working on getting someone here," including a Kenyan woman and a "Chinese girl."

(GX 413 (Aug. 25, 2012, 04:53:25, 05:19:48, 07:23:54).)   Mhal52 says he's "creating an album

dedicated to one of [his] girls on DFN."   (GX 413 (Aug. 25, 2012, 05:03:59).)

---

[3]    Other chats indicate that mhal52 and Moody Blues use words like "mouthwatering" to mean "attractive" or "beautiful."   When Moody Blues asks if it makes sense to kidnap Kim's housemate, mhal52 says, "she is not attractive at all," "not *appetizing* at all." (GX 412 (Aug. 24, 2012, 06:46:58-06:49:45) (emphasis added).)

Moody Blues then excitedly breaks off chatting with mhal52:   "Bloody hell just starting a conversation with an Asian American girl from DFN, let you know how it goes."   (GX 413 (Aug. 25, 2012, 05:52:05).)   He returns an hour later, seemingly elated:   "Woow!   She thinks I want to train her as a slave!   Lol!"   (GX 414 (Aug. 25, 2012, 06:55:21).)   Moody Blues brags that "she'll be being 'trained' [t]o do whatever I want.   You will take your c;othes [sic] off, yes even your panties.   Now kne[e]l and accept this gag."   (GX 414 (Aug. 25, 2012, 07:00:17).)

In their final two-way chat, Moody Blues reports that he's "chatting up a young Chinese girl."   (GX 415 (Sept. 8, 2012, 04:10:46).)   A month prior, mhal52 had said that Andria was "virtually impossible to get" so he had "pretty much ruled her out."   (GX 413 (Aug. 25, 2012, 06:09:56, 05:10:01)).   Mhal52 *now* says that he's "decided on" "Andria," and wants "to follow her home and then just stake it out."   (GX 415 (Sept. 8, 2012, 04:12:09, 04:12:13, 04:17:27).)   Moody Blues suggests that mhal52 "try and abduct her on the way home from a party or something."   (GX 415 (Sept. 8, 2012, 04:23:25).)

Mhal52 says he "doubt[s] it" would work, "not in new york city."   (GX 415 (Sept. 8, 2012, 04:23:59).)   Andria actually lives in Columbus, Ohio.   (Tr. 239:22-23.)   Moody Blues asks whether Andria "live[]s close"; mhal52 says, "not sure her exact location, but probably an hour to an hour and a half or so."   (GX 415 (Sept. 8, 2012, 04:24:59).)   Mr. Valle's home in Forest Hills, New York (Tr. 442:1-2) is more than 500 miles from Columbus.

### C.   The Government Did Not Present Evidence that the Allegedly "Real" Chats Are Inconsistent with Sadomasochistic Erotic Role-Play.

Agent Walsh's methodology for separating chats was as follows:   Chats were eligible for the "real" pile if they "described dates, names and activities that you would use to conduct a real crime," or if they included "[d]iscussions of past crimes."   (Tr. 650:23-651:2, 655:19.)   But if a chat contained "the word 'fantasy' in the actual chat[] or e-mail[]," that chat was

"cast aside."   (Tr. 651:3-9.)   Mr. Walsh "cho[]se not to focus on" chats with 21 individuals on

the same subjects, because, "Quite frankly, . . . they didn't seem realistic."   (Tr. 651:5-6.)

    Mr. Walsh had worked for the FBI for less than one year at the time that he made

these determinations.   (Tr. 418:16-17.)   He has no training in psychology and no graduate-level

training of any kind.   (Tr. 654:7-16.)   He has never read any conversations between known, real

kidnappers, and does not know what real kidnappers say when they talk.   (Tr. 769:16-770:15.)

    Mr. Walsh agreed that the dates, names and activities criteria do not necessarily

distinguish fantasy chats from real chats.   The so-called "real" chats and the fantasy chats both

used target dates, and the names of real women (often the same women from purportedly "real"

chats); and they both described the same activities (kidnapping, raping, and eating women).

(Tr. 658:6-9, 656:4-657:4, 657:16-658:5, 658:10-25.)   On redirect, the government did not

dispute that these criteria are not unique to the "real" chats.

    Instead, the redirect examination supplied reasons for putting the fantasy chats into

the fantasy pile.   In fantasy chats, the participants talk about "stories" (Tr. 819:5-820:5,

832:14-833:3), or explicitly say that the chat is a fantasy or "not real" (Tr. 820:24-821:18,

823:15-824:3, 825:24-826:20.)   The government concedes that the "clearly role-play" chats do

not all contain the word "fantasy" or refer to "stories."   (Tr. 876:16-22, 894:4-896:13.)   None of

the criteria that the government identified were unique to either set of chats.

## STANDARD OF REVIEW

    "[I]n our system . . . the application of the beyond-a-reasonable-doubt standard to

the evidence is not irretrievably committed to jury discretion."   *Jackson*, 443 U.S. at 318 n.10.

The Constitution prohibits a jury from convicting a defendant if no reasonable jury could have

found each element proven beyond a reasonable doubt.   *Id.* at 319.   Although the jury is

"permitted to enter an . . . unreasonable verdict of 'not guilty,'" it does not have the "power to enter an unreasonable verdict of guilty." *Id.* (citing *Carpenters & Joiners v. United States*, 330 U.S. 395, 408 (1899)).

　　　　　In reviewing the sufficiency of the evidence, the Court must defer to the jury's determination on the credibility of witness testimony, and to the jury's resolution of any conflicts between the testimony of multiple witnesses. *See United States v. Josephberg*, 562 F.3d 478, 487 (2d Cir. 2009) ("The assessment of witness credibility lies solely within the province of the jury, and the jury is free to believe part and disbelieve part of any witness's testimony. '[W]here there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.'" (quoting *United States v. Miller*, 116 F.3d 641, 676 (2d Cir. 1997))). "[T]estimony is unbelievable as a matter of law only if no reasonable juror could believe [it]." *Osorio v. Conway*, 496 F. Supp. 2d 285, 297 (S.D.N.Y. 2007) (internal quotation marks omitted) (quoting *Bonilla v. Portuondo*, No. 00-cv-2369(JGK), 2004 WL 1782174, at *3–4 (S.D.N.Y. Aug. 9, 2004)). The Court also must draw all reasonable, nonspeculative inferences in favor of the government, because "it is the task of the jury, not the court, to choose among competing inferences." *United States v. Kim*, 435 F.3d 182, 184 (2d Cir. 2006) (internal quotation marks omitted) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)).

　　　　　This trial did not revolve around credibility disputes or conflicts between the sworn testimony of different witnesses. We do not contend that any witness lied about what they saw or heard. The historical facts in this case—that certain chats and other records were found on Mr. Valle's computers, and that certain social interactions occurred—are undisputed. Reasonable, nonspeculative inferences are also undisputed; for example, the jury could infer that Mr. Valle was the one who wrote the things attributed to "mhal52."

The issue in dispute in this case is whether a reasonable mind could find beyond a reasonable doubt (without speculating) that Mr. Valle and others agreed to kidnap women and specifically intended to do so, based on the records found on Mr. Valle's computer and other evidence.   In reviewing that dispute—about what conclusions a reasonable person can reach from largely undisputed witness testimony—the Court does not categorically defer to the conclusions that the jury reached.

Quite the contrary, in reviewing a sufficiency challenge, "'specious inferences are not indulged,' because "'[it] would not satisfy the [Constitution] to have a jury determine that the defendant is *probably* guilty."'" *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (emphasis in original) (alterations in original) (quoting *United States v. Jones,* 393 F.3d 107, 111 (2d Cir. 2004); *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004)).   "[J]uries do not have carte blanche."   *Blasini-Lluberas*, 169 F.3d at 62.   And "[t]he jury may not be permitted to conjecture merely, or to conclude upon pure speculation or from passion, prejudice or sympathy." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972).

Because the jury may only make reasonable inferences grounded in evidence, the Court is obligated to "take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative."   *Blasini-Lluberas*, 169 F.3d at 62 (internal quotation marks omitted) (quoting *United States v. Woodward*, 149 F.3d 46, 56 (1st Cir. 1998)).   "[C]ourts may not credit inferences within the realm of possibility when those inferences are unreasonable."   *United States v. Quattrone*, 441 F.3d 153, 169 (2d Cir. 2006). Acquittal is required if, "in order to find the essential element of criminal intent beyond a reasonable doubt, a rational juror would have to speculate."   *United States v. Stewart*, 305 F. Supp. 2d 368, 370 (S.D.N.Y. 2004).

The jury also does not receive any greater deference when interpreting statements made by the defendants or by others—not even if the disputed issue is one of criminal intent. While the Court defers to the jury's determinations of witness credibility, it must review each inference from the witness testimony for reasonableness.   *See Stewart*, 305 F. Supp. 2d at 378 (defendant's statements insufficient to show criminal intent); *United States v. Cianchetti*, 315 F.2d 584, 588 (2d Cir. 1963) (defendant's statements insufficient to show membership in conspiracy); *United States v. Torres*, 604 F.3d 58, 69 (2d Cir. 2010) (defendant's statement and other evidence insufficient to show knowledge of purposes of conspiracy).

In making the overall sufficiency determination, the Court is "obligated to 'consider the evidence presented at trial in its totality, not in isolation.'"   *United States v. Kapelioujnyj*, 547 F.3d 149, 154 (2d Cir. 2008) (quoting *United States v. Zhou,* 428 F.3d 361, 369-70 (2d Cir. 2005)).   "If the evidence is such that reasonable jur[ors] must necessarily have . . . a [reasonable] doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *Taylor*, 464 F.2d at 243.   If the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."   *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012).   Accordingly, where the evidence is "in equipoise," a judgment of acquittal is required.   *Id.*

As set forth below, the evidence is not even in equipoise here.   There is far more support for "a theory of innocence" than there is for any "theory of guilt."   *Id.*   The Constitution requires acquittal.

**ARGUMENT**

"To prove conspiracy, the government must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and that an overt act in furtherance of the conspiracy was committed." *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001) (internal quotation marks omitted) (quoting *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999)). Conspiracy "is a specific intent crime, requiring that the government establish beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute." *Id.* (collecting cases). Moreover, "[t]he agreement to conspire requires that at least two culpable co-conspirators agree." *United States v. Carlton*, 442 F.3d 802, 811 (2d Cir. 2006). If one is merely pretending, there is no conspiracy. *Id.* "To support a conviction under a conspiracy charge, the government must show that a defendant had both the intent to agree to commit a crime, and the intent that the crime be completed." *United States v. Rodriguez-Adorno*, 695 F.3d 32, 41 (1st Cir. 2012).

A conspiracy does not exist merely because two or more men discuss or fantasize about crimes. "Men do not conspire to do that which they entertain only as a possibility; they must unite in a purpose to bring to pass all those elements which constitute the crime." *United States v. Penn*, 131 F.2d 1021, 1022 (2d Cir. 1942) (Learned Hand, J.). "The crux of the agreement element in a conspiracy case is that the government must prove a 'meeting of the minds' to achieve the unlawful result." *United States v. Arbane*, 446 F.3d 1223, 1229 (11th Cir. 2006). A conditional offer to engage in a crime is not a meeting of minds. *United States v. Melchor-Lopez*, 627 F.2d 886, 891-92 (9th Cir. 1980). "'Exploratory and inconclusive' or 'preliminary' discussions and negotiations are not sufficient to establish an agreement." *United States v. Iennaco*, 893 F.2d 394, 398 (D.C. Cir. 1990).

**I.     THERE WAS NO NONSPECULATIVE EVIDENCE THAT THE SUPPOSEDLY "REAL" CHATS WERE INCONSISTENT WITH EROTIC ROLE-PLAY.**

Given that "[t]here is almost no evidence of action by Valle beyond computer-based activities" (Tr. 857:8-9), the jury necessarily had to rely heavily on the written "chat" transcripts to reach a verdict.   But the government failed to introduce any evidence that would allow the jury to conclude, without speculating, that any particular aspect of these chats shows that they are real.

