UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA,        :

     - v -                    :       **12 Cr. 847 (PGG)**

**GILBERTO VALLE,**             :

                    Defendant.    :

--------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANT GILBERTO VALLE'S MOTION FOR A NEW TRIAL</u>

 

DAVID E. PATTON, ESQ.
Federal Defenders of New York, Inc.
Attorney for Defendant
 GILBERTO VALLE
52 Duane Street - 10th Floor
New York, New York 10007

JULIA GATTO
ROBERT BAUM
EDWARD S. ZAS
JOHN J. HUGHES, III
JAMES A. COHEN,
*Of Counsel*

TO:   PREET BHARARA, ESQ.
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007
      Attn.:  **HADASSA WAXMAN, ESQ.**
           Assistant United States Attorney

## TABLE OF CONTENTS

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

The Court should grant a new trial to avert a miscarriage of justice. . . . . . . . . . . . . . . . 4

1. The Court has broad discretion to grant a new trial. . . . . . . . . . . . . . . . . . . . . . . . . 4

2. The Court should grant a new trial because the weight of the evidence supports Mr.
   Valle's innocence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

3. The Court should grant a new trial because the government's summations were
   highly improper and prejudicial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   A. The government's summations were highly improper. . . . . . . . . . . . . . . . . . . . . 9

      (1) *The government improperly argued that the jury should convict
          the defendant because his fantasies are frightening and not "OK."* . . . . . . . . 9

      (2) *The government improperly maligned defense counsel and falsely
          accused her of arguing that Valle's fantasies are not disturbing, when that
          issue was not relevant.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      (3) *The prosecutor offered unsupported or false assertions, improperly
          appealed to "common sense" in lieu of evidence, and acted as a de facto
          expert on sexual fantasy, crime, and violence.* . . . . . . . . . . . . . . . . . . . . . . . 15

      (4) *The government improperly scared the jury.* . . . . . . . . . . . . . . . . . . . . . . . 21

      (5) *The government improperly invited jurors to convict based on positive
          views of law enforcement, irrelevant personal feelings, and the need to
          prevent future crimes.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      (6) *The government employed improper analogies, "golden rule"
          arguments, and other emotional appeals* . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      (7) *The government improperly commented on Mr. Valle's failure to
          testify.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*(8) The government improperly alluded to defense counsel's subjective belief about the defendant's supposed guilt.* . . . . . . . . . . . . . . . . . . . . . . . . . 37

*(9) The government engaged in additional misconduct.* . . . . . . . . . . . . . . . . . 39

    *(a) The government improperly asked the jury to convict based on Valle's character.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    *(b) The government improperly invoked Ms. Mangan's subjective reaction and opinions.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    *(c) The government improperly urged the jury to convict Mr. Valle because he had supposedly put women in "grave danger"* . . . . . . . . 42

B. The cumulative effect of the improper summations was to deny Mr. Valle a fair trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*(1) The misconduct was severe.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*(2) No special measures cured the misconduct.* . . . . . . . . . . . . . . . . . . . . . . 45

*(3) The improper arguments likely affected the jury.* . . . . . . . . . . . . . . . . . . . 45

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## TABLE OF AUTHORITIES

<u>**CASES**</u>

*Berger v. United States,*
  295 U.S. 78 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Brodie v. United States,*
  295 F.2d 157 (D.C. Cir. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Buttrum v. Black,*
  721 F. Supp. 1268 (N.D. Ga. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Cargle v. Mullin,*
  317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*City of Cleveland v. Egeland,*
  497 N.E.2d 1383 (Ohio 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Cox v. Herbert,*
  420 F. Supp. 2d 144 (W.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Floyd v. Meachum,*
  907 F.2d 347 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 36, 44, 45, 46

*Greenberg v. United States,*
  280 F.2d 472 (1st Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Griffin v. California,*
  380 U.S. 609 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Harrison v. United States,*
  7 F.2d 259 (2d Cir. 1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Henry v. Scully,*
  918 F. Supp. 693 (S.D.N.Y. 1995) aff'd, 78 F.3d 51 (2d Cir. 1996) . . . . . . . . . . . 18

*Hodge v. Hurley,*
  426 F.3d 368 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 40

*Homan v. United States,*
  279 F.2d 767 (8th Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Jacobson v. United States,*
  503 U.S. 520 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*King v. United States,*
   372 F.2d 383 (D.C. Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Paris Adult Theatre I v. Slaton,*
   413 U.S. 49 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Powell v. State of Tex.,*
   392 U.S. 514 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Runnels v. Hess,*
   653 F.2d 1359 (10th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Stanley v. Georgia,*
   394 U.S. 557 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*State v. Stewart,*
   933 P.2d 1085 (Mont. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*U. S. ex rel. Leak v. Follette,*
   418 F.2d 1266 (2d Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States ex rel. D'Ambrosio v. Fay,*
   349 F.2d 957 (2d Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Alfonso-Perez,*
   535 F.2d 1362  (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Allen,*
   488 F.3d 1244 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Autuori,*
   212 F.3d 105 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Ayala-Garcia, 574 F.3d 5*
   (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*United States v. Bradley,*
   5 F.3d 1317 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Briggs,*
   457 F.2d 908 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Brodie,*
   268 F. Supp. 2d 420 (E.D. Pa. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Burden*,
   600 F.3d 204 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Burse*,
   531 F.2d 1151 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Caro*,
   597 F.3d 608 (4th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Carter*,
   410 F.3d 1017 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Colon-Munoz*,
   318 F.3d 348 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Cox*,
   752 F.2d 741 (1st Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Cruz*,
   797 F.2d 90 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Curtin*,
   489 F.3d 935 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. D'Anna*,
   450 F.2d 1201 (2d Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Durham*,
   211 F.3d 437 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Elias*,
   285 F.3d 183 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Ferguson*,
   246 F.3d 129 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*United States v. Ferguson*,
   49 F. Supp. 2d 321 (S.D.N.Y. 1999), aff'd, 246 F.3d 129 (2d Cir. 2001) . . . 4, 5, 6, 8

*United States v. Friedman*,
   909 F.2d 705 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 44, 45, 46

*United States v. Fullmer*,
   457 F.2d 447 (7th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Grunberger,*
    431 F.2d 1062 (2d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Guang,*
    511 F.3d 110 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Henry,*
    545 F.3d 367 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 32

*United States v. Hunt,*
    412 F. Supp. 2d 1277 (M.D. Ga. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Kirkland,*
    637 F.2d 654 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Linares,*
    367 F.3d 941 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Lincoln,*
    630 F.2d 1313 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Locascio,*
    6 F.3d 924 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Lyman,*
    592 F.2d 496 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Maddox,*
    156 F.3d 1280 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*United States v. Mandelbaum,*
    803 F.2d 42 (1st Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Modica,*
    663 F.2d 1173 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*United States v. Monaghan,*
    741 F.2d 1434 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Muzii,*
    676 F.2d 919 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Myers,*
    550 F.2d 1036 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Nobari*,
   574 F.3d 1065 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*United States v. Ong*,
   541 F.2d 331 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Parkes*,
   497 F.3d 220 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Resto*,
   824 F.2d 210 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Rich*,
   326 F. Supp. 2d 670 (E.D. Pa. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Richter*,
   826 F.2d 206 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Rivera*,
   971 F.2d 876 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Robinson*,
   303 F. Supp. 2d 231 (N.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

*United States v. Rodriguez*,
   581 F.3d 775 (8th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 33

*United States v. Sanchez*,
   659 F.3d 1252 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*United States v. Sanchez*,
   969 F.2d 1409 (2d Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

*United States v. Schartner*,
   426 F.2d 470 (3d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 39

*United States v. Scheetz*,
   293 F.3d 175 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Schneider*,
   157 F. Supp. 2d 1044 (N.D. Iowa 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Scott*,
   677 F.3d 72 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Scroggins,*
379 F.3d 233 (5th Cir. 2004),  vacated on other grounds and remanded,
543 U.S 1112 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Sepulveda,*
15 F.3d 1161 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Shareef,*
190 F.3d 71 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Simon,*
964 F.2d 1082 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Stinson,*
473 F. App'x 62 (2d Cir. 2012), cert. denied, 133 S. Ct. 1607 (2013) . . . . . . . . . 33

*United States v. Teslim,*
869 F.2d 316 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Thai,*
29 F.3d 785 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Universita,*
298 F.2d 365 (2d Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Verduzco,*
373 F.3d 1022 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Vicaria,*
12 F.3d 195 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Washington,*
263 F. Supp. 2d 413 (D. Conn. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

*United States v. Weatherspoon,*
410 F.3d 1142 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Wright,*
625 F.3d 583 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 39

*Viereck v. United States,*
318 U.S. 236 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Weaver v. Bowersox,*
  438 F.3d 832 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## STATUTES AND OTHER AUTHORITIES

Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(B) . . . . . . . . . . . . . . . . . .  2

Fed. R. Crim. P. 33(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 17

Fed. R. Crim. P. 33(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. Crim. P. 33(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3 Charles A. Wright et al., Fed. Prac. & Proc. § 551 (3d ed. 2004) . . . . . . . . . . . . .  5

*Minority Report* (Twentieth Century Fox and Dreamworks Pictures 2002)  . . . . . . 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA      :

       - v -           :           **12 Cr. 847 (PGG)**

**GILBERTO VALLE,**      :

           Defendant.    :

-------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT GILBERTO VALLE'S MOTION FOR A NEW TRIAL

### Preliminary Statement

Gilberto Valle is innocent. He is "guilty" only of having deviant, sexually sadistic fantasies and sharing them with like-minded strangers through a "dark fetish" fantasy website, without telling his wife. And he engaged in this activity while he was a New York City police officer.

None of this is a crime. On the contrary, the Constitution grants every citizen, even police officers, the right to fantasize about whatever and whomever they like, free from government interference. And this country does not convict people based on the government's view that their fantasies are bad, or its speculation that someday a person might act on his fantasies and commit a crime.

Mr. Valle's conviction, if allowed to stand, threatens these fundamental principles. No evidence showed—the government did not even allege—that Valle acted on his fantasies by kidnapping anyone, attempting to kidnap anyone, threatening to kidnap anyone, or gathering any equipment to kidnap anyone. Given this lack of evidence, the government decided to charge

1

Valle only with the inchoate crime of conspiracy, "that darling of the modern prosecutor's nursery." *Harrison v. United States*, 7 F.2d 259, 263 (2d Cir. 1925) (L. Hand, J.).[1]

But the government failed to adduce any persuasive evidence to support even that elastic charge. No reliable evidence showed that Valle ever agreed with another person to kidnap any of the women he fantasized about. As a result, as shown in the accompanying Rule 29 papers on Count One, no rational jury could find guilt beyond a reasonable doubt. But even if the evidence were sufficient in the abstract to support the jury's verdict, the weight of the evidence supports Valle's innocence. For that reason, the Court should grant a new trial.

