**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
**UNITED STATES OF AMERICA**
                                        :            **12 Cr. 847 (PGG)**
       **- v. -**
                                        :
**GILBERTO VALLE,**
                                        :
              **Defendant.**
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**RESPONSE OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANT'S MOTIONS FOR
A NEW TRIAL AND JUDGMENT OF ACQUITTAL**

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Randall W. Jackson
Hadassa Waxman
Assistant United States Attorneys
       -Of Counsel-

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. Valle's Motions For Judgment of Acquittal . . . . . . . . . . . . . . . . . . . . . . . . . 5

  A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  B. There Was Sufficient Evidence For A Rational Jury To Find
     Valle Guilty of Participation in the Conspiracy Charged in Count One . . . . 8

    1. That Valle Engaged in "Fantasy" Conversations With Others
       Does Not Negate the Significance of His Conversations With
       His Coconspirators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    2. The Content of Valle's Communications With His Coconspirators
       Evidences Valle's Guilt on Count One . . . . . . . . . . . . . . . . . . . . . . . . 15

    3. The Evidence Established Numerous Overt Acts In Furtherance Of
       The Kidnapping Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

  C. There Was No Error in the Admission of Valle's
     Coconspirator's Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

  D. Valle's Multiple Conspiracies Arguments Should Be Rejected . . . . . . . . . 35

  E. Valle's Challenge to His Conviction on Count Two is Meritless . . . . . . . . 41

II. Valle's Motion For a New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

  A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

  B. Valle Has Failed to Demonstrate that the Weight of the Evidence
     Requires a New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

  C. There Was No Misconduct in the Government's Summations . . . . . . . . . . . 52

    1. The Government Did Not Argue That the Defendant Should Be Convicted
       Because His Fantasies Are Frightening . . . . . . . . . . . . . . . . . . . . . . . . 52

2. The Government Did Not Improperly Malign Defense Counsel . . . . . . . . . . . 57

3. The Government Did Not Make Improper Appeals to Common Sense
   and Did Not Act as A De Facto Expert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

4. The Government Did Not Improperly Scare the Jury . . . . . . . . . . . . . . . . . . . 62

5. The Government Did Not Invite Jurors To Convict Based on
   Positive Views of Law Enforcement, Personal Feelings, or the
   Need to Prevent Future Crimes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

6. The Government Did Not Use Improper Analogies or
   "Golden Rule" Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

7. The Government Did Not Comment on Valle's Failure to Testify
   Or Shift the Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

8. There is No Validity to Valle's Remaining
   Assertions of Prosecutorial Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

D. Valle Cannot Demonstrate That Any Misconduct Warrants
   A New Trial Under Controlling Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

   1. Valle Failed to Preserve the Bulk of His Objections to the Government's
      Arguments During its Summations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

   2. Even If Valle Could Demonstrate That The Government's Arguments
      Were Improper and That He Had Preserved His Objections, He Cannot
      Demonstrate That Any Error Warrants a New Trial . . . . . . . . . . . . . . . . . . . 94

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

# TABLE OF AUTHORITIES

## CASES

*Buttrum v. Black*, 721 F. Supp. 1268 (N.D. Ga. 1989) . . . . . . . . . . . . . . . . . . . . . . 81

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Drew v. Collins*, 963 F.2d 411 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*EF Cultural Travel  BV v. Explorica, Inc.*, 274 F.3d 577 (1st Cir.2001) . . . . . . . . 43

*Greenberg v. United States*, 280 F.2d 472 (1st Cir. 1960) . . . . . . . . . . . . . . . . . . 84

*Griffin v. California*, 380 U.S. 609 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Henry v. Scott*, 918 F. Supp. 693 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 62

*Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229 (1917) . . . . . . . . . . . . . . . 33

*Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Holland v. United States*, 348 U.S. 121 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Homan v. United States*, 279 F.2d 767 (8th Cir.1960) . . . . . . . . . . . . . . . . . . . . . 83

*International Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418 (7th Cir. 2006) . . . . . . 43

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Jacobson v. United States*, 503 U.S. 540 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Loliscio v. Goord*, 263 F.3d 178 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Mktg. Tech. Solutions, Inc. v. Medizine LLC,* 2010 WL 2034404
(S.D.N.Y. May 18, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973) . . . . . . . . . . . . . . . . . . . . . . . 55

*Powell v. Texas*, 392 U.S. 514 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238 (S.D.N.Y.2000) . . . . . . . . 43

*Runnels v. Hess*, 653 F.2d 1359 (10th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Salinas v. United States*, 522 U.S. 52 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Stanley v. Georgia*, 394 U.S. 557 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93
(2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States ex rel D'Ambrosio v. Fay*, 349 F.2d 957 (2d Cir. 1965) . . . . . . . . . 80

*United States ex rel. Leak v. Follette*, 418 F.2d 1266 (2d Cir. 1969) . . . . . . . . . . 80

*United States v. Acosto-Gallardo*, 656 F.3d 1109 (10th Cir. 2011) . . . . . . . . . . . 37

*United States v. Aleynikov*, 737 F. Supp. 2d 173 (S.D.N.Y. 2010) . . . . . . . . 42, 45

*United States v. Allen*, 488 F.3d 1244 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 53

*United States* v. *Amato*, 86 Fed. Appx. 447, 451 (2d Cir. 2004) . . . . . . . . . . . . . 84

*United States v. Anguiano*, 873 F.2d 1314 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . 38

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . 6, 15

*United States v. Banki*, 685 F.3d 99 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Bayer*, 331 U.S. 532 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Beals*, 698 F.3d 248 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . 39

*United States* v. *Beam*, 10 Cr. 47, 2010 WL 4623934 (M.D. Pa. Nov. 5, 2010)  74, 75

*United States* v. *Bossinger*, 311 Fed. Appx. 512 (2d Cir. 2009) . . . . . . . . . .45, 46, 48

*United States v. Briggs*, 457 F.2d 908 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . 93

*United States v. Bucaro*, 801 F.2d 1230 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . 33

*United States v. Burden*, 600 F.3d 204 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Carnagie*, 533 F.3d 1231 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . 37

*United States v. Carr*, 424 F.3d 213 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 91

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Cianchetti*, 315 F.2d 584 (2d Cir. 1963) . . . . . . . . . . . . . . . . . . . 19

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . . . 31, 50, 95, 98

*United States v. Corey*, 566 F.2d 429 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . 36, 37

*United States v. Cote*, 544 F.3d 88 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Curtin*, 489 F.3d 935 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 56

*United States v. D'Anna*, 450 F.2d 1201 (2d Cir. 1971) . . . . . . . . . . . . . . . . . 72, 74

*United States v. Daly*, 842 F.2d 1380 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Davis*, 609 F.3d 663 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . 89

*United States v. Delia*, 944 F.2d 1010 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Desimone*, 119 F.3d 217 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . 35

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Dibrizzi*, 393 F.2d 642 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . 92

*United States v. Edwards*, 342 F.3d 168 (2d Cir.2003) . . . . . . . . . . . . . . . . . . . . 50

*United States v. Elias*, 285 F.3d 183 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . 85, 96

*United States v. Eltayib*, 88 F.3d 157 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 62

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . 29

*United States v. Farmer*, 583 F.3d 131 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . 92

*United States v. Feola*, 420 U.S. 671 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Finley*, 245 F.3d 199 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Friedman*, 909 F.2d 705 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . 57

*United States v. Fullmer*, 457 F.2d 447 (7th Cir. 1972) . . . . . . . . . . . . . . . . . . . . 63

*United States v. Geibel*, 369 F.3d 682 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Giordano*, 693 F.2d 245 (2d Cir. 1982) . . . . . . . . . . . . . . . . . 7, 13

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Gonzalez*, 922 F.2d 1044 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . .  26

*United States v. Grauer*, 701 F.3d 318 (8th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . .  89

*United States v. Guadagna*, 183 F.3d 122 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . .  5

*United States v. Harte*, 108 F.3d 1370 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . .  79

*United States v. Henry*, 545 F.3d 367 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . .  72

*United States v. Hunt*, 412 F. Supp. 2d 1277 (M.D. Ga. 2005) . . . . . . . . . . . . . . .  81

*United States v. Jackson*, 335 F.3d 170 (2d Cir. 2003) . . . . . . . . . . . . . . . . . .  5, 6, 23

*United States v. James*, 712 F.3d 79 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . .  29

*United States v. Jaswal*, 47 F.3d 539 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . .  52

*United States v. John*, 597 F.3d 263 (5th Cir.2010) . . . . . . . . . . . . . . . . . . . . . . . . .  43

*United States v. Jones*, 482 F.3d 60 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . .  37

*United States v. Kennedy*, 32 F.3d 876 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . .  36

*United States v. Kirkland*, 637 F.2d 654 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . .  83

*United States v. Korfant*, 771 F.2d 660 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . .  37

*United States v. LaMorte*, 950 F.2d 80 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . .  77

*United States* v. *Ling*, 172 Fed. Appx. 365, 366 (2d Cir. 2006) . . . . . . . . . . . . . . . .  38

*United States v. Lyman*, 592 F.2d 496 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . .  92

*United States v. Martinez*, 54 F.3d 1040 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . .  5

*United States v. Matthews*, 20 F.3d 538 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . .  6

*United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001) . . . . . . . . . . . . . .  7, 18, 20

*United States v. Muzii*, 676 F.2d 919 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . .  56

*United States v. Naranjo*, 14 F.3d 145 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . .  26

*United States* v. *Needham*, 377 Fed. Appx. 84, 86-87 (2d Cir. 2010) . . . . . . . . 35,36

*United States v. Newton*, 369 F.3d 659 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 96

*United States v. Nobari*, 574 F.3d 1065 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 68

*United States v. Nosal*, 676 F.3d 854 (9th Cir.2012) . . . . . . . . . . . . . . . . . . . . . 42, 47

*United States v. Ong*, 541 F.2d 331 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . 94

*United States v. Parkes*, 497 F.3d 220 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Payton*, 159 F.3d 49 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Plitman*, 194 F.3d 59 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Portela*, 167 F.3d 687 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Praetorius*, 622 F.2d 1054 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . 67

*United States v. Quijada*, 588 F.2d 1253 (9th Cir.1978) . . . . . . . . . . . . . . . . . . . . 16

*United States v. Rabinowich*, 238 U.S. 78 (1915) . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Ramirez-Amaya*, 812 F.2d 813 (2d Cir. 1987) . . . . . . . . . . . . . . 26

*United States v. Resto*, 824 F.2d 210 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Rivera*, 22 F.3d 430 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 68, 91

*United States v. Robinson*, 303 F. Supp. 2d 231 (N.D.N.Y. 2004) . . . . . . . . . 50, 77

*United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009) . . . . . . . . . . . . . . . . 56, 73

*United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010) . . . . . . . . . . . . . . . . . 43

*United States* v. *Rodriguez*, 499 Fed. Appx. 904 (11th Cir. 2012) . . . . . . . . . . . . . 87

*United States v. Rosa*, 17 F.3d 1531 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Rose*, 590 F.2d 232 (7th Cir.1978) . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Rosnow*, 977 F.2d 399 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . 7, 91

*United States v. Sanchez*, 659 F.3d 1252 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . 65

*United States v. Scharner*, 426 F.2d 470 (3rd Cir. 1970) . . . . . . . . . . . . . . . . . . . . 83

*United States v. Scott*, 677 F.3d 72 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 61

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Si Lu Tian*, 339 F.3d 143 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . 5

*United States v. Silverman*, 861 F.2d 571 (9th Cir. 1988) . . . . . . . . . . . . . . . . . 33

*United States v. Simon*, 964 F.2d 1082 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . 78

*United States v. Sir Kue Chin*, 534 F.2d 1032 (2d Cir. 1976) . . . . . . . . . . . . . . . 36

*United States v. Snype*, 441 F.3d 119 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . 6

*United States v. Swafford*, 512 F.3d 833 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . 38

*United States v. Tellier*, 83 F.3d 578 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Teslim*, 869 F.2d 316 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Truman*, 688 F.3d 129 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . 96

*United States v. Waldron*, 590 F.2d 33 (1st Cir. 1979) . . . . . . . . . . . . . . . . . . . . 16

*United States v. Walker*, 191 F.3d 326 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 5

*United States* v. *Warren*, 306 Fed. Appx. 682 (2d Cir. 2009) . . . . . . . . . . . . . . . . .58

*United States v. Wexler*, 79 F.2d 526 (2d Cir. 1935) . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Williams*, 470 F.2d 915 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . 91

*United States v. Williams*, 536 F.2d 810 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . 27

*United States v. Wright*, 625 F.3d 583 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 84

*United States v. Young*, 470 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Zichettello*, 208 F.3d 72 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . 91

*WEC Carolina Energy Solutions LLC v. Miller*, *687* F.3d *199* (4th Cir.2012) . 42, 47

*Yates v. United States*, 354 U.S. 298 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**STATUTES**

18 U.S.C. § 1030 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 41-49

18 U.S.C. § 1201(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 21

18 U.S.C. § 3237(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**MISCELLANEOUS**

Leonard B. Sand *et al.*, *Modern Federal Jury Instructions* ¶ 5.02 . . . . . . . . . . . . 62

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
UNITED STATES OF AMERICA
                                            :          12 Cr. 847 (PGG)
        - v. -
                                            :
GILBERTO VALLE,
                                            :
                        Defendant.
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## RESPONSE OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S MOTIONS FOR A NEW TRIAL AND JUDGMENT OF ACQUITTAL

    The Government respectfully submits this response in opposition to defendant Gilberto

Valle's June 17, 2013 motions for: (1) Judgment of Acquittal on Count One; (2) Judgment of

Acquittal on Count Two; and (3) a New Trial. Each of these motions ignores the law related to

such post-trial applications, and cumulatively the defendant simply rehashes a number of

arguments that were rejected by the jury. In short, the Court presided over a trial in which

meticulous attention was paid to fundamental fairness and the proper application of the law.

Valle's claims of error are meritless. For the reasons explained in more detail below, the Court

should deny each of the defendant's applications.

### STATEMENT OF FACTS

    Between 2006 and 2012, defendant Gilberto Valle worked as an officer with the New

York City Police Department. (Tr. 156).[1] As a member of the police department, Valle received

---

[1] "Tr." refers to the trial transcript in the above-captioned case; "GX" refers to Government Exhibits
introduced at trial; "DX" refers to defense exhibits introduced at trial; "NT Br." refers to the defendant's
June 17, 2013 Memorandum in Support of his Motion for a New Trial; "JA1 Br." refers to the
defendant's June 17, 2013 Memorandum in Support of his Motion for Judgment of Acquittal on Count
One; "JA2 Br." refers to the defendant's June 17, 2013 Memorandum in Support of Motion for Judgment
of Acquittal on Count Two. "PD Decl." refers to the June 17, 2013 Declaration of Dr. Park E. Dietz in
Support of Valle's Motion for a New Trial.

extensive training and was entrusted with access to weapons, as well as access to police databases containing sensitive  information restricted to official police uses.  (Tr. 914-47, 992-94, 975-986; GX 610-614).  Valle lived in an apartment in Queens with his wife and infant child. (Tr. 150-51).

By 2012, Valle had begun communicating over the internet with three men regarding plans to kidnap and commit acts of violence against a group of women. (Tr. 418-652, 1030-34; GX 401-43). The three men were a New Jersey resident named Michael Van Hise, a resident of the United Kingdom known to Valle as "Moody Blues" or "Christopher Collins," and a resident of India and Pakistan known to Valle as "Ali Khan." (Tr. 1030-34; GX 401-43). With each of these individuals, Valle engaged in extensive discussions regarding the logistics of kidnapping specified women, and subjecting them to a number of violent activities, including rape, torture, and murder. (Tr. 418-652, 1030-34; GX 401-43). In his conversations with Van Hise, Valle agreed to kidnap and bring to Van Hise a specified woman in exchange for money. (GX 430-34). In his conversations with the two other men, Valle solicited advice on how to kidnap and commit acts of violence against other women without detection, and repeatedly assured the men of his seriousness. (GX 401-29). All of the women that Valle identified as his intended targets were women that Valle knew or had met in his personal life. (Tr. 180, 241-45, 271-73, 332-333, 905; GX 401-43).

As Valle's plans to kidnap his intended victims evolved online, he took additional steps toward realizing his plans. First, Valle took steps to retrieve updated information on where the women he was targeting lived and worked. (Tr. 273, 346-50, 560-84). These steps included offering to send items, such as a Policeman's Benevolent Association ("PBA") card, to their homes.  (Tr. 244, 273, 907-10; GX 110, 439). Valle searched for the address of one of the

intended victims, a high-school student who attended Valle's alma mater, on an online search

engine. (Tr. 1276; GX 1005A). Valle also repeatedly sent text messages to certain of the women

asking for updates on planned moves and updated employment information. (Tr. 273, 281, 346-

49; GX 436, 439).

Second, Valle engaged in surveillance of some of the women he discussed targeting. On

multiple occasions, Valle arranged for these women, most of whom he had not seen in years at

the time that his online conversations began to escalate, to meet with him at locations near their

workplaces and homes. (Tr. 289-91, 352-53, 997-98). On one occasion, Valle stated to one of his

coconspirators that he had arranged a ruse lunch meeting with a target in Maryland. (GX 410).

Valle then drove to Maryland and met with his target under the ruse of a lunch with his family.

(Tr. 290-91). Valle later described the meeting to his coconspirator and his thoughts of violence

as the lunch meeting unfolded. (GX 410). On yet another occasion, Valle surveilled the block of

a friend of his wife, whom he agreed to kidnap as part of his dealings with Van Hise. (Tr. 1034;

GX 434).

Third, Valle researched means and methods of executing his plans. (Tr. 1180-1276). On

multiple occasions, Valle searched for formulas to manufacture chloroform at home. (Tr. 1239;

GX 1000). On one occasion, Valle sent a link to one such chloroform recipe to a coconspirator.

(Tr. 542; GX 604). Valle also repeatedly searched for instructions on how to apply chloroform to

women, how to restrain women with ropes, what the "best rope" would be to restrain a person,

"how to cook a human alive," and methods of assaulting a human being with a blunt object,

among numerous other searches. (Tr. 1239, 1275, GX 1000, 1001). Valle also reviewed a

number of articles containing details about abducted women, convicted kidnappers, and the

circumstances surrounding investigations of these crimes. (Tr. 1197; GX 217, 229, 230, 606).

-3-

Moreover, in the time period before and during his planning with his coconspirators, Valle illegally accessed the New York City Police Department's ("NYPD") computer systems to gather information on the women who were his intended targets. (Tr. 571-84; GX 615, 616B, 616C, 616E, 617). In contravention with his training, Valle entered the names of women he targeted into NYPD computers that accessed local and federal law enforcement databases. (Tr. 940-43; GX 615, 616B, 616C, 616E, 617).

During the time period preceding his arrest, Valle's behavior at home grew increasingly abnormal. (Tr. 163). Valle grew estranged from his family, and began spending the entirety of his evenings online discussing his plans to engage in acts of violence with his coconspirators. (Tr. 163-64; GX 401-43). Valle missed a substantial period of work during this time period. (Tr. 1003-04). Concerned about his devolving behavior, Valle's wife ultimately installed software on the computer Valle used that allowed her to see certain of Valle's online activities and later discovered his discussions regarding plans to victimize her and other women. (Tr. 174-76, 180-83). After discovering this material, Valle's wife left their home and turned the computer over to the FBI. (Tr. 186-87). After an investigation, the FBI placed Valle under arrest. (Tr. 1016-22).

**PROCEDURAL HISTORY**

On October 24, 2012, Valle was arrested pursuant to a Complaint, presented before a United States Magistrate Judge, and detained. Valle subsequently appealed his detention in this Court and in the U.S. Court of Appeals for the Second Circuit. Valle's bail appeals were all rejected. On November 15, 2012, a grand jury in the Southern District of New York returned Indictment 12 Cr. 847 (PGG) (the "Indictment"), charging Valle with one count of kidnapping conspiracy, in violation of Title 18, United States Code, Section 1201(c), and one count of illegally accessing a restricted federal database, in violation of Title 18, United States Code,

-4-

Section 1030(a)(2)(B). Valle's trial before a jury commenced on February 25, 2013 and ended

on March 12, 2013 when the jury found Valle guilty on both counts of the Indictment. Valle

subsequently filed the instant motions.

## DISCUSSION

I.    **Valle's Motions For Judgment of Acquittal**

A.    **Applicable Law**

A defendant challenging the sufficiency of the evidence pursuant to Rule 29 "bears a

heavy burden." *United States* v. *Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (quoting *United*

*States* v. *Finley*, 245 F.3d 199, 202 (2d Cir. 2001)); *United States* v. *Si Lu Tian*, 339 F.3d 143,

150 (2d Cir. 2003.  A jury's verdict must be upheld if "any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." *Jackson* v. *Virginia*, 443

U.S. 307, 319 (1979) (emphasis in original); *see also United States* v. *Glenn*, 312 F.3d 58, 63 (2d

Cir. 2002); *United States* v. *Payton*, 159 F.3d 49, 55-56 (2d Cir. 1998).  "In other words, the

court may enter a judgment of acquittal only if the evidence that the defendant committed the

crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable

doubt." *United States* v. *Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal citation and

quotation omitted).

In considering a Rule 29 motion, the Court should "review all of the evidence presented

at trial in the light most favorable to the government, crediting every inference that the jury

might have drawn in favor of the government." *United States* v. *Walker*, 191 F.3d 326, 333 (2d

Cir. 1999) (internal quotation marks omitted); *accord United States* v. *Martinez*, 54 F.3d 1040,

1042 (2d Cir. 1995).  Even where "either of the two results, a reasonable doubt or no reasonable

doubt, is fairly possible, [the Court] must let the jury decide the matter." *United States* v.

*Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks omitted).  Thus, the task of choosing among the permissible competing inferences that can be drawn from the evidence is for the jury, not for the reviewing court.  *See, e.g.*, *United States* v. *Jackson*, 335 F.3d at 180 ("courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal") (citing *Guadagna*, 183 F.3d at 129 ("Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.")); *United States* v. *Matthews*, 20 F.3d 538, 548 (2d Cir. 1994) (stating that the Court must affirm conviction "so long as, from the inferences reasonably drawn from the record as a whole, the jury might fairly have concluded that the defendant was guilty beyond a reasonable doubt").

"The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences drawn were not available or were not reasonable." *United States* v. *Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994); *see also United States* v. *Plitman*, 194 F.3d 59, 67 (2d Cir. 1999) ("Even if there had been evidence regarding these [defense] theories in the record, the jury was free to reject it").  Accordingly, "the government need not 'exclude every reasonable hypothesis other than that of guilt.'"  *Guadagna*, 183 F.3d at 130 (quoting *Holland* v. *United States*, 348 U.S. 121, 139 (1954)); *see Martinez*, 54 F.3d at 1042 ("it is the task of the jury, not the Court, to choose among competing inferences").

