UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -

GILBERTO VALLE,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 30, 2014

**MEMORANDUM
OPINION & ORDER**

12 Cr. 847 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On March 12, 2013, a jury convicted Defendant Gilberto Valle of conspiracy to commit kidnapping (Count One), in violation of 18 U.S.C. § 1201(c), and of conducting a computer search of a federal database that exceeded his authorized access (Count Two), in violation of 18 U.S.C. § 1030(a)(2)(B). (Verdict Form (Dkt. No. 126)) Valle has moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 or, in the alternative, for a new trial under Fed. R. Crim. P. 33. (Def. Count One R. 29 Mot. (Dkt. No. 176); Def. Count Two R. 29 Mot. (Dkt. No. 178); Def. R. 33 Mot. (Dkt. No. 180)) For the reasons set forth below, Valle's motion for a judgment of acquittal will be granted as to Count One but denied as to Count Two. Valle's motion for a new trial as to Count One will be conditionally granted pursuant to Fed. R. Crim. P. 29(d)(1). To the extent that Valle seeks a new trial on Count Two, that motion will be denied.

The highly unusual facts of this case reflect the Internet age in which we live. To prove the kidnapping conspiracy alleged in Count One, the Government relied on numerous Internet "chats" in which Valle and three alleged co-conspirators discuss in graphic detail kidnapping, torturing, raping, murdering, and cannibalizing women. Valle and his three alleged co-conspirators "met" on Dark Fetish Network or darkfetishnet.com ("DFN"), which bills itself

as a fantasy sexual fetish website. Valle's DFN profile page stated: "I like to press the envelope but no matter what I say, it is all fantasy." Many of Valle's Internet communications involved him transmitting Facebook photographs of women he knew – whether his wife, her colleagues from work, or his college friends – and then "chatting" with other DFN users about committing acts of sexual violence against these women.

With respect to the kidnapping conspiracy charge, the primary issue raised in Valle's motion for a judgment of acquittal is whether the evidence and the reasonable inferences that may be drawn from that evidence are such that a rational jury could find that "criminal intent ha[d] crystallized," United States v. Feola, 420 U.S. 671, 694 (1975) – that is, that Valle and his alleged co-conspirators entered into a genuine agreement to kidnap certain women and had the specific intent to actually kidnap these woman.

Valle contends that his Internet chats are fantasy role-play, and that the Government did not prove beyond a reasonable doubt that he and his alleged co-conspirators entered into a "real" agreement to kidnap one or more women. The Government argues that the evidence shows that Valle entered into an illegal agreement to kidnap women with (1) a New Jersey man named Michael Van Hise; (2) an individual located in India or Pakistan who uses the screen name "Aly Khan"; and (3) a man using the screen name "Moody Blues," who lives in England. The alleged kidnapping conspiracy thus spanned three continents.

Although the alleged conspiracy lasted nearly a year, all communications between Valle and his alleged co-conspirators in New Jersey, India or Pakistan, and England took place over the Internet. None of the conspirators ever met or took steps to meet, nor did they ever speak by telephone. This is a conspiracy that existed solely in cyberspace. There is no evidence that the alleged conspirators ever exchanged telephone contact information or accurate

2

information about the area in which they lived, or that they ever knew or sought to learn each other's true identities. Communication between the alleged conspirators was episodic and generally infrequent; months often passed between chats, with the alleged conspirators forgetting what had previously been discussed.

After reviewing thousands of Valle's Internet communications, the Government determined that Valle had discussed kidnapping, torturing, raping, murdering, and/or cannibalizing women with twenty-four individuals. At trial, the Government conceded that – as to twenty-one of these individuals – Valle's communications about kidnapping, torturing, raping, murdering, and cannibalizing women are nothing more than fantasy role-play. The Government nonetheless contends that Valle's communications with the remaining three – Van Hise, Aly Khan, and Moody Blues – reflect a "real" kidnapping conspiracy.

As is discussed in detail below, however, Valle's "chats" with a number of the individuals who the Government concedes are fantasy role-play correspondents are substantively indistinguishable from his chats with Van Hise, Aly Khan, and Moody Blues. Both sets of chats involve discussions about Facebook photographs of women Valle knows; dates for planned kidnappings; prices Valle will charge for kidnapping these women; surveillance Valle has allegedly conducted of these women; the use of chloroform to incapacitate victims; acts of sexual violence that will be perpetrated on these women; and fantastical elements such as human-size ovens and rotisseries, and the construction of soundproofed basements and pulley apparatuses that will be used for purposes of torture.

Moreover, the nearly year-long kidnapping conspiracy alleged by the Government is one in which no one was ever kidnapped, no attempted kidnapping ever took place, and no real-world, non-Internet-based steps were ever taken to kidnap anyone. While the alleged

conspirators discussed dates for kidnappings, no reasonable juror could have found that Valle actually intended to kidnap a woman on those dates. For example, under the Government's theory, Valle separately "agreed" with two co-conspirators to kidnap three different women on or about the same day, February 20, 2012. Valle was to kidnap one woman in Manhattan (Government Exhibit ("GX") 430; Trial Transcript ("Tr.") 185-86); lure another to India or Pakistan (GX 417); and kidnap a third in Columbus, Ohio (GX 424; Tr. 239).

No one was kidnapped on February 20, 2012, however, and no one was kidnapped on any other date "agreed to" or discussed by Valle and his alleged co-conspirators. Moreover, neither Valle nor any of his alleged co-conspirators ever even raised the issue of whether a "planned" kidnapping had taken place, and if not, why not. Dates for "planned" kidnappings pass without comment, without discussion, without explanation, and with no follow-up. The only plausible explanation for the lack of comment or inquiry about allegedly agreed-upon and scheduled kidnappings is that Valle and the others engaged in these chats understood that no kidnapping would actually take place. No other reasonable inference is possible. Because the point of the chats was mutual fantasizing about committing acts of sexual violence on certain women, there was no reason for discussion, inquiry, or explanation when the agreed-upon date for kidnapping a woman came and went.

The kidnapping conspiracy alleged by the Government also featured a steady stream of lies from Valle to his alleged co-conspirators about himself and numerous critical aspects of the alleged conspiracy. Valle lied about his age; about his marital status; about the city and area in which he lived; about whom he lived with; and about his job and the hours he worked. He also lied about whether he owned a house "in the middle of nowhere . . . in Pennsylvania"; about whether he owned a van that could be used to transport victims; about

whether he had a "pulley-apparatus" in his basement; about whether he was soundproofing his basement; about whether he had a human-size oven and rotisserie; about whether he possessed address and contact information for the purported targets of the kidnapping conspiracy; about whether he was conducting surveillance of targeted women; about how often he was in contact with these women; and about whether he had obtained, or would obtain, rope, duct tape, and a stun gun for purposes of committing a kidnapping.

Similarly, the details Valle provided to his alleged co-conspirators concerning the targets of the kidnapping conspiracy were – as to identification information – all false.  Valle lied about where the purported kidnapping targets lived, their last names, their occupations, their dates and places of birth, where they had attended or were attending college, and the degrees they had obtained.  Despite repeated requests, Valle never provided his alleged co-conspirators with the last names and addresses that would have permitted them to locate and identify these women.

The Government, of course, is not required to prove that conspirators planning a kidnapping met in person, spoke over the telephone, or shared accurate information about their names and where they live, the names and addresses of kidnapping targets, or the resources each conspirator will contribute to the enterprise.  Those engaged in criminal activity frequently lie to each other about all manner of things, including, for example, the amount and purity of drugs they possess, the value of items to be stolen, and the likelihood of getting caught.  There is likewise no legal requirement that a kidnapping actually take place in order for a kidnapping conspiracy conviction to be sustained.  Moreover, the fact that Valle had fantasy chats with twenty-one individuals about kidnapping, raping, and murdering women does not establish that his conversations with Van Hise, Aly Khan, and Moody Blues are likewise fantasy.

But the kidnapping conspiracy here was formed and is alleged to have taken place almost exclusively in cyberspace, and in a context in which – according to the Government – the Defendant engaged in countless fantasy role-play conversations with at least twenty-one other individuals about the same topics: kidnapping, torturing, raping, murdering, and cannibalizing women. Under these unique circumstances, in determining whether the Government proved beyond a reasonable doubt Valle's criminal intent – his specific intent to actually kidnap a woman – the fact that no kidnappings took place and that no real-world, concrete steps toward committing a kidnapping were ever undertaken, is significant. And in determining whether Valle and his alleged co-conspirators ever intended to actually commit a kidnapping, the fact that dates for kidnappings are repeatedly set and then pass without incident, inquiry, or comment is powerful evidence that Valle and the three individuals engaged in these allegedly "real" chats understood that no actual kidnapping was going to take place.

Likewise indicative of Valle's lack of criminal intent is the fact that he provided his alleged co-conspirators with a veritable avalanche of false, fictitious, and fantastical information concerning himself and the steps he had allegedly taken to facilitate a kidnapping, including representations about a non-existent van that would be used to transport victims to a non-existent cabin in rural Pennsylvania, where they would be held in a non-existent soundproofed basement with a non-existent pulley mechanism, and cooked in a non-existent human-size oven or using a non-existent human-size rotisserie. The presence and quantity of concededly fictitious and fantastical elements in the chats and emails that the Government claims are "real" precludes any reasonable inference that Valle actually intended to kidnap a woman, particularly given the Government's concession that nearly all of the kidnapping-related chats and emails that Valle engaged in are, in fact, fantasy.

Once the lies and the fantastical elements are stripped away, what is left are deeply disturbing misogynistic chats and emails written by an individual obsessed with imagining women he knows suffering horrific sex-related pain, terror, and degradation. Despite the highly disturbing nature of Valle's deviant and depraved sexual interests, his chats and emails about these interests are not sufficient – standing alone – to make out the elements of conspiracy to commit kidnapping. There must be evidence that Valle actually intended to act on these interests with an alleged co-conspirator.

Under the unique circumstances of this extraordinary case, and for the reasons discussed in detail below, the Court concludes that the evidence offered by the Government at trial is not sufficient to demonstrate beyond a reasonable doubt that Valle entered into a genuine agreement to kidnap a woman, or that he specifically intended to commit a kidnapping. Accordingly, the jury's verdict on Count One, conspiracy to commit kidnapping, cannot stand, and Count One will be dismissed.

As to Count Two, which charges that Valle exceeded his authorized access to a federal database, the Court concludes that Valle's conduct falls squarely within the plain language of the statute. Accordingly, Valle's motion for a judgment of acquittal on Count Two will be denied. To the extent that Valle seeks a new trial on Count Two, that motion will also be denied.

## **BACKGROUND**

The Government contended at trial that Valle had conspired with three individuals to commit kidnapping: (1) Michael Van Hise, a New Jersey resident known to Valle only by his email addresses, "mikevanhise81@aol.com" and "michael19902135@yahoo.com" (Tr. 430; GX

430-34); (2) an individual known to Valle as "Aly Khan,"[1] who resided in Pakistan or India and used the email address "alisherkhan79@yahoo.com"[2] (Tr. 618; GX 417-29); and (3) an individual known to Valle as "Moody Blues" or "Christopher Collins," a resident of England whose email address was "meatmarketman@rocketmail.com."[3] (Tr. 613; GX 401-16)

According to the Government, the alleged targets of the kidnapping conspiracy were: (1) Kathleen Mangan, Valle's wife; (2) Alisa Friscia,[4] a New York City school teacher and Mangan's former co-worker; (3) Andria Noble,[5] an Ohio prosecutor and college friend of Valle; (4) Kimberly Sauer,[6] also one of Valle's college friends, who was then working as a promotions director for radio stations in the Washington, D.C. area; and (5) Kristen Ponticelli, a 2012 graduate of Valle's high school – Archbishop Malloy – whom Valle had never met.[7] (Tr. 1517)

---

[1]  Khan is referred to throughout the trial transcript as "Ali Khan."

[2]  Aly Khan's true identity is unknown.

[3]  By the time of trial, the authorities had identified "Moody Blues" as Dale Bolinger. (Tr. 1031) Bolinger resided in Canterbury, Kent, England. See Sam Chadderton, "Dale Bolinger: Nurse arrested by FBI over alleged cannibalism plot appears at court," The Daily Mirror, Nov. 9, 2013, http://www.mirror.co.uk/news/uk-news/dale-bolinger-nurse-arrested-fbi-2711279#.UumF7vuGd8F. There is no evidence that Valle ever knew Bolinger's name or where in England he lived.

[4]  Friscia's name is misspelled in the trial transcript as "Frisca."

[5]  Noble's name is sometimes misspelled in the trial transcript as "Nobel." She is also sometimes referred to by her maiden name, Andria Condez.

[6]  Sauer's name is frequently misspelled in the trial transcript as "Sawyer."

[7]  Prior to trial, the Court granted Valle's request for a bill of particulars and instructed the Government to identify Valle's alleged co-conspirators as well as the targets of the alleged kidnapping conspiracy. (Jan. 9, 2013 Order (Dkt. No. 40) at 10) In a January 11, 2013 letter, the Government listed Van Hise, Aly Khan, and Moody Blues as Valle's alleged co-conspirators, and identified Mangan, Friscia, Noble, Sauer, Ponticelli, Maureen Hartigan, Veronica Bennett, and Laura Chirico as targets of the kidnapping conspiracy. (Dkt. No. 335) At trial, the Government did not argue that Valle had conspired to kidnap Hartigan, Bennett, or Chirico. Accordingly, in the jury charge, the Court instructed the jury that the Government contended that Valle and his alleged co-conspirators – Van Hise, Aly Khan, and Moody Blues – had agreed to kidnap Mangan, Friscia, Noble, Sauer, and Ponticelli. (Tr. 1649)

The Government also contended that Valle had discussed kidnapping Maureen Hartigan – a woman Valle had known since high school – with Aly Khan, but did not argue that a conspiratorial agreement had been reached as to her. (Id. at 1517; see also id. at 1649) On May 31, 2012, Valle ran a search concerning Hartigan's name using a New York City Police Department ("NYPD") software program that queried certain federal, state, and local law enforcement databases. (Id. at 582-84). It was undisputed at trial that Valle had no law enforcement purpose for performing this search. That search provided the factual basis for Count Two of the Indictment, which charges Valle with exceeding his authorized access to a federal database. (Indictment (Dkt. No. 9))

The Government's evidence at trial included: (1) electronic "chats" and emails between Valle and his three alleged co-conspirators; (2) testimony and exhibits concerning Valle's relationships and contacts with women who were alleged targets of the kidnapping conspiracy, including his wife; (3) other computer-related evidence, including text and image files Valle had downloaded or created, search terms he had input into his web browser, websites he had visited, and database searches he had run on his patrol car computer; and (4) excerpts from Valle's post-arrest statement to FBI Special Agent Anthony Foto.[8]

## I.   VALLE'S BACKGROUND AND MANGAN'S DISCOVERY OF HIS INTERNET ACTIVITIES

Gilberto Valle was raised in Forest Hills, Queens. (Tr. 1024) He graduated from Archbishop Malloy High School and the University of Maryland. (Id. at 205, 208) After college, Valle returned to New York, and in 2006 he became a police officer in the NYPD. (Id. at 156) At the time of his arrest six years later in October 2012, Valle worked as a patrol officer

---

[8] The factual discussion that follows presents the evidence offered at trial "in the light most favorable to the prosecution." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

in the 26th Precinct on the Upper West Side.  (Id. at 156, 987-88, 990)  There was no evidence at trial that Valle had ever acted violently toward a woman, had ever threatened a woman, had ever been the subject of any misconduct complaint as a police officer, or had ever been involved in criminal activity prior to this case.  Kathleen Mangan, Valle's estranged wife, testified that he had never been violent toward her or their child, and that he had no drug or alcohol problems. (Id. at 197)

Valle and Mangan met on a dating website in 2009.  (Id. at 150)  Their relationship quickly became serious and they soon moved in together.  (Id. at 188)  Mangan described these early months as "fun."  (Id. at 150)  "We laughed together.  It was nice.  He opened doors, pulled out chairs."  (Id.)  The relationship declined, however, after Mangan – a New York City school teacher – became pregnant in the fall of 2011.  (Id. at 151-52)

As an NYPD officer, Valle worked a 3:00 p.m. to midnight shift.  (Id. at 159) After arriving home from work, Valle would typically spend a few hours "play[ing] video games, watch[ing] TV, [or] go[ing] on the Internet[.]"  (Id. at 163)  In the months after Mangan became pregnant, Valle "started staying up really late or not coming to bed at all."  (Id. at 163-64)

The couple's relationship did not improve after their June 2012 wedding.  (Id. at 150, 238)  According to Mangan, "[t]he wedding was nice.  The marriage was not."  (Id. at 238) Valle continued to spend the early morning hours online.  (Id. at 164)  Unbeknownst to his wife, Valle spent much of this time "chatting" over the Internet with others about kidnapping, raping, torturing, murdering, and cannibalizing various women he knew, including Mangan.  (GX 401-34)

Mangan became increasingly concerned about Valle's nighttime behavior.  In August 2012, she discovered two image files on a MacBook laptop computer that the couple shared, after Valle had neglected to log out of his account.  (Id. at 165)  Although the images did not load, Mangan was able to discern the URL for the website from which the images had been downloaded.  (Id.)  After entering the URL into the computer's web browser, a website Mangan recalled as "Fetish Net" appeared on the screen.  (Id.)  Mangan recalls that a "girl [shown] on the [website's] front page was dead."  (Id. at 166)  Mangan confronted Valle about what she had discovered, but his late-night online activities continued, and their relationship steadily deteriorated.  (Id. at 166-67, 176)

On September 9, 2012, Mangan installed spyware on the couple's MacBook computer.  (Id. at 174)  The spyware recorded every keystroke and website entered by the computer's users, and took "pictures every five minutes or so of whatever [was] happening on the computer screen."  (Id. at 175)  The next morning, Mangan found several disturbing images captured by the spyware, including "pictures of feet that were not attached to bodies."  (Id. at 176)  Mangan was also alarmed by several screen names that Valle had been using to communicate with others, including "girldealer" and "girlmeathunter," as well as websites he had visited, including "[d]arkfetishnet," "sexyamazons," "darkfet," "motherless," and "fetlife." (Id.)

After confronting Valle a second time about his Internet activities, Mangan left the couple's Queens apartment with their infant daughter and flew to her parents' home in Nevada.  (Id. at 177-79, 224-25)  Once in Nevada, Mangan further inspected the contents of the MacBook.  (Id. at 180)  Using the couple's shared password, she was able to log-in to an email account whose address – "Mhal52@yahoo.com" – she did not recognize.  (Id.)  Mangan's review

of this email account uncovered Facebook images of herself and several other women she knew. (Id.) Mangan's search regarding her own name revealed a lurid Internet chat in which Valle discussed butchering her: "I was going to be tied up by my feet and my throat slit and they would have fun watching the blood gush out of me because I was young[.]" Mangan testified that one participant wrote, "['] if she cries, don't listen to her, don't give her mercy.['] And Gil just said, ['I]t's okay, we will just gag her.[']" (Id. at 181) In other chats Mangan read, Valle discussed raping and torturing women Mangan knew, including Alisa Friscia, Kimberly Sauer, and Andria Noble. (Id. at 181-82) In connection with "the pictures of the girls [Mangan] knew," she also recalled reading, "this is a fantasy[.]" (Id. at 182)

Shortly after discovering these communications, Mangan contacted the FBI and authorized agents to make a copy of the MacBook's hard drive. (Id. at 187) She also provided agents with keys to the couple's apartment and authorized them to seize an HP laptop computer that had been used by both Mangan and Valle.[9] (Id. at 187-88)

## II.     VALLE'S INTERNET CHATS

Valle used his Yahoo! email account[10] to communicate with other members of the DFN. (Id. at 233-34, 1056) DFN is a "social media" website with 38,000 registered members worldwide, 4,500 of whom are active users of the site. (Defense Exhibit ("DX") P1 (Merenkov Deposition) at 11:16:29-36; 11:57:01-11:58:50)[11] The website is designed to facilitate

---

[9]  Mangan purchased the HP computer in 2006 or 2007 and bought the MacBook in 2011. (Tr. 154) She testified that Valle used the HP laptop – kept in the couple's living room – until it malfunctioned during the summer of 2012. Valle then began using the MacBook. (Id. at 154, 221)

[10]  Valle used the email address mhal52@yahoo.com. (Tr. 180, 423-24)

[11]  Because Valle moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(a) at the close of the Government's case, this Court may not consider evidence presented during the defense case in determining whether to grant Valle's Rule 29(a) motion. See Fed. R. Crim. P. 29(b) ("If the court reserves decision, it must decide the motion on the basis of the evidence at

communication among those interested in a variety of sexual fetishes and deviant practices, including erotic asphyxiation, cannibalism, rape, necrophilia, and "peril" scenarios (i.e., fantasies that involve "a victim in a dangerous situation"). (Id. at 11:15:34-44; 11:46:30-11:47:05; 13:10:30-13:12:44) According to Sergey Merenkov, one of the website's founders, DFN users typically access the site to engage in fantasy "role-playing." (Id. at 11:12:24-26; 11:45:23-11:46:33) Valle began visiting the DFN website in 2010.[12] (Tr. 1029)

By early 2012, Valle began communicating with certain DFN members – including his alleged co-conspirators – on email and Yahoo! messenger, an electronic chat service. (Tr. 1030) One of Valle's alleged co-conspirators – Aly Khan – told Valle that he had been "banned from DFN due to [his] search for real women willing for slaughter or people wil[l]ing to send their women to me." (GX 421 (Feb. 9, 2012, 10:25:06)) Merenkov testified that DFN would terminate the accounts of individuals who violated the site's terms of service, including by engaging in conversations that sounded like they "could have led to something bad." (DX P1 (Merenkov Deposition) at 13:08:13-13:09:41)

A.    **Agent Walsh's Analysis of Valle's Internet Chats and Emails**

The FBI's forensic review of Valle and Mangan's MacBook and HP computers revealed "thousands" of email and real-time electronic chats between Valle and "about two dozen other individuals." (Tr. 424) Many of these Internet chats involved discussion of

---

the time the ruling was reserved."). Accordingly, the Court has not considered the Merenkov deposition or any other evidence introduced during the defense case in resolving Valle's Rule 29(a) motion. This evidence is, of course, relevant in connection with Valle's new trial motion under Fed. R. Crim. P. 33.

[12] On DFN, Valle used the name "Girlmeathunter." (Tr. 880) His DFN profile stated, "I like to press the envelope but no matter what I say, it is all fantasy." (Id. at 1409) Similarly, in posting Facebook images of women in connection with his DFN account (see id. at 502, 1200, 1201, 1244, 1409, 1413), Valle stated that the photographs were for "fantasy only." (Id. at 1409)

"[k]idnapping, raping, killing, eating, [and] cooking" women. (Id. at 445) The Bureau assigned Special Agent Corey Walsh to review and analyze Valle's Internet-based communications. (Id. at 420)

In conducting his analysis, Agent Walsh divided Valle's Internet communications into two groups: the first group consisted of chats and emails that Walsh believed were "fantasy," while the second group consisted of chats and emails that Walsh believed reflected "real" criminal activity (id. at 425, 653):

> In the ones that I believe[d] were fantasy, the individuals said they were fantasy. In the ones that I thought were real, people were sharing, the two people were sharing real details of women, names, what appeared to be photographs of the women, details of past crimes and they also said they were for real. . . .
>
> [In the "real" chats, the participants] described dates, names and activities that you would use to conduct a real crime. . . .
>
> [The "fantasy" chats were those] that didn't seem realistic. . . . They were clearly role-play. [The participants] used the word "fantasy" in the actual chats or emails.

(Id. at 425, 651)

Agent Walsh had been with the FBI about seven or eight months when he was assigned to the Valle investigation. (Id. at 418-20) Walsh joined the Bureau after graduating from college with a sociology degree and serving in the United States Army for several years. (Id. at 418-20, 654) There is no evidence that Walsh had any prior experience in law enforcement, nor is there any evidence that he had received academic or other specialized training that would have assisted him in distinguishing Internet chats and emails constituting "real" criminal activity from those reflecting fantasy role-play. (Id. at 654) Walsh acknowledged that he had never read the communications of known kidnappers and was not in a position to know how "real" kidnappers communicate with each other. (Id. at 769-70)

14

After reviewing "thousands" of Valle's emails and electronic chats, Agent Walsh concluded that nearly all of Valle's communications about kidnapping, sexual assault, murder, and cannibalism "were clearly role-play." (Id. at 424, 425-26, 650-51, 653-55, 674)  Valle's fantasy role-play chats involved twenty-one of the twenty-four individuals with whom he had discussed these topics.[13]  Walsh further concluded, however, that forty of Valle's chats and emails "contained elements of real crime[.]" (Id. at 650)  Walsh reached this conclusion – as to these chats and emails – because "[t]hey described dates, names and activities that you would use to conduct a real crime." (Id. at 651)  In these forty chats and emails, Valle corresponded with one of three individuals – Michael Van Hise, Aly Khan, or Moody Blues. (Id. at 656-57)  Although Walsh testified that Valle's communications with Van Hise, Aly Khan, and Moody Blues reflect an intent to actually commit a kidnapping, he conceded that the "fantasy role-play" chats and emails share many of the same features as the "real" chats and emails that allegedly reflect criminal intent, including discussion of dates for planned kidnappings, purported past crimes, and real women. (Id. at 657-75, 680-701, 703-24, 754-810, 813-16)

**B.      Valle's Chats and Emails with Alleged Co-Conspirators**

At trial, the Government argued that the evidence demonstrated a single conspiracy to kidnap certain women identified by Valle. (Id. at 121)  However, the Government offered no evidence that Valle's alleged co-conspirators – Van Hise, Aly Khan, and Moody Blues – communicated with each other or knew of each other's existence.  Accordingly, Valle's communications with each co-conspirator are discussed separately below.

---

[13]  Agent Walsh testified that "approximately eight to 10" other agents and "about two" Assistant United States Attorneys concurred in his "decision that 21 out of the 24 participants [in the kidnapping-related chats] with Mr. Valle were engaged in fantasy role-play." (Tr. 654-55; see also id. at 674)

1.    **Valle's Communications with Michael Van Hise**

The Government contended at trial that on February 28, 2012, Valle and Michael

Van Hise[14] entered into an agreement to kidnap Alisa Friscia.  (Id. at 1518)  The earliest

Valle/Van Hise communications introduced at trial are emails exchanged a month earlier, on

January 27, 2012.  (GX 430)  In those emails, Van Hise asks Valle if he is "interested in trading"

if Van Hise can "get a girl" for Valle.[15]  (Id. (Jan. 27, 2012, 1:11 p.m.))  Valle replies, "honestly

i'm more in it for the cash.  I have a few women who i plan on grabbing for myself[.]"  (Id. at

1:14 p.m.)  Van Hise then asks whether Valle will agree to a payment plan, and whether Valle

can send "pics of the [women] we[']re talking about[.]"  (Id. at 1:15 p.m.)  Valle responds by

emailing Van Hise four Facebook images of a woman Valle describes as 28-year-old "Alisa[.]"

(Id. at 1:18 p.m.)  The woman shown in these images is Alisa Friscia.  (Tr. 433)  Valle offers to

kidnap Friscia and deliver her to Van Hise on a "[c]ash . . . upon delivery" basis.  (GX 430 (Jan.

27, 2012, 1:18 p.m.))  Van Hise asks Valle to "save her for me" (id. at 1:32 p.m.), and Valle

replies, "yep she is all yours[,]" adding that Alisa is "around 5'5", 115 pounds[,] nice slender

build[,] takes good care of herself."  (Id. at 1:33 p.m.)  Valle further explains that Alisa "is a

teacher and has the week of Feb 20 off."[16]  (Id. at 1:36 p.m.)  Valle states that he "can kidnap her

then, [and that] it will be awhile before anyone realizes she is missing."  (Id. at 1:36 p.m.)

