UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

GILBERTO VALLE,

Defendant.

**MEMORANDUM
OPINION & ORDER**

12 Cr. 847 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On March 12, 2013, a jury convicted Gilberto Valle of conspiracy to commit kidnapping (Count One) and of accessing a federal database without authorization in violation of the Computer Fraud and Abuse Act (the "CFAA") (18 U.S.C. § 1030) (Count Two).  (Verdict Form (Dkt. No. 126)  In a June 30, 2014 Memorandum Opinion and Order (the "Opinion"), this Court granted Valle's motion for a judgment of acquittal on his kidnapping conspiracy conviction, but allowed the jury's verdict on the CFAA charge to stand.  United States v. Valle, 301 F.R.D. 53 (S.D.N.Y. 2014)[1]  The Government appealed this Court's ruling concerning the kidnapping conspiracy charge, and Valle appealed his CFAA conviction.  In a 2-1 decision, the Second Circuit affirmed as to the kidnapping conspiracy count, but reversed as to the CFAA charge, finding that the statute cannot be read to criminalize Valle's misuse of police databases. United States v. Valle, 807 F.3d 508, 511-12, 515 (2d Cir. 2015).

Valle now moves for a certificate of innocence under the Unjust Conviction and Imprisonment Act, 28 U.S.C. § 2513 (the "Act").  (Dkt. No. 435)  For the reasons stated below, Valle's motion will be denied.

---

[1]  Familiarity with the Opinion is assumed.

**BACKGROUND**

At trial, the Government argued that Valle – a New York City Police Department ("NYPD") patrol officer – had conspired with other men to kidnap and sexually torture Kathleen Mangan – his wife – and four other women, including former college classmates and friends of his wife. Valle, 301 F.R.D. at 62. Most of Valle's alleged criminal conduct took place over the Internet, in electronic "chats" with "Moody Blues" -- located in the United Kingdom – "Aly Khan" – located in Pakistan or India – and Michael Van Hise, located in Hamilton, New Jersey. Id.; see also Aug. 8, 2017 Order (Dkt. No. 469) at 3. Valle had "met" his alleged co-conspirators on Dark Fetish Network, a social media website for people interested in sexual torture, cannibalism, asphyxiation, and other fetishes. Id. at 64-65.

Valle provided his alleged co-conspirators with Facebook photographs of the women he was purportedly targeting for abduction, and discussed the logistics of how he intended to kidnap these women, and the various acts of sexual torture he intended to inflict on them. Id. at 60.

Although most of Valle's alleged criminal conduct took place in these electronic "chats," the Government cited other conduct that was allegedly preparatory to the planned kidnappings. For example, Valle conducted unauthorized searches over NYPD computer databases concerning several women he targeted. Id. at 109-10. Valle conducted these improper searches despite training in which he had been instructed that the NYPD's computer databases could only be accessed for a legitimate law enforcement purpose. Id. In conducting searches regarding these women, Valle accessed a variety of federal, state, and local law enforcement databases that contain pedigree and criminal history data. Id. He had no law enforcement purpose for performing these searches. Id. at 62-63, 77. Valle also maintained contact with

certain of his "targets," and traveled from New York to Maryland to visit with a "victim" that he was then discussing online with an alleged co-conspirator.  Id. at 75-76.  Valle also performed Internet searches relating to kidnapping, including "how to kidnap someone"; "how to abduct a girl"; and "how to chloroform a girl."  Id. at 76.

In August 2012, Valle's illicit Internet-based conduct was discovered by Kathleen Mangan, his newly married wife.  Valle – who worked the 3:00 p.m. to midnight shift for the NYPD – was often up all night "chatting" with his Internet associates about kidnaping, sexually torturing, and murdering his wife and female friends and associates.  Id. at 94.  Mangan had grown curious about her husband's late-night online activities, and she installed spyware on the couple's shared MacBook laptop computer.  Id. at 63-64.  Horrified after finding evidence of what Valle was discussing online, Mangan fled with the laptop and the couple's new baby.  Id. at 64.  After further research on the laptop revealed "chats" in which Valle had discussed at great length sexually torturing and butchering her and other real women, Mangan contacted the Federal Bureau of Investigation.  Id.  Valle was subsequently charged with kidnapping conspiracy and with violating the CFAA.  (Indictment (Dkt. No. 9))

The principal, if not the only, material issue at trial was whether Valle had acted with criminal intent.  Valle, 301 F.R.D. at 59.  The Government argued that – as to certain of his "chats" – Valle had actually intended to kidnap the referenced women.  Id. at 66.  The defense argued that all of Valle's Internet chats were sexual fantasy.  Id. at 59.  The jury concluded that the Government had proved criminal intent, and found Valle guilty on both counts.  (Verdict Form (Dkt. No. 126))

In connection with Valle's post-trial motions filed pursuant to Fed. R. Crim. P. 29 and 33, this Court concluded – as to the kidnapping conspiracy charge – that "the Government

did not offer sufficient evidence to permit a reasonable juror to distinguish between Valle's

alleged 'real' chats . . . and his conceded fantasy chats. . . ."  Valle, 301 F.R.D. at 89.  This Court

further concluded – as to each of the alleged five "victims" – that no reasonable juror could find

that Valle had entered into a genuine agreement to kidnap her, or that Valle ever had the specific

intent to commit the crime.  Id. at 92, 94, 99-101, 102.