The parties both agree that the vast majority of Mr. Valle's "chats" about kidnapping, raping, torturing, murdering, cooking, and eating women—even doing so in exchange for money—were "clearly role-play."   (Tr. 651:8.)   No other conclusion is possible, because many of the chats are obviously fictional stories or scripts, and use "the word 'fantasy' in the actual chats or e-mails."   (Tr. 651:8-9.)   Accordingly, in the context of this case, it is not rational or reasonable to infer that a chat about kidnapping is "real" simply because the conversation occurred.   The undisputed evidence is that the vast majority of such chats are fake.

As a result, in order to prove that some of the chats were real (even though most are fake), the government needed to introduce evidence that some of the chats are different from the "role-play" chats—and different in a way that proves beyond a reasonable doubt that they are real. There was no such evidence here.   While the government "focus[ed] on" some chats based on the presence, in those chats, of "dates, names and activities that you would use to conduct a real crime," there was no evidence that those elements were unique to the "real" chats or that those elements prove a chat to be real.   Quite the contrary, those same elements were present in some configuration or another in nearly all the chats that the government conceded to be "role-play."

The only distinction that the government identified was the absence of an explicit statement in some chats that the chat was a "fantasy."   The government pointed to the fact that

some chats actually "used the word 'fantasy'" or at least referred to story-telling or gave other explicit indications that the chat was not real.   But there was no evidence that noncriminal fantasists explicitly refer to "fantasy" at least once with every person with whom they chat online. Commonsense would suggest the contrary; no one would enjoy an action movie that the theater interrupted every 45 minutes to remind the audience that it's fake.

And the record evidence refutes any suggestion that the absence of the word "fantasy" or references to storytelling proves that a chat is real.   In the Tim Chase "role-play" chats, mhal52 acted out the same kidnapper-for-hire fantasy that he acted out in the supposedly real chats.   We know that the Tim Chase chats are fake, because mhal52 did not in fact kidnap the woman discussed, "Sally," and tie her up in his basement, as he claims to have done.   (DX E1 (Apr. 22, 2012, 03:13:04-03:13:21); Tr. 662:13-19.)   But neither participant ever alludes to "fantasy" or story-telling or anything of the sort.   The same is true in a number of the chats that the government concedes were mere "role-play."   (GX E4 (Feb. 9, 2012, 09:46:42) (sten9979 re kidnapping Andria); GX E12 (May 16, 2012, 04:59:12) (Brenda Falcon re kidnapping Andria); DX E13 (May 17, 2012, 4:00 a.m., 4:21 a.m.) (sending pictures of attractive women to Wolfman); Tr. 895:13-896:13.)

The real-world evidence only underscored that all of the chats must have been a fantasy.   The evidence showed that the things discussed in the supposedly real chats (the house in the mountains, the pulley apparatus, the human-sized oven) do not exist.   And the various plots detailed in the supposedly real chats (the week of February 20, mid-April, July 4 weekend, Labor Day) do not come to pass—just like the purported kidnapping of "Sally" did not take place.

The jury thus had no rational and reasonable basis for concluding beyond a reasonable doubt that any of these discussions were real.   There was no nonspeculative evidence

(a) that the allegedly real chats are meaningfully different from the "clearly role-play" chats, or

(b) that any differences that do exist prove that the "real" chats are in fact real.

This last point is important.   In the face of evidence that almost all of mhal52's chats on the same subjects were erotic role-play, the jury needed evidence on which to premise a finding that three of the chats were, unlike the others, real crimes.   But without any testimony from a profiling expert or even an experienced FBI agent about sexual fantasy and role-play chats, the jury could only speculate, surmise, and conjecture about norms of sadomasochistic erotic role-play—a subject plainly outside the jury's knowledge.   Instead of presenting evidence, the government invited the jury to act like armchair psychologists and guess that some of mhal52's chats might be inconsistent with erotic role-play and might be real.

"It is the function of the judge to deny the jury any opportunity to operate beyond its province," which is limited to "the determination of the credibility of witnesses, the weighing of the evidence, and the drawing of justifiable inferences of fact *from proven facts*."   *Taylor*, 464 F.2d at 243 (Friendly, J.) (emphasis added).   "The jury may not be permitted to conjecture."   *Id.* If "in order to find the essential element of criminal intent beyond a reasonable doubt, a rational juror would have to speculate," the Court must enter a judgment of acquittal.   *Stewart*, 305 F. Supp. 2d at 370.   Here, the jury could find Mr. Valle guilty only by speculating.   The absence of proof on this point alone requires an acquittal.

(This deficiency in the evidence is not a mere technicality: the basic premise of the government's "sorting" is unsound as a matter of scientific fact.   Noncriminal fantasists do have elaborate fantasies.   And it is not uncommon for those to include discussions of realistic-sounding elements, which give fantasists a sexual charge.   (*See* Decl. of Park Dietz ¶¶ 17, 19.)   The

armchair psychological speculation that the government invited was thus highly prejudicial

because, in addition to lacking evidentiary support, it misled the jury.   (*Id.* ¶ 27.))

## II.    EVEN CONSIDERING THE CHATS, NO RATIONAL JURY COULD FIND A REAL CONSPIRACY BEYOND A REASONABLE DOUBT.

Even assuming there was a nonspeculative basis for distinguishing three of the

chats from other chats of the same nature that were "clearly role-play," the content of the three

allegedly "real" chats would leave any reasonable jury with a reasonable doubt about whether

these preposterous discussions were a real conspiracy.

### A.    No Rational Jury Could Find Beyond a Reasonable Doubt that the Mikevanhise81 Chats Are a Real Criminal Conspiracy.

The mikevanhise81 chats were the shortest of the bunch.   But even in a few short

pages, there are countless signs that the chats are fake—and no nonspeculative evidence they are

real.

### 1.    Every Statement in the Chats About Kidnapping or Surveillance Was Either Uncorroborated or Disproven by Extrinsic Evidence.

In virtually every mikevanhise81 conversation, mhal52 says that he will kidnap a

woman in a specific week or on a specific date.   But months and months go by, and Mr. Valle

never carries out a single one of the kidnapping "plots."   Not one.   These plans, among others,

never materialize:

- Mhal52 says that he will kidnap "Alisa" the week of February 20, 2012, because "she is a teacher and has the week of Feb 20 off."   (GX 430 (Jan. 27, 2012, 1:36 p.m.).)   The two do not discuss the plot again.   Nothing happens. (Tr. 756:8-13.)

- Mhal52 says Alisa "will be stuffed into a large piece of luggage and wheeled out to [his] van."   (GX 432 (Feb. 28, 2012, 5:27 p.m.).)   Mr. Valle does not even own a van.   (Tr. 770:23-771:4.)   This plot too never happens.

- Mhal52 says that he observed Veronica on April 23-24, 2012.   (*See* GX 433 (Apr. 24, 2012, 9:57 a.m.) ("I got her route to and from her job yesterday. I saw her go to work this morning too.").)   There is no evidence he did any such thing.

- Mhal52 proposes meeting on the week of May 6, 2012, so they can "watch [Veronica] together." (GX 434 (May 3, 2012, 22:39:21 PDT).) The two never meet. (Tr. 662:20-664:4, 803:2-7.)

- Around that time, mhal52 says, "[i]t may be a tough abduction but give me a couple of more days"—implying he will kidnap her within "days." (GX 433 (Apr. 24, 2012, 9:57 a.m.).) Mr. Valle is free for 183 days, until his arrest in late October 2012, and there is no kidnapping.

The government had no nonspeculative explanation for these vanishing plots. There was no change in circumstances that could have caused the men to abandon plans that they had initially intended to carry out. That, coupled with evidence that Mr. Valle concededly had engaged in fantasy "role-play" of the same nature with 21 other people, necessarily creates a reasonable doubt as to whether Mr. Valle really agreed or really intended to carry out these plots.

## 2.   There Were No Overt Acts in Furtherance of the Vanhise Chats.

There is no evidence that Mr. Valle took any of the actions that he did discuss online. The government, however, tried to prove two acts he did not discuss. Neither withstands scrutiny.

(a) The first claim was that Mr. Valle engaged in "surveillance" of Ms. Frisca on March 1, 2012. But the government introduced no evidence of "surveillance." The only evidence was two statements—one, from Ms. Mangan, that Mr. Valle met her at a hospital on the Upper East Side; and a second, from Mr. Valle, that he dropped his wife off near Ms. Frisca's apartment on March 1 so those two women could have lunch. (Tr. 1034:4-6, 217:18-218:14, 185:19-24, 219:19-221:2.).) The jury could believe either statement. In neither of them is Mr. Valle engaging in surveillance of Ms. Frisca.

The government tried to argue that Mr. Valle lied to Agent Foto for the purpose of concealing his surveillance. But the evidence was insufficient to permit the conclusion that Mr. Valle lied. While Mr. Valle's statement conflicted with his wife's recollection, even if

Ms. Mangan's testimony was accepted, there was no evidence that Mr. Valle actually remembered his March 1 whereabouts or "could not possibly have forgotten." *United States v. Mathern*, 329 F. Supp. 536, 538 (E.D. Pa. 1971).   Quite the contrary, Mr. Valle was being asked about banal activities seven months after the fact; there was no evidence that the activities on that date were so important or meaningful that he could not possibly have mixed up two dates or activities.

Even if Mr. Valle *had* lied, that still would not allow an inference of "surveillance," because there was no evidence of "surveillance."   "[F]alse exculpatory statements are not admissible as evidence of guilt, but rather as evidence of consciousness of guilt." *United States v. Nusraty*, 867 F.2d 759, 765 (2d Cir. 1989) (internal quotation marks omitted) (quoting *United States v. Di Stefano*, 555 F.2d 1094, 1104 (2d Cir. 1977)).   It would be rank speculation to infer that Mr. Valle lied to conceal "surveillance," as opposed to some other activity he felt guilty about. Mr. Valle could have lied because on March 1, he cheated on his wife, had sex with a man, or met his secret, illegitimate child.   These alternatives are no less speculative than the government's.

(b)   The government's second claimed "act" was that Mr. Valle gave his wife a PBA card to give to Ms. Frisca.   There was no mention of "PBA cards" in any chat with Vanhise or others.   In fact, the last Vanhise conversation about "Alisa" was in February 2012, and the cards were given months later (sometime that summer), so there is not even any temporal proximity that might suggest that the chat and the card were related.   *Cf. Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 136 (E.D.N.Y. 2012) ("[I]t is well-settled that temporal proximity alone is insufficient as circumstantial evidence of causation.").   Thus, there was no evidence that this act was "within the scope of the conspiratorial agreement." *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002).

While the government argued that Mr. Valle used the cards to build trust with victims, that theory was entirely made up:   Mr. Valle never contacted Ms. Friscia in relation to the card or tried to use it as a basis for contacting her.   And the claim that Mr. Valle was trying to build trust is pure speculation.   Mhal52 never spoke with Vanhise or others about building trust with women.   Quite the contrary, mhal52 only chatted about imminent plots—plans that supposedly would be realized in weeks or months, no further than the next major holiday.

Finally, the act was consistent with an innocent social gesture, rather than a secret intention to further a kidnapping.   Thus, the act fails to "manifest that the conspiracy is at work." *United States v. Armone*, 363 F.2d 385, 400 (2d Cir. 1966) (internal quotation marks omitted).

For these reasons, the evidence is insufficient to establish that the purported "acts" are overt acts in furtherance of the alleged kidnapping conspiracy.[4]

Even if the government managed to prove something that constituted an "overt act," moreover, the paucity of real-world action is strong evidence that there was no criminal intent.   (Tr. 857:8-9.)   Mr. Vanhise and Mr. Valle first chatted in January 2012, and their last chat was in April 2012.   If the two really did specifically intend to kidnap women, as they discussed, there is no nonspeculative explanation for why no kidnapping was even attempted during the ten months that both Mr. Valle and Mr. Vanhise were at liberty.