A new trial is warranted for a second reason as well. The government, unable to point to any real evidence of a conspiracy, secured a conviction by engaging in unfair arguments in its summations, particularly its rebuttal summation. Though this Court admonished the parties and the jury before trial began that this case should not become a referendum on the morality of Mr. Valle's thoughts, the prosecution made it just that. It expressly invited the jury to convict based on the government's repeated insistence that Mr. Valle's fantasies are not "ok," (Trial Transcript ("Tr.") 1581:19-20), that his pornography is "not normal" (Tr. 1596:15), that the jury could not allow him to continue walking the streets of New York as a police officer "with a loaded weapon" (Tr. 1578:8-11), and that he is simply a "sick" man who will victimize a woman at any moment if given the chance. Tr. 1613:1-7. These arguments are not only improper and inflammatory; they are unconstitutional.

---

[1] The government also charged Mr. Valle with a substantive misdemeanor count of violating the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(B), by allegedly using his police computer to access a federal law enforcement database without authorization. As demonstrated in the accompanying Memorandum of Law in Support of a Judgment of Acquittal on Count Two, Mr. Valle is not guilty of that charge as a matter of law.

The government went on to stir the jurors' passions and fears in many other ways, asking them, for example, to convict based on who Valle "really is" (Tr. 1608:10-11) and how they would "feel" if he were to act on his fantasies. Tr. 1607:15-17. The government also employed a host of improper, graphically violent analogies that had nothing to do with this case, placed the jurors in the shoes of potential crime victims, played to jury emotions, and improperly shifted or diluted the government's burden of proof. The government also made assertions about the nature of sexual fantasy and its supposed relationship to criminal behavior that find no support in the record and, indeed, contradict the existing body of medical and scientific knowledge. The government even commented on Mr. Valle's failure to testify, in violation of the Fifth Amendment, by arguing that he had not explained his conduct and that the jury had "heard nothing" from him. Tr. 1605:5-10.

The government's arguments to the jury are particularly troubling because they took unfair advantage of the risks inherent in this sensational, high-profile prosecution, risks that this Court recognized early on and tried to minimize. For example, the Court used an extensive *voir dire* questionnaire to weed out potential jurors who might decide this case based on fear and disgust. But the government's closing arguments exploited these risks, playing on the jurors' very natural revulsion and, more importantly, their very human fear that, if they didn't convict Valle now, someone with such a deviant imagination could potentially harm someone in the future. The government's arguments, having led the jury away from its sworn duty to decide this case based solely on whether evidence of the charged crimes had proven guilt beyond a reasonable doubt, resulted in a verdict in which the Court can place no confidence.

In short, given the overall weakness of the evidence, and the seriousness of the

government's errors in summation, this Court should exercise its broad discretion under Rule 33 to grant Mr. Valle a new trial. The risk that an innocent man sits in prison—based simply on his lurid fantasy chats—is too great to allow the conviction to stand.

### Argument

**The Court should grant a new trial to avert a miscarriage of justice.**

**1. The Court has broad discretion to grant a new trial.**

Rule 33(a) of the Federal Rules of Criminal Procedure grants the Court "'broad discretion ... to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)).[2] "The test is whether 'it would be a manifest injustice to let the guilty verdict stand.'" *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007) (quoting *Sanchez*, 969 F.2d at 1414). A new trial is proper if there is "'a real concern that an innocent person may have been convicted.'" *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quoting *Ferguson*, 246 F.3d at 134). "'Innocent,' of course, must mean innocent of the *crime charged*[.]" *United States v. Ferguson*, 49 F. Supp. 2d 321, 324 n.3 (S.D.N.Y. 1999) (emphasis in original) (citing *United States v. Thai*, 29 F.3d 785, 818-19 (2d Cir. 1994) (though defendant had conspired to bomb a restaurant, he was not guilty of doing so in aid of racketeering because there was a failure of proof of the motivation element)), *aff'd*, 246 F.3d 129 (2d Cir. 2001).

Under Rule 33, the Court need not view the evidence in the light most favorable to the

---

[2] Rule 33(a) provides that a trial court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

government; rather, it may "weigh the evidence and in so doing evaluate for itself the credibility

of the witnesses." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir.1992) (internal

quotation marks omitted). The Court also may hold an evidentiary hearing to resolve factual

disputes. *See, e.g., United States v. Colon-Munoz*, 318 F.3d 348, 358 (1st Cir. 2003).

      The Court may not "'wholly usurp' the role of the jury," *United States v. Ferguson*, 246

F.3d 129, 133 (2d Cir. 2001) (quoting *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir.

2000)), but must exercise its Rule 33 authority 'sparingly' and in 'the most extraordinary

circumstances.'" *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414). Nevertheless,

the Court has wide discretion to order a new trial. *See, e.g.*, *Ferguson*, 246 F.3d at 133. And the

Court may grant a new trial even if it does not find that a specific legal error occurred at trial.

*See United States v. Scroggins*, 379 F.3d 233, 239, 253, 255-56 (5th Cir. 2004) (quoting 3

Charles Alan Wright et al., *Fed. Prac. & Proc.* § 551 (3d ed. 2004)), *vacated on other grounds

and remanded*, 543 U.S 1112 (2005); *United States v. Vicaria*, 12 F.3d 195, 198-99 (11th Cir.

1994).

      Courts have ordered new trials under Rule 33(a) when, for example: (1) the verdict was

against the weight of the evidence, *see, e.g., United States v. Robinson*, 303 F. Supp. 2d 231, 233

(N.D.N.Y. 2004); *United States v. Ferguson*, 49 F. Supp. 2d 321, 328-29 (S.D.N.Y. 1999), *aff'd*,

246 F.3d 129 (2d Cir. 2001), or (2) prosecutors made improper arguments during summation,

*see, e.g., United States v. Rich*, 326 F. Supp. 2d 670, 680-82 (E.D. Pa. 2004); *United States v.

Brodie*, 268 F. Supp. 2d 420, 425-35 (E.D. Pa. 2003); *United States v. Washington*, 263 F. Supp.

2d 413, 431-40 (D. Conn. 2003); *United States v. Schneider*, 157 F. Supp. 2d 1044, 1064-65

(N.D. Iowa 2001). As we now show, both of these grounds are present here. Accordingly, given

the real concern that Mr. Valle is innocent, the Court should set aside the jury's verdict and, if it does not enter a judgment of acquittal, should order a new trial.

**2. The Court should grant a new trial because the weight of the evidence supports Mr. Valle's innocence.**

The Court should grant a new trial because, even if the evidence were sufficient under Rule 29, "'the evidence preponderates sufficiently heavily against the verdict [such] that a serious miscarriage of justice may have occurred.'" *United States v. Ferguson*, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999) (citing *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

The trial evidence is described in detail in Mr. Valle's Memorandum of Law in Support of His Motion for a Judgment of Acquittal on Count One ("Rule 29 Memorandum"). In brief summary, the case against Valle turned largely, if not entirely, on the interpretation of his e-mails and chats with three strangers over the internet, people he knew only by their screen names or e-mail addresses. He never met or arranged to meet these individuals, two of whom live overseas.

The government was required to prove beyond a reasonable doubt, *inter alia*, that the communications produced a serious agreement to kidnap women. But, as discussed fully in the Rule 29 Memorandum, the overwhelming majority of Mr. Valle's communications over the internet were fantasy role-play, as the government's own witness, FBI Special Agent Walsh, admitted. And the government offered no reliable, convincing proof that the remaining communications were meaningfully different from the acknowledged fantasy chats, so as to support a conviction beyond a reasonable doubt.[3]

---

[3]As discussed in the Rule 29 Memorandum, no persuasive evidence demonstrates that
(continued...)

The evidence of Valle's innocence includes the following:

- Valle "met" his alleged co-conspirators through darkfetishnet.com (DFN), a self-described fantasy website (modeled after facebook.com) with thousands of members who explore and share their most deviant fetishes and fantasies, including fantasies about suffocating, kidnapping, and eating women.

- Valle's public profile on DFN announced to the world, including to his alleged co-conspirators, that he was an "aspiring professional kidnapper" in "fantasy only."

- Despite an alleged conspiracy lasting nearly a year, the "conspirators" never met, or spoke by telephone, or took any real-world steps to kidnap anyone.

- Numerous "kidnapping" dates came and went, with no action, no explanation, and no follow-up conversations about why nothing happened. Valle never complained that a "deal" was not consummated.

- Valle frequently gave imaginary and untrue information about his location, potential "victims," real estate, having a woman tied up in his basement,

---

[3](...continued)

Mr. Valle entered into a real agreement to kidnap, cook, and eat women. On the other hand, it is undisputed that he engaged in fantasy role-play scenarios in which he discussed various imaginary "plots" involving women "victims." These pretend "agreements" concerned plans to kidnap women he knew (including "agreements" that followed discussions of specific dates and "negotiation" of prices). While the government argued that Mr. Valle's conversations with Moody Blues, Ali Khan, and Michael Vanhise were materially different from the pretend "agreements," and constituted serious conspiratorial plots that the men actually intended to carry out (even though they never took steps to do so), the government presented no compelling evidence, such as expert testimony, to back up this assertion. As a consequence, there is a grave risk that the jury mistook Mr. Valle's fantasy internet chats for real plots to kidnap.

equipment, and other parts of        the pretend scenario.

- Valle never revealed detailed personal information about any woman, such as a real address or last name, that would permit another person to identify and locate the women whose photos he used.

- Valle never requested or received information revealing the address or phone number of any of his "co-conspirators" or other online correspondents.

- Despite his talk, Valle never acquired chloroform or its ingredients, a van, a human-sized platter, a human "pulley apparatus," a human-sized oven, a human-sized barbeque pit, or a human-sized spit.

- The proof of a kidnapping plot depended on the interpretation of the internet chats themselves, but it was undisputed that Valle's chats included many erotic fantasy role-play scenarios that involved fake plans to kidnap women. The government provided no reliable evidence that these acknowledged fantasy chats were materially different from the alleged "real" chats.

In summary, with almost no proof of any acts beyond outlandish chats in cyberspace, the weight of the evidence heavily supports the conclusion that *all* of Valle's chats were fantasy only, and that no true conspiracy ever existed.