To prove a conspiracy charge as relevant here, the Government must establish that: (i) two or more persons entered into the unlawful agreement charged in the Indictment; (ii) the defendant knowingly and willfully joined the conspiracy; and (iii) one of the conspirators committed an overt act in furtherance of the conspiracy. *See, e.g.*, *United States* v. *Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003). "The coconspirators need not have agreed on the details of the

conspiracy, so long as they agreed on the essential nature of the plan." *United States* v. *McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) (internal quotations omitted); *see also United States* v. *Salameh*, 152 F.3d 88, 151 (2d Cir. 1998). "What matters in a conspiracy prosecution is whether the defendants agreed to commit the underlying offense, not whether their conduct would actually have constituted that offense." *United States* v. *Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994); *see also McDermott*, 245 F.3d at 137 ("[T]he essence of conspiracy is the agreement and not the commission of the substantive offense." (internal quotations omitted)). Likewise, "'the illegality of [a conspiracy] does not depend upon the achievement of its goal' and it therefore 'does not matter that the ends of the conspiracy were from the beginning unattainable.'" *United States* v. *Shellef*, 507 F.3d 82, 105 (2d Cir. 2007) (quoting *United States* v. *Giordano*, 693 F.2d 245, 249 (2d Cir. 1982)).

A conspiracy also may exist "even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas* v. *United States*, 522 U.S. 52, 63 (1997). "The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." *Id.* at 63-64. Regarding the final element for conspiracy, it is well established that an overt act in furtherance of the conspiracy need not be criminal in nature. *See Yates* v. *United States*, 354 U.S. 298, 334 (1957) ("It is not necessary that an overt act be the substantive crime charged in the indictment as the object of the conspiracy. Nor, indeed, need such an act, taken by itself, even be criminal in character.") (internal citations omitted),  overruled on other grounds, *Burks* v. *United States*, 437 U.S. 1 (1978).

-7-

**B.     There Was Sufficient Evidence For A Rational Jury To Find Valle Guilty of Participation in the Conspiracy Charged in Count One**

Valle makes a number of arguments in support of his motion for judgment of acquittal on Count One. All of these arguments should be rejected. The Government provided evidence at trial sufficient for the jury to conclude that Valle's electronic conversations with certain individuals and other conduct demonstrated genuine agreements to commit kidnappings.

**1.     That Valle Engaged in "Fantasy" Conversations With Others Does Not Negate the Significance of His Conversations With His Coconspirators**

First, Valle argues that because some of his communications with various others were fantastical, no reasonable juror could find that his communications with Michael Van Hise, Moody Blues and Ali Khan were part of a genuine conspiracy.  This argument fails.  There was nothing inconsistent or unreasonable in the jury finding that Valle agreed with his coconspirators named at trial to engage in kidnappings, while at the same time engaging in story-telling and fantastical chats with a host of others who did not share Valle's intent. The evidence presented at trial showed that Moody Blues, Ali Khan and Michael Van Hise were serious about their participation in the conspiracy.  And in their conversations with Valle, they stated as much explicitly.  For example:

<u>**Moody Blues**</u>

- On July 9, 2012, Moody Blues told Valle that he previously kidnapped and cannibalized two individuals. Moody Blues explained that he "tend[s] to work alone" because he had not found anyone who was serious and willing to assist him.  Moody also explained that his experience included previously victimizing others. (GX 404).

- During this same exchange, Moody Blues sent to Valle photographs of individuals he asserted he had previously

-8-

victimized and asked Valle whether he was "shocked." Valle responded, "not really. You seem legit." (GX 404).

- On July 9, 2012, during discussions about equipment needed to carry out a kidnapping and murder, Moody Blues stated that he had a "good cleaver" to cut a woman's body, but was concerned about transporting it from England to the United States. (GX 403). Moody Blues also stated that he had access to "anaesthetic gasses" to render a woman unconscious.  (GX 401).

- On July 9, 2012, Moody Blues gave Valle practical advice on how to get away with the kidnapping, including using cash to pay for supplies. (GX 403).

- On July 10, 2012, after Valle and Moody Blues discussed the kidnapping of Kimberly Sauer, Moody Blues asked for Sauer's address, so that he could find her house on Google Maps and know exactly where she lived.  (GX 407).

## Ali Khan

- On January 25, 2012, Ali Khan said that "I am for real. Not fantasy."  Khan also told Valle that he could advise Valle on how not to get caught: "I can guarantee . . . I hvae [sic] done it before, I ma [sic] doing it this month and I will always do it."  (GX 418).

- On January 27, 2012, Ali Khan told Valle that he was watching videos of animals being slaughtered to practice his slaughtering techniques. Khan sent Valle an internet link to one of the videos.  (GX 419).

- On April 4, 2012, Ali Khan complained of "going crazy" because of his recent inability to find a suitable victim. (GX 425).

## Michael Van Hise

- On February 28, 2012, during negotiations over the price for kidnapping Alisa Frisca, Michael Van Hise asked Valle if he was willing to lower the price to perform a kidnapping, and whether Van Hise could pay Valle in installments because Van Hise was short on cash.  (GX 432).

-9-

Moreover, Valle assured these men of his seriousness. He told them that only his fear of getting caught stood in the way of him taking action. For example:

### To Moody Blues

- On July 9, 2012, Moody Blues asked Valle, "You WILL go through with this? I've been let down before.  That's why I tend to work alone."  Valle responded, "Yes." (GX 404)(emphasis in the original).

- During that same conversation, Moody Blues and Valle discussed the kidnapping and cannibalization of Kimberly Sauer, and Valle stated "kidnapping her and getting away with it is an absolute truth."  (GX 405).

### To Ali Khan

- On January 25, 2012, Ali Khan said to Valle, "I think you are not for real . . . otherwise they would not be living." Valle explained that he is "just afraid of getting caught . . . if I were guaranteed to get away with it, I would do it." (GX 418).

- Later in the same conversation, Ali Khan asked Valle "ARE YOU REALLY REALLY INTO IT. ARE YOU READY TO SLAUGHTER ONE BEING SAFE."  Valle replied, "yes."  Khan then asked, "ARE YOU SURE?" Valle responded, "definitely." (GX 418) (emphasis in original).

### To Van Hise

- On February 28, 2012, Valle told Van Hise that the kidnapping plan was risky and that he needed to be properly compensated for that risk: "I'm putting my neck on the line here . . . if something goes wrong some how [sic] I am in deep shit. $5,000 and you need to make sure that she is not found.  She will definitely make the news." (GX 432).

FBI Special Agent Walsh, who reviewed all of Valle's communications obtained in the investigation, testified that at no point in his communications with these men did Valle claim to

-10-

any of them that he was merely engaging in fantasy discussion. (Tr. 821).  Moreover, in his post-arrest statement, Valle acknowledged that his conversations with these men were serious and genuine in a way that his conversations with others were not – Valle told FBI Special Agent Foto that Moody Blues and Ali Khan appeared to be more "serious" than other DFN users, and that his chats with Moody Blues and Ali Khan began to "bleed into his personal life." (Tr. 1031)

Although at trial Valle attempted to draw parallels between his conversations with his coconspirators and with others, the evidence at trial made clear the difference between the two sets of conversations. Unlike in Valle's conversations with his coconspirators, Valle's conversations with certain others highlighted in the defense case involved explicit assurances between the participants that these were "fantasy" conversations. For example:

- On February 24, 2012, a DFN user identified as Jackcrow and Valle discussed writing stories about violence against women. Jackcrow asked Valle to write a fictional story about a particular girl.  (DX E6).

- On April 22, 2012, Valle asked a DFN user identified as MeandHaris whether he would actually kidnap and torture a woman. MeandHaris replied, "I say know [sic] but you never know most probably NO . . . *no [sic]." (DX E10).

- On May 12, 2012, Valle and a DFN user identified as Gertrude H together wrote a story about knocking two women unconscious. Gertrude H commented "I think there is a great story evolving." (Defense E11).

- On April 22, 2012, MeandHaris asked Valle whether he would actually cannibalize a woman if given the opportunity.  Valle responded that "never for real . . .its fun to chat and push the envelope." (DX E10).

- On February 24, 2012, Valle agreed to assist Jackcrow in writing a story about the kidnapping and torture of a woman. (DX E10).

-11-

The distinction between the groups of conversation was clear: Moody Blues, Ali Khan and Van Hise all expressed a genuine desire to kidnap, torture and kill women, and because Valle believed these men were serious (as he told Special Agent Foto in a post-arrest statement), he was able to express to them his true intentions. By contrast, the other individuals with whom Valle communicated identified themselves as fantasists. Valle, who had an undisputed interest in kidnapping and brutalizing women, partnered with them in story-telling exercises.

There was nothing unreasonable or irrational in the jury's finding that Valle participated in fantastical chats with the fantasists, while at the same time engaging in actual planning with those who shared his commitment. In short, the evidence presented at trial – taken in the context of all the other evidence and seen in the light most favorable to the Government – demonstrates clearly that Valle's conversations with Moody Blues, Ali Khan and Michael Van Hise were genuine and real, and were meaningfully different from the conversations with other DFN users. Valle's arguments to the contrary (JA1 Br. 26-29) were advanced during the defense's cross-examinations and summation, and they were rejected by the jury.

Moreover, the jury was entitled to evaluate the chats in light of the other evidence presented at trial. For example, at set forth below, at the time Valle communicated with Moody Blues about kidnapping Sauer, Valle took concrete steps in furtherance of the plot. The evidence of those concrete steps was undoubtedly relevant to the jury's assessment of whether the Valle/Moody Blues chats were "real."

On July 9, 2012, Valle and Moody Blues began to discuss Sauer as a possible kidnapping target. (GX 401). On July 10, 2012, after deciding to focus on Sauer, Valle created a "word document . . . a blueprint of everything we will need to carry this out . . . will send it to you and we will review it an add to it as time goes on." (GX 407). Valle then sent the blueprint to

Moody Blues. (GX 407).  The document, entitled "Abducting and Cooking Kimberly: A Blueprint," contained a photograph of Sauer, accurate information about her physical characteristics, and a list of  "materials needed" to carry out the plan, including "chloroform," "rope (strongest kind to tie her up securely)," "gag (duct tape?)," "separate bag to gather her clothes," "gloves," and "cheap sneakers."  (GX 601).

On July 17, 2012, Moody Blues asked Valle whether he had a recipe for chloroform, one of the items on the "materials needed" list contained on the "Blueprint."  (GX 409). Valle told Moody Blues that he "found a website a couple of nights ago" and then sent Moody Blues a link to the website.  (GX 409).  Agent Walsh who reviewed the website testified that it was entitled "How to Make Chloroform at Home, Chemical and Lab Safety," and contained a list of ingredients (all of which were household items) and instructions on how to handle the gas safely. (GX 604; Tr. 485).

In the days that followed, Valle and Sauer exchanged text messages to arrange to meet in Maryland, where Sauer lived.  (GX 436).  By July 19, Valle and Sauer had agreed to meet for brunch on Sunday, July 21, 2012. Not long after the meeting was confirmed, Valle sent an electronic message to Moody Blues: "when I see her on Sunday, my mouth will be watering." (GX 410).  Ideas for torturing Sauer "will come to me on Sunday . . . I will be eyeing her from head to toe and licking my lips and longing for the day I can cram a chloroform soaked rag in her face."  (GX 410).

That same night, beginning at approximately 4:30 a.m., Valle conducted internet research in preparation for the Sauer kidnapping:

- 4:27 a.m. "how to kidnap someone"

- 4:30 a.m.  "how to abduct a girl"

- 4:38 a.m.  "how to chloroform a girl"

- 4:39 a.m. "can you use chloroform to have sex with your girlfriend"

- 4:40 a.m. "how to chloroform a girl"

- 4:52 a.m. "kidnapped girl"

(Tr. 1239, 1275, GX 1000, 1001).  On July 21, 2013, Valle drove from Queens to Maryland and had brunch with Sauer, along with his wife and baby.  (Tr. 290-91).  After Valle returned home, he emailed Moody Blues: "she look absolutely mouth watering.  I could hardly contain myself." (GX 411) .

In addition, Valle created approximately 89 separate file folders on a computer, each with the name of a potential kidnapping target.  (Tr. 422).   One file was called "Kimberly Sauer," and inside the file were a number of photographs of Sauer, and two images of a woman being roasted on a spit.  (Tr. 459).  Valle and Moody Blues previously discussed the possibility of roasting Sauer on a spit. (GX 402).  While discussing plans to kidnap Sauer, Valle sent Moody Blues a link to a video showing Sauer on vacation with her family.  (GX 405, 301).  Valle commented that Sauer "will be a terrific victim." (GX 405).

Though the Valle/Moody Blues chats contained elements of likely fiction (Valle's unsubstantiated reference to having access to a place in the mountains, for example) the jury was entitled to weigh that fact against other evidence that indicated Valle and Moody entered into a real criminal agreement: (i) Valle and Moody Blues statements to one another that they were serious; (ii) the Blueprint; (iii) the chloroform recipe; (iv) the timing of the trip to Maryland and related chats; (v) Valle's internet research; and (iv) the Kimberly Sauer file folder on Valle's computer containing photographs of her, and images of a woman roasting on a spit. In short, the

evidence presented at trial  taken in the context of all the other evidence and seen in the light

most favorable to the Government demonstrates clearly that Valle and Moody Blues entered into

a genuine criminal conspiracy to kidnap women.  To the extent conflicting inferences exist from

this evidence (and there are no legitimate conflicting inferences) the jury's decision cannot be

disturbed.  *Autuori*, 212 F.3d at 114.

> **2.    The Content of Valle's Communications With His Coconspirators**
> **Evidences Valle's Guilt on Count One**

Second, Valle argues that the content of Valle's communications with his coconspirators

was insufficient for the jury to conclude that a genuine conspiracy existed. Valle is wrong. The

content of these chats when viewed in light of the evidence of overt acts taken in furtherance of

the chats, were sufficient for the jury to find the existence of a conspiracy involving all four men.

For example, the evidence demonstrated that Valle and Michael Van Hise entered into a

kidnapping agreement.  They settled on a particular target: Alisa Frisca.  They settled on a price

of $5,000.  The agreement was evidenced in the following exchange:

> **Valle:** $5,000 and she is all yours.
>
> **Van Hise:** could we do 4[?]
>
> **Valle:** I'm putting my neck on the line here . . . if something goes
> wrong some how [sic] I am in deep shit. $5,000 and you need to
> make sure that she is not found.  She will definitely make the
> news.
> **Van Hise:** no prob shes [sic] never leaving the house and also k
> about the price and would you do a payment plan or full up
> front[?]
>
> **Valle:** full payment due at delivery . . . just so that you know she
> may be knocked out when I get her to you.  I don't know how ling
> the solvent I am using will last but I have to knock her our to get
> her out of her apartment safely

-15-

(GX 432). In the face of this explicit agreement, Valle argues that the fact that he did not kidnap

Frisca on certain of the dates that he and Van Hise discussed created reasonable doubt as to

whether Valle intended to carry out the plot.  (JA1 Br. 30). This argument is inconsistent with

the law. It is well settled that conspiracy is a crime separate and apart from the substantive

offense that is the object of the conspiracy.  In *United States* v. *Feola*, 420 U.S. 671, 95 S.Ct.

1255, 43 L.Ed.2d 541 (1975), the Supreme Court explained:

> The law of conspiracy identifies the agreement to engage in a
> criminal venture as an event of sufficient threat to social order to
> permit the imposition of criminal sanctions for the agreement
> alone, plus an overt act in pursuit of it, regardless of whether the
> crime agreed upon is actually committed. *United States* v. *Bayer*,
> 331 U.S. 532, 542 [67 S.Ct. 1394, 1399, 91 L.Ed. 1654] (1947).
> Criminal intent has crystallized, and the likelihood of actual,
> fulfilled commission warrants preventive action.

*Feola,* 420 U.S. at 694. "Since the conspiratorial plan itself raises the danger, the illegality of the

agreement does not depend upon the achievement of its goal." *Giordano*, 693 F.2d at 249

(internal citations omitted). "Moreover, it does not matter that the ends of the conspiracy were

from the beginning unattainable." *Id.* (citing *United States* v. *Rabinowich*, 238 U.S. 78, 85-86

(1915); *United States* v. *Rose*, 590 F.2d 232, 235-36 (7th Cir.1978), cert. denied, 442 U.S. 929

(1979); *United States* v. *Waldron*, 590 F.2d 33 (1st Cir. 1979); *United States* v. *Quijada*, 588

F.2d 1253, 1255 (9th Cir.1978)).  Here, the evidence of a real agreement could not have been

more clear: Valle and Van Hise decided on a target and on a price.  Viewed in light of the other

evidence presented in the case, the jury could have fairly concluded that Valle and Van Hise

entered into a genuine agreement to kidnap Frisca.

  In spite of the evidence discussed above, Valle also argues that the Government failed to

provide sufficient evidence at trial to demonstrate that Van Hise intended to kidnap a woman.

This argument is inconsistent with the evidence. First, and as discussed in greater detail above, Valle and Van Hise came to a specific agreement to kidnap Frisca for $5,000. (GX 432). Moreover, based on testimony regarding Van Hise's actual lack of financial resources (Tr. 755), a reasonable jury could find that Van Hise's attempt to convince Valle to accept a lower price for the kidnapping, or a payment plan, was consistent with his seriousness of purpose. In addition, as Special Agent Walsh testified that the FBI's conclusion that Van Hise was in fact serious about committing a kidnapping was based not only on Van Hise's email changes with Valle, but also on the FBI's interview of Van Hise, and the FBI review's of Van Hise's email communications with individuals other than Valle. (Tr. 873-74).

Valle makes similar arguments about Ali Khan.  Specifically, Valle argues that the jury could not have reasonably concluded that his conversations with Ali Khan were proof of the conspiracy because they included falsehoods. This argument is incorrect – the presence of fantastical or false elements of the Ali Khan conversations does not undermine the jury's conclusion that Valle entered into a real criminal conspiracy to commit a kidnapping.  First, the jury was entitled to evaluate the Ali Khan chats in their totality and in light of the other evidence presented at trial.  In doing so, the jury could have fairly concluded that both Valle and Ali Khan were serious about kidnapping a woman, and intended to work together to achieve this end.

As noted above, Ali Khan told Valle that he was experienced in kidnapping and committing violent acts against women, that he was willing to guide Valle through the process, and help ensure that Valle did not get caught. (GX 418).  He told Valle that he was "for real and not fantasy."  (GX 418).   Ali Khan also sent Valle a video of a goat being slaughtered.  (GX 419).  He commented that "the most easier [sic] thing in life is slaughtering. When I killed my first goat, my workers said it's easy . . . So it was. But the most important thing, 'NEVER GET

CAUGHT." (GX 417) (emphasis in original). Ali Khan complained to Valle about being unable to find a suitable victim, and that as a result he was going "crazy." (GX 425). Notwithstanding the fantastical elements within the chats, the jury could have easily believed that Ali Khan meant what he said: the he had victimized women in the past; that he wanted to do it again; and that he wanted to work with Valle. Moreover, as noted above, the fact that Valle and Ali Khan never completed a kidnapping does not undermine Valle's conviction on the conspiracy charge. *McDermott*, 245 F.3d at 137 ("[T]he essence of conspiracy is the agreement and not the commission of the substantive offense.").

   In arguing that Valle's communications with Ali Khan demonstrate that Valle did not commit to participating in a kidnapping plot, Valle points to the following exchange:

> **Ali Khan**: so when you think you can do it . . . how soon can you gather the courage[?]
>
> **Valle**: I don't know.

(GX 418). Contrary to Valle's arguments, this portion of the chat does not create reasonable doubt so to Valle's intentions. Earlier in the conversation, Valle told Ali Khan that he was "definitely" committed to a kidnapping, but that he still feared getting caught. (GX 418). In response Ali Khan asked "*when* [do] you think you can do it . . . how soon can you gather the courage [?]" (GX 418) (emphasis added). Ali Khan's question relates to *timing*, and not to Valle's commitment. Valle said "I don't know" – in other words, "I don't know exactly when I will be ready." Significantly, Valle did not say he would "never" be ready, or that he was reconsidering. Valle simply told Ali Khan that he was not *yet* prepared to set a specific date. This does not invalidate the agreement. *United States v. McDermott*, 245 F.3d at 137 ("The

coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan.").

After Valle's response "I don't know," Ali Khan assured Valle: "get your mind ready . . . I will guide the rest." (GX 418). Valle responded: "ok." (GX 418). Valle did not say, "I will never be ready" or "if I am ever ready, I will contact you. But until then, do not contact me." Ali Khan offered to guide Valle through the process "safely" and Valle agreed to be guided. Viewing the chat in its entirety, and in light of the other evidence in the case, the jury was entitled to find that Valle committed to participating in a kidnapping with Ali Khan.

*United States* v. *Cianchetti*, 315 F.2d 584 (2d Cir. 1963) is not to the contrary. In that case, the defendant's conviction for participating in a narcotics conspiracy was overturned after he had affirmatively "disclaimed any intention of buying heroin," and agreed that he could "do nothing at all" in connection with the conspiracy. *Cianchetti*, 315 F.2d at 588. In contrast, Valle clearly and affirmatively expressed his agreement to participate in a kidnapping ("definitely" (GX 418)) and only expressed uncertainty with respect to the date on which the plan would be executed. This is no way demonstrates that Valle was uncertain or "equivocal" (JA1 Br. 37) about joining the conspiracy.

Indeed, Valle's conversations with Ali Khan repeatedly demonstrated that *both* men were serious about achieving the goals of the charged conspiracy. For example, on January 25, 2012, Ali Khan told Valle, "I am for real. Not fantasy." (GX 418). Khan also told Valle that he could advise Valle on how not to get caught: "I can guarantee . . . I hvae [sic] done it before, I ma [sic] doing it this month and I will always do it." (GX 418). Ali Khan was also persistent in ensuring that Valle was equally serious. Ali Khan said "I am not happy with you. I think you are not for real. .other they would not be living. . .you are wasting my time buddy." (GX 418). Based on

-19-

these statements, viewed in light of the other evidence in the case, the jury was entitled to find

that Ali Khan was serious about completing the objectives of the conspiracy.

   Finally, Valle argues that his conversations with Moody Blues were insufficient to

evidence the existence of the charged agreement. (JA1 Br. 42). This argument is in conflict with

the evidence.  Indeed, Valle made this argument vigorously to the jury at trial, and the jury

rejected that argument based on the evidence, including:

- Moody Blues told Valle that he had kidnapped and victimized two individuals in the past. (GX 404).

- Moody Blues sent Valle photographs of his victims. (GX 404).

- Moody Blues told Valle he is generally works alone because he could not find a partner willing actually kidnap and cannibalize a woman. (GX 404).

- Moody Blues discussed with Valle necessary equipment such as cleavers and sleeping gasses. (GX 401).

- Moody Blues asked Valle for Sauer's exact address. (GX 407).

- Moody Blues provided Valle with practical advice on how to get away with the kidnapping, including using cash to pay for supplies. (GX 403).

- Moody Blues provided Valle with strategic advice, including: "Need a cleaver, not a saw (tried it – not very good!)";"Would need the week to spent, maybe a few days before to scope out the house and surrounds [sic], then get the meat."; and "REMEMBER, use cash at the [Home] Depot" when buying the rope. (GX 403).

- After deciding that they would put Sauer in the trunk of Valle's car, Moody Blues told Valle to line the trunk with "large plastic bags" rather than "tarp" because bags "might be easier to dispose of." (GX 405).

- Moody Blues stated to Valle "its good to brainstorm like this, everything needs to be perfect."  (GX 405).

In addition, Valle kept Moody Blues informed about the concrete steps he was taking in furtherance of the plan.  Valle told Moody Blues about the Blueprint and sent him a copy.  Valle told Moody Blues about the meeting with Sauer, and Moody Blues responded enthusiastically. From this, the jury could reasonably find a concrete agreement between Valle and Moody Blues to kidnap Sauer.