---

[14]  As noted earlier, Van Hise used the email addresses mikevanhise81@aol.com and
michael19902135@yahoo.com.  (GX 430-34)
[15]  The chats and emails introduced at trial contain numerous grammatical and typographical
errors.  They are reproduced here unedited except for necessary tense, capitalization, pronoun,
and punctuation changes, which are indicated by the use of brackets.
[16]  At the time of trial, Friscia was a single, 29-year-old New York City special education teacher
who stood 5'5" tall and weighed 130 pounds.  (Tr. 903)  Friscia testified that the week of
February 20, 2012 was a vacation week at her school.  (Id. at 904)

Van Hise discloses that he doesn't "have the money right now[,]" but asks Valle

to name his price. (Id. at 1:37 p.m.) Valle[17] writes that the price is $4,000, and asks Van Hise,

"what will you do with her?" (Id. at 1:38 p.m.) The following exchange then takes place:

| | |
|---|---|
| **mikevanhise81:** | [. . .] what i wanna do is make her my slave[,] sex, maid and other wise. i will cause her to play my fantasies and do what i like. if she gets preg. i will kill her if she cheats i will kill her and if she tries to leave first shell get a bad beating second time shell be hung. |
| **Hal M:** | very very nice…. she is a sweet girl.  not sure how soon before she would submit.  I will abduct her right out of her apartment, stuff her into a large piece of luggage after tying up her hands and feet and off we go.  do you want her clothed in what she was wearing? or stripped naked? |
| **mikevanhise81:** | whatever is better for you and when i get her we[']ll meet somewhere so we can rape her together before i leave with her. |
| **Hal M:** | excellent!  i'll leave her clothes on.  I will give you the pleasure of unwrapping your gift |
| **mikevanhise81:** | sounds great to me also do you wanna hang her with me just for laughs before we leave |
| **Hal M:** | its up to you.  she is all yours.  I really don't mind if she experiences pain and suffering.  I will sleep like a baby. |
| **mikevanhise81:** | k great anyway gtg for now but wil message later |

(Id. at 1:40-1:50 p.m.)  After this January 27, 2012 chat, Van Hise does not "message later[,]"

and the week of February 20, 2012, passes with no more discussion between Valle and Van Hise

about kidnapping Friscia, with no attempt to kidnap Friscia, and with no steps taken to kidnap

Friscia. (Tr. 756)

Valle and Van Hise's next exchange takes place on February 28, 2012.  (GX 432)

On that day, Valle transmits Facebook images of a number of women to Van Hise, and Van Hise

again selects "Alisa" for kidnapping. (Id. (Feb. 28, 2012, 4:06 p.m.))  Van Hise asks Valle,

---

Valle met Friscia through his wife, who had worked with Friscia at P.S. 375 in Harlem.  (Id. at 184-85, 905)  Friscia and Mangan were not close friends – the two saw each other only a "handful of times" after Mangan left the school in June 2010.  (Id. at 904-06)
[17] In his Internet chats and emails, Valle uses the name "Hal M."

"thats the teacher right?" (Id. at 4:13 p.m.)  Valle replies, "yes 5th grade teacher, single, 28 yrs

old[.]" (Id. at 4:16 p.m.)  Valle adds that the attached image "is the most recent picture of her

[. . .] taken this past Friday[.]" (Id. at 4:21 p.m.)  Van Hise says that he "definitely want[s] her

and how much again im sorry to ask but I dont rememeber[.]" (Id. at 4:22 p.m.)  The two then

discuss price.  Valle insists that Van Hise pay $5,000 for the kidnapping of Friscia, even though

a month earlier he had set a price of $4,000.  Neither Valle nor Van Hise acknowledge the fact

that Valle had previously set a price of $4,000 (see GX 430 (Jan. 27, 2012, 1:38 p.m.)):

| | |
|---|---|
| **Hal M:** | $5,000 and she is all yours |
| **mikevanhise81:** | could we do 4 |
| **Hal M:** | i'm putting my neck on the line here.... if something goes wrong some how i am in deep shit.  $5,000 and you need to make sure that she is not found.  She will definitely make the news. |
| **mikevanhise81:** | no prob shes never leaving the house and also k about the price and would you do a payment plan or full up front |
| **Hal M:** | full payment due at delivery... just so that you know she may be knocked out when I get her to you. I don't know how long the solvent I am using will last but I have to knock her out to get her out of her apartment safely |

(GX 432 (Feb. 28, 2012, 4:25-4:32 p.m.))

Van Hise then asks Valle whether he "want[s] to know what im going to do with

her if the cops get close or she gets to much to handle[.]" (Id. at 5:14 p.m.)  Valle replies,

| | |
|---|---|
| **Hal M:** | yeah fill me in a bit on her ordeal... i think she will be tough to break, she is kind of feisty and no nonsense |
| **mikevanhise81:** | thats fine i can beat her and break her in more than one way also her ordeal is after she fills her purpose or the cops get close she will be raped made to passout by suffocation, tied up drove to somewhere secluded, raped again made to pass out again by strangling than when she comes to hung and raped up the ass while hanging before being buried while i take pics or tape it |
| **Hal M:** | thats fuckin great.  whenever you come here to meet me, it will be absolutely amazing to watch her come out of her school and follow her without her knowing.  All the while we both know that her days of freedom are limited.  i think |

| | |
|---|---|
| | you will be happy with what you see.  Pictures don't do her justice |
| **mikevanhise81:** | i like that and i believe i will be so fucking hapy ill probably fuck her right than and there once we get her in my car |
| **Hal M:** | it is going to be so hard to restrain myself when i knock her out, but i am aspiring to be a professional kidnapper and that's business.  But i will really get off on knocking her out, tying up her hands and bare feet and gagging her. Then she will be stuffed into a large piece of luggage and wheeled out to my van[18] |

(Id. at 5:18-5:27 p.m.)[19] Van Hise responds, "gtg talk later this week[.]" (Id. at 5:37 p.m.)

The Government offered no evidence that Valle and Van Hise ever again discuss

kidnapping Alisa Friscia,[20] and their next communication does not take place "later [that] week"

but instead on April 20, 2012, nearly two months later. (GX 433)

---

[18] There is no evidence that Valle owned or had access to a van.  (Tr. 770-71)

[19] As discussed in more detail below, Valle's "agreement" with Van Hise is similar to chats and emails he had with others at about the same time – communications that the FBI deemed to be fantasy role-play.  For example, in a March 11, 2012 chat with "Tim Chase" ("chasingmypast@yahoo.com"), Valle offers several women for sale in the "$4,000-$5,000" range.  (DX E1 (Mar. 11, 2012, 04:34:54-04:36:06))  Valle and Chase agree that on March 24, 2012, one of the women – "Sally" – will be "[d]elivered bound and gagged" in exchange for $3,500.  (Id. (Mar. 11, 2012, 05:19:24-05:20:15, 04:36:56-04:37:00, 04:50:03-04:50:27); id. (Mar. 23, 2012, 05:37:42); see also Tr. 698)  FBI agents identified "Sally" as Sally Kane.  (Tr. 703)  In an April 22, 2012 chat with Chase, Valle claims that he has kidnapped Kane and is holding her in his basement.  (DX E1 (Apr. 22, 2012, 03:12:08, 03:13:03))  Agent Walsh conceded at trial that Kane was never kidnapped and that the entire discussion about her being bound and held in Valle's basement is fantasy.  (Tr. 695, 703-04)  Valle lived in a multi-story apartment building with a common basement.  (Id. at 667)

[20] The only other proof involving Valle, Van Hise, and Friscia concerns (1) a Police Benevolent Association ("PBA") card; and (2) Special Agent Anthony Foto's testimony that Valle acknowledged during his post-arrest statement that he was on Friscia's block on March 1, 2012, to drop off his wife for a lunch date with Friscia.  (See Tr. 186, 1034)

At some point in 2012, Valle asked Mangan to give Friscia a PBA card that had Valle's name and telephone number on the back.  (Id. at 186)  The PBA issues PBA cards to police officers for "a dollar apiece" (id. at 1424), and officers typically give them "to immediate family, to friends, [and to] store owners."  (Id. at 1425)  Friscia testified that she had "no relationship at all" with Valle.  (Id. at 905)

On that day, Valle sends Van Hise an email with the subject line "Veronica." (Id.

(Apr. 20, 2012, 3:16 p.m.))  At trial, Agent Walsh identified one of the attachments to this email

as an image of Veronica Bennett.  (Tr. 444)  The Government did not contend at trial that Valle

had entered into an agreement to kidnap Bennett.  In their email exchange, Valle tells Van Hise,

"[g]ive me a week to watch her and get to know her routine, then we will agree on a date." (GX

433 (Apr. 20, 2012, 3:16 p.m.))  Van Hise replies "k about the routine thing[,]" and asks "do you

want to know what id do with her[?]" (Id. (Apr. 24, 2012, 9:11 a.m.))  Valle responds, "yeah

what will you do with her?  I got her route to and from her job yesterday.  I saw her go to work

this morning too.  It may be a tough abduction but give me a couple of more days." (Id. (Apr.

24, 2012, 9:57 a.m.))  Van Hise replies, "i want to rape her snuff her in different ways and use

her as a prostitute till i tire of her than kill her[.]" (Id. (Apr. 25, 2012, 10:05 a.m.))

On May 2, 2012, Van Hise and Valle have an email exchange about a possible

---

There is no evidence as to whether Valle made this request to Mangan before, during, or after the
time period in which he was exchanging emails with Van Hise about kidnapping Friscia.  What
is clear is that Mangan gave Friscia the PBA card several months after Valle's chats with Van
Hise about kidnapping Friscia.  Friscia testified that Mangan gave her a PBA card (GX 109)
during the spring of 2012 (Tr. 906-07), and Mangan likewise testified that she gave Friscia the
PBA card in May or June 2012. (Id. at 186, 217)

As to the post-arrest statement, Agent Foto testified that he asked Valle "if he was on Alisa
Friscia's block on March 1st, 2012 and he told me, [']Yes, to drop off his wife to have lunch
with her.[']" (Id. at 1034)  Mangan and Friscia both testified that they had not met on March 1,
2012, however (see id. at 185, 910-11), and Mangan testified that Valle had never dropped her
off at Friscia's Upper East Side apartment building. (Id. at 185-86)  Mangan did recall that Valle
had dropped her off for a lunch date in May or June 2012 on the Upper East Side, that she
"coinciden[tally]" ran into Friscia, and that Friscia ate lunch with Mangan and their "girlfriends"
at an Upper East Side restaurant. (Id. at 217-18)  Mangan did not remember whether the
restaurant was near where Friscia lives or works. (Id.)

As to March 1, 2012, Mangan testified that she visited a friend that day who had just given birth
at Mount Sinai Medical Center on the Upper East Side. (Id. at 219)  Mangan recalled that Valle
and his sergeant drove by the hospital to say hello to her, and that she, Valle, and the sergeant
"had a small visit together." (Id. at 220-21)

meeting.  Referring again to "Veronica," Van Hise asks, "when can we meet so i can see her[?]" (GX 434 (May 2, 2012, 12:19 p.m.))  Valle replies, "Come over here next week.  We'll watch her together and I can knock the price down to $10,000."[21]  (Id. (May 3, 2012, 1:39 a.m.))  There is no evidence that Valle or Van Hise ever took any steps to kidnap Veronica Bennett; that Van Hise and Valle ever met or made preparations to meet; or that Van Hise knew where Valle lived. The Government introduced no other communications involving Valle and Van Hise.

### 2.     Valle's Communications with "Aly Khan"

The Government argued at trial that Valle had also conspired with an individual known to him only as "Aly Khan" ("alisherkhan79@yahoo.com") to kidnap Kathleen Mangan and Andria Noble.  (Tr. 1522)

As with Van Hise, Valle's chats with Khan begin with Valle offering to "get[ ] a girl" for Khan, who lives in India or Pakistan.[22]  (GX 417 (Jan. 23, 2012, 05:34:48); Tr. 618) During this exchange, Valle and Khan discuss several potential kidnapping scenarios, but do not settle on a specific target.  Valle first suggests that he could "talk [his] girlfriend" "Kathleen" "into going to india" during "the week of Feb 20[,]"[23] which at that time was less than a month away.  (GX 417 (Jan. 23, 2012, 05:42:38, 05:55:50, 05:52:47))  Valle tells Khan that because "Kathleen" is "a teacher[,]" she "has a week off" then.[24]  (Id. at 06:45:38)

---

[21]  Valle and Van Hise do not discuss why the price for Veronica ($10,000 or more) is higher than the price for Alisa ($4,000-$5,000).

[22]  While Aly Khan tells Valle that he lives in India, the Government "trac[ed] [his] Internet Protocol IP address" and learned that he resides in Pakistan.  (Tr. 618)

[23]  As noted above, on January 27, 2012, Valle and Van Hise discuss a kidnapping of Alisa Friscia that will take place on or about the same day, February 20, 2012.  (GX 430 (Jan. 27, 2012, 1:36 p.m.))

[24]  Given that Valle and Mangan did not marry until June 19, 2012, Mangan was then Valle's girlfriend.  (Tr. 151, 203)  Mangan had been a stay-at-home mom since the birth of the couple's daughter in the fall of 2011, however.  Accordingly, she was not employed as a school teacher at this time and was not on vacation during the week of February 20, 2012.  (Id. at 148)

During this same January 23, 2012 chat, Valle suggests that Khan instead travel to Pennsylvania, where Valle claims to live and where he purportedly "ha[s] a place in the middle of nowhere[.]" (Id. at 06:01:56, 06:00:37) Khan complains that U.S. immigration laws will not permit him to enter this country (id. at 06:03:55), and he proposes an alternative plan in which he will travel across the Indian border to meet Valle and his girlfriend in Rawalpindi, Pakistan. (Id. at 06:14:31) Khan suggests that Valle tell his girlfriend that Khan is an "old friend." (Id.) Khan goes on to say that, from Rawalpindi, they can travel to Khan's home in India, where they will gag "Kathleen" and "take her to [Khan's] basement" before slaughtering her. (Id.) Based on a photograph of Mangan that Valle had previously transmitted, Khan offers to send Valle a "meat analysis report as we do on our goats[.]" (Id. at 06:17:39) In the same chat, Khan proposes yet another scenario in which Valle would kidnap a woman himself, and Khan would "guide" Valle via "web cam" in slaughtering her. (Id. at 06:49:37-06:51:14)

Two days later, on January 25, 2012, Khan tells Valle that he has found a woman who is willing to come to his home on January 29, 2012, and that he plans to "drug her and do her." (GX 418 (Jan. 25, 2012, 7:56:00)) He asks Valle, "can you get your girl here??" (Id. at 7:56:15) Valle responds, "not on that day[,]" and adds that will not be able to bring Kathleen during the week of February 20 either, as they had originally discussed, because his girlfriend made plans to visit her parents. (Id. at 07:56:32-44) Valle's response appears to irritate Khan, who writes: "i am serious about it [. . .] so donot think im joiking and wasting my time...may be later you can bring her[?]" (Id. at 07:56:54) Valle replies, "i really wish i could[.]" (Id. at 07:59:59)

Khan then changes course and asks Valle if he has the "courage to do her there??" Valle responds, "not alone[.]" (Id. at 08:05:10, 08:05:28) Valle also volunteers that there are

"others who i would eat before her[.]"  (Id. at 08:05:55)  Khan replies, "great [. . .] why cant you

do them alone.  Its dam easy[.]"  (Id. at 08:07:19)  Valle responds "maybe you can talk me into

it[.]"  (Id. at 08:07:33)  Khan then gives Valle the following instructions:

> listen.  when you are lone call them for drink.  Put vallium tablets or daizapaam
> into drink.  They will feel knocked out.  When they are more sleepy.  Bind them
> Take them to your bathroom.  Cut their throats open.  Wash their meat in bath tub.
> put their meat in small plastic bags and freeze it.  use it when needed.  Head and
> guts can be burried in your court yard[.]

(Id. at 08:11:48)

The January 25, 2012 chat then turns to women other than Mangan.  Valle

describes a woman he has never met who is 21 years old, 5'8" tall, 145 pounds, and whose name

is "Kristen[.]"[25]  (Id. at 08:17:05-16, 08:17:44)  The two then discuss another woman whom

Valle "actually do[es] know[,]" and whom he claims he "could definitely take the risk [of]

eating[.]"  (Id. at 08:21:51-08:22:09)  Khan then asks Valle, "who are these girls anyways

buddy???  you have lot of them[.]"  (Id. at 08:25:04)  Valle responds, "friends of mine[.]"  (Id. at

08:25:14)  Khan comments that Valle is "lucky[,]" but that he needs to "get some courage[.]"

(Id. at 08:25:28)

Khan then questions Valle about whether he is "for real":

| | |
|---|---|
| alisherkhan79: | I think you are not for real..otherwise they would not be living |
| alisherkhan79: | you are not realy interested in slaughetring them |
| mhal52: | maybe one day |
| alisherkhan79: | you are wasting time buddy.  I am for real not fantasy. |
| mhal52: | i am just afraid of getting caugh t |
| mhal52: | if i were guaranteed to get away with it, i would do it |
| alisherkhan79: | ok..let me tell you.  can you please close these phots... it makes me hot :) |

---

[25]  The Government offered evidence that the "Kristen" Valle references is Kristen Ponticelli, a
woman who graduated from Valle's high school, Archbishop Malloy, in 2012.  (Tr. 414)
Although Ponticelli and Valle had never met, Valle had posted Facebook photographs of her on
DFN.  (Tr. 414, 1222-23)

| **alisherkhan79:** | i can gurantee.... i ahve done it before, i ma doing it this month and i will always do it. |
| **alisherkhan79:** | you need a plan in little detail |
| **mhal52:** | i am a little different though, i am a little more sadistic |
| **mhal52:** | i would want to see her suffer |
| **mhal52:** | i want to tie her up to a metal frame and slowly roast her alive until she dies |

*     *     *     *

| **alisherkhan79:** | ok..let me ask you one last time before i tell you more. |
| **alisherkhan79:** | ARE YOU REALLY RAELLY INTO IT.  ARE YOU READY TO SLAUGHTER ONE BEING SAFE |
| **mhal52:** | yes |
| **alisherkhan79:** | ARE YOU SURE? |
| **mhal52:** | definitely |
| **alisherkhan79:** | so, when you think you can do it...how soon can you gather courage |
| **mhal52:** | i dont know... |
| **alisherkhan79:** | get your mind ready..i will guide you rest |
| **mhal52:** | ok |

(Id. at 08:27:02-08:33:05, 08:37:07-08:39:30) (emphasis in original).

      Valle and Khan do not agree upon a particular victim at that time.  Instead, Khan tells Valle to "get your mind ready and choose your first victim."  (Id. at 08:41:59)  Valle replies that he already has a victim "picked out[,]" but he does not identify her.  (Id. at 08:42:45)  Khan questions Valle about what hours he works and how he is employed.  Valle tells Khan that he works a "typical office job" and is "home by 6" p.m. every day, with weekends off.[26]  (Id. at 08:40:01, 08:40:26-32)  Khan then comments that Valle "can do it on [the] week end."  (Id. at 08:40:39)  Khan advises Valle to take "some time to think on a plan" and that Khan will "wait for final words" from him.  (Id. at 08:43:37-46)  There is no evidence that Valle and Khan ever discuss Mangan or Ponticelli again.

---

[26]  As noted above, Valle actually worked from 3:00 p.m. to midnight as a patrol officer.  (Tr. 193, 204, 991-92)

On January 27, 2012, Khan tells Valle that he has a victim picked out whom he intends to kill in three days. (GX 419 (Jan. 27, 2012, 16:37:37, 16:38:12)) He sends Valle a link to a YouTube video depicting the slaughter of a goat, claiming that he is watching this video and others to "practice [his] slaughter." (Id. at 16:36:04) Khan says that he wants "white meat" but could only find "a local hooker who has brown meat." (Id. at 16:38:54) Khan complains to Valle, "i thought you will help me ..but you could not get me one." (Id. at 16:40:54)

In their next chat, on February 9, 2012, Valle tells Khan that he has his "victim picked out[,]" a 26-year-old woman he identifies as "Andria[.]" (GX 421 (Feb. 9, 2012, 10:18:27, 10:40:01)) Khan appears jealous that Valle has found a victim. He writes: "i donot know, how to find woman for slaughter now.... You are lucky to have got your animal." (Id. at 10:25:41-10:25:58) Valle asks whether it would be "remotely possible to stick [Andria] in the oven while she is alive?  at a relatively low heat, maybe 160-170 just for my own entertainment and for her suffering[?]" (Id. at 10:34:53) Khan replies, "ya ya ...but alive will be difficult. You will have to cut her body or tie her well to oven her. her brain will pop in oven and eyes will pop as well. kind of messy with shit inside her tummy.  I think [you] need to take her intetsines out and clean her well." (Id. at 10:37:20) In discussing his plan to kidnap Andria, Valle tells Khan that he was "able to get a stun gun[,]"[27] and that he will "pack her in a large suitcase" when he kidnaps her. (Id. at 10:20:06, 10:20:32)

---

[27] There is no evidence that Valle ever possessed a "stun gun." While NYPD patrol supervisors are issued tasers during their shifts, Valle was not a patrol supervisor. (Tr. 993) Moreover, tasers must be returned after every shift and accounted for – officers are not permitted to take them home. (Id. at 1005)

At trial, the Government offered evidence that "Andria" is Andria Noble. Noble was then a 27-year-old prosecutor who lived and worked in Columbus, Ohio.[28] (Id. at 239) Valle and Noble became friends while attending the University of Maryland. (Tr. 495, 634) Noble testified that she communicated with Valle online on a "regular basis" and that she considered him a "close friend" in college. (Id. at 242-43)

On February 10, 2012, Valle sends Facebook images of Noble to Khan. (GX 422 (Feb. 10, 2012, 18:26:14-18:31:41); Tr. 634) In their chat that day, Valle tells Khan that he "really want[s] [Andria] to be alive in the oven" so she can "experience being cooked alive[.]" (GX 422 (Feb. 10, 2012, 18:34:32-40)) He explains that he "is not into the humane stuff" and that "its personal with Andria. she will absolutely suffer[.]" (Id. at 18:44:16) Valle also tells Khan that he has "been watchin outside [Andria's] house[.]" (Id. at 18:24:57) The next day, Valle tells Khan that "Feb 20 is a holiday, so that is my target weekend[.]"[29] (GX 424 (Feb. 11, 2012, 05:57:38)) Valle also tells Khan that he "could use an assistant[,]" but Khan advises Valle that it is "better [to] do it alone[,]" because one "cant trust too many" people. (Id. at 05:58:54, 06:00:08)

Noble was not kidnapped on February 20, 2012, and the Government offered no evidence that Valle travelled to Columbus, Ohio that weekend or at any other time, whether to conduct surveillance of Noble or for some other purpose. (Tr. 807, 808)

---

[28] More than six months earlier – on July 20, 2011 – Valle had run a search concerning "Andria Condez," Noble's maiden name, in police databases. (Tr. 578-79) The search returned only her driver's license record. (Id. at 580; GX 616B)

[29] Having discussed with Van Hise a kidnapping of Alisa Friscia that would take place on or about February 20, 2012, and having proposed to Khan that he bring Kathleen Mangan to India at that time, Noble is the third woman that Valle discussed kidnapping on or about February 20, 2012.

The next communication between Valle and Khan takes place nearly six weeks later, on April 4, 2012. (GX 425 (Apr. 4, 2012)) In an apparent reference to DFN, Khan tells Valle that he "was kicked out as i wrote a message to find a real victim for slaughter :)[.]" (Id. at 05:53:21) Khan inquires as to how Valle's "hunt" is going. (Id. at 05:54:29) Valle replies that he is "going to grab this girl i have known for 7 years[,]" and he again sends Khan Facebook images of "Andria[.]" (Id. at 05:55:01-05:56:08, 05:56:52) Khan does not appear to recall the earlier discussion about Andria, but comments that she has "Good breasts and fine meat[.]" (Id. at 05:57:15) The two proceed to discuss how Valle intends to rape Andria before killing her. (Id. at 05:57:26-06:00:28)

On May 1, 2012, Khan again asks Valle "how is the plan going on[?]" (GX 426 (May 1, 2012, 06:02:11)) Valle replies that it is "going well" and that he has been "keeping in touch with [Andria.]" (Id. at 06:03:05) He tells Khan that he has "thought about cooking her" for eight years. (Id. at 06:07:51) At one point Valle asks, "if i use chloroform to abduct her will it ruin the meat?" (Id. at 06:18:39) Khan responds "no, it wont[,]" but asks Valle how he knows how to make chloroform. (Id. at 06:19:48, 06:20:21) Valle explains that "there are a couple of websites with instructions[,]" and that chloroform can be made with "basic household products[.]" (Id. at 06:20:36-43) Valle also tells Khan that he is "working on a list of everything i need[.]" (Id. at 06:28:26)

A week later, Khan asks Valle if he has "met" with Andria. (GX 427 (May 9, 2012, 05:30:21)) Valle answers no, explaining that he intends to "cook her for Thanksgiving[.]" (Id. at 05:30:48) Khan then asks Valle if he is in contact with Andria, and Valle responds that he talks to her "a couple of times a week[,]" and that she "wont be alarmed at all when [he] show[s]

up at her house to kidnap her[.]"[30]  (Id. at 05:31:27, 05:32:20)  During their chat, Valle sends

Khan a link to a website that contains instructions for making chloroform.  (Id. at 05:34:18)

      Six weeks pass before Valle and Khan communicate again.  (GX 428 (June 25,

2012))  In a June 25, 2012 chat, Valle tells Khan that he is "in the middle of constructing a pulley

apparatus in [his] basement[,]" so he can "string [Andria] up by her feet[.]"[31]  (Id. at 05:50:38)

      Valle's next and final conversation with Khan takes place on July 17, 2012.  (GX

429 (July 17, 2012))  Valle tells Khan that he has "found someone who is going to help me with

Andria[.]"  (Id. at 08:21:03)  Instead of cooking Andria for Thanksgiving – as previously

discussed with Khan – Valle and his purported accomplice have decided to "cook her outdoors

on the rotisserie in september[.]"[32]  (Id. at 08:21:16)  According to Valle, they "just need to work

out a few kinks with the abduction[,]" but are otherwise "all set[.]"  (Id. at 08:33:38-47)  Valle

explains that Andria's husband "goes out on friday afternoons after work[,]"[33] and that he

intends to "show up at her place and chloroform her" and "strip her right there and tie her up[.]"

(Id. at 08:35:10, 08:35:22-30)  Valle estimates that he can be "out of there with Andria in 10

minutes[,]" or "maybe even less" if he works on "practic[ing] [his] technique in tieing someone

---

[30]  There is no evidence that Valle was talking with Noble "a couple of times a week," nor is
there any evidence that he had ever "show[n] up at her house" in Columbus, Ohio.  Noble
testified that Valle had never visited her in Ohio and that her communication with him was
"sporadic."  (Tr. 243-44)
[31]  Valle lived in a multi-story Queens apartment building with a common basement.  There is no
evidence that he was constructing a pulley apparatus in the building's basement.  (Tr. 664-65,
667, 814)
[32]  That same day – July 17, 2012 – and less than thirty minutes later, Valle makes a nearly
identical statement in a chat with "Meand Haris":  "we are going to tie her onto a rotisserie and
slowly roast her alive over a fire[.]"  (DX E10 (July 17, 2012, 08:49:00))  The Government
conceded at trial that this chat is fantasy role-play.  (Tr. 710)
[33]  The Government offered no evidence that Valle had "found someone" to help him kidnap
Noble.  The Government likewise offered no evidence that Noble had a husband who went out
"on Friday afternoons after work[.]"

up[.]"  (Id. at 08:37:24, 08:37:41)  Valle also tells Khan that he and his accomplice are "working

on soundproofing the basement" where Andria "will be held captive and raped" (id. at 08:39:21),

and that he plans to cook her outdoors, as "no one is around for 3/4 of a mile[.]"[34]  (Id. at

08:39:39)

      Andria Noble was never kidnapped, and there is no evidence that Valle took any

concrete steps to kidnap her.  There is likewise no evidence that Valle and Aly Khan

communicated again after their July 17, 2012 chat.