As to each alleged conspiracy to kidnap a woman, the Court found – after

exhaustive analysis of thousands of Valle's Internet "chats" – that Valle was engaged in fantasy

role-play.  The Court summarized its findings as follows:

> Valle contends that his Internet chats are fantasy role-play, and that the Government did
> not prove beyond a reasonable doubt that he and his alleged co-conspirators entered into
> a "real" agreement to kidnap one or more women.  The Government argues that the
> evidence shows that Valle entered into an illegal agreement to kidnap women with (1) a
> New Jersey man named Michael Van Hise; (2) an individual located in India or Pakistan
> who uses the screen name "Aly Khan"; and (3) a man using the screen name "Moody
> Blues," who lives in England.  The alleged kidnapping conspiracy thus spanned three
> continents.
>
> Although the alleged conspiracy lasted nearly a year, all communications between Valle
> and his alleged co-conspirators in New Jersey, India or Pakistan, and England took place
> over the Internet.  None of the conspirators ever met or took steps to meet, nor did they
> ever speak by telephone.  This is a conspiracy that existed solely in cyberspace.  There is
> no evidence that the alleged conspirators ever exchanged telephone contact information
> or accurate information about the area in which they lived, or that they ever knew or
> sought to learn each other's true identities.  Communication between the alleged
> conspirators was episodic and generally infrequent; months often passed between chats,
> with the alleged conspirators forgetting what had previously been discussed.
>
> After reviewing thousands of Valle's Internet communications, the Government
> determined that Valle had discussed kidnapping, torturing, raping, murdering, and/or
> cannibalizing women with twenty-four individuals.  At trial, the Government conceded
> that – as to twenty-one of these individuals – Valle's communications about kidnapping,
> torturing, raping, murdering, and cannibalizing women are nothing more than fantasy
> role-play.  The Government nonetheless contends that Valle's communications with the
> remaining three – Van Hise, Aly Khan, and Moody Blues – reflect a "real" kidnapping
> conspiracy.
>
> As is discussed in detail below, however, Valle's "chats" with a number of the
> individuals who the Government concedes are fantasy role-play correspondents are

substantively indistinguishable from his chats with Van Hise, Aly Khan, and Moody Blues.  Both sets of chats involve discussions about Facebook photographs of women Valle knows; dates for planned kidnappings; prices Valle will charge for kidnapping these women; surveillance Valle has allegedly conducted of these women; the use of chloroform to incapacitate victims; acts of sexual violence that will be perpetrated on these women; and fantastical elements such as human-size ovens and rotisseries, and the construction of soundproofed basements and pulley apparatuses that will be used for purposes of torture.

Moreover, the nearly year-long kidnapping conspiracy alleged by the Government is one in which no one was ever kidnapped, no attempted kidnapping ever took place, and no real-world, non-Internet-based steps were ever taken to kidnap anyone.  While the alleged conspirators discussed dates for kidnappings, no reasonable juror could have found that Valle actually intended to kidnap a woman on those dates.  For example, under the Government's theory, Valle separately "agreed" with two co-conspirators to kidnap three different women on or about the same day, February 20, 2012.  Valle was to kidnap one woman in Manhattan (Government Exhibit ("GX") 430; Trial Transcript ("Tr.") 185–86); lure another to India or Pakistan (GX 417); and kidnap a third in Columbus, Ohio (GX 424; Tr. 239).

No one was kidnapped on February 20, 2012, however, and no one was kidnapped on any other date "agreed to" or discussed by Valle and his alleged co-conspirators.  Moreover, neither Valle nor any of his alleged co-conspirators ever even raised the issue of whether a "planned" kidnapping had taken place, and if not, why not.  Dates for "planned" kidnappings pass without comment, without discussion, without explanation, and with no follow-up.  The only plausible explanation for the lack of comment or inquiry about allegedly agreed-upon and scheduled kidnappings is that Valle and the others engaged in these chats understood that no kidnapping would actually take place.  No other reasonable inference is possible.  Because the point of the chats was mutual fantasizing about committing acts of sexual violence on certain women, there was no reason for discussion, inquiry, or explanation when the agreed-upon date for kidnapping a woman came and went.

The kidnapping conspiracy alleged by the Government also featured a steady stream of lies from Valle to his alleged co-conspirators about himself and numerous critical aspects of the alleged conspiracy.  Valle lied about his age; about his marital status; about the city and area in which he lived; about whom he lived with; and about his job and the hours he worked.  He also lied about whether he owned a house "in the middle of nowhere . . . in Pennsylvania"; about whether he owned a van that could be used to transport victims; about whether he had a "pulley-apparatus" in his basement; about whether he was soundproofing his basement; about whether he had a human-size oven and rotisserie; about whether he possessed address and contact information for the purported targets of the kidnapping conspiracy; about whether he was conducting surveillance of targeted women; about how often he was in contact with these women; and about whether he had obtained, or would obtain, rope, duct tape, and a stun gun for purposes of committing a kidnapping.

Similarly, the details Valle provided to his alleged co-conspirators concerning the targets of the kidnapping conspiracy were – as to identification information – all false. Valle lied about where the purported kidnapping targets lived, their last names, their occupations, their dates and places of birth, where they had attended or were attending college, and the degrees they had obtained. Despite repeated requests, Valle never provided his alleged co-conspirators with the last names and addresses that would have permitted them to locate and identify these women.