### 3.    There Was Insufficient Evidence that MikeVanhise81 Had the Specific Intent to Kidnap and That He Entered a Real Agreement.

Even if the jury could somehow cobble together enough evidence to conclude that mhal52 agreed to kidnap women with Vanhise and specifically intended to do so, there was

---

[4]    Because there are no overt acts in furtherance of the Vanhise conspiracy in this District, the inclusion of that conspiracy also violated Mr. Valle's Sixth Amendment right to trial in "the State and district wherein the crime shall have been committed."   (*See infra* Part IV.B.2.)

insufficient evidence that mikevanhise81 also agreed and also specifically intended to kidnap

women.   *See Carlton*, 442 F.3d at 811.   Vanhise's statements in chats were not meaningfully

different from chats in which the government concedes mhal52 and others were role-playing.

The jury had no basis for concluding, beyond a reasonable doubt, that mikevanhise81's chats were

not also a role-play.

**B.      No Rational Jury Could Find Beyond a Reasonable Doubt that the Aly Khan
         Chats Are a Real Criminal Conspiracy.**

The Aly Khan chats provide no greater evidence of any real plot.

**1.      The Purported "Agreement" Is Riddled with Make-Believe Elements
         that Only Make Sense as Fantasy.**

The undisputed evidence was that countless elements in these chats, even crucial

aspects of a real kidnapping, were mere make-believe that existed only in mhal52's imagination:

- Mhal52 wants to drive the victims to "a place in the middle of nowhere" "in
  Pennsylvania" "with plenty of space."   (GX 417 (Jan. 23, 2012, 06:00:37,
  06:00:44, 06:01:56); GX 418 (Jan. 25, 2012, 08:34:42); *see also* GX 429 (July 17,
  2012, 08:39:39).)   Sometimes there is "no one around for a half mile"; other
  times, "no one is around for 3/4 of a mile."   (GX 418 (Jan. 25, 2012, 08:34:49);
  GX 429 (July 17, 2012, 08:39:39).)   No such house exists.   (Tr. 666:13-22.)

- Mhal52 claims his victim "will very easily fit in th[e] oven" in his kitchen.
  (GX 422 (Feb. 10, 2012, 18:38:00); *see also* GX 421 (Feb. 9, 2012, 10:34:53).)
  In fact, Mr. Valle has a regular-size oven in his Queens apartment.
  (Tr. 189:15-16, 666:4-19, 794:15-23.)

- Mhal52 tells Aly Khan, "yeah I was actually able to get a stun gun."   (GX 421
  (Feb. 9, 2012, 10:20:06).)   Mr. Valle never had any stun gun, and tellingly he
  never mentions that he has a real firearm.   (Tr. 1005:3-12.)

- Mhal52 says he works a "typical office job" and is "home by 6" p.m. every day,
  with weekends off.   (GX 418 (Jan. 25, 2012, 08:40:01, 08:40:26-08:40:32).)   In
  fact, Mr. Valle worked as a patrol officer in the field, from 3 p.m. to 11 p.m.
  (Tr. 193:9-15, 204:8-9, 991:21-992:11.)

- Mhal52 tells Aly Khan that he lives "alone."   (GX 426 (May 1, 2012, 06:30:06).)
  Mr. Valle was living with Ms. Mangan at the time.   (Tr. 188:17-18.)

- In June 2012, mhal52 says he is "constructing a pulley apparatus in [his] basement" "to string . . . up" women.   (GX 428 (June 25, 2012, 05:50:38, 05:50:42).)   No such apparatus exists.   (Tr. 664:25-665:2, 814:14-18.)

- Mhal52 said he was "working on soundproofing the basement too[;] that's where she will be held captive and raped."   (GX 429 (July 17, 2012, 08:39:21).) Mr. Valle's Queens apartment building has a common basement; there was no evidence of soundproofing.   (Tr. 667:18-19.)

These make-believe elements make sense in the context of a fantasy role-play. They make no sense in the context of the government's claim that this was a real crime.   Mr. Valle knew that the "plot" he was describing depended in numerous respects on things that did not exist. In that sense, he did not "subjectively believe[] that the conditions necessary for [carrying out the conspiracy] were likely to be fulfilled."   *United States v. Wallach*, 935 F.2d 445, 471 (2d Cir. 1991).   He knew they would not be, which defeats any suggestion that he had criminal intent.

The government had no explanation for the vast majority of these make-believe elements.   It attempted to explain just one, the mountain house.   The government argued in summation that Mr. Valle was planning to rent a house through the vacation rental service, "AirBNB.com."   (Tr. 1611:11-15 ("Your common experience also tells you it is not hard to rent a house in the mountains. . . .   AirB&B has thousand places online that you can get in a heartbeat.").)   But there is no record evidence about AirBNB.com—certainly none that it rents houses with human-sized ovens and no one around for three-quarters of a mile.   And there was no evidence that Mr. Valle ever mentioned or researched *renting* a house at all.   (*Cf.* GX 1000-1003 (hundreds of pages of Mr. Valle's Google searches and Web history).)   Even the government's speculation does not explain why Mr. Valle told Aly Khan that he already lives in a mountain house if his plan was merely to rent one.   (GX 417 (Jan. 23, 2012, 06:01:56).)   This argument is little more than rank speculation, not proof beyond a reasonable doubt.

### 2. Every Statement About Kidnapping or Surveillance Was Uncorroborated or Disproven.

As with the Vanhise chats, the following Aly Khan "plots" go nowhere:

- Mhal52 promises to "talk [his] girlfriend into going to india" "the week of Feb 20." (GX 417 (Jan. 23, 2012, 05:42:38, 05:52:47).) Because she is "a teacher[, she] has a week off" then. (GX 417 (Jan. 23, 2012, 06:45:38).) That never happens: two days later, mhal52 says his girlfriend made plans for "her week off" and cannot be kidnapped. (GX 418 (Jan. 25, 2012, 07:56:44).) Tellingly, this entire discussion was fictional. At the time, Mr. Valle's girlfriend was a stay-at-home mother, not a teacher, and had no fixed vacation week. (Tr. 194:8-14, 190:13-22, 759:3-10.)

- Later, mhal52 has a new "victim picked out"; once again because February 20 "is a holiday . . . that is [his] target weekend." (GX 421 (Feb. 9, 2012, 10:18:27, 10:40:01); GX 424 (Feb. 11, 2012, 05:57:38).) That plot too goes nowhere.

- Mhal52 next claims to have "been watchin outside of [Andria's] house." (GX 422 (Feb. 10, 2012, 18:24:57); GX 421 (Feb. 9, 2012, 10:40:01).) Andria lived 500 miles away in Ohio. Mr. Valle never went there. (Tr. 798:25-799:1, 243:25-244:1, 799:10-12, 807:2-20, 808:11-14.)

- Aly Khan himself also seems to have described at least one plot that never materialized. He claimed in January that a woman "[wa]s willing to come" to him; he planned to "drug her and do her…the date i[s] 29 January." (GX 418 (Jan. 25, 2012, 07:56:00).) Two days later he says again, "i have found a woman," and "i am kiling her in three days." (GX 419 (Jan. 27, 2012, 16:37:37, 16:38:12).) But Aly Khan never mentions the plot again, and in subsequent months, he repeatedly complains that his "hunt is not getting [him] anyone." (GX 425 (Apr. 4, 2012, 05:54:29); *see also* GX 421 (Feb. 9, 2012, 10:25:41).)

### 3. Valle Explicitly Told Aly Khan that He Does Not Intend to Carry Out the Kidnappings.

The Aly Khan chats are the only of the purportedly "real" chats in which the topic of "fantasy vs. reality" comes up in express terms. Mhal52 repeatedly states that he would *not* kidnap a woman in reality—undermining any suggestion that he had specific intent to kidnap.

As noted earlier, in the first Aly Khan chat, the two discuss several possible kidnappings in various locations, including a scenario in which mhal52 and his girlfriend would meet Aly Khan in India. Two days later, Aly Khan asks about that scenario again, and mhal52

abruptly cancels, saying (inaccurately) that his girlfriend only had the week of February 20 off and already had plans that week.   (GX 418 (Jan. 25, 2012, 07:56:44).)   This angers Aly Khan: "i am serious about it..so donot think im joking and wasting my time."   (GX 418 (Jan. 25, 2012, 07:56:54).)   Mhal52 changes the subject to other beautiful women.   (GX 418 (Jan. 25, 2012, 08:05:55, 08:06:40).)   But after a few minutes, Aly Khan returns to the subject of reality:

> [Aly Khan]:   i am not happy with you.
> [Aly Khan]:   I think you are not for real..otherwise they would not be living.
> mhal52[]:   maybe one day
> [Aly Khan]:    you are wasting time buddy.   I am for real not fantasy.
> mhal52[]:   i am just afraid of getting caugh t [sic]
> mhal52[]:   if i were guaranteed to get away with it, i would do it

(GX 418 (Jan. 25, 2012, 08:26:48-08:29:51).)   In other words, mhal52 tries to assure Aly Khan that he genuinely desires kidnapping women—but he does not intend to do so, because he is "afraid of" the legal consequences, and there is no "guarantee[]" he would not face them.

Aly Khan tries to persuade mhal52 that risk-free kidnappings are possible:   "i can gurantee…. i ahve [sic] done it before, i ma [sic] doing it this month and i will always do it. . . . you [just] need a plan in little detail."   (GX 418 (Jan. 25, 2012, 08:32:04-08:32:13).)   Mhal52 continues to disagree, however: "i am a little different though, i am a little more sadistic. . . .   i would want to see her suffer."   (GX 418 (Jan. 25, 2012, 08:32:44-08:32:48).)   In other words, mhal52 believes he would be caught and face legal consequences for the sexually sadistic kidnapping that he would find pleasurable—even if Aly Khan "can guarantee" a risk-free kidnapping that is less sadistic.   (*See also* GX 418 (Jan. 25, 2012, 08:34:08-08:34:28).)   The two then have this exchange:

> [Aly Khan]:   ok..let me ask you one last time before i tell you more.
> [Aly Khan]:   ARE YOU REALLY RAELLY INTO IT.   ARE YOU READY
> TO SLAUGHTER ONE BEING SAFE
> mhal52[]:   yes
> [Aly Khan]:   ARE YOU SURE?
> mhal52[]:   definitely

> [Aly Khan]:   so, when you think you can do it…how soon can you gather
> courage
> mhal52[]:   I don't know…
> [Aly Khan]:   get your mind ready..   i will guide you rest
> mhal52[]:   ok
> [Aly Khan]:   what time you have free with you in a day time.   what you do to
> earn
> mhal52[]:   typical office job, i am home by 6
> mhal52[]:   pm

(GX 418 (Jan. 25, 2012, 08:25:28-08:29:51, 08:37:07-08:39:30).)

These statements demonstrate that mhal52 does not have specific intent.   He repeatedly says he is afraid of getting caught—even though, in the abstract, he says he would like to carry out a kidnapping.   While mhal52 does answer "yes," when Aly Khan shouts, "ARE YOU READY TO SLAUGHTER ONE BEING SAFE," the important condition embedded in that question is "ONE BEING SAFE."   Mhal52 stated several times in the same conversation that he does not believe he can kidnap someone without risks of legal consequences (nor would such a belief be reasonable).   *Cf. United States v. Palmer*, 203 F.3d 55, 64 (1st Cir. 2000) (conspiracy liability cannot be imposed for a conditional agreement unless "the defendant reasonably believed that the conditions *would* obtain" (emphasis added)); *Wallach*, 935 F.2d at 471.   Accordingly, the "yes" answer here did not create an agreement.

Moreover, after Aly Khan calms down enough to stop "shouting" in all caps, he asks, "so, when you think you can do it…how soon can you gather courage."   Mhal52 says again: "I don't know."   This clearly communicates that mhal52 is still unmoved.