Given the grave doubt that Mr. Valle is guilty of the charges, the Court should hold that the verdict is contrary to the weight of the evidence, and grant a new trial. *See, e.g., United States v. Robinson*, 303 F. Supp. 2d 231, 233-34 (N.D.N.Y. 2004) (adhering to earlier ruling granting a new trial because the evidence "was far too flimsy to support a conviction" and because of "the very real concern that an innocent person may have been convicted"); *United*

8

*States v. Ferguson*, 49 F. Supp. 2d 321, 329 (granting new trial because the evidence provided "too slender a reed to support a guilty verdict.").

**3. The Court should grant a new trial because the government's summations were highly improper and prejudicial.**

    **A. The government's summations were highly improper.**

    The Court should grant a new trial for a second reason as well. The government's summations, especially the rebuttal summation, were replete with improper arguments. Indeed, "[t]his is one of those rare cases where the improper comments in a prosecutor's summation were so numerous and, in combination, so prejudicial that a new trial is required." *Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir. 1990).

    The misconduct includes: (1) arguing, in violation of the Constitution, that the jury should convict Mr. Valle because his fantasies are frightening and not "ok;" (2) impugning defense counsel and accusing her falsely of defending the morality of Valle's fantasies; (3) making unproven (and, indeed, false) assertions about the nature of sexual fantasy, criminal behavior, and other subjects requiring specialized knowledge, under the guise of appeals to "common sense;" (4) appealing repeatedly to the jury's fears, passions, and prejudices, diverting the jury from the relevant factual and legal issues, and using improper, inflammatory and misleading analogies that diluted or shifted the burden of proof; (5) commenting on the defendant's failure to testify and impugning his character as a husband, father, and police officer; and (6) engaging in other forms of improper argument.

    ***(1) The government improperly argued that the jury should convict the defendant because his fantasies are frightening and not "OK."***

    The government began its rebuttal summation by arguing that the defense summation

was "remarkable, remarkable" because defense counsel was "trying to sell you" on "two broad

concepts that are in total conflict with your common sense:" (1) that it is acceptable for a police

officer to have deviant fantasies, and (2) that the jury should "not be bothered" by the fantasies.

Tr. 1577:25-1578:24. The prosecutor argued:

> First, since the beginning of this case—and it is clear now because of the summation, that from the beginning of this case until the end, right now, *defense counsel has been trying to sell you* on two broad concepts that are in total conflict with your common sense.
>
> *The first one is the idea that it is OK, a police officer, walking around New York City with a loaded weapon who on a daily basis is engaging in making detailed plans about the execution of actual women. That is one of the underlying themes of what we just heard, that that is just something that is OK.*
>
> The second broad theme that sort of underlies everything that Ms. Gatto is getting at is this idea that *you should somehow not be disturbed by the fact that this man, a police officer, walking around New York City every single day with a loaded weapon has a—*
>
> MS. GATTO: Objection.
>
> THE COURT: Overruled.
>
> MR. JACKSON: —primary sexual fantasy of seeing women mutilated and harmed in horrific ways, that this is the thing that turns Gil Valle on, *that you should somehow not be bothered by that.*

Tr. 1578:3-24 (emphasis added).[4]

---

[4] The defense objected to the rebuttal summation at several points. Tr. 1578:19; 1584:9; 1594:4; 1598:17. All the objections were overruled. The defense also moved for a mistrial after the rebuttal summation. Tr. 1621:7-10. Under these circumstances, the government's improper remarks are adequately preserved for review. *See United States v. Lyman*, 592 F.2d 496, 499 (9th Cir. 1978) (motion for mistrial following rebuttal argument in which objectionable remark was made "was sufficient to preserve the point for appeal") (citations and footnote omitted); *see also United States v. Ong*, 541 F.2d 331, 342 (2d Cir. 1976) (noting that counsel need not continue objecting before the jury after valid objections have been repeatedly overruled); *United States v. Briggs*, 457 F.2d 908, 911-12 (2d Cir. 1972) (recognizing that objections may be raised at the end of a summation that is "permeated with improprieties").

The prosecutor continued to hammer this theme: "And one of the underlying ideas of this entire [defense] summation is that [Valle's fantasy of imagining a woman on a platter about to be cooked] is something that you should not be disturbed by, that that is just something that you should whistle or pass [*sic*]." Tr. 1579:11-14. The prosecutor argued that Mr. Valle's fantasy was "an incredibly disturbing fact" that, in the context of "all the evidence," "points squarely at Mr. Valle's guilt." Tr. 1579:14-17.

Having argued that the defense was asking the jury not to "be bothered" by Mr. Valle's fantasies, the prosecutor then contended that those fantasies are "not OK" because they are not "positive" fantasies, such as romantic fantasies about "Mariah Carey," or tales about "pixie dust, fairies, and unicorns" that parents read to their children:

> [T]he word "fantasy" has been completely misused and corrupted here. There is a reason why the word "fantasy" gets sprinkled over and over and over again through every cross-examination. These are the fantasy chats, throughout the entire summation. This is fantasy. This is fantasy. It is because we think of fantasies, we normally have a positive idea. You think of Mariah Carey, or maybe you think about the stories that you told to your children—fairies, pixie dust, unicorns. That is not what we are talking about here.
>
> Gil Valle's fantasy is about seeing women executed. The fantasies that he is engaging in are about seeing women sexually assaulted, executed and left for dead. *That's not a fantasy that is OK.* It is a fantasy that gives you deep insight into what this man's motivations were. Once you have that insight, that's the lens through which you have to look at the evidence. That is the lens through which you have to look at his actions and his conversations that are the subject of this trial.

Tr. 1581:8-15 (emphasis added).

All of the above arguments were grossly improper in numerous respects:

*First*, the government's arguments improperly suggested that the jury needed to convict Mr. Valle to stop him from walking the streets with a loaded gun, because he might

decide to act on his fantasies someday. Under our criminal justice system, prosecutors may

not ask juries to convict people based on fear about what they might do in the future. As the

Tenth Circuit has noted, our society does not punish a person based on "the prospect that he

would commit ... crimes when he got the opportunity...." *United States v. Allen*, 488 F.3d

1244, 1260 (10th Cir. 2007). While it "may be tempting to depart from that principle when

the contemplated deeds are horrific beyond measure," courts must refrain from doing so. *Id*.

at 1260-61.[5]

    *Second*, by repeatedly arguing that the jury should convict Mr. Valle because his

fantasies are not "ok," the government violated the Constitution. Contrary to the

government's view, the Constitution grants every citizen, even police officers, the right to

fantasize about anything or anyone they like, and to share those fantasies with others. The

Supreme Court has explicitly stated that "a person's inclinations and 'fantasies ... are his own

and beyond the reach of the government.'" *Jacobson v. United States*, 503 U.S. 520, 551-52

(1992) (quoting *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67 (1973)); *see also United

States v. Curtin*, 489 F.3d 935, 960 (9th Cir. 2007) (*en banc*) (Kleinfeld, J., concurring)

("Fantasy is constitutionally protected."). "When a desire is inhibited it may find expression

in fantasy; but it would be absurd to condemn this natural psychological mechanism as

illegal.'" *Powell v. State of Tex.*, 392 U.S. 514, 543–44 (1968) (Black, J., concurring)

---

[5]The government's argument—that the jury should convict because Mr. Valle would "victimize a woman as soon as he has the opportunity" (Tr. 1613:6-7)—is reminiscent of the scenario from *Minority Report*, "a film that depicts a world in which would-be criminals are apprehended and punished for crimes they are predicted to commit, before they have a chance actually to commit them." *Allen*, 488 F.3d at 1260 & n.7 (citing *Minority Report* (Twentieth Century Fox and Dreamworks Pictures 2002)). Fortunately, the Constitution prohibits the government from using this preemptive approach, except in science fiction. *Id.*

(quoting Glanville Williams, *Criminal Law—the General Part 2* (1961)); *see also Stanley v. Georgia*, 394 U.S. 557, 566 (1969) ("Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds.").

The government's argument also implied, falsely, that having deviant sadistic fantasies is itself a crime, and that the jury should convict to express its condemnation of such fantasies and to prevent future societal harm. But the moral impropriety of Mr. Valle's fantasies was legally irrelevant and not for the jury to judge; it was highly improper for the prosecutor to suggest otherwise. *See United States v. Muzii*, 676 F.2d 919, 920 (2d Cir. 1982) ("The reach of the criminal law has long been limited by the principle that no one is punishable for his thoughts."). Regardless of how disturbing Valle's fantasies are, such thoughts are "beyond the reach of the government." *Jacobson*, 503 U.S. at 552.

### (2) The government improperly maligned defense counsel and falsely accused her of arguing that Valle's fantasies are not disturbing, when that issue was not relevant.

Further, in the rebuttal the government improperly contrasted its view—that Valle's fantasies are despicable—with the view it attributed to defense counsel: that his fantasies are just fine and that the jury should not "be bothered" by them. This contrast was false, of course, because defense counsel had never argued that Valle's fantasies are morally defensible. The prosecutor's argument to the contrary was therefore an improper attempt to turn the jury's emotions against the defense.

The initial insinuation that defense counsel was trying to "sell" something to the jury (Tr. 1578:6) was also impermissible, because it unfairly disparaged counsel's role. *See, e.g.*, *United States v. Rodriguez*, 581 F.3d 775, 802 (8th Cir. 2009) (improper for prosecutor to

argue that the defense was "trying to sell you" something: "Defense counsel was not 'selling' a case, but was instead providing constitutionally required assistance to the accused."); *see also United States v. Warren*, 306 F. Appx. 682, 685 (2d Cir. 2009) (portrayal of defense tactics as "tricks of the trade" was inappropriate); *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990) (reversing conviction) ("grossly improper" to say that defense counsel will make any possible argument to "get that guy off."); *United States v. Resto*, 824 F.2d 210, 212 (2d Cir. 1987) (comments suggesting that defense counsel was trying to "pull the wool over the jury's eyes" were disparaging and improper).

The remark was particularly pernicious because it was false. The defense never contended that Mr. Valle's fantasies are "OK" or that the jury should not be bothered by them, as the prosecutor claimed. In fact, counsel repeatedly acknowledged in her summation that Valle's fantasies were "disgusting" (Tr. 1546:21), "disturbing" (Tr. 1548:15), "gross" (Tr. 1548:19), "sick" (Tr. 1574:11), "twisted" (*id.*), and "ugly" (*id.*), and that everyone should be "upset" by them. Tr. 1555:19. Counsel merely argued that having fantasies, even very disturbing fantasies, did not establish the crime of conspiracy.