### 3.    The Evidence Established Numerous Overt Acts In Furtherance Of The Kidnapping Conspiracy

Focusing separately on each of Valle's coconspirators, Valle argues that the Government failed to prove any overt acts in furtherance of the conspiracy (JA1 Br. 30, 42, 45). This argument is factually incorrect and it depends on a misunderstanding of the Government's burden with regard to an overt act. The Indictment charged, and the Government proved at trial, a single conspiracy involving Valle and his three identified coconspirators to commit kidnappings of women.  Thus, to satisfy the overt act requirement, the Government was required to prove only a single overt act by any coconspirator. 18 U.S.C. § 1201(c). The proof at trial went well-beyond this requirement and proved numerous overt acts, including:

- Valle's drafting and transmission of the Blueprint for the abduction of Kimberly Sauer. (GX 601).

- Valle's research for chloroform formulas and his transmission of such a formula to one of his coconspirators. (GX 409, 604, 1001).

- Valle's surveillance of Frisca on March 1, 2012.  (Tr. 1034).

- Valle's trip to Maryland and meeting with Sauer. (Tr. 290-91; GX 436).

- Valle's unauthorized access to law enforcement databases to research potential kidnapping targets.

- Valle's transmission of PBA cards to Sauer and Frisca (Tr. 186, 273, 907; GX 109, 110)

The jury could have believed that any one of these events, among others, occurred for the overt act element of the kidnapping statute to be met. Valle has not demonstrated anything to the contrary.

Valle specifically argues that the lack of any overt acts related to Valle's discussions with Van Hise evidence the nonexistence of the conspiracy. Again, Valle is wrong in his suggestion that the Government was required to prove overt acts specifically involving his discussion with Van Hise, as opposed to an overt act in furtherance of the overall conspiracy. Regardless, contrary to Valle's assertions, the Government provided evidence sufficient to prove that Valle took at least two concrete steps with respect to the plan to kidnap Frisca. First, Valle surveilled Frisca shortly after agreeing to kidnap her. Second, Valle caused his wife to give Frisca a PBA card to establish a relationship of trust with her.

As to Valle's surveillance, the evidence demonstrated that Valle went to Frisca's apartment building on the Upper East Side of Manhattan on March 1, 2012, just two days after agreeing to kidnap her.  The evidence of Valle's presence at Frisca's building came from Valle's own words: he told Special Agent Foto that he was at the apartment building on March 1st to drop his wife off for a lunch date. (Tr. 1034).  Based on Valle's post-arrest statement the jury could have fairly concluded that on March 1st Valle was where he told Special Agent Foto he was.

Moreover, there was sufficient evidence for the jury to conclude that Valle intentionally lied to Agent Foto about the reason for his presence at the apartment.  Kathleen Mangan, Valle's

wife, testified that she and Frisca did not have a lunch date on March 1, 2012, and that she and

Frisca had not seen each other for almost a year before March 1st.  (Tr. 185).  Similarly, Frisca

testified that she and Mangan did not meet on March 1, 2012, and that the last time she saw

Mangan was in 2011.  (Tr. 910-11).  From this, a jury could have reasonably inferred that Valle

was not confused about the date of his wife's lunch with Frisca (the women had not seen each

other for a year).  The jury could have reasonably concluded that when Valle was confronted by

the FBI with evidence that he was at Frisca's apartment on March 1st, Valle was willing to admit

where he was, but not the reason for his presence.

       Valle argues in his papers that he could have lied to conceal another, non-criminal act,

such as a marital affair. (JA1 Br. 31).  Yet Valle was not just anywhere on March 1, 2012 for this

alleged other purpose. He was at the location of Frisca's apartment.  Given the timing of Valle's

presence at the apartment —  a mere two days after agreeing to kidnap Frisca —  the jury could

have easily concluded that Valle lied to Special Agent Foto to conceal that he was there for a

nefarious purpose, in furtherance of the kidnapping plot. And even if Valle could credibly argue

that he lied to conceal a non-criminal act (and there was no evidence to support such an

inference) the task of choosing among the permissible competing inferences that can be drawn

from the evidence is for the jury, not for the reviewing court.  *United States* v. *Jackson*, 335 F.3d

at 180.

       Valle does not dispute that he gave a PBA card to Frisca. He disputes, however, that a

jury could conclude that this was an act in furtherance of the kidnapping conspiracy.  Valle is

wrong.  In evaluating the evidence of the PBA card, the jury was entitled to consider other

evidence in the case, including the nature of the relationship between Valle and Frisca.  Frisca

testified that she and Valle had "no relationship at all," and that Valle's wife was not a close

friend. (Tr. 905). Frisca also testified that she did not drive and did not need a PBA card. (Tr. 908). Moreover, Michael McDermott, a retired NYPD officer and former union delegate to the PBA called by the defense to provide testimony on standard practices regarding PBA cards, testified that police officers typically give PBA cards to "immediate family" – parents, spouses and children – and "people who help you out" such as doctors and dentists. (Tr. 1425, 1428) Officer McDermott testified that he never gave a PBA card to someone who was not a friend of his, at the request of his wife. (Tr. 1429).

The jury also heard evidence that Valle gave a PBA card to Kimberly Sauer, another kidnapping target. Sauer, who lived in Maryland testified that she had no need for a PBA card, and never asked Valle to send her one. (Tr. 275). Sauer further testified that Valle asked for her address, so that he could mail the card to her. (Tr. 273-74). Officer McDermott testified that he never gave a PBA card to someone who lived outside of New York unless the person specifically asked for one. (Tr. 1429).

Taking this evidence together: (1) that Frisca and Valle had no relationship; (2) that Frisca did not need a PBA card; (3) that Valle gave a PBA to another kidnapping target who lived out of state, and who neither needed it, nor asked for it; and (4) that Valle's actions with regard to the PBA card were a significant departure from the way such cards are typically handled by NYPD officers, a jury could have easily concluded that Valle gave Frisca the PBA card in furtherance of the plot to kidnap her. That there could be another, innocent explanation for Valle's PBA card activities is an argument Valle was permitted to make on summation, but not a basis for the grant of a Rule 29 motion.

Furthermore, Valle is incorrect in arguing that there was insufficient evidence for the jury to conclude that Valle's visit to Kimberly Sauer in Maryland in July 2012 was for the purpose of

surveillance, and in furtherance of the kidnapping plot. The chronology of Valle's chats with

Moody Blues, his internet research and the timing of his trip to Maryland, all made clear that the

trip was an act in furtherance of the conspiracy. Specifically:

- July 9, 2012: Valle and Moody Blues chatted about various kidnapping victims (GX 401) and decided on Sauer. (GX 402, 403, 404).

- July 9, 2012: Valle sent Moody Blues a link to the video of Sauer on vacation, and stated that she would be a "terrific victim." (GX 405, 301).

- July 10, 2012: Valle created the "Blueprint" and sent it to Moody Blues. (GX 407, 601).

- July 17, 2012: Valle told Moody Blues that he planned to meet Sauer on Sunday, July 21. (GX 408).

- July 17, 2012: Moody Blues asked Valle whether he found a recipe for chloroform and Valle sent Moody Blues an internet link to a recipe. (GX 409, 604).

- July 19, 2012: Valle told Moody Blues that his "mouth will be watering" when he sees Sauer, and ideas for torturing her will come to him. (GX 410).

- July 20, 2012: Valle conducted a series of internet searches including "how to kidnap a girl" and "how to chloroform a girl." (Tr. 1239, 1275, GX 1000, 1001).

- July 21, 2012: Valle met with Kimberly in Maryland. (Tr. 290).

- July 22, 2012: after the meeting, Valle told Moody Blues that Sauer "looked absolutely mouthwatering." (GX 411).

The trip to Maryland occurred after Valle and Moody Blues reached an agreement with respect

to Sauer, and around the time that Valle drafted the Blueprint and conducted internet research on

chloroform and kidnapping. Based on this sequence of events, the jury could have easily

concluded that Valle's visit to Maryland was not an innocent "family vacation" (JA1 Br. 45), but rather an overt act in furtherance of the kidnapping conspiracy.

Moreover, Valle's argument that the there was insufficient proof of venue, based on the alleged lack of overt acts in the district, should be rejected. The Government need not prove venue beyond a reasonable doubt, but rather by the less demanding standard of preponderance of the evidence. *United States* v. *Geibel*, 369 F.3d 682, 695-96 (2d Cir. 2004); *United States* v. *Gonzalez*, 922 F. 2d 1044, 1054-55 (2d Cir. 1991). A defendant charged with a "continuing" offense – as is the case here – may be tried in any district in which some part of the offense occurred. 18 U.S.C. § 3237(a); *see, e.g., United States* v. *Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994); *United States* v. *Delia*, 944 F.2d 1010, 1013-14 (2d Cir. 1991). Therefore, "venue may properly be laid in the district in which the conspiratorial agreement was formed or in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators." *United States* v. *Ramirez-Amaya*, 812 F.2d 813, 816  (2d Cir. 1987).

Here, Valle's meeting with Sauer in Maryland was clearly an appropriate basis for venue. The trip occurred after Valle and his coconspirator had explicitly discussed kidnapping Sauer, and the communications described above made clear that the real purpose of the trip was surveilling her. As such, the trip to Maryland was not mere preparation as Valle argues (JA1 Br. 47), but rather an overt act in furtherance of the kidnapping conspiracy. When driving from Queens to Maryland, Valle had to have traveled through the Southern District of New York, which establishes venue.  *Ramirez-Amaya*, 812 F.2d at 816.  In *Ramirez-Amaya*, the Court held that an airplane flight over land or water contained within the Southern District of New York was "sufficient to make venue in the Southern District proper." *Id.* at 816 (citing *United States* v. *Williams,* 536 F.2d 810, 812 (9th Cir. 1976) (holding that co-conspirator's flight over a district

while en route to obtain narcotics was sufficient to support venue there)). The same analysis applies to Valle's trip over a bridge within the Southern District of New York. That trip was sufficient for a jury to find venue by a preponderance of the evidence.  Moreover, as discussed above, the Government proved at trial a single conspiracy, and the jury could have found that another concrete step occurred in the Southern District of New York (the surveillance of Frisca, for example) for the overt act element of the kidnapping statute to be met. There is no validity to any of Valle's overt act arguments, or his related argument that there was insufficient proof of venue.

In addition to the chat and the other evidence described above, the Government presented at trial other evidence from which the jury could infer that the Valle intended to kidnap and cannibalize women and that the above-described overt acts were committed in furtherance of the charged conspiracy.  This evidence included:

- Valle's internet web history that showed Valle logged on to internet sites dealing with death, violence and kidnapping "tens of thousands of times."  (Tr. 1112).

- Valle's internet search such as "how to tie someone up," "how to kidnap a girl," "how to abduct a girl," "how to knock someone unconscious."  (Tr. 1239, 1275, GX 1000, 1001).

- Valle's access to a confidential and restricted NYPD database where he searched for information about potential kidnap targets. (Tr. 940-43; GX 615, 616B, 616C, 616E, 617).

- The scores of file folders Valle created on his computer, each containing photographs of identified women.  (GX 618, 619A - 619G).

- Still images and videos that Valle viewed including a film of a naked women standing as a flame burned in between her legs. (GX 295A, 295B)  (Tr.1093-94).

- Valle searched for the address of one of the intended victims, a high-school student who attended Valle's alma mater, on an online search engine. (Tr. 1276; GX 1005A).

In short, the evidence presented at trial – taken in the context of all the other evidence and seen in the light most favorable to the Government – demonstrates clearly that Valle entered into kidnapping agreements with one or more of his charged coconspirators and that overt acts were taken in furtherance of the agreement. Valle's argument that the evidence was insufficient should be rejected.

## C.        There Was No Error in the Admission of Valle's Coconspirator's Statements

Valle argues that the Court erred in admitting the statements of his co-conspirators. (JA1 Br. 52). He asserts, in support of this argument, that the Government failed to demonstrate the reliability of the statements. (JA1 Br. 54). He relatedly asserts that the Government did not prove that the conspiracy was real, justifying the admission of Valle's coconspirators' statements. (JA1 Br. 56). With these arguments, Valle essentially rehashes his argument that the evidence supporting the jury's verdict on Count One was insufficient. But he also badly misapplies the law that concerns the admission of coconspirator statements.

There is no question that Valle's own statements were admissible at his trial. Fed. R. Evid. 801(d)(2)(A) (a statement is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party in an individual or representative capacity").  Rule 801 further provides that a statement is non-hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). "To admit an out-of-court declaration under this rule, the district court must find by a preponderance of the evidence '(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the

course of and in furtherance of the conspiracy.'" *United States* v. *James*, 712 F.3d 79, 105 (2d

Cir. 2013) (quoting *United States* v. *Farhane*, 634 F.3d 127, 161 (2d Cir. 2011)). "In making a

preliminary factual determination of these prerequisites, the court may consider the hearsay

statements themselves." *United States* v. *Diaz*, 176 F.3d 52, 83 (2d Cir. 1999).

       With regard to the first and second prongs of the Second Circuit test for the admission of

co-conspirator statements, Valle simply cannot demonstrate the Court erred in finding, by a

preponderance of the evidence, the existence of a conspiracy involving Valle and his three

co-conspirators. *See James*, 712 F.3d at 105. In making this determination, the Court had

available recorded chat transcripts between Valle and each of his co-conspirators describing, in

vivid detail, plans to engage in kidnappings and related acts of violence against specified

women. Moreover, the Court heard the testimony of Valle's wife, who described her discovery

of these communications on the computer used by Valle. There was no countervailing evidence

suggesting that the conspiracy did not exist; the preponderance standard for determining the

existence of a conspiracy involving Valle and his three coconspirators was therefore easily met.

       With regard to the third prong, that the statement was made "during the course of and in

furtherance of the conspiracy," Valle similarly cannot demonstrate that, by a preponderance of

the evidence, this prong was not met.  *See James*, 712 F.3d at 105. The Court of Appeals has

observed that this prong may be established in a multitude of ways, writing in *James* that "[t]he

ways in which a statement might 'promote or facilitate' the conspiracy include, among others,

'seeking to induce a coconspirator's assistance'; 'informing coconspirators as to the progress or

status of the conspiracy'; and prompting a non-coconspirator to respond in some way that

'promotes or facilitates the carrying out of a criminal activity.'" *Id.* at 106 (quoting *United States*

v. *Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993) (internal citation omitted). Thus, the Second Circuit

has approved the admission of statements as "in furtherance of the conspiracy, for example,"
where one coconspirator gave another "advice . . . on how [he] should conceal his identity when
traveling on behalf of al Qaeda outside the Afghanistan-Pakistan area," even where neither
participant in the conversation was the defendant. *See In re Terrorist Bombings of U.S.
Embassies in East Africa*, 552 F.3d 93, 139-40 (2d Cir. 2008). Similarly, in *James*, the Court of
Appeals rejected the defendant's assertion that a statement should not have been admitted as in
furtherance of a conspiracy involving him because it was a discussion between two other
individuals, one of whom was "no longer talking" to the defendant. *James*, 712 F.3d at 106. This
precedent makes clear that here, where the conversations at issue served all of the purposes
described in the case law, there can be no serious claim that these conversations were not in
furtherance of the conspiracy. At a minimum, Valle used his conversations with each of the three
men to "inform[] [his] coconspirators as to the progress or status of the conspiracy," but the
record demonstrates that, with all three of them, Valle clearly went much further. *Id.*

  Valle, however, argues that the Court failed to take sufficient steps to confirm the
reliability of the coconspirator statements admitted at Valle's trial. (JA1 Br. 54). He cites the
*Diaz* court's admonition that for coconspirator statements to be admissible "there must be some
independent corroborating evidence of the defendant's participation in the conspiracy." *Diaz*,
176 F.3d at 83. But here, there was ample corroborating evidence of Valle's participation. Apart
from records demonstrating that the defendant had illegally accessed NYPD computers, the
corroborating evidence included the testimony of Valle's wife that she had discovered Valle was
using a shared computer to engage in nightly conversations with the three men who were proven
to be Valle's coconspirators (Tr. 155, 175-83); Ms. Mangan's testimony that Valle's discussions
with his coconspirator's involved real women whom Valle knew from their personal interactions

(Tr. 182-86); Ms. Mangan's testimony that she had observed that Valle was transmitting images of these women to his coconspirators over the Mhal52@yahoo.com account (Tr. 184-86); testimony of Andria Nobel confirming that Valle had transmitted accurate details regarding her profession, ethnic identity and other identifying information to a coconspirator (Tr. 240, 250); the testimony of Kimberly Sauer that Valle had traveled to meet her in Maryland, after not seeing her for many years, which corresponded with Valle's communications with a coconspirator (Tr. 290-92); and the testimony of Ms. Sauer that Valle had requested her address and sent her a PBA card in Maryland (Tr. 273-74). Moreover, Valle ignores the subsequently admitted digital records confirming that Valle had sought information on the manufacture of chloroform, the application of chloroform, and the use of objects to incapacitate (GX 1000), as well as the testimony regarding Valle's post-arrest statement in which he admitted to discussions with all three coconspirators involving kidnapping and violence. (Tr. 1030-34).  *See United States* v. *Coplan*, 703 F.3d 46, 82-83 (2d Cir. 2012) (observing that coconspirator statements may be admitted initially on the basis of statements alone and that subsequently-admitted evidence may later be used to assess the general admissibility of the statements).[2] Indeed, Valle ignores the fact that the conversations whose admission he challenges all featured Valle's own words, which were unquestionably admissible, and that the Court was entitled also to examine Valle's own statements in "independently" determining the reliability of his coconspirator's

---

[2] Although the Court did not frame its ruling explicitly under the "subject to connection," rubric, the *Coplan* court indicated that formulaic rulings in connection with the admission of coconspirator statements are unnecessary. *See id.* at 83 ("it appears that the defendants' fundamental objection to the coconspirator evidence relates to the generalized nature of the District Court's ruling . . . . we have never required a district court to make particularized rulings or conduct separable analysis with respect to each coconspirator, much less each coconspirator statement."). Moreover, Valle failed to reissue his challenge to the admissibility of the statements at the close of the Government's evidence. This failure could be considered a waiver of his challenge to their admissibility. Regardless, there is no question that, considering the information later admitted in the trial, a preponderance of the evidence would have independently demonstrated the existence of the conspiracy, and thus any procedural error was harmless. *Diaz*, 176 F.3d at 83 ("the improper admission of [coconspirator statements] is subject to harmless error analysis.").

statements. On this record, Valle cannot demonstrate that the Court erred in concluding, by a preponderance of the evidence, that these statements were sufficiently reliable to be admitted.

The cases upon which Valle relies are not to the contrary. *United States* v. *Stewart*, 433 F.3d 273, 290-93 (2d Cir. 2006), is not a case dealing with a situation remotely similar to the one presented here. (JA1 Br. 54). In *Stewart*, the Government admitted the separately-taken statements of both Martha Stewart and her stockbroker, to government officials, against each other. *Id.* at 290. On appeal, after the Supreme Court's *Crawford* decision, the defendants asserted that the statements were admitted in violation of the Confrontation Clause. *Id.* Before delving into the Sixth Amendment issues that were at the center of the decision, the court briefly observed that the admission of these statements required a preponderance of evidence independent of the statements demonstrating the existence of the conspiracy and the participation of the defendant and the declarants who made the statements in furtherance. *Id.* at 291.[3] Without detailing it, the court observed that, in that case, there was "ample evidence" of the existence of the conspiracy. *Id. Tellier* involved a situation where the "only evidence" of the defendant's participation in a narcotics conspiracy was one witness's description of a conversation between two individuals, neither of whom was the defendant. *Tellier*, 83 F.3d at 580 ("Roy Tellier maintains, and the government does not dispute, that the only evidence linking him to the marijuana conspiracy was Rodriguez's recitation of what Robin Tellier had told him about Roy selling the marijuana."). In *Conrad*, although the Sixth Circuit vacated on other grounds, the court actually concluded that the Government had presented "sufficient independent and

---

[3] Although the distinction is ultimately immaterial here, this *dicta* in the *Stewart* case arguably goes a step beyond what the Second Circuit has generally instructed is necessary in terms of corroboration. *See United States* v. *Tellier*, 83 F.3d 578, 580 (2d Cir. 1996) (collecting cases, observing "for such statements to be admissible, there must be some independent corroborating evidence of the defendant's participation in the conspiracy.").

corroborating evidence" of the defendant's participation in a drug conspiracy, where agents had described drugs found in her home and a post-arrest statement, and another witness described an admission by the defendant. *Conrad*, 507 F.3d at 429-30. In *United States* v. *Bucaro*, 801 F.2d 1230, 1232-33 (10th Cir. 1986) (JA1 Br. 54), the Tenth Circuit affirmed and rejected the defendant's argument that there was insufficient corroborative evidence of his participation to warrant the admission of conspirator statements. Importantly, the court observed that "[w]hat must be proved by 'substantial, independent evidence' is that a combination existed between third parties and the defendant. It is not necessary, however, for the government to prove that the conspiracy was for unlawful purposes. 'The element of illegality may be shown by the declarations themselves.'" *Id.* (quoting *Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 249 (1917)). The *Bucaro* court concluded that there was substantial "circumstantial" evidence of the defendant's participation in the conspiracy, such as phone records showing he communicated with coconspirators, and therefore "conclude[d] that the district court did not erroneously admit co-conspirator hearsay testimony." *Id.* at 1232-33. *United States* v. *Daly*, 842 F.2d 1380, 1386 (2d Cir. 1988) (JA1 Br. 54), is yet another case relied upon by Valle in which the court concluded that a conversation between two of the defendant's coconspirators was properly admitted where other evidence suggested that the defendant was, in fact, participating in the activities described in the coconspirator conversations. *United States* v. *Silverman*, 861 F.2d 571, 579 (9th Cir. 1988) (JA1 Br. 54), stands only for the principle that a "co-conspirator's out-of-court statement, standing alone, is insufficient to establish that the defendant had knowledge of and participated in a particular conspiracy." In that case, the only proof of the defendant's participation was testimony regarding a conversation not involving the defendant in which a third-party claimed that the defendant was his "cocaine source." *Id.* at 579. Thus, Valle

has relied on a series of dissimilar cases involving challenges to conversations not involving the defendant. These cases in no way demonstrate that the Court here erred in admitting the contested online chats.

Indeed, both Valle's brief and the case law are devoid of any cases where a court found that conversations which actually involved the defendant were improperly admitted pursuant to the law governing the coconspirator hearsay exception. A strange feature of Valle's challenge is that, even accepting his argument that the coconspirator statements were improperly admitted, all of his statements were unquestionably admissible under Rule 801(d)(2)(A), and therefore the other half of the conversations would have had to have been admitted in order to explain the context of these statements. The lack of cases excluding conversations involving the defendant suggests that the reliability concerns in the cases addressing the coconspirator hearsay exception are in reality focused upon conversations in which the defendant was not a participant. Regardless, this all underscores the extent to which Valle's coconspirator hearsay argument is really just an attempt to reframe his argument that the jury should not have concluded that Valle was guilty of the crime charged in Count One. He finds no support in the law for this argument. The Court should reject the notion that the reliability of the chats between Valle and his coconspirators was insufficiently demonstrated. Similarly, the Court should reject Valle's argument that the Government failed to prove, by a preponderance, the existence of the conspiracy. (JA1 Br. 56). This is another recitation of his challenge to the sufficiency of the evidence and Valle cites no authority in support of it. Valle's coconspirator statement arguments are meritless.