### 3.  Valle's Communications with "Moody Blues"

      The Government contended at trial that Valle had also conspired with an

individual known to him as "Moody Blues" or "Christopher Collins"

("meatmarketman@rocketmail.com") to kidnap Kathleen Mangan, Kimberly Sauer, Andria

Noble, and Kristen Ponticelli.[35]  (Tr. 1517, 1520)

      The earliest chat between Valle and Moody Blues introduced at trial takes place

on July 9, 2012.  (GX 401 (July 9, 2012))  Moody Blues introduces himself as "ChrisC from

DFN[,]" suggesting that the two had communicated previously.  (Id. at 07:35:53)  Valle tells

Moody Blues that he lives in New York "about an hour north of the city[,]"[36] while Moody Blues

tells Valle that he "live[s] in England[.]"  (Id. at 07:36:27-33, 07:54:02)  Valle begins the chat by

---

[34]  There is no evidence that Valle owned or had access to such a remote site, nor is there any
evidence that he had soundproofed a basement or had a human-size rotisserie.  (Tr. 666, 782,
784, 803)

[35]  The FBI identified "Moody Blues" as Dale Bolinger, who lived in Canterbury, Kent, England.
See supra note 3.  As noted above, there is no evidence that Valle ever knew Bolinger's name or
where he lived in England.

[36]  Valle actually lived in Forest Hills, a neighborhood in Queens that is approximately thirty
minutes east of Manhattan by car.

offering to "send" Moody Blues "the girls I have available for $6,000[.]"[37] (Id. at 07:37:42)

Valle presents several potential victims, including "Kathleen[,]" described as a 26-year-old

teacher and the mother of an infant daughter; "Kimberly[,]" described as "27, single"; and

"Andria[,]" described as "5'4," "140 pounds[,]" "portuguese[,]" and a "prosecutor[.]" (Id. at

07:43:47, 07:46:45, 07:50:25, 07:50:43, 07:55:01, 07:55:06, 07:56:55, 07:58:18) Valle tells

Moody Blues that he is "working on grabbing one [of these women] for thanksgiving[.]" (Id. at

07:39:11)

      At one point during this chat, Valle suggests that "maybe [Moody Blues] can

make it here and help [him]" with a kidnapping. (Id. at 07:51:14) Valle offers to provide a

female victim for "free[,]" since he "definitely need[s] an assistant" and Moody Blues appears to

have "experience[.]" (Id. at 07:51:20-07:52:25) Moody Blues writes that he can "teach [Valle]

the proper way to prepare a girl" and also claims to have eaten two victims.[38] (Id. at 07:54:02;

07:41:45) Later in this same chat, Moody Blues sends photographs of his purported victims to

Valle. (GX 404 (July 9, 2012, 09:04:14-09:06:33)) When Moody Blues asks whether his

account of cannibalism "shock[s]" Valle, Valle responds, "not really you seem legit[.]" (Id. at

09:10:52, 09:11:05)

      The two men also discuss the pros and cons of kidnapping "Kathleen," "Andria,"

and "Kimberly." As to "Andria," Valle warns that the "abduction will have to be flawless[,]"

since she is a prosecutor and "they will be looking for her right away[.]" (GX 401 (July 9, 2012,

---

[37] The "women-for-sale" scenario is a common theme in Valle's chats with DFN users, including in chats that the Government concedes are fantasy role-play. (See, e.g., DX E1 ("Tim Chase") (Mar. 11, 2012, 04:36:56-04:37:00 (offering to sell "Sally" for "$3,500")); DX E6 ("Jackcrow Two") (Feb. 24, 2012, 10:03:18 ("someone has expressed a very deep interest in buying Danielle from me")))

[38] The Government offered no evidence that Bolinger had ever actually engaged in cannibalism.

07:58:18, 07:59:08, 07:59:15))  As to "Kathleen," Valle cautions that she "would be a little tough

too just because she's married and i would feel a little bad because of the baby[.]"  (Id. at

08:04:41)  Valle identifies "Kimberly" as the most "viable option" (id. at 08:05:01-08:05:16),

and tells Moody Blues that "she's been one of my favorite victims to fantasize about for almost

10 years now[.]"  (GX 402 (July 9, 2012, 08:36:39))  Valle tells Khan that he sees Kimberly

"once a month or so" and that they "talk on the phone more often[.]"[39]  (GX 404 (July 9, 2012,

09:02:56, 09:03:04))

      Valle tells Moody Blues that he is "single," and that he has "a big gas oven" that

they can use for cooking Kimberly.  (GX 402 (July 9, 2012, 08:09:38))  Valle also claims to live

in a secluded house "up in the mountains," with "no one [. . .] around [. . .] for about 3/4 of a

mile[.]"[40]  (Id. at 08:10:14, 08:19:36-43)  Moody Blues expresses skepticism about the human-

size oven, noting that he has "seldom seen an oven big enough to take a whole adult[.]"  He

directs Valle "to find out the dimensions of [his] oven[,]" noting that he is "not sure if [Kimberly

would] fit even as small as she is."  (Id. at 08:10:20, 08:18:12)  Valle rejects Moody Blues's

suggestion that they eat Kimberly alive.  (Id. at 08:16:48-08:17:15)

      During this same July 9, 2012 chat, Valle tells Moody Blues that he is "thinking

of a Labor Day cookout [. . .] with Kimberly as the main course[.]"  The "cookout" will take

place at Valle's "place up in the mountains" (id. at 08:32:15-30, 08:19:36):

| mhal52: | labor day is sept 3, so i'll go to her place on sept 2 |
| mhal52: | kidnap her from there and we'll get her cooking monday afternoon |
| meatmarketman: | I thought she was for Thanksgiving? |

---

[39] Kimberly Sauer's testimony indicates that she had seen Valle twice during the eight years between her December 2005 graduation and the 2013 trial.  According to Sauer, the two spoke "very rarely" by telephone.  (Tr. 273, 282-83, 290, 303)
[40] Valle was married at that time, had no such oven, and did not live "up in the mountains," but instead in an apartment in Queens.  (Tr. 203, 666, 794, 803, 189)

| mhal52: | no it will be too cold for a cookout |
| meatmarketman: | Of course. When do you want me over and will I be staying with you? |

(GX 403 (July 9, 2012, 08:39:06-08:40:26))  Valle assures Moody Blues that he can "absolutely stay" at Valle's mountain retreat (GX 403 (July 9, 2012, 08:40:44)), which is "a couple of hours from the airport[,]" with "lots of winding roads" "and peace and quiet."[41]  (GX 404 (July 9, 2012, 08:53:37-48))

In this same chat, Valle sends Moody Blues a link to a video showing Sauer on vacation.  (GX 301; GX 405 (July 9, 2012, 09:44:10))  He also volunteers to make chloroform and to buy rope at Home Depot.  (GX 403 (July 9, 2012, 08:42:09-16))  Moody Blues, who had told Valle that he lives in England, notes that – since "Labour day is the 3rd [of] september," there is "not a lot of time to sort out plane tickets etc.[,]" but that he "[w]ill see what cheap deals [he] can get[.]"[42]  (GX 404 (July 9, 2012, 08:52:13))  He asks Valle, "You WILL go through with this?  I've been let down before.  That's why i tend to work alone."  (Id. at 09:01:36) (emphasis in original)  Valle answers "yes[.]"  (Id. at 09:01:58)

At trial, the Government offered evidence that the "Kimberly" Valle discussed in his July 9, 2012 chat with Moody Blues is Kimberly Sauer, a 29-year-old woman who works as a promotions manager for several Washington, D.C.-area radio stations.  (Tr. 445, 448, 269)  Valle conducted Internet searches for "kim sauer" and "Kimberly Sauer" on July 9, 2012, the same day as his chat with Moody Blues.  (GX 1001, Record Nos. 873-880)

---

[41]  As previously noted, there is no evidence that Valle's "place up in the mountains" is anything other than a figment of his imagination.

[42]  There is no evidence that Bolinger made travel plans of any sort, or that he ever discussed travel plans with Valle again.

Sauer and Valle became friends at the University of Maryland. (Tr. 267) After graduation, Valle and Sauer communicated via text message approximately ten to fifteen times a year. (Id. at 273) In a January 18, 2012 text message – six months before Valle's July 9, 2012 chat with Moody Blues – Valle asked Sauer for her address so that he could send her a PBA card. (Id.; GX 436 (Jan. 18, 2012 text message from Valle to Sauer); GX 110 (PBA card sent by Valle to Sauer)) Valle told Sauer that the PBA card "can be handy if u get pulled over." (GX 436 (Jan. 18, 2012, 5:28 p.m.)) On January 20, 2012, Valle sent a text message to Sauer telling her that the PBA card was "on the way." (Id. (Jan. 20, 2012, 3:44 p.m.))

The Government also offered evidence that Valle had created 89 computer file folders regarding various women on the MacBook computer he shared with Mangan. The folders contain Facebook photographs of women; one such folder is entitled "Kimberly Sauer." (Tr. 422, 459, 1293-94) That folder contains Facebook images of Sauer along with two staged images of a woman being roasted on a spit. (Id. at 459, 1294; GX 619D)

In a July 10, 2012 chat, Valle tells Moody Blues that he is "working on a word document [. . . ,] a blueprint of everything we will need to carry this out[,]" and that he will send the document to Moody Blues so that they can "review it an[d] add to it as time goes on[.]" (GX 407 (July 10, 2012, 05:48:51-05:49:03, 05:49:19)) The document Valle sends to Moody Blues is entitled "Abducting and Cooking Kimberly: A Blueprint" (the "Blueprint").[43] (GX 601) The Blueprint contains a photograph of Sauer and accurately states that she is single, has never been married, is a non-smoker and an occasional drinker, and has no tattoos.[44] None of the

---

[43] During a fantasy chat with "Meand Haris" a week later, Valle makes reference to another "blueprint" relating to the abduction and cooking of Andria Noble. (DX E10 (July 17, 2012, 08:50:18); Tr. 704, 793)
[44] Compare GX 601 with Tr. 266-67.

identification information concerning Sauer that Valle provides in the Blueprint is accurate, however. Valle falsely states that Sauer's last name is "Shea[,]" that her date of birth is February 24, 1985, that she was born in Cary, North Carolina, that she attended Syracuse University, and that she has a master's degree in journalism. (GX 601; Tr. 300)

The Blueprint reflects a "target date" of September 2, 2012, for Kimberly's abduction and contains a list of "MATERIALS NEEDED[.]" The list includes "[c]hloroform[,]" "[r]ope (strongest kind to tie her up securely)[,]" "[g]ag ([d]uct [t]ape?)," "[s]eparate bag to gather her clothes[,]" "[g]loves[,]" and "[c]heap [s]neakers." (GX 601)

After receiving the Blueprint, Moody Blues writes, "[m]ay I have her address? For Googling using the Map app?" (GX 407 (July 10, 2012, 06:08:23)) Valle responds that he is "not sure [of] her exact address."[45] (Id. at 06:08:33)

At some point prior to July 12, 2012, Valle leaves a voicemail message for Sauer stating that he will be traveling with his family to Maryland on the weekend of July 21-22, 2012, and asking whether they can get together.[46] (GX 436 (July 12, 2012, 10:41 a.m.)) In a July 12, 2012 text message, Sauer tells Valle that she will "be around all weekend that weekend" and that they should "plan some time to hang out!" (Id.) On July 16, 2012, Valle and Sauer agree to meet for lunch that Sunday, July 22, 2012. (Id. (July 16, 2012, 3:06 p.m.))

---

[45] As discussed above, Valle had obtained Sauer's address in January 2012. (GX 436 (Jan. 18, 2012, 7:10 p.m.))

[46] It was not unusual for Valle to travel to Maryland to visit with his college friends. Mangan testified that she and Valle made three or four such trips during their relationship. (Tr. 208-12) Mangan also testified that whenever they were planning a trip to Maryland, Valle "would try to make plans to meet with [Sauer]." (Id. at 183) Indeed, in August 2011, Valle sent Sauer a text message asking whether she wanted to meet for lunch during another visit by Valle and Mangan with Valle's college friends in Maryland. (GX 436 (Aug. 13, 2011, 4:52 p.m.)) The Government does not contend that Valle was conspiring to kidnap Sauer at this time.

The next morning, July 17, 2012, Valle sends an electronic message to Moody Blues telling him, "im having lunch with kimberly on sunday[.]"[47] (GX 408 (July 17, 2012, 07:18:58)) In a chat on July 19, Valle writes, "when i see her on sunday, my mouth will be watering[.]" (GX 410 (July 19, 2012, 06:13:48)) At the end of their July 19 chat, Moody Blues again asks Valle for Kimberly's address: "give me the address of Kim and I can google the address. REALLY want to see the neighbourhood!" (Id. at 07:10:48) (emphasis in original) Valle dodges the request, writing, "dont know it by heart[.]" (Id. at 07:10:57) Moody Blues replies, "Make sure you get it for me please. I want to be involved in the planning and an address will let me check out the area. Nearest police station, maybe video cameras etc." (Id. at 07:12:14) Despite Moody Blues's repeated requests, Valle never provides him with Sauer's address.

In the early morning hours of July 20, 2012, Valle conducts a number of Internet searches relating to kidnapping, including "how to kidnap someone"; "how to abduct a girl"; "how to chloroform a girl"; "can you use chloroform to have sex with your girlfriend"; "how to chloroform a girl"; and "kidnapped girl." (GX 1001, Record Nos. 1111, 1097, 1094, 1100, 1125; Tr. 1239, 1275)

Valle, his wife, and their infant daughter travel to Maryland on July 21, 2012, and spend the weekend visiting Valle's college friends. (Tr. 210; GX 436) On Sunday, July 22,

---

[47] Later in their July 17, 2012 chat, Moody Blues asks Valle whether he has "a recipe for chloroform." (GX 409 (July 17, 2012, 08:09:29)) Valle tells Moody Blues that he "found a website a couple of nights ago" and sends Moody Blues a link to the website. (Id. at 08:09:48, 08:11:21) Agent Walsh testified that the website is entitled "How To Make Chloroform at Home: Chemical and Lab Safety," and that it contains a list of necessary ingredients, all of which are common household items. (GX 604; Tr. 485-88) Two months earlier, Valle had sent Aly Khan a link to a different website that also contained instructions for making chloroform. (GX 426 (May 9, 2012, 05:34:18))

2012, they have lunch with Sauer. (Tr. 290-91) The day before, Valle texts Sauer, "[w]e drove by your pink building today." (GX 436 (July 21, 2012, 9:33 p.m.)) Sauer understood Valle to be referring to the office building where she works, which has pink-tinted windows. (Tr. 290) Valle had never visited Sauer at work, nor had she sent him photographs of its exterior. (Id.) At trial, Sauer described the lunch as "fine" and "pleasant," and recalled that she and Valle "talked about old college friends." (Id. at 291, 326)

After Valle's return home, he emails Moody Blues to tell him that Sauer "looked absolutely mouthwatering i could hardly contain myself[.]" (GX 411 (July 22, 2012, 23:57:42)) The purported plan to kidnap Sauer over Labor Day weekend is never mentioned again, however, and a month passes before Valle and Moody Blues's next communication on August 21, 2012.

The subject line in Valle's first email to Moody Blues on August 21, 2012 is "Meet Kristen." (GX 445 (Aug. 21, 2012)) Attached to this email are numerous photographs of Kristen Ponticelli, a recent graduate of Valle's high school, Archbishop Malloy.[48] (Id. at 22:19:56) Valle reports that Kristen is "10 years younger than Kim, better body. I say we go for it." (Id. at 22:46:00) Valle also tells Moody Blues that Kristen is "around 5'3'[,]" and he points out that his oven measures "around 5 feet long, 4 feet deep and 4 feet high" and that he "can take the racks out." (Id.) Valle tells Moody Blues that the drive from Kristen's college to his house would be "around 4/4 and a half hours[,]" and that "she will be playing softball" at the University of Maryland.[49] (GX 412 (Aug. 24, 2012, 07:01:34, 07:07:57)) Although Valle

_____

[48] Valle had conducted Google searches concerning Kristen Ponticelli on July 4, 2012. (Tr. 1254-55; GX 1001 at Record No. 1073-76)
[49] Kristen Ponticelli plays softball, but she attends college in the New York metropolitan area. (Tr. 413)

conducts a Google search for Ponticelli's address on August 22, 2012 (Tr. 1276; GX 1005A at

Record No. 66566), there is no evidence that Valle and Moody Blues ever discuss her or

Kimberly Sauer again.

On August 25, 2012, Moody Blues tells Valle that he's "working on getting

someone here to kill and eat" and he mentions a "Kenyan student" and a "young Chinese girl."

(GX 412 (Aug. 25, 2012, 07:23:54), GX 413 (Aug. 25, 2012, 04:53:25, 05:19:48))  Valle tells

Moody Blues that "Andria the prosecutor [. . .] is the girl [he] would most want to eat but she

lives around 6 hours away[.]"  (GX 413 (Aug. 25, 2012, 05:05:18-05:05:37))  Valle states that

while he has "pretty much ruled her out" as a potential target because she lives too far away, "in

[his] fantasies, she is #1 by far[.]"  (Id. at 05:10:01, 05:10:10)

In their last chat on September 8, 2012, however, Valle tells Moody Blues that he

has "decided on" Andria, and wants "to follow her home and then just stake it out[.]"  (GX 415

(Sept. 8, 2012, 04:12:09, 04:12:13, 04:17:27))  Moody Blues suggests that Valle "try and abduct

her on the way home from a party or something" (id. at 04:23:25), but Valle says he "doubt[s]"

that would work, at least "not in new york city[.]"  (Id. at 04:23:44-59)  Moody Blues asks

whether Andria "live[s] close to you[.]"  (Id. at 04:24:18)  Valle writes that he is "not sure [of]

her exact location," but she is "probably an hour to an hour and a half or so [away.]"[50]  (Id. at

---

[50]  As noted above, Valle knew that Andria Noble lived in Columbus, Ohio.  (Tr. 239, 244)
Indeed, Valle had obtained Noble's street address in Columbus on July 20, 2011, through a
database search.  (Id. at 578-81; GX 616B)  Valle's home in Queens (Tr. 442) is more than 500
miles from Columbus.

Valle had also told Moody Blues on August 25, 2012, that Andria "lives around 6 hours away."
(GX 413 (Aug. 25, 2012, 05:05:18-05:05:37))  No mention is made of the discrepancy in the
September 8, 2012 chat.  Indeed, Moody Blues does not even appear to remember who "Andria"
is:

**mhal52:**          when I grab Andria

04:24:59)  There is no discussion of Moody Blues traveling to the United States to help Valle

with Andria's kidnapping.

In this final chat on September 8, 2012, Valle tells Moody Blues:

| | |
|---|---|
| **mhal52:** | I closed out my DFN account |
| **meatmarketman:** | [. . . .] |
| **meatmarketman:** | Why[?] |
| **mhal52:** | Less of a chance of getting caught I figure |
| **meatmarketman:** | Lol! |

(<u>Id.</u> at 04:10:57-04:12:03)  As noted above, in August 2012 Mangan had discovered disturbing

images on the couple's MacBook computer and confronted Valle.  (Tr. 165-67)  She installed

spyware on the MacBook computer the day after Valle's last chat with Moody Blues.  (<u>Id.</u> at

174-75)

### C.    <u>Other Computer-Related Evidence</u>

The FBI's search of computers used by Valle revealed that he had created

approximately 89 computer folders containing the names and Facebook images of women he

knew, including the targets of the alleged kidnapping conspiracy.  (Tr. 422, 1293-94; GX 618,

619A-619G)  Investigators also learned that Valle had logged on to websites involving death and

kidnapping thousands of times, and that he had conducted Internet searches – referenced above –

concerning various means and methods of kidnapping.  (Tr. 1239, 1275; GX 1000, 1001)

Investigators also found still images and video files that Valle had viewed, including a staged

video of a naked woman "chained hand and foot" above an open flame positioned between her

legs.  (GX 295A, 295B; Tr., 1206, 1275)

---

| | |
|---|---|
| **mhal52:** | I've decided on her |
| **meatmarketman:** | That's the student? |
| **mhal52:** | no the assistant district attorney |

(GX 415 (Sept. 8, 2012, 04:12:09-49))

The Government also introduced evidence that Valle had queried the names of several women on his NYPD patrol car computer. (Tr. 578-84; GX 615, 616B, 616C, 616E, 617)  As part of his training as a police officer, Valle had been instructed that the NYPD's computer databases could only be accessed for purposes "within the performance of [a police officer's] duty." (Tr. 940-41; GX 612)  Valle nonetheless queried the name of Maureen Hartigan on May 31, 2012, despite having no legitimate law enforcement reason for doing so. (Tr. 582-84; GX 616E)  Valle likewise ran queries concerning Sauer and Noble on July 20 and 21, 2011, five months before the time period of the kidnapping conspiracy alleged in the Indictment. (GX 616B, 616C; Tr. 579-82; Indictment (Dkt. No. 9) at ¶ 1)  In running searches concerning these women, Valle accessed a variety of federal, state, and local law enforcement databases that contain pedigree and criminal history data, including the National Crime Information Center database. (Id. at 572, 583-84)  There is no evidence, however, that Valle used any information obtained from these searches in furtherance of the alleged kidnapping conspiracy, or that he told his alleged co-conspirators that he had conducted these searches or had access to such information.

### D.     Valle's Post-Arrest Statement

After his arrest on October 24, 2012, Valle gave a statement to FBI Special Agent Anthony Foto in which he acknowledged having had Internet chats and email exchanges with Van Hise, Aly Khan, and Moody Blues. (Id. at 1030)  Agent Foto began the interview by falsely telling Valle that he had been under surveillance for more than a year. (Id. at 1023-24)  When asked to explain why he thought he had been arrested, Valle replied "that he believed that he was there for conspiracy to murder, commit murder or attempted murder." (Id. at 1026-27)  Valle told Agent Foto that he had been interested in cannibalism since college and had started visiting

39

the DFN website in 2010.  (Id. at 1029)  He offered to help the FBI distinguish between "which users [on DFN] were real and which users were fantasy," noting that "it was hard to make that distinction." (Id. at 1029)

Valle also told Agent Foto that he began communicating with some DFN members on Yahoo! messenger at the beginning of 2012.  (Id. at 1030)  Agent Foto testified that Valle volunteered that he believed Moody Blues and Aly Khan were "more serious" than other DFN users, and that his communications with them

> began to bleed into his personal life.  He was spending much more time communicating [online].  He was basically exhausted.  He . . . began to pull away from his wife [and] . . . ultimately stopped having sex with her.

(Id. at 1031)

Valle mentioned that he believed that Aly Khan was a butcher, and that Khan had sent him a video of a goat being slaughtered, which had "freaked him out."  (Id. at 1032, 1173) Valle also told Agent Foto that Moody Blues had encouraged him to prepare a document containing information about Kimberly Sauer and the materials that would be needed to kidnap her.  (Id. at 1032)  Valle discussed his July 22, 2012 lunch with Sauer in Maryland, and said that he had told Moody Blues that he would be meeting with Sauer "to decide . . . whether he was going to want to kidnap her or not."  (Id. at 1033)

As discussed above, Agent Foto asked Valle if he was on Alisa Friscia's block on March 1, 2012.  Valle responded that he had been at that location that day "to drop his wife off to have lunch with" Friscia.  (Id. at 1034)

Valle denied that he would have "gone through with" any of the kidnapping plans that he had discussed.  (Id. at 1030)  Valle also told Agent Foto that – as part of an effort to

convince others that he was serious – he had falsely stated during the Internet chats that he would commit a kidnapping if he thought that he could "get away with it."  (Id. at 1170)

## PROCEDURAL HISTORY

On October 24, 2012, FBI agents arrested Valle on a criminal complaint charging him with conspiracy to commit kidnapping and unauthorized use of a restricted federal database. (United States v. Valle, 12 Mag. 2820 (Cmplt.); Tr. 1019-22)  On November 15, 2012, a grand jury returned an indictment charging Valle with conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c), and with conducting a computer search of a federal database that exceeded his authorized access, in violation of 18 U.S.C. § 1030(a)(2)(B).  (Indictment (Dkt. No. 9))

Trial began on February 11, 2013.  At the close of the Government's case, Valle moved for a judgment of acquittal on both counts pursuant to Fed. R. Crim. P. 29(a).  (Tr. 1308)  The Court reserved decision at that time.  (Id. at 1322)  On March 12, 2013, the jury found Valle guilty on both counts.  (Verdict Form (Dkt. No. 126))  Valle renewed his Rule 29 motion after the jury's verdict and obtained an extension of time to brief his Rule 29 and Rule 33 motions. (Tr. 1697)  On June 17, 2013, Valle submitted briefs in support of his motion for a judgment of acquittal on Counts One and Two or, in the alternative, for a new trial.  (Def. Count One R. 29 Mot. (Dkt. No. 176); Def. Count Two R. 29 Mot. (Dkt. No. 178); Def. R. 33 Mot. (Dkt. No. 180))  The Government submitted its opposition to Valle's motions on August 16, 2013, and Valle replied on October 1, 2013.  (Govt. Br. (Dkt. No. 195); Def. Count One Reply (Dkt. No. 208); Def. Count Two Reply (Dkt. No. 209); Def. R. 33 Reply (Dkt. No. 210))

## DISCUSSION

I. **VALLE'S MOTION FOR A JUDGMENT OF ACQUITTAL ON COUNT ONE:  KIDNAPPING CONSPIRACY**

    A.    **Law Applicable to Sufficiency Challenges**

        1.    **General Rule 29 Standard**

Fed. R. Crim. P. 29(a) provides that a court shall, upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(b) permits the Court to "reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict." "Under Rule 29(b), when a district court reserves decision on a defendant's Rule 29 motion at the close of the Government's evidence, 'it must decide the motion on the basis of the evidence at the time the ruling was reserved.'" United States v. Truman, 688 F.3d 129, 139 (2d Cir. 2012) (quoting Fed. R. Crim. P. 29(b)).[51]

A defendant seeking to challenge a jury's guilty verdict "carries a heavy burden." United States v. Oguns, 921 F.2d 442, 449 (2d Cir. 1990).  In evaluating a sufficiency challenge, this Court "'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's

---

[51] The Second Circuit, however, has "not read Federal Rule of Criminal Procedure 29(d), which provides for a conditional grant of a new trial upon grant of a judgment of acquittal after a guilty verdict, to incorporate Rule 29(b)'s restriction on the consideration of evidence admitted after the Rule 29 motion was made and while decision on the motion was held reserved." Truman, 688 F.3d at 142. Accordingly, in determining whether to conditionally grant Valle's motion for a new trial, this Court must consider the entire evidentiary record. Id.

assessment of witness credibility and its assessment of the weight of the evidence.'" United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012) (quoting United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008)).  "So long as the inference is reasonable, 'it is the task of the jury, not the court, to choose among competing inferences.'"  United States v. Kim, 435 F.3d 182, 184 (2d Cir. 2006) (quoting United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995)).

   Under Rule 29, the critical question "is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  United States v. Downing, 297 F.3d 52, 56 (2d Cir. 2002) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in Jackson).  "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."  Cavazos v. Smith, __ U.S.__, 132 S. Ct. 2, 4 (2011) (per curiam).  In other words, Rule 29(c) "does not provide the trial court with an opportunity to 'substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'"  United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)).

   "[I]f [courts] are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, [however,] [they] must take seriously [their] obligation to assess the record to determine, as Jackson instructs, whether a jury could reasonably find guilt beyond a reasonable doubt."  United States v. Clark, 740 F.3d 808, 811 (2d Cir. 2014) (emphasis in original).  While a defendant challenging a jury's verdict "carries a heavy burden," Oguns, 921 F.2d at 449, that "burden is not an impossible one."  United States v. Kapelioujnyj, 547 F.3d 149, 152-53 (2d Cir. 2008) (citing United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004)).  Moreover, "a conviction based on

speculation and surmise alone cannot stand." United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994). "[T]he government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt." Id. (citing Jackson, 443 U.S. at 319; United States v. Macklin, 671 F.2d 60, 65 (2d Cir. 1982)). "The evidence, in other words, must be of such persuasive quality that a jury could reasonably find the essential elements beyond a reasonable doubt on the basis of that evidence." United States v. Jackson, 368 F.3d 59, 63 (2d Cir. 2004) (emphasis in original).