The Government, of course, is not required to prove that conspirators planning a kidnapping met in person, spoke over the telephone, or shared accurate information about their names and where they live, the names and addresses of kidnapping targets, or the resources each conspirator will contribute to the enterprise. Those engaged in criminal activity frequently lie to each other about all manner of things, including, for example, the amount and purity of drugs they possess, the value of items to be stolen, and the likelihood of getting caught. There is likewise no legal requirement that a kidnapping actually take place in order for a kidnapping conspiracy conviction to be sustained. Moreover, the fact that Valle had fantasy chats with twenty-one individuals about kidnapping, raping, and murdering women does not establish that his conversations with Van Hise, Aly Khan, and Moody Blues are likewise fantasy.

But the kidnapping conspiracy here was formed and is alleged to have taken place almost exclusively in cyberspace, and in a context in which – according to the Government – the Defendant engaged in countless fantasy role-play conversations with at least twenty-one other individuals about the same topics:  kidnapping, torturing, raping, murdering, and cannibalizing women. Under these unique circumstances, in determining whether the Government proved beyond a reasonable doubt Valle's criminal intent – his specific intent to actually kidnap a woman – the fact that no kidnappings took place and that no real-world, concrete steps toward committing a kidnapping were ever undertaken, is significant. And in determining whether Valle and his alleged co-conspirators ever intended to actually commit a kidnapping, the fact that dates for kidnappings are repeatedly set and then pass without incident, inquiry, or comment is powerful evidence that Valle and the three individuals engaged in these allegedly "real" chats understood that no actual kidnapping was going to take place.

Likewise indicative of Valle's lack of criminal intent is the fact that he provided his alleged co-conspirators with a veritable avalanche of false, fictitious, and fantastical information concerning himself and the steps he had allegedly taken to facilitate a kidnapping, including representations about a non-existent van that would be used to transport victims to a non-existent cabin in rural Pennsylvania, where they would be held in a non-existent soundproofed basement with a non-existent pulley mechanism, and cooked in a non-existent human-size oven or using a non-existent human-size rotisserie. The presence and quantity of concededly fictitious and fantastical elements in the chats and emails that the Government claims are "real" precludes any reasonable inference that Valle actually intended to kidnap a woman, particularly given the Government's concession that nearly all of the kidnapping-related chats and emails that Valle engaged in are, in fact, fantasy.

Once the lies and the fantastical elements are stripped away, what is left are deeply disturbing misogynistic chats and emails written by an individual obsessed with imagining women he knows suffering horrific sex-related pain, terror, and degradation. Despite the highly disturbing nature of Valle's deviant and depraved sexual interests, his chats and emails about these interests are not sufficient – standing alone – to make out the elements of conspiracy to commit kidnapping. There must be evidence that Valle actually intended to act on these interests with an alleged co-conspirator.

Under the unique circumstances of this extraordinary case, and for the reasons discussed in detail below, the Court concludes that the evidence offered by the Government at trial is not sufficient to demonstrate beyond a reasonable doubt that Valle entered into a genuine agreement to kidnap a woman, or that he specifically intended to commit a kidnapping. Accordingly, the jury's verdict on Count One, conspiracy to commit kidnapping, cannot stand, and Count One will be dismissed.

As to Count Two, which charges that Valle exceeded his authorized access to a federal database, the Court concludes that Valle's conduct falls squarely within the plain language of the statute. Accordingly, Valle's motion for a judgment of acquittal on Count Two will be denied. To the extent that Valle seeks a new trial on Count Two, that motion will also be denied.

Id. at 59-62.

In addition to granting Valle's motion for a judgment of acquittal on the

kidnapping conspiracy charge, this Court also conditionally granted Valle a new trial as to that

charge. In doing so, this Court noted that

[t]he Government did not demonstrate – as to any alleged co-conspirator or as to any alleged kidnapping target – a genuine agreement to actually commit a kidnapping or Valle's specific intent to commit such a kidnapping. Indeed, the balance of the evidence concerning these issues favors the Defendant. . . . Valle's Internet chats take place in a context that the Government concedes is overwhelmingly fantasy role-play. Given that no one is ever kidnapped; that no concrete steps are ever taken to kidnap anyone; that alleged agreements to kidnap specific women on specific days come to naught without inquiry, explanation, or comment; and that the chats allegedly reflecting conspiratorial agreements are replete with the same false, fictitious, and fantastical elements seen in the chats that the Government concedes are fantasy, the prosecution was required to provide the jury with an evidentiary basis for distinguishing chats reflecting allegedly "real" conspiratorial agreements from those that are mere fantasy. This the Government did not do. Instead, the evidentiary record is such that it is more likely than not the case that all of Valle's Internet communications about kidnapping are fantasy role-play. . . . [T]he weight of the evidence supports

Valle's contention that he was engaged in fantasy role-play rather than in planning a series of real kidnappings . . . .

Id. at 104.

The Government appealed as to the dismissal of the kidnapping conspiracy charge, and Valle appealed his conviction on the CFAA charge.  Valle, 807 F.3d at 515.