The Second Circuit has made clear that such equivocal statements cannot be a basis for conspiracy liability.   *See, e.g.*, *Cianchetti*, 315 F.2d at 588.   In *Cianchetti*, the defendant resisted joining a conspiratorial plot "because of his fear that he was under surveillance" by law enforcement.   *Id.*   Although "his protestations soon diminished somewhat, the most he could say in support of the conspiratorial enterprise was 'Well, maybe I could help you out.   I don't know.'"

*Id.* This "evidence show[ed] that [the defendant] did indeed abstain," requiring acquittal. *Id.*
Here, mhal52 used the same equivocal language—"I don't know"—making explicit that he did not
commit to the plot.

### 4. The Evidence Created a Reasonable Doubt About Whether Aly Khan Was Also Merely Engaged in Fantasy.

No reasonable jury could rely solely on these Internet chats as proof that Aly Khan
is a "culpable co-conspirator[]," *United States v. Vazquez*, 113 F.3d 383, 387 (2d Cir. 1997),
because of the numerous internal contradictions and inconsistencies:

*First*, as noted earlier, Aly Khan talked about plots that never materialized.   He
claimed in late January to have a kidnapping planned in three days, but never mentioned the plot
afterwards, complaining months later that he had not found anyone.   (*See supra* Part II.B.2,
at 35.)   This shows Aly Khan was fantasizing about fake plots, just like mhal52 concededly was.

*Second*, Aly Khan contradicts himself from one conversation to the next—asserting
at one point that he has no access to women, while claiming in another that he has a girlfriend who
he tied up.   Aly Khan complains, "i donot [sic] know, how to find woman for slaughter," and later
he says again, "My hunt is not getting me anyone."   (GX 421 (Feb. 9, 2012, 10:25:41); GX 425
(Apr. 4, 2012, 05:54:29).)   But in another conversation, Aly Khan claims to have a girlfriend,
whom he tied up and threatened "in fun play."   (GX 426 (May 1, 2012, 06:11:04).)   Aly Khan
untied his girlfriend without harming her.   (GX 426 (May 1, 2012, 06:11:04).)

If Aly Khan is "real," it is unclear why he untied his girlfriend when he had the
chance to slaughter her.   And the contradiction between Aly Khan's claims to have no women to
slaughter, and his claim here that he could have slaughtered his girlfriend (but did not), necessarily
raises a reasonable doubt about which (if any) of Aly Khan's statements are true.

*Third*, further casting doubt on the idea that Aly Khan is real is his obsession with consensual victims.   In one chat, he asks:   "What if . . . [s]he says 'cut my throat. I,m [sic] ready'?   he he he he."   (GX 417 (Jan. 23, 2013, 06:51:14, 06:51:36).)   At other times, he talks of finding "women willing for slaughter," or "getting a[] real one willing for this."   (GX 421 (Feb. 9, 2012, 10:25:06); GX 425 (Apr. 4, 2012, 05:55:01).)   In light of the other contradictions in Aly Khan's statements, this raises a reasonable doubt about whether Aly Khan intended to commit real crimes, or is a mere fantasist dreaming of masochistic women who would willingly sacrifice themselves for his pleasure.

*Finally*, the only extrinsic evidence about Aly Khan contradicts his chats.   The government ascertained "that [Aly Khan] lives in Pakistan," by "tracing [his] Internet protocol IP address."   (Tr. 618:2-10.)   But Aly Khan told mhal52 that he was writing from India, not Pakistan:   Aly Khan says he would have to "take [his] car *accross the border* to Pakistan"; his business "*import[s]* sheep form a city called lahore."   (GX 417 (Jan. 23, 2012, 06:14:31, 06:46:46) (emphasis added); *see also* GX 417 (Jan. 23, 2012, 05:42:38, 06:59:00) (discussion of India).)   Aly Khan later said, "hi buddy, just talked with my Dad for allowing me to go to Pakistan.   he said the law and order is bad but he still allowed me to go."   (GX 417 (Jan. 23, 2012, 07:13:00).)   In other words, Aly Khan made a false statement about his location—again raising reasonable doubts about which, if any, of his statements are true.

### 5.      Even if Assumed to Be Real, the Discussions Would, at Best, Be Mere Preliminary Negotiations, Not a True "Meeting of the Minds."

Even if the chats were taken as "real," they still do not prove a conspiracy because the participants did not go beyond preliminary negotiations and discussions, and did not reach an actual "'meeting of the minds' to achieve the unlawful result" through interdependent, joint action. *Arbane*, 446 F.3d at 1229.

At first, Aly Khan and mhal52 discussed various alternative scenarios—kidnapping "Kathleen" in India, mhal52 kidnapping a woman alone in the United States, Aly Khan meeting mhal52 at the mountain house in Pennsylvania.   The last option that mhal52 describes in the first conversation is kidnapping in the United States.   Mhal52 then has to "to get going," and leaves before the two settle on one scenario.   (GX 417 (Jan. 23, 2012, 07:01:33).)   The next time they chat, mhal52 says he does not want to kidnap Kathleen in India because she already has plans.

These "'[e]xploratory and inconclusive' or 'preliminary' discussions and negotiations are not sufficient to establish an agreement."   *Iennaco*, 893 F.2d at 398; *see also Penn*, 131 F.2d 1021.   In *Penn*, kidnappers for ransom had agreed to kidnap rich children and "had discussed two places which might be satisfactory."   But the Court found insufficient evidence that the conspirators had agreed to move the victims across state lines, because there was no evidence that the conspirators "had agreed upon one of" the two places they discussed (even though both places were out-of-state).   *Id.* at 1022.   Although the interstate travel element in *Penn* is not directly implicated here, that case illustrates the firmness of purpose that must exist to prove an agreement—particularly one that is never carried into action.   Discussing several possibilities is not enough—not even if all the possibilities are unlawful.   As Judge Learned Hand explained:   "Men do not conspire to do that which they entertain only as a possibility; they must unite in a purpose to bring to pass all those elements which constitute the crime."   *Id.*   Here, mhal52 and Aly Khan did not "unite in a purpose"; they "entertain[ed] only . . . possibilit[ies]," none of which were settled on.   Two days later, mhal52 unequivocally rejected the proposal.

The subsequent chats merely involve references to separate kidnappings by Aly Khan and mhal52 independent of each other.   For example, in the third chat, Aly Khan is claiming he will slaughter a woman by himself within three days.   (GX 419.)   (As noted, there was no

evidence that ever happened.)   And after that, mhal52 says, "i have my victim picked out,"

prompting Aly Khan to express jealousy:   "You are lucky to have got your animal."   (GX 421

(Feb. 9, 2012, 10:18:27, 10:25:58).)   These outlandish discussions continued for some time.

        Both say they *wish* that it were possible for Aly Khan to participate.   Aly Khan

says, "i wish if you could travel here with her :)."   (GX 425 (Apr. 4, 2012, 06:03:35).   Likewise,

mhal52 says:   "i wish you could come here . . . to help out."   (GX 426 (May 1, 2012, 06:12:47,

06:12:54).)   But they never agree that one will go to the other country or vice versa.   Aly Khan

rules out the idea, "i wish to come there, but its risky for me."   (GX 426 (May 1, 2012, 06:17:46).)

        There is thus no meeting of the minds, and no agreement to kidnap anyone.

"Without evidence showing or tending to show a meeting of the minds . . . the convictions cannot

stand."   *United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1988).   While the two do talk

together about kidnapping women in their respective countries, "[a]ssociation with a conspirator,

without more, is insufficient to establish the requisite degree of participation in a conspiratorial

venture."   *United States v. Steinberg*, 525 F.2d 1126, 1134 (2d Cir. 1975).   "'There must be

something more than [m]ere knowledge, approval of or acquiescence in the object or the purpose

of the conspiracy'; the [coconspirator]'s 'attitude towards the forbidden undertaking must be more

positive . . . . he must in some sense promote their venture himself, make it his own, have a stake in

its outcome,' or make 'an affirmative attempt to further its purposes.'"   *United States v. Ceballos*,

340 F.3d 115, 124 (2d Cir. 2003) (citations omitted) (quoting *Cianchetti,* 315 F.2d at 588; *United*

*States v. Direct Sales Co.,* 319 U.S. 703, 713 (1943)).   The government failed to prove that both

individuals had "a stake in the outcome" of the separate plots they discussed.   *Steinberg*, 525 F.2d

at 1134.   Accordingly, the Aly Khan chats do not prove a conspiracy.

6.      There Were No Overt Acts.

"[O]vert acts . . . are meaningful only if they are within the scope of the conspiratorial agreement."   *Grunewald v. United States*, 353 U.S. 391, 414 (1957) (reversing conspiracy convictions, noting that "the scope of the agreement cannot be broadened retroactively"), *quoted in LaSpina*, 299 F.3d at 176.

Here, the government proved no overt acts in the Southern District "within the scope of the" purported Aly Khan conspiracy.   Accordingly, the government's prosecution of Mr. Valle in this District for that conspiracy violated the Sixth Amendment.   (*See infra* IV.B.2.)

Moreover, as the Court recognized, actions speak louder than words.   In this conspiracy, the first communication was in January 2012, the last was in July, and Mr. Valle was at liberty under October 2012.   The fact that the real-world action never went beyond chit-chat is strong evidence that neither man had any criminal intent with respect to these chats.

C.      No Rational Jury Could Find Beyond a Reasonable Doubt that the Moody Blues Chats Are a Real Criminal Conspiracy.

The Moody Blues chats are noteworthy principally for their preposterousness.   As grotesque as some of his chats are, their very absurdity underscores that these chats were little more than macabre humor—designed to shock and provoke, not to plan real crimes.

1.      The Make-Believe Elements Necessarily Created a Reasonable Doubt About Whether the Chats Are Real.

Mhal52's chats with Moody Blues were peppered with fiction:

- Mhal52 claims to be a single man who lives "about an hour north of" New York City, in "a place up in the mountains" with "no one around for 3/4 [of a] mile." (GX 402 (July 9, 2012, 07:36:33, 08:09:38, 08:19:36, 08:19:43); *see also* Tr. 203:7-9, 666:13-22, 706:21-707:2.)

- At this fictional home, his oven is "big enough to fit one of these girls." (07:58:34)   He "verif[ied] the measurements on the oven" as "around 5 feet long, 4 feet deep and 4 feet high."   (GX 445 (Aug. 21, 2012, 22:46:00); GX 412

(Aug. 24, 2012, 06:52:18, 06:52:27); *see also* GX 402 (July 9, 2012, 08:11:34).)
There is no such oven.   (Tr. 189:15-16, 794:15-23.)

- Mhal52 sends a "[b]lueprint" for kidnapping "Kimberly."   All the identifying
  information in that document—last name, birthday, city and state of birth, and
  educational background—is made-up.   (*Compare* GX 601 *with* Tr. 786:12-13;
  Tr. 266:16-17, 300:10-11; Tr. 266:18-19, 300:22-25; Tr. 267:11-12, 300:12-21.)
  Only physical characteristics (5'2" and Irish) and lifestyle information (single, no
  tattoos, social drinker, no smoking or drugs) were accurate.

- The "[b]lueprint" lists "MATERIALS NEEDED," like a car, chloroform, rope,
  duct tape, tarp, gloves, and sneakers.   (GX 601, at 2.)   It never mentions a gun
  or handcuffs—things Mr. Valle actually has.

- In response to requests from Moody Blues,[5] mhal52 repeatedly says he is "not
  sure" of the woman's address or "do[es]n't know" it.   (GX 407 (July 10, 2012,
  06:08:33); GX 410 (July 19, 2012, 07:10:57).)   In fact, Mr. Valle had the address
  in his iPhone.   (GX 436 (Jan. 18, 2012, 19:10 ET).)[6]

    The government again had no nonspeculative explanation for this

make-believe—relying solely on "the AirBNB.com" theory that was first raised in the rebuttal

summation and lacked any evidentiary support.   The argument that Mr. Valle told Moody Blues

he owned a mountain house when he was merely planning to rent one is particularly puzzling here.