Accordingly, the government had no basis for its repeated claim that the defense was arguing that Valle's fantasies are "OK." As the Second Circuit held in reversing a conviction, "The prosecutor was entitled in rebuttal to provide an answering argument, based on the trial evidence, to any argument that defense counsel advanced in summation. *He was not entitled, however, to malign defense counsel by accusing [her] of willingness to make unfounded arguments that were not made.*" *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990) (emphasis added). Here, the government did just that by misrepresenting the defense

14

position, in violation of settled law. *See, e.g., United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002) (prosecutor may not "mis-characteriz[e defense arguments in a manner] . . . clearly designed to inflame the passions of the jury"); *Friedman*, 909 F.2d at 709 (prosecutor may not accuse counsel of making arguments that were not made); *United States v. Washington*, 263 F. Supp. 2d 413, 436-37 (D. Conn. 2003) (granting new trial where prosecutor falsely accused defense counsel of intentionally ignoring unfavorable evidence when in fact he "had spent significant energy explaining the very problem the prosecutor accused him of neglecting.") .

The prosecutor's argument also violated his "special duty" to avoid misleading the jury. *United States v. Richter*, 826 F.2d 206, 209 (2d Cir. 1987) (quoting *United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962)). Contrary to the government's position, the issue of whether Valle's fantasies are "OK" was completely irrelevant. The sole issue was whether the government had proven every element of the charges beyond a reasonable doubt. If not, the jury had to acquit, no matter how vile it thought Valle's fantasies were.

### (3) The prosecutor offered unsupported or false assertions, improperly appealed to "common sense" in lieu of evidence, and acted as a *de facto* expert on sexual fantasy, crime, and violence.

The prosecutor repeatedly offered his own personal opinions, and improperly appealed to the "common sense," "common experience," or "logic" of the jury in lieu of expert testimony or other evidence. Examples include:

- "[I]f you are so comfortable putting people's information up on the web and you think it is all fun and fantasy, why so reluctant to put up your own information? The reason is, he realizes that what he is doing is part of a plan

that goes far beyond fantasy. *That's the only logical reason that his photo was not up on his profile.* His name was not up on his profile when all of these other women's are. It is not just fantasy." Tr. 1586:1-8 (emphasis added).

- "*Every person who is caught for a crime for the first time before that appeared to be someone else.* There are plenty of people that your common experiences tells, excluding [*sic*] police officers, who have been discovered to engage in serious, illegal misconduct. There is nothing about Mr. Valle that is special. *At bottom he is a dirty cop. It is something that we've seen a million times.*" Tr. 1608:3-9 (emphasis added).

- "Now, another thing, this fantasy idea, it is important. *It is important for us to realize that the limits of fantasy under common sense have to do with what other participants who are dragged into that fantasy are aware of. You can't have a fantasy where you have unwilling participants in the fantasy. That doesn't make any sense.*" Tr. 1582:14-19 (emphasis added).

- "We all saw the video that Mr. Valle had on his computer. *That is not normal pornography for any human being. It is not a sexual thing at all.* Mr. Valle is watching videos of women screaming for their life. He is looking at photographs. *He is storing photographs in his computer that have no sexual value.* It is women being abducted. Sequences like that, women being roasted over flames. That is the photo that was in the file that he had under the name

Kimberly Sauer. *So this is not a masticatory [sic[6]] sexual fantasy.* This is a man who has a deep seated desire to see harm coming to women and the evidence reflects that he was taking actual steps to advance that." Tr. 1596:14-25 (emphasis added).

- "Also, just one more point on this discussion about the fact that the site says it is all fantasy. *Your common sense tells you that every business that caters to people who are engaging in illegal conduct or potentially engaging in illegal conduct has the same kind of disclaimers.*" Tr. 1586:9-13 (emphasis added).

- "He has a whole conversation with her and at different points she talks about the fact that she has roommates, her situation, that she is living in a suburban residential community. This is not a coincidence. *This is not normal. No one driving down a street like this randomly takes note of the office building that a friend that they haven't seen in years looked at. You are not doing that if you are just having fun on the Internet. You only do that if you are a sexually sadistic person who is piecing together a plan to actually victimize women.*" Tr. 1603:1-10 (emphasis added).

The highlighted assertions are all improper, and largely for the same reason: there is no evidence to support them, and they are, in fact, false.[7]

---

[6] The transcript mistakenly contains the word "masticatory" instead of "masturbatory."

[7] As discussed in the accompanying Declaration of Dr. Park Dietz, executed on June 14, 2013 ("Dietz Decl."), many of the government's assertions about sexual fantasy and related matters are misleading or simply untrue, as the government knew or should have known based upon the detailed summary of Dr. Dietz's expert conclusions that was provided to the

(continued...)

Perhaps the most compelling proof that the government's "common sense/common experience" arguments were improper is the fact that, before trial, the court found a number of these subjects, including the likelihood that someone with sexually sadistic fantasies would commit future violence, and the use of sexual role play over the internet as a coping mechanism, to be "beyond the ken of the average juror." *United States v. Valle*, 12 CR. 847 (PGG), 2013 WL 440687, *8 (S.D.N.Y. Feb. 2, 2013). The fact that Dr. Dietz was not called as a witness does not transform subject matter requiring specialized knowledge into an area that a layperson like the prosecutor can simply make freewheeling, unsupported "common sense" assertions about. This is especially so when one considers that the government retained but did not call its own expert, and the fact that the prosecutor was aware before trial of the opinions of Dr. Dietz, who is indisputably qualified as a leading expert in this field.

The government may not advance an impermissible argument by framing it as a "common sense" or "common knowledge" argument. *See United States v. Scott*, 677 F.3d 72, 80 (2d Cir. 2012) (improper to use an unfounded "common sense" argument to bring in inadmissible evidence such as propensity); *Henry v. Scully*, 918 F. Supp. 693, 712 (S.D.N.Y. 1995) *aff'd*, 78 F.3d 51 (2d Cir. 1996) (prosecutor cannot raise the specter of danger by appealing to the jury's "common sense"). And while "juries are allowed to draw upon their

---

[7](...continued)
government before trial. Because this motion is made under Fed. R. Crim. P. 33(a) and (b)(2), rather than under Fed. R. Crim. P. 33(b)(1), the Court need not find that the Dietz Declaration qualifies as "newly discovered evidence" before it may be considered. *See Brodie v. United States*, 295 F.2d 157, 159-60 (D.C. Cir. 1961) (court's power to consider additional evidence and grant new trial is "much broader" with respect to a motion made "within five days" (now 14 days under current Fed. R. Crim. P. 33(b)(2)) than to motions filed within the longer time period for motions based on "newly discovered evidence").

own experience in life as well as their common sense in reaching their verdict ... common sense is no substitute for evidence...." *United States v. Durham*, 211 F.3d 437, 441 (7th Cir. 2000) (internal quotation omitted); *see also United States v. Maddox*, 156 F.3d 1280, 1282 (D.C. Cir. 1998) (improper for prosecutor to make a "common knowledge" argument when the fact at issue was not supported by evidence and was not common knowledge); *United States v. George*, 11-CR-250 (DLI), 2012 WL 2564373 (E.D.N.Y. June 29, 2012) (improper for prosecutor to rely on fact not in evidence by claiming it is "common knowledge").

Here, the government appealed to the jury's "common sense" or "common experience" numerous times,[8] but it did so with respect to highly controversial assertions that required *evidence* to support them, and *expert* evidence at that, not personal opinions masquerading as "common sense." For example, the prosecutor argued that the jury knew from "common sense" that "[y]ou can't have a fantasy where you have unwilling participants in the fantasy." Tr. 1582:18-19. Not only was there no evidence introduced to support this notion, but it is demonstrably false: people fantasize all the time about other people without obtaining their permission to do so. *See* Dietz Decl. ¶ 18. (Further, this argument once again completely distorted the issue before the jury. The issue was not whether Valle betrayed the trust of his friends by fantasizing about them without their approval, which is perhaps a moral failing, but whether he agreed to kidnap them.)

---

[8] The government appealed to the "common sense" or "common experience" of the jury no less than 28 times in the rebuttal summation alone. *See, e.g.*, Tr. 1578:7; 1582:16; 1584:1; 1586:10; 1593:15-16, 24; 1594:24; 1597:5; 1600:15; 1602:12; 1608:5; 1611:5; 1613:17; 1618:24.

The prosecutor also asserted that Mr. Valle's pornography was "not normal pornography for any human being" and that it was "not a sexual thing at all." These assertions were just the prosecutor's own unsworn personal views that had no basis in the evidence introduced at trial and that the defense had no opportunity to confront. And, as Dr. Dietz explains, they are not true. *See* Dietz Decl. ¶¶ 13-14.

Likewise, the government argued that "common sense" showed "every business that caters to people who engage in illegal conduct" have the "same kind of disclaimers" that were displayed on "darkfetishnet.com." Again, there was no evidence in the record on this score.

The government even argued that its hypothetical airplane-hijacking scenario, discussed *infra*, fell within the jury's "common sense" and "common experience" (Tr. 1593:23-24), even though only very few people in our society have experienced such a traumatic event. The prosecutor suggested that the jury's "common sense" would show them that people who commit such horrible crimes often engage beforehand in fictional discussions about them. Of course, no evidence, expert or otherwise, was presented on this point. Accordingly, the government's arguments were improper. *See United States v. Suarez*, 588 F.2d 352, 354 (2d Cir. 1978) ("counsel [may not] substitute his own opinions on summation in lieu of expert testimony, where such is called for.") (citing *King v. United States*, 372 F.2d 383, 394 (D.C. Cir. 1967)).

The government also improperly referred to its own supposed expertise in prosecuting guilty police officers. The government said: "There is nothing about Mr. Valle that is special. *At bottom he is a dirty cop. It is something that we've seen a million times.*"

Tr. 1608:7-11 (emphasis added). Of course, there was no evidence about the prevalence of "dirty cops" in society. And calling Valle a "dirty cop" was improper and inflammatory. *See State v. Stewart*, 933 P.2d 1085, 1089-90 (Mont. 1992) (prosecutor's references in summation to defendant, a former police chief, as a "crooked cop," were improper).

The jury likely took the assertion that "we've seen [dirty cops] a million times" as a reference to the prosecutor's own supposed experience prosecuting many "dirty cop[s]." Courts have squarely held that "invit[ing] the jury to rely on the Government attorney's experience in prosecuting criminals generally" is improper, and even a two-sentence statement on that topic can be reversible error. *United States v. Schartner*, 426 F.2d 470, 478 (3d Cir. 1970). "[T]he prosecutor's comment not only gave the jury his impression of the evidence in the case, but it improperly introduced evidence outside the record—i.e., the prosecutor's experience with similar cases . . . ." *United States v. Wright*, 625 F.3d 583, 611-12 (9th Cir. 2010).