### D.    Valle's Multiple Conspiracies Arguments Should Be Rejected

Valle argues that the Government failed to prove the single conspiracy charged in the Indictment, but rather "at most" proved "the possible existence of three distinct conspiracies." (JA1 Br. 57). Valle argues that this was highly prejudicial and requires that the Court enter judgment of acquittal. (JA1 Br. 58). Valle is wrong. Although Valle's brief fails to adequately articulate its theory under which the existence of multiple conspiracies warrants judgment of acquittal, the Circuit has instructed that "to secure the reversal of a conviction on a multiple conspiracies theory, [a defendant] must show both that (1) 'the indictment charged a single conspiracy, but the proof disclosed several independent conspiracies, and (2) [the] defendant was so prejudiced by this variance as to be denied a fair trial.'" *United States* v. *Needham*, 377 Fed. Appx. 84, 86-87 (2d Cir. 2010) (quoting *United States* v. *Desimone*, 119 F.3d 217, 226 (2d Cir. 1997)). The Court of Appeals has further instructed that "[g]enerally, [w]hether the government's proof shows a single conspiracy or multiple conspiracies is a question of fact for a properly instructed jury." *Id.* (internal quotation marks omitted). In the "analysis of the first prong," courts in this circuit are instructed to "apply a sufficiency of the evidence standard, viewing the evidence 'in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *Id.* (quoting *United States* v. *Parkes*, 497 F.3d 220, 225 (2d Cir. 2007)). For all of the reasons described earlier in this submission, Valle cannot demonstrate that the proof was insufficient to establish the existence of the charged conspiracy.  At bottom, in this single-defendant trial, the question of whether the defendant participated in the single conspiracy charged in the Indictment was a fact question for the jury, which it decided in the affirmative. Valle's argument that multiple conspiracies were proved is, considered most favorably, simply another version of his

argument that the evidence was insufficient to support the jury's verdict on Count One. This argument should be rejected, as should his argument that there was no evidence of a common goal among the conspirators. The proof demonstrated that the four identified conspirators shared a common goal of accomplishing kidnappings of women identified by Valle. Nothing more complex was required. Valle cannot demonstrate that the evidence was insufficient to prove the existence of the single conspiracy charged in the Indictment. For this reason alone, his multiple conspiracies argument fails.

But even if Valle could meet the "demanding standard" related to the first prong, *see Needham*, 377 Fed. Appx. at 87, his multiple conspiracies argument would fail because he simply cannot show any prejudice. In the context of addressing appropriate jury charges, the Second Circuit has held that the multiple conspiracy analysis is inapplicable to a trial of a single defendant because such a defendant cannot demonstrate prejudice. *See United States* v. *Sir Kue Chin*, 534 F.2d 1032, 1035 (2d Cir. 1976) (multiple conspiracy analysis inapplicable in the trial of a single defendant); *United States* v. *Corey*, 566 F.2d 429, 431 n. 3 (2d Cir. 1977) (observing that the "single/multiple conspiracy analysis does not apply to the trial of a single defendant. Here, appellant stood trial alone."); *United States* v. *Galtieri*, No. SS 99 Cr. 891 (KTD), 1992 WL 245499 at *3 (S.D.N.Y. Sep. 17, 1992) ("A defendant who stands trial alone is not entitled to a charge on multiple conspiracies"); *see also United States* v. *Kennedy*, 32 F.3d 876, 884 (4th Cir. 1994) ("both Ingram and Kennedy [although charged in the same indictment] ultimately stood trial alone, and evidence at each trial focused on the individual appellant's own role in the conspiracy and the direct consequences of that defendant's actions in furthering the conspiracy"); *United States* v. *Anguiano*, 873 F.2d 1314, 1317-1318 (9th Cir. 1989) ("there is no problem of spillover prejudice when . . . the defendant stands trial alone" and single defendants

are not entitled to a multiple conspiracies instruction on that basis); Sand, Modern Federal Jury Instructions, Instruction 19-5 Commentary (citing cases).

Moreover, Valle cannot coherently identify any prejudice he suffered. He has failed to cite authority indicating that a new trial is warranted under the circumstances of this case – the bulk of the cases upon which he relies either rejected the defendants' multiple conspiracies arguments or dealt with multi-defendant trials. (JA1 Br. 58). *See United States* v. *Portela*, 167 F.3d 687, 695 (1st Cir. 1999) (affirming narcotics conspiracy conviction and rejecting argument that multiple conspiracies were proven in four-defendant trial); *United States* v. *Jones*, 482 F.3d 60, 72 (2d Cir. 2006) (affirming narcotics and RICO conviction, rejecting multiple conspiracies argument, and observing that "it is not necessary that each coconspirator have expressly agreed with-or even have known the identities of-all the other coconspirators in order for the jury to find that there was but a single conspiracy."); *United States* v. *Korfant*, 771 F.2d 660, 662-63 (2d Cir. 1985) (affirming conviction and rejecting defendant's double-jeopardy arguments); *United States* v. *Acosto-Gallardo*, 656 F.3d 1109, 112 (10th Cir. 2011) (rejecting defendant's sufficiency argument and observing that "[the defendant's arguments] are unpersuasive because it is well-established that a conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy."); *United States* v. *Rosnow,* 977 F.2d 399, 406-08 (8th Cir. 1992) (finding prejudicial variance between Indictment and proof presented at trial related to existence of single conspiracy charged in Indictment after multi-defendant trial); *United States* v. *Carnagie*, 533 F.3d 1231, 1239-43 (10th Cir. 2008) (reversing district court's grant of judgment of acquittal under "multiple conspiracies" theory and rejecting defendant's argument, after three-defendant trial, that variance between single conspiracy charged and multiple conspiracies proven was prejudicial to defendants). These cases actually

undermine Valle's argument that there was any error here.  Even assuming that the prejudice

analysis should be engaged in a trial involving one defendant, to the extent that Valle offers any

specificity as to how he was prejudiced, his brief is incoherent. (JA1 Br. 62). The notion that the

single conspiracy charge in Count One "invited the jury to aggregate the evidence" is nebulous –

it is unclear why "aggregating" all of the evidence that could be charged separately prejudices

the defendant. This is not a theory of prejudice that this Circuit has ever acknowledged. The

remainder of his prejudice argument is that part of Valle's conversations with one coconspirator

may have been considered more inflammatory to some jurors than to others. This is not a

genuine argument that he was prejudiced by the combination of multiple conspiracies, but rather

an argument that he was harmed by the admission of evidence concerning multiple

coconspirators. But there is no dispute that the Government is entitled to charge a conspiracy

involving multiple individuals.

The only case relied upon by Valle which lends even arguable support for his claim is the

Sixth Circuit's decision *United States* v. *Swafford*, 512 F.3d 833, 841-44 (6th Cir. 2008). But

*Swafford* ultimately is not persuasive. In *Swafford*, the Sixth Circuit observed that "[w]e have

found single conspiracies even where the connections between the co-conspirators were

minimal," but ultimately vacated the defendant's convictions on two narcotics conspiracy counts

because the multiple conspiracies within them constituted a variance. *Id.* The court affirmed the

defendant's remaining 19 substantive narcotics convictions, but remanded them for resentencing

in a manner that would cure the multiplicity problems of the charges. *Id.* With regard to

*Swafford*'s inapplicability, first, the Second Circuit has repeatedly instructed that the multiple

conspiracy analysis is not applicable in the trial of a single defendant. *See United States* v. *Ling*,

172 Fed. Appx. 365, 366 (2d Cir. 2006) (rejecting defendant's multiple conspiracy argument and

reaffirming *Corey* decision's instruction that "single/multiple conspiracy analysis does not apply to the trial of a single defendant") (citing *Corey*, 566 F.2d at 429). To the extent that *Swafford* is in conflict with the controlling precedent of this Circuit, it should be disregarded. Indeed, the *Swafford* court unpersuasively based its reasoning on the theory that the Second Circuit's "spillover" prejudice analysis could be applied to a single defendant trail, when this Circuit has explicitly held that the "spillover" problem refers only to the prejudice resulting from the joinder of multiple defendants. *See Swafford*, 512 F.3d at 842-43 (quoting the Second Circuit's admonition that "the possibility of prejudice resulting from a variance increases with the number of defendants tried and the number of conspiracies proven." and then asserting that "[w]here there is no connection between users of the same product but the factfinder mistakenly believes there is a union of interest and criminal intent and an agreement to coordinate activity, the harm to the public will appear to be greater and the participants more culpable.") (internal quotation marks omitted). It is unclear how the *Swafford* court moved from the notion that "spillover" prejudice from another defendant's activities could be equated to prejudice from the aggregation of all of a defendant's activities in one count, particularly where it was conceded that all of the criminal activity could have been, and indeed was, charged in substantive counts.[4]

Regardless, even accepting the flawed reasoning of *Swafford*'s aggregation theory of prejudice, *Swafford* is also factually dissimilar from the instant case in important respects. What motivated the prejudice concerns of the Sixth Circuit was the fact that the alleged coconspirators

---

[4] Indeed, with regard to the first prong of the multiple conspiracy variance analysis, the Sixth Circuit more recently distinguished *Swafford* in *United States* v. *Beals*, 698 F.3d 248, 257 (6th Cir. 2012). In *Beals*, the Sixth Circuit rejected the defendant's "multiple conspiracy" variance argument in a trial involving two defendants. The court observed that a single conspiracy is not converted into multiple conspiracies "simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *Id.* at 259. The *Beals* court observed that the multiple conspiracy analysis was defeated by the fact that the conspirators, who did not all know each other, "all shared a common goal of manufacturing the drug for the primary purpose of satisfying their addictions."

in *Swafford* were merely a number of "unrelated customers" of the defendant's iodine business. *Swafford*, 512 F.3d at 843 ("The sale of iodine to many unrelated customers is no different from the sale of birdseed to many birdwatchers or the sale of other products at retail to many users who are unconnected to each other."). The court observed that "[w]here there is no connection between users of the same product but the factfinder mistakenly believes there is a union of interest and criminal intent and an agreement to coordinate activity, the harm to the public will appear to be greater and the participants more culpable." *Id.* Thus, the *Swafford* court appears to have been motivated by special concerns involving the limited inferences of shared plan that can be gleaned from the existence of pure buyer-seller relationships. Indeed, a number of courts have held that the existence of any conspiracy at all should be questioned in certain situations where the relationship between the conspirators is merely that of buyer and seller. *See United States* v. *Banki*, 685 F.3d 99, 117 (2d Cir. 2012) ("Although, as a literal matter, when a buyer purchases illegal drugs from a seller, two persons have agreed to a concerted effort to achieve the unlawful transfer of the drugs from the seller to the buyer, we have carved out a narrow exception to the general conspiracy rule for such transactions. This exception is intended to preserve important priorities and distinctions of the federal narcotics laws, which would otherwise be obliterated") (brackets omitted). But Valle's conviction implicates neither the special concerns applicable to narcotics cases nor the special concerns relevant to pure buyer-seller relationships. For these reasons and the others described above, *Swafford* simply does not dictate that there was a prejudicial "multiple conspiracies" variance in this case.  At bottom, the Circuit has instructed that a single defendant cannot demonstrate prejudice under a "multiple conspiracies" theory, and

Valle has failed to articulate why this Court should take exception to that instruction. The Court should reject his argument.[5]

### E.   Valle's Challenge to His Conviction on Count Two is Meritless

Valle's motion for judgment of acquittal on Count Two argues that the statute does not cover his conduct. (JA2 Br. 1). Valle contends that because he was authorized by the NYPD to access the National Crime Information Center ("NCIC") database to perform his duties as an NYPD police officer, there can be no criminal liability under Section 1030. Valle is incorrect. As the evidence at trial demonstrated, Valle accessed the database in violation of NYPD policies and state law, in service of an attempt to gather information about potential kidnapping targets. Although Valle is correct that the courts are divided on the scope of liability under Section 1030, Valle's conduct was criminal under either view of the scope of Section 1030. The Court should rejection his motion for judgment of acquittal.

### 1.   Applicable Law

Title 18, United States Code, Section 1030(a)(2)(B),  provides, in pertinent part:

> Whoever–* * *(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains–

> * * *(B) information from any department or agency of the United States [is guilty of a crime].

18 U.S.C. § 1030(a)(2)(B). The statute defines "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer

---

[5] A brief note regarding Valle's "venue" theory of prejudice is appropriate. (JA1 Br. 66). As discussed earlier in this submission, the Government was required to prove venue only by a preponderance of the evidence. Even separated into three separate conspiracies, there would have been proof by a preponderance of venue for each conspiracy. But more importantly, Valle does not even attempt to argue that the Government could not have produced proof of venue for at least one of the separate conspiracies, and if the only defect in the proof of the other activity was venue it would have been relevant and admissible proof of Valle's motive or intent. Thus, even assuming Valle could establish that venue would have been defective for one of the three separate conspiracies that he alleges should have been charged, the proof would have been identical.

that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). The statute does

not define "authorized access."

   The courts that have examined the scope of Section 1030 are somewhat divided.  Some

cases have taken the narrower view of liability under Section 1030, holding, essentially, that

when examining whether access is unauthorized or exceeding authorization, a court must look

only to whether a defendant had authorization to access the information in question, and not at

the defendant's intentions in accessing the information.  *See, e.g., WEC Carolina Energy*

*Solutions LLC* v. *Miller*, 687 F.3d 199, 203–07 (4th Cir. 2012) (holding that employee who

downloaded an employer's confidential information, emailed it to his personal account, and

provided that information to employer's competitor was not liable under CFAA); *United States*

v. *Nosal*, 676 F.3d 854, 863 (9th Cir. 2012) (en banc) (holding that "the CFAA does not extend

to violations of [employee] use restrictions," where employee of executive search firm used

employer's information, in violation of a non-compete agreement, to set up competing executive

search firm); *United States* v. *Aleynikov*, 737 F.Supp.2d 173, 190–94 (S.D.N.Y. 2010) (stating

that "[t]he phrases 'accesses a computer without authorization' and 'exceeds authorized access'

cannot be read to encompass an individual's misuse or misappropriation of information to which

the individual was permitted access. What use an individual makes of the accessed information is

utterly distinct from whether the access was authorized in the first place.").

   By contrast, another line of cases takes a broader view of Section 1030, finding that the

statutory terms "without authorization" and/or "exceeds authorized access" are broad enough to

reach the situation in which an employee misuses employer information that he is otherwise

permitted to access. *See, e.g., United States* v. *John,* 597 F.3d 263, 271–72 (5th Cir. 2010)

(employee "exceed[ed] authorized access" when he used employer information, to which he had

-42-

access for other purposes, to perpetrate a fraud); *United States* v. *Rodriguez*, 628 F.3d 1258,

1263–64 (11th Cir. 2010) (employee "exceed[ed] his authorized access" when he accessed

information for a non-business reason in violation of employer policy); *Int'l. Airport Ctrs.,*

*L.L.C.* v. *Citrin*, 440 F.3d 418, 420 (7th Cir. 2006) (based on principles of agency, employee's

authorization to use employer's laptop ended once he violated duty of loyalty to employer, and

thus employee accessed computer "without authorization"); *EF Cultural Travel BV* v. *Explorica,*

*Inc.*, 274 F.3d 577, 581 (1st Cir. 2001) (disloyal employee "exceed [ed] authorized access" when

he breached employer confidentiality agreement by helping competitor obtain proprietary

information); *Register.com, Inc.* v. *Verio*, Inc., 126 F.Supp.2d 238, 253 (S.D.N.Y. 2000).

　　　　None of the cases analyzing Section 1030 have found that the statute is constitutionally

or otherwise deficient, in any respect.

### 2.　　Relevant Facts

　　　　The NYPD provided Valle with a log-in and password to use NYPD computers. (Tr. 970,

995). The NYPD also provided Valle with specific training as to the limits of his authorization to

use the NYPD's computer systems – Valle was trained that his authorization to use these law

enforcement databases extended only to use "within the performance of [a police officer's]

duty." (Tr. 914, 941) (GX 612). During his training, Valle's NYPD instructors also informed

him that accessing the databases for reasons unrelated to his work as an NYPD officer was a

violation of NYPD policy and illegal. (Tr. 950)

　　　　On May 31, 2012, without any law enforcement purpose, Valle ran a query for Maureen

Hartigan. (GX 616C).  As a result of this query, Valle accessed a variety of local, state and

national databases that contain basic pedigree, criminal history, and other information.  (GX

616E)  (Tr. 583-584).  The National Crime Information Center ("NCIC") data, maintained and

operated by the FBI, is one of the databases that Valle accessed as a result of his query. (Tr. 572).

### 3.   Discussion

Under any reading of the statute, Valle's conduct leading to his conviction on Count Two was a violation of Section 1030. First, contrary to Valle's argument, a plain reading of the text of the statute covers Valle's conduct in this case. Section 1030 criminalizes behavior by which a person "accesses a computer without authorization" or "exceeds authorized access" to "a computer" and thereby obtains "information from any department or agency of the United States." 18 U.S.C. § 1030(a)(2)(B). The statute instructs that "the term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). Here, consistent with the plain language of the statute, Valle either accessed NYPD computers and ultimately the NCIC computers, without authorization, or exceeded his access to NYPD computers and ultimately the NCIC computers, to obtain information to which he was not entitled. As the evidence at trial demonstrated, a necessary condition to Valle having authorization to access information about any individual was his first having an appropriate law enforcement purpose. (GX 210C; Tr. 940 ("members of the service, pertaining to both uniformed and civilian members" – 'may only examine a criminal history record or any other confidential information when they are required to do so in the course of their official duties and responsibilities. There are no exceptions to this policy.'")). Valle's training explicitly indicated that "access[ing] information" without first having a proper law enforcement purpose was punishable by arrest, prosecution, termination and fines. (GX 210C; Tr. 942). Under these facts, and a plain reading of Section 1030, Valle's conduct clearly was punishable. This conclusion is

mandated by the Second Circuit's only relevant decision in this area, indicating that prosecution

is appropriate in a case such as this one. *See United States* v. *Bossinger*, 311 Fed. Appx. 512, 514

(2d Cir. 2009) (affirming conviction of U.S. Border Patrol agent who accessed a restricted

federal database, TECS, by inputting a license plate that she was not authorized to run for any

purpose related to her duties).[6]

      The decisions Valle cites in support of his application are not to the contrary. For

example, Valle cites Judge Cote's decision in *Aleynikov* for the proposition that the Government

was not permitted to prosecute Valle based on his intended use of the information. (JA2 Br. 6-8).

But the Government never sought to convict Valle based on his intended "use" of the

information. Valle's argument represents a misunderstanding of how *Aleynikov* relates to the

facts of this case. In *Aleynikov*, the defendant was prosecuted after he accessed certain Goldman

Sachs source code related to Goldman's high-frequency trading and then transferred the code to

an outside server in German. *Aleynikov*, 737 F. Supp. 2d at 175. It was undisputed, and indeed

alleged in the indictment, that the defendant "was a member of a team of computer programmers

responsible for developing and improving" the specific computer source code that he was

charged with illegally accessing. *Id.* In that case, "[t]he Government concede[d] that Aleynikov

was authorized to access the source code for the Trading System that he allegedly stole, but

argue[d] that a defendant's purpose or intention is a necessary component of the violation." *Id.* at

191. In finding that Section 1030 could not be applied to Aleynikov's conduct, Judge Cote held

---

[6] More elaboration of the underlying facts of this case are found in the Indictment, available at 2007 WL 4664331, and in the district court's opinion denying the defendant's motion to suppress. *United States* v. *Bossinger*, No. 06 Cr. 054A, 2007 WL 1791644 at *1-*2 (W.D.N.Y. Jun. 20, 2007). Moreover, while the Second Circuit issued its *Bossinger* decision by summary order, summary orders entered after January 1, 2007 are appropriate authority in the Second Circuit. *See* Local Rule 32.1.1, U.S. Court of Appeals for the Second Circuit; Fed. R. App. Proc. 32.1(a) (court not permitted to restrict reliance on any decisions issues after January 1, 2007).

merely that "[t]he phrases 'accesses a computer without authorization' and 'exceeds authorized access' cannot be read to encompass an individual's misuse or misappropriation of information to which the individual was permitted access." *Id.* at 193.

Judge Cote's reasoning in *Aleynikov* in no way undermines Valle's conviction. Here, the charges against Valle were never based on his "misuse" or "misappropriation" of information which he was authorized to access – as the evidence made clear, Valle never had authorization to access the information in question in the first place. Unlike the software engineer in *Aleynikov*, who had previously accessed and manipulated the contested data for a proper purpose as a necessary component of his job, Valle's NYPD authorization to access information about specific individuals was explicitly limited to situations where he first had a law enforcement purpose for accessing that particular information. That is, in this case, a necessary condition for Valle to have authorization to obtain information was his first having a proper law enforcement purpose. In the absence of such a law enforcement purpose, Valle had no authorization in the first place to access the information, regardless of what use to which he later intended to put the information. *See Bossinger*, 311 Fed. Appx. at 514.

Similarly, Valle's reliance on the Ninth Circuit and Fourth Circuit decisions addressing Section 1030 is improper here. In *Nosal*, 676 F.3d at 863-64, the defendant was a former employee of an executive search firm who "convinced some of his former colleagues who were still working for Korn/Ferry to help him start a competing business." The employees contacted by the defendant "used their log-in credentials to download source lists, names and contact information from a confidential database on the company's computer, and then transferred that information to Nosal." *Id.* at 856. The Ninth Circuit made clear that "[t]he employees were authorized to access the database, but Korn/Ferry had a policy that forbade disclosing

confidential information." *Id.* In invalidating the conviction in *Nosal*, the Ninth Circuit merely held that the statute could not reach conduct which constituted use of data to which an individual had access in violation of a company policy. *Id.* at 858. *Nosal* thus represents the same conclusion that Judge Cote reach in *Aleynikov* – Section 1030 cannot be used to prosecute individuals for misuse of data that they undisputably were authorized to access. This was not the situation in Valle's prosecution – the evidence demonstrated that Valle accessed computer systems and data for which he had no authorized access. This was quite different from the access of "contact information," such as in *Nosal*, for which the employees involved unquestionably had authorized access for certain purposes. Similarly in *WED Carolina Energy Solutions LLC*, 687 F.3d at 202, the defendant at issue was sued for using in a powerpoint presentation, to pitch a competitor,  information he had been authorized to access, in supposed violation of the defendant's former company's policies. The court observed that "[t]hese policies did not restrict Miller's authorization to access the information, however." *Id.* Again, this is a critical dissimilarity from the instant case – *WED Carolina Energy* is yet another case which stands against "use" prosecutions under Section 1030. *See also JBCHoldings NY, LLC* v. *Pakter,* No. 12-cv-7555 (PAE), 2013 WL 1149061 at *8 (S.D.N.Y. Mar. 20, 2013) ("although Janou's alleged actions violated plaintiffs' electronic media policy . . . such misuse does not state a claim under the CFAA, because an employee does not 'exceed [ ] authorized access' or act 'without authorization' when she misuses information to which she otherwise has access."); and *Advanced Aerofoil Techs., AG* v. *Todaro*, No. 11 Civ. 9505 (ALC), 2013 WL 410873 at *7 (S.D.N.Y. Jan. 30, 2013) ("There is no analysis in this decision of whether Defendants 'exceeded authorized access', even though the CFAA recognizes exceeding authorized access as an alternative to accessing a computer without authorization, because there are no allegations that

AAT gave any of the Defendants something short of unlimited and unfettered access to its systems."). Indeed, none of the decisions relied upon by Valle speak to the situation that was charged in the Indictment and proven at trial – the situation where a defendant's authorized access to computer systems was specifically limited and the defendant illegally exceeded such authorization. The only case in this Circuit analogous to Valle's in this respect is *Bossinger*, in which the Second Circuit concluded that the prosecution of a Border Patrol agent was entirely appropriate. *See Bossinger*, 311 Fed. Appx. at 514. Valle, however, has ignored *Bossinger* in his motion for judgment of acquittal.