In assessing a sufficiency challenge, a court "'looks at the "evidence in its totality"'" and collectively, United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Glenn, 312 F.3d 58, 63 (2d Cir. 2002) (quoting United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000))) – "'not in isolation but in conjunction.'" Mariani, 725 F.2d at 865 (quoting United States v. Geaney, 417 F.2d 1116, 1121 (2d Cir. 1969)).

Moreover, while a jury is "permitted to enter an unassailable but unreasonable verdict of 'not guilty,'" it does not have the "power to enter an unreasonable verdict of guilty." Jackson, 443 U.S. at 318 n.10 (citing United Bhd. of Carpenters & Joiners of Am. v. United States, 330 U.S. 395, 408 (1947)). Accordingly, in reviewing a sufficiency challenge, "'specious inferences are not indulged, because [it] would not satisfy the [Constitution] to have a jury determine that the defendant is probably guilty.'" Lorenzo, 534 F.3d at 159 (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004) (quoting Sullivan v. Louisiana, 508 U.S. 275, 278 (1993))) (emphasis and alterations in original) (internal quotation marks and citations omitted).

Finally, the Second Circuit has made clear that "'[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a

theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'" Coplan, 703 F.3d at 69 (quoting United States v. Huezo, 546 F.3d 174, 193 (2d Cir. 2008)) (alteration in original); see also D'Amato, 39 F.3d at 1256 ("[T]he government must do more than introduce evidence 'at least as consistent with innocence as with guilt.'" (quoting United States v. Mulheren, 938 F.2d 364, 372 (2d Cir. 1991))).  Accordingly, a district court must grant a defendant's Rule 29 motion where the evidence "viewed in the light most favorable to the government, remains, at best, in equipoise." Coplan, 703 F.3d at 69.

### 2.    Review of Jury Determinations Concerning Criminal Intent

In reviewing the sufficiency of the evidence here, this Court is mindful of the jury's critical role in our legal system, and the daunting standard for overturning a jury's determinations regarding a defendant's criminal intent.

"[T]he jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion of guilt or innocence." United States v. Gaudin, 515 U.S. 506, 514 (1995).  The jury acts as "the oracle of the citizenry in weighing the culpability of the accused, and should it find him guilty it condemns him with the full legal and moral authority of the society." United States v. Gilliam, 994 F.2d 97, 101 (2d Cir. 1993).

Ordinarily, "[t]he question of whether criminal intent is inferable from the facts proved is a question for the jury." United States v. Speare, 297 F.2d 408, 410 (2d Cir. 1962); see also Morissette v. United States, 342 U.S. 246, 274 (1952) ("Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury."); United States v. Sullivan, 98 F.2d 79, 80 (2d Cir. 1938) ("Plainly the issue of criminal intent was for the jury."); United States v. Mehanna, 735 F.3d 32, 47 (1st Cir. 2013) ("It is the

jury's role – not that of the [court] – to choose between conflicting hypotheses, especially when such choices depend on the drawing of inferences and elusive concepts such as motive and intent."); United States v. Depew, 932 F.2d 324, 326 (4th Cir. 1991) ("There was sufficient evidence to establish the essential elements of a conspiracy, and it was for the jury to decide whether the appellant's actions represented fantasies or whether he and his coconspirator intended to go through with their gruesome plan."); United States v. Malsom, 779 F.2d 1228, 1233 (7th Cir. 1985) ("Whether or not the necessary intent was established is in all cases a question for the trier of fact to resolve.").

On a Rule 29 motion, "[w]here . . . the issue is one of intent, the question is whether 'the inferences [in favor of the Government] are sufficiently supported to permit a rational juror to find that th[is] element, like all elements, is established beyond a reasonable doubt.'" United States v. Workman, 80 F.3d 688, 699 (2d Cir. 1996) (quoting Martinez, 54 F.3d at 1043) (second alteration in Workman). "A conspiracy conviction cannot be sustained unless the government established beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute." United States v. Hassan, 578 F.3d 108, 123 (2d Cir. 2008) (emphasis in original) (citing United States v. DiTommaso, 817 F.2d 201, 218 (2d Cir. 1987)). Thus, a motion for a judgment of acquittal must be granted where, "in order to find the essential element of criminal intent beyond a reasonable doubt, a rational juror would have to speculate." United States v. Stewart, 305 F. Supp. 2d 368, 370 (S.D.N.Y. 2004).

A district court must "defer to the jury's determination of the weight of the evidence . . . , and to the jury's choice of the competing inferences that can be drawn from the evidence." United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998) (citation omitted). "[A] court, whether at the trial or appellate level, may not usurp the role of the jury by substituting its

own determination of the weight of the evidence and the reasonable inferences to be drawn for

that of the jury." United States v. MacPherson, 424 F.3d 183, 187 (2d Cir. 2005) (internal

quotation marks, citations, and alterations omitted). "'[I]f the court concludes that either of . . .

two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the

jury decide the matter.'" Autuori, 212 F.3d at 114 (quoting Guadagna, 183 F.3d at 129)

(alterations in Autuori) (ellipsis added).  A court may only overturn a defendant's conviction if

evidence concerning his or her intent, "'viewed in the light most favorable to the prosecution[,]

gives equal or nearly equal circumstantial support to a theory of guilt and a theory of

innocence,'" Coplan, 703 F.3d at 69 (quoting Huezo, 546 F.3d at 193), or where the balance tips

in the defendant's favor.

### 3.     Requirements to Sustain a Conspiracy Conviction

Conspiracy statutes reflect a societal choice to detect and punish criminal

wrongdoing at its inception, before the object of the illegal agreement has been realized or

achieved.  "The essence of a conspiracy is 'an agreement to commit an unlawful act.'" United

States v. Jimenez Recio, 537 U.S. 270, 274 (2003) (quoting Iannelli v. United States, 420 U.S.

770, 777 (1975)).  While "the law does not punish criminal thoughts," in a criminal conspiracy

"the criminal agreement itself is the actus reus."  United States v. Shabani, 513 U.S. 10, 16

(1994).

Conspiracy law is premised on the long-standing belief that criminal agreements

themselves warrant punishment separate and apart from the substantive crimes that are their

objects.  See, e.g., United States v. Eppolito, 543 F.3d 25, 47 (2d Cir. 2008) ("Where there is an

agreement to commit an unlawful act, '[t]hat agreement is a distinct evil, which may exist and be

punished whether or not the substantive crime ensues.'" (quoting Jimenez Recio, 537 U.S. at 274

(internal quotation marks and citation omitted))) (emphasis and alteration in Eppolito).

Accordingly, the conspiracy and the substantive crime that is the objective of the conspiracy do

not merge, and individuals can be charged with, convicted of, and punished separately for both.

      The elements of conspiracy are generally more easily proven than the elements of

either a substantive offense or an attempt, the latter of which typically requires proof that a

defendant took a "substantial step" toward completing a crime.  Conspiracy merely requires

proof of "(1) an agreement among the conspirators to commit an offense; (2) specific intent to

achieve the objective of the conspiracy; and (3) [here] an overt act to effect the object of the

conspiracy." United States v. Pinckney, 85 F.3d 4, 8 (2d Cir. 1996) (alteration added) (citation

omitted).  "'Whether the substantive crime itself is, or is likely to be, committed is irrelevant,'"

United States v. Wallach, 935 F.2d 445, 470 (2d Cir. 1991) (quoting United States v. Rose, 590

F.2d 232, 235 (7th Cir. 1978)), and "'impossibility of success is not a defense.'" Hassan, 578

F.3d at 123 (quoting Jimenez Recio, 537 U.S. at 276).  "'[T]he crime of conspiracy is complete

upon the agreement to violate the law, as implemented by one or more overt acts . . . , and is not

at all dependent upon the ultimate success or failure of the planned scheme.'" United States v.

Trapilo, 130 F.3d 547, 552 n.9 (2d Cir. 1997) (quoting United States v. Everett, 692 F.2d 596,

600 (9th Cir. 1982)).

      Moreover, a defendant may be convicted of conspiracy without having entered

into a formal or express agreement.  "'[I]t is enough that the parties have a tacit understanding to

carry out the prohibited conduct.'" United States v. Rubin, 844 F.2d 979, 984 (2d Cir. 1988)

(quoting United States v. Wardy, 777 F.2d 101, 107 (2d Cir. 1985)).  A conspiracy may also

exist "even if a conspirator does not agree to commit or facilitate each and every part of the

substantive offense." Salinas v. United States, 522 U.S. 52, 63 (1997) (citation omitted).  "The

partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." Id. at 63-64 (citing Pinkerton v. United States, 328 U.S. 640, 646 (1946)). Because "[s]ecrecy and concealment are essential features of successful conspiracy," prosecutors may prove the "essential nature of the plan and [a defendant's] connections with it" through circumstantial evidence and inferences. Blumenthal v. United States, 332 U.S. 539, 557 (1947); see also United States v. Stewart, 485 F.3d 666, 671 (2d Cir. 2007) ("Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence.").

Although the Government may rely on circumstantial evidence and reasonable inferences to establish the elements of a conspiracy, "'because conspiracy is a specific intent crime,'" the Government must demonstrate that the defendant had the specific intent to both engage in the conspiracy and commit the underlying crime. Hassan, 578 F.3d at 123 (quoting United States v. Morgan, 385 F.3d 196, 206 (2d Cir. 2004)); see id. ("A conspiracy conviction cannot be sustained unless the government established beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute.") (emphasis in original) (citing DiTommaso, 817 F.2d at 218). However, a defendant's specific intent may be proven by circumstantial evidence, see Huezo, 546 F.3d at 180, and – under appropriate circumstances – intent may be inferred from a single act. Id. ("'[A] single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy.'" (quoting United States v. Tramunti, 513 F.2d 1087, 1111 (2d Cir. 1975))).

"As an added protection to defendants against punishment for mere talk, in some instances an overt act must take place in furtherance of the conspiracy." United States v. Gigante, 982 F. Supp. 140, 169 (E.D.N.Y. 1997), aff'd, 166 F.3d 75 (2d Cir. 1999) (citation omitted). Where – as here – the applicable conspiracy statute contains an overt act requirement, the purpose of that element is to require the Government to demonstrate that the conspiracy was actually "at work." Carlson v. United States, 187 F.2d 366, 370 (10th Cir. 1951) (citation omitted). The overt act may itself be lawful and need not be charged in the indictment. See, e.g., Iannelli, 420 U.S. at 786 n.17 ("The [overt] act can be innocent in nature, provided it furthers the purpose of the conspiracy."); United States v. Salmonese, 352 F.3d 608, 619 (2d Cir. 2003) (noting "'the well-established rule of this and other circuits that the overt act element of a conspiracy charge may be satisfied by an overt act that is not specified in the indictment, at least so long [as] there is no prejudice to the defendant'" (quoting United States v. Frank, 156 F.3d 332, 337 (2d Cir. 1998))).

Finally, in order to establish proper venue, the Government must demonstrate that at least one overt act in furtherance of the alleged conspiracy was committed within the Southern District of New York. United States v. Naranjo, 14 F.3d 145, 147 (2d Cir. 1994). "This includes not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy." United States v. Royer, 549 F.3d 886, 896 (2d Cir. 2008) (citing United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003) (venue is proper in a district where the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur)).

### B.  Sufficiency of the Evidence on Count One:  Kidnapping Conspiracy

Count One of the Indictment charges Valle with violating 18 U.S.C. § 1201(c).

(Indictment (Dkt. No. 9))  Section 1201(c) provides:

> If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.

18 U.S.C. § 1201(c).

To obtain a conviction under Section 1201(c), the Government was required to demonstrate beyond a reasonable doubt that Valle "agreed with another to commit [one or more kidnappings]; that he knowingly engaged in the conspiracy with the specific intent to commit the [kidnapping or kidnappings] that were the objects of the conspiracy; and that an overt act in furtherance of the conspiracy was committed [in the Southern District of New York]." United States v. Monaco, 194 F.3d 381, 386 (2d Cir. 1991) (citation and internal quotation marks omitted); see also Naranjo, 14 F.3d at 147.

"[B]ecause conspiracy is a specific intent crime," the Government was required to prove, beyond a reasonable doubt, both that Valle entered into a genuine agreement to commit a kidnapping, and that he had the specific intent to actually kidnap one or more women.  Hassan, 578 F.3d at 123 ("A conspiracy conviction cannot be sustained unless the government established beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute.") (emphasis in original) (citing DiTommaso, 817 F.2d at 218).

Valle argues that he is entitled to a judgment of acquittal on Count One because the Government did not establish by proof beyond a reasonable doubt that he (1) entered into a genuine agreement to kidnap a woman, and (2) had the specific intent to actually kidnap a woman.  More specifically, Valle contends that his Internet activities and other actions are

entirely consistent with fantasy role-play, and that – given the Government's concession that nearly all of his Internet communications about kidnapping, rape, murder, and cannibalism are in fact fantasy – the Government's failure to distinguish the allegedly "real" chats from the admittedly fantasy chats requires that his motion for a judgment of acquittal be granted.[52]  (Def. Count One R. 29 Br. (Dkt. No. 177) at 26-52)

> **1.** **The Government Did Not Demonstrate by Proof Beyond a Reasonable Doubt that Valle's Chats with his Alleged Co-Conspirators Reflect True Criminal Intent as Opposed to Fantasy Role-Play**
>
> > **a.** **The Government Did Not Offer Sufficient Evidence to Permit a Reasonable Juror to Distinguish the Alleged "Real" Chats from the Conceded Fantasy Chats**

At trial, the Government relied almost exclusively on Valle's computer-based activities – chats, emails, searches, and computer-generated documents – to demonstrate his alleged criminal intent to kidnap one or more women.  Indeed, the centerpiece of the Government's case was Agent Walsh's analysis of Valle's Internet communications, and his division of these communications into two groups: "real" and fantasy.  (See Tr. 425-26, 653) Given the Government's concession that nearly all of Valle's thousands of online communications about kidnapping, rape, murder, and cannibalism are fantasy role-play, the foundation of the Government's case at trial was its argument that Valle's forty chats and emails with Van Hise, Aly Khan, and Moody Blues are meaningfully different, in that they evince true

---

[52]  Valle also argues that (1) the Court improperly admitted into evidence statements of Valle's alleged co-conspirators; (2) a prejudicial variance occurred at trial, because the Government's evidence – at best – established three separate conspiracies rather than the single conspiracy alleged in the Indictment; and (3) the Government did not prove that an overt act in furtherance of the alleged kidnapping conspiracy occurred in the Southern District of New York, and thus did not establish proper venue.  (Def. Count One R. 29 Br. (Dkt. No. 177) at 26-68)  Given the Court's determination that the Government did not establish Valle's criminal intent beyond a reasonable doubt, it is not necessary to reach Valle's arguments concerning the admission of co-conspirator statements, multiple conspiracies, and venue.

criminal intent. Stated another way, no reasonable juror could find criminal intent and vote to

convict unless the Government demonstrated, by proof beyond a reasonable doubt, that the Van

Hise/Aly Khan/Moody Blues chats differ significantly from the fantasy chats in content and/or in

surrounding circumstances.

According to Agent Walsh, the differences between the "real" chats and

emails and the fantasy chats and emails are as follows:

> In the ones that I believe[d] were fantasy, the individuals said they were fantasy.
> In the ones that I thought were real, people were sharing, the two people were
> sharing real details of women, names, what appeared to be photographs of the
> women, details of past crimes and they also said they were for real. . . .

> [In the "real" chats, the participants] described dates, names and activities that
> you would use to conduct a real crime. . . .

> [The fantasy chats] didn't seem realistic. . . . They were clearly role-play. [The
> participants] used the word "fantasy" in the actual chats or emails.

(Id. at 425, 651)  No reasonable juror could have distinguished between the "real" and fantasy

chats on this basis, however, because the chats that the Government claims are "real" and the

chats that the Government concedes are fantasy share the same elements and characteristics.

For example, in both the alleged "real" chats and the fantasy chats Valle

- transmits Facebook images of real women he knows without their consent (Compare
  DX E13 ("Carl Wolfe" fantasy chat) (May 17, 2012, 3:39 a.m. (sharing images of
  several women, including "Kristen P.," "Cecilia," and "Kathleen")) with GX 401
  (Moody Blues "real" chat) (July 9, 2012, 07:38:37-07:46:09 (sharing images of
  several women, including "Cecilia," "Kathleen," and "Kimberly"));

- offers to kidnap women and sell them on a "cash upon delivery" basis (Compare DX
  E1 ("Tim Chase" fantasy chat) (Jan. 23, 2012 (offering to sell "Danielle" for $4,000))
  with GX 430 (Van Hise "real" chat) (Jan. 27, 2012 (offering to sell "Alisa" for
  $4,000));

- expresses a desire to kidnap, rape, torture, murder, and/or cannibalize the same real
  women (Compare DX E6 ("Jackcrow Two" fantasy chat) (Feb. 27, 2012 (discussing
  "Andria")) and id. (Apr. 29, 2012 (discussing "Kristen")) and DX E10 ("Meand
  Haris" fantasy chat) (July 17, 2012 (discussing "Andria")) with GX 415 (Moody
  Blues "real" chat) (Sept. 8, 2012 (discussing "Andria")) and GX 412 (Moody Blues

"real" chat) (Aug. 24, 2012 (discussing "Kristen")) and GX 421 (Aly Khan "real"
chat) (Feb. 9, 2012 (discussing "Andria")));

- claims to be surveilling potential victims (Compare DX E10 ("Meand Haris" fantasy
  chat ) (Apr. 26, 2012, 05:27:26 ("i followed Kristen home")) with GX 422 (Aly Khan
  "real" chat) (Feb. 10, 2012, 18:24:57 ("been watchin outside of [Andria's] house")));

- discusses acts of extreme violence in graphic and nearly identical detail (Compare
  DX E10 ("Meand Haris" fantasy chat) (Jul. 17, 2012, 08:49:00 ("we are going to tie
  her onto a rotisserrie and slowly roast her alive over a fire")) with GX 429 (Aly Khan
  "real" chat) (Jul. 17, 2012, 08:21:16, 08:23:44 ("we are going to cook her outdoors on
  the rotisserrie in september" and "very slowly cook her alive until she dies")));

- discusses his intention to commit kidnappings on specific dates, all of which pass
  without incident (Compare DX E1 ("Tim Chase" fantasy chat) (Jan. 23, 2012,
  05:25:30 ("we are a go for the 27th")) with GX 417 (Aly Khan "real" chat) (Jan. 23,
  2012, 05:52:47 ("i can have her there the week of Feb 20")); and

- explains the means and methods he will use to kidnap women, including chloroform,
  packing them into suitcases, and tying them up (Compare DX E12 ("sten9979"
  fantasy chat) (June 12, 2012, 06:26:15-24 ("some chloroform will do the trick" and
  "she is small enough to pack into a piece of luggage")) with GX 405 (Moody Blues
  "real" chat) (Jul. 9, 2012, 09:29:01-51 (discussing use of chloroform and binding of
  victim)) and GX 430 (Van Hise "real" chat) (Jan. 27, 2012, 1:40-1:50 p.m. ("I will
  abduct her right out of her apartment, stuff her into a large piece of luggage after
  tying up her hands and feet and off we go.")))).

    Valle's "real" and fantasy chats also contain the same lies.  As in the Van

Hise/Aly Khan/Moody Blues chats, in the fantasy chats Valle lies about where he lives (DX E1

(Jan. 23, 2012, 05:46:25 (claiming to be "2 to 3 hrs" from Erie, Pennsylvania; Forest Hills,

where Valle lived, is nearly seven hours from Erie by car))); about whether he owns a house "up

in the mountains" with "no one around for a half mile" (DX E10 (Apr. 22, 2012, 06:55:45-

06:55:51); see also DX E6 (Feb. 27, 2012, 07:36:07)); about whether he owns a van (DX E1

(Apr. 22, 2012, 03:19:11)); about whether he has a basement in his "country house" (DX E10

(Apr. 25, 2012, 07:08:00-07:08:12); DX E1 (Apr. 22, 2012, 03:13:03)); about whether he is

constructing a "BBQ pit" or a "rotisserie" (DX E10 (Apr. 25, 2012, 07:08:55 (claiming to have a

"[b]ig back yard away from view" where "I am working on building a BBQ pit")); id. (July 17,

2012, 08:49:39 ("i have all the parts [for the rotisserie] we jus thave to weld the metal

together"))); about whether he is surveilling proposed victims (DX E1 (Jan. 23, 2012, 05:27:24-

05:29:31 (claiming that a potential kidnapping victim has "been the priority everyday," that "her

building has no cameras," and that she "gets home around 5:15, hits the gym and is back around

7:45/8")); and about where the kidnapping targets live (DX E12 (May 16, 2012, 06:01:06,

06:03:52 (claiming that "Andria" lives in "maryland"))).

      While Agent Walsh testified that he concluded that the Van Hise/Aly

Khan/Moody Blues chats as "real" because "they describe[ ] dates, names and activities that you

would use to conduct a real crime" (Tr. 651), the fantasy chats also contain agreed-upon dates for

kidnappings, the names of the same real women, and discussion of the same activities –

kidnapping, rape, torture, murder, and cannibalization of women.  (Tr. 658; see also DX E1

("Tim Chase" fantasy chat) (Jan. 23, 2012, 05:25:30 ("we are a go for the 27th")), DX E10

("Meand Haris" fantasy chat) (July 17, 2012, 09:00:17, 09:02:09 (discussing kidnapping

"Andria" the "city prosecutor")), DX E12 (sten9979 fantasy chat) (May 16, 2012, 04:59:12,

05:02:06 (discussing cooking and eating "Andria" for "Thanksgivign dinner")))  Moreover, as

Agent Walsh acknowledged at trial, Valle's fantasy chats – like the "real" chats – are replete

with the same graphic descriptions of extreme sexual violence.  (See Tr. 656-58, 695, 697-98,

703-04, 707, 712, 716-17, 718, 892)

      The Government defends its "real" versus fantasy categorization by arguing that

"Moody Blues, Aly Khan and Van Hise all expressed a genuine desire to kidnap, torture and kill

women. . . . ," while "the other individuals with whom Valle communicated identified

themselves as fantasists." (Govt. Br. (Dkt. No. 195) at 12)  No reasonable juror could have

distinguished between the "real" and fantasy chats on this basis, however.

As an initial matter, many of Valle's fantasy correspondents never state that they are engaged in fantasy. (DX E1 ("Tim Chase" discussing kidnapping of "Sally"); DX E4 ("Brenda Falcon" discussing kidnapping and cooking of "Andria" on Thanksgiving); DX E6 ("Jackcrow Two" discussing kidnapping and cannibalization of "Andria" on Thanksgiving); DX E12 ("sten9979" discussing kidnapping of "Andria"); DX E13 ("Carl Wolfe" discussing "4th of July Menu" involving several women, including "Kristen P" and "Kathleen")) The Government's claim that the chats it designated as fantasy all contain "explicit assurances" that the participants are engaged in fantasy role-play (Govt. Br. (Dkt. No. 195) at 11) is thus not supported by the evidence.

Moreover, and contrary to Agent Walsh's testimony that he designated as fantasy those chats in which the participants "used the [ ] word 'fantasy' in the actual chats or e-mails" (Tr. 651), the chats that the Government claims reflect true criminal intent also contain numerous references to fantasy. (See, e.g., GX 402 (mhal52 to meatmarketman) (July 9, 2012, 08:36:39 (Valle telling Moody Blues that Sauer has "been one of my favorite victims to fantasize about for almost 10 years now")); GX 408 (meatmarketman to mhal52) (July 17, 2012, 07:36:24 ("When you sit at her table are you going to fantasize that the meal isn't from her but form her!")); GX 410 (mhal52 to meatmarketman) (July 19, 2012, 06:57:41 ("my true fantasy is to cook her whole though until she dies")); GX 413 (mhal52 to meatmarketman) (Aug. 25, 2012, 05:09:56-05:10:10 (Valle stating that "in my fantasies, [Andria] is #1 by far")); GX 417 (alisherkhan to mhal52) (Jan. 23, 2012, 06:38:36 ("what if she agrees for this and we dont have to force her. may be she has a reverse fantasy like us.  May be not. . . .")); GX 430 (mikevanhise81 to mhal52) (Jan. 27, 2012, 1:40 p.m. ("i will cause her to play my fantasies and do what i like.")))

Agent Walsh's explanation that he designated as fantasy those chats that "didn't seem realistic" (Tr. 651) also does not provide a reasonable basis on which to distinguish the alleged "real" chats from the fantasy chats. As discussed above, the chats that the Government has designated as "real" contain a myriad of false, fantastical, and fictional elements, including multiple kidnappings occurring on or about the same day – both inside and outside the United States and the New York-area; a human-size oven and rotisserie; a non-existent soundproofed basement with non-existent pulley apparatus; and the transport of victims in a non-existent van to a non-existent cabin in a remote part of Pennsylvania.

An analysis of Valle's fantasy chats reveals that they are substantively indistinguishable from those chats that the Government claims evince true criminal intent.

### i.   Valle's Chats with "Tim Chase"

On January 23, 2012 – the same day that Valle first chats with Aly Khan "about getting a girl to [him,]" and just four days before Valle's purported agreement with Van Hise to kidnap Alisa Friscia – Valle engages in an Internet chat with "Tim Chase" ("chasingmypast@yahoo.com") in which the two discuss kidnapping a woman. The Government has designated Tim Chase a "fantasist." As in the alleged "real chats," Valle's fantasy chats with Chase involve him supplying Facebook images of real women he knows as potential targets and discussing (1) a date for a kidnapping; (2) the price that Valle will charge for kidnapping a woman; (3) surveillance that Valle has allegedly performed on the potential target; and (4) where the victim will be brought once kidnapped:

| | |
|---|---|
| **mhal52:** | we are a go for the 27th |
| **chasingmypast:** | Cool! |
| **mhal52:** | i wrote all kinds of notes down, like a log |
| **mhal52:** | times she leaves, times she gets back |
| **mhal52:** | she goes to the gym after work every night |
| **mhal52:** | takes great care of herself |

| | |
|---|---|
| **chasingmypast:** | Good to hear that. Been keeping good track of her huh? |
| **mhal52:** | she's been the priority everyday |
| **mhal52:** | and her building has no cameras |
| **mhal52:** | i can lower it down to $4,000 |
| **chasingmypast:** | Sounds good. Better for both of us |

* * *

| | |
|---|---|
| **chasingmypast:** | You have a time planned for delivery? |
| **mhal52:** | depends on how far you are |
| **chasingmypast:** | I'm a hundred miles east of Erie |
| **chasingmypast:** | Middle of nowhere |
| **mhal52:** | ok good |

(DX E1 (Jan. 23, 2012, 05:25:30-05:28:00; 05:37:38-05:38:53)) While Valle claims in his chat with Chase that he is "all set" to kidnap the woman on "friday[,]" January 27, 2012 (id. at 05:32:11, 05:33:39) – as in the "real" chats – this target date passes without incident, inquiry, or comment, and no kidnapping occurs on that or on any other day. (Tr. 704)

Although Valle's communications with Tim Chase involve (1) Valle "getting a girl" for Chase; (2) an agreed-upon date for a kidnapping; (3) an agreed-upon price; (4) claims of surveillance; and (5) a discussion about where the victim will be delivered, the Government maintained at trial (Tr. 801-02)[53] that the Chase chats are fantasy while Valle's communications with Van Hise, Aly Khan, and Moody Blues – containing the same elements (see, e.g., GX 430 (Van Hise) (Jan. 27, 2012, 1:15 p.m.-1:50 p.m.); GX 401 (Moody Blues) (July 9, 2012, 7:37:42); GX 417 (Aly Khan) (Jan. 23, 2012, 05:34:48-05:42:38)) – reflect true criminal intent and a "real" kidnapping conspiracy. The Government did not offer sufficient evidence to permit a reasonable juror to distinguish between Valle's chats with Tim Chase and Valle's chats with his alleged co-conspirators.