On December 3, 2015, the Second Circuit affirmed this Court's decision as to the kidnapping conspiracy charge, but reversed as to the CFAA charge, holding that Valle had not "exceed[ed] authorized access" under the CFAA.  Id. at 511-12.  The Second Circuit thus rejected this Court's ruling (Valle, 301 F.R.D at 114-15) that an individual such as Valle with authorized access to computer databases can violate the CFAA by misusing his access.[2]

Valle has now moved this Court for a certificate of innocence pursuant to 28 U.S.C. § 2513.  (Dkt. No. 435)

## DISCUSSION

## I.    LEGAL STANDARD

A person bringing suit under 28 U.S.C. § 1495 to recover damages for unjust imprisonment must obtain a certificate of innocence from the district court in which he was convicted.  28 U.S.C. § 2513(b).  To obtain a certificate of innocence, the person must prove that (1) "[h]is conviction has been reversed or set aside on the ground that he is not guilty of the offense of which he was convicted"; and (2) "[h]e did not commit any of the acts charged or his acts, deeds, or omissions in connection with such charge constituted no offense against the United States . . . and he did not by misconduct or neglect cause or bring about his own prosecution."  28 U.S.C. § 2513(a).  "The person seeking the certificate bears the burden of

---

[2]  The Supreme Court has granted certiorari on this issue.  See United States v. Van Buren, 940 F.3d 1192, 1208 (11th Cir. 2019), cert. granted, No. 19-783, 2020 WL 1906566 (U.S. Apr. 20, 2020).

proof" and "preponderance of the evidence is the appropriate standard to apply in proceedings for a certificate of innocence." United States v. Grubbs, 773 F.3d 726, 732–33 (6th Cir. 2014). District courts are afforded "substantial discretion" in determining whether to grant a certificate of innocence, United States v. Graham, 608 F.3d 164, 166 (4th Cir. 2010), and "[t]he case law construing the statute makes clear that it provides a remedy to be applied in exceptional cases." United States v. Lyons, 726 F. Supp. 2d 1359, 1360 (M.D. Fl. 2010) (citing United States. v. Graham, 595 F. Supp. 2d 681, 684 (S.D.W.V. 2008)).

       28 U.S.C. § 2513 is not "an avenue for monetary compensation to all whose criminal convictions are reversed after incarceration. Rather, 'the phrasing of the Act and its legislative history proclaim the care with which its framers guarded against opening wide the door through which the treasury may be assailed by persons erroneously convicted.'" Graham, 608 F.3d at 171 (quoting United States v. Brunner, 200 F.2d 276, 280 (6th Cir. 1952)) (citations omitted). 28 U.S.C. §§ 1495 and 2513 "compensate only persons who are actually innocent— whether because they did not do what the indictment charged or because what they did is not a crime." Pulungan v. United States, 722 F.3d 983, 985 (7th Cir. 2013).

       "A reversal of the criminal conviction based on insufficiency of the prosecution's evidence does not entitle the defendant to a certificate of innocence." United States v. Racing Servs., 580 F.3d 710, 712 (8th Cir. 2009) (citing Osborn v. United States, 322 F.2d 835, 840 (5th Cir. 1963)). This is because "[a] conclusion that the prosecutor did not prove a charge beyond a reasonable doubt differs from a conclusion that the defendant is innocent in fact." Pulungan, 722 F.3d at 985; see also Rigsbee v. United States, 204 F.3d 70, 72 (D.C. Cir. 1953) (holding that a plaintiff under Section 1495 must prove "not only his acquittal . . . but also that the judge himself was convinced of his innocence").

The first clause of Section 2513(a)(2) requires the defendant to prove "[h]e did not commit any of the acts charged or his acts, deeds, or omissions in connection with such charge constituted no offense against the United States . . . ."  28 U.S.C. § 2513(a)(2) (emphasis added).  In other words, the defendant must prove he is actually innocent either because he did not commit the charged acts, or because the charged acts do not constitute a crime.

The second clause of Section 2513(a)(2) requires the defendant to prove that "he did not by misconduct or neglect cause or bring about his own prosecution."  Id.  The Second Circuit has not had occasion to construe this or any other provision in 28 U.S.C. § 2513.  Other circuits have disagreed as to whether the "misconduct or neglect" finding can be premised on offense conduct, or must be based on other, separate conduct.

In Betts v. United States, 10 F.3d 1278 (7th Cir. 1993), the Seventh Circuit held that a "misconduct or neglect" finding cannot be premised on offense conduct; such a finding must instead be based on conduct separate and apart from the offense conduct.[3]  According to the Betts court, a defendant fails to satisfy the "misconduct or neglect" clause of Section 2513(a)(2) only where he has "acted or failed to act in such a way as to mislead the authorities into thinking he had committed an offense."  Betts, 10 F.3d at 1285.

More recently, in United States v. Graham, 608 F.3d 164 (4th Cir. 2010), the Fourth Circuit rejected the Betts analysis, holding that "the plain language of the statute dictates that any 'misconduct or neglect' that 'cause[s] or bring[s] about' a petitioner's prosecution renders him ineligible for a certificate of innocence."  Graham, 608 F.3d at 176 (emphasis added).  Such "misconduct or neglect" may include "those acts [that had] originally been charged as crimes. . . ."  Id. at 177.

---

[3]  This Court refers to the necessary showing under Betts as a "plus factor."