According to the government, Moody Blues was "to act as Valle's senior adviser, his guide

through the process," because Moody Blues "ha[d] experience cannibalizing women."

---

[5]    (GX 407 (July 10, 2012, 06:07:16) ("Love to have her address so I can google it!");
GX 407 (July 10, 2012, 06:08:23) ("May I have her address?   For Googling using the Map
app?"); GX 410 (July 19, 2012, 07:12:14) ("Well, give me the address of Kim and I can
google the address.   REALLY want to see the neighbourhood!").)

[6]    For similar reasons, the search for "Kristen Ponticelli 'address'" is of little significance.
The search seems to have turned up nothing:   Although the government argued that
GX 1005A shows "a continuous stream" of Mr. Valle's Internet use on the day in question
(Tr. 1614:20), there is no record of Mr. Valle clicking on pages that could have been results
from this search.   And Mr. Valle did not keep looking.   Mr. Valle made no effort to find
Ms. Ponticelli on his police computer, or through any other means.   Given that evidence,
it is speculative to conclude that this search was anything more than a passing, idle
curiosity.

(Tr. 1520:18-20.)   But if the relationship was about advice, candor would be essential and desirable for mhal52.   Why wouldn't he tell his "adviser" he planned to rent a mountain house so they could discuss how to cover his tracks from the rental company and the next set of guests?

      The only other discrepancy the government tried to explain was mhal52's refusal to provide a home address for any woman.   The government argued:   "[O]ne of the oldest clich[é]s in the world is there is no honor among thieves."   (Tr. 1597:7-8.)   But there was no evidence that Moody Blues and mhal52 had any history of tension or distrusted each other.   *Cf. Ceballos*, 340 F.3d at 127 (rejecting as speculative a prosecution argument that a drug supplier would not trust a buyer to pay, where there was "no evidence that [the buyer] was generally perceived by drug suppliers as a bad credit risk").

      Moreover, when applied to prospective targets that have not been kidnapped, the "no honor among thieves" point makes sense only if targets are hard to come by.   A bank robber who discovers a security vulnerability may guard that secret so he can exploit it before others. But here, the men considered as many as "90 women" (Tr. 1459:11) to be viable targets.   There is thus no basis for inferring that any one target would be a jealously guarded secret.   England has plenty of beautiful women Moody Blues can kidnap; the hard work is the kidnapping, not identifying targets.   And even if Moody Blues did "steal" a woman (flying to the United States to do so, with nothing but the woman's first name and address), mhal52 had numerous other targets.

      "[A] conspiracy may not be proved merely '"by piling inference upon inference" where those inferences do not logically support the ultimate finding of guilt.'"   *United States v. Tyson*, 653 F.3d 192, 206 (3d Cir. 2011) (quoting *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005)).   At some point, the force of Occam's razor is undeniable; the simplest explanation is

probably the correct one.   These chats contain fictional elements like the mountain house because,

just like the other 21, these were role-play.

### 2.      There Were No Overt Acts in This District.

The only real-world act was the July 2012 brunch in Maryland.   But the evidence

is insufficient to prove that the brunch was in furtherance of any conspiracy.   And even if the

brunch could be an overt act, it did not occur in the Southern District of New York.   Driving the

Valle family over a bridge en route to Maryland was not an overt act.

The evidence showed that the family vacation to Maryland was planned before the

brunch was planned.   (GX 436, at 25-26; Tr. 183:19-25, 288:3-19.)   The Valle family "went to

Maryland a lot," because Mr. Valle was a University of Maryland alum and frequently visited

friends there (indeed, he visited several the weekend in question).   (Tr. 196:19, 208:8-211:1,

322:19-22; *see also* Tr. 209:6-210:8.)   Thus, it is speculative to conclude that the brunch was the

dominant purpose of the trip to Maryland.   The brunch was not a "but for" cause of driving over

the bridge because the Valle family regularly went to Maryland for other purposes (driving over

the necessary bridges in the process), whether a brunch was scheduled or not.

Ms. Sauer saw "nothing unusual about" Mr. Valle contacting her.   (Tr. 322:8-16.)

He had done so occasionally before, and there was "nothing atypical" about it.   (GX 436, at 1

(Aug. 13, 2011); Tr. 324:3-7.)   The brunch itself was banal and ordinary.   There was no evidence

of any aspect of the brunch that might relate to a kidnapping.   The brunch "lasted about an hour"

and was "pleasant."   (Tr. 326:9-10, 326:18-22.)   Ms. Sauer, not Mr. Valle, chose the location.

(Tr. 322:23-323:1, 324:8-10.)

The only evidence that the brunch had anything to do with kidnapping was that

mhal52 told his online buddy Moody Blues about it.   Moody Blues joked light-heartedly, "When

you sit at her table are you going to fantasize that the meal isn't from her but form her!   Lol!"

(GX 408 (July 17, 2012, 07:18:58, 07:36:24).)   At this point, notably, the two do not talk about

how to use the brunch to engage in "surveillance" of Kimberly.   They spend most of the chat

talking idly about *other* women.   Mhal52 says he's "dinking around on facebook and . . . found [a

different] girl in [his] area"; Moody Blues jokes that he would "[l]ove to eat [his] way around the

world! . . .   Try Japanese (sushi!), Chinese, Indian.   Love to try an Islamic girl.   Try to prepare

her Halal!"   (GX 408 (July 17, 2012, 07:37:49, 07:40:31, 07:47:05, 07:49:03).)   Two days later,

the two also briefly talk about Kimberly, but discuss a number of other women and do not focus on

her.   (GX 410 (July 19, 2012, 06:13:48, 06:18:08, 06:20:57, 06:21:30-06:23:42,

06:26:10-06:27:54).)   The light-hearted tone of these chats and the absence of any serious

discussion of conducting "surveillance" at the brunch show that the two did not view the brunch as

a real step in furtherance of a crime.

   After the brunch, moreover, mhal52 sends Moody Blues a one-liner, saying "she

looked absolutely mouthwatering" ("cannibal-speak" for "beautiful," *see supra* note 3).   (GX 411

(July 22, 2012, 23:57:42).)   But neither man discusses the brunch beyond that.   The next chat is a

month later.   At that point, they mention Kimberly once in passing and spend the bulk of the chat

talking about numerous *other* women.   (GX 412 (Aug. 24, 2012, 06:52:27, 07:26:37, 07:27:34).)

They never mention Kimberly again.   Thus, the evidence was insufficient to show that the

purpose of the "brunch" was to kidnap Kimberly or further a kidnapping conspiracy.   The only

thing that Mr. Valle indisputably accomplished at the brunch was to see a beautiful woman (and an

old friend) whom he had fantasized about.

   Even assuming that the brunch was related to the kidnapping, driving over the

bridge in New York was too attenuated from the conspiracy to qualify as an overt act.   Courts

have sometimes found venue proper when conspirators pass through a district in order to commit a

substantive offense (typically when transporting contraband), or en route to commit an offense or

to return from one.   But here, the brunch had only an attenuated relationship to any substantive

offense.   It was, at most, very preliminary preparation for a substantive kidnapping—which takes

it outside the cases premising venue on passage through a district in the course of a substantive

offense.   The Constitution "does not establish venue in a district where only preparatory

acts—even those closely related to, but preceding, a crime's 'essential conduct

element[s]'—occurred."   *United States v. Perlitz*, 728 F. Supp. 2d 46, 57-58 (D. Conn. 2010).

Driving over the bridge cannot be an "essential conduct element" in the context of

this case, *see id.*, because "[p]lainly if the trial record contained evidence only of [Mr. Valle

driving his family over a bridge], the proof would be insufficient to support a conviction for"

conspiracy to kidnap.   *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir.

1989).   Unlike the overt acts in *Beech-Nut*, driving the Valle family over a bridge (and perhaps

turning around in New Jersey) could not be the sole overt act on which a conspiracy conviction

rested.   It therefore cannot establish venue.

More broadly, we are unaware of any case finding venue where the dominant

purpose for passage through the district was a nonconspiracy purpose (here, a family vacation).

The family went to Maryland "a lot," and on that occasion, the brunch was only one hour of an

entire weekend trip, during which the Valle family saw a number of other friends.   (Tr. 196:19.)

The jury thus could not find that furthering the conspiracy was the dominant purpose of driving

over the bridge.

"Venue is more than a technical concept."   *United States v. Johnson*, 337 F.2d

180, 193 (4th Cir. 1964), *aff'd*, 383 U.S. 169 (1966).   "Proper venue in a criminal prosecution is a

constitutional right."   *United States v. Bowens*, 224 F.3d 302, 308 (4th Cir. 2000).   The Court

should not reinterpret the Sixth Amendment in novel ways, merely to save a prosecution that could easily have been brought in another district.

In any event, in the context of an alleged conspiracy that purportedly lasted months, the fact that this pedestrian social interaction is the only real-world act demonstrates that neither man had any intention of carrying these discussions out.   Mhal52 and Moody Blues set "target dates" (for example, "a Labor Day cookout" for the "first Monday of september").   (08:32:15, 08:32:30)   But nothing happened.   And as with others, there was no evidence of any change that would have caused the two to abandon plans that were real when made.   No reasonable jury could find an overt act or intent on this flimsy record.

### 3.   Internal Contradictions in the Chats Necessarily Created a Reasonable Doubt about Whether Moody Blues Is "Real."

Moody Blues had the most elaborate and macabre discussions—chats sprinkled with shocking assertions and twisted jokes.   While this dark humor may frighten and offend most people, the law requires a rational and dispassionate review of the evidence.   A rational jury cannot ignore the indications that Moody Blues is a mere fantasist like the others.

As an initial matter, Moody Blues describes plans to eat female DFN users that make sense only as role-play.   For example, Moody Blues says:   "Bloody hell just starting a conversation with an Asian American girl from DFN, let you know how it goes……."   (GX 415 (Aug. 25, 2012, 05:52:05).)   An hour later:   "Woow! She thinks I want to train her as a slave! Lol! . . . Half Han Chinese, half White American, all stupid.   Still if she wants slave training, she will get it; if only transiently. . . .   You will take your c;othes [sic] off, yes even your panties. Now kne[e]l and accept this gag."   (GX 414 (Aug. 25, 2012, 05:52:05, 06:55:21-07:16:32).)

This discussion makes sense only as kinky role-play.   The undisputed evidence was that DFN is focused on extreme sadomasochistic activities and that many female DFN users

enjoy role-playing "peril" scenarios in which they are in danger.   (Merenkov Dep. 10:24-11:2,

24:12-13, 64:12-25, 66:4-6.)   Given that evidence, it is plain that what Moody Blues is describing

is role-play.   A female DFN user willing to discuss slave training has sufficient familiarity with

the extreme sadomasochistic activities on DFN that she could hardly be tricked by Moody Blues.

Obviously, this user, whose only interaction with Moody Blues was an hour-long chat, is not

planning to fly from the United States to Europe to be Moody Blues's slave (only to arrive and be

eaten).   This conversation makes sense only as a half-baked fantasy—Moody Blues being so

excited only because the men so rarely find actual women to fantasize with.

There are other conversations to the same effect.   For example, Moody Blues says

he has "been talking to a couple of owned slaves, but they are not giving me much after they find

out WHY I want a slave."   Mhal52 asks about selling a slave for money—and Moody Blues cuts

off that line of fantasy, saying, "Yeh but I'm not sure if he deals in non-consensual."   (GX 408

(July 17, 2012, 07:57:17-08:01:08).)   A "consensual" slave by definition is someone merely

role-playing.