### *(4) The government improperly scared the jury.*

The government terrified the jury by repeatedly suggesting that Valle would victimize women "as soon as he has the opportunity" (Tr. 1613:7) if he were allowed to continue walking the streets as a police officer "with a loaded gun." It is well-settled that inflammatory rhetoric about guns creates reversible error. *See United States v. Fullmer*, 457 F.2d 447, 449 (7th Cir. 1972). In *Fullmer*, the prosecutor argued to the jury that gun control legislation was passed to support law enforcement "in their fight against crime and violence" because some "people . . . are using ammunition and guns for sniping and creating disturbances, and so forth." *Id.* at 449. The court of appeals reversed the conviction: "The use

of such inflammatory comments by the United States Attorney could only arouse passion and prejudice causing what we feel was reversible error on the part of the trial court in overruling defense counsel's objections." *Id.*

The repeated emphasis on Valle's "loaded gun" was just a scare tactic. At the time of trial, it was stipulated that Mr. Valle had already been suspended from the police force. His gun had been confiscated long ago and, given his use of a police computer in violation of NYPD policy, there was no realistic chance he would ever be restored to active police duty, even if he were acquitted. And no evidence suggested that his duty weapon was in any way related to the alleged conspiracy or unauthorized computer use. In fact, in none of his internet chats with alleged coconspirators did he ever mention his gun; he only discussed rope, chloroform, and a "human sized oven," items he indisputably *never had*.

The government's multiple inflammatory references to Valle's duty weapon were thus a distraction, and created a serious risk that the jury convicted because it viewed Mr. Valle as a dangerous person with scary fantasies who should not be allowed to be a police officer carrying a gun in New York City—rather than based on a dispassionate review of the evidence. This was improper because prosecutors may not "comment on 'the potential social ramifications of'" a particular verdict, or suggest that a guilty verdict will "protect other[s]." *United States v. Sanchez*, 659 F.3d 1252, 1256-57 (9th Cir. 2011) (quoting *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005)). And courts have recognized that suggesting that a defendant was "less than an exemplary police officer," or that he should "be held to a higher standard" is improper. *United States v. Monaghan*, 741 F.2d 1434, 1442 (D.C. Cir. 1984).

The government also violated the rule that "[p]rosecutors may not urge jurors to convict a criminal defendant . . . for reasons wholly irrelevant to his own guilt or innocence." *United States v. Sanchez*, 659 F.3d 1252, 1256 (9th Cir. 2011). The sole function of the jury is to consider whether the government has proven beyond a reasonable doubt each element of a past crime. A defendant's propensity for violence or capacity for future harm is irrelevant to this determination. Accordingly, it is "intolerable" for a prosecutor to attempt to instill in the jury fear of the defendant. *United States v. Locascio*, 6 F.3d 924, 946 (2d Cir. 1993). Similarly, it is "wholly inappropriate for the prosecutor to equate the jurors' civic duty with returning a guilty verdict," *Cox v. Herbert*, 420 F. Supp. 2d 144, 153 (W.D.N.Y. 2006), and it is equally improper to argue that the jury should convict in order to "deter future lawbreaking." *Sanchez*, 659 F.3d at 1256. "The evil lurking in such prosecutorial appeals is that" the jury will disregard its obligation to focus on the evidence of past criminality, and instead speculate about the consequences of its verdict. *Id.*

The government here engaged in precisely this improper argument—essentially inviting the jury to convict not because of any proven past criminality, but because it was supposedly "reasonable" for the FBI to take action against Mr. Valle before something happens in the future. Tr. 1607:17-19. And the government repeatedly argued that it was not "OK" for a police officer carrying a weapon to be having violent fantasies about women. *See, e.g.*, Tr. 1578:9; 1578:18; 1607:7-8. Together, these arguments denied Mr. Valle a fair trial and pushed the jury to convict out of fear and revulsion.

***(5) The government improperly invited jurors to convict based on positive views of law enforcement, irrelevant personal feelings, and the need to prevent future crimes.***

The government also improperly argued that, in assessing reasonable doubt, jurors should ask "how [they] would feel after all that [if] something had happened to all these women?" The government put it this way in summation:

> *One of the things that you can consider, that you can reasonably consider, in terms of whether or not there is a reasonable doubt in this case is how you would feel if seeing everything that you have seen, if the FBI had all this information and they decided not to act*, they decided I see he has downloaded a recipe for chloroform, I see he is a NYPD officer who carries a gun, I see he is discussing the specified real women and sending name photographs, backgrounds occupations, and we see that he is illegally accessing databases, we see all this, and we see he is conducting surveillance of these women but we are going to stick our heads in the sand because he also told stories with MeandHarris who has nothing to do with this.
>
> *One of the questions you can ask yourself in terms if there is a reasonable doubt is how you would feel after all that something had happened to all these women. Would you conclude that the FBI's activities had been reasonable? Of course not*. You would be saying, How could they ignore all of those signs. How could they ignore all of the evidence pointing to the fact that this man was putting together a plan to victimize these women and *that fact eliminates the possibility that we have a reasonable doubt in this case.*

Tr. 1607:2-23 (emphasis added).

This argument was not even thinly veiled. It was an explicit appeal to the jury's sympathy for law enforcement and putative victims, and to the jury's fear that it would feel responsible if Valle were acquitted and he then committed violent crimes. The government, in effect, improperly asked the jury to view the evidence from the perspective of law enforcement and putative victims.

The government also improperly equated the minimal suspicion needed to trigger an FBI investigation with the demanding standard of proof required for a guilty verdict: the

24

constitutional standard of proof beyond a reasonable doubt. Under the government's theory, if it were "reasonable" for the FBI to investigate Valle, then there was no "reasonable doubt" as to his guilt. The government then expressly invited jurors to consider, in resolving reasonable doubt, the completely irrelevant, extremely prejudicial, and purely emotional question of how they "would feel" if law enforcement had not arrested Mr. Valle and harm had come to the women he discussed online.

"Law enforcement" pleas of this sort, and appeals to concerns about public safety, are highly improper. *See, e.g.*, *United States v. Nobari*, 574 F.3d 1065 (9th Cir. 2009). The proper function of the jurors is "impartial arbitration between the defendant and the government," not "law enforcement." *United States v. Caro*, 597 F.3d 608, 626 (4th Cir. 2010); *see also Cargle v. Mullin*, 317 F.3d 1196, 1222-23 (10th Cir. 2003) (concluding it was "extremely improper" for prosecutor to suggest to jurors they "are part of 'the team' of the prosecution and police, rather than impartial arbiters between the State and the defendant"); *Weaver v. Bowersox*, 438 F.3d 832, 840-41 (8th Cir. 2002) (argument that the death penalty was "necessary to sustain a societal effort as part of the 'war on drugs'" is improper as it "prevents an individual determination of the appropriateness of capital punishment," and "unfairly inflammatory" because it "invok[es] a jury's general fear of crime to encourage the application of the death penalty in a particular case" (citations omitted)).

In *Nobari*, the prosecutor intimated that a defendant was arrested just in time to prevent tragic harm to a potential victim: "Had these agents not been out there, this would have been another drug rip and who knows what would have happened to the little boy that was coming out of that McDonald's." 574 F.3d at 1077. Although the district court sustained

25

an objection to this "improper statement," the Ninth Circuit still found that the court had not

"sufficiently neutralized" the inflammatory remark. *Id.* at 1077. Although the alleged victims

here are young women, rather than children, the effect of the remarks is essentially the same:

inviting the jury to view law enforcement positively by arguing that the FBI had to arrest the

defendant to prevent imminent future harm. *See id.* at 1077 (prosecutor's suggestion that the

city "should be thankful to law enforcement for their efforts in diffusing a volatile situation"

and for arresting the defendants was improper appeal to "positive emotion for law

enforcement officers").

This law enforcement plea was particularly prejudicial and inflammatory in light of

the government's repeated emphasis on Mr. Valle carrying a loaded gun as a New York City

police officer. The combined effect of these two lines of argument was to suggest to the jury

both that Mr. Valle would be dangerous if acquitted, and that the only way to protect the

community was to convict him before he could act. *See United States v. Ayala-Garcia*, 574

F.3d 5, 17-18 (1st Cir. 2009). After all, the prosecutor and FBI agents claimed at the outset to

"represent[] the American people in this trial" (Tr. 118:24) and asserted throughout the trial

that they had saved lives by arresting Mr. Valle in the nick of time. *See* Tr. 1515:7

("[T]hankfully, he was stopped before he could act."); *id.* at 662:16 ("Thankfully, no [women

were kidnapped]."); *id.* at 662:19 ("Thankfully, no [women were tortured, raped, or

cooked]."); *id.* at 666:11-12 ("Thankfully, no [body parts or bodies were found at Mr. Valle's

home].").

These assertions "served no purpose other than to inflame the jury's passions by

depicting the defendant[] as [a] dangerous m[a]n who needed to be put away for a long

26

time." *Ayala-Garcia*, 574 F.3d at 17. This inflammatory rhetoric is a "deplor[able]" attempt

"to stir passion [that] can only distract a jury from its actual duty: impartiality." *Id.* at 17, 18

(quoting *United States v. Sepulveda,* 15 F.3d 1161, 1189 (1st Cir. 1993); *United States v.

Mandelbaum,* 803 F.2d 42, 44 (1st Cir. 1986)). Such arguments have no place in a criminal

proceeding.[9]

### (6) The government employed improper analogies, "golden rule" arguments, and other emotional appeals.

The government also repeatedly asked jurors to put themselves in the shoes of

potential victims of violent plots. In one example, the jurors were asked whether they would

continue eating at a restaurant after learning that the chef had recurring fantasies of poisoning

his customers. *See* Tr. 1584:4-16. In another example, jurors were asked to put themselves in

the shoes of victims of a terrifying armed bank robbery during which guns were pointed at

people's heads. Tr. 1582:20-24. In a third, even more inflammatory hypothetical, jurors were

asked to imagine themselves as passengers on an airplane, where two other passengers

attempt to hijack the plane, with the purpose of crashing it and killing everyone on board. Tr.

1593:23-1594:7. All of these analogies had a common thread: they were all violent, the

jurors were always the victims, they generally posited completed (or nearly completed)

criminal conduct, and they had nothing to do with the issues on trial. The government used

these hypothetical scenarios to arouse jurors' emotions and fears, asking, "Would the fact

---

[9] Of course, "[a] prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation." *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992). But while a prosecutor is permitted to strike "hard blows, he is not at liberty strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). Here, for all the reasons discussed in the text, the government's arguments went well beyond "vigorous advocacy" or "colorful adjectives."

that [the hijackers] had been engaging in . . . fantasy discussions [of hijacking an airplane]

make it any less chilling for you" as a passenger? Tr. 1594:13-15.