Valle's claim that his prosecution under Section 1030 will pave the way to prosecutions of "secretaries who play Farmville" and "distracted cubical dwellers who trawl CNN.com" is simply unfounded. (JA2 Br. 3). First, neither CNN.com nor public websites hosting online games are restricted computer systems – they are not analogous to NCIC or any of the computer systems accessible through the NYPD's restricted electronic facilities. Second, Valle was warned repeatedly that the very activity in which he engaged would lead to criminal prosecution and other sanctions. He is not similarly situated to the hypothetical individuals he warns are endangered by the implications of his conviction. The statute, as applied to Valle, covers a very narrow subset of activity over computer networks. Moreover, although Valle argues that a reading of the statute covering his activity would cover an unreasonably broad range of activity, there are any number of misdemeanor statutes that, like this one, cover a broad range of common activity, such as trespass statutes. In sum, Valle's claims regarding the practical implications of his conviction are overblown.

That Valle's motion should be rejected is even more clear under the line of decisions taking a broader view of Section 1030. *See, e.g., Mktg. Tech. Solutions, Inc.* v. *Medizine LLC,*

No. 09 Civ. 8122 (LLM), 2010 WL 2034404, at *7 (S.D.N.Y. May 18, 2010) (finding former employee of website to have "exceeded his authorized use" of website's computer systems where employed transferred trade secrets to a competitor in violation of his employment agreement and "its broad confidentiality section"); *Calyon* v. *Mizuho Securities USA, Inc.*, No. 07 Civ. 2241 (RO), 2007 WL 2618658, at *1 (S.D.N.Y. Sept. 5, 2007); *Register.com, Inc.*, 126 F. Supp. 2d at 253 ("even if Verio's means of access to the WHOIS database would otherwise be authorized, that access would be rendered unauthorized *ab initio* by virtue of the fact that prior to entry Verio knows that the data obtained will be later used for an unauthorized purpose."). But Valle does not even attempt to argue that the validity of his conviction could be questioned if the Court were to apply the well-reasoned analysis of these decisions. Regardless, as demonstrated above, under any reading of the statute, Valle's conduct is clearly proscribed. Valle's motion for judgment of acquittal on Count Two should be denied.

## II.     Valle's Motion For a New Trial

### A.     Applicable Law

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The Second Circuit has stated, however, that courts must "exercise Rule 33 authority sparingly" and only in "the most extraordinary circumstances." *United States* v. *Cote*, 544 F.3d 88, 101 (2d Cir. 2008) (internal quotation marks omitted). "[O]n a Rule 33 motion to vacate, the ultimate test is whether letting a guilty verdict stand would be a manifest injustice." *United States* v. *Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (internal quotation marks omitted). "[A] defendant asserting that a prosecutor's remarks warrant a new trial faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial." *United*

*States* v. *Coplan*, 703 F.3d 46, 86 (2d Cir. 2012) (citing *United States* v. *Banki*, 685 F.3d 99, 120 (2d Cir. 2012)) (internal quotation marks omitted). "It is well established that the Government 'has broad latitude in the inferences it may reasonably suggest to the jury during summation.'" *Coplan*, 703 F.3d at 87 (quoting *United States* v. *Edwards*, 342 F.3d 168, 181 (2d Cir.2003)). Even if a defendant can meet the heavy burden of demonstrating that a prosecutor's remarks were improper, he must demonstrate that the remarks caused "substantial prejudice" in order to demonstrate that a new trial is warranted. *Banki*, 685 F.3d at 120.  Moreover, courts should be mindful that "[i]t is impossible to expect that a criminal trial shall be conducted without some showing of feeling; the stakes are high, and the participants are inevitably charged with emotion." *United States* v. *Wexler*, 79 F.2d 526, 529-530 (2d Cir. 1935) (L. Hand, J.).

## B. Valle Has Failed to Demonstrate that the Weight of the Evidence Requires a New Trial

Valle's argument that the Court should grant him a new trial based on the weight of the evidence is merely a recitation of his arguments for judgment of acquittal. For the all the reasons described in the Government's responses to Valle's Motions for Judgment of Acquittal, the Court should also reject his motion for a new trial. Indeed, the only aspect of Valle's new trial motion which adds to the motions for judgment of acquittal is Valle's reliance on *United States* v. *Robinson*, 303 F. Supp. 2d 231, 233-34 (N.D.N.Y. 2004). Valle cites *Robinson* for the proposition that the Court should find the evidence in the instant case "too flimsy" to support Valle's conviction. (NT Br. 8). As is obvious from even a cursory examination of the facts in that case, *Robinson* is completely dissimilar from the instant case. In *Robinson*, the defendant was convicted of participation in a broad marijuana conspiracy, two shootings, and one count of using a firearm to murder another individual. *Id.* at 232.  The district court rejected the

defendant's motion for a new trial on the charges related to the drug conspiracy and the first

shooting, but vacated the charges related to the murder because of several glaring deficiencies in

the proof regarding that incident. *Id.* Specifically, the court observed that: (1) the sole witness

who claimed to have observed the shooting admitted that he had used an extraordinary amount of

marijuana (a psychoactive hallucinogen), in the hours just before the shooting; (2) the sole

witness had twice informed detectives that he could not identify the shooter before ultimately

claiming that he could; (3) the sole witness's claim of identification came only after his

girlfriend described to him criminal charges that could be dropped in exchange for testimony and

other potential benefits; (4) several other witnesses were present at the scene where the sole

witness to the shooting claimed to have seen the defendant commit the shooting, and none of

these other individuals could corroborate the sole witness's story; (5) the sole witness's

testimony was, in the view of the district judge, "vague and left many holes." *Id.* at 233; *see also*

*United States* v. *Robinson*, No. 01-Cr-131 (LEK), 2004 WL 21095584 at *1-*5 (N.D.N.Y. May

14, 2003).

In stark contrast to *Robinson*, the proof of Valle's participation in the charged conspiracy

was not limited to a single eye-witness, but rather was based on an extensive documentary record

and the testimony of several different witnesses who shed light on Valle's criminal conduct from

different angles, none of whom were impeached in any way by the defense. Indeed, the defense

declined to even cross-examine certain of the Government's witnesses. The documentary

evidence supporting Valle's conviction included numerous transcripts of his actual

communications with his coconspirators, a detailed forensic review of his computer and online

activities, and various communications with his intended victims. The proof in the instant case

was multifaceted and was not bedeviled by any of the deficiencies that were the focus of the

district court in *Robinson*. Valle's claim that the weight of the evidence supports his motion for a new trial is meritless.

### C.      There Was No Misconduct in the Government's Summations

Valle argues that the Court should grant him a new trial because the Government's summations "were replete with improper arguments." (NT Br. 9). Valle is simply wrong. Not only is Valle's overarching conclusion regarding the Government's summation incorrect, all of Valle's sub-arguments are fundamentally unsound, based on improper reliance on dissimilar cases and numerous misreads or misstatements of the record. The various deficiencies of these arguments are taken in turn below.

### 1.      The Government Did Not Argue That the Defendant Should Be Convicted Because His Fantasies Are Frightening

Valle argues that the Government initiated its rebuttal summation with an argument that amounted to a request that the jury convict the defendant because of frightening fantasies. (NT Br. 9). This is incorrect. The point made by the Government during this aspect of the rebuttal summation was simple and unobjectionable – that the defendant's concession that he harbored a deeply-held fantasy involving mutilating women was neither irrelevant to the determination of his intent nor exculpatory.[7] In this portion of his brief, Valle further argues that the Government

---

[7] The Government briefly notes that the defendant's argument that the prosecutor suggested that Valle's fantasies were improper because they were not "'positive' fantasies, such as romantic fantasies about 'Mariah Carey'" is wrong. (NT Br. 11). First, as described above, the point of this language was simply to respond to the notion implicit in the defense's use of the word "fantasy" some 58 times during its summation. The Government was responding to the suggestion that the fact that the defendant harbored violent "fantasies" was somehow exculpatory. Second, the Government's reference to "Mariah Carey" was not a reference to "romantic fantasies," but rather a benign reference to the performer's 1995 No. 1 single – "Fantasy," one of the singer's most well-known and critically-acclaimed works. *See* Sasha Frere-Jones, "On Top: Mariah Carey's Record-Breaking Career," THE NEW YORKER, April 3, 2006, available at: http://www.newyorker.com/archive/2006/04/03/060403crmu_music (last visited July 28, 2013); *see also United States* v. *Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995) (rejecting defendant's argument of prosecutorial misconduct where prosecutor referred to the defendant's case as a "fairy tale" and noting that "a prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation). This argument was made to underscore that while the word "fantasy" may have a positive charge, in the context of this case, that charge was being misapplied by the defense.

hereby "improperly suggested that the jury needed to convict Mr. Valle to stop him from walking the streets with a loaded gun, because he might decide to act on his fantasies someday." (NT Br. 11-12). This language is an illogical interpretation of the Government's rebuttal arguments, and appears nowhere in the actual transcript. The Government made reference to the fact that the defendant possessed and carried a loaded weapon during the time period before his arrest to respond to defense counsel's repeated arguments that the defendant had never posed any danger to his victims. This was an argument squarely focused on the defendant's conduct during the time of the conspiracy and not potential future acts.

In support of his argument, which is based on a misinterpretation of the Government's statements, Valle relies only on *United States* v. *Allen*, 488 F.3d 1244, 1260 (10th Cir. 2007). *Allen* does not at all support Valle's position – the case is not about improper appeals to a jury based on future-looking arguments or even jury addresses in general. In *Allen*, the defendant had entered a guilty plea to one count of methamphetamine distribution. *Id.* at 1248-49. At sentencing, the Government sought an upward enhancement based on the defendant's numerous recorded statements during the investigation regarding his desires to abduct, torture and sexually assault eight-year old girls and an incident during the investigation in which he had approached a minor in a threatening way. *Id.* at 1246, 1249. The Government argued that the defendant's criminal history category, which was based in part on a prior conviction for raping a minor, underrepresented the seriousness of his criminal history. *Id.* The district court, relying on the same incidents and the defendant's criminal history, imposed a sentence of 360 months' imprisonment, triple the bottom of his Guidelines range. *Id.* at 1251. The Tenth Circuit concluded that it was error for the district court to rely on the defendant's expressed sexual urges because they "did not constitute relevant conduct under §1B1.3." *Id.* at 1256. The court further

-53-

observed that it was improper to consider such features of the defendant's case as "criminal history" given their unadjudicated nature. *Id.* at 1256-57. Finally, the court observed that while the defendant's uncharged conduct might have been relevant to certain components of the sentencing, it was ultimately an improper use of the district court's *Booker* discretion to sentence the defendant as if he had been convicted of this conduct. *Id.* at 1259-60. Thus, even accepting Valle's flawed interpretation of the Government's arguments, *Allen* has no relevance to the instant case. Valle has failed to cite any authority supporting the notion that this aspect of the Government's summation was improper.

Valle relatedly argues that the Government violated the Constitution by stating that fantasies involving the slaughter of women are "not ok." (NT Br. 12). Again, Valle is wrong and has improperly relied on cases that have no relevance to the point he is attempting to make. Valle cites the Supreme Court's decision in *Jacobson* v. *United States*, 503 U.S. 540, 551-52 (1992),[8] for the simple and uncontested principle that a person's fantasies are generally his own province. (NT Br. 12). But *Jacobson* does not support the idea that the Government is not entitled to comment on supposed fantasies that are themselves evidence of a defendant's intent to participate in a criminal conspiracy. *Jacobson* does not deal with jury arguments or even a case factually similar in any respect to Valle's. In *Jacobson*, the petitioner was convicted after asserting an entrapment defense to child pornography receipt charges. *Id.* at 547-48. The charges came about after more than two years of repeated efforts by investigators in Nebraska to get the petitioner to purchase a magazine containing child pornography. *Id.* Ultimately, the petitioner's purchase was triggered by a political message surrounding freedom of speech made by a fake organization created by investigators. *Id.* The Supreme Court observed that the prosecution had failed to identify any relevant evidence of the

---

[8] Valle's brief incorrectly cites this case at "503 U.S. 520." (NT Br. 12).

petitioner's predisposition to commit the crime and vacated the conviction. *Id.* at 550-54.[3] In contrast, Valle's case involved no sting operation or entrapment defense. *Jacobson* is irrelevant to Valle's jury address arguments, and his reliance on its "fantasy" language is misplaced when that language is considered in context.

The misuse of the language quoted in Valle's brief is even more clear upon examination of the Supreme Court's decision in *Paris Adult Theatre I* v. *Slaton*, 413 U.S. 49, 67 (1973), which Valle identifies as the source of the quoted language in *Jacobson*. (NT Br. 12). In that case, the Supreme Court held that the Constitution did not prevent the State of Georgia from regulating adult obscene materials exhibited in public theaters. *Id.* at 69-70. The case thus dealt with the limits of individual freedoms where an individual attempts to apply them in non-private contexts. *Id.* Indeed, the language from *Jacobson* quoted in Valle's brief cuts off the important end of the sentence in *Paris Adult Theatre I*, where the Court wrote "[t]he fantasies of a drug addict are his own and beyond the reach of government, **but government regulation of drug sales is not prohibited by the Constitution.**" *Paris Adult Theatre I* v. *Slaton*, 413 U.S. at 67-68 (emphasis added).[4] This language, which is at the heart of the decision, actually buttresses the Government's summation point that Valle argues was improper – that an individual is entitled to his fantasies does not mean that he is entitled to the criminal activity that flows from them. Given the defense's repeated use of the word "fantasy" throughout the summation and its insistence on the benign nature of Valle's

---

[3] The Court observed "The evidence that petitioner was ready and willing to commit the offense came only after the Government had devoted 2 1/2 years to convincing him that he had or should have the right to engage in the very behavior proscribed by law." *Jacobson*, 503 U.S. at 553.

[4] The Court further instructed that "[w]here communication of ideas, protected by the First Amendment, is not involved, or the particular privacy of the home protected by Stanley, or any of the other 'areas or zones' of constitutionally protected privacy, the mere fact that, as a consequence, some human 'utterances' or 'thoughts' may be incidentally affected does not bar the State from acting to protect legitimate state interests." *Id.*

supposed fantasies, the Government was required to respond and emphasize the extent to which the

defendant's deeply-harbored fantasies were relevant to the question of his intent.

The other cases upon which Valle relies similarly do not support his argument. (NT Br. 12-

13).[5] *See United States* v. *Curtin*, 489 F.3d 935, 950-52, 956-57 (9th Cir. 2007) (finding stories

defendant possessed describing sex between adults and minors relevant to question of intent in child

enticement trial, but vacating based on district judge's Rule 403 error)[6]; *Powell* v. *Texas*, 392 U.S.

514, 532-33 (1968) (rejecting petitioner's claim that prosecution for public intoxication amounted

to cruel and unusual punishment of his status as an alcoholic, and observing "Texas thus has not

sought to punish a mere status . . . nor has it attempted to regulate appellant's behavior in the privacy

of his own home. Rather, it has imposed upon appellant a criminal sanction for public behavior

which may create substantial health and safety hazards"); *Stanley* v. *Georgia*, 394 U.S. 557, 568

(1969) ("We hold that the First and Fourteenth Amendments prohibit making mere private

possession of obscene material a crime"); *United States* v. *Muzii*, 676 F.2d 919, 923-24 (2d Cir.

1982) (affirming defendant's conviction for receipt of stolen goods where defendant argued that

undercover operation negated the stolen nature of goods and necessary *actus reus*). Thus, while

Valle has randomly extracted several snippets of language he considers favorable to his arguments,

he has failed to identify a single case supporting his argument that the rebuttal summation statements

he cites at pages 10 and 11 of his brief were improper. Indeed, the bulk of the cases cited by Valle

support the validity of the Government's arguments. The Court should reject this argument.

---

[5] The cases referenced here appear in the order in which they are cited in the defendant's memorandum.

[6] Valle's reliance on *Curtin* is apparently based on one line in Judge Kleinfeld's concurring opinion, even though the entire majority opinion runs counter to Valle's arguments. (NT Br. 12). The sentence quoted by Valle in the concurring opinion, however, cites to *Jacobson*. As discussed above, *Jacobson*'s language discussing the protection of fantasy was limited to a context inapplicable here.  Moreover, Judge Kleinfeld's concurring opinion focuses on mere reading material downloaded by the defendant, which is dissimilar from the situation at hand. *Curtin*, 489 F.3d at 960.

## 2.      The Government Did Not Improperly Malign Defense Counsel

Valle argues that the Government, in its rebuttal summation, improperly contrasted its view of Valle's fantasies with that of defense counsel and unfairly disparaged defense counsel's role by insinuating that "defense counsel was trying to 'sell' something to the jury." (NT Br. 13). This is false – the Government did not malign defense counsel with any of its statements. The "sell" language challenged by Valle, viewed in context, was merely unobjectionable shorthand for argument. (Tr. 1578 ("defense counsel has been trying to sell you on two broad concepts that are in total conflict with your common sense")).[7] In challenging the Government's choice of language here, the defendant cites the Eighth Circuit's decision in *United States* v. *Rodriguez*, 581 F.3d 775, 802 (8th Cir. 2009) (affirming the conviction and sentence of death of defendant who kidnapped and murdered a woman after transporting her across state lines). In *Rodriguez*, while the court disagreed with the use of the prosecutor's reference to defense counsel "'selling' a case," the court quickly rejected the defendant's argument that such a reference warranted upsetting the verdict, writing "this comment did not 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (brackets omitted). The other cases cited by the defendant are so dissimilar from the language used in this case by the Government that they do not merit serious discussion. (NT Br. 13-14). At no point did the Government state that the defense was using "tricks of the trade," "mak[ing] any possible argument to 'get that guy off,'" or was attempting to "pull the wool over the jury's eyes." (NT Br. 13-14). Notably, however, even this language did not result in overturning the convictions in two of the three cases cited by Valle. *See United States* v. *Warren*, 306 Fed. Appx.

---

[7] Moreover, Valle failed to object to this language when it was used. While Valle argues in his brief that, at some unspecified point, defense counsel's objections had been rejected so many times that she was no longer required to object, it seems clear that this point could not have been reached here, before even the first objection. Moreover, as discussed in more detail *infra*, the Government does not agree that the defendant's objections were so numerous as to render further objection unnecessary.

682, 685 (2d Cir. 2009) (affirming narcotics conviction where prosecutor referred to "defense counsel's cross examination tactics as 'tricks of the trade'"); *United States* v. *Resto*, 824 F.2d 210, 212 (2d Cir. 1987) (affirming narcotics conviction where prosecutor made several improper comments, writing "[s]imilarly, we find no ground for reversal in the prosecutor's references to specific defense tactics as 'slick bits' and 'slyness' or in his statements that the defense engaged in 'sleight-of-hand' and tried to pull the wool over the jury's eyes.").[8] The defendant has failed to identify any cases where a court concluded that the type of language here challenged was an appropriate grounds for vacating a conviction.

Regardless, the defendant's argument on this point is premised on a misread of the Government's argument. The Government never contended that defense counsel had endorsed the goodness of Valle's violent thoughts. The Government's argument was focused, as it had to be, on the notion that Valle's conceded desire to see women sexually assaulted and otherwise harmed was not relevant to the question of his intent to participate in the charged conspiracy. The Government disagreed with the defense on this point, and appropriately argued this disagreement to the jury. This argument was not focused on the character of defense counsel, and Valle's argument to this effect should be rejected.

### 3.   The Government Did Not Make Improper Appeals to Common Sense and Did Not Act as A De Facto Expert

Valle argues that six of the Government's rebuttal summation arguments were improper appeals because "there [was] no evidence to support them, and are, in fact, false." (NT Br. 15-17).

---

[8] The one case cited by Valle in support of this point that did result in reversal involved prosecutorial misconduct reaching far beyond any language to which Valle can point in this case. See *United States* v. *Friedman*, 909 F.2d 705, 707-08 (2d Cir. 1990) (vacating conviction where prosecutor stated "some people would have you pull down the wool over your eyes and forget all that, because while some people, ladies and gentlemen, go out and investigate drug dealers and prosecute drug dealers and try to see them brought to justice, there are others who defend them, try to get them off, perhaps even for high fees," further stated that defense counsel would "make any argument he can to get that guy off," and referred to defense counsel as "the defendant's witness, Mr. Goldberger" who had provided "unsworn" testimony).

He argues that the Government's appeals to "common sense" were improper because they crossed into the province of expert psychologists. (NT Br. 18). Valle's arguments on this score should be rejected. The arguments he challenges are: (1) an argument that Valle's unwillingness to post personal information about himself, in contrast to his targets, was relevant to his culpability; (2) an argument that, by definition, a person caught committing a crime for the first time will have had a different public perception before his apprehension, and that this is true even for police officers, who sometimes commit crimes; (3) an argument that the common sense limits of what can be considered a private fantasy do not allow for the actual involvement of unwitting participants; (4) an argument that videos contained on the defendant's computer depicting torture of women, to include the burning of a woman's vagina, were unusual material in terms of sexual stimulation; (5) an argument that businesses which cater to illegal conduct often display disingenuous disclaimers, such as the "tobacco use only" signs used at many shops catering to marijuana users; (6) an argument that it was abnormal for Valle to have taken notice of the location of his intended target's office building, a nondescript corporate tower. (NT Br. 18). None of these arguments were objectionable, and none of them were demonstrably "false" as suggested by Valle. Each of these arguments is an appeal to the common experience of the jury and to the common sense trial judges have instructed juries to apply throughout the history of American jurisprudence. Nor was there any impropriety in the Government's reference to the fact that Valle's sexuality was tied to sadism. This was not a psychological diagnosis – this was a fact made evident by all of the proof in the case, including evidence in the defense case. This fact was conceded in the defense's opening and summation  – Valle was sexually stimulated by discussion and images of women being tortured and otherwise harmed. Indeed, defense counsel explicitly brought this issue into the case during the earliest words of Valle's opening statement, arguing "Gil Valle is aroused by the idea [of] extreme bondage, by

-59-

the thought of a woman tied up and placed in harm's way. In fact, what turns Gil Valle on is the idea of a woman oiled, bound, laid out on a platter with an apple in her mouth about to be offed." (Tr. 131). Valle's argument that the Government was not permitted to comment on this fact, which was key to the questions of intent at the center of this case, borders on the absurd.