---

[53] In its opposition brief (Dkt. No. 195), the Government does not explain how Valle's chats with Chase are distinguishable from his chats with the alleged co-conspirators.

On March 11, 2012, Valle again offers to kidnap various women for Chase at a

price of $4,000-$5,000:

| | |
|---|---|
| **mhal52:** | yeah anyway sorry about danielle |
| **mhal52:** | she was a little riskier than i originally thought |
| **mhal52:** | too many people around all hours of the day |
| **chasingmypast:** | Thats cool, no prob. |
| **mhal52:** | if you're still interested i have some others with around $4,000-$5,000 |
| **chasingmypast:** | Still in my price range.  What about the risk? |
| **mhal52:** | very low risk hence the lower prices |

(DX E1 (Mar. 11, 2012, 04:33:21-04:36:06))  After discussing several potential targets,

including "Maureen," "Allison," and "Kristina," Valle and Chase settle on "Sally," whom Valle

describes as "extremely feisty[.]"  (Id. at 04:37:42, 04:40:38, 04:41:05, 04:48:21-41, 04:42:50;

compare with GX 432 (Hal M to mikevanhise81) ("[Alisa] is kind of feisty and no nonsense"))

In language almost identical to that which Valle uses with Van Hise when discussing a purported

plan to kidnap Alisa Friscia, Valle asks Chase whether he would prefer to have "Sally"

"delivered with her clothes on or stripped naked[.]"  (Id. at 05:04:53, 05:05:35; compare GX 430

(Hal M to mikevanhise81) (Jan. 27, 2012, at 1:42 p.m. ("do you want her clothed in what she

was wearing?  or stripped naked?"))

There are no meaningful differences between Valle's chats with Chase, the

fantasist, and Valle's chats with Van Hise, an alleged "real" kidnapper and co-conspirator.  In

both sets of chats, Valle portrays himself as a professional kidnapper who is offering to kidnap

real women he knows for cash.  As in Valle's chats with Van Hise, Valle and Chase "agree" on a

kidnapping victim, a date for the kidnapping, and a price.  (Compare DX E1 (Jan. 23, 2012,

05:25:30, 05:27:35-05:28:00) and id. (Mar. 11, 2012, 04:36:56-04:37:00, 04:48:21-41) with GX

430 (Jan. 27, 2012, 1:31 p.m., 1:36 p.m., 1:38 p.m.) and GX 431 (Feb. 28, 2012, 4:16 p.m., 4:29-

4:30 p.m., 5:33 p.m.))

Valle's chats with Chase, like his chats with Van Hise, Aly Khan, and Moody Blues, do contain fantastical elements. For example, in an April 22, 2012 chat with Chase, Valle states that he has kidnapped "Sally" and is holding her in his basement. (DX E1 (Apr. 22, 2012, 03:12:08)) The Government conceded at trial that Valle never kidnapped "Sally" and that she was not then tied up in the basement of his Queens apartment building. (Tr. 703-04) The fact that Valle lied to Chase about having "Sally" tied up in his basement does not distinguish the Chase fantasy chats from Valle's chats with Van Hise, Aly Khan, and Moody Blues, however. As discussed above, Valle's chats with his alleged co-conspirators contain countless lies just as outlandish, including Valle's assertions about having a home in rural Pennsylvania, a human-size oven and rotisserie, and a soundproofed basement with a pulley apparatus. Accordingly, the outlandish lies in the fantasy chats do not distinguish them from the chats that the Government claims reflect true criminal intent.

### ii.     Valle's Chats with "Jackcrow Two"

At the same time that Valle was communicating with Van Hise and Aly Khan, he was also engaged in Internet chats with "Jackcrow Two" ("jackcrow_2011@yahoo.com), an individual the FBI designated as a "fantasist." (Tr. 893-94; DX E6)

On February 27, 2012, Valle and Jackcrow Two discuss kidnapping and cannibalizing "Andria" – the same woman Valle was supposed to have kidnapped two weeks earlier as part of his purported conspiracy with Aly Khan. (See GX 424 (Feb. 11, 2012, 05:57:38)) As in his chats with Aly Khan and Moody Blues, Valle discusses roasting "Andria" in his non-existent human-size oven:

| | |
|---|---|
| **mhal52:** | i am torn between a couple of things... |
| **mhal52:** | part of me wants to put her in the oven while she is still alive, but at a very low heat |
| **mhal52:** | like 160-170 |

60

| mhal52: | i figure without much oxygen in there and will all of the screaming she will suffocate herself within 20 minutes |
| mhal52: | and that wont ruin her body |
| jackcrow_2011: | yes |
| mhal52: | but the other half of me just says dont risk it, just string her up by her feet and butcher her |
| jackcrow_2011: | well i do love a good buthcering |

(DX E6 (Feb. 24, 2012, 06:47:53-06:49:22))

Valle's chats with Jackcrow Two, like his chats with Aly Khan and Moody Blues, involve discussion of kidnapping methods, including the use of chloroform and surveillance of "Andria":

| jackcrow_2011: | trying to think of other things to do to her, but all my ideas would ruin her |
| mhal52: | yeah i will do a lot of studying and researching |
| mhal52: | apparently auto starter fluid has the effects of chloroform |
| jackcrow_2011: | nice. |
| jackcrow_2011: | too bad we couldn't get this ready for this past thanksgiving.  it would have been nice. |
| mhal52: | i have to figure out a way to grab her from her house |
| mhal52: | it would be easiest |
| mhal52: | i need to stake it out and find out when the husband leaves |
| jackcrow_2011: | yeah.  i need to make a little trip their soon so we can and learn the routes to drive |
| jackcrow_2011: | we can meet, and i can learn the routes |
| mhal52: | yeah |

(Id. (Feb. 27, 2012, 06:59:30-07:03:31))  Despite the fact that Valle's chats with Jackcrow Two involve one of the same potential female victims discussed in the "real" chats – Andria Noble – and the same topics discussed in the "real" chats – how to kidnap "Andria," what tools will be used, the need for surveillance, and how she will be tortured and eaten – the Government asserts that the Jackcrow Two chats are fantasy (Govt. Br. (Dkt. No. 195) at 11) while Valle's chats with his co-conspirators are "real."

\*       \*       \*       \*

In its response to Valle's motion for a judgment of acquittal, the Government argues that "[t]here was nothing inconsistent or unreasonable in the jury finding that Valle agreed with his coconspirators named at trial to engage in kidnappings, while at the same time engaging in story-telling and fantastical chats with a host of others who did not share Valle's intent." (Govt. Br. (Dkt. No. 195) at 8)  This argument misstates the relevant inquiry, however, and the premise for the argument involves a mischaracterization of the record.  The relevant question is whether the Government offered sufficient evidence to permit a reasonable juror to distinguish the alleged "real" chats evincing true criminal intent from the concededly fantasy role-play chats.  For the reasons set forth above, the Government did not provide the jury with sufficient evidence to reasonably make such a distinction.  Moreover, the suggestion that Valle's alleged "real" chats do not contain fantastical elements, and are substantively different from the fantasy chats, flies in the face of the record.

In the context of a case in which (1) it was uncontested that the vast majority of the Defendant's online chats about kidnappings and related crimes are fantasy role-play; (2) no one was ever kidnapped and no concrete steps were ever taken toward kidnapping anyone; (3) the Defendant and his online correspondents never exchanged names, physical addresses, or telephone numbers, let alone met or took steps to meet in person; (4) the Defendant lied to his alleged co-conspirators about countless facts critical to the purported kidnapping conspiracy; and (5) the Defendant's alleged "real" chats contain concededly fantastical elements, such as human-size ovens and rotisseries, and non-existent soundproofed basements with non-existent pulley equipment, the Government was required to offer evidence that would have permitted a reasonable juror to conclude that Valle's chats with Van Hise, Aly Khan, and Moody Blues are substantively different from the thousands of communications about kidnappings and related

crimes in which Valle is concededly engaged in fantasy. Because the Government did not offer

sufficient evidence to permit a reasonable juror to distinguish between Valle's alleged "real"

chats with Van Hise, Aly Khan, and Moody Blues and his conceded fantasy chats with others,

the jury's verdict on Count One cannot stand.

> **2.      The Government Did Not Offer Sufficient Evidence that**
> **Valle and His Co-Conspirators Entered Into a Genuine**
> **Agreement to Commit a Kidnapping, or that Valle**
> <u>**Specifically Intended that a Kidnapping be Committed**</u>

The Government likewise did not offer sufficient evidence that Valle and his co-

conspirators agreed to commit an actual kidnapping, or that Valle specifically intended that a

kidnapping be committed. As noted above, the proof concerning these issues includes evidence

that Valle and his alleged co-conspirators agreed on a number of dates for planned kidnappings

of specific women, including February 20, 2012, and September 2, 2012. Those dates come and

go, however, and no one is ever kidnapped, and no concrete steps are ever taken to actually

kidnap one or more of the allegedly targeted women. Moreover, neither Valle nor his alleged co-

conspirators ever comment on, or raise a question about, what happened with respect to a

scheduled kidnapping, or why nothing happened. Instead, dates for planned kidnappings pass

without remark or explanation, and Valle and his alleged co-conspirators simply begin

discussing another woman as a potential target, in the same manner that a consumer of

pornography might turn to a different image, photograph, or movie.

It is, of course, well established that proof of subsequent conduct may be

admissible as shedding light on a defendant's state of mind at an earlier time, including on the

issue of whether the defendant acted with criminal intent. See, e.g., United States v. Kelley, 551

F.3d 171, 175-76 (2d Cir. 2009) (per curiam) (finding that fraudulent account statements sent by

defendant two to four years after alleged securities violations were relevant to defendant's intent

at the time of the alleged violations); United States v. Rutkoske, 506 F.3d 170, 177-78 (2d Cir. 2007) (upholding admission of conversations that occurred four years after the charged conspiracy); United States v. Germosen, 139 F.3d 120, 128 (2d Cir. 1998) (upholding admission of subsequent fraud scheme to show intent to defraud); United States v. Ramirez, 894 F.2d 565, 569 (2d Cir. 1990) ("'A subsequent act, as well as a prior act, can be used to show intent . . . .'") (quoting United States v. Hurley, 755 F.2d 788, 790 (11th Cir. 1985)); United States v. Viruet, 539 F.2d 295, 296-97 (2d Cir. 1976) (per curiam) (upholding admission of evidence concerning subsequent transactions in stolen goods to show intent to participate in earlier stolen goods conspiracy); see also United States v. Mangual-Santiago, 562 F.3d 411, 428-29 (1st Cir. 2009) (finding that evidence of bank account activity after a conspiracy had ended was relevant to defendant's intent to conceal funds); United States v. Mares, 441 F.3d 1152, 1157 (10th Cir. 2006) ("Subsequent acts evidence is particularly relevant when a defendant's intent is at issue."); United States v. Johnson, 934 F.2d 936, 940 (8th Cir. 1991) ("Testimony concerning Johnson's subsequent acts helped to prove that he had the requisite intent. . . ."); United States v. Mehrmanesh, 689 F.2d 822, 832-33 (9th Cir. 1982) (approving introduction of subsequent drug sales to demonstrate intent to distribute).

      Here, the only reasonable inference that can be drawn from the proof concerning the conduct and statements of Valle and his alleged co-conspirators after the date for a scheduled kidnapping had come and gone, is that they understood that no actual kidnapping would take place on scheduled dates, whether February 20, 2012, September 2, 2012, or any other "agreed-upon" date.

      The Government does not attempt to explain the "vanishing plots" phenomenon repeatedly seen in the evidence at trial. It simply argues that a court may sustain a conspiracy

conviction even where the substantive crime that is its object is never consummated.  (Govt. Br. (Dkt. No. 195) at 16, 18)  While this is a correct statement of the law, it misses the point.  If there was a genuine agreement to kidnap someone, and a specific intent to do so, it is inconceivable that the dates for planned kidnappings would repeatedly pass without inquiry, comment, or explanation from Valle or any of his alleged co-conspirators.  Moreover, while this aspect of the allegedly "real" chats is entirely inconsistent with the notion that Valle was involved in plotting real kidnappings, it is entirely consistent with Valle's defense that he was engaged in fantasy role-play.

Likewise entirely inconsistent with a genuine kidnapping conspiracy is Valle's expressed intention to kidnap three different women in three different places on or about the same day: February 20, 2012.  The Government alleges that Valle agreed with Aly Khan to lure his wife, Kathleen Mangan, to either India or Pakistan on or about February 20, 2012, where she would be slaughtered.  (GX 417 (Jan. 23, 2012, 05:52:47, 06:45:38))  The Government also introduced evidence that Valle and Van Hise made arrangements to kidnap Alisa Friscia in Manhattan on or about February 20, 2012, and deliver her to an unknown destination in exchange for $4,000 in cash.  (GX 430 (Jan. 27, 2012, 1:36 p.m.))  Finally, the Government argues that Valle agreed with Aly Khan to kidnap Andria Noble on or about February 20, 2012, from her home in Columbus, Ohio.  (GX 424 (Feb. 11, 2012, 05:57:38))  The notion that Valle had resolved to lure Mangan to India or Pakistan, while at about the same time kidnapping Andria Noble in Columbus, Ohio, and kidnapping Alisa Friscia from the Upper East Side of Manhattan, is simply outlandish.  The alleged agreements to commit multiple kidnappings of different women in different places with different co-conspirators at about the same time are

entirely inconsistent with the notion that Valle was engaged in a genuine kidnapping conspiracy, but entirely consistent with Valle's defense that he was engaged in fantasy role-play.

As discussed below, as to each co-conspirator and as to each alleged kidnapping target, there is insufficient evidence demonstrating (1) a genuine agreement to commit an actual kidnapping; and (2) specific intent on Valle's part to commit such a crime.

### a.    Valle's Alleged Plot with Van Hise to Kidnap Alisa Friscia

The Government argues that in February 2012, Valle entered into an agreement with Michael Van Hise to kidnap Alisa Friscia.  The Government asserts that the evidence demonstrates a genuine kidnapping conspiracy because (1) the two men "settled on a particular target:  Alisa Frisc[i]a"; (2) they agreed on a specific price of $5,000; (3) both men evidenced their seriousness by "negotiat[ing] over the price"; (4) Valle expressed concerns about getting caught; and (5) Valle undertook specific acts in furtherance of the conspiracy, namely "surveill[ing] Frisc[i]a shortly after agreeing to kidnap her," and "caus[ing] his wife to give Frisc[i]a a PBA [Police Benevolent Association] card to establish a relationship of trust with her."  (Govt. Br. (Dkt. No. 195) at 15, 9, 10, 22)  The circumstances surrounding Valle's communications with Van Hise, however, are such that no reasonable juror could have concluded that the two entered into a genuine agreement to kidnap Friscia, or that either had the specific intent to kidnap her.

During their first chat on January 27, 2012, Valle transmits four Facebook images of women to Van Hise, and offers to kidnap any of these women for Van Hise.  Van Hise chooses "Alisa."  (GX 430 (Jan. 27, 2012, 1:29 p.m.))  Valle tells Van Hise that he can kidnap Alisa during the "week of Feb 20[,]" because she is a teacher and is on vacation that week.  (Id. at 1:36 p.m.)  Van Hise agrees to pay Valle $4,000 up front for kidnapping Alisa.  (Id. at 1:40

p.m.) There is no discussion about where Valle is to bring Friscia or how Valle will be paid. At the close of the January 27 chat, Van Hise promises to "message later[,]" but he does not. (Id. at 1:50 p.m.) The period between January 27, 2012, and February 27, 2012, passes with no further discussion about kidnapping Friscia, with no steps taken to kidnap Friscia, and with no attempt to kidnap Friscia. (Tr. 756)

   The next chat between Valle and Van Hise takes place on February 28, 2012. Neither Valle nor Van Hise mentions the earlier purported agreement to kidnap Friscia during the week of February 20, let alone why nothing happened. Instead, the two men essentially repeat their earlier Internet encounter. Valle once again transmits a number of Facebook images of women he knows to Van Hise, and offers to kidnap these women for Van Hise. Van Hise once again selects "[A]lisa" as a kidnapping target. (GX 432 (Feb. 28, 2012, 4:06 p.m.))

   Although the two men – a month earlier – had purportedly agreed that Valle would kidnap Friscia for $4,000, in the February 28, 2012 chat, Valle – without explanation – increases the price for kidnapping Friscia to $5,000. (Id. at 4:25 p.m.) Neither Valle nor Van Hise acknowledges that there was an earlier agreement to kidnap Friscia, or that the price now quoted by Valle is $1,000 higher than the previously "agreed-upon" price. Valle informs Van Hise that "Alisa" will be "stuffed into a large piece of luggage and wheeled out to [Valle's] van[.]" (Id. at 5:27 p.m.) There is no evidence that Valle owned or had access to a van. (Tr. 771) Alisa Friscia is never kidnapped, and the Government introduced no evidence that Valle and Van Hise ever discuss kidnapping her again.

   Valle and Van Hise's next chats take place months later, in late April and early May. No mention is made of Alisa Friscia. Instead, Valle sends Van Hise a series of Facebook images of another real woman he knows, Veronica Bennett, and the two begin discussing her

bikini-clad photographs and a kidnapping-for-hire scenario involving her.[54]  (Tr. 442-44)  Van

Hise asks, "when can we meet so i can see her[?]"  (GX 434 (May 2, 2012, 12:19 p.m.))  Valle

replies, "Come over here next week.  We'll watch her together and I can knock the price down to

$10,000."  (Id. (May 3, 2012, 1:39 a.m.))  Valle and Van Hise do not discuss why the price for

Veronica ($10,000 or more) is higher than the price for Alisa ($4,000-$5,000).  Moreover, there

is no evidence that Van Hise knew Valle's name or address, or that the two men ever spoke by

telephone or met in person or took steps to meet in person.  (Tr. 663)  Indeed, when Van Hise

asks Valle on May 4, 2012, "where are you again?," Valle does not respond.  (DX W3 (May 4,

2012, 9:15 a.m.); Tr. 774-75).  As with Friscia, Bennett is never kidnapped.  There is likewise no

evidence that Valle or Van Hise ever took concrete steps to kidnap her, or that they ever discuss

Bennett again.

Given the lack of any concrete steps taken to kidnap Friscia, the fluctuating price

for her capture – which changed without comment or explanation – the fact that Valle never even

inquired as to where Friscia was to be delivered, the fact that discussion about kidnapping Friscia

ends without explanation, and the fact that Valle and Van Hise's attention switches to another

woman – Veronica Bennett – no reasonable juror could conclude that Valle and Van Hise had

entered into a genuine agreement to kidnap Friscia, or that they ever had the specific intent to

kidnap her.

The Government argues, however, that a reasonable juror could find a genuine

agreement and specific intent to kidnap Friscia because (1) Valle and Van Hise negotiated over

price, and (2) Valle expressed concern about getting caught.  (Govt. Br. (Dkt. No. 195) at 9-10)

---

[54]  The Government did not contend at trial that Valle entered into a conspiratorial agreement
with Van Hise to kidnap Veronica Bennett.

No reasonable juror could infer from Valle and Van Hise's discussions about price that they are engaged in a "real" kidnapping conspiracy. As discussed above, Valle increases the price for kidnapping Friscia without explanation and without complaint from Van Hise, even though Van Hise is a 22-year-old with "not a lot" of money in the bank. (Tr. 755) Although the Government argues that "Van Hise's lack of financial resources" supports its argument that he attempted to negotiate price (Govt. Br. (Dkt. No. 195) at 17), the evidence is that Valle – without explanation – increases the price for kidnapping Friscia from $4,000 to $5,000, and Van Hise does not complain or even point out that the two had agreed on a price of $4,000 a month earlier. The discussion about price is inconsistent with the Government's claim that Valle and Van Hise are engaged in a "real" kidnapping conspiracy, but consistent with Valle's argument that he and Van Hise are merely fantasizing. Indeed, similar "negotiations" take place in chats that the Government has acknowledged are fantasy. (See, e.g., DX E1 (Tim Chase) (Jan. 23, 2012, 05:27:35 ("i can lower it down to $4,000")); id. (Mar. 11, 2012, 04:40:38 ("Allison is listed as $6000 but i can get her down to $5")); DX E6 (Jackcrow Two) (Feb. 24, 2012, 10:10:54 ("well, in determining prices i factor in the degree of difficulty in kidnapping the girl")))

Valle's comment to Van Hise that he is "putting [his] neck on the line" – in justifying a price of $5,000 – does not change the analysis. References to the risk of getting caught are a consistent theme in both the fantasy chats and the alleged "real" chats. (See, e.g., DX E1 ("Tim Chase" fantasy chat) (Jan. 23, 2012, 05:27:29, 05:33:39-05:33:45 (referring to fact that purported victim's "building has no cameras" and stating that "its just safer [to commit a kidnapping on] friday [. . .] not due back at work until monday")); id. (Mar. 11, 2012, 04:33:32-41 ("she was a little riskier than i originally thought [. . .] too many people around all hours of

the day")); DX E10 ("Meand Haris" fantasy chat) (Apr. 22, 2012, 06:46:18 ("if i were absolutely

100% sure to get away with it, i think i would think about it")); id. (July 17, 2012, 09:00:08-

09:01:49 (referring to the fact that a kidnapping of Andria Noble would present less risk, because

she "is a city prosecutor" and "they will focus on family members of people she help put in

jail")); DX E12 (sten9979 fantasy chat) (June 12, 2012, 06:23:54-06:25:59 (expressing concern

about "cameras in the street"))) Given that references to risk are a standard feature of Valle's

fantasy chats, no reasonable juror could infer from Valle's comment about "putting [his] neck on

the line" that he and Van Hise are planning an actual kidnapping.

    Finally, the Government contends that a "real" conspiracy between Valle and Van

Hise was proven by evidence that Valle (1) "surveilled Friscia shortly after agreeing to kidnap

her," and (2) "caused his wife to give Friscia a PBA card to establish a relationship of trust with

her." (Govt. Br. (Dkt. No. 195) at 22) The record does not support either argument.

    The evidence concerning the alleged surveillance of Friscia is as follows: On

February 28, 2012, Valle and Van Hise engage in an Internet chat in which Valle agrees to

kidnap Friscia for Van Hise in exchange for $5,000. (GX 432) After Valle's arrest on October

24, 2012, Agent Foto asks Valle – nearly eight months after the fact – whether he had been on

Friscia's block on March 1, 2012. (Tr. 1034) Valle answers, "[']Yes, to drop [my] wife off to

have lunch with [Friscia].[']" (Id.)

    Both Mangan and Friscia testified, however, that they had not met for lunch that

day. (Id. at 185, 910-11) Mangan testified that on March 1, 2012, she visited a friend – who had

just had a baby – at Mount Sinai Medical Center on the Upper East Side of Manhattan, and that

Valle and his NYPD supervisor, Sergeant Edwige Anatsui, visited with Mangan while she was at

Mount Sinai. (Tr. 219-21) Mangan further testified that Valle had in fact dropped her off for a

lunch date on the Upper East Side in May or June 2012, at which time she "coincident[ally]" ran into Friscia, with whom she ate lunch. (Id. at 217-18)  Although the Government introduced evidence that on March 1, 2012, Friscia lived on the Upper East Side (Tr. 186), no evidence was offered as to where in that neighborhood Friscia lived or where Mount Sinai is in relation to Friscia's apartment.

Viewing this evidence in the light most favorable to the Government, Valle's statement to Agent Foto constitutes (1) an admission that Valle was on Friscia's block two days after he and Van Hise discussed kidnapping her; and (2) a false exculpatory statement, in that while Valle stated that he was there to drop Mangan off for lunch, in reality he was there for some other, nefarious purpose.[55]

However, the Government's argument that Valle "surveilled Friscia" on March 1, 2012 (see Govt. Br. (Dkt. No. 195) at 22), is not a reasonable inference.  It cannot be determined from the evidence offered at trial whether Valle was on Friscia's block five seconds, five minutes, or five hours.  His statement to Agent Foto indicates that he was there very briefly. "Surveillance" connotes closely watching a subject, generally for a significant period of time. See Webster's Third New International Dictionary 2302 (1993) (defining "surveillance as "1: a close watch kept over one or more persons: continuous observation of a person or area (as to detect developments, movements, or activities)").  There is likewise no evidence that Valle observed Friscia or her apartment building while he was on her block.  In sum, only by engaging

---

[55] The Government also argues that significance should be attached to Valle's admission because it came only after he was "confronted by the FBI with evidence that he was at Friscia's apartment on March 1st." (Govt. Br. (Dkt. No. 195) at 23)  There is no evidence that Valle was "confronted" with any evidence when questioned about this incident, however.

in speculation could a reasonable juror have concluded that Valle "surveilled Friscia" on March

1.

Finally, even if a reasonable juror could have inferred that Valle lied about his

purpose in visiting Friscia's block, Valle's false exculpatory statement is not itself "'admissible

as evidence of guilt'" under the circumstances of this case.  United States v. Nusraty, 867 F.2d

759, 765 (2d Cir. 1989) (quoting United States v. Di Stefano, 555 F.2d 1094, 1104 (2d Cir.

1977)).  As the Second Circuit explained in United States v. Johnson:

> [F]alsehoods told by a defendant in the hope of extricating himself from
> suspicious circumstances are insufficient proof on which to convict where other
> evidence of guilt is weak and the evidence before the court is as hospitable to an
> interpretation consistent with the defendant's innocence as it is to the
> Government's theory of guilt.

513 F.2d 819, 824 (2d Cir. 1975) (quoted in Nusraty, 867 F.2d at 765).

In sum, given the absence of evidence demonstrating (1) a genuine agreement

between Valle and Van Hise to kidnap Friscia, and (2) that either man had the specific intent to

actually kidnap her, neither Valle's presence on Friscia's block on March 1, 2012, nor his false

exculpatory statement provides a sufficient basis on which to sustain a conspiracy conviction.

See Nusraty, 867 F.2d at 765 ("false exculpatory statement here 'fail[s] to save an otherwise

inadequate case'") (quoting United States v. Martino, 759 F.2d 998, 1005 (2d Cir. 1985))

(alteration in Nusraty).

The Government's arguments concerning Valle's use of the PBA card likewise

call for speculation.  As an initial matter, Valle did not give the PBA card directly to Friscia, nor

did he use it as a means to obtain her address.  Instead, the evidence indicates that Valle asked

Mangan to give Friscia the PBA card.  (Tr. 186)  There is no evidence, however, as to when

Valle asked Mangan to give Friscia the card – whether before, during, or long after Valle's chats

with Van Hise about kidnapping Friscia.  What is clear is that by the time Mangan gave the PBA card to Friscia – sometime during the spring or summer of 2012 (Id. at 186, 217, 906-07) – Van Hise and Valle had long since moved on to another "target," Veronica Bennett.  (Id. at 217-18, 906-07; GX 433 (discussing "Veronica"))  In short, there is no evidence that Valle's distribution – through Mangan – of the PBA card occurred "'within the scope of the conspiratorial agreement,'" United States v. LaSpina, 299 F.3d 165, 177 (2d Cir. 2002) (quoting Grunewald v. United States, 353 U.S. 391, 414 (1957)), or that it in any way furthered the alleged agreement between Valle and Van Hise to kidnap Friscia.

Because the Government did not offer sufficient evidence to demonstrate that Valle and Van Hise entered into a genuine agreement to kidnap Friscia, or that either had the specific intent to kidnap her, the Valle/Van Hise chats cannot serve as the basis for a conviction on Count One.