II.    **ANALYSIS**

    A.    **Whether Valle's Convictions Were Reversed**

        Valle plainly meets the test set forth in Section 2513(a)(1), as both of his convictions were "reversed . . . on the ground that he is not guilty of the offense of which he was convicted."  28 U.S.C. § 2513(a)(1)  As discussed above, this Court granted Valle's motion for a judgment of acquittal on the kidnapping conspiracy charge on the ground that the Government did not "prove[] beyond a reasonable doubt that (1) Valle entered into genuine agreements . . . to kidnap . . . and (2) Valle had the specific intent to kidnap one or more of these women."  Valle, 301 F.R.D. at 102.  The Second Circuit affirmed that ruling, but also held that Valle was not guilty of the CFAA charge, finding that CFAA's reference to "exceed[ing] authorized access" did not encompass Valle's misuse of the NYPD's databases.  See Valle, 807 F.3d at 511-12.  Accordingly, Section 2513(a)(1) is satisfied as to both convictions.

    B.    **Whether Valle Committed the Charged Acts**

        As to the first clause of Section 2513(a)(2), the Government argues that "[n]o Court has found Valle innocent of the kidnapping conspiracy charges," citing language in the Opinion finding the evidence insufficient.  (Govt. Br. (Dkt. No. 441) at 10)

        While the focus of the Opinion is – as to the kidnapping conspiracy charge – whether the Government offered evidence sufficient to demonstrate Valle's criminal intent, the Court did not merely find the Government's evidence insufficient.  In conditionally granting Valle's motion for a new trial, this Court went further, finding that "it is more likely than not the case that all of Valle's Internet communications about kidnapping are fantasy role-play. . . . [T]he weight of the evidence supports Valle's contention that he was engaged in fantasy role-play rather than in planning a series of real kidnappings . . . ."  Valle, 301 F.R.D. at 104.  In other

words, this Court found that it is more likely than not the case that Valle is innocent of the

kidnapping conspiracy charge, and that – in connection with that charge – he committed no

"acts, deeds, or omissions [that] . . . constitute[] [an] offense against the United States."  28

U.S.C. § 2513(a)(2).  Accordingly, the first clause of Section 2513(a)(2) is satisfied with respect

to the kidnapping conspiracy charge.

        As to the CFAA charge, the Second Circuit held that Valle's actions do not

constitute a violation of the CFAA, because someone who misuses his access to restricted

databases has not "exceed[ed] authorized access" within the meaning of the statute.  See Valle,

807 F.3d at 511-12.  Valle has thus shown that the "acts, deeds, or omissions in connection with

[the CFAA charge] constitute[] no offense against the United States."  28 U.S.C. § 2513(a)(2).

Accordingly, the first clause of Section 2513(a)(2) is satisfied with respect to the CFAA charge.

### C.    Whether Valle's Misconduct Caused His Prosecution

        As to the second clause of Section 2513(a)(2) – whether Valle "by misconduct or

neglect cause[d] or [brought] about his own prosecution" – the Government argues that, by his

own misconduct, Valle did just that.  (Gov't Br. (Dkt. No. 441) at 12)  Relying heavily on

Graham, the Government cites a litany of acts – all related to the charged offenses – that

allegedly constitute such misconduct.  (Id. at 12-14)  By contrast, Valle cites Betts to argue that

this Court should require some additional act of misconduct or neglect, separate and apart from

the offense conduct.  (Def. Reply Br. (Dkt. No. 445) at 4-6)  Because Betts and Graham present

conflicting interpretations of the statute, the Court considers these cases in some detail below.

        In Betts, the defendant had been convicted of criminal contempt, because of his

failure to appear for a scheduled court hearing.  Betts v. United States, 10 F.3d 1278, 1280-81

(7th Cir. 1993).  The Seventh Circuit reversed the conviction, finding that the order on which the

contempt finding was premised was ambiguous as to whether the defendant's personal appearance was required.  Betts, 10 F.3d at 1281.

The defendant then moved for a certificate of innocence.  The district court denied that application, finding that the defendant's own misconduct had led to his prosecution, because he "waited until the last moment to inform the Court that it was simply not convenient for him to appear at a scheduled hearing."  Id. at 1282 (internal quotation marks and citation omitted).  The Seventh Circuit again reversed, finding that – for purposes of denying a certificate of innocence under 28 U.S.C. § 2513(a)(2) – a defendant "must have acted or failed to act in such a way as to mislead the authorities into thinking he had committed an offense."  Id. at 1285.  A defendant commits such misconduct where he "falsely confesses to a crime or intentionally withholds exculpatory evidence . . . [or where] 'there has been an attempt to flee, a false confession, the removal of evidence, or an attempt to induce a witness or an expert to give false testimony or opinion, or an analogous attempt to suppress such testimony or opinion.'"  Id. (quoting United States v. Keegan, 71 F. Supp. 623, 638 (S.D.N.Y. 1947)).

In Graham, the defendant was convicted of embezzling more than $30,000 from his non-profit employer by converting sick leave into cash, but was found not guilty on a variety of fraud, tax, and other embezzlement counts.  United States v. Graham, 608 F.3d 164, 167-68 (4th Cir. 2010).  Defendant's conviction on the embezzlement count was reversed on grounds of insufficiency.  Id. at 169.

The district court denied the defendant's motion for a certificate of innocence, finding that the defendant was negligent in not obtaining approval from his employer for the sick-leave conversion, and thereby caused his own prosecution.  Id. at 170.  The Fourth Circuit affirmed, explicitly rejecting the Betts analysis.  In doing so, the Graham court said that Betts

effectively reads "neglect" out of the statute.  Each of the <u>Betts</u> court's enumerated
examples implicates some element of wrongful intent.  Indeed, the Seventh Circuit
appears to limit denial on "neglect" grounds to situations in which "a defendant has it
within his means to avoid prosecution but elects not to do so."