Moody Blues also describes "recipes" for eating woman.   These discussions are

revolting to normal sensibilities, but the very preposterousness of the proposals—and the casual,

joking tone Moody Blues uses in describing them—underscores that the discussion is only a joke.

Among other absurdities, Moody Blues recommends a "a good quality olive oil," which he says

produces a wonderful smell.   (GX 405 (July 9, 2012, 09:17:27).)   He jokes that one of the

women is a "lovely Southern (fried) Belle."   (GX 405 (July 9, 2012, 09:20:12).)   And he presents

an elaborate set of ludicrous gourmet recipes:

- "I personally don't like the intestines, (unless you have the ability to make sausage meat).   But you can eat almost all the internal organs.   I have a recipe for Haggis (uses lungs and stomach) and black pudding (for the tit fat and blood)

that work well.   As for feet they are a favorite of mine along with the cunt fillet."
(GX 403 (July 9, 2012, 08:46:22).)

- "One great meal I had was the hands cupped around some rice with chillies [sic]
then steamed.   Wonderful!"   (GX 404 (July 9, 2012, 08:59:34).)

- "Girl soup!   I've mad [sic] that before!" (GX 405 (July 9, 2012, 02:23:09).)

- "Good, cut off the tits and slow roast them until you get lots of liquefied girl fat,
great for roasting potatoes and making yorkshire puddings!   Want the thigh as a
celebratory roast on the Monday?   Or maybe a selection of cooked body parts?"
(GX 404 (July 9, 2012, 08:58:33).)

- "Could use her face to make braun!   Great for sandwiches.   ake [sic] some to
work!"   (GX 405 (July 9, 2012, 09:26:04).)

- "Shame could have had smoked bacon!   A lovely light applewood smoking goes
well"   (GX 405 (July 9, 2012, 09:48:14-09:51:14))

- "From what I can see the legs and arms are pretty good too.   Carving a thick
succulent steak from her thigh or rump……..   Yum!!"   (GX 415 (Sept. 8, 2012,
04:43:45).)

- "Love to eat my way around the world!   . . .   Try Japanese (sushi!), chinese,
Indian.   Love to try an Islamic girl.   Try to prepare her Halal!"   (GX 408
(July 17, 2012, 07:39:14, 07:40:31).

While it is difficult to get past the depravity of this fantasy, no rational reader could believe that

these chats prove beyond a reasonable doubt that Moody Blues was an actual coconspirator.

These farcical quips about women's body parts are a form of self-conscious, ironic humor—much

like that observed in *Scream*, the *Rocky Horror Picture Show*, or comic remakes of *Sweeney Todd*.

The recipes are obviously not intended as the building blocks of a real crime.

### 4.   Even if Their Chats Were Real, Moody Blues and Mhal52 Never Reached a "Conclusive" Agreement.

The Moody Blues chats, like the Aly Khan chats, do not show a true agreement was

reached with the requisite unity of purpose and interdependent venture.   (*Cf. supra* Part II.B.5.)

Although in the initial Moody Blues chat, Moody Blues suggests he might

participate in the kidnapping the two discuss, the only kidnapping to which Moody Blues purports

-50-

to agree is a Labor Day cookout at mhal52's mountain house.   Even indulging the far-fetched

notion that Moody Blues thought that was a real agreement, mhal52 obviously did not.   Mhal52

explains that what he's "thinking of [is] a Labor Day cookout" at his "place up in the mountains."

(GX 402 (July 9, 2012, 08:19:36, 08:32:15).)   Mhal52 assures Moody Blues, "yes you can

absolutely stay" at the mountain house.   (GX 402 (July 9, 2012, 08:40:44).)   Moody Blues wants

to know, "how long to get to the mountain place.   What's it like?"   Mhal52 says, it's "a couple of

hours from the airport," with "lots of winding roads" "and peace and quiet."   (GX 404 (July 9,

2012, 08:53:16-08:53:48).)   The next day, mhal52 sends the blueprint, full of fictional

information, and declines to provide the woman's address, falsely stating, "not sure her exact

address."   (GX 407 (July 10, 2012, 06:08:33); *see also supra* note 5 and accompanying text.)

    No reasonable jury could conclude that this was a genuine, two-way agreement,

because everything mhal52 has said is fake.   He cannot really host Moody Blues in his mountain

house, or take victims there, because he does not have one; the blueprint is full of fake information;

and the two ultimately take no meaningful steps—nothing happens on Labor Day.

    The subsequent conversations flit from one beautiful woman to

another—demonstrating much "tentative talk, but no agreement."   *Iennaco*, 893 F.2d at 398;

*United States v. Wieschenberg,* 604 F.2d 326, 334–36 (5th Cir. 1979) (no agreement where parties

"just discussed how [they] possibly could do it").   For example, Moody Blues relates at various

points his dealings with an attractive "Kenyan student," ultimately complaining that he got a phone

number "but [it went] no further with her."   (GX 413 (Aug. 25, 2012, 04:53:25).)   There is no

evidence that mhal52 agreed to help with this woman; the discussion was merely an exchange

among friends.   And the abstractness of the conversations about kidnapping illustrates that the

two had not moved beyond contemplating and negotiating to a true agreement.   *See United States*

*v. Reyes*, 979 F.2d 1406, 1410 (10th Cir. 1992) ("[T]he lack of specific details . . . indicates that, at best, Defendant intended to negotiate later.").

Indeed, the government itself argued that "Moody Blues assumed the role of senior advisor."  (Tr. 1314:19.)   If that was his role, then on the government's own theory, he does not have the required interdependence or stake in the venture.   Even if these two "aided and abetted one another's [plans,] . . . aiding and abetting is different from committing the independent crime of conspiracy."  *United States v. Beckham*, 968 F.2d 47, 51 (D.C. Cir. 1992).   Conspiracy requires proof that the participants actually depend on each other—not for mere whimsy or pleasure, but to achieve "a shared, single criminal objective, not just have similar or parallel objectives between similarly situated people."  *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1123 (10th Cir. 2011).   Mentorship and advice does not create this shared criminal objective, and the government thus failed to prove the interdependence and common stake in a shared goal required for a conspiracy.

## III.   THE COCONSPIRATORS' STATEMENTS WERE INADMISSIBLE FOR THEIR TRUTH.

The government's heavy reliance on the chats created another problem:   There is no basis for finding that the statements of mikevanhise81, Moody Blues, and Aly Khan—all of which are hearsay—are admissible for their truth.   Statements from these men were admitted for their truth, over defense objection, under the coconspirator exception.   (Tr. 416:2-417:11, 429:9-430:6.)   As a result, the jury was allowed to consider, for example, assertions by Moody Blues that he had eaten women before, and Aly Khan's claim to have tied up his girlfriend as evidence of specific intent; the jury was allowed to find overt acts supposedly carried out by the coconspirators based only on statements in chats concerning those purported acts.   (Tr. 460:1-12, 465:19-24, 1479:13-21; GX 426 (May 1, 2012, 06:11:04).)

But before these statements could be admitted under the coconspirator exception, the government had to prove to the Court by a preponderance that a conspiracy existed and that all four of these men were members of it.   "To admit hearsay testimony under Rule 801(d)(2)(E) of the Federal Rules of Evidence, the district court 'must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy.'" *United States v. Alameh*, 341 F.3d 167, 176 (2d Cir. 2003) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990)); *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993).   The government had the burden of demonstrating these factual predicates by a preponderance.   *Alameh*, 341 F.3d at 176-77.   This is not a mere *prima facie* requirement, and because statements from three coconspirators were admitted, the government had to show that *all three* coconspirators were members of a real conspiracy with Mr. Valle.

This evidentiary issue normally would be part of a new trial motion.   We include it here because, without the coconspirator statements in this case, the evidence plainly would be insufficient to establish a true, two-way conspiracy.   *See Vazquez*, 113 F.3d at 387.   When the evidence would be insufficient without coconspirator statements, under Second Circuit law, entry of a judgment of acquittal (rather than formally ordering a new trial) is the appropriate remedy. *See infra* Part III.C.[7]

---

[7]      If the Court concludes that some of the coconspirator statements were admissible but that some were not, the appropriate remedy would be a new trial limited to the coconspirators whose statements are found to be admissible.   Accordingly, we ask that the Court consider this argument as a basis for an acquittal, and in the alternative, as a basis for a new trial.

## A.    The Government Failed to Rebut the Presumption that the Coconspirators' Statements Are Unreliable.

"In making a preliminary factual determination of the[] prerequisites [for introducing coconspirator hearsay], the court may consider the hearsay statements themselves." *United States v. Diaz*, 176 F.3d 52, 83 (2d Cir. 1999) (citing *Bourjaily,* 483 U.S. at 181). "However, these hearsay statements are presumptively unreliable, and, for such statements to be admissible, there must be some independent corroborating evidence . . . ." *Id.* (internal quotation marks omitted) (quoting *United States v. Tellier,* 83 F.3d 578, 580 (2d Cir. 1996)).   In particular, the government is required to prove, by "a preponderance of evidence *independent of* the proffered statements . . . that there was a conspiracy [and] that the declarant and the person against whom the statement is offered belonged to the conspiracy."   *United States v. Stewart*, 433 F.3d 273, 291 (2d Cir. 2006) (emphasis added).

"[S]ufficient 'independent evidence is not merely a scintilla, but rather enough to rebut the presumed unreliability of hearsay . . . .'"   *United States v. Conrad*, 507 F.3d 424, 429 (6th Cir. 2007) (quoting *United States v. Clark*, 18 F.3d 1337, 1341 (6th Cir. 1994)); *see also United States v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir. 1986) ("Substantial, independent evidence has been described as more than a scintilla . . . .").   In other words, the Court's consideration of the coconspirators' statements turns on whether "those statements are sufficiently *reliable* in light of independent corroborating evidence."   *United States v. Daly*, 842 F.2d 1380, 1386 (2d Cir. 1988) (emphasis added) (citing *Bourjaily*); *see also United States v. Silverman*, 861 F.2d 571, 579 (9th Cir. 1988) ("One presumptively unreliable statement cannot be invoked to corroborate another . . . .").[8]

---

[8]    In light of the importance and difficulty of this determination, some circuits hold pre-trial evidentiary hearings on this issue.   But "pretrial hearing[s] . . . [are not] customarily
(*footnote continued*)

The government failed to introduce sufficient evidence, independent of the proffered statements, that would establish that any of the three "coconspirator" statements were reliable.   There was no evidence that any of these three men were members of a conspiracy with Mr. Valle apart from their hearsay statements in the chats.   None.   Aly Khan has not even been identified; the only extrinsic evidence concerning him was his IP address, which has little or no bearing on whether he has joined a criminal conspiracy to kidnap with Mr. Valle.   Likewise, Moody Blues was identified by name and location.   But there was no extrinsic evidence that would connect him to a conspiracy with Mr. Valle.   For Mr. Vanhise, the government added a mug shot and perhaps a few additional details—but none of those facts showed that Mr. Vanhise was in a criminal conspiracy with Mr. Valle.

Other factors, such as "the circumstances surrounding the statement . . . [and ] the context in which the statement was made," only underscore that these statements are *not* reliable. Fed. R. Evid. 801, advisory committee's notes, 1997 amendment.   The men all met on a sadomasochistic erotic fantasy website.   Mr. Valle's profile indicated he was merely a fantasist—inviting other fantasists to engage in fantasy role-play, not truth telling.   (GX 401 (July 9, 2012, 07:35:53); Tr. 776:5-11, 840:5-11, 880:4-7, 1056:9-16, 1409:2-6, 1409:21-25.) And the alleged coconspirator statements were internally contradictory and inconsistent in a

---

(*continued from previous page*)
conducted in this Circuit."   *United States v. Davis*, No. 06-cr-911(LBS), 2009 WL 1098477 (S.D.N.Y. Apr. 21, 2009); *United States v. Grant*, No. 05-cr-1192(NRB), 2008 WL 678553 (S.D.N.Y. Mar. 11, 2008); *United States v. Saneaux*, 365 F. Supp. 2d 488, 491-93 (S.D.N.Y. 2005).   The Second Circuit has issued "a note of caution to criminal prosecutors" to tread carefully when introducing coconspirator hearsay because "trial judges have little ability to prevent error if prosecutors act without due caution."   *United States v. Reyes*, 18 F.3d 65, 72 (2d Cir. 1994).

number of respects that undermine any suggestion that these statements are reliable.   (*See supra*

Parts II.A.3, II.B.4, II.C.3.)