In the prosecution's airplane-hijacking hypothetical, two men conspire to hijack a

plane with the goal of crashing it. The men are stopped by an air marshal just as they get up

out of their seats to break down the cockpit door and carry out their plot. Tr. 1597:2-7. The

government asked the jurors to envision themselves as passengers on this hypothetical

airplane, and appealed directly to jurors' emotions, asking whether their potential

victimization in this murderous plot would be "any less chilling" just because the would-be

hijackers had fantasies about the plot before trying to carry it out:

> *Let me just pose another scenario for you that you can identify with in
> your common experience, your common sense.* Imagine if you were on an
> airplane and two men are sitting behind you in the airplane and you can
> overhear them talking and the two of them say, Let's rush the cock pit and
> take the plane down. And then as they start to get up –
>
> MS. GATTO: Objection.
>
> THE COURT: Overruled.
>
> MR. JACKSON:—an Air Marshal grabs them and arrests them before
> they are able to do anything else.
>
> Now, let's say it is determined later on that these men had both been
> engaging in these discussions with one another with wild fantasies about
> taking airplanes down, explosions, and saying, Oh, it would be so great if this
> plane were to crash, there will be things going off everywhere, people will be
> dead everywhere, this will be fantastic. *Would the fact that they had been
> engaging in those fantasy discussions make it any less chilling for you that
> they were on the plane discussing taking the airplane down? No.*
> [P]articularly if you found out that these people had been researching
> chemicals that could be snuck by the TSA. If you had found out that they had
> been looking into the schematics of specific planes, gathering details about the
> pilots who flew different flights, if you found out all that information, it
> wouldn't matter to you at all that they were also engaging in fantastic
> discussions about their desire to see planes exploding. *And the reason is your*

28

*common sense tells you, yes, people do engage in discussions that are fictional, about things that they are actually interested in. It is not a surprising fact. It is a fact we brought up in our opening statements.*

Tr. 1593:23-95:3 (emphasis added).[10]

To the same effect was the prosecutor's hypothetical about a sadistic chef who

fantasizes about poisoning customers at his restaurant:

> Just another example. *Think about the situation just on this fantasy in terms of how you value fantasy in your own real life, in terms of your own real common sense.* Think about your favorite restaurant, wherever it is in New York City, where you like to go, places you love to get food. If you were to find out that the chef at that restaurant had a deep-seated fantasy of poisoning all of the people in the restaurant, and that night after night he was engaging in conversations with other people about how he could poison the restaurant goers at his restaurant, that he was researching online –
>
> MS. GATTO: Objection, your Honor.
>
> THE COURT: Overruled.
>
> MR. JACKSON:—the different poisons, that he was communicating with people the names of certain other people who come to his restaurant all the time and saying, *I can't wait to see this person drop dead when they taste this cyanide filling up their throat. If you found out about that and you [sic] said, oh, this is just my fantasy, would you continue to eat at that restaurant? Of course you wouldn't. Of course you wouldn't. You would call the police, because the reality is, fantasies point towards people's actual desires*—that's not to say that every fantasy every person ever engaged in was something that they were going to do, but the deep-seated fantasies that they have, they spend night after night after night ignoring their wife, ignoring their child to focus on developing—these are pointing to their actual desires. And for that same reason, if you were to discover that a person in your life harbored these types of fantasies and was engaging in activity that suggested that he might be trying to bring those fantasies into reality, *you would absolutely be terrified. You couldn't be convinced to eat at that restaurant. And for the same reason,*

---

[10]   In addition to its inflammatory nature, this hypothetical is another example of the improper use of appeals to "common sense" and "common experience" as a substitute for evidence. There is, for example, no proof that people who engage in fictional discussions about criminal activities are actually interested in carrying out those activities in the real world, as the prosecutor asserted.

> *you should reject this idea that Mr. Valle's fantasies, the fact that he engaged*
> *in a fantasy means that you should disregard all of the evidence that he*
> *engaged in a plot.*

Tr. 1583:24-1585:7 (emphasis added).

This argument contains so many improprieties that it alone warrants a new trial. First, the prosecutor improperly asked the jurors to consider "how you value fantasy in your own real life" (Tr. 1583:25-1584:1), a consideration that was completely irrelevant. Second, the argument was extraordinarily inflammatory, explicitly inviting the jurors to be "absolutely ... terrified" (Tr. 1585:3); the prosecutor even went so far as to invoke the gory image of people "drop[ping] dead when they taste this cyanide filling up their throat[s]." Tr. 1584:13-15.

The "sadistic chef" analogy also was an improper and prejudicial attempt to reduce or shift the government's burden of proof. The Sixth Circuit's decision in *United States v. Henry*, 545 F.3d 367 (6th Cir. 2008), is on point. There, the defendant was accused of conspiring to distribute drugs by hiding them inside concert speakers that were transported on musical-band tour buses. In rebuttal summation, the prosecutor asked the jurors how they would feel if their child had just graduated from college and been offered the opportunity to work for the defendant in the music business:

> What do you think, ladies and gentleman? You have heard evidence from people who have criminal records. Do you know enough when your son and daughter comes to you and say great, I'm going to work for Roderick Henry, what do you tell them? Do you tell him or her, great, sounds great to me, good luck. If it was the most important decision in your life, what decision would you ask your son or daughter to make based on the evidence you heard from that witness stand?
>
> You know what your decision would be. You know your decision would be that you know enough about Roderick Henry based on the [evidence], you know, in the most important decisions in your life, you would say he is a drug dealer, don't work for him.

30

*Id.* at 382-83.

On appeal, the Sixth Circuit ruled these remarks an "improper effort on the part of the prosecutor to reduce the government's burden of proof." *Id.* at 383. "By suggesting to the jurors that the decision of whether to convict Henry was equivalent to the decision of whether to recommend that their child take a job with Henry, the prosecutor inverted the burden of proof. In other words, the prosecutor's statement encouraged the jury to evaluate how sure they were that Henry was *not* a drug dealer, as opposed to how sure they were that he *was* guilty of the crime charged beyond a reasonable doubt." *Id.* The court of appeals continued:

> No caring parent would recommend that their child take a job with anyone whom they remotely feared might be a drug dealer. The prosecutor's example therefore suggested that the jury should convict Henry unless they were so convinced that he was not a drug dealer that they would recommend that their child enter his employ. Such a characterization of the reasonable-doubt standard was error.

*Id.*

Although the *Henry* court ultimately decided that these improper remarks were "isolated," and, given the strength of the proof, did not require reversal under the rigorous "plain error" standard of review, the court acknowledged that, "[i]f the evidence against Henry were less strong," a "serious question would be presented as to whether the argument rose to the level of reversible prosecutorial misconduct." *Id.*

Here, in contrast, a new trial is warranted. Like the improper prosecutorial analogy in *Henry*, the government here improperly suggested that the decision of whether to eat at a restaurant whose chef fantasizes about poisoning customers—which, of course, no prudent person would do—was equivalent to whether reasonable doubt existed as to Valle's guilt. The example implied that the jury could not acquit Valle unless he persuaded them to a certainty that

31

his fantasies were just make-believe. In fact, the burden was on the government to prove beyond

a reasonable doubt that his communications were not just fantasy, but established a true criminal

conspiracy. In this respect, the government improperly inverted the burden of proof. The clear

implication was that, unless the defense had firmly convinced the jury that Valle's fantasies were

just make believe, the jury had to convict because, like the hypothetical chef, there was too great

a risk that he would hurt someone someday.

Finally on this point, the chef analogy once again suggested that sadistic fantasies

themselves are a crime because, even though the hypothetical chef had not actually poisoned

anyone (but only fantasized and conducted research about doing so), the government argued that

the jury not only would not eat at the restaurant, but would "call the police." Tr. 1584:18.

The improper analogy was also deeply prejudicial. Unlike in *Henry*, the evidence of

Valle's guilt was weak, and the defense immediately objected to the offensive analogy. *See* Tr.

1584:9. And the analogy was far from "isolated," as it was in *Henry*. On the contrary, it was part

of a larger, improper theme that pervaded the government's speculative arguments throughout

the trial: the government suggested that, because Mr. Valle's fantasies were violent, deviant, and

scary, he was likely to act on them someday, and was too dangerous to be acquitted, particularly

since he was a police officer with supposed access to a loaded gun.

Nor was the inflammatory analogy responsive to anything the defense said in summation.

The Court suggested in its mistrial ruling that the rebuttal was a proper response to the defense's

effort to "minimize" the significance of Mr. Valle's fantasies. Tr. 1624:7-15. But the defense did

not minimize his fantasies; it acknowledged their depravity. Defense counsel properly argued

that the fantasies themselves, however abhorrent, were not crimes and did not necessarily

establish an intent to act. Accordingly, the government's improper analogies were not a fair response to the defense summation.

Further, the government's incendiary analogies were improper attempts to personalize the crime with the jury, in violation of the prohibition on "golden rule" arguments. A "golden rule" argument improperly personalizes the crime by asking jurors to put themselves in the shoes of victims. *See, e.g., United States v. Rodriguez*, 581 F.3d 775, 802-03 (8th Cir. 2009) (asking "the jury to imagine themselves in the place of the victim" is an improper "'golden rule'" argument). "Comments which personalize the crime with the individual jurors . . . will give rise to an appellate issue and, if egregious enough, reversal of the conviction." *United States v. Maass*, No. 97-2118, 1997 WL 785526, at *5 (10th Cir. 1997); *cf. United States v. D'Anna*, 450 F.2d 1201, 1206 (2d Cir. 1971) (noting, in the context of an argument that tax cheats force jurors to carry additional tax burden, that "[a] prosecutor should not be permitted to indulge in oratorical flights that seriously endanger a defendant's right to a fair trial."). These arguments are prohibited because they "ask the jurors to shed their objectivity and to assume the role of interested parties." *Hodge v. Hurley*, 426 F.3d 368, 384 (6th Cir. 2005) (internal quotation marks omitted) (quoting *City of Cleveland v. Egeland,* 497 N.E.2d 1383, 1389 (Ohio 1986)); *see also United States v. Teslim*, 869 F.2d 316, 327 (7th Cir. 1989) ("[A] Golden Rule argument is never proper . . . ."); *United States v. Stinson*, 473 F. App'x 62, 68 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1607 (2013) (improper to ask the jury what they or an innocent person would do in the defendant's shoes).