Similarly illogical is Valle's argument that the Government was required to make only arguments in agreement with the conclusions of Valle's proffered expert, Dr. Park Dietz, whom Valle ultimately elected not to call during the defense case. (NT Br. 17 n. 7 ("many of the government's assertions about sexual fantasy and related matters are misleading or simply untrue, as the government knew or should have known based upon the detailed summary of Dr. Dietz's expert conclusions that was provided to the government before trial")).[9] The Court permitted Valle to call Dr. Dietz at trial for the opinions discussed in his expert report, and the Government was prepared to cross-examine Dr. Dietz regarding the many conclusions in his report with which the Government disagreed. Indeed, the Government was prepared to confront Dr. Dietz with his own writings in conflict with his proffered expert opinion and with a rebuttal expert witness, if necessary. Valle, throughout the case and in the defense summation, invited the jury to engage in analysis of psychological questions related to the nature of fantasy role play and its relationship to the defendant's intent. Tr. 1550 ("You see, really, the only dispute, I think the main confusion here is what exactly is fantasy role-play. The government simply does not understand what fantasy role-play is. They have never."). Valle, however, elected not to call Dr. Dietz at the end of the defense case, apparently concluding that the determination of whether Valle's acts constituted a crime could be accomplished by lay persons without the assistance of such expert testimony. In

---

[9] Dr. Dietz's declaration, submitted in support of Valle's Motion for a New Trial, should be rejected by the Court as entirely irrelevant and improperly submitted.

light of this decision, he cannot credibly argue that the Government should have been prohibited from asking the jury to assess Valle's criminal culpability through the lens of their experiences and common sense.

The "common sense" cases upon which Valle relies do not support his position. In *United States* v. *Scott*, 677 F.3d 72, 80 (2d Cir. 2012), the Court of Appeals found merely that the "common sense" argument made by the prosecutor was unpersuasive, and to the extent that it had any logical resonance it was in the context of an improper propensity argument. In this case, Valle has not identified any improper propensity argument disguised as a "common sense" argument, and he has not explained why any of the Government's common sense appeals were illogical, apart from his argument that they were inconsistent with the purported conclusions of his uncalled expert. Similarly, in *Henry* v. *Scott*, 918 F. Supp. 693, 712 (S.D.N.Y. 1995), the court found improper the prosecution's suggestion that the jury could use its "common sense," considering the dangerousness of the heroin business, to determine the reason that a confidential informant did not testify. This argument, inviting the jury to speculate about the reasons its informant did not testify related to his safety concerns, was obviously improper and completely unlike any of the common sense appeals that Valle challenges in this case. Nevertheless, the court found that the impropriety in *Scott* was insufficient to warrant upsetting the verdict. *Id.* Indeed, the Second Circuit has repeatedly instructed that the Government, and indeed any other party before the court, is entitled to make appeals to the common sense and common experience of the jury. *See, e.g., United States* v. *Cavera*, 550 F.3d 180, 205 (2d Cir. 2008) ("when the issue to be resolved is factual, the law expects the factfinder–whether judge or jury–to draw on common sense and experience in making any determination") (citing 1 Leonard B. Sand *et al.*, *Modern Federal Jury Instructions* ¶ 5.02, Instr. 5-4 (2005)); *United States* v. *Eltayib*, 88 F.3d 157, 173 (2d Cir. 1996) (observing that there was no error in the prosecutor's use

of language which "asked the jurors to draw inferences based on their common sense"). In sum, the Government's appeals to common sense were appropriate and the prosecutor did not act as a de facto expert.

### 4.   The Government Did Not Improperly Scare the Jury

Valle argues that "the government terrified the jury by repeatedly suggesting that Valle would victimize women 'as soon as he has the opportunity' (Tr. 1613:7) if he were allowed to continue walking the streets as a police officer 'with a loaded gun.'" (NT Br. 21). Again, Valle here misstates the record and misapplies the law. At no point did the Government make the argument Valle here describes. First, Valle's brief incorrectly suggests that the two statements, "as soon as he has the opportunity," and the Government's references to Valle's gun, happened in close proximity to one another. This is misleading. There was no discussion of Valle's gun during the portion of the Government's rebuttal summation in which the words "as soon as he has the opportunity" were used. (Tr. 1612-13). Indeed, although Valle challenges the "repeated emphasis on Valle's 'loaded gun,'" the only references to Valle's "loaded weapon" in the entire rebuttal summation took place in the very first sentences of the jury address. (Tr. 1578). More importantly, contrary to Valle's argument, the "opportunity" language Valle challenges did not refer to what Valle would do if he was released. As is made obvious by the context of the statement, the Government was commenting on the fact that, at the time Valle was conducting a number of disturbing internet searches, he had an actual intent to achieve the goals of the charged conspiracy.[10] Again, Valle relies on a series of quotes cherry picked from cases in different circuits that simply have no application here. In *United States* v. *Fullmer*, 457 F.2d 447, 449 (7th Cir. 1972), the defendant was being prosecuted for a crime

---

[10] The Government stated "He is engaging in research and he is thinking about thin[g]s in a very real way that are highly disturbing. Clanking knife and fork. How to light coals with a match. That ties back to the whole idea of the smoker grill. The man is going to buy a smoker grill and is he going to victimize a woman as soon as he has the opportunity."

that did not even involve violence: "wilfully conducting the business of a firearms dealer on premises not licensed to him at a County Fair in Mercer County, Illinois." The Seventh Circuit observed that:

> Defendant had an excellent reputation. In 1962, he was employed by Western Electric Company, remaining with them for one and a half years at which time he enlisted in the Marine Corps. He served in the Corps for three years and was honorably discharged. He was a member of the Marine Corps Reserve for a period of five years. Defendant returned to work for Western Electric Company and stayed with it for eleven more years. After passing an examination, he worked for the Winnebago County, Illinois, Sheriff's Department for a period of four years. Part of his duty was to drive patrol cars. Thereafter he was appointed to the Communications Section. After defendant left the Marine Corps, he started a business called Chevron Arms. In 1957 he applied for and was granted a federal license as a firearms dealer. This license was renewed annually and was in full force and effect at the time of the trial. His business consisted of selling at wholesale and retail ammunition, reloading components and some firearms . . . . During his eleven years as a federally licensed firearms dealer and until the occurrences on October 11 and 12, 1969, defendant never was censored by the Alcohol, Tobacco and Firearms Division which administers the Federal Gun Control Act and the National Firearms Act.

*Id.* at 448. After the defendant's lifetime of service and lawful operation as a gun dealer, he was arrested by ATF agents based on a technical violation of the gun sale laws, which the court indicated was likely due to a misunderstanding. *Id.* at 449. During summation at the defendant's trial, the prosecutor, however, made inflammatory and irrelevant arguments that prosecution of the defendant was necessary because of violent activities, including sniper shootings, being committed by others, in spite of the fact that the defendant's case in no way involved violence. *Id.* ("I don't have to tell you ladies and gentlemen, what is happening today in our country with people–not the man who shoots his wife or that kind–but people who are using ammunition and guns for sniping and creating disturbances, and so forth."). Because of these errors, coupled with the district court's error in failing

to suppress critical evidence that the Seventh Circuit concluded should have been excluded, the court reversed the judgment of conviction. *Id.* at 450. From the complicated circumstances of this case, Valle attempts to extract the wildly oversimplified principle that "[i]t is well-settled that inflammatory rhetoric about guns creates reversible error." (NT. Br. 21). That is a misstatement of what the *Fullmer* court decided – their decision to vacate Fullmer's conviction was based on several significant errors, not just the prosecutor's inflammatory remark. Regardless, the type of inflammatory remark criticized in *Fullmer* simply was not present in the Government's rebuttal summation in this case. As the Court is well aware, this case was not about a technical violation regarding the location of gun sales, it was about highly detailed plans to engage in deplorable forms of violence. Given the defense's arguments that the defendant had never posed a danger to his target and had no access to dangerous instruments,[11] the Government was required to reference the weapons available to Valle, and the Government made relatively limited use of these references in its summations. The Government's arguments simply were not analogous to the arguments in *Fullmer.*

Similarly, the Government never commented on the "social ramifications" of any verdict in the case and never argued that Valle should "be held to a higher standard." (NT Br. 22). Valle's reliance on cases that included these problems is misplaced. In *United States* v. *Sanchez*, 659 F.3d 1252, 1256-57 (9th Cir. 2011), the prosecutor made the following statement, regarding the defendant's duress defense, during his final jury address:

> [W]hy don't we send a memo to all drug traffickers, to all persons south of the border and in Imperial County and in California—why not our nation while we're at it. Send a memo to them and say dear drug traffickers, when you hire someone to drive a load, tell them that

---

[11] Tr. 1574 ("And Gil told Agent Foto . . . .Gil would never hurt anyone. He would never do the things he chatted about.").

> they were forced to do it. Because even if they don't say it at primary
> and secondary, they'll get away with it if they just say their family
> was threatened. Because they don't trust Mexican police, and they
> don't think that the U.S. authorities can help them. Why don't we do
> that?

*Id.* The Ninth Circuit concluded that this statement "encourag[ed] the jury to come to a verdict based
not on Sanchez's guilt or innocence, but on the potential social ramifications of the verdict," and
reversed the conviction. *Id.* at 1257-58. But the language used by the prosecution in *Sanchez* is
nothing like the challenged statement in this case. At no point did the Government reference any
societal implications of a possible acquittal. The Government's focus was on the reasonable
conclusions that could be drawn about Valle's intent and capacity based on his access to a weapon
and his understanding of the implications of his actions as a trained police officer. Valle's reliance
on *Sanchez* makes no sense and should be rejected.

Indeed, Valle's argument, with no support in the record, that the Government sought a
verdict based on societal ramifications is particularly astounding considering defense counsel made
explicit claims during summation that the jurors' verdict would have societal ramifications. Defense
counsel stated "In a case like this, I really don't think it is too much to suggest that the burden of
proof itself is on trial." (Tr. 1575). After this inflammatory comment, defense counsel continued
"We are so proud to stand up here and protect Gil Valle's rights because we are protecting all of our
rights. We are protecting against the otherwise unchecked power of a government . . .". (Tr. 1576).
These improper arguments were, of course, a continuation of societal ramification themes argued
explicitly in the defense opening, where defense counsel stated "You are not coming in here every
day doing the hard work just for Gil Valle. You are really doing it for all of us. It is cases like this
that bedrock principles that the freedom to think, freedom to say, the freedom to write even the
darkest thoughts from our human imagination." (Tr. 140). In sum, Valle's argument that the

-65-

Government attempted to scare the jury, seeking conviction based on societal outcomes, is in direct conflict with the record. Valle has also cited no authority supporting his position. The Court should reject this argument.

### 5.   The Government Did Not Invite Jurors To Convict Based on Positive Views of Law Enforcement, Personal Feelings, or the Need to Prevent Future Crimes

Valle argues that the Government erred by arguing in rebuttal that, in determining the appropriate verdict, the jury could consider whether, considering all of the evidence against Valle, they would have approved of the FBI declining to take action in this case, particularly if Valle's planned activities had come into fruition before his arrest. (NT Tr. 24). First, this argument was an appropriate response to Valle's repeated attacks on the integrity of the investigation and his arguments that the FBI had acted improperly in investigating and arresting him. The notion of a misguided group of agents and prosecutors was central to Valle's trial strategy and summation arguments. Defense counsel argued in summation that when "the FBI" had "stumbled" across Valle's communications, "panic ensues because they think it is real, but it is make believe." (Tr. 1545). The implication of this argument was that the FBI's investigation of Valle was the imprudent result of panic, rather than a valid response to serious communications transmitted by Valle concerning identifiable targets. Defense counsel continued "[t]he government simply does not understand what fantasy role-play is. They have never. When Agent Walsh less than a year at the FBI first went through that exercise where he separated the chats one file is fantasy and one pile that he thinks are for real, he didn't understand what fantasy role-play was." (Tr. 1550). In this portion of the summation, defense counsel again attempted to exploit the notion of an investigation stemming from misguided and inexperienced FBI agents operating improperly. Defense counsel went on to argue, with no evidentiary basis, that the case agent had perjured himself in pursuit of

the outcome the alleged the FBI improvidently sought. (Tr. 1569) ("And Agent Foto took the stand and claimed during his testimony that Gil told him that Gil was in front of Alisa Frisca's apartment on March 1st. We know it isn't true.").[12] These attacks on the investigating agents and the investigation warranted a response, and the Second Circuit has instructed that the Government is entitled to respond to such attacks. *See United States* v. *Rivera*, 22 F.3d 430, 438 (2d Cir. 1994) (rejecting defendant's argument that prosecutor's language was improper where defense summation had "accused the government of having fabricated" a witness's testimony, and observing that "the government is allowed to respond to argument that impugns its integrity or the integrity of its case."); *United States* v. *Praetorius*, 622 F.2d 1054, 1060-61 (2d Cir. 1979) ("when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with 'rebutting language suitable to the occasion.'") (quoting *United States* v. *LaSorsa*, 480 F.2d 522,  526 (2d Cir. 1973)). That the Government framed its response to Valle's arguments in terms of the myriad questions the jury could assess in determining ultimately whether the Government had proven Valle's guilt beyond a reasonable doubt was not error. None of the cases cited by Valle indicate otherwise.

For example, Valle cites *United States* v. *Nobari*, 574 F.3d 1065 (9th Cir. 2009), for the notion that the Government's argument constituted an impermissible "'law enforcement' plea." (NT Br. 25). *Nobari*, however, involved a prosecutor's instruction to the jury that the "City of Turlock should be thankful to law enforcement for their efforts" in the case and that "you, ladies and gentlemen, should not let the City of Turlock down." *Id.* at 1077. The argument in that case thus coupled an explicit instruction that the jurors should be thankful to law enforcement for their efforts

---

[12] Defense counsel even pressed the notion that FBI agents were fabricating their belief that the investigation was valid during cross-examination of one of the investigating agents. (Tr. 723) ("Q. And are you telling the jury that you believe that this is a real statement that a kidnapper and his coconspirator would make to each other?").

with an instruction that the jurors should return a verdict that would serve as a sort of thank you on behalf of the city. This is not analogous to the argument that Valle challenges here. Regardless, the Ninth Circuit ultimately concluded that this error, even considered with several other prosecution errors, was insufficient to warrant upsetting the verdict. *Id.* at 1082. Similarly, in *Cargle* v. *Mullin*, 317 F.3d 1196, 1222-23 (10th Cir. 2003), the argument that the Tenth Circuit found improper was nothing like the argument Valle challenges here. In *Cargle*, the prosecutor stated to the jury "your job is hard, but you can do it. Only you can do it. The police department has done all that it can do. When I sit down, Mrs. Smith and I will have done all that we can do. Only the 12 of **you can finish the job by going up in that jury room and bringing back a verdict of death**. Unless you do that, the efforts of the police department and my office have all been in vain." *Id.* (emphasis added). The Tenth Circuit observed that this argument improperly misled the jury about its role as "impartial arbiters," as opposed to being part of the prosecution "team." *Id.* Considered with a number of other errors, the Tenth Circuit concluded that the penalty phase of the defendant's his trial had been fundamentally unfair. *Id.* These cases reveal a subtle but important distinction between the sort of normal emphasis on the importance of the case that is obviously permissible and literal attempts to enlist the jury as agents of the community and law enforcement, as occurred in *Nobari* and *Cargle*. Regardless, as discussed above, the defendant invited the Government's response with his repeated attacks on the reasonableness of the FBI agents  and the Government in pursuing the investigation. Indeed, even in *Nobari*, the Tenth Circuit rejected the defendant's argument that the prosecutor improperly appealed to the jury's emotions by stating "[the agent] knew this was a volatile situation . . . . These drug traffickers pose a real and viable threat. Had it not been for the intervention of these law enforcement officers, it was a volatile situation. There was a real danger." *Nobari*, 574 F.3d at 1077 (ellipsis in original). The court held "this statement was directly responsive to a suggestion

made by George's attorney . . . Even if we viewed this statement, in part, as calculated to appeal to jurors' emotions, it was a permissible 'invited response' to the defense's argument. No error was committed here." *Id.* (internal citation omitted) (quoting *United States* v. *Young*, 470 U.S. 1, 11 (1985).

Indeed, in *Wexler*, Judge Hand touched on the undesirable likely results if the Government is prevented from responding with appropriate rhetorical fervor to emotional pleas on the part of the defense, writing "the truth is not likely to emerge, if the prosecution is confined to such detached exposition as would be appropriate in a lecture, while the defense is allowed those appeals in *misericordiam*[13] which long custom has come to sanction." *Wexler*, 79 F.2d at 530. In *Wexler*, the Second Circuit rejected the defendant's argument regarding the prosecution's conduct, writing that the defendant "complains of the conduct of the prosecution at the trial, its intemperate denunciations, its irrelevant appeals to passion, the introduction of damaging and immaterial evidence against him." *Id.* at 529-30. The court observed that "[i]t is impossible to expect that a criminal trial shall be conducted without some show of feeling; the stakes are high, and the participants are inevitably charged with emotion." *Id.* The court noted that the prosecutor had stated that the defendant had "spent his entire life from his childhood in cheating and robbing and assaulting and worse" and had "never earned an honest penny in his entire forty-seven years." *Id.* Examining these statements, the Court of Appeals ultimately concluded that "while that kind of rhetoric seems to us intemperate and feeble, it cannot be said to step beyond limits permissible to those who like it." *Id.* Here, Valle is

---

[13] Indeed, the defense summation was replete with pure appeals to pity for Valle. (Tr. 1575) ("They are especially disturbing because Gil had a pretty wife and an adorable baby and, yes, an NYPD badge. Ladies and gentlemen, he has lost all of that. His foolishness on the Internet, his insensitive, ugly thoughts has cost him everything."); Tr. 1575 ("Gil Valle committed wrong. For that he is serving a life sentence, but he didn't commit any crimes."). Notably, this argument involved a prohibited reference to the amount of time Valle was potentially serving.

essentially arguing that the Government should have been limited to precisely the "detached exposition" that Judge Hand observed would be meaningless in a charged criminal trial.

Valle further misstates the record by suggesting that the Government repeatedly injected into the trial the forward-looking question of whether lives were saved by the FBI's arrest of Valle. First, in a trial in which the defense was largely based on the fact that the goals of conspiracy had not been completed at the time of arrest, it was appropriate for the Government to comment on the fact that the arrest had fortunately occurred before violence was committed. But it was Valle who repeatedly injected this issue into the trial. In Valle's opening statement, defense counsel emphasized the plans that had not been actualized at the time of arrest. (Tr. 135-36). Valle's brief cites three different points during witness testimony in the trial transcript and suggests that these evince the Government repeatedly emphasizing that "thankfully," certain actions did not occur. (NT br. 26). But these are all responses to questions put to one of the investigating agents on cross-examination, by Valle's attorney. (Tr. 662, 668). In his brief, Valle misleadingly inserts in brackets language that was actually part of the question posed by the defense attorney. (NT Br. 26; Tr. 662, 668). This is misleading, and it serves argument that is, in its entirety, unsound. In short, Valle has failed to demonstrate the arguments he cites at page 24 of his brief are improper. The court should reject this argument.

### 6.    The Government Did Not Use Improper Analogies or "Golden Rule" Arguments

Valle argues that three analogies used by the Government in its rebuttal summation were improper for various reasons, including that they constituted "golden rule" arguments. (NT Br. 27-28). Valle is incorrect. Here, again, Valle attempts to apply concepts taken from wildly different

cases to the unique circumstances of this case. Examination of these cases demonstrates that Valle fundamentally misunderstands the decisions upon which he relies.

The three analogies Valle challenges are: (1) an analogy in which a group of individuals initiate a bank robbery with guns, is apprehended before the robbery is completed, and then claim that the robbery was all an elaborate bit of performance art (Tr. 1582-83); (2) an analogy that posed the question of whether jurors would eat at their favorite restaurant if they discovered that the chef at the restaurant harbored a deeply held fantasy of poisoning his patrons (Tr. 1584); and (3) an analogy in which federal marshals arrested a group of men just before they attempted to take down an airplane, where it was later discovered that they had discussed fantasizing about attempting to engage in such activity (Tr. 1593-94). This third analogy posed the question to jurors of whether the fact that such persons had previously been involved in fantasy discussions negate the significance of their activity or make it more surprising. (Tr. 1594-95).

In arguing that the restaurant analogy was improper, Valle incorrectly cites the Sixth Circuit's decision in *United States* v. *Henry*, 545 F.3d 367 (6th Cir. 2008). (NT Br. 30). In *Henry*, the prosecutor did not use any "analogy" but rather, in the context of explaining the ultimate determination to be made at trial, simply posed the question to jurors of whether they would feel comfortable if their "son or daughter . . . just out of college" came to them and said "I'm going to work for Roderick Henry," the defendant. *Id.* at 382-83. The prosecutor stated "You know your decision would be that you know enough about Roderick Henry based on the evidence, you know, in the most important decisions in your life, you would say he is a drug dealer, don't work for him." *Id.* at 383 (brackets omitted). The Sixth Circuit observed that this argument was improper, given its attempt "suggest[] to the jurors that the decision of whether to convict Henry was equivalent to the decision of whether to recommend that their child take a job with Henry, the prosecutor inverted

the burden of proof . . . . No caring parent would recommend that their child take a job with anyone

whom they remotely feared might be a drug dealer." *Id.* The Sixth Circuit ultimately found,

however, after rejecting other alleged errors in the prosecutor's summation, that this error did not

even raise a "serious question" about whether "the argument rose to the level of reversible

prosecutorial misconduct," considering the strength of the case and other factors *Id.* The court noted

that the district court had properly instructed the jury on the reasonable doubt standard and the

burden of proof. *Id.* at 383-384.

      It is inexplicable that Valle compares *Henry* to the Government's restaurant analogy he

challenges. Again, *Henry* was not about an improper analogy  – the case involved an explicit

hypothetical question of whether the jurors would let their children work for the defendant. Here,

the Government never posed the jurors any questions involving their children, and certainly not

involving their children in potentially perilous situations. More importantly, the Government also

never asked the jurors a question involving personal dealings with Valle. And while Valle argues

that the situation here is more problematic than in *Henry*, his only support is the conclusory

argument that the evidence here was "weak" and the Government had made other improper

arguments. As discussed elsewhere in this brief, Valle has failed to establish either of these

premises. Moreover, the restaurant analogy was an appropriate response to a repeated attempt by

the defense to argue that the defendant's violent "fantasies" could be disregarded in the

determination of his intent to participate in the conspiracy. There is no similarity between the

argument challenged in *Henry* and the instant case.