### b. Valle's Alleged Plot with Aly Khan to Kidnap Kathleen Mangan and Andria Noble

The Government contends that Valle and Aly Khan – an individual whose IP address was traced to Pakistan, but who claimed to be living in India (Tr. 618; GX 417 (Jan. 23, 2012, 05:54:06, 06:14:31)) – entered into a "real" conspiracy to kidnap Kathleen Mangan and Andria Noble.  (Tr. 615)  The Government claims that, as part of the conspiracy, Valle "solicited advice" from Khan and "agreed to be guided [by him]."  (Govt. Br. (Dkt. No. 195) at 2, 19)

Valle and Aly Khan never met and never took steps to meet; they likewise never exchanged true names or telephone numbers.  (Tr. 663-64)  Each lied about his location – Valle claimed to live in rural Pennsylvania, while Khan pretended to live in India.  (GX 417 (Jan. 23, 2012, 06:01:56, 05:54:06, 06:14:31))  Khan's true identity – including Khan's gender – was unknown to Valle and remains unknown today.

73

i.       The Alleged Valle/Aly Khan
**Conspiracy to Kidnap Mangan**

The Government's allegation that Valle and Aly Khan conspired to kidnap

Kathleen Mangan is based on Internet chats that take place in late January 2012. As part of the

alleged conspiracy, Valle tells Aly Khan that he lives alone in "pennsylvania" – "no one around

for a half mile" – where he works a "typical office job" and is "home by 6." (GX 426 (May 1,

2012, 06:30:01); GX 417 (Jan. 23, 2012, 06:01:56); GX 418 (Jan. 25, 2012, 08:40:01)) Valle

suggests that he will convince his "girlfriend" ("Kathleen") to travel to India or Pakistan over the

coming month, because "she is a teacher" who "has a week off starting feb 20." (GX 417 (Jan.

23, 2012, 05:42:38, 05:55:50, 05:52:47, 06:01:56, 06:45:38))

In reality, Valle was an NYPD officer who worked from 3:00 p.m. to midnight

and lived with Mangan and the couple's infant daughter in a two-bedroom apartment in Queens.

(Tr. 193, 204, 991-92; 189-90) Mangan was not a teacher who would be on vacation during the

week of February 20; she was a stay-at-home mother with no fixed vacation schedule. (Id. at

194, 759) Moreover, there is no evidence that Valle ever seriously entertained the idea of

attempting to lure Mangan to India or Pakistan. He never broached the topic with her, and he

never made any travel arrangements or took any steps to investigate or make travel arrangements

regarding India or Pakistan. (Id. at 803-04) Valle eventually tells Khan that he will not be

bringing "Kathleen" to India on February 20, 2012, as originally "planned," because she made

plans to visit her parents that day. (GX 418 (Jan. 25, 2012, 07:56:32-44))

Based on this record, no reasonable juror could conclude that Valle and Aly Khan

entered into a genuine agreement to lure Mangan to India or Pakistan for purposes of murdering

her, or that Valle ever had the specific intent to commit this crime.

Valle and Khan also discuss the possibility of Khan coming to the United States. Valle tells Khan that he has "a place in the middle of nowhere" in Pennsylvania "with plenty of space," and where "no one [is] around" for either "a half mile" or "3/4 of a mile[.]" (GX 417 (Jan. 23, 2012, 06:00:37, 06:00:44); compare GX 418 (Jan. 25, 2012, 08:34:49 ("a half mile")) with GX 429 (July 17, 2012, 08:39:39 ("3/4 of a mile"))) Valle actually lived in a two-bedroom apartment in Forest Hills, Queens. (Tr. 189) In any event, Valle and Khan never agree to any plan involving Khan's travel to the United States. Khan states that it is not possible for him to travel here, given this nation's immigration laws. (GX 417 (Jan. 23, 2012, 06:03:55))

Finally, Khan suggests that Valle kidnap Mangan on his own, and asks whether Valle has the "courage to do her there." (GX 418 (Jan. 25, 2012, 08:05:10)) Valle responds, "not alone." (Id. at 08:05:28)

In sum, nothing in the trial record provides a basis for a reasonable juror to conclude that Valle and Aly Khan ever entered into a genuine agreement to kidnap Mangan, or that Valle ever had the specific intent to commit this crime.

###        ii.        The Alleged Valle/Aly Khan
               Conspiracy to Kidnap Andria Noble

On February 9, 2012, after their discussions about kidnapping Kathleen Mangan end without resolution, Valle and Aly Khan turn their attention to "Andria." The Government offered evidence that "Andria" is Valle's former college classmate, Andria Noble. (GX 421 (Feb. 9, 2012, 10:18:27, 10:40:01); Tr. 495, 634)

Valle tells Khan that he has "been watchin outside [Andria's] house." (GX 421 (Feb. 9, 2012, 10:40:01); GX 422 (Feb. 10, 2012, 18:24:57)) Andria Noble lived more than 500 miles away in Columbus, Ohio, however, and there is no evidence that Valle ever traveled to Ohio. (Tr. 239; 807, 808)

Valle also tells Khan that he was "able to get a stun gun," which he plans to use to "zap the bitch in her home." (GX 421 (Feb. 9, 2012, 10:30:06-15)) Valle will then "tie her up, pack her in a large suitcase and get her to my car." [56] (Id. at 10:20:32) There is no evidence that Valle ever had a stun gun; he did have a firearm, handcuffs, and a police shield, but he never mentions any of these items to Aly Khan or to any other alleged co-conspirator. (Tr. 159, 992)

Once Andria is at his home, Valle tells Khan that he intends to rape her before tying her hands and feet with "cooking twine" and cooking her alive. (GX 422 (Feb. 10, 2012, 18:33:43-18:36:16)) Valle assures Khan that Andria "will very easily fit in [his] oven." (Id. at 18:38:00) In reality, Valle owned a standard-sized oven not capable of accommodating a human body. (Tr. 189, 666)

As to timing, Valle tells Khan that "Feb 20 is a holiday, so that is [the] target weekend." (GX 424 (Feb. 11, 2012, 05:57:38)) Andria Noble was not kidnapped on the weekend of February 20, however, and there is no evidence that Valle took any steps toward kidnapping her at that time. February 20 passes without comment by Valle, and without inquiry from Khan, as to whether the planned kidnapping happened and, if not, why not.

On June 25, 2012, Valle tells Khan that he is "in the middle of constructing a pulley apparatus in [his] basement," which he intends to use to "string [Andria] up by her feet." (GX 428 (June 25, 2012, 05:50:38-42)) It is undisputed that Valle had no pulley apparatus (Tr. 814), and that the basement in Valle's apartment building is common space shared by all occupants of the building. (Id. at 667)

---

[56] On the same day, Valle has a very similar fantasy chat with "Brenda Falcon." (DX E4 (Feb. 9, 2012); Tr. 692) Valle tells Falcon that he "would like to get [his] hands on a stun gun" so he can "show up unexpectedly" and "zap [Andria] and knock her out, tie up her hands and feet and get her to my place[.]" (See DX E4 (Feb. 9, 2012, 09:39:18, 09:39:30-45, 09:46:42))

On July 17, 2012, Valle tells Khan that he is going to "show up at [Andria's] place and chloroform her[,]" using a recipe he found on the Internet. (GX 429 (July 17, 2012, 08:35:22))  Valle writes that he will use "nice strong hemp to tie her hands and feet[,]" and that he is "working on soundproofing the basement" because "that's where she will be held captive and raped[.]"  (Id. at 08:36:53, 08:39:21)  As noted above, there is no evidence that Valle has ever been to Columbus, Ohio, much less to Noble's home.  Moreover, when Valle was arrested, agents found no chloroform or rope in his possession.  (Tr. 664)  Finally, there is no evidence that Valle was "working on soundproofing the basement[.]"

In their July 17, 2012 chat, Valle also tells Khan that he is ready to implement his plan to "cook [Andria] outdoors on the rotisserie" "in september."  (GX 429 (July 17, 2012, 08:21:16, 08:24:13))  Valle explains that he has "a lot of space and no one is around for 3/4 a mile[.]"  (Id. at 08:39:39)  Valle did not have a human-size rotisserie, however, nor did he own or have access to the remote residence he describes.

None of the activities Valle discusses with Khan ever take place, and no concrete steps are ever taken to engage in any of these activities:  Andria Noble is never kidnapped; Valle never conducts surveillance of her home in Columbus, Ohio; he never builds a pulley mechanism or soundproofs a basement; he never prepares chloroform or purchases rope; and he never obtains a human-size rotisserie for his non-existent cabin in rural Pennsylvania.  While, as noted above, those engaged in criminal conduct frequently lie to one another, the fictional and fantastical elements present here – the house in the middle of nowhere, the pulley system, the soundproofed basement, and the human-size rotisserie – only make sense in the context of fantasy role-play; they serve no purpose in furthering an actual crime.  No reasonable juror "look[ing] at the evidence in its totality," Lorenzo, 534 F.3d at 159, could have concluded that

77

Valle and Aly Khan actually agreed to commit a kidnapping of Noble or that Valle had the specific intent to commit this crime.

The Government contends, however, that Valle's criminal intent to commit an actual kidnapping of Noble can properly be inferred from, inter alia, the fact that he:

> (1) tells Khan that he is "just afraid of getting caught [. . .] if i were guaranteed to get away with it, i would do it" (Govt. Br. (Dkt. No. 195) at 10 (quoting GX 418 (Jan. 25, 2012, 08:29:42-51));

> (2) responds "yes" and "definitely" when Khan asks if he is "sure" about whether he is "ready to slaughter one being safe" (id. (quoting GX 418 (Jan. 25, 2014, 08:37:46-08:38:23));

> (3) tells Agent Foto, in his post-arrest statement, that Aly Khan and Moody Blues "appeared to be more 'serious' than other [DFN] users" (id. at 11 (quoting Tr. 1031));

> (4) viewed Internet sites "dealing with death, violence, and kidnapping 'tens of thousands of times'" (id. at 27 (quoting Tr. 1112));

> (5) performed Internet searches regarding kidnapping methods (id. (citing Tr. 1239, 1275; GX 1000, 1001));

> (6) accessed a restricted NYPD database to search for information concerning women he was discussing kidnapping with Aly Khan and others (id. (citing Tr. 940-43; GX 615, 616B, 616C, 616E));

> (7) created 89 computer folders containing the names and Facebook photographs of women, including the conspiracy's alleged targets (id. (citing Tr. 422));

> (8) possessed images and videos involving acts of sexual violence against women (id. (citing GX 295A, 295B; Tr. 1275)); and

> (9) "searched for the address of Kristen Ponticelli, a woman he discussed kidnapping with Khan" (id. at 28 (citing Tr. 1276; GX 1005A)).

The Government argues that the jury was entitled to weigh this proof against the false, fictitious, and fantastical elements in the chats in determining Valle's intent. None of this evidence, however – whether considered separately or as a whole – is sufficient to demonstrate that Valle

entered into a genuine agreement with Aly Khan to kidnap Noble, or that he specifically intended to commit this crime.

As an initial matter, Valle's assurances to Aly Khan that he would commit a kidnapping if he was "guaranteed to get away with it" do not demonstrate either a criminal agreement with Khan or the specific intent to kidnap Noble.  There is no evidence that Valle ever believed that the condition he set – a guarantee that he would "get away with it" – was satisfied or would ever be satisfied.  Where an alleged participant in a conspiracy sets conditions for his participation, "the relevant question is whether the alleged conspirator[ ] subjectively believed that the condition[ ] necessary for attaining the objective [was] likely to be fulfilled. . . . This approach appropriately focuses on the actual intent of the alleged part[y] to the conspiracy." Wallach, 935 F.2d at 471; see also United States v. Palmer, 203 F.3d 55, 64 (1st Cir. 2000) ("In United States v. Dworken, 855 F.2d 12, 19 (1st Cir.1988), we suggested that the test for conditional conspiratorial liability should focus on the likelihood that the condition precedent will be fulfilled. . . . Liability should attach if the defendant reasonably believed that the conditions would obtain.  See Dworken, 855 F.2d at 19.  In this case, one factor suggesting such reasonable belief is the fact that the conditions were met in two other cases, and when they were met, the defendants carried out the robberies.") (emphasis in Palmer).  Because there is no evidence that Valle ever believed that he could commit a kidnapping and "get away with it," his assurances to Aly Khan that he would commit a kidnapping if he was "guaranteed to get away with it" do not assist the Government in demonstrating either a criminal agreement or Valle's specific intent to commit a kidnapping.

Valle's remark to Agent Foto that Aly Khan and Moody Blues "appeared to be more serious . . . than other [DFN] users" (Tr. 1031) likewise does not demonstrate that Valle entered into a conspiratorial agreement with these individuals.

Valle's visits to Internet sites devoted to death, violence, and kidnapping; his possession of images and videos depicting acts of sexual violence against women; his computer searches regarding kidnapping methods; and his 89 computer folders containing Facebook images of women he knew, all graphically illustrate his depraved interests. The Government did not, however, meet its burden to demonstrate that these activities and interests are inconsistent with fantasy role-play. Stated another way, the Government offered no evidence that would have permitted a reasonable juror to determine whether someone who is truly interested in kidnapping a woman would be more likely to engage in these activities than someone who is merely interested in fantasizing about kidnapping and committing acts of sexual violence against women.

While "the government need not 'exclude every reasonable hypothesis other than that of guilt,'" United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (quoting Holland v. United States, 348 U.S. 121, 139 (1954)), under the circumstances here, the Government was required to offer evidence sufficient to permit a reasonable juror to conclude that Valle's activities are not fantasy role-play. This conclusion flows from the well settled law that where the evidence viewed in the light most favorable to the Government is "'at least as consistent with innocence as with guilt,'" the Government has not met its burden. D'Amato, 39 F.3d at 1256 (quoting Mulheren, 938 F.2d at 372); see also Coplan, 703 F.2d at 69 ("'If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial

support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'" (quoting Huezo, 546 F.3d at 193)).

Valle's database searches likewise do not demonstrate that he had the specific intent to actually kidnap Andria Noble. While Valle conducted a database search concerning Noble (see GX 616B, Tr. 578-81), this search occurred more than six months before his first chat with Aly Khan about kidnapping "Andria." (Compare id. with GX 421 (Feb. 9, 2012, 10:18:27, 10:40:01 (Valle telling Aly Khan that he has his "victim picked out," a 26-year-old woman named "Andria"))). Valle's database search in July 2011 – six months before the conspiratorial agreement alleged in the Indictment (see Dkt. No. 9, ¶ 1) and more than six months before Valle suggested to Khan that Noble be kidnapped – does not establish that Valle and Khan entered into a genuine agreement to kidnap Noble, or that Valle had the specific intent to commit this crime.

Finally, Valle's Google search for Ponticelli's address in August 2012 does not demonstrate that he had entered into a genuine agreement with Aly Khan – at some point between February and July 2012 – to kidnap Noble. While Valle shares Facebook images of Ponticelli with Khan on January 25, 2012, and Khan comments on her physical appearance at that time, the two do not discuss any plan to kidnap Ponticelli nor do they reach any agreement to do so. (See GX 418 (Jan. 25, 2012, 08:16:57-08-18:49))

In sum, nothing in the trial record provides a basis for a reasonable juror to conclude, beyond a reasonable doubt, that Valle and Aly Khan entered into a genuine agreement to kidnap Noble, or that Valle ever had the specific intent to commit this crime. Valle's chats with Aly Khan are not sufficient to support a conviction on Count One.

    **c.**    **Valle's Alleged Plot with Moody Blues**
                **to Kidnap Kathleen Mangan, Kimberly**
                <u>**Sauer, Kristen Ponticelli, and Andria Noble**</u>

As is typically the case with Valle's Internet chats, whether "real" or fantasy, Valle's communications with Moody Blues begin with him transmitting a series of Facebook photographs of women he knows. Valle tells Moody Blues – who informs Valle that he lives in England – that he will kidnap any of the women shown, and provide the victim to Moody Blues, for $6,000. (GX 401 (July 9, 2012, 07:37:42, 07:54:02)) Included in the series of Facebook photographs Valle transmits to Moody Blues are images of Kathleen Mangan, Kimberly Sauer, and Andria Noble. (<u>Id.</u> at 07:43:47, 07:46:45, 07:50:25, 07:50:43, 07:55:01, 07:55:06, 07:56:55, 07:58:18)

As discussed above, the two men discuss the pros and cons of kidnapping "Kathleen," "Andria," and "Kimberly." As to "Andria," Valle warns that the "abduction will have to be flawless[,]" since she is a prosecutor and "they will be looking for her right away[.]" (GX 401 (July 9, 2012, 07:59:15, 07:58:18, 07:59:08)) As to "Kathleen," Valle states that she "would be a little tough too just because she's married and i would feel a little bad because of the baby[.]" (<u>Id.</u> at 08:04:41) Valle identifies "Kimberly" as "by far the easiest [to kidnap]" and the most "viable option[.]" (<u>Id.</u> at 07:56:33, 08:05:01-08:05:16) He also tells Moody Blues that Sauer has "been one of my favorite victims to fantasize about for almost 10 years now[.]" (GX 402 (July 9, 2012, 08:36:39)) Valle goes on to say that he "might just settle on Kimberly[,]" (GX 401 (July 9, 2012, 08:06:37)), and the two men then embark on an extended discussion about Sauer's physical attributes and how she will be cooked and eaten. (GX 402-404)

Mangan and Noble are thus discarded as kidnapping targets at this time, although – as discussed below – Noble re-emerges later in the Valle/Moody Blues chats.

i.      **The Alleged Valle/Moody Blues**
**Conspiracy to Kidnap Kimberly Sauer**

In discussing a possible kidnapping of Sauer, Valle provides Moody Blues with a great deal of information, none of which is true. He tells Moody Blues that he is "single," and that he has "a big gas oven" that they can use for cooking Kimberly. (GX 402 (July 9, 2012, 08:09:38)) Valle also claims to live in a secluded house "up in the mountains," with "no one [. . .] around [. . .] for about 3/4 of a mile[.]" (Id. at 08:19:36-43, 08:10:14) As to timing, Valle tells Moody Blues that he is "thinking of a Labor Day cookout [. . .] with Kimberly as the main course." The "cookout" will happen at Valle's "place up in the mountains." (Id. at 08:32:15-30, 08:19:36) Valle assures Moody Blues that he can stay at Valle's mountain retreat (GX 403 (July 9, 2012, 08:40:44)), which is "a couple of hours from the airport[,]" with "lots of winding roads" "and peace and quiet." (GX 404 (July 9, 2012, 08:53:37-48)) Valle also promises to make chloroform and to purchase rope at Home Depot. (GX 403 (July 9, 2012, 08:42:09-16)) Moody Blues, who has told Valle that he lives in England, notes that – since "Labour day is the 3rd [of] september," there is "not a lot of time to sort out plane tickets etc.[,]" but that he "[w]ill see what cheap deals [he] can get[.]" (GX 404 (July 9, 2012, 08:52:13))

The information and representations that Valle and Moody Blues exchange with each other on July 9, 2012, are all false. Valle was not single but instead was married to Mangan. He had no secluded cabin "in the mountains," and he had no human-size oven. There is likewise no evidence that Valle ever made chloroform or purchased rope. Finally, there is no evidence that either Valle or Moody Blues ever made travel plans, or took steps to make travel plans, concerning Moody Blues's proposed Labor Day visit. The exchange between the two men makes sense in the context of fantasy role-play; it makes no sense in the context of a real kidnapping conspiracy.

As discussed above, on July 10, 2012, Valle sends a document to Moody Blues entitled "Abducting and Cooking Kimberly: A Blueprint." (GX 601) All of the identification information concerning Sauer that Valle provides in the Blueprint is false. Valle gives Moody Blues false information about Sauer's last name, her date of birth, where she was born, where she went to college, and what degree she graduated with. (GX 601) While providing false identification information to Moody Blues about the purported kidnapping target is entirely consistent with fantasy role-play, it makes no sense in the context of a real kidnapping conspiracy.

The Blueprint reflects a "target date" of September 2, 2012, for Kimberly's abduction and contains a list of "MATERIALS NEEDED[.]" (GX 601) The list includes "[c]hloroform[,]" "[r]ope (strongest kind to tie her up securely)[,]" "[g]ag ([d]uct [t]ape?)[,]" "[s]eparate bag to gather her clothes[,]" "[g]loves[,]" and "[c]heap [s]neakers." (Id.) There is no evidence that Valle ever obtained any of these materials.

After receiving the Blueprint, Moody Blues asks for Sauer's address, explaining that he wants to Google the address "using the Map app[.]" (GX 407 (July 10, 2012, 06:08:23) Valle responds that he is "not sure [of] her exact address" (id. at 06:08:33), even though he had obtained Sauer's address in January 2012. (GX 436 (Jan. 18, 2012, 7:10 p.m.)) Again, Valle's refusal to provide Moody Blues with Sauer's address makes sense in the context of fantasy role-play, but makes no sense if this is a real kidnapping conspiracy.

On or about July 12, 2012, Valle leaves a voicemail message for Sauer telling her that he, Mangan, and their baby will be visiting Maryland on the weekend of July 21-22, 2012, and asking whether they can get together. (GX 436 (July 12, 2012, 10:41 a.m.)) On January 16, 2012, the two arrange a lunch date for Sunday, July 22, 2012. (Id. (July 16, 2012, 3:06 p.m.))

The next morning, July 17, 2012, Valle tells Moody Blues, "im having lunch with kimberly on sunday[.]" (GX 408 (July 17, 2012, 07:18:58))  That same day, Moody Blues asks Valle whether he has "a recipe for chloroform" (GX 409 (July 17, 2012, 08:09:29)), and Valle provides Moody Blues with a link to a website entitled "How To Make Chloroform at Home: Chemical and Lab Safety."  (Id. at 08:09:48-08:11:21; GX 604; Tr. 485-88)

In a chat on July 19, 2012, Valle tells Moody Blues that "when i see her on sunday, my mouth will be watering[.]" (GX 410 (July 19, 2012, 06:13:48))  At the end of their chat, Moody Blues again asks Valle for Kimberly's address:  "give me the address of Kim and I can google the address.  REALLY want to see the neighbourhood!" (Id. at 07:10:48) (emphasis in original)  Valle again dodges the request, writing, "dont know it by heart[.]" (Id. at 07:10:57)  Moody Blues replies, "Make sure you get it for me please.  I want to be involved in the planning and an address will let me check out the area.  Nearest police station, maybe video cameras etc." (Id. at 07:12:14)  Despite Moody Blues's repeated requests, Valle never provides him with Sauer's address.  Valle's refusal to provide Moody Blues with Sauer's address could only undermine Moody Blues's efforts to assist Valle in the planning of the purported kidnapping and in advising Valle on how to perform the kidnapping safely.  Valle's refusal to provide Sauer's address to Moody Blues only makes sense in the context of fantasy role-play.  It makes no sense if Valle and Moody Blues are planning an actual kidnapping.

Between 4:27 a.m. and 4:52 a.m. on July 20, 2012, Valle conducts the following Internet searches:  "how to kidnap someone"; "how to abduct a girl"; "how to chloroform a girl"; "can you use chloroform to have sex with your girlfriend"; "how to chloroform a girl"; and "kidnapped girl." (GX 1001, Record Nos. 1111, 1097, 1094, 1100, 1125; Tr. 1239)

Valle and his family travel to Maryland on July 21, 2012. (Tr. 210; GX 436)

Valle sends a text to Sauer indicating that he has driven by the office building where she works.

(GX 436 (July 21, 2012, 9:33 p.m.)) Valle and his family spend the weekend visiting Valle's

college friends, and they have lunch with Sauer on Sunday, July 22, 2012. (Tr. 210, 290-91; GX

436) Nothing unusual happens at the lunch, which Sauer testified was "pleasant." (Id. at 291,

326)

After Valle returns home, he emails Moody Blues to tell him that Sauer "looked

absolutely mouthwatering i could hardly contain myself[.]" (GX 411 (July 22, 2012, 23:57:42))

The purported plan to kidnap Sauer over Labor Day weekend is never mentioned again,

however, and a month passes before Valle and Moody Blues's next communication on August

21, 2012.

Based on this record, no reasonable juror could find that Valle and Moody Blues

entered into a genuine agreement to kidnap Sauer or that Valle ever had the specific intent to

commit this crime. As noted above, (1) the false information Valle provides to Moody Blues

about Sauer and about critical aspects of the purported kidnapping plan; (2) his repeated refusal

to provide Sauer's address to Moody Blues; (3) his failure to purchase any of the items listed in

the Blueprint; and (4) the fact that – after Valle's July 22 visit with Sauer – Valle and Moody

Blues never again discuss kidnapping her, only make sense if Valle and Moody Blues's

communications are fantasy role-play. None of this makes any sense if Valle and Moody Blues

are engaged in a real conspiracy.

The Government argues, however, that a reasonable juror could have found that

Valle and Moody Blues entered into a "real criminal agreement" to kidnap Sauer based on the

following:

(1) Valle and Moody Blues['s] statements to one another that they were serious;

(2) the Blueprint;

(3) the chloroform recipe;

(4) the timing of the trip to Maryland and related chats;

(5) Valle's internet research; and

(6) the Kimberly Sauer file folder on Valle's computer containing photographs of her, and images of a woman roasting on a spit.

(Govt. Br. (Dkt. No. 195) at 14)

On July 9, 2012, after Valle has told Moody Blues a litany of lies about who he is, about his secluded home "up in the mountains," about how often he sees and speaks with "Kimberly," about his possession of a human-size oven, and about his intention to make chloroform and purchase rope at Home Depot, and after Moody Blues has promised to "see what cheap deals" might be available for flights from England to New York over "Labour day" weekend, Moody Blues asks Valle: "You WILL go through with this?  I've been let down before.  That's why i tend to work alone."  Valle answers "yes."  (GX 404 (July 9, 2012, 09:01:36-09:01:58) (emphasis in original)).  The Government argues that from this exchange a reasonable juror could infer that Valle intended to enter into a genuine agreement with Moody Blues to kidnap Sauer, and that he specifically intended to kidnap her on or about September 2, 2012.

Given the false and fantastical information Valle provides to Moody Blues about Sauer and critical aspects of the purported kidnapping plan; his repeated refusal to provide Sauer's address to Moody Blues; his failure to purchase any of the items listed in the Blueprint; and the fact that – after the July 22 visit with Sauer – Valle and Moody Blues never again discuss kidnapping her, no reasonable juror could draw the inference urged by the Government.

87

For the same reasons, the Blueprint does not demonstrate that Valle entered into a genuine agreement to kidnap Sauer, or that he ever intended to commit this crime. As discussed above, every critical fact set forth in the Blueprint is false, including all of the identification information concerning Sauer, such as her last name, date of birth, and place of birth. Moreover, there is no evidence that Valle ever purchased any of the "MATERIALS NEEDED" items listed in the Blueprint. Valle's repeated refusal to provide Sauer's address to Moody Blues – perhaps the first piece of information that a true kidnapper would include in such a "blueprint" and provide to a confederate – is inexplicable unless this is fantasy role-play.

As to Valle's Internet research about kidnapping; the link he provides to Moody Blues about chloroform; the computer folders containing Facebook images of women; and his possession of staged images of women being roasted on a rotisserie, the Government has offered no evidence suggesting that these actions and materials are inconsistent with fantasy role-play. As discussed in connection with Aly Khan, the Government provided no evidence that would have permitted a reasonable juror to determine whether an individual who is truly interested in kidnapping a woman would be more likely to engage in these Internet-based activities than someone who is fantasizing about kidnapping and committing acts of sexual violence against women. And given Valle's "thousands" of fantasy chats about kidnapping, raping, torturing, murdering, and cannibalizing women, there is no question that he had an extremely strong interest in this type of fantasy role-play. Where, as here, the evidence viewed in the light most favorable to the Government is "'at least as consistent with innocence as with guilt,'" the Government has not met its burden. D'Amato, 39 F.3d at 1256 (quoting Mulheren, 938 F.2d at 372); see also Coplan, 703 F.2d at 69.