<u>Id.</u> at 174 (quoting <u>Betts</u>, 10 F.3d at 1285).

   The <u>Graham</u> court observes that the <u>Betts</u> approach requires the insertion of a

modifier – such as "other" or "separate" – before "misconduct or neglect."  <u>Id.</u> at 175.  But the

plain language of the statute "does not in any way limit the type of causative 'misconduct or

neglect' that will bar relief."  <u>Id.</u>  Rather, "the plain language of the statute dictates that any

'misconduct or neglect' that 'cause[s] or bring[s] about' a petitioner's prosecution renders him

ineligible for a certificate of innocence."  <u>Id.</u> at 176.  Such misconduct or neglect may include

"those acts [that had] originally been charged as crimes. . . ."  <u>Id.</u> at 177.

   This Court concludes that the <u>Graham</u> court's approach is more persuasive,

because it is true to the plain language of the statute.  <u>Betts</u> reads into the statute a restriction that

simply is not there.  Congress could easily have inserted the words "other" or "separate" if it

intended that only conduct other than offense conduct would justify denying a certificate of

innocence.  Congress inserted no such language, and it is not this Court's role to read into the

statute critical language that the legislature chose not to employ.  Other courts have joined

<u>Graham</u> in concluding that a court ruling on an application for a certificate of innocence may

consider both offense conduct and non-offense conduct.  <u>See, e.g.</u>, <u>Gates v. D.C.</u>, 66 F. Supp. 3d

1, 15 (D.D.C. 2014) (interpreting Section 2513 to "include conduct only [that] relates to the

specific allegations at issue in the conviction" or "where a defendant attempts to cover up the

underlying criminal act"); <u>United States v. Mills</u>, No. 5:03-CR-249-BR, 2013 WL 3864304, at

*4 (E.D.N.C. July 24, 2013), <u>aff'd</u>, 773 F.3d 563 (4th Cir. 2014) (declining to issue a certificate

of innocence where "defendant came under investigation because the firearms at issue were

reported as having been stolen. . . . Defendant provides absolutely no information about how he came into possession of the stolen firearms, and none is in the record").

In sum, this court interprets Section 2513(a)(2) to mean what it says:  a court ruling on an application for a certificate of innocence must consider whether the petitioner "by [his own] misconduct or neglect cause[d] or [brought] about his own prosecution."  28 U.S.C. § 2513(a)(2).  In making that determination, a court's inquiry is not limited to matters outside the offense conduct.  The statute does not require a court to find the existence of a "plus factor" before denying an application for a certificate of innocence.  A court must instead consider whether the conduct in which the applicant engaged – including the conduct that led to criminal charges – caused or brought about the applicant's criminal prosecution.  If so, a certificate of innocence may not properly be issued.

Contrary to Valle's argument, there is no contrary persuasive authority.  As discussed above, <u>Betts</u> is not persuasive because it ignores the plain language of the statute and reads qualifying language into the statute that Congress chose not to include.  And to the extent that the <u>Betts</u> court contends that a plain language reading of the statute would invariably "require courts to assess the virtue of a petitioner's behavior even when it does not amount to a criminal offense," <u>Betts</u>, 10 F.3d at 1285, that concern is misplaced.  For example, where a defendant is convicted based on the perjured testimony of a cooperating witness or law enforcement officer, a motion for a certificate of innocence could be resolved without any assessment of the defendant's "virtue."  It is easy to envision many other scenarios in which a defendant could be said not to have engaged in misconduct that caused or brought about his prosecution.

15

And while Valle argues that the weight of post-Graham authority favors the Betts analysis (Def. Reply Br. (Dkt. No. 445) at 4-6), and asserts that there is a "consensus interpretation" that the term "misconduct" means conduct in addition to the offense conduct (id. at 5), the cases he cites do not demonstrate any such reasoned judicial consensus. Instead, in the remaining cases on which Valle relies, courts do not grapple with the "misconduct or neglect" language, either because the applicant has not demonstrated actual innocence, or because the Government has chosen not to litigate the issue.

In United States v. Grubbs, 773 F.3d 726, 733 (6th Cir. 2014), for example, the Sixth Circuit affirmed the district court's decision denying a certificate of innocence, finding "that [the] Defendant failed to establish his innocence by a preponderance of the evidence." See also id. at 734 ("Defendant fails to prevail on his request for a certificate of innocence . . . because Defendant has not satisfied his burden of establishing his innocence by a preponderance of the evidence"). Similarly, in Holmes v. United States, No. 4:08-CV-1142 (CEJ), 2015 WL 6702269 (E.D. Mo. Nov. 3, 2015), the district court denied a certificate of innocence, find that the defendant had "not met his burden of proving actual innocence." Id. at *3. In that case, the Government chose not to litigate the issue of whether Holmes had brought about or caused his own prosecution. Id. ("it is undisputed that the second prong has been established"). Likewise in Jones v. United States, No. 4:10-CV-1748 CEJ, 2011 WL 2516600 (E.D. Mo. June 23, 2011), "the government affirmatively represent[ed] . . . that, upon its re-examination of the investigative materials and the record in the underlying criminal case, [the defendant] did not bring about his own prosecution either by misconduct or neglect." Id. at *3.