        There also was little or no "evidence corroborating the contents of the

statement[s]."   Fed. R. Evid. 801, advisory committee's notes, 1997 amendment.   Aly Khan said

in chats that he lived in India, but the only extrinsic evidence about him was that his IP address

traces to Pakistan.   (*See supra* Part II.B.4, at 39.)   Thus, the only extrinsic evidence contradicts

what he said—and there was no evidence corroborating statements (admitted for their truth) that

he had a girlfriend, tied her up, or had arranged for another women to meet him in India.

Similarly, there was no corroboration of Moody Blues's claims to have eaten women, and no

corroboration of Mr. Vanhise's statements that he wanted to keep women as sex slaves.

        "[T]he independent non-hearsay evidence simply did not establish that [Mr. Valle

and his supposed coconspirators] were participants in the same [criminal] conspiracy."   *United

States v. Garcia-Duarte*, 718 F.2d 42, 46 (2d Cir. 1983); *United States v. Al-Moayad*, 545 F.3d

139, 176 (2d Cir. 2008).

    **B.**    **The Government Did Not Prove that It Is More Likely than Not that a Real
Conspiracy Existed and that All Four Men Were Members of It.**

        Even if there had been independent evidence that the coconspirator statements were

reliable, in light of the evidence as a whole in this case, the government failed to show that it was

more likely than not that Mr. Valle was in a real conspiracy with all three of these men.   As noted,

the Court must decide this issue *de novo*—with no deference owed to the jury.[9]

---

[9]    The jury was not asked the same question that the Court must decide.   Statements from
three different alleged coconspirators were introduced.   Accordingly, the Court, unlike the
jury, must be persuaded that *all three* alleged coconspirators were members of a conspiracy
with Mr. Valle.   As noted, if the Court concludes that one alleged coconspirator was a
member of a conspiracy with Mr. Valle (but not all three), the Court should order a new
trial limited to the one.   *See supra* note 7.

At bottom, the evidence as a whole shows that Mr. Valle engaged in lots of erotic fantasy role-play; the allegedly real chats were not meaningfully different (at least not in terms of mhal52's comments); and his discussions were filled with make-believe like a nonexistent house in the mountains, a human-sized oven, and a pulley apparatus.   (*See supra* Parts II.A.1, II.B.1, II.C.1.)   These factors provide ample basis for the Court conclude that the government has failed to meet its burden of demonstrating that all four men were members of a real conspiracy.

###    C.    The Remedy in This Case Is an Acquittal.

Because the government has never demonstrated that admission of this hearsay satisfied any firmly rooted exception to the hearsay rule, the admission of the chats was an evidentiary error and violated Mr. Valle's Confrontation Clause rights.   Because the error is not harmless beyond a reasonable doubt, a new trial ordinarily would be required.   But where, as here, "there is no suggestion by the government that any more evidence of [the declarant's] participation in a conspiracy with [the defendant] could be produced on a retrial," the proper remedy is to "not only reverse the conviction but direct dismissal of the conspiracy count."   *Garcia-Duarte*, 718 F.2d at 47; *see also United States v. Lopac*, 411 F. Supp. 2d 350, 360 (S.D.N.Y. 2006) ("[I]f there is no reason to believe that "'the defect in the evidence might be supplied on another trial,'" acquittal may be a more appropriate judgment." (quoting *United States v. Steinberg,* 525 F.2d 1126, 1134 (2d Cir. 1975) (Friendly, J., concurring and dissenting))).

## IV.    THE GOVERNMENT FAILED TO PROVE THE SINGLE CONSPIRACY IT ALLEGED BEYOND A REASONABLE DOUBT.

The government's failure to adduce any evidence of the conspiracy it actually charged is an independent grounds for acquittal in this case.   Instead of proving a single conspiracy involving Mr. Valle, Michael Vanhise, Aly Khan, and Moody Blues, the government at most introduced evidence suggesting the possible existence of three distinct conspiracies:

(1) Mr. Valle and Mr. Vanhise; (2) Mr. Valle and Aly Khan; and (3) Mr. Valle and Moody Blues. This error was highly prejudicial and requires an acquittal.

**A.      The Government Proved, at Most, Multiple, Independent Conspiracies.**

"To determine if the evidence supports finding a single conspiracy (that is to say, a single general agreement), courts have looked for (1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants."   *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999).   Here, Mr. Valle was allegedly a member of all the purported conspiracies.

But "the participation of a single common actor in what are allegedly two [or three] sets of conspiratorial activities does not establish the existence of a single conspiracy."   *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006) (internal quotation marks omitted) (quoting *United States v. Korfant*, 771 F.2d 660, 663 (2d Cir. 1985)).   Indeed, even "'overlap with respect to *a number of characteristics*, including time frame, geographic locale, participants, and criminal objective' does not necessarily mean that there was but a single conspiracy."   *Id.* (emphasis added) (quoting *United States v. Macchia*, 35 F.3d 662, 668 (2d Cir. 1994)).

Rather, the "common goal" and "interdependence" are crucial elements of proving a single conspiracy.   *Acosta-Gallardo*, 656 F.3d at 1123 ("To prove a conspiracy, the government must show that . . . the alleged coconspirators were interdependent."); *United States v. Swafford*, 512 F.3d 833, 842 (6th Cir. 2008) ("[A] common goal . . . [is] a necessary element of a single conspiracy . . . .").   "[U]nlike the wheel conspiracy" alleged in this case, in a "typical 'chain' conspiracy case," a common goal and interdependence can be inferred from the nature of the organization.   *United States v. Rosnow*, 977 F.2d 399, 406 (8th Cir. 1992).   For example, in a drug organization, the drug manufacturer sells to a supplier, who sells to various distributors, who sell to (and may provide security for) retail-level dealers.   *Id.*   Each link in this chain depends on all of the other links to accomplish the common goal of the organization—namely, earning

-58-

financial profits from the sale of drugs.   *Id.*; *United States v. Bertolotti*, 529 F.2d 149, 154-55 (2d Cir. 1975).

But where the criminal object does not by its nature require a large-scale, "albeit illegal, business venture[]," *id.*, "one cannot infer an illegal common purpose" from the nature of the activity itself; instead, "interdependence must be proved more precisely."   *United States v. Carnagie*, 533 F.3d 1231, 1239 (10th Cir. 2008).   "*Each* individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key."   *Portela*, 167 F.3d at 695-96 (emphasis added).   With one central hub (Mr. Valle) connected to a number of different spokes (Mr. Vanhise, Moody Blues, and Aly Khan), there must be "some interaction between those conspirators who form the spokes of the wheel as to at least one common illegal object."   Otherwise, "the 'wheel' is incomplete, and two [or more] conspiracies rather than one are charged."   *Rosnow*, 977 F.2d at 405.

The basic flaw in the government's alleged single conspiracy is that no evidence suggested that the people constituting the purported "spokes" believed that the success of their respective ventures depended on the other spokes, or that they were all united by a "common goal."   Here, Mr. Valle purportedly agreed to kidnap "Alisa" or "Veronica," in exchange for a fee, so that those women could serve as Mr. Vanhise's "sex slave."   (GX 430 (Jan. 27, 2012, 1:38 p.m., 1:40 p.m.).)   By contrast, Aly Khan never agreed to kidnap a woman in the United States because he regarded it as too risky.   (GX 426 (May 1, 2012, 06:17:46).)   Mhal52 and Aly Khan talked about kidnapping "Kathleen" in India for a bit, but after that, they chatted about plots each would carry out on his own (*i.e.*, Aly Khan slaughtering his girlfriend in India, mhal52 kidnapping "Andria" in the United States).   Mhal52 and Moody Blues talked about a number of different women in a preliminary way—"Kimberly," a Kenyan woman, "Kristen," an Asian-American

-59-

consensual slave, "Andria," and others—but these scattershot discussions disclose little or no meaningful evidence of an agreement to work together.

But even if these individual discussions amounted to conspiracies, there is no evidence that the plots with one "spoke" depend on another "spoke" to succeed.   Vanhise could keep Alisa and Veronica as sex slaves, whether or not Kathleen is kidnapped in India, and vice versa.   Moody Blues could prepare his "recipes" for women in England, or help mhal52 kidnap "Kimberly," regardless of what happens with the other spokes.   The success of one of these plots does not advance the others.   There is no interdependence.

And there is no evidence that the spokes *believed* their activities were interdependent with those of other spokes.   "[S]tate of mind . . . is key."   *Portela*, 167 F.3d at 695.   Here, the spokes "did not care about the success of the other [spokes], and for the most part they did not assist the other [spokes]."   *Rosnow*, 977 F.2d at 406.   Even if the spokes had some indication that mhal52 was involved in other kidnappings, "the evidence suggested that the [spokes] were indifferent to [the hub's other] operations, and therefore it was *not* reasonable to conclude that the [spokes] agreed to join" in those other kidnappings.   *United States v. Dellosantos*, 649 F.3d 109, 122 (1st Cir. 2011) (emphasis in original).[10]

---

[10]   There was no evidence that Vanhise or Moody Blues even knew any other spokes.   And Aly Khan was told that mhal52 was going to work with someone else only after Aly Khan and mhal52 had abandoned whatever plans they ever had of working together.   (GX 429 (July 17, 2012, 08:21:03).)   But even with respect to Aly Khan, knowledge of the existence of others is insufficient absent evidence of interdependence and a common goal. *See Dellosantos*, 649 F.3d at 122 (coconspirators not necessarily part of hub's related conspiracies "even if the [coconspirators] had knowledge of the same"); *Rosnow*, 977 F.2d at 405-06 ("[M]ere knowledge of another similarly motivated conspiracy or an overlap in personnel do [sic] not prove one overall agreement." (internal quotation marks omitted) (quoting *United States v. Snider,* 720 F.2d 985, 988 (8th Cir. 1983))); *United States v. Durades*, 607 F.2d 818, 819-20 (9th Cir. 1979) (no single conspiracy even though spoke
*(footnote continued)*

For the same reason, the government did not show a common goal.   "What is required is a *shared,* single criminal objective, not just similar or parallel objectives between similarly situated people."   *Carnagie*, 533 F.3d at 1239 (emphasis in original).   The indictment does not identify any such goal.   The members of this purported conspiracy are not unified by a profit motive; mhal52 is the only one supposedly motivated by money.   Moreover, to the extent that the "spokes" agree to any kidnapping, the identity of the women appears to be quite material to them; each spoke has very specific women that they find attractive, and there is evidence that they reject women who do not satisfy their criteria.   (GX 432 (Feb. 28, 2012, 4:06 p.m.) (Vanhise rejecting one proposal).)   By and large, each "spoke" is interested in kidnapping a *different* woman, so there is no shared object.   *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004) (internal quotation marks omitted).

Even when the named woman is the same, the *date* of the kidnapping is different, and mhal52 never suggests to the "spokes" that a third person will be involved.   Thus, mhal52's chats do not contemplate any spokes working together.   And the "spokes" never "agree[] to participate in what [they] knew to be a collective venture."   *United States v. Adan*, No. 3:10-cr-00260, 2012 WL 6623079, at *20 (M.D. Tenn. Dec. 19, 2012) (internal quotation marks omitted) (quoting *United States v. Warner,* 690 F.2d 545, 549 (6th Cir. 1982)) ("[E]vidence of a willing agreement to engage in isolated conduct or transaction is not evidence of a larger agreement to join a large *enterprise* of sex trafficking, as in a drug distribution conspiracy, with operators at different levels." (emphasis added)).