Indeed, the hijacking hypothetical is even worse than the typical golden rule argument because, instead of asking jurors to imagine themselves in the shoes of one of Mr. Valle's

imagined "victims"—none of whom ever came close to being harmed—the prosecutor asked jurors to imagine themselves as hypothetical victims of a nearly completed, horrific terrorist plot. In particular, the hypothetical describes a scenario in which two individuals conspire to commit a hijacking, and actually attempt a hijacking that is thwarted only at the last minute by the actions of a U.S. air marshal. This crime bears no resemblance to the purely inchoate crime Mr. Valle is alleged to have planned. Asking the jurors to consider how they would feel about an actual attempt at committing a heinous crime of terrorism was only likely to incite emotional reactions—and to confuse the jury, since there is no contention here that Mr. Valle attempted to carry out any kidnapping.

This hypothetical was also extraordinarily inflammatory, because the jurors inevitably understood it as a reference to terrorism. As described by the prosecutor, the hypothetical hijackers were hoping to "rush the cock pit and take the plane down" (Tr. 1594:2-3)—a suicidal plan by its nature, since the intentional crashing of a passenger airliner would cause the death of all passengers, including the hijackers. The only cultural referents for such suicidal plots on passenger airliners are acts of terror. The only suicidal plots involving an American passenger airline since the 1980s are the September 11 attacks. Although the summation did not reference September 11 directly, some jurors probably interpreted the comments that way. Tellingly, the prosecutor specifically presented the example to this New York jury as a "scenario ... that you can identify with in your common experience, your common sense." Tr. 1593:23-24. As courts have recognized, such comparisons are highly inflammatory. *See United States v. Burden*, 600 F.3d 204, 222 (2d Cir. 2010) (noting that "a blatant ploy to evoke images of . . . September 11" was improper); *United States v. Beam*, 1:10-CR-047, 2010 WL 4623934 (M.D. Pa. Nov. 5, 2010)

34

(ordering government prosecutors not to "appeal[] to the jurors' feelings of patriotism through . . . the events of September 11, 2001").

These incendiary remarks worsened the effect of the prosecution's improper references to Mr. Valle's supposed future dangerousness. The summation elsewhere asserted that jurors would ask, "How could the [FBI] ignore all of the evidence" that Mr. Valle was plotting a kidnapping if "something had happened to all these women." Tr. 1607:17, 20. And the summation repeatedly referred (at least seven times) to Valle's occupation as a police officer who could be "walking around New York City with a loaded weapon." Tr. 1578:9; *see also* Tr. 1578:17-18; 1584:18; 1598:13; 1607:7-8; 1608:17; 1608:21-22; 1613:17-18. By then alluding to an air marshal's intervention to stop a terrorist attack on an airplane, the prosecution suggested that the jury should convict Mr. Valle to ensure the future safety of the women who were allegedly targeted—even if past criminality has not been proven beyond a reasonable doubt. This argument deprived Mr. Valle of a fair trial.

### *(7) The government improperly commented on Mr. Valle's failure to testify.*

In discussing Mr. Valle's allegedly unauthorized police computer searches, which were relevant to both counts, the government committed another serious constitutional violation: it expressly invited the jury to consider his failure to explain his conduct, a transparent reference to his failure to testify:

> By the way, throughout the entire defense summation, and as I said before we have the burden of proof, but since they did challenge the relevance of these searches that he engaged in of these women, *it is important for you to consider the fact that you heard no reasonable explanation of why he is risking his job, his freedom, his livelihood, his life by conducting blantantly illegal searches of the very women he is talking about during the time period leading into these conspiracies. You heard nothing.*

Tr. 1605:2-12 (emphasis added). This was a violation of the Fifth Amendment and an improper burden-shifting argument.

Prosecutors, of course, may not comment, directly or indirectly, on a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609 (1965); *United States ex rel. D'Ambrosio v. Fay*, 349 F.2d 957, 961 (2d Cir. 1965). The test is whether the comment was "manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be[,] a comment on the failure of the accused to testify." *U. S. ex rel. Leak v. Follette*, 418 F.2d 1266, 1269-70 (2d Cir. 1969).[11]

Here, the only person who could have explained why Mr. Valle was conducting the computer searches in question was Mr. Valle himself. The jury therefore would necessarily find "the comment in question to be a remark on [his] failure to testify at trial." *United States v. Hunt*, 412 F. Supp. 2d 1277, 1289 (M.D. Ga. 2005) (ordering a new trial); *Buttrum v. Black*, 721 F. Supp. 1268, 1304 (N.D. Ga. 1989); *see also Runnels v. Hess*, 653 F.2d 1359, 1363 (10th Cir. 1981) ("[N]o one but [the defendant] could have contradicted the prosecutrix. Thus, the innuendo was sufficiently plain, as was the error."). This Fifth Amendment error alone warrants a new trial.[12]

---

[11] *See also United States v. Alfonso-Perez*, 535 F.2d 1362, 1366 (2d Cir.1976) (prosecutor's suggestion, while commenting on credibility of government witness, that "'the man in the room'" could have "'prove[d] otherwise,' but did not," implicitly called for an inference from defendant's failure to testify); *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) (prosecutor's question, "If there were facts left out in this case, from whence did that come?" could be interpreted as a comment on the defendant's failure to testify).

[12] Challenging the defendant to "explain" certain facts has been characterized as a severe violation of the *Griffin* principle. *United States v. Cox*, 752 F.2d 741, 745 (1st Cir. 1985).

The prosecutor's comment also constituted an improper burden-shifting argument. It falsely suggested that the defense had an obligation to explain Mr. Valle's computer searches. *See United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992) ("[P]rosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence."); *cf. United States v. Cruz*, 797 F.2d 90, 93 (2d Cir. 1986) ("[A prosecutor's] use of the phrase '[t]he defense . . . has to convince you' in his summation" . . . is indefensible . . . ."). *See also United States v. Shareef*, 190 F.3d 71, 79 (2d Cir. 1999) (challenging the defense to prove something was improper insofar as it suggests that the defendant has any burden to come forward with evidence in his defense).

### (8) The government further maligned defense counsel and improperly alluded to counsel's subjective belief about the defendant's supposed guilt.

The government also made several improper comments in response to defense arguments concerning the Google search for "'Kristen Ponticelli' address." After noting the search and stating again, "This is a New York city police officer," *see* Tr. 1613:15-16, 20-21, the government addressed the possibility that it could be Ms. Mangan's search as follows:

> Now, defense counsel tried to suggest that this could be Kathleen Mangan's search. That is absurd and *that points to the degree to which the facts are being contorted by defense counsel and attempting to distract you from the actual evidence.* Look at the other searches on this day. At 4:34 he logs onto Facebook and is looking at Maureen Hartigan. He continues looking at Maureen Hartigan. 4:47 he goes into Darkfetish and is looking at his user messages. 4:41 he is uploading something to some album on Dark Fetish Network. Are we supposed to believe that in August before Ms. Mangan actually installed the spyware and she said it was in September and after she discovered all this disturbing information that caused her to get out of the house, are we supposed to believe that she was logging on to the Dark Fetish Network and uploading photographs? Of course not. That is ridiculous.
>
> It continues. It continues along this line of plausible [*sic*] searches for anyone other than Gilberto Valle, the man engaging in these discussions about killing

> Kristen Ponticelli. He is looking at softball information about her and then at 6:01 it is a continuous stream of searching the Kristen Ponticelli address. At 6:22 is he back into his Dark Fetish Network. There is zero possibility that this search was conducted by anyone other than Gilberto Valle. And the reason defense counsel tried to stress to you that this could have been somebody else, the reason it was so important to make that wildly plausible [*sic*] point is because *defense counsel knows if it is true then Gilberto Valle is attempting to get the address of Kristen Ponticelli, he is guilty because that is proof beyond any reasonable doubt* that he is taking steps far beyond someone thinking about this in his mind. He is attempting to get location information about a high school student who he has been talking about killing.

Tr. 1614:1-1615:7 (emphasis added). These arguments once again improperly denigrated the role of defense counsel—and worse yet, improperly alluded to defense counsel's supposed subjective beliefs about her client's guilt.

It is improper for a prosecutor to suggest that "defense counsel knows . . . [her client] is guilty" (or would know he was guilty if her own "ridiculous" argument is rejected). Tr. 1615:1-3. As numerous courts have recognized, "statement[s] by the prosecutor during closing argument that counsel for [a] defendant[]" knows her client is guilty are "clearly improper." *United States v. Kirkland*, 637 F.2d 654, 656 (9th Cir. 1980). "[R]emarks of this nature should not enter into jury arguments." *Homan v. United States*, 279 F.2d 767, 775 (8th Cir. 1960); *cf. Greenberg v. United States*, 280 F.2d 472, 475 (1st Cir. 1960) (prosecutor expressing improper opinion on guilt). Indeed, even where a government prosecutor has not directly stated an opinion on the defendant's guilt (or made an assertion about defense counsel's personal opinion on that issue), courts have found reversible error where comments by a government attorney effectively "invite the jury to" consider the "sincerity" of one attorney or another. *United States v. Schartner*, 426 F.2d 470, 478 (3d Cir. 1970) (reversing where prosecutor invoked his own "sincerity" in arguing that a guilty defendant would escape unless the jury convicted). This injects into the proceedings

38

questions about a lawyer's "moral integrity" that have nothing "to do with the evidence in the case." *Id.*

The remarks here involved precisely this improper reasoning. The government asked the jury to conclude that defense counsel was making implausible arguments "because defense counsel *knows*" that evidence of a Google search for "the address of Kristen Ponticelli" would establish Mr. Valle's guilt. Tr. 1615:1-2.

By arguing that "the facts are being contorted by defense counsel and [that defense counsel is] attempting to distract you from the actual evidence," the government further improperly "denigrate[d] the defense as a sham." *United States v. Wright*, 625 F.3d 583, 610 (9th Cir. 2010). Using that argument to put into issue defense counsel's subjective views of Valle's guilt amounted to an egregiously improper argument.

### (9) The government engaged in additional misconduct.

The summations contained other improprieties. These statements increased the prejudice and, in tandem with the many other improper remarks, they require a new trial.

#### (a) The government improperly asked the jury to convict based on Valle's character.

The government argued that "[t]his is a man who is sick," and that "Mr. Valle is a sadistic person." Tr. 1613:1-2, 1596:4-5. The government also argued that he neglected his wife, his baby, and his job in favor of his online activities. *See* Tr. 1608:12-15 ("His wife told you Mr. Valle was not a family man. Mr. Valle during the entire time that they were married was not only neglecting his wife and his child, but he was neglecting his job."). The cumulative effect of these and similar arguments was to mislead the jury into believing that what was at issue was Mr. Valle's character. Indeed, after calling Mr. Valle "a dirty cop," the government directly argued

that the jury should "focus[] on what the evidence reveals about *who he really is*." Tr. 1608:10-11 (emphasis added).