      Similarly, none of the challenged analogies amount to disfavored, so-called "golden rule"

arguments, as Valle argues. (NT Br. 33).  Valle cites the Eighth Circuit's decision in *United States*

v. *Rodriguez*, 581 F3d 775, 802-03 (8th Cir. 2009), for the general proposition that a "'golden rule'

closing argument, ask[s] jurors to imagine themselves in the place of the victim." (NT Br. 33). But *Rodriguez* did not even involve a so-called "golden rule" argument – the court rejected the defendant's argument the prosecutor erred in this fashion by asking the jury to imagine what the victim of the defendant's kidnapping "went through" on the night she was kidnapped and murdered. *Id.* It is unclear how Valle concludes that any of the three analogies he challenges asked the juror to put themselves in the place of Valle's victims. The additional "golden rule" cases he cites do not shed any light on this question. He relies on *United States* v. *Maass*, No. 97-2118, 1997 WL 785526 at *5 (10th Cir. 1997) and *United States* v. *D'Anna*, 450 F.2d 1201, 1206 (2d Cir. 1971), but neither of these cases feature cases remotely similar to the arguments he challenges. In *Maass*, as in *Rodriguez*, the prosecutor explicitly asked the jury to put itself in the shoes of the defendant's victim. *Maass*, 1997 WL 785526 at *5. The defendant in *Maass* was charged with threatening a postal carrier, and the prosecutor stated "[i]f it was you, would you ignore those words?" *Id.* Importantly, the court found these words, which the defendant alleged were a "golden rule" argument, only "arguably improper," but concluded that the alleged violation was insufficient to warrant a new trial given the context of the argument in the entire case. *Id.*

The improper "golden rule" argument in *D'Anna* is even more impossible to logically align with the instant case. In *D'Anna*, the court observed that "the prosecutor twice asked the members of the jury to consider the fact that they as citizens carry an additional burden when someone does not pay his taxes. Such statements were improper." *D'Anna*, 450 F.2d at 1205-06. Again, the challenged "golden rule" arguments in this case were nothing like *D'Anna* – at no point did the Government suggest that Valle's crimes placed some specific additional burden on the members of the jury. The prosecutor in *D'Anna* actually went a step past the "golden rule" argument which puts the jury in the place of the victims – his argument was that the jury members were actual victims of

the defendant's financial crime. Nevertheless, the *D'Anna* court found that there was no basis to upset the verdict. *Id.* at 1206 ("the record before the Court does not indicate that the appellants were deprived of a fair trial by the prosecutor's statements"). The remaining cases *Valle* cites in support of his "golden rule" argument do not merit significant discussion as they are also dissimilar from the instant case. *See Hodge* v. *Hurley*, 426 F.3d 368, 384 (6th Cir. 2005) (granting habeas where, amid numerous other errors and ineffective assistance of counsel, prosecutor asked the jury to "put [itself] in the place of someone that might run into [the defendant] at night"); *United States* v. *Teslim*, 869 F.2d 316, 327 (7th Cir. 1989) (finding harmless error and affirming conviction where prosecutor asked the jury if they would have behaved as the defendant did if they were innocent and had been approached by a narcotics-detecting dog as the defendant was). Thus, while Valle has identified a set of cases disapproving of so-called "golden rule" arguments, he has failed to identify even a single case suggesting that the type of arguments he challenges here were in fact "golden rule" arguments. Ultimately, Valle appears to be more generally arguing against any use of analogies in a jury address. This is anathema to any understanding of the appropriate role of litigants in a criminal trial, and should be rejected.

Finally, Valle argues that the Government's airplane analogy was improper because it referenced terrorism and allegedly referenced the September 11 attacks. (Br. 34). In support of the notion that this argument, by its nature, warrants a new trial, Valle cites two cases – *United States* v. *Burden*, 600 F.3d 204, 222 (2d Cir. 2010), and *United States* v. *Beam*, 10 Cr. 47, 2010 WL 4623934 (M.D. Pa. Nov. 5, 2010). Neither of these cases supports the argument that this analogy was in any way improper. In *Burden*, during a RICO trial of members of a Connecticut gang, the Government explicitly argued that the gang was comparable to a terrorist organization, stating that the gang was "equivalent to, in an international context, a nation, or not a nation, a group who

-74-

doesn't have defined boundaries, doesn't raise a flag, doesn't wear a common uniform, maybe even doesn't speak the same language . . . hijacks a plane from London, they blow up a tank in Afghanistan . . . do things all over the world." *Burden*, 600 F.3d at 222.  The Court of Appeals observed that, while the purpose of the analogy was unclear and it seemed unnecessary, the analogy, even having been made less than two years after the September 11 tragedy, was not a basis for upsetting the verdict. *Id.* The *Beam* decision Valle cites is merely a pre-trial order granting the defendant's motion, in a tax fraud prosecution, that the Government not be permitted to invoke the "war on terror" or "the events of September 11, 2001." *Beam*, 2010 WL 4623934 at *1. Neither *Burden* nor *Beam* involve an analogy of the type used in this case, and neither case stands for the proposition that any reference to a scenario that could be described as terrorism warrants an automatic new trial. The Government's airplane analogy in this case did not in any way suggest that the defendant was a member of the equivalent of a terrorist organization. The point made was that the participants in any number of crimes might be individuals who first fantasized about engaging in such activity, and that the jury would not be surprised to learn that in the context of any number of more-familiar crimes. Moreover, in this case, where the crime at issue was inevitably foreign to the experience of any of the jurors, it was important for the Government to argue important concepts in terms of crimes with which the jurors likely had more familiarity, such as bank robberies or even hijackings. These are crimes reported frequently in the press and depicted in other media, and Valle is wrong in his suggestion that any reference to hijacking would necessarily be understood as a reference to the September 11 tragedy.[14] This is particularly true given that the facts of the airplane

---

[14] Quite unfortunately, in the years since September 11, 2011, numerous incidents of individuals having to be restrained on airplanes have been reported in the press. *See, e.g.,* Associated Press, "Oregon: Plane Passengers Restrain Unruly Traveler," **The New York Times**, May 27, 2013 (describing incident where passengers and crew members were required to restrained a man with "seat belt extensions and three sets of shoelaces" after "witnesses said he tried to open an emergency exit during the plane's descent"), available at http://www.nytimes.com/2013/05/28/us/oregon-plane-passengers-restrain-unruly

analogy, involving successful air marshals and two unaffiliated hypothetical criminals, were dissimilar to the events of September 11. Given the nature of the argument and its context in the case, there was no impropriety in the Government's use of the airplane analogy. Valle has cited no authority to the contrary.

Valle's arguments challenging the propriety of the three analogies further ignores the reality that analogies involving potentially violent crimes are reasonable in the context of a trial involving a conspiracy to commit extremely violent crimes. *Cf. United States* v. *Robinson*, 702 F.3d 22, 37-38 (2d Cir. 2012) (observing that admission of potentially inflammatory evidence was not a violation of Rule 403 where "that evidence was no more inflammatory" than the charges themselves) (citing *United States* v. *Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir.1990) (prior act evidence was not unduly prejudicial where it "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged")). Indeed, the Second Circuit has previously declined to find prosecutorial misconduct where a prosecutor used an analogy involving a time bomb exploding an airplane in a case involving no violence at all. *See United States* v. *LaMorte*, 950 F.2d 80, 85 (2d Cir. 1991) (affirming marijuana distribution conviction in case where prosecutor stated "Suppose you had a group of people who were going to blow up a plane maybe to collect the insurance money on somebody in it and they all got together and they built a time bomb . . . . If the bomb goes off,

---

-traveler.html; Fox News, "2 Injured While Restraining Flight Attendant Who Ranted 'I am Not Responsible for Crashing This Plane,'" available at http://www.foxnews.com/us/2012/03/09/2-flight-attendants-reportedly-injured-in-incident-on-board-american-airlines; ; Mar. 9, 201; Monica Davey, "Would-Be Plane Bomber Pleads Guilty, Ending Trial, **The New York Times**, Oct. 12, 2011 at A1(describing guilty plea in Detroit, Michigan of so-called "Underwear Bomber" Umar Farouk Abdulmutallab); CNN Wire Staff, "Hijack Attempt Foiled Aboard Turkish Air Flight," **CNN.com,** Jan. 6, 2011 ("A man claiming to have a bomb tried to enter the cockpit of a Turkish Airlines plane about to land in Istanbul, Turkey, but was tackled by passengers and taken into custody"), available at http://www.cnn.com/2011/WORLD/europe/01/05/turkey.hijack.foiled/index.html; Pam Belluck, "Unrepentent Shoe Bomber Sentenced to Life," **The New York Times**, Jan. 31, 2003 at A1 (describing sentencing of so-called "Shoe Bomber" Richard Reid). This nonexhaustive list demonstrates the falsity of Valle's claim that "[t]he only suicidal plots involving an American passenger airline since the 1980s are the September 11 attacks." (NT br. 34).

as a defendant, you don't get to say 'Hey, I'm not responsible, I wasn't there when the bomb went off.'). The Second Circuit observed that the analogy, in the context of that case, "was, in the abstract, somewhat inflammatory and misleading." *Id.* The court stated, however, that "[n]onetheless, '[t]he government is not barred from using rhetorical devices during the trial,'" and held that the defendant was not prejudiced. *Id.* (quoting *United States* v. *Biasucci*, 786 F.2d at 513). It seems clear that if the defendant was not prejudiced by such a metaphor in a case involving only the distribution of marijuana, Valle is on weak footing in arguing that he was prejudiced by the use of even milder metaphors in a case involving numerous descriptions of plans to engage in heinous violent acts against women, images of abject brutality and corpses, and other abhorrent material. Valle's argument that the Government used improper analogies should be rejected.

### 7.   The Government Did Not Comment on Valle's Failure to Testify Or Shift the Burden of Proof

Valle argues that the Government's improperly commented on Valle's failure to testify and improperly shifted the burden of proof in stating "throughout the entire defense summation, as I said before we have the burden of proof, but since they did challenge the relevance of these searches that he engaged in of these women, it is important for you to consider the fact that you heard no reasonable explanation of why he is risking his job, his freedom . . . by conducting blatantly illegal searches of the very women he is talking about during the time period leading into these conspiracies." (NT Br. 35). First, Valle cannot credibly claim that the Government shifted the burden of proof in a sentence that included the phrase "we have the burden of proof." (Tr. 1605). This reminder that the Government had the burden of proof came after the prosecutor's statement at the outset of the rebuttal summation that "we bear the burden in this case. The judge has already told you that, but it is a fact. We bear the burden from the beginning of the case until the end, and

it is a burden that we embrace. It is a burden that we wrap around ourselves like a warm blanket and we don't take it off until the case is over." (Tr. 1580). It is difficult to conceive of a less equivocal announcement of the prosecution's unmitigated burden than the words actually used by the Government during the rebuttal summation. There was no improper burden shifting. *See United States* v. *Harte*, 108 F.3d 1370 (2d Cir. 1997) ("Although the government always retains the burden of proving its case beyond a reasonable doubt, the government may comment on the defense's failure to support its own factual theories with evidence") (internal citation omitted).[15]

Similarly, Valle cannot credibly claim that this sentence constituted an attempt to reference the defendant's failure to testify where the sentence began with the words "throughout the entire defense summation." (Tr. 1605). Valle's argument ignores the context of the language used by the Government during this portion of the rebuttal, and it ignores the extent to which it was a direct response to defense counsel's attempt to posit an illogical theory as to why Valle was conducting the restricted database inquiries. Immediately after the language quoted by Valle, the Government stated "[t]he only explanation that Ms. Gatto offers is that he may have been trying to test the system." (Tr. 1605). The Government then explained why the defense's argument that Valle may have been attempting to test the system was neither based in evidence nor logical. (Tr. 1605). This was, of course, a response to the defense's argument that Valle's unauthorized use of NYPD computers could be explained as innocent activity. (Tr. 1566) ("Isn't it possible that Gil inputs these names . . . to check the system, to make sure it is working? Isn't that reasonable doubt as to Count

---

[15] *United States* v. *Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992), the primary "burden shifting" case upon which Valle appears to rely (NT Br. 37), is inapposite. In that case, the Eleventh Circuit concluded that the prosecutor's comment "when you have lost your job because some bum comes in and says you killed somebody with your .45, doesn't common sense dictate that you are going to say, 'Hold it, hold it, guys. I have got a .45 at home. I never killed nobody with it" was "probably improper." *Id.* Nevertheless, the Eleventh Circuit concluded that any error was harmless because the jury was properly instructed on the burden of proof.

2?"). The context of the Government argument and the language of the argument itself both made clear that the Government was responding to a defense summation argument and not commenting on the defendant's failure to testify.

Not one of the cases cited by Valle supports the notion that the type of comment Valle challenges can be understood as a prohibited reference to the defendant's failure to testify. (NT Br. 36-37). In *Griffin* v. *California*, 380 U.S. 609, 610-11 (1965), of course, the disapproved statements made by the prosecutor were explicit and unlike anything Valle can allege occurred here. The prosecutor stated "The defendant certainly knows whether Essie Mae had this beat up appearance at the time he left her apartment . . . . He would know how the blood got on the bottom of the concrete steps . . . . These things he has not seen fit to take the stand and deny or explain . . . . And in the whole world, if anybody would know, this defendant would know." *Id.* In *United States ex rel D'Ambrosio* v. *Fay*, 349 F.2d 957, 961 (2d Cir. 1965), which Valle also cites, the Second Circuit rejected the petitioner's arguments that the prosecutor's statements constituted impermissible references to the defendant's failure to testify. In that case, the prosecutor made reference to a possible defense argument by using the defendant's name, and the court observed that "in the context in which the remark was made, it is apparent that the prosecutor was making a reference only to the accused's plea of 'not guilty' and defense counsel's theory of the case which had just been presented in the summation for the defendant." *Id.* Similarly, in *United States ex rel. Leak* v. *Follette*, 418 F.2d 1266, 1267 (2d Cir. 1969) (Friendly, J.), the Second Circuit rejected the petitioner's argument that the prosecutor violated the Fifth Amendment where the prosecutor stated:

> And I say to you broadly, before I go into any further detail, the evidence of Alamo and the young boy stands uncontradicted in this case. Cross-examination and recross-examination has not shaken Mr. Alamo's positive unequivocal identification of these two defendant(s), and as the state of the evidence is now, they stand

> positively identified as the two men who perpetrated this crime, uncontradicted, that is the evidence. Is there any evidence here other than the positive identification by Alamo? And I say this to you, ladies and gentlemen, if you had nothing else in this case but the testimony of Mr. Alamo, I say you are duty bound to convict these two defendants. And if you are going to go by the evidence where is there anything to say that Alamo was wrong? Where? Is there any evidence to contradict his positive identification, and again I repeat, I want you to remember this, that if you had nothing else in this case but the uncontradicted testimony of Alamo consisting of a positive unequivocal identification, if that stands uncontradicted, it is sufficient to warrant a verdict of guilty in this case and I repeat it and I will stand on that. And that (Alamo's identification) stands uncontradicted here and there isn't the slightest reason given to you for disbelieving Alamo.

*Id.* at 1267 n. 1. Judge Friendly, writing for the panel, observed that "[n]either the language, the history, nor the policy of the self-incrimination clause affords support for the surprising proposition that in declaring that no person 'shall be compelled in any criminal case to be a witness against himself,' the authors of the Bill of Rights intended to prohibit proper advocacy concerning the strength of the prosecution's case. This is quite different from specific comment on the defendant's failure to take the stand." *Id.* at 1268.

Not even the two Georgia district court cases Valle cites support his argument. *United States* v. *Hunt*, 412 F. Supp. 2d 1277, 1290 (M.D. Ga. 2005) involved a summation in which the prosecutor stated, regarding the defendant's post-arrest silence "common sense would tell you that when people are being arrested, if it's not yours, what's the very *numero uno*, number one, thing you're going to say? 'It's not mine.'" *Buttrum* v. *Black*, 721 F. Supp. 1268, 1304 (N.D. Ga. 1989), involved a prosecution summation which stated "Defense? There is none. There has not been one iota of evidence to indicate that this defendant did not do what she is charged with." There is, quite clearly, no similarity between the comments in *Hunt* and *Buttrum* and the instant case. Valle does not even attempt to explain how these two cases are analogous.  Similarly, *Runnels* v. *Hess*, 653 F.2d 1359,

1363 (10th Cir. 1981), involved language by the prosecutor so explicitly focused on the defendant's

failure to testify that it is impossible to understand how Valle analogizes the case. In that case, the

prosecutor stated:

> I submit to you that if He-that if the defendant did not rape this prosecuting witness, There would be some evidence to rebut it. There would be some evidence to rebut it. If he didn't hit her there would be some evidence today by the defense to rebut it. If he didn't choke her three times there would be some evidence By the defendant to rebut it. Did you hear any? Not one bit, not one bit, didn't hear a bit . . . . If it wasn't true there would be Testimony here to say that he did not rape her. There would be testimony here to say that he didn't hit her. There would be Testimony here to say that he didn't hit her. There would be Testimony here to say that he didn't strike her and there would be Testimony to show that he didn't tear her blouse. So when you go to your jury room think in your mind, please, Why wasn't there some testimony refuting this. Why wasn't there? . . . . And she's laying down there in the seat By this defendant. Is there any testimony to refute that? No, not one.'

*Runnels* v. *State*, 562 P.2d 932, 937 n. 6 (Okl. Cr. 1977).[16]  No further explanation of the extreme

distinction between *Runnels* and the instant case is necessary.  There is simply no authority that

supports the notion that the Government's challenged statements could be construed as a comment

on the defendant's failure to testify.

**8.     The Government Did Not Err in Responding To Valle's Arguments Regarding An Internet Search for the Address of Kristin Ponticelli**

Valle argues that the Government improperly maligned defense counsel in arguing that

defense counsel had attempted to assign responsibility for an incriminating Google search to Valle's

wife in order to distract the jury from the evidence pointing to Valle's guilt. (NT Br. 37-38).[17]  In

---

[16] The Tenth Circuit did not actually quote the offending language but made reference to the state court decision.

[17] During this portion of the Government's rebuttal summation, the Government stated "the reason defense counsel tried to stress to you that this could have been somebody else, the reason it was so important to make that wildly [im]plausible point is because defense counsel knows if it is true [that] Gilberto Valle is attempting to get the address of Kristen Ponticelli, he is guilty because that is proof

support of this argument, Valle has again relied on a series of cases whose facts demonstrate that his reliance is improper. He has again extracted general legal principles – here, the principle that the Government should not argue that the defense attorney knows the defendant is guilty – and attempted to apply them in a way that no court has indicated is improper. As an initial matter, the Government disputes the notion that its argument constituted an argument opining on defense counsel's knowledge of her client's guilt. The essence of the Government's argument was merely that defense counsel was making an implausible argument in the face of particularly damaging evidence in an attempt to mitigate this evidence. None of the cases upon which Valle relies suggest that such an argument is improper, and certainly not that such an argument constitutes a basis for granting a new trial. For example, Valle relies on the Ninth Circuit's decision in *United States* v. *Kirkland*, 637 F.2d 654, 656 (9th Cir. 1980). (NT Br. 38). But in *Kirkland*, the prosecutor stated explicitly that "counsel for both defendants knew that their clients were 'guilty as sin.'" *Id.* This comment was nothing like the comment Valle challenges here – *Kirkland* featured an explicit argument on the part of the prosecutor that defense counsel was actually aware of their client's total guilt. Nevertheless, in *Kirkland*, the Ninth Circuit ultimately concluded that these statements were insufficient to warrant upsetting the conviction. *Id.* at 656 ("we cannot say that the trial judge abused his discretion in failing to grant a mistrial"). Similarly, in *Homan* v. *United States*, 279 F.2d 767, 775 (8th Cir. 1960), a fifty-year old Eighth Circuit case that Valle cites as support, the prosecutor stated in his closing argument, regarding defense counsel "I think he . . . knows [the defendant] is guilty." The *Homan* prosecutor further stated "I have to commend Mr. Kelley (appellant's counsel)

---

beyond any reasonable doubt that he is taking steps far beyond someone thinking about this in his mind. He is attempting to get location information about a high school student who he has been talking about killing."

for the job he has been able to do to represent that boy whom I think he knows is guilty." *Id.* at 776.

Thus, like *Kirkland*, *Homan* featured the dissimilar situation of explicit commentary on the defense

attorney's subjective belief in the guilt of his client, rather than a comment on the implausibility of

an argument. Nevertheless, the Eighth Circuit also declined to find significant error in that remark,

and observed that:

> Accusations or remarks of this nature should not enter into jury
> arguments. But there is no way to prevent them from at times
> occurring in natural human reaction. And when they do happen, this
> reality must be allowed for, and examination engaged in of them in
> their setting, and appraisal made of their capacity in the
> circumstances to prejudice the result. American forensic tradition,
> while never licensing such lacks of restraint, has always judged them
> unartificially, in a fair-play spirit, on the basis of a jury having
> common intelligence and under-standing, and with a consideration of
> how they may have been prompted. While Government counsel may
> not subject a defendant to an unfair trial, he cannot, like the court, be
> expected to cease entirely being an advocate.

*Id.* (internal citation omitted). The First Circuit case which Valle argues provides support by

analogy, *Greenberg* v. *United States*, 280 F.2d 472, 475 (1st Cir. 1960) (NT Br. 38), did not involve

an argument regarding defense counsel's subjective beliefs at all, but rather featured a prosecutor's

argument that "he was 'a sort of thirteenth juror (who) applies his training in the evaluation of

evidence, in analyzing evidence, and tries to convey to the jury just what part the evidence plays in

the presentation of a case," followed by "vigorous language [in which] he expressed his personal

opinion of the trustworthiness of the government's evidence and the consequent guilt of the

accused." *Greenberg* is entirely irrelevant to the argument Valle advances here.[18]

---

[18] Similarly irrelevant are *United States* v. *Scharner*, 426 F.2d 470, 478 (3rd Cir. 1970) (reversing where prosecutor stated "I say to you with all the sincerity I can muster that if you do not convict the defendant, the guilty will escape . . . . Members of the jury, this is a man— is this the way an honest man would act? Is this what you would expect if you were on trial in this case?") and *United States* v. *Wright*, 625 F.3d 583, 610 (9th Cir. 2010) (affirming and finding no prejudicial error where, among other improprieties, prosecutor improperly stated "Now, I've been handling these cases for a number of years and I've seen [three different child pornography defenses]. But never have I seen the trifecta, all three in this same place. This is very—this is unbelievably remarkable that you guys got to witness this."). Valle's argument

Moreover, the Government's argument was a response to a particularly inflammatory argument on the part of defense counsel. The suggestion that Valle's wife had potentially conducted the "Kristin Ponticelli address" search was tantamount to a suggestion that either Valle had potentially been framed by his wife or that the critical forensic computer evidence introduced by the Government actually constituted records of Valle's wife's internet activity. The argument was improper and entirely inconsistent with the evidence that had been introduced at trial. The Government was entitled to respond to such an argument "with rebutting language suitable to the occasion." *See United States* v. *Amato*, 86 Fed. Appx. 447, 451 (2d Cir. 2004) (where "defense counsel makes arguments that are themselves improper, the government is granted greater latitude in its rebuttal"); *see also United States* v. *Elias*, 285 F.3d 183, 190 (2d Cir. 2002) (rejecting claim of prosecutorial misconduct in summation and observing that "[w]e see nothing inherently wrong with characterizing a defense tactic as desperate"). The Court should reject Valle's claim that the Government's arguments regarding the Kristin Ponticelli address search was improper.

---

finds no support in these decisions.