Finally, no reasonable juror could infer from Valle's trip to Maryland that he intended to enter into a genuine agreement with Moody Blues to kidnap Sauer, or that he had the specific intent to kidnap her. Given that (1) Valle and Moody Blues never again discuss kidnapping Sauer after Valle's July 22 lunch with her in Maryland; (2) Valle takes no steps of any sort in furtherance of kidnapping Sauer after the trip to Maryland; (3) after the trip to Maryland, Valle and Moody Blues move on to discussing a different woman – Kristen Ponticelli (GX 445 (Aug. 21, 2012)); and (4) the target date of September 2, 2012, for kidnapping Sauer comes and goes without discussion, inquiry, or comment from either Valle or Moody Blues, the only reasonable inference flowing from the Maryland trip is that it was the culmination of Valle's fantasy concerning Sauer, and not a step toward actually kidnapping her.

### ii. The Alleged Valle/Moody Blues Conspiracy to Kidnap Kristen Ponticelli

The subject line in Valle's first email to Moody Blues after the July 21-22 trip to Maryland reads "Meet Kristen." (GX 445 (Aug. 21, 2012)) Attached to this August 21, 2012 email are numerous photographs of Kristen Ponticelli, a recent graduate of Valle's high school, Archbishop Malloy.[57] (Id. at 22:19:56) Valle reports that Kristen is "10 years younger than Kim, better body. I say we go for it." (Id. at 22:46:00) Valle assures Moody Blues that Kristen will fit in his oven, which is allegedly "5 feet long, 4 feet deep and 4 feet high." (Id.) Valle also falsely states that Kristen will be attending Valle's college, the University of Maryland, and that she will be "around 4/4 and a half hours [away from him]." (GX 412 (Aug. 24, 2012, 07:01:34, 07:07:57)) In reality, Ponticelli was attending a college in the New York area. (Tr. 413)

---

[57] On July 4, 2012, Valle had conducted Google searches concerning Kristen Ponticelli. (Tr. 1254-55; GX 1001 at Record No. 1073-76)

Although Valle conducts a Google search for Ponticelli's address on August 22, 2012 (Tr. 1276; GX 1005A at Record No. 66566), there is no evidence that Valle and Moody Blues discuss Kristen Ponticelli again after August 24, 2012, or that Valle ever obtained, much less transmitted, information about her location to Moody Blues. As discussed below, in an August 25, 2012 chat with Moody Blues, Valle returns to discussing "Andria the prosecutor." (GX 413 (Aug. 25, 2012, 05:05:18)) Given this record, no reasonable juror could find that Valle and Moody Blues entered into a genuine agreement to kidnap Ponticelli, or that Valle ever had the specific intent to commit this crime.

### iii.    The Alleged Valle/Moody Blues Conspiracy to Kidnap Andria Noble

On August 25, 2012, Valle tells Moody Blues that "Andria the prosecutor [. . .] is the girl [he] would most want to eat but she lives around 6 hours away[.]" (GX 413 (Aug. 25, 2012, 05:05:18-05:05:37)) Valle states that while he has "pretty much ruled her out" as a potential target because she lives too far away, "in [his] fantasies, she is #1 by far[.]" (Id. at 05:10:01, 05:10:10)

In their last chat on September 8, 2012, however, Valle tells Moody Blues that he has "decided on" Andria, and wants "to follow her home and then just stake it out[.]" (GX 415 (Sept. 8, 2012, 04:12:09-04:12:13, 04:17:27)) Moody Blues suggests that Valle "try and abduct her on the way home from a party or something" (id. at 04:23:25), but Valle says he "doubt[s]" that would work, at least "not in new york city[.]" (Id. at 04:23:44-59) Moody Blues asks whether Andria "live[s] close to you[.]" (Id. at 04:24:18) Valle writes that he is "not sure [of] her exact location," but that she is "probably an hour to an hour and a half or so [away.]" (Id. at 04:24:59)

No reasonable juror could conclude that these exchanges reflect a genuine

agreement to kidnap Andria Noble, or a specific intent on Valle's part to commit this crime.

Despite the reference to following Noble home and surveilling her house, there is no evidence

that Valle ever travelled to Columbus, Ohio.  Valle's September 8, 2012 statements that he is

"not sure" where Noble lives, and that she is "probably an hour to an hour and a half or so"

away, and his suggestion that Noble lives in "new york city[,]" are outright lies.  Valle had

Noble's street address in Columbus (Tr. 578-81; GX 616B), and he knew that Noble lived not

"an hour to an hour and a half" away, but instead around "6 hours away[,]" as he had previously

told Moody Blues on August 25, 2012.  (GX 413 (Aug. 25, 2012, 05:05:18-05:05:37))  The

reference to Noble being "#1" "in [Valle's] fantasies [. . .] by far," and the bizarre suggestion

that Noble actually lives in New York City, merely confirm the fantastical nature of this

discussion.  While Valle's lies and contradictions are fully consistent with fantasy role-play, they

are inexplicable in the context of a real kidnapping conspiracy.

*     *     *     *

Valle's  depraved, misogynistic sexual fantasies about his wife, former college

classmates, and acquaintances undoubtedly reflect a mind diseased.  But the question before this

Court is whether the Government proved beyond a reasonable doubt that (1) Valle entered into

genuine agreements with Van Hise, Aly Khan, and Moody Blues to kidnap Mangan, Friscia,

Sauer, Noble, or Ponticelli, and (2) Valle had the specific intent to kidnap one or more of these

women.  An exhaustive analysis of Valle's Internet communications – both the chats that the

Government concedes are fantasy and the chats that the Government alleges are "real" – and a

careful consideration of the circumstances surrounding those communications – including what

happens and what does not happen – demonstrate that the Government has not met its burden.

91

Accordingly, the jury's verdict on Count One will be vacated, and Count One will be

dismissed.[58]

---

[58] Although the Court does not reach the issue of whether the Government proved proper venue by a preponderance of the evidence, it is doubtful that this standard was met.

In a conspiracy prosecution, "'venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators.'" United States v. Smith, 198 F.3d 377, 382 (2d Cir. 1999) (quoting Naranjo, 14 F.3d at 147). "To prove venue, the prosecution must show by a preponderance of the evidence that 'any part of the crime was committed within the district.'" United States v. Potamitis, 739 F.2d 784, 791 (2d Cir. 1984) (citation omitted). "[V]enue may properly be laid in the district in which the conspiratorial agreement was formed or in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators." United States v. Ramirez-Amaya, 812 F.2d 813, 816 (2d Cir. 1987) (citation omitted). While "[o]bjections to venue are waived unless 'specifically articulated' in defense counsel's motion for acquittal," United States v. Potamitis, 739 F.2d 784, 791 (2d Cir. 1984) (quoting United States v. Grammatikos, 633 F.2d 1013, 1022 (2d Cir.1980)), here the Defendant, at the close of the Government's case, argued that Count One should be dismissed because the Government had not offered proof demonstrating proper venue. (Tr. 1309-10)

As to the proof at trial concerning venue, the Government does not allege that any overt act took place in this District relating to Valle's alleged conspiratorial agreement with Aly Khan.

As to Moody Blues, the Government relies on Ramirez-Amaya, 812 F.2d 813, in which the Second Circuit found proper venue based on the fact that a plane carrying cocaine had flown "over the Narrows, a body of water that lies within the joint jurisdiction of the Southern and Eastern Districts of New York." Ramirez-Amaya, 812 F.2d at 816 (citing 28 U.S.C. § 112(b)). The Government argues that the instant case is analogous, because "[w]hen driving from Queens to Maryland [for the lunch with Sauer], Valle had to have traveled through the Southern District of New York." (Govt. Br. (Dkt. No. 195) at 26)

While venue may lie in a district that the defendant "travel[s] through" "in furtherance of the conspiracy," see United States v. Tzolov, 642 F.3d 314, 320 (2d Cir. 2011), here the Government did not offer any evidence as to how Valle and Mangan traveled from Queens to Maryland, or how any traveler might journey between these two points. While the jury was instructed that "the Southern District of New York encompasses, among other things . . . the waters surrounding Manhattan, Brooklyn, Staten Island, and Long Island and the air and bridges over those waters" (Tr. 1664), venue must be proven by competent evidence. Prior cases discussing this issue have involved testimony or other evidence concerning the route that implicated the waters surrounding the relevant boroughs and Long Island. See, e.g., Ramirez-Amaya, 812 F.3d at 816 ("The evidence was . . . that the course of the flight carried the airplane over the Narrows"); Potamitis, 739 F.2d at 791-92 ("[T]he Government put on sufficient evidence [of venue, including testimony] . . . that [the defendant] told [a witness] that he had left New York early that morning

## II.    VALLE'S MOTION FOR A NEW TRIAL ON COUNT ONE

Rule 29(d)(1) of the Federal Rules of Criminal Procedure requires that

> [i]f the court enters a judgment of acquittal after a guilty verdict, the court must
> also conditionally determine whether any motion for a new trial should be granted
> if the judgment of acquittal is later vacated or reversed.  The court must specify
> the reasons for that determination.

Fed. R. Crim. P. 29(d)(1).  Accordingly, having granted Valle's motion for a judgment of

acquittal on Count One pursuant to Fed. R. Crim. P. 29, this Court must now go on to

"conditionally determine" whether Valle is entitled to a new trial pursuant to Fed. R. Crim. P. 33.

In his Rule 33 motion, Valle argues that he is entitled to a new trial because

(1) "even if the evidence were sufficient in the abstract to support the jury's verdict, the weight

---

and planned to return to New York that night," and that he "also asked [the witness] for
directions to the New York State Thruway 'to get back to New York,' the route which, according
to other testimony at trial, is the most direct route for automobile travel between East
Greenbush[, New York] and New York City and passes through the Southern District of New
York.") (alterations added).

This Court's research has revealed no precedential decision upholding this theory of venue
where the Government offered no evidence whatsoever concerning the route or mode of travel
that implicates the territorial waters of the Southern District of New York.  Whether jurors'
general knowledge of geography may be presumed in such circumstances is an open question.
Given the ease with which the necessary testimony may be elicited, this is not an issue that
should ever arise.

As to Van Hise, the Government has proffered two theories of venue.  In its opposition brief, the
Government argues that Valle "surveill[ed] Friscia" on the Upper East Side of Manhattan on
March 1, 2012.  (Govt. Br. (Dkt. No. 195) at 27)  At trial, the Government also argued that Valle
had caused Mangan to deliver a PBA card to Friscia in Manhattan on Valle's behalf, so that
Valle could build a relationship of trust with her.  (Tr. 1528).  As discussed above, neither theory
is adequately supported by the evidence.  With respect to the March 1 incident, no reasonable
jury could find – without speculating – that Valle surveilled Friscia on that day.  As to the PBA
card, the undisputed evidence is that Mangan gave the PBA card to Friscia in May or June of
2012 (id. at 906-07, 186, 217), several months after Valle and Van Hise had moved on to other
potential kidnapping "targets."  (GX 433 (Apr. 25, 2012) ("Re: Veronica"))  The spring or
summer 2012 distribution of the PBA card cannot serve as an overt act in furtherance of the
alleged conspiracy to kidnap Friscia in January or February 2012.

of the evidence supports [his] innocence," and (2) "the Government's summations were replete with improper arguments." (Def. R. 33 Br. (Dkt. No. 182) at 2, 9)  The Government denies that the weight of the evidence favors the Defendant, and argues that Valle's new trial motion should be denied for substantially the same reasons that his motion for a judgment of acquittal should be denied. (Govt. Br. (Dkt. No. 195) at 50)  The Government further contends that Valle "has failed to demonstrate that the Government engaged in any actual improprieties" during its summations. (Id. at 88)

### A.    <u>Weight of the Evidence</u>

#### 1.    <u>Legal Standard</u>

On a defendant's motion, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33.  "Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." <u>United States v. Sanchez</u>, 969 F.2d 1409, 1413 (2d Cir. 1992).  Courts may not only grant a Rule 33 motion where the evidence is legally insufficient, <u>see</u> <u>United States v. Leslie</u>, 103 F.3d 1093, 1100-01 (2d Cir. 1997), but also where a jury's verdict is contrary to the weight of the evidence.  <u>United States v. Ferguson</u>, 246 F.3d 129, 136 (2d Cir. 2001) ("We cannot say that the district judge abused her discretion when she concluded that the weight of the evidence showed that [the defendant] was an outside hit man and not a [gang] member acting to further that membership.").

The Second Circuit has explained that

> [t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.  The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict.  The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.  There must be a real concern that an innocent person may have been convicted.  Generally, the trial court has

broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

Id. at 134 (internal citations and quotation marks omitted).

Under Rule 33, "[i]n the exercise of its discretion, the court may weigh the evidence and credibility of witnesses." Autuori, 212 F.3d at 120 (citing Sanchez, 969 F.2d at 1413). However, "[t]he district court must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury." Ferguson, 246 F.3d at 133 (quoting Autuori, 212 F.3d at 120) (alteration in Ferguson). Finally, in contrast to a Rule 29 motion, a district court need not view the evidence in the light most favorable to the Government. United States v. Lopac, 411 F. Supp. 2d 350, 359 (S.D.N.Y. 2006) (citing United States v. Ferguson, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999), aff'd, 246 F.3d 129 (2d Cir. 2001)).

### 2.    **Analysis**

Applying the legal standard articulated above to the facts of this case, the Court concludes that the jury's verdict on Count One is contrary to the weight of the evidence. Moreover, allowing the verdict to stand would constitute a "manifest injustice," because – for the reasons discussed above – there is "a real concern" that Valle is innocent of the crime of conspiracy to commit kidnapping. Ferguson, 246 F.3d at 134.

The Court's reasons for conditionally granting Valle's motion for a new trial on Count One are substantially the same as those articulated above in connection with the decision granting Valle's motion for a judgment of acquittal. The Government did not demonstrate – as to any alleged co-conspirator or as to any alleged kidnapping target – a genuine agreement to

actually commit a kidnapping or Valle's specific intent to commit such a kidnapping. Indeed, the balance of the evidence concerning these issues favors the Defendant.

Having analyzed the evidence at length in connection with Valle's Rule 29 motion, the Court will not repeat that analysis here. Suffice it to say that Valle's Internet chats take place in a context that the Government concedes is overwhelmingly fantasy role-play. Given that no one is ever kidnapped; that no concrete steps are ever taken to kidnap anyone; that alleged agreements to kidnap specific women on specific days come to naught without inquiry, explanation, or comment; and that the chats allegedly reflecting conspiratorial agreements are replete with the same false, fictitious, and fantastical elements seen in the chats that the Government concedes are fantasy, the prosecution was required to provide the jury with an evidentiary basis for distinguishing chats reflecting allegedly "real" conspiratorial agreements from those that are mere fantasy. This the Government did not do. Instead, the evidentiary record is such that it is more likely than not the case that all of Valle's Internet communications about kidnapping are fantasy role-play.

Given that the weight of the evidence supports Valle's contention that he was engaged in fantasy role-play rather than in planning a series of real kidnappings, in the event that the Court of Appeals vacates this Court's decision granting Valle's motion for a judgment of acquittal, he would be entitled to a new trial under Fed. R. Crim. P. 33. See Ferguson, 49 F. Supp. 2d at 323 (granting new trial where the evidence provided "too slender a reed to support a guilty verdict").

B.    **Prosecutorial Misconduct**

Valle alleges that the Government made numerous improper arguments in its summations to the jury, including:

(1) arguing, in violation of the Constitution, that the jury should convict Mr. Valle because his fantasies are frightening and not "ok;" (2) impugning defense counsel and accusing her falsely of defending the morality of Valle's fantasies; (3) making unproven (and, indeed, false) assertions about the nature of sexual fantasy, criminal behavior, and other subjects requiring specialized knowledge, under the guise of appeals to "common sense;" (4) appealing repeatedly to the jury's fears, passions, and prejudices, diverting the jury from the relevant factual and legal issues, and using improper, inflammatory and misleading analogies that diluted or shifted the burden of proof; [and] (5) commenting on the defendant's failure to testify and impugning his character as a husband, father, and police officer. . . .

(Def. R. 33 Br. (Dkt. No. 182) at 9)

The Government contends that "Valle has collected a series of areas of potential prosecutorial misconduct and attempted, through unnecessarily bloated briefing, to create the impression of multifaceted prosecutorial error," but "has failed to demonstrate that the Government engaged in any actual improprieties." (Govt. Br. (Dkt. No. 195) at 88)  The Government further contends that Valle did not preserve the majority of his objections. (Id. at 89)

1.    **Legal Standard**

A defendant who seeks a new trial based on a prosecutor's improper closing argument "'faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial.'" Coplan, 703 F.3d at 86 (quoting United States v. Banki, 685 F.3d 99, 120 (2d Cir. 2012)); see also id. ("'We will reverse on the ground of prosecutorial misconduct only if that misconduct caused substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process.'") (quoting United States v. Whitten, 610 F.3d 168, 202 (2d Cir. 2010).  "'Flaws in the government's summation will require a new trial only in the rare case in which improper statements – viewed against the entire argument to the jury – can be said to have deprived the

defendant of a fair trial.'" United States v. Gansman, 657 F.3d 85, 96 (2d Cir. 2011) (quoting

United States v. Caracappa, 614 F.3d 30, 41 (2d Cir. 2010)).  "In considering whether

inappropriate remarks rise to the level of prejudicial error," a court must "examine 'the severity

of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction

absent the misconduct.'" Id. (quoting Caracappa, 614 F.3d at 41).  "A prosecutor's improper

summation results in a denial of due process when the improper statements cause substantial

prejudice to the defendant." United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981).

"Often, the existence of substantial prejudice turns upon the strength of the government's case:

if proof of guilt is strong, then the prejudicial effect of the comments tend to be insubstantial; if

proof of guilt is weak, then improper statements are more likely to result in reversal." Id.

(citations omitted).

  A defendant who fails to object to a prosecutor's allegedly improper remarks

faces a higher burden.  Such a defendant cannot prevail on a Rule 33 motion absent a showing of

"flagrant abuse." United States v. Zichettello, 208 F.3d 72, 103 (2d Cir. 2000).

### 2. Discussion

  Given this Court's decision granting Valle's Rule 29(a) motion on Count One,

and its decision under Rule 33 and Rule 29(d)(1) conditionally granting Valle's new trial motion

on the ground that the weight of the evidence is contrary to the jury's verdict, it is not necessary

to resolve Valle's alternative argument that he is entitled to a new trial because of improper

prosecutorial argument.  It is worth noting, however, that certain arguments made by the

Government tended to undermine or contradict the Court's prior rulings and jury instructions,

raising concerns about whether – in what was an extraordinary case involving highly

inflammatory and emotional subjects – the jury's verdict was the product of unfair prejudice.

The Government's first witness was Kathleen Mangan, Valle's then-estranged wife. The mere fact that she was willing to testify against her husband spoke volumes, of course, and she was a devastating witness. Although her actions – including removing the couple's MacBook computer from their apartment and turning it over to the FBI – were a necessary part of the proof, her testimony presented a risk of unfair prejudice to the Defendant. Recognizing that the jury might interpret Mangan's reaction to what she had read as proof of what Valle intended, the Court ruled – prior to Mangan's testimony – that

> [t]he government [would] not be permitted . . . to elicit evidence of [Mangan's] mental state, because [her] mental state is not relevant to any issue in this case. Mangan will likewise not be permitted to offer an opinion concerning Valle's mental state, including whether he intended to kidnap her or other women.

(Tr. 57) Accordingly, the Court ruled that the Government could not seek to prove Valle's alleged criminal state of mind through (1) his wife's reaction to reading his Internet chats; and (2) his wife's opinion as to his "mental state, including whether he intended to kidnap her or other women." (Id.) The Government, for its part, never argued that Mangan was competent to offer an opinion concerning Valle's intent.[59]

In testifying about her discovery of Valle's Internet activities, however – including his chats about participating in a brutal murder of her – Mangan's understandable horror at what she read was obvious, as well as her conviction that she was in serious danger. If that was not apparent from her demeanor on direct, it became pellucid on cross-examination,

---

[59] Prior to trial, Valle moved in limine to preclude Mangan from testifying about her own state of mind and from offering an opinion concerning Valle's state of mind. (Def. MIL (Dkt. No. 103) at 7-8) In response, the Government did not contend that Mangan's state of mind was relevant or that she was competent to offer an opinion concerning Valle's state of mind. Instead, the Government argued that Mangan should be permitted to testify to facts "critical to establishing the background of the investigation [and] the origin of key evidence in the case, and to situate the crimes with which Valle is charged in a coherent narrative for the jury." (Govt. Opp. Br. (Dkt. No. 104) at 5)

when Valle's counsel sought to elicit confirmation that Mangan had refused to meet with her prior to trial. Mangan responded: "[y]ou represent the man who wanted to kill me. No. I do not want to talk with you." (Id. at 237)

There is, of course, much that takes place during any trial that will never be conveyed in a cold transcript, but that is particularly true here. Young, attractive, the mother of a toddler, and a newly married wife who had discovered Internet chats in which her husband said that he wanted to kill her, Mangan presented as an extraordinarily sympathetic witness.

During her testimony against her husband, a courtroom filled with hundreds of spectators sat rapt with attention. Both Mangan and Valle cried, requiring the Court to recess. (Id. at 200) Valle's wracking sobs echoed throughout the courtroom. In this Court's thirty-year experience in courtrooms as a lawyer and as a judge, Mangan's testimony ranks as some of the most dramatic. Undoubtedly, it made a powerful impression on the jury.

Despite the Court's ruling concerning the permissible scope of Mangan's testimony, the Government – without objection – made the following argument in summation:

> Look at the way his wife, the person who knew him best reacted when she read his words, when she saw his images and when she learned of his plans for havoc and violence. What was her response? Did she say, oh, that's just my husband getting into some crazy stuff? No. She took her baby and fled. She got out as fast as she could. She got out of there because this was not a sick joke. This was not just pornography. These were real plans for violence.

(Id. at 1531)

Accordingly, the Government argued to the jury that it could and should decide the critical issue in the case – whether Valle had criminal intent – on the basis of Mangan's reaction to his Internet chats – the reaction of "the person who knew him best." (Id.)

Mangan was not competent to testify as to whether Valle had criminal intent, however, and the jury's resolution of this issue could not be based on her reaction to, or

100

speculation about, what she read.  See, e.g., 1-10 Weinstein's Evidence Manual § 10.02 ("Lay opinion or inference testimony that is based on inferences or speculation is not based on the witness's personal perception, and is not admissible. . . ."); United States v. Brown, 938 F.2d 1482, 1488 (1st Cir. 1991) ("Testimony regarding the inchoate state of mind of a defendant does not fall within the category of allowable opinion testimony by lay witnesses.") (citing Fed. R. Evid. 701); see also United States v. Rodriguez-Adorno, 695 F.3d 32, 38 (1st Cir. 2012) ("[T]estimony regarding culpability is a form of lay opinion that will rarely, if ever, meet the requirements of Federal Rule of Evidence 701."); United States v. Popejoy, 578 F.2d 1346, 1351-52 (10th Cir. 1978) (objection was properly sustained to question that required witness to "interpret the mind" of the defendant; "[t]he statement was clearly incompetent as opinion evidence on a crucial element of the offense[:] defendant Popejoy's knowledge of the other parties' participation in the robbery"); Fenje v. Feld, 301 F. Supp. 2d 781, 815-16 (N.D. Ill. 2003) (while a witness may testify as to his own state of mind, and may testify subject to applicable limitations about another person's actions or statements, a witness is not competent to testify as to another person's state of mind); Ferrar v. Federal Kemper Life Assurance Co., 198 F. Supp. 2d 940, 949 (S.D. Ohio 2002) (witness's testimony based on her own belief of what her deceased husband believed "is inadmissible as incompetent evidence").

Although the jury may have found the "person who knew him best" argument compelling on the issue of whether Valle had criminal intent, this argument was not consistent with the Court's earlier ruling concerning the permissible scope of Mangan's testimony, and it presented a risk that the jury would improperly decide the critical question of criminal intent based, at least in part, on Mangan's evaluation of Valle's intent.

The inflammatory nature of the evidence at trial also presented a risk that Valle would be convicted merely because of juror disgust and revulsion. The Court took extraordinary measures to guard against this risk, both in connection with jury selection and in its instructions to the jury. These measures included use of a jury questionnaire focused on the nature of the subject matter, including sexual violence, sexual torture, other deviant sexual practices, and cannibalism. (Dkt. No. 90) The questionnaire included graphic pictorial exhibits that provided members of the panel with a clear understanding of the nature of the evidence. (Id. & attached exhibits) The Court also instructed the jury that the trial was not a referendum on whether the jury approved or disapproved of Valle's sexual interests and those of his alleged co-conspirators. See Feb. 8, 2013 Tr. (Dkt. No. 325) 14 ("The trial will not be a referendum on the web sites I have described or the interests and practices discussed or shown on those web sites."); Trial Tr. 1641 ("The defendant cannot be convicted of a crime based solely on his thoughts or his interests, as reflected by the evidence in this case. . . . [T]he issue is not whether you approve or disapprove of, for example, the activities of the darkfetishnet.com web site.").

Nonetheless, much of the Government's rebuttal summation focused on whether Valle's sexual interests and fantasies were "okay" or "not okay" – normal or abnormal:

- "We are talking about the idea that a man who is entrusted with the ability to walk around this city with a weapon is sexually stimulated by the idea of a woman who is about to be executed. And one of the underlying ideas of this entire summation is that, that is something you should not be disturbed by, that that is just something that you should whistle or pass. Well, you should not." (Id. at 1579)

- "There is a reason why the word 'fantasy' gets sprinkled over and over again through every cross-examination. . . . It is because [when] we think of fantasies, we normally have a positive idea. You think of Mariah Carey, or maybe you think about the stories you told to your children – fairies, pixie dust, unicorns. That is not what we are talking about here. Gil Valle's fantasy is about seeing women executed. The fantasies he is engaging in are about seeing women sexually assaulted, executed and left for dead. That's not a fantasy that is OK." (Id. at 1581)

102

- "He is Googling, [']Sound you make with a knife before carving.['] Let's just step back and think about that for a second. That is not normal." (Id. at 1612)

- "Defense counsel stated that the file folders reflect the women that Gil was attracted to and that is it. Well, that doesn't explain why he is Googling death fetish. That is not sex. The man likes seeing people dead." (Id. at 1615)

- "If your por[n] is seeing actual dead women's mutilated bodie[s], that is incredibly telling about what your state of mind is. That is not normal." (Id. at 1616)

Finally, Valle's status as a New York City police officer presented a risk that the jury would improperly hold him to a higher standard, or lessen the Government's burden of proof. To address that risk, the Court instructed the jury that

the defendant's status as a New York City police officer – currently under suspension[ ] – does not lessen or increase the government's burden of proof. Stated another way, the defendant is not held to a higher standard because he is a police officer. As with any other individual charged with a crime, the issue is whether the government has met its burden of demonstrating each element of the offense beyond a reasonable doubt.

(Id. at 1631)

Valle's status as a police officer – and the fact that he carried a gun and a badge – was a consistent theme throughout the Government's jury addresses, however, from the beginning of the opening statement to the rebuttal summation:

- "There is a thin piece of metal that some members of our community are privileged to wear close to their heart. Some call it a shield. You may know it as a police badge, and it is the mark of an individual sworn to protect other members of the community . . . . What you are going to learn during this trial is that Officer Valle chose to desecrate the trust that his community had placed in him." (Id. at 117)

- "There is no dispute that Officer Valle was a police officer in Manhattan and that he walked around New York City with his police shield, his handcuffs and a gun." (Id. at 1517)

- "[S]ince the beginning of this case . . . defense counsel has been trying to sell you on two broad concepts that are in total conflict with your common sense. The first one is the idea that it is OK, a police officer, walking around New York City with a loaded weapon who on a daily basis is engaging in making detailed plans about the execution of actual women. That is one of the underlying themes of what we just heard, that that is just something that is OK." (Id. at 1578)

103

- "The second broad theme . . . is this idea that you should somehow not be disturbed by the fact that this man, a police officer, walking around New York City every single day with a loaded weapon has a . . . primary sexual fantasy of seeing women mutilated and harmed in horrific ways, that this is the thing that turns Gil Valle on, that you should somehow not be bothered by that." (Id.)