In Pulungan v. United States, 722 F.3d 983 (7th Cir. 2013), the Seventh Circuit reversed a district court's issuance of a certificate of innocence, finding that the district judge had

erroneously "treated our decision that he is entitled to an acquittal as equivalent to a decision that he did not commit a crime." Id. at 985. While the Seventh Circuit recited the standard it announced in Betts (see id. at 986 (quoting Betts, 10 F.3d at 1285)), it did not reach the issue, finding that "it would take an evidentiary hearing to support [the defendant's] position." Id.

Finally, in United States v. Lyons, 726 F. Supp. 2d 1359 (M.D. Fla. 2010), a jury convicted the defendant of, inter alia, cocaine trafficking, carjacking, and selling counterfeit goods. Id. at 1361. Brady and Giglio violations came to light after the jury's verdict and, based on those violations and a "concerted campaign of prosecutorial abuse," the district court dismissed all charges against the defendant, finding that "the most damning testimony against Lyons had come from people who had been allowed, if not encouraged, to lie under oath." Id. at 1360-61, 1364.

The district court also granted Lyons a certificate of innocence, finding that he had demonstrated actual innocence. Id. at 1367-69. In granting Lyons a certificate of innocence, the district court noted that the Government had only made "a pro forma argument" that he had brought about his own prosecution for carjacking and selling counterfeit goods, citing the offense conduct. Id. at 1366. Relying on Betts, the district court rejected the Government's "pro forma" argument, asserting that "the legislative history of the statute shows that, to be disqualifying, the misconduct must consist of something outside of the charged conduct, 'such as an attempt to flee, a false confession, the removal of evidence, or an attempt to induce a witness or an expert to give false testimony or opinion, or an analogous attempt to suppress such testimony or opinion.'" Id. (quoting United States v. Keegan, 71 F. Supp. 623, 638 (S.D.N.Y. 1947)).

Lyons has no application here.  The prosecution of Valle was not premised on perjurious testimony from cooperating witnesses, nor did it reflect "a concerted campaign of prosecutorial abuse."  Instead, the prosecution was the consequence of Valle's own misconduct.

As to Lyons' assertion that the legislative history of the Act reveals that the presence of a "plus factor" – conduct separate and apart from the offense conduct – is necessary before a court can find that an applicant brought about his own prosecution, resort to legislative history is improper where, as here, the plain language of the statute is clear.[4]  See Lee v. Bankers Tr. Co., 166 F.3d 540, 544 (2d Cir. 1999) ("Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous."); Greenberg v. Comptroller of the Currency, 938 F.2d 8, 11 (2d Cir. 1991) ("Assuming for the sake of argument only that there is some ambiguity in the legislative history, we will not substitute a strained interpretation of the legislative history for the plain language of the statute."); see also United States v. Dauray, 215 F.3d 257, 264 (2d Cir. 2000) ("When the plain language and canons of statutory interpretation fail to resolve statutory ambiguity, we will resort to legislative history.").

In any event, the legislative history does not contain a clear statement demonstrating that Congress intended that, "to be disqualifying, the [applicant's] misconduct must consist of something outside the charged conduct. . . ."  Lyons, 726 F. Supp. 2d at 1366.

The provision now codified as Section 2513 was first enacted in 1938, and required – in relevant part – that a petitioner demonstrate "that he has not, either intentionally or by willful misconduct or negligence, contributed to bring about his arrest or conviction."  18

---

[4]  Even if there were ambiguity in the Act's language – which there is not – any such ambiguity would be resolved against the applicant for a certificate of innocence, who is ultimately seeking to pursue a claim against the United States pursuant to its waiver of sovereign immunity in 28 U.S.C. § 1495.  See Papadopoulos v. Comm'r of Soc. Sec., No. 13 CIV. 3163, 2014 WL 2038314, at *2 (S.D.N.Y. May 15, 2014) ("Waivers of sovereign immunity and any limiting conditions must be strictly construed.").

U.S.C. § 730 (1940); <u>see</u> <u>also</u> Pub. L. 75-539, 52 Stat. 438 (1938).  The Senate report

accompanying this legislation quoted at length from a 1912 report prepared by Edwin M.

Borchard, then the Law Librarian of Congress.  S. Rep. 75-2229, at 3-4 (1938) (citing S. Rep.

62-974 (1912)).  In Borchard's report, he proposes substantially the above-quoted language,

which was ultimately enacted in 1938.  Borchard explains the "misconduct or negligence"

language as follows:

> This carries out simply the equitable maxim that no one shall profit by his own
> wrong or come into court with unclean hands.  It follows the provisions generally
> found in the European statutes, although these provide, for example in the
> German act, that gross negligence must exist to bar the right.  In the United States
> we are opposed to fixing degrees of negligence.

S. Rep. 62-974 at 32.

Borchard further notes that

> [a] limitation almost uniformly expressed in the [European] statutes is that the
> claimant shall not have intentionally or by gross negligence caused his detention.
> The statutes of some of the countries, such as Germany, Hungary, Norway, and
> Sweden, specifically mention certain limitations in cases where the detention or
> conviction may be said to have been due to the act of the claimant himself – thus,
> for example, where there has been an attempt to flee, a false confession, the
> removal of evidence, or an attempt to induce a witness or an expert to give false
> testimony or opinion, or an analogous attempt to suppress such testimony or
> opinion. . . . Germany has gone furthest of all in defining the conditions and
> limitations under which the claim shall be excluded . . . [including] if it appears
> that the act charged involved an infamous or immoral transaction. . . . Similar
> restrictions are found in the Hungarian statute. . . . France expressly declined to
> specify any limitations on the right. . . . The draft of the proposed law of Austria
> governing unjust detention provides that – "[w]here the accused through
> inexcusable negligence has failed to object to the imposition or prolongation of
> the detention when he had good ground so to do, he shall be denied the award of
> an indemnity."