---

(*continued from previous page*)
"knew that [the hub] was a dealer in large quantities of narcotics before [the two] entered into an agreement").

The mere fact that these four "engaged in similar acts for similar reasons" does not tie them into one conspiracy. *Rosnow*, 977 F.2d at 406; *see also United States v. Johansen*, 56 F.3d 347, 351 (2d Cir. 1995). The government has simply "confuse[d] the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character." *Kotteakos v. United States,* 328 U.S. 750, 769 (1946). Even if "each of these alleged spoke conspiracies had the same goal, there was no evidence that this was a *common* goal." *Chandler*, 388 F.3d at 811 (emphasis in oirignal). That is fatal to the government's claim of a single conspiracy.

**B.   The Agglomeration of Three Conspiracies Into One Was Prejudicial.**

The government's failure to prove the single conspiracy alleged was an error, and in this case, the error was highly prejudicial. Of course, merely technical errors do not require acquittal or a new trial. "The federal 'harmless-error' statute, now codified at 28 U.S.C. § 2111, tells courts to review cases for errors of law 'without regard to errors' that do not affect the parties' 'substantial rights.' That language seeks to prevent appellate courts from becoming 'impregnable citadels of technicality.'" *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (quoting *Kotteakos*, 328 U.S. at 759). But this statute does "not make irrelevant the fact that a person is on trial for his life or his liberty," and Congress wants courts to guard against "too easy relaxation of historic securities thrown around the citizen charged with crime." *Kotteakos*, 328 U.S. at 762-63. Accordingly, an error is harmless only if the Court "is sure that the error did not influence the jury, or had but very slight effect." *Id.* at 764. "[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Id.* at 765 (reversing due to multiple conspiracy error).

-62-

For several reasons, there is no assurance here that the verdict was not substantially influenced by the government's erroneous agglomeration of three conspiracies into one.

### 1.    The Error Misled the Jury into Aggregating Evidence.

The erroneous agglomeration invited the jury to aggregate the evidence.   This error permeated the trial.   It misled the jury into focusing on whether the evidence suggested that Mr. Valle might kidnap someone at some point—instead of considering whether the evidence proved beyond a reasonable doubt that Mr. Valle actually agreed with *these* men to kidnap women. The jury was invited, effectively, to add the evidence together to create a sum greater than the component parts.   *See Swafford*, 512 F.3d at 841-44; *Brooks v. United States*, 164 F.2d 142, 143 (5th Cir. 1947).

*Swafford* illustrates how this kind of aggregation can result in prejudice from a multiple conspiracy error, even when there is no risk of guilt transference among defendants tried together.   The defendant in *Swafford* allegedly conspired to aid and abet the manufacture of methamphetamine, by selling large quantities of iodine to numerous methamphetamine "cooks." 512 F.3d at 838, 841.   The court concluded that there was no single conspiracy, because "[t]he government failed to prove that the methamphetamine cooks [the customers] were acting in furtherance of a common goal or that there was any significant interdependence among them." *Id.* at 842.   The Sixth Circuit also found prejudice because the government's theory invited the jury to aggregate weak evidence:

> Here, the variance created the following problem: instead of having to prove each of the multiple conspiracies, which was necessary due to the failure to demonstrate a single conspiracy, the government offered evidence only as to the alleged single criminal enterprise.   Consequently, the jury could simply seize upon the most significant iodine sales and the most suspicious behavior exhibited by Swafford and then apply that evidence against the defendant vis-à-vis each of the alleged co-conspirators.   This distributive application of evidence diminishes the level of proof necessary for convictions based on the multiple conspiracy

> theory proven at trial.   Under such circumstances, it is impossible to say that the
> variance did not affect the outcome of the trial.

*Id.* at 843.   The Sixth Circuit also held that a defendant can suffer prejudice from aggregation

even where the multiple coconspirators are not joined as codefendants at trial.   *Id.* at 843 n.4.

       The same prejudice exists here.   The evidence of each individual conspiracy was

weak, and the jury might not have found that any individual conspiracies satisfied all required

elements.   There was very little evidence to support specific intent with Vanhise, for example; no

meaningful real-world acts with Aly Khan; and numerous indications that any mhal52

"agreement" with Moody Blues was only a fantasy role-play.   But when the three are combined

into one, the jury might believe there is enough to show that Mr. Valle intended to kidnap *someone*

at some point, and that one of the three coconspirators is probably real (even if the jury was not

convinced beyond a reasonable doubt as to any one of the three in particular).

       This approach also allows the jury to mix and match elements.   For example, as

the case went to the jury, the jury might have found that Mr. Valle "agreed" with Mr. Vanhise; that

Mr. Valle conducted an overt act in Queens related to women he had discussed with Aly Khan; and

that venue was proper here because of an act relating to Moody Blues.   *Cf. United States v.

Coward*, 630 F.2d 229, 231 (4th Cir. 1980) (juror confusion about the relationship of the evidence

to particular coconspirators amounts to "actual prejudice" warranting reversal).

       Indeed, the prejudice problem is particularly acute in light of the potential for

internal disagreement among jurors where the evidence of the individual conspiracies is weak.   In

this case, for example, four jurors might have thought the Vanhise conspiracy was real; four others

might have thought Aly Khan was real; and yet another four might have thought Moody Blues was

real.   On a proper indictment, the jury as a whole would be undecided—and further deliberations

could well have caused the jury to decide unanimously that reasonable doubts existed as to all

three.    But "the conglomeration of distinct and separate offenses," *Kotteakos*, 328 U.S. at 775,

allowed the jury to convict on the aggregated conspiracy—even though a solid majority of the jury

could have thought Mr. Valle not guilty of each of the properly charged counts.    In that sense, the

error deprived Mr. Valle of his constitutional right in federal court to a unanimous jury.

The error was thus highly prejudicial.    Courts have sometimes found no prejudice

from multiple-conspiracy errors in a single-defendant trial, because in a single-defendant trial,

there is little risk of "guilt transference" prejudice (being convicted based on crimes committed by

others).    But the Second Circuit considers each "claim of prejudice" separately.    *United States v.*

*Miley*, 513 F.2d 1191, 1209 (2d Cir. 1975).    And the claim here is not based on "guilt

transference."    (*Swafford* recognized "guilt transference" prejudice was not applicable.    512 F.3d

at 842.)    Rather, when evidence of individual conspiracies is not overwhelming, the defendant

faces a different kind of prejudice.    *Cf. Rosnow*, 977 F.2d at 408 (finding prejudice from a

multiple conspiracy error because, *inter alia*, there was not "overwhelming evidence of guilt").

Here, the government's error invited the jury to aggregate weak evidence, thereby diluting the

burden of proof; it allowed mixing-and-matching of elements from different conspiracies; and it

allowed less than a unanimous verdict by permitting the aggregation of juror votes on separate

crimes.    As the Supreme Court has made clear, the prejudice inquiry is case-specific, and reversal

appropriate in one case might not be appropriate in another, even where "the errors in variance and

instructions were identical in character."    *Kotteakos*, 328 U.S. at 766.    Here, the fact that there

was so little evidence of real-world acts created a real possibility that the jury might acquit as to

one or all of the conspiracies viewed individually, and the aggregation easily could have

substantially influenced the result.    That requires acquittal on the conspiracy as charged.

### 2.    The Prosecution Included at Least One Conspiracy in the Wrong District.

The mixing-and-matching problem is particularly prejudicial to Mr. Valle's Sixth Amendment right to trial in the district where the crime took place.   As discussed earlier, the government failed to prove any overt acts in this District at all, which requires an acquittal due to improper venue.   (*See supra* Parts II.A.2, II.B.6, II.C.2.)   But even if the government proved one or more, the evidence of acts in this District was not so overwhelming that the jury necessarily would have found overt acts in this District for all three conspiracies.   For example, there were seemingly no overt acts in this District within the scope of the Aly Khan conspiracy.   But as the government presented its case to the jury, the jury could have convicted based on an agreement as to the Aly Khan conspiracy, and premised venue on an overt act by Mr. Valle relating to another conspiracy.   The same is true of the Vanhise and Moody Blues; there can be no assurance that the jury premised venue on the same conspiracy as the one that it used as the basis for criminal liability.

"Proper venue is not a mere technicality."   *United States v. Lukashov*, 694 F.3d 1107, 1119 (9th Cir. 2012).   "[Q]uestions of venue in criminal cases are of constitutional concern" because of the defendant's "constitutional right to be tried in a district where the crime was committed."   *Lukashov*, 694 F.3d at 1119; *United States v. Candella*, 487 F.2d 1223, 1227-28 (2d Cir. 1973).   Accordingly, as numerous courts have recognized, where the improper agglomeration of multiple conspiracies causes the defendant to stand trial in a district where venue might have been improper under a correct indictment of the underlying conspiracies, an acquittal is required.   *United States v. Glenn*, 828 F.2d 855, 860 (1st Cir. 1987) ("Under a proper indictment, the government could not have established venue in Rhode Island for Glenn's trial.   We therefore reverse Glenn's convictions." (citation omitted)); *Durades*, 607 F.2d at 819-20.

3.     **The Error Allowed the Introduction of Inflammatory and Irrelevant Evidence Concerning Other Conspiracies.**

The agglomeration was also prejudicial because it resulted in the introduction of prejudicial and inflammatory evidence that would have been inadmissible on a properly charged indictment.   For this purpose, the Court considers what evidence would have been admissible if only one of the conspiracies was included in the indictment.   *See United States v. Russano*, 257 F.2d 712 (2d Cir. 1958).   In *Russano*, the government introduced evidence as to two conspiracies but failed to connect them.   The Second Circuit found prejudice because if the defendants had been tried only for the first conspiracy, "the admission of evidence relating to the later conspiracy . . . would have constituted prejudicial error."   *Id.* at 715.   Likewise, if the defendant had been tried only for the second, "evidence of earlier illegal acts would have been seriously prejudicial." *Id.* (reversing conviction); *see also United States v. Bibby*, 752 F.2d 1116, 1124 (6th Cir. 1985) (reversing because "[a] substantial amount of evidence was introduced at trial . . . that would not have been admissible in a separate trial").

The prejudice is greater here because each chat is prejudicial and inflammatory in a different way.   Some members of the jury might be able to get over the disgusting talk of "slaughter" or treating women like "goats" that pervades the Aly Khan conversations; but Moody Blues's recipes, or Vanhise's idea that women could be kept as sex slaves to be bought and sold like chattel, may shock those jurors and make it difficult for them to consider the evidence dispassionately.   On the other hand, some jurors may see the macabre humor in Moody Blues's discussion of gourmet ingredients and recipes—but those jurors could find the violence in Aly Khan's chats off-putting and horrific.   Putting all three of these together results in substantially more prejudicial evidence—and substantially heightens the risk that the jury will ultimately convict because of the inflammatory nature of the evidence, rather than real proof beyond a

reasonable doubt.   *See Snider*, 720 F.2d at 990 ("In view of the inflammatory nature of Austin's testimony . . . we hold this variance between the indictment and the proof at trial substantially prejudiced the appellants right to a fair trial . . . ."); *United States v. Jackson*, 696 F.2d 578, 587 (8th Cir. 1982) (danger of prejudice "heightened by the inflammatory nature of much of the evidence presented").

**CONCLUSION**

For the foregoing reasons, the Court should enter a judgment of acquittal on count one of the indictment.


Dated: New York, New York
       June 17, 2013

                              Respectfully submitted,

                              David Patton
                              Federal Defenders of New York


                     By:     /s/ Julia Gatto
                             Julia Gatto
                             52 Duane Street, 10th Floor
                             New York, New York 10007
                             *Attorney for Defendant Gilberto Valle*


*Of Counsel*:
Julia Gatto
Robert Baum
Edward S. Zas
John J. Hughes, III
James A. Cohen