This argument was highly improper. The issue for the jury was not "who" Mr. Valle "really is," as the prosecutor argued, but whether he committed the crimes charged. *See, e.g.,United States v. Verduzco,* 373 F.3d 1022, 1026 (9th Cir. 2004) (the "underlying premise of our criminal justice system [is] that the defendant must be tried for what he did, not for who he is") (citing *United States v. Bradley*, 5 F.3d 1317, 1320 (9th Cir. 1993) (internal quotation marks and citations omitted));. *United States v. Linares*, 367 F.3d 941, 945 (D.C. Cir. 2004) (recognizing that "a defendant must be tried for what he did, not for who he is"); *United States v. Myers,* 550 F.2d 1036, 1044 (5th Cir. 1977) ("[A] concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is."). Thus, courts have recognized that it is improper for prosecutors to "suggest[] that the jury could consider [the defendant's allegedly] bad character as a thumb on the scale in favor of a finding of guilt." *Hodge v. Hurley*, 426 F.3d 368, 385 (6th Cir. 2005). Moreover, conduct that is abusive of the defendant, including "name-calling[,] is improper." *United States v. Carter*, 410 F.3d 1017, 1026 (8th Cir. 2005) (improper to refer to defendant as a "con man" and "deviate [sic]" during closing argument). Besides improperly "arous[ing] passion and prejudice," such comments are "offensive to the dignity and good order with which all proceedings in court should be conducted." *Viereck v. United States*, 318 U.S. 236, 248 (1943).

**(b) The government improperly invoked Ms. Mangan's subjective reaction and opinions.**

The Court ruled before trial that Ms. Mangan could testify only to provide a narrative of the pertinent events. She was not allowed to say that she was afraid of Mr. Valle or that she thought Mr. Valle's chats were real, because such testimony was irrelevant. *See* Tr. 57:10-15 ("The government will not be permitted, however, to elicit evidence of her mental state, because Mangan's mental state is not relevant to any issue in this case. Mangan will likewise not be permitted to offer an opinion concerning Valle's mental state, including whether she believed that he intended to kidnap her or other women."). But in its main summation, the government used Ms. Mangan's testimony for the very purpose that the Court prohibited:

> Look at the way his wife, *the person who knew him best reacted* when she read his words, when she saw his images and when she learned of his plans for havoc and violence. What was her response? Did she say, oh, that's just my husband getting into some crazy stuff? No. She took her baby and fled. She got out as fast as she could. *She got out of there because this was not a sick joke. This was not just pornography. These were real plans for violence.*

Tr. 1531:14-21 (emphasis added). In other words, because Mangan allegedly thought Valle was "for real," the jury should too.

This is exactly the purpose for which Mangan's testimony was *not* admitted. Given the Court's clear *in limine* ruling, it was improper for the prosecutor to ask the jury to conclude from Ms. Mangan's testimony that she was afraid of Valle and thought he was engaging in "real plans for violence." *See, e.g., United States v. Scheetz*, 293 F.3d 175, 185 (4th Cir. 2002) (prosecutor improperly used evidence in summation by exceeding the court's earlier limiting instruction regarding the evidence). Her opinions were irrelevant, as the Court correctly ruled. And the improper argument was doubtlessly harmful: since, according to the prosecution, Valle's own

wife, "the person who knew him best," thought Valle was "for real," the jury naturally would have found it nearly impossible to disagree, however irrelevant her views were.

> ### (c) The government improperly urged the jury to convict Mr. Valle because he had supposedly placed women in "grave danger," a crime with which he was not charged.

The prosecutor urged the jury to convict Mr. Valle because he had supposedly placed the women about whom he fantasized in "grave danger:"

> I expect Ms. Gatto to say, nothing happened here. This was all in Valle's mind. But that is not true. Something did happen here. *A number of real women who did not consent to any of this—women who wanted no part of this were put in grave danger. And they were put in grave danger by that man, Gilberto Valle.* He discussed these women with men who he believed were serious. He sent photographs of these women. He sent a video of Kimberly on vacation. He sent accurate information about their height, their weight, about their profession. *And in doing so, he made it possible for these women to be identified and harmed in very horrific ways, and that is what happened as a result of Valle's conduct.*

Tr. 1537: 17-1538: 3 (emphasis added).

This emotional argument was highly misleading and improper for at least two reasons. First, the government presented no evidence that any of the women Mr. Valle discussed online ever came close to being harmed as a result of his conduct. Indeed, the proof showed that he never revealed any woman's real address or real last name; on the contrary, he often provided fake information about women to his "coconspirators." *See* Rule 29 Mem. at 33-34, 35, 42-43. Second, Mr. Valle was not charged with reckless endangerment or any crime that would require proof that people were endangered. The government's argument about the supposed danger to these women was thus irrelevant and invited the jury to convict Mr. Valle simply because he was supposedly a bad and inconsiderate person.

42

In sum, the government's summations, and the rebuttal summation in particular, were a textbook example of what prosecutors should *not* do to obtain a conviction. The resulting prejudice was enormous, as we now show.

**B. The cumulative effect of the improper summations was to deny Mr. Valle a fair trial.**

The government's offensive summations were highly prejudicial. The improper comments were so pervasive and severe, and the evidence of Mr. Valle's guilt so questionable, that the improper comments may have led the jury to convict despite the very weak evidence of guilt, thus resulting in "substantial prejudice." A new trial is therefore warranted.

"A prosecutor's improper summation results in a denial of due process when the improper statements cause substantial prejudice to the defendant." *United States v. Modica,* 663 F.2d 1172, 1181 (2d Cir. 1981). Determining the existence of substantial prejudice depends on the overall context, but generally involves three factors: the severity of the improper statement; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements. *Id.*

*(1) The improper comments were severe.*

The improper arguments were repeated and flagrant. Whether or not the misconduct was willful, the prosecutors' statements were made deliberately, and exhibited at least a reckless disregard for the long line of cases disapproving the kinds of statements they made.

Moreover, the government had to know that many of its assertions about the nature of sexual fantasy were not simply matters of "common sense," but were highly

43

controversial, because the defense provided the government before trial with an extensive summary of Dr. Dietz's views on the subject. Having decided not to call an expert of its own, or to have Mr. Valle examined by a mental health professional, the government had no basis in evidence for making unsupported assertions about his mental condition, the nature of sadistic fantasies, or the other claims that the government knew contradicted Dr. Dietz's expert conclusions.

Further, the multitude and nature of the government's improper arguments made it difficult, if not impossible, for the jury, however well-meaning, to decide Mr. Valle's guilt based solely on the evidence, rather than based on fear, disgust, and animus. And this is not a case where the improper statements can be described as a fair response to defense counsel's remarks in summation. *See United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990) (government misconduct not a fair response to defense counsel's summation which was "vigorous, but ... focused on the evidence and lack of evidence"); *Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990) (prosecutorial vouching not proper response to defense remarks where defense counsel did not accuse "the prosecutor of knowingly putting on perjured testimony or otherwise acting unethically").

### (2) No measures cured the improper remarks.

In addition, no adequate steps were taken to cure the effects of the government's improper remarks. As in *Modica*, the Court's pattern instruction to the jury—advising that the arguments of counsel are not to be considered evidence—was "an insufficient response to the prosecutor's conduct." 663 F.2d at 1182. In cases "where a prosecutor's improper remarks have not been deemed prejudicial, the record has disclosed emphatic

44

curative instructions by the trial judge." *United States v. Friedman*, 909 F.2d 705, 710 (2d Cir. 1990). Here, there were no curative instructions.

In any event, no instruction probably could have cured the prejudice, for "some occurrences at trial may be too clearly prejudicial for ... a curative instruction to mitigate their effect," *Floyd*, 907 F.2d at 356. The "cumulative effect of the prosecutor's remarks in this case were of such a character." *Id.*

### (3) *The improper arguments likely affected the jury.*

Finally, there is no reason to believe this jury would have convicted Valle absent the misconduct. After all, the evidence against Valle, even if sufficient to support a guilty verdict, was not strong. And the prosecutor's improper, lengthy rebuttal summation—the 42-page rebuttal was 50 percent longer than the government's main summation and substantially longer than the defense summation—was the last word the jury heard before being charged and starting its deliberations. And defense counsel, of course, had no chance to respond to the rebuttal arguments.

While courts are reluctant to grant new trials based on improper prosecutorial arguments in summation, they have not hesitated to do so where the evidence was as weak, and the improper comments as egregious and prejudicial, as here. *See United States v. Burse*, 531 F.2d 1151, 1153-55 (2d Cir. 1976) (reversing conviction where the prosecutor continually told the jury that "we know" that certain testimony "is true."); *see also United States v. Friedman*, 909 F.2d 705, 708-10 (2d Cir. 1990); *Floyd*, 907 F.2d at 355-57; *United States v. Grunberger*, 431 F.2d 1062, 1068 (2d Cir. 1970).

In sum, this trial was supposed to be about whether the government could prove, beyond a reasonable doubt, that Mr. Valle conspired with others to actually kidnap and harm women, and that one or more overt acts was performed in furtherance of such a plot. Instead, the government's improper summations made the trial a referendum on whether Mr. Valle's fantasies are "OK," whether he should be a police officer walking the streets with a "loaded weapon," whether he was a good husband and father, whether his pornography was "normal," how the jury "would feel" if Valle acted on his fantasies, whether the jury would eat at a restaurant with a sadistic, poisoning-obsessed chef, and other irrelevant, inflammatory matters. The prosecutor, acting as an unsworn and unqualified *de facto* expert, also misled the jury as to the nature of sexual fantasy and its supposed relationship to actual criminal conduct. Given the serious concern that Mr. Valle is not guilty, and that the jury may have been misled, a new trial is warranted.

**Conclusion**

For these reasons, if the Court declines to grant a judgment of acquittal, the Court

should set aside the jury's verdict, order a new trial, and grant any other relief that is

appropriate.

Dated: New York, New York
      June 17, 2013

                            Respectfully submitted,

                            DAVID PATTON
                            Federal Defenders of New York


                  By:     /s/ Julia Gatto
                          Julia Gatto
                          Attorney for Defendant
                          GILBERTO VALLE
                          52 Duane Street - 10th Floor
                          New York, New York 10007

JULIA GATTO
ROBERT BAUM
EDWARD S. ZAS
JOHN J. HUGHES, III
JAMES A. COHEN,
*Of Counsel*