9.    There is No Validity to Valle's Remaining Assertions of Prosecutorial Misconduct

After devoting some 40 pages of briefing to detailing eight supposed areas of prosecutorial misconduct in the Government's summations, as described above, Valle agues that the Government engaged in "additional misconduct," and in support of this argument points to: (1) the Government's supposed argument that the jury should convict based on Valle's character; (2) the Government's supposed invocation of Valle's wife's subjective reactions and opinions; and (3) the Government's supposed argument that Valle should be convicted because he placed women in grave danger. (NT Br. 39-42). None of these arguments merit significant discussion. First, the Government, in stating that "Mr. Valle is a sadistic person" who is "sick" did not make an argument regarding Valle's character. These arguments went to factors underscoring the evidence demonstrating Valle had a mind state capable of engaging in the activities that he discussed. The "sick" comment was made in the context of the Government's discussion of evidence that the defendant was spending his nights listening to "the sound of a knife scraping against a carving, sharpening blade." (Tr. 1613). The "sadistic" comment was made in the context of the Government's discussion of evidence that Valle was storing images of "women being abducted . . . women being roasted over flames," and "videos of women screaming for their lives." (Tr. 1596). In a trial where the core question was whether the defendant had an intent to engage in the activities he unquestionably planned, the Government was entitled to comment on the evidence of his actual intent – an intent which could not be squared with the notion that the defendant possessed a healthy mind. *See Drew* v. *Collins*, 963 F.2d 411, 419 (5th Cir. 1992) (affirming conviction and finding no constitutional error in the prosecutor's reference to defendant as a "sadistic killer" and to a trip taken by defendant as "rolling torture chamber," where "comments referred to specific evidence in the record"). Indeed, the extent to which this language

was the necessary language of the trial, given the materials at issue, is underscored by defense counsel's own use of the challenged terminology in the defense opening statement and summation. ( Tr. 130 ("ladies and gentlemen, we don't convict people for their thoughts **even if they are sick**"); Tr. 1574 ("It was all fantasy – **sick, twisted, ugly fantasies**, traded on the computer.")). (emphasis added). Indeed, in the communications admitted in evidence during the trial, Valle described himself as "sadistic." (Tr. 629 ("I am a little different, though. **I am a little more sadistic.** I would want her to suffer. I would want to see her suffer.") (emphasis added).[19] Moreover, while Valle ultimately chose not to call Dr. Dietz, for much of the trial the defense indicated that its strategy would be to use the testimony of Dr. Dietz, who would indicate that the defendant had supposedly benign "sexually sadistic" fantasies. (Tr. 1339) ("THE COURT: I received a letter from Ms. Gatto stating that Dr. Dietz would not be offering any opinions specific to Mr. Valle, but that he would be giving what Ms. Gatto refers to as 'general educational testimony about sexually sadistic fantasies and behavior,' citing Ms. Gatto's March 4, 2013 letter."). It is incongruous that Valle now argues that the very language he used to describe the area of expertise of his proffered expert was somehow so inflammatory when used by the Government that it warrants a new trial. Considered in context, there can be no serious allegation that the Government's language constituted error here.

There was also no error in the Government's argument, in its principal summation, that Valle's wife had taken seriously Valle's plan and had fled their home. (NT Br. 41). The Court's ruling regarding Ms. Mangan's testimony was that the Government would not be permitted to elicit

---

[19] While Valle ultimately chose not to call Dr. Dietz, for much of the trial the defense indicated that its strategy would be to use the testimony of Dr. Dietz, who would indicate that the defendant had supposedly benign "sadistic" sexual fantasies. (Tr. 1339) ("THE COURT: I received a letter from Ms. Gatto stating that Dr. Dietz would not be offering any opinions specific to Mr. Valle, but that he would be giving what Ms. Gatto refers to as 'general educational testimony about **sexually sadistic fantasies** and behavior,' citing Ms. Gatto's March 4, 2013 letter."). It is incongruous that Valle argues the very language he used to describe the area of expertise of his proffered expert was somehow so inflammatory when used by the Government that it warrants a new trial.

testimony regarding her subjective view of Valle's mental state or her own, but the Court explicitly

ruled that "the government will be permitted to elicit what Mangan did after discovering Valle's

Internet chats." (Tr. 57). The Court explained that "Mangan's discovery of her husband's Internet

activities was critical to the narrative of this case, because it was she who reported Valle's activities

to the FBI, and thus it was Mangan who provided the impetus for the government's investigation."

(Tr. 57). Here, the Government commented not on any testimony regarding Valle's wife's views,

but on what Valle's wife had done – the precise area of testimony in which the Court permitted

inquiry. That the Government argued that these actions underscored the seriousness of Valle's

activities was not error. Moreover, Valle has failed to identify any authority supporting the notion

that references to Ms. Mangan's actions following her discovery constitute error warranting the

grant of a new trial.

Valle's argument that the Government, in its principal summation, "urged the jury to convict

Mr. Valle because he had supposed placed [his targets] in 'grave danger'" misreads the portion of

the Government's summation that it attacks. (NT Br. 42). The Government did not argue that the

jury should convict because of the danger the defendant created – the Government described specific

activities in which the defendant engaged, such as sending images of his targets to his

coconspirators, that advanced the conspiracy towards its goals. There was no error in pointing out

this fact, and Valle has not even attempted to cite any case suggesting that the Government is not

permitted to point out that the actions of a defendant in furtherance of a violent conspiracy had very

real potential consequences. (NT Br. 42). Indeed, the unsurprisingly limited case law related to this

issue is to the contrary. *See*, *e.g.*, *United States* v. *Rodriguez*, 499 Fed. Appx. 904, 907 (11th Cir.

2012) (finding no error in Government summation, observing "the prosecutor's comment that

Rodriguez's lies could have ruined the correctional officer's life was a common-sense inference as

-87-

to the likely consequences of Rodriguez's lies."); *see also United States* v. *Grauer*, 701 F.3d 318, 322-23 (8th Cir. 2012) (finding no error where prosecutor stated in closing argument "I told you, make no mistake about it, this is a dangerous man, and he proved it," in attempted child enticement case); *United States* v. *Davis*, 609 F.3d 663, 682 (5th Cir. 2010) (rejecting claim of prosecutorial misconduct where, in murder trial of New Orleans police officer, prosecutor stated "You see, ladies and gentlemen, this crime not only involved one victim, but 500,000 victims, the people of the city of New Orleans. And it was an insult on our entire criminal justice system.").

In sum, Valle has collected a series of areas of potential prosecutorial misconduct and attempted, through unnecessarily bloated briefing, to create the impression of multifaceted prosecutorial error. But despite the breadth of Valle's protestations, he has failed to demonstrate that the Government engaged in any actual improprieties.  Indeed, a remarkable feature of Valle's Motion for a New Trial is that, amid the numerous cases cited in his motion, he has failed to even attempt to explain how any of the authorities upon which he relies connect to the facts of this case. Valle's arguments for prosecutorial misconduct ultimately find no support in the law. The Court should reject all of them.

### D.  Valle Cannot Demonstrate That Any Misconduct Warrants A New Trial Under Controlling Precedent

Even if Valle could establish that the Government had engaged in any of the supposed misconduct he describes, Valle's Motion for a New Trial would fail because Valle cannot demonstrate that this alleged misconduct is of a character warranting upsetting the verdict.

### 1.  Valle Failed to Preserve the Bulk of His Objections to the Government's Arguments During its Summations

Valle argues, at Footnote 4 of his memorandum, that even though he failed to object to the bulk of the arguments he challenges, the Court should deem his objections preserved. (NT Br. 10 n. 4). Valle is wrong. Of the numerous challenges he raises to the Government's summations at pages 9-42 of his brief, only three were preserved by a contemporaneous objection. Specifically, Valle objected to: (1) the Government's statement early in the rebuttal summation that "[t]he second broad theme . . . is this idea that you should somehow not be disturbed by the fact that this man, a police officer, walking around New York City every single day with a loaded weapon has a . . . primary sexual fantasy of seeing women mutilated and harmed in horrific ways" (Tr. 1578); the rebuttal summations's restaurant analogy (Tr. 1584); and the rebuttal summation's airplane analogy (Tr. 1594). The defendant did not object once during the Government's principal summation. (Tr. 1514-42). After the conclusion of the rebuttal summation, defense counsel moved for a mistrial on the basis of the airplane analogy, the Government's statements disapproving of Valle's violent "fantasies," and the Government's statements referencing the propriety of the FBI's actions in this case. (Tr. 1621-23). The Court denied the motion for a mistrial. (Tr. 1623-24).

Where a defendant fails to object to a challenged portion of the Government's summation, he cannot demonstrate that a new trial is warranted absent a showing of "flagrant abuse." *United States* v. *Zichettello*, 208 F.3d 72, 103 (2d Cir. 2000); *United States* v. *Rivera*, 22 F.3d 430, 437 (2d

Cir. 1994) ("If the defendant failed to make timely objection to a statement contained in the prosecutor's summation, the statement will not be deemed a ground for reversal unless it amounts to a 'flagrant abuse.'") (quoting *United States* v. *Ortiz*, 857 F.2d 900, 904 (2d Cir. 1988) ("To the extent that Ortiz rests her appeal on the imbalance of her closing as against the government's rebuttal on the intent issue, her claim was not preserved because her counsel failed to object to the rebuttal. In the absence of such an objection, our inquiry is limited to whether the challenged argument amounted to a flagrant abuse.") (internal quotation marks omitted).

The Second Circuit has almost never concluded that a prosecutor's summation, even where erroneous, constituted "flagrant abuse" warranting a new trial. *See United States* v. *Carr*, 424 F.3d 213, 229 (2d Cir. 2005) ("Although the language employed by the government may have been unclear and arguably may have suggested that Boyd had testified against Rollack when in fact he was merely prepared to testify against other SMM members, any error did not rise to the level of "flagrant abuse."); *United States* v. *Salameh*, 152 F.3d 88, 134 (2d Cir. 1998) (rejecting numerous claims of prosecutorial misconduct in summation and observing that "given the broad latitude afforded both sides during summation, there was no impropriety in the government's argument because the inference sought was reasonable and Abouhalima remained free to argue his own interpretation of the testimony. Moreover, because Abouhalima did not object to this argument at trial, he must show 'flagrant abuse,' which is simply not present here."); *United States* v. *Rivera*, 22 F.3d 430, 437 (2d Cir. 1994) (rejecting claim of "flagrant abuse" in Government summation where defendant alleged repeated misrepresentations of the nature of the charged criminal organization); *United States* v. *Williams*, 470 F.2d 915, 918 (2d Cir. 1972) ("While this part of the summation may have gone beyond the purpose for which Exhibit 25 was offered, it cannot be denominated a 'flagrant abuse.'"); *United States* v. *Dibrizzi*, 393 F.2d 642, 646 (2d Cir. 1968)

(declining to find "flagrant abuse" where prosecutor, among other alleged errors, stated "With respect to character witnesses, I am not going to tell you whatever information I myself possess."). Indeed, in one of the only cases in which the Court of Appeals did find flagrant abuse, it limited its finding to a subset of the charges for which the evidence was particularly weak, and the court affirmed the defendant's conviction on all of the other charges. *See United States* v. *Farmer*, 583 F.3d 131, 147 (2d Cir. 2009). In *Farmer*, the court based its decision, vacating a subset of the charges, on the prosecutor's use of the defendant's improperly utilized nickname, "Murder," "no fewer than thirty times during the rebuttal summation in a presentation that occupie[d] only sixteen transcript pages." *Id. But see United States* v. *Price*, 443 Fed. Appx. 576, 579 (2d Cir. 2011) (finding no error and no ineffective assistance where defense counsel failed to object to the prosecution's use of the defendant's nickname "Crime.")

Here, even though Valle bases his motion on the entirety of the Government's summations, he fails to explain why the Government's summations, taken as a whole, could be considered "flagrant abuse," instead arguing that the Court should ignore his failure to object. But the cases upon which Valle relies, suggesting that the failure to object could in certain circumstances be overlooked, are inapplicable. In *United States* v. *Lyman*, 592 F.2d 496, 499 (9th Cir. 1978), the Ninth Circuit concluded that defense counsel had preserved one objection that it failed to make during the rebuttal summation by challenging it afterwards. Notably, the court ultimately concluded that the remark, improperly referencing a witness's diary which he had allegedly "used to refresh his recollection about dates and so forth," was insufficient to warrant upsetting the verdict. *Id.* at 499. This case said nothing about the wholesale failure to raise an objection to an argument during the jury address or afterwards, and the Ninth Circuit observed that at least one other circuit had concluded that "failure to interrupt during closing argument" foreclosed review except for plain

error. *Id.* at 499 n. 2 (noting that Fifth Circuit required contemporaneous objection, that First and Eighth Circuit had indicated "immediate objection during argument is the proper practice" and that Second Circuit allowed an objection at end of summation only where the summation was "permeated with improprieties.").

The Second Circuit decision referenced by the *Lyman* court, *United States* v. *Briggs*, 457 F.2d 908, 911-12 (2d Cir. 1972), is also relied upon by Valle in support of his argument that the court should ignore his failure to object to the bulk of the challenged arguments. *Briggs*, however, actually demonstrates just how far short Valle falls from demonstrating that the court should excuse his failure. In *Briggs*, the defendant argued prosecutorial misconduct "list[ing] no less than eleven points in which the prosecutor's summation allegedly transgressed proper standards." *Id.* at 911. The court noted that "[o]nly two" of the challenged points "were the subject of objection." *Id.* Addressing the obligation of the defendant during summations, the court observed that "the general rule is that the burden is on the defendant to take his objection at the earliest possible opportunity when, by so doing he can enable the trial judge to take the most efficacious action." *Id.* (internal quotation marks omitted). The court indicated that "a prosecutor's summation may be so permeated with improprieties that defense counsel may legitimately consider constant objection during the summation to be useless and even detrimental." *Id.* at 912.[20] The court found, however, that the defendant in *Briggs* had failed to demonstrate that the summation was "so permeated with improprieties" that he was relieved of his obligation to make objections to challenged arguments. *Id.* This was on a record that included two sustained objections early in the Government's

---

[20] The court further observed that "[h]owever, even in such extreme cases there would seem to be no reason why he should not be required to bring the matter to the judge's attention, outside the presence of the jury, at the end of the summation, so that the court can consider whether to attempt curative instructions or to declare a mistrial, rather than gamble on obtaining an acquittal." *Id.* (internal citation omitted).

summation, including an argument suggesting that the defense was likely providing the critical

defense witness with drugs "to keep him going until after his trial." *Id.* at 911. The other sustained

objection was to a reference by the prosecutor to nonexistent testimony from an agent that the

defendant had threatened to kill a witness. *Id.* Considering these two conceded errors and others, the

Circuit still concluded that the defendant could not overcome his failure to object and certainly could

not demonstrate "plain error" warranting the grant of a new trial. *Id.* at 912 ("careful examination

of the summation indicates that on many of the points listed by appellant as objectionable, the

remarks were legitimate argument and that, on others, the degree of departure from proper norms

has been considerably exaggerated"). It follows that if the defendant in *Briggs*, whose two objections

were actually sustained by the district court and found clearly improper by the Circuit, was not

relieved of his responsibility to continue objecting to allegedly improper arguments, Valle cannot

demonstrate that he was relieved of his duty to object by making only three objections, all of which

were overruled and none of which, on examination, have any merit. *See also United States* v. *Ong*,

541 F.2d 331, 342 (2d Cir. 1976) (rejecting argument that prosecutor's summations deprived

defendant of fair trial and observing "The other matters now complained of do not warrant

objections of appeal and surely did not seem to defense counsel to warrant objection at the time.

Although under certain circumstances as where the trial judge repeatedly brushes aside valid

objections we do not expect counsel to continue to make objections before the jury, here the trial

judge responded effectively to all the defense objections during the summation."). Although Valle

relies upon *Ong* (NT Br. 10 n. 4), that decision also underscores the point that the requirement

defense counsel object contemporaneously is only excused in situations such as when the trial judge

"repeatedly brushes aside valid objections." *Ong*, 541 F.2d at 343-44. That obviously did not occur

here. Valle has not attempted to demonstrate that the Government's arguments, taken as a whole,

constituted flagrant abuse, and he cannot. For this reason, his arguments for a new trial based on the Government's summations should be rejected.

> ### 2. Even If Valle Could Demonstrate That The Government's Arguments Were Improper and That He Had Preserved His Objections, He Cannot Demonstrate That Any Error Warrants a New Trial

Even if Valle could overcome his failure to demonstrate that the Government acted improperly and his failure to preserve his challenges, he cannot meet his "heavy burden" of demonstrating that any misconduct was "so severe and significant as to result in the denial of his right to a fair trial." *Coplan*, 703 F.3d at 86. The Second Circuit examines three factors in determining whether inappropriate remarks rise to the level of prejudicial error – "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *Id.* Here, assuming there was any misconduct, the severity was extraordinarily low. The remarks Valle challenges are almost all rhetorical flourishes, as opposed to the references to nonexistent evidence, etc., that still failed to warrant the grant of a new trial in many of the cases Valle cites. As described above, the bulk of the remarks challenged by defense counsel could be linked to a specific argument first broached by defense counsel. Several of the alleged areas of misconduct, even if accepted as true, simply have little resonance given the context of the entire case. For example, Valle argues that the Government "terrified" the jury with brief references to the fact that Valle was armed during the time period of the conspiracy. (NT Br. 21). But this was a trial which featured, in the Government's case and in the defense case, vivid descriptions of violence that Valle planned for his targets, to include sexual assault, stabbing, and cannibalism. The notion that the jurors, in the context of this case, were ultimately "terrified" by reference to a gun, is not credible. Valle's other arguments of impropriety, even taken as valid, also do not resonate as severe given the context of the case. He argues that the Government "maligned" defense counsel by

rejecting defense counsel's argument that Valle's fantasies were benign (NT Br. 13); that the Government's appeals to "common sense" were not valid appeals to "common sense" (NT Br. 15); that the Government "invited jurors to convict based on positive views of law enforcement" (NT Br. 24); and that the Government used improper analogies (NT Br. 27). As explained above, none of these claims are valid, but regardless they simply could not constitute misconduct of a severity warranting a new trial. *See United States* v. *Truman*, 688 F.3d 129, 143-44 (2d Cir. 2012) (reversing the district court's grant of a new trial where Government's summation constituted misconduct but was "not so severe" as to deprive defendant of a fair trial).

The second factor in this Circuit's prejudice analysis, "the measures adopted to cure the misconduct," cuts against any conclusion that the grant of a new trial is warranted. *Coplan*, 703 F.3d at 86. Here, because there was no impropriety in the Government's summations, the Court did not give curative instructions to the jury immediately following the defense's objections. But even assuming impropriety, the bulk of the defendant's objections would have been cured by the accurate and clear instructions given to the jury in its charge. *See United States* v. *Newton*, 369 F.3d 659, 681 (2d Cir. 2004) (rejecting prosecutorial misconduct in summation arguments and observing that "because the error was not serious, the district court acted reasonably in deciding not to highlight it with a special curative admonition, relying instead on its general instruction that the jury must base a verdict only on the evidence and that the attorneys' arguments were not evidence"). With regard to how the lawyers' arguments should be examined, Court explicitly instructed the jury that "it is your recollection that controls . . . . [w]hat the lawyers said in opening statements, in closing arguments, in objections, or in questions is not evidence." (Tr. 1634). With regard to the burden of proof, the Court instructed:

> A defendant does not have to prove his innocence. To the contrary, the defendant is presumed innocent until such time, if ever, that you as a jury are satisfied that the government has proven him guilty beyond a reasonable doubt. The defendant began the trial here with a clean slate. This presumption of innocence alone is sufficient to acquit a defendant unless you as jurors are unanimously convinced beyond a reasonable doubt of his guilt, after a careful and impartial consideration of all the evidence. If the government fails to sustain its burden, you must find the defendant not guilty.

(Tr. 1631-32). The Court gave detailed instructions on the nature of "reasonable doubt" and how the jury was required to apply that standard in the case, instructing:

> I will now address reasonable doubt. What is reasonable doubt? It is a doubt founded in reason and arising out the evidence in the case, or the lack of evidence. It is doubt at that a reasonable person has after carefully weighing all the evidence. Reasonable doubt is a doubt that arises from your own judgment, experience and common sense when applied to the evidence.

(Tr. 1632). With regard to the issue of fear or other improper consideration, the Court instructed:

> It is for you alone to decide whether the government has proven that the defendant is guilty of the crimes charged, and you are to do so solely on the basis of the evidence and subject to the law as I explain it to you. If you let fear or prejudice, or bias or sympathy, interfere with your thinking, there is a risk that you will not arrive at a true and just verdict.

(Tr. 1629). With regard to the defendant's decision not to testify, the Court instructed:

> The defendant did not testify in this case. Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the government's burden to prove the defendant's guilt beyond a reasonable doubt. That burden remains with the government throughout the trial and never shifts to the defendant. The defendant is never required to prove that he is innocent. You may not attach any significance to the fact that the defendant did not testify. You may not draw any inference against him because he did not take the witness stand. You may not speculate as to why the defendant did not testify, and you may not consider this against the defendant in any way in your deliberations.

(Tr. 1643). Thus, in nearly every area of alleged misconduct alleged by Valle, the Court subsequently provided clear and accurate instructions to the jury which served as a bulwark against the possibility that the verdict was based on improper considerations. Examination, therefore, of the second factor in the determination of prejudice from the alleged misconduct militates against any finding that a new trial is warranted.

The third factor, "the certainty of conviction absent the misconduct," also indicates that Valle's motion must be denied. *Coplan***,** 703 F.3d at 86. It is unnecessary here to recount all of the evidence establishing Valle's guilt. But importantly, this was a case in which the jury was able to review all of the intercepted communications between the coconspirators evidencing the crime, was able to review the extensive details of the defendant's electronic activities during the crime, saw record demonstrating that the defendant had illegally accessed NYPD databases and queried his targets, and heard testimony from several of the women that Valle targeted regarding their interactions and the nature of their relationships. In such a case, where the evidence was both rich and voluminous, the argument that the verdict ultimately turned on rhetoric is illogical. *See Elias*, 285 F.3d at 192 (rejecting claim of prosecutorial misconduct and observing that the "certainty of conviction" factor "weigh[ed] heavily in favor of the government" in case where the allegedly improper remarks "did not touch upon or bolster the most potent of the government's evidence."). Indeed, Valle has not identified any allegedly improper arguments that he can demonstrate altered the significance of any of the proof. Valle's challenges are almost exclusively about rhetoric that he found objectionable – none of this goes to the strength of the evidence or undermines the likelihood that he would have been convicted. Moreover, that the jury deliberated for several days after the alleged prosecutorial misconduct indicates that the effect of any misconduct was insignificant in light of the proof. *Cf. Loliscio* v. *Goord*, 263 F.3d 178, 189-90 (2d Cir. 2001) ("there was no rush

to judgment following the introduction of the rumors. Subsequent to the rumor incident-which occurred on the second of five days of deliberations-the jury deliberated three additional days.") (internal citation omitted).

In this case, the Court exercised extraordinary diligence and care in the administration of the trial in order to assure that Valle had a fair trial – granting multiple continuances in order to assure that Valle had time to prepare his defense; allowing for unconventional jury selection procedures requested by the defense; permitting the admission of multiple areas of unconventional expert testimony requested by the defense; permitting the use of a Rule 15 deposition of a foreign witness in the defense case; excluding significant portions of Valle's communications with his co-defendants, including references to acts of violence to be committed against children, under Rule 403, along with numerous other measures taken by the Court. In short, Valle could not have been given a fairer trial. His arguments to the contrary here are unsupported by the facts and the law. His motion should be rejected.

**CONCLUSION**

For all of the reasons described above, the Court should deny the defendant's motions for judgment of acquittal and for a new trial.

New York, New York
August 16, 2013

Respectfully submitted,

_____/s/_____
Randall W. Jackson
Hadassa Waxman
Assistant United States Attorneys
212-637-1029/2277