- "There is nothing about Mr. Valle that is special. At bottom he is a dirty cop. It is something we've seen a million times." (Id. at 1608)

- "The man is attempting to find the address of a high school student who he has been talking about killing. This is a New York [C]ity police officer. That is what we were talking about when we talked about common sense in the beginning. . . . There is something incredibly wrong just on that fact with a New York City police officer talking about killing a high school student and then Googling to try to get information about her address." (Id. at 1613)

While Valle's status as a police officer was not irrelevant to the charges against him,[60] the Government's focus on this fact in its jury addresses presented a risk that the jury would disregard the Court's instruction that Valle could not be held to a higher standard because of his status as a police officer.

Given the Court's resolution of Valle's Rule 29(a) motion, and its decision to conditionally grant Valle's motion for a new trial under Rule 33 and Rule 29(d)(1) based on the weight of the evidence, a thorough analysis of these and other issues the defense has raised concerning the Government's jury addresses is not necessary. Accordingly, the Court makes no finding at this time as to whether the Government's arguments to the jury justify a new trial.[61]

---

[60] Although Valle's possession of a gun, handcuffs, and a police badge never figured in any of his Internet chats, all of these items could have proven useful in a kidnapping. Moreover, Valle used his status as an NYPD officer to query NYPD databases for information about women who were alleged kidnapping targets.

[61] In nearly all cases, of course, improper arguments by prosecutors are found insufficient to justify relief, typically because there is no reason to believe that they affected the outcome of the trial. See, e.g., United States v. Williams, 690 F.3d 70, 77 (2d Cir. 2012) (denying new trial motion where prosecutor stated in rebuttal summation that "this is not a search for reasonable doubt" but a "search for truth"); United States v. Thomas, 377 F.3d 232, 245 (2d Cir. 2004) (defendant not prejudiced by prosecutor's comment in summation that defendant lied during his testimony); United States v. Coriaty, 300 F.3d 244, 255 (2d Cir. 2002) (prosecutor's statement

III.   **VALLE'S MOTION FOR A JUDGMENT OF ACQUITTAL ON COUNT TWO: EXCEEDING AUTHORIZED ACCESS TO A COMPUTER DATABASE**

Valle contends that he is entitled to a judgment of acquittal on Count Two because "the plain text of the Computer Fraud and Abuse Act . . . makes clear that a defendant violates th[e] statute only when he accesses information that [he] is not entitled to access for any purpose – not when [he] accesses information for personal purposes, in violation of employer policies or regulations limiting computer use to official purposes or official business." (Def. Count Two Br. (Dkt. No. 179) at 1-2) (emphasis in original). Because, as an NYPD officer, Valle was authorized to access the National Crime Information Center database, he argues that he cannot be found liable under the CFAA. (Id. at 10)

A.   **The Evidence at Trial**

As an NYPD patrol officer, Valle had access to the Department's Omnixx Force Mobile (the "OFM"), a software program that NYPD patrol officers use to query various restricted databases, including the federal National Crime Information Center ("NCIC") database. (Tr. 931, 933-34, 970) To access their patrol car computers, NYPD officers must enter their tax identification number as well as an alphanumeric personal identification number ("PIN"). (Id. at 934-35) The restricted databases queried by the OFM contain sensitive and confidential information, including home addresses, dates of birth, driver's license information, criminal history, and probation and parole status. (Id. at 570-72, 934-35) Valle received training

---

that defense witness's "testimony was built on the lies of the defendant" insufficient to warrant new trial).

There is nothing typical about this case, however, either as to subject matter or the amount of evidence demonstrating criminal intent. See Modica, 663 F.2d at 1181 ("Often the existence of substantial prejudice turns upon the strength of the government's case. . . .").

concerning the OFM, including instruction on the limits of his authority to access and use the

software and the associated databases. (Id. at 931, 934, 940-41)  In particular, Valle was

instructed that these computer resources could be accessed only "'in the course of [an officer's]

official duties and responsibilities.'"  He was also told that "'[t]here are no exceptions to this

policy.'"  (Id. at 941; GX 612)  Valle was warned that accessing these databases for "non-work

related purposes [wa]s improper," and that doing so could result in his arrest and prosecution,

and/or the termination of his employment.  (Tr. 942, 950)

> The evidence at trial demonstrated that on May 31, 2012, Valle accessed the OFM

from his patrol car by entering his tax identification number and four-digit PIN.  (Id. at 582-84,

970, 995; GX 616E)  Valle then entered "an input message with a query for the person Maureen

Hartigan." (Tr. 582)  Valle obtained information from the New York State Department of Motor

Vehicles, including Hartigan's date of birth, address, height, eye color, restrictions on her

driver's license, and accident history.  (Id. at 583; GX 616E at GV 003891)  Valle also received

a response from the NCIC indicating that there were no active warrants for Hartigan and that she

had no criminal record.  (Tr. 582-84; GX 616E at GV 003893)  It is undisputed that Valle had no

law enforcement purpose for querying Hartigan's name in the databases made available to him

through the NYPD's OFM system.

> **B.**   **The Charge Against Valle and His Rule 29 Challenge**

> Count Two of the Indictment reads as follows:

> On or about May 31, 2012, in the Southern District of New York, GILBERTO
> VALLE, the defendant, intentionally and knowingly accessed a computer without
> authorization and exceeded authorized access and thereby obtained information
> from a department and agency of the United States, to wit, VALLE accessed, and
> obtained information from, the federal National Crime Information Center
> database, without authorization, and outside the scope of his authority.

(Indictment (Dkt. No. 9) at ¶ 4) (emphasis in original)

Count Two alleges a violation of the Computer Fraud and Abuse Act (the "CFAA" or the "Act"). The CFAA, 18 U.S.C. § 1030, imposes criminal liability on anyone who

> intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any department or agency of the United States; . . .

18 U.S.C. § 1030(a)(2)(B). Under the CFAA, "'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled to obtain or alter[.]" 18 U.S.C. § 1030(e)(6).

In its charge, the Court instructed the jury – without objection – that Valle could be convicted on Court Two only if the Government proved, <u>inter alia</u>, that he had "accessed a computer with authorization, but that he exceeded his authority in accessing the information in question."[62] (Tr. 1662; <u>see also id.</u> at 1662-63 ("[T]o satisfy the first element of Count Two, the government must prove beyond a reasonable doubt that the defendant had access to the computer in question, and that while he was authorized to access the computer, he exceeded his authority in accessing the information at issue."); <u>id.</u> at 1663 ("In the context of Count Two, the government must establish beyond a reasonable doubt that the defendant knew that, in using the computer to access the NCIC database to obtain the information at issue, he was exceeding his

---

[62] The Court's charge was consistent with the Government's requests to charge concerning Count Two. The Government asked the Court to instruct the jury that "[t]he first element the Government must prove beyond a reasonable doubt is that the defendant accessed a computer, and exceeded his authorization in accessing the information in question. . . . In this case, the Government charges that the defendant, while authorized to access the computer, exceeded his authority in accessing the information in question. This requires the Government to prove beyond a reasonable doubt that the defendant had access to the computer, and used that access to obtain information in the computer that the defendant was not entitled to obtain." (Govt. Request to Charge No. 15 (Dkt. No. 45) at 28; <u>see also id.</u>, Charge No. 14 at 26 ("The Government must prove beyond a reasonable doubt the following three elements: <u>First</u>, the Government must prove that the defendant accessed a computer, but exceeded his authority in accessing the information in question; . . .")) (emphasis in original)

authority.")).  The jury returned a guilty verdict on Count Two.  (Tr. 1695; Verdict Form (Dkt. No. 126))

In arguing that he is entitled to a judgment of acquittal on Count Two, Valle contends that a defendant violates Section 1030(a)(2)(B) "only when he accesses information that [he] is not entitled to access for <u>any</u> purpose – not when the defendant accesses information for personal purposes, in violation of employer policies or regulations limiting computer use to official purposes or official business."  (Def. Count Two R. 29 Br. (Dkt. No. 179) at 2) (emphasis in original)  According to Valle, Section 1030(a)(2)(B) "only reaches defendants who obtain information, generally by hacking or stealing passwords, that they have no right to access for any purpose."  (<u>Id.</u>)  Because Valle was authorized to access and use the OFM pursuant to his duties as an NYPD officer, he argues that he cannot be held criminally liable under Section 1030(a)(2)(B) for his improper query concerning Hartigan.

**C.**     **Analysis**

In resolving questions of statutory interpretation, courts must begin "with the language of the statute itself."  <u>United States v. Ron Pair Enterprises, Inc.</u>, 489 U.S. 235, 241 (1989) (citation omitted); <u>see also</u> <u>United States v. Robinson</u>, 702 F.3d 22, 31 (2d Cir. 2012) (analysis begins "with the plain language of the statute").  The "starting point" of any statutory interpretation exercise "is the statute's plain meaning, if it has one."  <u>United States v. Dauray</u>, 215 F.3d 257, 260 (2d Cir. 2000) (citation omitted).

Here, Valle's conduct falls squarely within the plain language of Section 1030(a)(2)(B).  Although Valle – as an NYPD officer – was authorized to access the OFM system and thereby perform queries of the associated databases, including the NCIC database, he was not authorized to input a query regarding Hartigan's name, because he had no valid law

enforcement reason to do so. Valle's conduct fits the definition of "exceeds authorized access": he "access[ed] a computer with authorization and . . . use[d] such access to obtain . . . information in the computer that [he was] . . . not entitled . . . to obtain. . . ." See 18 U.S.C. § 1030(e)(6).

After Valle entered his tax identification number and PIN, and thereby obtained access to the OFM system and its associated databases, he took a second step: he input a query for Hartigan's name. That second step was illegal ab initio; Valle was barred by NYPD policy from performing a search regarding Hartigan's name unless he had a valid law enforcement purpose for doing so. Valle queried Hartigan's name despite having been instructed that entering such a query absent a law enforcement purpose could subject him to criminal liability. Under the plain language of the statute, the crime was complete once Valle obtained information from the NCIC database as a result of his query.[63]

The Second Circuit has not addressed the scope of Section 1030(a)(2)(B) in a precedential opinion,[64] but other circuits have found criminal liability on similar facts. For

---

[63] Valle does not argue now, and did not dispute at trial, that he obtained information from the NCIC database.

[64] The Government argues that rejection of Valle's argument is "mandated by the Second Circuit's only relevant decision in this area. . . . United States v. Bossinger, 311 F. App'x 512 (2d Cir. 2009)." (Govt. Br. (Dkt. No. 195) at 45) Bossinger does not "mandate" that Valle's conviction on Count Two be sustained. That decision is a summary order that has no precedential effect. Moreover, the Court of Appeals did not have occasion to address the "exceeds authorized access" language of the statute, because the defendant conceded that she had exceeded her authorized access.

In Bossinger, the defendant – a U.S. Border Patrol agent – improperly entered her sister-in-law's vehicle registration information into the Homeland Security Department's Treasury Enforcement Customs Services (or "TECS") computer system. "The defendant concede[d] that she accessed TECS in excess of her authorization to do so but argue[d] that testimony that she 'ran' a valid license plate number to test the system's automatic e-mail notification process d[id] not establish that she 'actually obtained information' from running the test." Bossinger, 311 F. App'x at 514. Both the jury and the Second Circuit rejected her argument. The case sheds no light here,

example, in <u>United States v. Rodriguez</u>, 628 F.3d 1258 (11th Cir. 2010), the defendant – as part

of his duties as an employee of the Social Security Administration (the "Administration") – had

access to

> Administration databases that contained sensitive personal information, including any
> person's social security number, address, date of birth, father's name, mother's maiden
> name, amount and type of social security benefit received, and annual income.
>
> The Administration established a policy that prohibits an employee from obtaining
> information from its databases without a business reason.  The Administration informed
> its TeleService employees about its policy through mandatory training sessions, notices
> posted in the office, and a banner that appeared on every computer screen daily.  The
> Administration also required TeleService employees annually to sign acknowledgment
> forms after receiving the policies in writing.  The Administration warned employees that
> they faced criminal penalties if they violated policies on unauthorized use of databases.

<u>Rodriguez</u>, 628 F.3d at 1260.  The evidence at trial showed that Rodriguez had accessed the

Administration's databases and obtained information concerning seventeen women, and that he

had no business reason for doing so.  <u>Id.</u>  A jury convicted Rodriguez of violating Section 1030

(a)(2)(B).  <u>Id.</u> at 1262.

On appeal, the Eleventh Circuit rejected the argument that Valle makes here:

> Rodriguez argues that he did not violate section 1030(a)(2)(B) because he accessed only
> databases that he was authorized to use as a TeleService representative, but his argument
> ignores both the law and the record.  The Computer Fraud and Abuse Act makes it a
> crime to "intentionally access[ ] a computer without authorization or exceed[ ] authorized
> access, and thereby obtain[ ] information from any department or agency of the United
> States." 18 U.S.C. § 1030(a)(2)(B).  The Act defines the phrase "exceeds authorized
> access" as "to access a computer with authorization and to use such access to obtain or
> alter information in the computer that the accesser is not entitled to obtain or alter." <u>Id.</u>
> § 1030(e)(6).  The policy of the Administration is that use of databases to obtain personal
> information is authorized only when done for business reasons.  Rodriguez conceded at
> trial that his access of the victims' personal information was not in furtherance of his
> duties as a TeleService representative and that "he did access things that were
> unauthorized."  In the light of this record, the plain language of the Act forecloses any
> argument that Rodriguez did not exceed his authorized access.

---

however, because the issue before this Court was not litigated, given Bossinger's concession that
she had exceeded her authorized access to the TECS system.

Id. at 1263.  In affirming the conviction, the court noted that Rodriguez's argument that he had

not made criminal use of the information he obtained was irrelevant:

> [Rodriguez's] use of information is irrelevant if he obtained the information without
> authorization or as a result of exceeding his authorized access.  See § 1030(a)(2)(B).
> Rodriguez exceeded his authorized access and violated the Act when he obtained personal
> information for a nonbusiness reason.

Id.

  Similarly, in United States v. John, 597 F.3d 263 (5th Cir. 2010), the court

affirmed convictions under Section 1030(a)(2) where a Citigroup account manager accessed the

bank's internal computer system and customer account information for purposes of enabling her

half-brother to commit fraud.  The defendant argued that "she was authorized to use Citigroup's

computers and to view and print information regarding accounts in the course of her official

duties."  John, 597 F.3d at 271.  The court concluded, however, that the defendant had

"exceed[ed] [her] authorized access" under Section 1030(a)(2) when she accessed Citigroup's

computer systems and obtained detailed, confidential account information for purposes of

committing fraud:  "when the [computer] user knows or reasonably should know that he or she is

not authorized to access a computer and information obtainable from that access in furtherance

of or to perpetrate a crime," and the employee uses the computer for this purpose, the "exceeds

authorized access" element is satisfied.  Id.

  Likewise, in United States v. Teague, 646 F.3d 1119 (8th Cir. 2011), the court

affirmed a conviction under Section 1030(a)(2) where the defendant – an employee of a

contractor working for the U.S. Department of Education – had been granted permission to

access the National Student Loan Data System (the "NSLDS") to perform her duties.  The

defendant used her access to the NSLDS to access President Obama's student loan records.

Teague, 646 F.3d at 1121.  Although Teague was entitled to access the system to perform her

duties, the Government contended that she had "exceed[ed] [her] authorized access" under

Section 1030(a)(2) in accessing President Obama's records.  Id.  The Eighth Circuit upheld the

defendant's conviction against a sufficiency challenge.  Id. at 1121-23.

        More broadly, many courts have recognized that the provisions of the CFAA that

include the "without authorization" and "exceeds authorized access" language – see 18 U.S.C.

§§ 1030(a)(1), 1030(a)(2), 1030(a)(4)[65] – require a two stage analysis in which a court must first

determine whether a defendant was authorized to access a particular computer system and – if so

– then determine whether the defendant "exceed[ed]" his or her "authorized access" by obtaining

information stored within the system that the defendant was not entitled to access.[66]  See, e.g.,

WEC Carolina Energy Solutions LLC v. Miller, 687 F.3d 199, 204 (4th Cir. 2012) (a defendant

"accesses a computer 'without authorization' when he gains admission to a computer without

approval. . . . [An individual] 'exceeds authorized access' when he has approval to access a

computer, but uses his access to obtain or alter information that falls outside the bounds of his

approved access."); United States v. Czubinski, 106 F.3d 1069, 1071-72, 1078 (1st Cir. 1997)

---

[65]  Section 1030(a)(1) addresses improper computer use involving national security information, while Section 1030(a)(4) concerns use of a computer with intent to defraud.  See 18 U.S.C. §§ 1030(a)(1), 1030(a)(4).

[66]  "The CFAA targets [computer] access 'without authorization' in six separate offenses (§§ 1030(a)(1), (a)(2), (a)(3), (a)(4), (a)(5)(ii), (a)(5)(iii)), only three of which also reach persons 'exceeding authorized access' (§§ 1030(a)(1), (a)(2), (a)(4)).  Thus, it is plain from the outset that Congress singled out two groups of accessers, those 'without authorization' (or those below authorization, meaning those having no permission to access whatsoever – typically outsiders, as well as insiders that are not permitted any computer access) and those exceeding authorization (or those above authorization, meaning those that go beyond the permitted access granted to them – typically insiders exceeding whatever access is permitted to them)."  Lockheed Martin Corp. v. Speed, No. 6:05-CV-1580-ORL-31, 2006 WL 2683058, at *5 (M.D. Fla. Aug. 1, 2006) (emphasis in original).

(noting in computer fraud action brought under 18 U.S.C. § 1030(a)(4), in dicta, that IRS

employee with authorized access to IRS databases had "unquestionably exceeded authorized

access" when he retrieved certain individuals' tax returns outside the scope of his official duties);

JBCHoldings NY, LLC v. Pakter, 931 F. Supp. 2d 514, 523 (S.D.N.Y. 2013) ("An employee acts

'without authorization' when he accesses a computer without permission to do so; an employee

'exceeds authorized access' when he has permission to access certain information on a computer,

but accesses other information as to which he lacks permission.") (citation omitted); United

States v. Aleynikov, 737 F. Supp. 2d 173, 174, 190–94 (S.D.N.Y. 2010) ("[A] person who

'accesses a computer without authorization' does so without any permission at all.  By contrast, a

person who 'exceeds authorized access' has permission to access the computer, but not the

particular information on the computer that is at issue."); Diamond Power Int'l, Inc. v. Davidson,

540 F. Supp. 2d 1322, 1342 (N.D. Ga. 2007) ("Section 1030(e)(6) contemplates that an 'exceeds

authorized access' violation occurs where the defendant first has initial 'authorization' to access

the computer.  But, once the computer is permissibly accessed, the use of that access is improper

because the defendant accesses information to which he is not entitled.").

     In arguing that Section 1030(a)(2)(B) does not reach his conduct, Valle cites

cases[67] that reflect one side of a vigorous judicial debate addressing an issue that is not posed

here:  whether the CFAA provides a cause of action to an employer where a disloyal employee –

---

[67] See Def. Count Two R. 29 Br. (Dkt. No. 179) at 5-6 (citing WEC Carolina Energy Solutions
LLC, 687 F.3d at 203-07; United States v. Nosal, 676 F.3d 854, 863-64 (9th Cir. 2012) (en
banc); Aleynikov, 737 F. Supp. 2d at 190–94; JBCHoldings NY, LLC, 931 F. Supp. 2d 514;
Advanced Aerofoil Techs., AG v. Todaro, No. 11 Civ. 9505(ALC)(DCF), 2013 WL 410873
(S.D.N.Y. Jan. 30, 2013); Scottrade, Inc. v. BroCo Invs., Inc., 774 F. Supp. 2d 573, 583-84
(S.D.N.Y. 2011); Univ. Sports Publ'ns Co. v. Playmakers Media Co., 725 F. Supp. 2d 378, 382-
85 (S.D.N.Y. 2010); Orbit One Comme'ns., Inc. v. Numerex Corp., 692 F. Supp. 2d 373, 385-86
(S.D.N.Y. 2010); Major, Lindsey & Africa, LLC v. Mahn, No. 10-cv-4329 (CM), 2010 WL
3959609 (S.D.N.Y. Sept. 7, 2010)).

in violation of company policy – has misappropriated confidential information stored on a computer, generally by providing it to his employer's competitor.

Many courts have concluded that the CFAA does not provide a cause of action to an employer in this context, because the statute does not expressly prohibit the misuse or misappropriation of information. WEC Carolina Energy Solutions LLC, 687 F.3d at 202, 203-07 (affirming dismissal of CFAA claim where defendant downloaded employer's proprietary information, resigned, and then used this data in making a presentation on behalf of a competing company; defendant had unrestricted access to information stored in plaintiff's computer system, and the CFAA does not "extend[ ] to the improper use of information validly accessed") (emphasis in original); United States v. Nosal, 676 F.3d 854, 863 (9th Cir. 2012) (en banc) (affirming dismissal of Section 1030(a)(4) charge against a defendant who resigned and then induced his former colleagues to download confidential customer information and transfer that information to him, in violation of company's policy prohibiting disclosure of confidential information; "the CFAA 'target[s] the unauthorized procurement or alteration of information, not its misuse or misappropriation'" (alteration in original) (quoting Shamrock Foods Co. v. Gast, 535 F. Supp. 2d 962, 965 (D. Ariz. 2008))); JBCHoldings NY, LLC, 931 F. Supp. 2d at 523, 525-26 (employee misappropriated employer's proprietary information, including client lists, and used this information in a competing business venture; employer's claims under Section 1030(a)(2)(C), (a)(4), and (a)(5)(C) dismissed because defendant had the authority to access information at issue and CFAA does not address "the circumstance where an employee has permission to access certain information and then uses that information for an improper purpose"); Advanced Aerofoil Techs., AG v. Todaro, No. 11 Civ. 9505 (ALC) (DCF), 2013 WL 410873, at *5, *7 (S.D.N.Y. Jan. 30, 2013) (dismissing claims brought under Section

1030(a)(2)(C), (a)(4), and (a)(5)(A) where defendants allegedly stole their employer's computer

data and used that information to form a competing company; noting that defendants had

"unlimited and unfettered access to [the employer's computer] systems" and concluding that the

CFAA was not intended to reach misuse or misappropriation of computer data); Scottrade, Inc.

v. BroCo Invs., Inc., 774 F. Supp. 2d 573, 583-84 (S.D.N.Y. 2011) (CFAA claim against

investment firm dismissed where plaintiff conceded that defendant had not accessed plaintiff's

computer systems without authorization); Univ. Sports Publ'ns Co. v. Playmakers Media Co.,

725 F. Supp. 2d 378, 381, 383-84 (S.D.N.Y. 2010) (defendant employee conspired with former

employee to steal confidential client information from employer's database; CFAA claim could

not be premised on acts of system administrator, because he had "full access" to the database at

issue); Major, Lindsey & Africa, LLC v. Mahn, No. 10-cv-4329 (CM), 2010 WL 3959609, at *3,

*5 (S.D.N.Y. Sept. 7, 2010) (defendant disclosed employer's proprietary information stored on

computer system to competitor; Section 1030(a)(4) claim dismissed because "the statute does not

expressly prohibit the misuse or misappropriation of information"); Orbit One Commc'ns., Inc.

v. Numerex Corp., 692 F. Supp. 2d 373, 377, 384-86 (S.D.N.Y. 2010) (defendants accessed

employer's computer system and downloaded confidential and proprietary information contained

on that system for the purpose of providing this information to their employer's competitor;

claims brought under Section 1030(a)(4) and 1030(a)(5)(A)(iii) dismissed because the CFAA

does not "encompass an employee's misuse or misappropriation of information to which the

employee freely was given access and which the employee lawfully obtained"); see also

Aleynikov, 737 F. Supp. 2d at 174, 190-94 (dismissing Section 1030(a)(2)(C) charge based on

theft of employer's proprietary trading source code for use at competing company; holding that

Section 1030(a)(2) "cannot be read to encompass an individual's misuse or misappropriation of

information to which the individual was permitted access[, because] [w]hat use an individual makes of the accessed information is utterly distinct from whether the access was authorized in the first place").

A conflicting line of authority holds that the statutory terms "without authorization" and/or "exceeds authorized access" are broad enough to include the acts of disloyal employees who have misappropriated or misused confidential and proprietary computer-stored information that they are otherwise permitted to access in the course of their duties. See, e.g., John, 597 F.3d at 271-72 (employee "exceed[ed] authorized access" when she used employer information, to which she had access for other purposes, to perpetrate a fraud); Int'l. Airport Ctrs., L.L.C. v. Citrin, 440 F.3d 418, 420 (7th Cir. 2006) (based on principles of agency, employee's authorization to use employer's laptop ended once he violated duty of loyalty to employer, and thus employee accessed computer "without authorization"); EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 579-80, 583 (1st Cir. 2001) (interpreting "exceeds authorized access" to encompass breach of an employer confidentiality agreement where disloyal employee allegedly helped competitor obtain proprietary information).

The disloyal employee misappropriation and misuse cases cited by Valle – and those cases that have adopted a contrary view in the misappropriation context – address a much different factual scenario than that present here. The Government does not allege that Valle misappropriated or misused information that he obtained about Hartigan through the OFM system. Indeed, the Government has not alleged that Valle made any use of the information he obtained from the NCIC database concerning Hartigan. How Valle intended to use any information about Hartigan that he hoped to obtain from the NCIC database is likewise irrelevant. What matters is that Valle was not authorized to access the OFM system to perform a

116

query regarding Hartigan's name because his employer – the NYPD – had restricted his access to the OFM system to circumstances in which he had a valid law enforcement purpose for querying the system and its associated databases.

Unlike the disloyal employees discussed in the cases cited by Defendant, Valle did not have unrestricted access to the OFM system and its associated databases – he was not free to access the information contained in these databases under all circumstances. Instead, his access to the OFM system and its associated databases was limited to circumstances in which he had a valid law enforcement purpose for querying the system. In sum, even assuming <u>arguendo</u> that the CFAA does not provide a cause of action to employers whose employees steal confidential computer data and provide it to a competitor, such a conclusion would not justify granting Valle's motion for a judgment of acquittal on Count Two.

Valle's conduct falls squarely within the plain language of Section 1030(a)(2), and the jury's verdict is consistent with the circuit court decisions in <u>Rodriguez</u>, <u>John</u>, and <u>Teague</u>. Valle's motion for judgment of acquittal on Count Two will therefore be denied. To the extent Valle seeks a new trial on Count Two, that motion will likewise be denied.[68]

---

[68] In his Rule 33 motion, Valle does not address the weight of the evidence on Count Two, nor does he argue that his conviction on Count Two was the result of prosecutorial misconduct. At trial, defense counsel conceded that Valle had performed an NYPD database search concerning Maureen Hartigan on May 31, 2012, but argued that the Government had not demonstrated that he did so for an improper purpose: "Isn't it possible that Gil inputs these names, including his own, including Ms. Hartigan, including Daniel Valle[,] to check the system, to make sure it is working? Isn't that a reasonable doubt as to Count [Two]?" (Tr. 1566) Because (1) Valle's only argument for relief as to Count Two concerns a matter of statutory interpretation, and (2) the Court has rejected Valle's interpretation of the CFAA, Valle is not entitled to a new trial or any other relief concerning Count Two.

## CONCLUSION

Valle's motion for a judgment of acquittal on Count One is granted, and Count One is dismissed. Valle's motion for a new trial on Count One is – pursuant to Fed. R. Crim. P. 29(d)(1) and Fed. R. Crim. P. 33 – conditionally granted. Valle's motion for a judgment of acquittal or, alternatively, a new trial, on Count Two is denied. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 176, 178, 180).

Dated: New York, New York
      June 30, 2014

SO ORDERED.

Paul G. Gardephe
United States District Judge