<u>Id.</u> at 17-18.

Read in context, this legislative history concerning the Act demonstrates that the

drafter considered various European statutes, some of which "specifically mention certain

limitations in cases where the detention or conviction may be said to have been due to the act of

the claimant himself." But the 1938 statute as drafted and enacted references none of the

specified "limitations" found in the statutes of Germany, Hungary, Norway, and Sweden, and

contains no language suggesting that Congress intended to forbid courts from considering

offense conduct in determining whether an applicant had caused or brought about his own

prosecution. Congress's decision not to include the limitations found in the European statutes

suggests an intent not to incorporate these limitations. It is not reasonable to interpret the

decision not to incorporate these limitations as somehow signaling adoption of these limitations.

   In sum, the Act's legislative history demonstrates that Congress was aware of

more prescriptive alternatives, but opted for a flexible approach that would permit courts to

consider both offense and non-offense conduct in determining whether an applicant had brought

about his own prosecution.[5]

---

[5] United States v. Keegan, 71 F. Supp. 623 (S.D.N.Y. 1947), also cited by Valle (Def. Reply Br. (Dkt. No. 445) at 5), does not support his argument. In Keegan, the defendant had been convicted of violating the Selective Training and Service Act of 1940 by "conspiring 'to counsel divers[e] persons to evade, resist and refuse service in the land and naval forces of the United States." Keegan, 71 F. Supp. at 625. Keegan "was a member of the [German-American] Bund" and made a speech in Buffalo, New York in 1942 in which he urged attendees to "evade military service by claiming to be conscientious objectors." Id. at 638-39. Keegan's conviction was later overturned for insufficiency of evidence, and he sought a certificate of innocence. Id. at 625. The court analyzed an older version of the statute which similarly required that the applicant "has not, either intentionally, or by willful misconduct, or negligence, contributed to bring about his arrest or conviction." Id. at 633.

The court declined to issue the certificate of innocence finding, inter alia, that Keegan's speech "constitute[d] wilful misconduct which contributed to bring about his arrest and conviction." Id. at 640. The court thus considered offense conduct in denying Keegan's application. In doing so, the court acknowledged the Act's legislative history, including the European statutes cited by Borchard that contain "[e]xamples of . . . misconduct" that would render a certificate of innocence improper, such as "[w]here there has been an attempt to flee, a false confession, the removal of evidence, or an attempt to induce a witness or an expert to give false testimony or opinion, or an analogous attempt to suppress such testimony or opinion.'" Id. at 638 (internal quotation marks and citations omitted). But the Keegan court also notes the legislative history stating that the "misconduct or neglect" clause "carries out simply the equitable maxim that no one shall profit by his own wrong or come into court with unclean hands." Id. at 628.

The Court concludes that – in determining whether an applicant has demonstrated that he did not "cause or bring about [his] own prosecution" by "misconduct or neglect" – a court may consider the offense conduct.

Turning to the evidence here, it is difficult to conceive of a matter in which a defendant more clearly brought about his own prosecution. In the middle of the night, in the solitude of his own apartment, Valle – an NYPD officer who patrolled the streets of New York City each day with a firearm and handcuffs – planned and schemed with others over hundreds of hours, in excruciating detail, how he would kidnap, sexually torture, and murder real women he knew, including his wife. In these Internet chats, Valle exchanged ideas and plans with his alleged co-conspirators about how these crimes could best be accomplished, and in a fashion so as to avoid arrest.

None of Valle's conduct was influenced or motivated by a cooperating witness or law enforcement agent. Instead, his misconduct was all self-generated. And Valle was well-aware – as an experienced police officer – that someone viewing his Internet activity might reasonably conclude that he had schemed to commit "conspiracy to murder, murder, or attempted murder." He said as much to the FBI agent who arrested him. Valle, 301 F.R.D. at 77-78. Valle was likewise aware, at the time, that the searches he conducted regarding targeted women over the NYPD's computer system – searches that accessed federal, state, and local law enforcement databases – constituted misconduct.

---

Keegan makes clear that a court considering an application for a certificate of innocence may take into account misconduct that is part of the offense conduct. See also Weiss v. United States, 95 F. Supp. 176, 180 (S.D.N.Y. 1951) (applicant's conviction for violating the Selective Training and Service Act of 1940 overturned for insufficiency; denying certificate of innocence where applicant had engaged in misconduct that was part of the offense conduct; applicant had "admonished the members [of his military unit] to refuse to do military service. If the reading of this admonition to the members did not constitute a crime, it would seem to me that at least it constituted misconduct which caused or brought about his prosecution.")

The Court concludes that Valle has not satisfied the second clause of 28 U.S.C.

§ 2513(a)(2), because "by [his] misconduct [he] . . . cause[d] or [brought] about his own

prosecution."

## **CONCLUSION**

For the reasons stated above, Valle's motion for a certificate of innocence is

denied.  The Clerk of Court is directed to terminate the motion (Dkt. No. 435).

Dated: New York, New York
        June 18, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge